EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) 1:20-cr-00238 |
| Plaintiff, | ) |
| | ) Motion to Suppress Hearing |
| vs. | ) |
| | ) |
| KENNETH BASH, et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Fresno, California                    Friday, November 19, 2021

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**APPEARANCES OF COUNSEL**:

For the Government:            **STEPHANIE STOKMAN**
                              Assistant U.S. Attorney
                              2500 Tulare Street, Rm. 4401
                              Fresno, California  93721

For the Defendant Bash:       Law Office of W. Scott Quinlan
                              2333 Merced Street
                              Fresno, CA  93721
                              BY:  **W. SCOTT QUINLAN**

For Defendant Renshaw &       Law Office of David A. Torres
Specially appearing for       1318 K. Street
Defendant Booth:              Bakersfield, CA  93301
                              BY:  **DAVID A. TORRES**

For Defendant Madsen:         Law Office of Barbara H. O'Neill
                              Post Office Box 11825
                              Fresno, CA 93725
                              BY:  **BARBARA O'NEILL**

For Defendant Larsen:         Carol Ann Moses, Attorney At Law
                              7636 N. Ingram Avenue,
                              Suite 104
                              Fresno, California 93711
                              BY:  **CAROL ANN MOSES, ESQ.**

For Defendant Palmer &        Law Office of Roger D. Wilson
specially appearing for       2300 Tulare Street,
Defendant McWilliams:         Suite 115
                              Fresno, CA 93721
                              BY:  **ROGER D. WILSON**

For Defendant Gourley:        Law Office of Steven L. Crawford
                              P.O. Box 553
                              Grover Beach, CA 93483
                              BY:  **STEVEN L. CRAWFORD**

3

1  Friday, November 19, 2021                    Fresno, California

2  11:54 a.m.

3      (The following proceedings were held remotely via Zoom

4       application.)

5          THE CLERK:  The Court calls United States vs. Kenneth

6  Bash, et al., case number 1:20-cr-238, scheduled for motion to

7  suppress, filed by Kenneth Bash, and joinder by the

8  co-defendants.

9          MS. STOKMAN:  Good morning.  Stephanie Stokman for

10  the United States.

11          MR. QUINLAN:  Good morning, Your Honor.  Scott

12  Quinlan for Mr. Bash.  I don't see him on Zoom at the moment.

13  Well, I see that he's supposed to be over here, so --

14          Mr. Bash, are you there?

15          DEFENDANT BASH:  I'm here.

16          MR. QUINLAN:  Yes, he's here.  That's Mr. Bash.

17          THE COURT:  Mr. Bash, can you hear us?

18          DEFENDANT BASH:  Yes, sir.

19          THE COURT:  Other appearances?

20          MS. O'NEILL:  Barbara O'Neil for Stephanie Madsen.

21  I'm requesting a waiver of her personal presence.  I have had

22  frequent contact with her.  I have spoken with her about this,

23  and she --

24          THE COURT:  We can't do this.  Nope, nope, nope.

25          MS. O'NEILL:  I said --

4

1          THE COURT:  No.  No, stop.

2          THE CLERK:  All the iPads at the Fresno County Jail,

3   can you guys mute?

4          THE COURT:  Marshals, we need you to tell them to

5   mute all the screens except when they need to speak.

6          I need Mr. Palmer's screen muted.  I need

7   Mr. McWilliams screen muted.

8          All right.  Ms. O'Neil, I'm sorry.  Go ahead.

9          MS. O'NEILL:  Yes.  I'm appearing for Stephanie

10  Madsen.  I'm asking the Court to waive her personal

11  appearance.  I have discussed this with her.  She is working,

12  and she asked me to appear for her.  And I have had frequent

13  contact with her, almost weekly.

14         THE COURT:  Did you submit a written waiver of

15  appearance?

16         MS. O'NEILL:  No, Your Honor.  I did an email, and it

17  was indicated I could do it on the record.  If that's

18  incorrect, I can file one after this.

19         THE COURT:  I thought I remember you submitting a

20  written waiver of appearance.  Maybe it was in another case.

21         Any objection to me allowing the waiver of

22  Ms. Madsen's appearance?

23         MS. STOKMAN:  No objection.

24         THE COURT:  All right.  I'll accept the waiver of

25  appearance.

5

1          The next defense appearance?

2          MR. CRAWFORD:  Good morning, Your Honor.  Steve

3    Crawford appearing on behalf of Amanda Gourley, who's joined

4    in this matter.  And I would ask the Court also for a waiver

5    of appearance.  She is on the line in case the Court wants her

6    here, because we didn't get indication she can be excused.

7    But she is working today, and it makes it very difficult.  And

8    as well as Ms. O'Neill's client, I've been in contact with her

9    as well.

10          THE COURT:  And you ask that her appearance be waived

11   she's on the public line?

12          MR. CRAWFORD:  Yes, Your Honor.

13          THE COURT:  She can't confirm, because -- she can't

14   speak on the public line, so she can't confirm that.  But I'll

15   excuse Ms. Gourley's appearance as well at the request of her

16   counsel.

17          MR. CRAWFORD:  I appreciate that, Your Honor.

18          MS. STOKMAN:  There's no objection from the

19   government, Judge.  I did see Mr. Crawford filed that earlier

20   this morning or late last night, so no objection on that as

21   well.

22          THE COURT:  Other defense appearances?

23          MS. MOSES:  Good morning, Your Honor.  Carol Moses on

24   behalf of Brock Larson.  Mr. Larson is appearing by Zoom from

25   the Fresno County Jail.

1          MR. WILSON:  Good morning, Your Honor.  Roger Wilson

2   appearing for Marlon Palmer.  Mr. Palmer is appearing via Zoom

3   from the Fresno County Jail.

4          Also making an appearance for Mark Coleman for

5   Mr. McWilliams, and I see he's present also in the Fresno

6   County Jail appearing by Zoom.

7          MR. TORRES:  Good morning, Your Honor.  David A.

8   Torres making an appearance on behalf of Jacob Renshaw.  We do

9   consent to proceeding via Zoom.  Mr. Renshaw appears to be

10  present via Zoom from the Fresno County Jail.

11         I've also been asked to make a special appearance on

12  behalf of attorney Monica Bermudez.  She represents

13  Ms. Samantha Booth.  With regard to Ms. Booth, a waiver is on

14  file, and with request -- Ms. Bermudez, she's asking to make

15  an oral request to join this motion, if there's no objection

16  by the government.

17         THE COURT:  Any objection to Ms. Booth's joinder in

18  the motion even though one apparently hasn't been filed in

19  writing?

20         MS. STOKMAN:  No objection.

21         THE COURT:  All right.  The joinder will be

22  recognized.  I can't ask Ms. Booth whether she agrees to have

23  Mr. Torres represent her at this hearing, because she's not

24  present.

25         MR. TORRES:  Your Honor --

1          THE COURT:  Yes?

2          MR. TORRES:  My apologies for interrupting.  It's my

3    understanding Ms. Bermudez has spoken to her client, and she

4    does agree to my making a special appearance on her behalf and

5    the waiver is on file.

6          THE COURT:  Okay.  And Mr. McWilliams, I don't want

7    to unmute you, but do you agree that Mr. --

8          MR. WILSON:  Wilson.

9          THE COURT:  -- Wilson can make a special appearance

10   on behalf of your attorney, Mr. Coleman, and represent you

11   just at this hearing on the motion to suppress that's been

12   brought, and that you've joined in?  And are you giving me

13   another nod?

14          DEFENDANT McWILLIAMS:  Yes, (nods head.)

15          THE COURT:  Mr. McWilliams nodding "yes," and a

16   thumbs up; a double agreement.  So I'll allow that as well.

17          All right.  Well, I'm sorry to keep you all waiting

18   so long.  I've read the motion.  Mr. Quinlan's declaration

19   with the 594 -- 590 pages of attachments, the government's

20   63-page opposition and the attachments, the defense reply --

21   Mr. Quinlan's reply.  Is there anything else that -- and the

22   joinders, some of which added a little bit of additional

23   information with respect to each of the joinders.  Is there

24   anything else I should have received in connection with the

25   motion?

8

1          MS. STOKMAN:  Not from the government.

2          MR. QUINLAN:  Not on behalf of Mr. Bash.

3          THE COURT:  So I assume Mr. Quinlan is going to be

4    primarily responsible for the arguments since it's the motion

5    he filed and everybody has joined in?

6          Mr. Quinlan, I've read it all.  I have only the

7    vaguest of senses of what this motion is about.

8          What I do understand it says somewhere, it says that

9    it's a *Franks* motion, I think.

10         MR. QUINLAN:  A request.

11         THE COURT:  Maybe it's a *Franks* motion, and I -- I

12   don't know, a probable cause motion.  I'm not sure.  I'm not

13   sure which warrants specifically that it -- which wiretap

14   authorizations it specifically aimed at.  Here's my general

15   sense of what the motion is:  Judge, there were two separate

16   investigations, the Bash investigation, and the -- what's the

17   other gentleman's name?  I keep forgetting.

18         MR. QUINLAN:  Eversole.

19         THE COURT:  Eversole.  And there was a Bash

20   investigation and an Eversole investigation.  And the problem

21   with some warrant that I'm challenging is that with respect to

22   the requisite necessity showing, the affidavits to seeking to

23   authorize wiretaps of phones involved in the Bash conspiracy,

24   relied upon efforts that were undertaken and proved

25   unsuccessful in the Ever -- investigation of the Eversole

1 | conspiracy.

2 |       MR. QUINLAN:  Proved successful, successful in the

3 | Eversole conspiracy.

4 |       THE COURT:  Well, I'm not sure about that.  Maybe

5 | you'll enlighten me.

6 |       A wiretap was issued with respect to the

7 | Eversole-related telephones.  So I'm not sure what your point

8 | there is.  I remain confused about much of this motion.

9 |       But in any event, what my understanding is, you say,

10 | Well, the government couldn't rely on their showing about

11 | means that had been attempted and proved either successful or

12 | unsuccessful in the Eversole investigation in establishing

13 | that means would be -- traditional means of investigation

14 | would be unsuccessful in the Bash conspiracy investigation.

15 |       And therefore, that is -- what?  That either fails to

16 | make a sufficient showing in support of the issuance of the

17 | tapping -- or the wiretapping of the Bash-related phones, or

18 | that's a material misrepresentation.  I don't know.  I don't

19 | know what the defense position or argument is specifically.

20 |       And then, after that, whatever warrants it was that

21 | are flawed because of that essential error, then all the --

22 | all the -- all the wiretap authorizations after that, whether

23 | they be state or federal, they're all tainted as a result of

24 | that initial flaw.  I think that's the position that's being

25 | taken.

1        There's a few other things in here.  I'm not exactly

2   sure what they are.  I mean, I've read it.  I'm confused by

3   it.  It seems to me like the kitchen sink has been thrown --

4   the spaghetti has been tossed against the wall, and I'm not

5   exactly sure what's sticking and what's dripping down.

6        The government comes back and says, Well -- and its

7   lengthy.  It's 63 pages of opposition.  A lot of it deals with

8   general principals of wiretap law.  I think the basic thing

9   about the government's opposition is, No, the whole defense

10  theory underlying this motion is -- is wrong, because this

11  was, in fact, one investigation.

12       I mean, when you set out on an investigation, was it

13  a coordinated investigation.  You don't know where it's going

14  to lead.  You don't know what the evidence is going to end up

15  showing eventually.

16       Any objection to the notion that we referred to the

17  Eversole wiretap application as being an earlier application,

18  it was earlier by a couple hours.  But we weren't suggesting,

19  nor is there anything in those things to suggest that somehow

20  the Eversole wiretap resulted in the discovery of evidence

21  that supports the Bash wiretap application.  We never said

22  that.  It was one investigation.  That's -- that's, in fact,

23  the case.

24       Did it play out that it may have different tentacles

25  and different arms?  Sure, it might.  We have no idea where

1  it's going to lead when we start, but there was no

2  misrepresentation.

3        And it's perfectly fine -- you know, that I think

4  Ms. Stokman used the major league baseball analogy to say,

5  Look, the fact that you tried something with respect to the

6  Giants and the Dodgers, and it wasn't successful, can't you

7  extrapolate from that that it's no more likely to have been

8  successful with the other major league teams?  Yes, you can.

9  That's perfectly reasonable, and that's all that we did here.

10        Beyond that, the government gives me a lot of law.

11  This whole issue about whether unlawfully possessed contraband

12  cell phones are protected by the Fourth Amendment or not, I

13  mean, obviously, I'm not inclined to decide that issue,

14  especially if I don't have to.  I would rather assume without

15  deciding that they are protected, and then analyze whatever

16  legal argument is being made about suppression and see where

17  that leads.

18        But I'll be honest with you, Mr. Quinlan, I really

19  don't even know what the -- what the defense's motion is all

20  about other than what I've just described.

21        A *Franks* showing -- and I know you know this.  I

22  mean, I'm not saying that this is easy.  I'm sure it's very

23  complicated.  You know, what I really want to say,

24  Mr. Quinlan, is, I read the reply.  The reply -- I'm thinking

25  that your hand was heavier in the reply brief than it was in

1    the motion, because the reply brief made sense to me.  The

2    motion did not.

3         And I'm sorry to be so blunt about it, but that's the

4    truth.  It didn't make a lot of sense to me, but the reply

5    did.  That I understood.

6         And hey, I know you've been swamped too.  You've been

7    in a long trial in front of me during the middle of this, so

8    I'm not casting any aspersions, but I'm struggling to figure

9    out really what -- what is the defendant -- what the defense

10   is even trying to present as the basis for the attack here.

11   And in particular to the extent it's a *Franks* motion,

12   what's -- what's the materially misleading fact?  If that fact

13   were corrected, what would the application read like?  And

14   given that rewritten application with the materially omitted

15   fact added or the misleading information omitted, why would

16   there not be probable cause supporting the issuance of the

17   wiretap?  I don't think that's been done, or at least I can't

18   see it in all those pages.

19        I -- I -- really, I'm lost.  So if you could help me,

20   tell me what it is I'm supposed to be focused on, I would

21   really appreciate it.

22        MR. MR. QUINLAN:  Sure.  The federal wiretap for

23   targets 1 through 5, which was submitted to you on September

24   16th, we don't have a problem with.

25        Also submitted that day, was the first of the three

1   state wiretaps that I'm going after.

2           I only chose the first three, because they extend

3   into their entire investigation of Mr. Bash.  But I'm only

4   going after, right now, the first three.

5           The first one, the first state wiretap was on

6   September the 16th.  And as though that wiretap is relied by

7   incorporation by reference on the investigation that had been

8   done of Eversole's operation, in the government's reply, they

9   point out -- and I cited to it in my reply, they point out

10  that they had great success against Eversole by the use of the

11  informants of Eversole, which was close to.  And then, of

12  course, they surveilled it, and they -- they -- found out, you

13  know, source of supply, and they found out who his associates

14  were, and they did a lot of gun and drug transactions in

15  Eversole's operation.

16          And the government says in their reply -- or in their

17  opposition that they weren't successful using those techniques

18  with Bash, because unlike Eversole, with Bash they didn't have

19  anybody -- any CIs that they could use.

20          THE COURT:  Right.

21          MR. QUINLAN:  Right.

22          THE COURT:  And you may make the point that, Look,

23  there was, in fact, a CI who -- who was in constant contact

24  with Bash, and that Bash had expressed a willingness to do a

25  deal with them.

1        MR. QUINLAN:  Yes.  And where the *Franks* part comes

2   in, is that at that interview -- and it's Bates number 9701 --

3   that interview with the ATF agents and this informant, was the

4   affiant in the state wiretap, Officer Phelps.  He was also --

5   Officer Phelps was also at the July 10, 2010 interview of an

6   FBI informant who also could have been used.  And that's at

7   Bates number 5380.

8        So when the affiant on all these three wiretaps --

9   it's the same affiant, Detective Phelps.  When the affiant

10  swears to the judge looking at this that, We don't have

11  anybody, any informants or anybody that can get close to Bash,

12  and have the same kind of success using an informant, we don't

13  have anybody like that.  That's false.  They told the judge

14  that.  That's false.

15        THE COURT:  What exactly did they tell Judge --

16  it's --

17        MR. QUINLAN:  The state judge.  The state judge.

18        THE COURT:  Yes, it's Judge -- the presiding judge of

19  the Fresno County Superior Court.

20        MS. STOKMAN:  Judge Harrell.

21        THE COURT:  Right --

22        MR.  QUINLAN:  They told the judge --

23        THE COURT:  -- what did they tell him in that regard?

24        MR. QUINLAN:  They told him that they were -- they --

25  that there were no -- they said that there was no -- I'm

1    looking for the exact language, Your Honor.  I've cited to it

2    in my points and authorities, but they told the judge that

3    there was no informant that they could use with -- with the

4    Bash organization, and that's not true.

5            THE COURT:  Okay.

6            MR.  QUINLAN:  They had certainly one and possibly

7    three, because the FBI interview discusses one known FBI

8    informant and possibly another one.  They had three.

9            And so when Detective Phelps is inferring that they

10   can't use their most successful technique, which was informant

11   with surveillance of the Bash organization, that's not true.

12           THE COURT:  So let me ask you this, why is that --

13   why is that material?  Let's say I were to hold an evidentiary

14   hearing and decide, yes, that was not true.  They had

15   available informants who had expressed willingness to deal

16   with Bash.  And so it wasn't true when they told the reviewing

17   superior court judge that they had no ability to use

18   informants with respect to Bash, why -- why would that

19   inaccuracy of false statement be material?

20           The Eversole matter, where they did, and you make the

21   point, hey, they successfully used informants there.  And

22   after using informants, they then said, yes, informants have

23   been used successfully, but they are of limited value.  You

24   can only learn so much through the involvement of informants.

25   We can't discover all of the connections, all of the

16

1    involvement of everybody else.  We can't go all the way up the

2    line of responsibility.  We can't identify all sources.  Also,

3    even though we can use informants, we can't do so and

4    effectively advance the investigation to its ultimate end.

5         So why would the nonuse of informants be material in

6    the Bash affidavit, even though the use of informants still

7    resulted in the issuance of Eversole wiretaps?

8         MR. QUINLAN:  I want to start with the *U.S. versus*

9    *Carneiro*, the specific case I cited, 861 F.2d 1171, and this

10   is at 1181, and they're talking about omissions and

11   misstatements in a successful wiretap.  It was called the

12   "Hardy wiretap."

13        And the Court says -- they suppressed the Hardy

14   wiretap, and the Court says, (as read):

15        "As noted above, the necessity requirement does not

16             compel law enforcement agencies to use wiretap, only

17             as a last resort.  However, a wiretap cannot be the

18             initial step in a criminal investigation.  Before

19             using a wiretap, the agents must, at the very least,

20             use traditional investigative methods that easily

21             suggest themselves are potentially productive and not

22             unduly dangerous."

23        So that case there says that if they have a known

24   successful technique, which they have a known successful

25   technique in Eversole's operation, and they have an informant

1   so that they can use that known successful technique in Bash's

2   operation.  If they don't do it, then they haven't -- they

3   haven't fulfilled the necessity requirements.

4           Other cases --

5           THE COURT:  Well, is this a *Franks* challenge, or is

6   it -- is it probable cause, that they haven't established the

7   need for a wiretap challenge?

8           MR. QUINLAN:  Okay.

9           THE COURT:  Which is it?

10          MR. QUINLAN:  Okay.  It's -- it goes to three

11  different things.

12          The first is, is that the -- if you put in the

13  correct information that they did have a CI that was available

14  with Bash -- with the Bash organization, then the application

15  is incomplete.  If -- if there's a -- a dispute over that --

16  over whether that's accurate or not, what I'm telling you that

17  they had a Bash informant available and that Phelps, the

18  affiant knew it, if that was disputed that would be the reason

19  for the *Franks* hearing.

20          If you find that the face -- with the correct

21  information that the face of the wiretap affidavit showed

22  necessity, then you go on to the second task, whether or not

23  as a whole -- looking at it as a whole, the necessity was

24  shown for that particular wiretap.

25          So first, you look at it with the correct information

1  to see if the wiretap application itself is deficient for

2  failing to show necessity.  If it passes that test, then you

3  look at it as a whole to see if -- if it shows necessity.

4          And like I say, the *Franks* part of it is, if you

5  dispute what I'm saying, that Affiant Phelps knew that they

6  had a CI who would work with Bash, and didn't disclose that,

7  that's an intentional -- not only an omission, because he

8  didn't disclose that they had a guy, but it's a

9  misrepresentation to the Court, because he misled the Court in

10  saying that they didn't have any such persons.

11          So that's it, in essence, in that regard, Your Honor.

12          As far as the two investigations go, the first

13  wiretap was for Bash associates.  It was -- actually it was

14  for Ms. Bash, and it was for Mr. Smith, and it was for

15  officer -- oh, Stephanie Madsen.

16          There's no investigation of those people prior to

17  their -- their wiretaps.  They surveilled them for two or

18  three days each to determine where they live, where Ms. Madsen

19  worked, and to determine that they were still using the

20  phones.  And that was it.  No other surveillance of them of

21  any -- of any note.

22          And they just applied for the wiretap.  They

23  didn't -- they didn't use any informants.  They didn't try to

24  develop who Mr. Bash was in contact with by the use of

25  informants.

1    The one informant who said -- whom Bash said he would

2 do business with, that conversation was recorded by that

3 informant.  Well, law enforcement, they listened in on the

4 call, and they recorded it.  And so those are the kinds of

5 things that were available to law enforcement, that law

6 enforcement misled the judge by representing that they were

7 not available to them in the Bash investigation.

8    The government has cited cases which really sort of

9 address the fissure between what I'm saying and what happened.

10    And in the case of *United States v. Rivera*, that's

11 another Ninth Circuit case, 827 F.3d 891, 2008 case.  In that

12 case, they came down on the side that the wiretap the

13 application was okay.  Here they note at page 903, they're

14 saying here that (as read):

15    "DEA conducted far more than a cursory investigation

16       before applying for the wiretap.  Over the course of

17       19 months, the DEA conducted physical surveillance of

18       various targets of the investigation, conducted

19       telephone information analysis of target phones 1 and

20       2, and other telephone numbers associated with the

21       Rivera organization, used several confidential

22       sources to try infiltrate the Rivera organization or

23       purchase narcotics from it."

24    And they go:

25    "Thus the" -- continuing on, "thus the DEA's prior

1          wiretap investigation was significantly more thorough

2          than that called in *Gonzalez, Inc.*, and we find it to

3          be sufficient."

4     And that's -- what's missing here, is that all of

5 their investigation --

6     THE COURT:  Stop.  This is not helping me

7 particularly.  It remains as clear as mud.

8     Is the defense moving on the grounds that with

9 respect to the Bash wiretaps obtained in state court --

10     MR. QUINLAN:  Not all of them.

11     THE COURT:  -- the Bash-related wiretaps obtained in

12 state court, that there was a failure to establish requisite

13 necessity?

14     And alternatively, that the two -- the extent there

15 was a showing of requisite necessity, that the requisite

16 necessity was based upon a false and materially misleading

17 affidavit, and that if the true information was revealed, that

18 requisite necessity would have been lacking to support the

19 issuance of the state wiretaps?

20     MR. QUINLAN:  Yes.  And also, I want to point out

21 that you if you take out the false statements and you plug in

22 the correct ones, then the standard of review for you is

23 whether or not a reasonable reviewing judge could have that

24 found that there was not sufficient necessity shown.  That's a

25 legal standard.  That's -- that's different from the other

1    tests that once you plug it in, you find that the affidavit is

2    technically sufficient.  Then you look to see if using an

3    abuse of discretion standard, if the judge abused his

4    discretion in finding necessity as to the wiretap.

5         THE COURT:  And I'm supposed to apply that less

6    demanding standard, because I'm reviewing a state court issued

7    wiretap?

8         MR. QUINLAN:  No.  That's federal law that I'm citing

9    in reviewing any wiretap application.

10        THE COURT:  Okay.  So in addition to the argument

11   that the Fourth Amendment protects unlawfully possessed

12   contraband cell phones, and this argument about -- and this

13   argument that the Bash-related wiretap applications failed to

14   establish requisite necessity, or that their showing in that

15   regard were based upon false or misleading statements provided

16   to the issuing superior court judge, is there any other

17   argument that is being advanced by the defense in support of

18   suppression of the wiretap evidence?

19        MR. QUINLAN:  Title 3, the wiretap statutes, yes.

20        THE COURT:  What's --

21        MR. QUINLAN:  Title 3 --

22        THE COURT:  What's the basis?

23        MR. QUINLAN:  Well, Title 3 is the federal wiretap

24   statutes.

25        THE COURT:  I understand that, but just saying I'm

1   moving to suppress pursuant to Title 3, doesn't tell me much.

2   MR. MR. QUINLAN:  But they're the ones that have the

3   necessary requirements, and they're the ones that -- those

4   statutes -- those statutes, I cited to them.

5   THE COURT:  I understand.  How's that -- how's that a

6   different ground than what I just articulated about, they

7   failed to show requisite necessity, and to the extent they do

8   show requisite necessity, the showing is based upon false or

9   misleading information.  Are you -- is that --

10   MR. MR. QUINLAN:  That's part of Title 3, yes.

11   THE COURT:  Is there something else?

12   MR. MR. QUINLAN:  When you were talking about the

13   Fourth Amendment, I'm standing on Title 3.  The Ninth Circuit

14   says --

15   THE COURT:  We have a failure to communicate, but

16   it's -- I don't think I'm going to advance the ball by asking

17   any more.  There's -- there's one issue about whether the

18   Fourth Amendment protects contraband cell phones by prisoners.

19   I don't want to reach that issue.

20   MR. QUINLAN:  You ruled on that.

21   THE COURT:  I understand.  I don't want to base --

22   MR. QUINLAN:  Set aside for a moment, if you would,

23   the Fourth Amendment.

24   THE COURT:  Yes, let's do that.

25   MR. QUINLAN:  Okay.  I'm talking about the federal

1   statutes, which are collectively referred to as Title 3, the

2   Wiretap Act.

3           THE COURT:  And that's what?

4           MR. MR. QUINLAN:  Under the Wiretap Act, everything

5   I've told you already, the necessity showing, the test --

6           THE COURT:  That's all Title 3.

7           MR. MR. QUINLAN:  That's all Title 3, exactly.

8           THE COURT:  I got it.  I thought you were telling me

9   that there's some other Title 3 aspect that you're arguing was

10  violated that should lead to suppression.  Is there anything

11  more?

12          MR. MR. QUINLAN:  Other than what I've articulated

13  today and in my papers, no.

14          THE COURT:  Okay.  And then, the final position is,

15  and everything after these three state court issued wiretaps,

16  which are flawed because of a failure to show requisite

17  necessity, or that the requisite necessity showing was based

18  upon false or misleading information, the final argument is,

19  and everything that came thereafter, because it was based on

20  those state court wiretaps, those three that we're

21  challenging, they all relied on evidence developed in those

22  wiretaps and, therefore, it's all tainted; is that the final

23  kicker?

24          MR. QUINLAN:  I'm only currently addressing the three

25  state wiretaps.  First three, okay.  I'm not addressing -- I

1  mean, I may say to you today, you know, because of everything

2  else is related to these first three wiretaps, I believe it's

3  all going to be suppressible.  But that's not before you right

4  now.  I haven't put those facts before you -- or those other

5  wiretaps, which would show that.  I'm just after the first

6  three wiretaps right now.

7          The ones that I --

8          THE COURT:  Okay.

9          MR. QUINLAN:  -- attached to my declaration.

10          THE COURT:  Before turning to Ms. Stokman, have you

11  told me what you want to tell me as far as getting me focused,

12  right, Mr. Quinlan?

13          MR. QUINLAN:  I tried.

14          THE COURT:  Do any other defense counsel want to say

15  anything before I turn to Ms. Stokman?

16          Hearing no takers, and given that all defense counsel

17  are sizing up the situation and saying, No, I'd rather not

18  poke that bear --

19          Ms. Stokman, Mr. Quinlan has helped me focus a little

20  bit on exactly what it is that this motion is all about.

21          His argument that the affidavits in support of the

22  Bash-related wiretaps, should have told the reviewing superior

23  court judge, Well, A, that they said that use of informants

24  wasn't available, and that that was the -- that statement was

25  false, because they had more than one, as I understand

1   Mr. Quinlan arguing now.  There's evidence that they had more

2   than one informant who was dealing with Bash or willing --

3   that Bash was willing to deal with, who they could have

4   utilized, but they did not.  And that that failure to tell the

5   reviewing superior court judge that was material to the

6   issuance of those wiretaps.

7            What's the government's position about, A, whether

8   that statement was false or misleading, why isn't the

9   defense's proffer in that regard sufficient to obtain an

10  evidentiary hearing as to -- to -- so that the affiant to

11  those wiretaps shouldn't be questioned as to why they omitted

12  that information?

13           And what's the government's position ultimately about

14  whether or not any such statement was material to the issuance

15  of those Bash-related wiretaps?

16           MS. STOKMAN:  Judge, I think I can answer that all

17  with one blanket statement and then give a little bit of

18  detail.  But Mr. Quinlan's statement to the Court and in his

19  papers is what's false and misleading here.

20           The affiant of the wiretaps did disclose that

21  individual, that informant, and the meeting with that

22  informant.  That's how Mr. Quinlan knows about that informant,

23  because it's in the affidavit itself.

24           There's information about how law enforcement met

25  with this informant.  The informant called Bash and other

1    people, and that Bash had mentioned he would want to work with

2    that informant.

3          The affidavit also when it discussed all the

4    informants that had been utilized, or tried to be utilized

5    within the investigation, describes that that informant was

6    inactive because law enforcement could no longer reach that

7    informant.  And so they can't consider that informant to be

8    inactive, because they fell off the face of the planet with

9    regard to an investigation and any helpfulness they can

10   provide.

11         So in that sense, there's no material -- there's no

12   omission at all.  And therefore, there's no material omission,

13   because that information is all laid out within the affidavit

14   itself.

15         THE COURT:  And do you happen to have at your

16   fingertips where I should be looking to --

17         MS. STOKMAN:  Yes, Judge.  On affidavit 20-017, the

18   first affidavit, on page 81, there's a section regarding

19   recorded calls with Kenneth Bash and others.  And there's a

20   reference in there that the person who made those calls is

21   then CRI8.  And CRI8 is then discussed in the informant

22   section on page 138.

23         I will point out that in the discussion of CRI8, it

24   talks about recorded calls with Eversole, which is inaccurate.

25   That's inaccurate.  That was a misstatement.  But I believe

1  that to be a typo, because they do reference that it was CRI8

2  when they talk about the communication itself and the recorded

3  call itself.

4          But CRI8 is talked about on page 138, and that is

5  also where the affiant talks about how they consider that

6  informant to be inactive at the time of the author of the

7  affidavit.

8          THE COURT:  You say it was inaccurate, and that it

9  referred to Eversole.  Do you mean because it should have said

10 "Bash"?

11         MS. STOKMAN:  Correct.  But --

12         THE COURT:  And does --

13         MS. STOKMAN:  Based on --

14         THE COURT:  Does it -- but does it say elsewhere that

15 it was Bash?

16         MS. STOKMAN:  Yes.  In the actual part on page 81,

17 where it talks about CRI8 making the recorded phone call and

18 what the call was about.

19         THE COURT:  Mr. Quinlan has referred to another

20 informant that federal law enforcement had access to who

21 somehow was available to do deal with Bash.  Do you know what

22 he's talking about in that regard?

23         MS. STOKMAN:  Judge, my understanding is that it is

24 the same individual.

25         THE COURT:  Same person?

1        MS. STOKMAN:  That's my understanding.

2        THE COURT:  I thought Mr. Quinlan was telling me

3   there were two but maybe not.  I'll come back to Mr. Quinlan

4   if he needs to clarify that.

5        Is it the government's position that this was one

6   investigation?

7        MS. STOKMAN:  Yes, Judge.  In the sense that, as I

8   pointed out in my response, this is focused on not only

9   Fresneck criminal activity within Fresno County, but also the

10  larger umbrella of Aryan Brotherhood activity, because that's

11  where the orders and the communication is trickling down from

12  in order to reach the strength of the Fresneck criminal street

13  gang.

14        And based on that, the investigation was, as most

15  investigations at this level, the goals of that investigation

16  were not only to get to the players on the street, but also

17  the higher-ups within the organization that are in control of

18  that activity and that rely on that activity by people

19  underneath them for their own source of money or whatever it

20  would be.

21        And as the Court pointed out, was an investigation

22  that led to different tentacles because of the nature of how

23  the Aryan Brotherhood is organized in California.

24        And because of that, it all fell under one

25  investigation.  There are key players that interact and

1   overlap.  There are members of Aryan Brotherhood who are

2   associated with either Bash or Eversole, who also overlap and

3   interact.  It's all one organization.  And the players within

4   it, we consider to be part of the same gang and the same

5   organization.

6           THE COURT:  So your position is that those state

7   court wiretap applications accurately revealed to the

8   reviewing superior court judge that, yes, at one time there

9   was an informant willing to deal with Bash, but that that

10  informant was no longer available to law enforcement

11  authorities, had fallen off the face of the earth, and that

12  law enforcement, therefore, considered that it was not

13  fruitful to utilize that informant.

14          MS. STOKMAN:  Yes.  That is correct.

15          THE COURT:  Do you think I have to reach this issue

16  of whether Title 3 protects contraband cell phones or not, or

17  even if I assume without deciding that it does, I mean, do you

18  would -- does the government have any objection to me assuming

19  without deciding as long as I end up coming to the conclusion

20  that the government does that the motion to suppress should be

21  denied?

22          MS. STOKMAN:  Judge, I believe that, yes, if that is

23  the Court's ultimate decision, that the motion to suppress

24  should be denied, because there are now joinders of defendants

25  who have standing to contest it, I don't think we need to get

1   into that.

2         However, it is our position that the incarcerated

3   defendants do not have standing to even bring this claim.

4         THE COURT:  Mr. Quinlan, Ms. Stokman said you've got

5   no showing whatsoever of either a false statement or a

6   misleading statement or even a showing of a failure to

7   establish requisite necessity, because they disclosed the

8   informant in the affidavit.  And the informant was no longer

9   available, and they specifically told the reviewing superior

10   court judge that.  And game, set, match, end of story, no

11   *Franks* hearing, motion denied.

12         MR. QUINLAN:  They didn't tell the judge about the

13   quarter-pound transaction CI was able to do a quarter pound

14   transaction at page -- page that have cited about informant

15   number 8, that was someone that inquired about work of both

16   Eversole and Bash, and they say that Eversole got back to him

17   about more work, but they don't say anything about whether or

18   not the informant ever got back with Bash about work.

19         But that's about something different.  They don't

20   disclose that they had someone who would do a quarter pound

21   deal with Bash.  They don't say that that person disappeared.

22   They have filed no declaration, and together with their reply,

23   they don't address the two FBI informants, which are noted by

24   me at Bates 5380.  Those are people who were, at that time --

25   at least one of them was at that time, associated with AB.

1   And they don't talk about whether or not they could use that
2   person.

3           THE COURT:  So Ms. Stokman, Ms. Stokman, I want to
4   interrupt Mr. Quinlan.  See, he is talking about -- I don't
5   know now.  He's telling me now there's three different
6   people --

7           MS. STOKMAN:  Judge --

8           THE COURT:  -- that the government had access to.  I
9   don't know.  I don't know what to make of any of this.  Maybe
10  you are having as much trouble as I am trying to figure out
11  what the defense's motion is.

12          MS. STOKMAN:  A little bit, Judge, but I understand
13  because I know the facts of this case, the reports that he's
14  referring to.

15          So the FBI informant is, in fact, addressed within
16  the affidavit as CRI number 5.  That informant was
17  deactivated, because they showed up to a drug buy with drugs
18  on them.  So they deactivated that informant after that.  So
19  there was an attempt to use the FBI informant, but
20  unfortunately, it didn't-- it didn't work out because of
21  policies and what needs to happen when you're using an
22  informant.

23          THE COURT:  How do I know from what's in front of me
24  that -- you're connecting, Oh, well, the guy that was willing
25  to do this deal but disappeared off the face of the earth,

1    he's the guy referred to in the affidavit as CR8.

2            The FBI informant, who got booted from the informant

3    program, because he showed up to a drug deal with drugs on him

4    when he wasn't authorized to, that's referred to in the

5    affidavit in question as CR5 or whatever.

6            How do I know this other than you telling me?

7            MS. STOKMAN:  Judge, for CRI8, the affidavit lays out

8    that that is the person who was on the phone with Bash and

9    other individuals.

10           And then they reference in "description of the

11   informants used," CRI8, and why they were deactivated or

12   inactive.

13           CRI5 is also listed as an informant.  In the section

14   of necessity it talks about the use of informant and what the

15   team had done already in that regard.

16           CRI5 does not specifically say this was an FBI

17   informant, but I think Mr. Quinlan connected the dots based

18   off of a report from FBI about meeting with that informant,

19   which at the time -- well, it's -- the fact that it's an FBI

20   informant, Judge, is not a material fact.  The fact is that

21   they tried to use this informant.  It is listed in the

22   affidavit, and they also talked about why that informant is

23   now deactivated.

24           And so what the Court should look at as far as what

25   the team has done with informants is the section in the

1  necessity part of the affidavit that does talk about the nine

2  CRIs, they're calling them, that were utilized during this

3  investigation.

4          And then discusses the pros and cons or the status of

5  each one.  So that information is all there.

6          THE COURT:  I guess what I'm asking is, where's the

7  scorecard, the evidentiary scorecard that tells me who's on

8  first?

9          MS. STOKMAN:  I think --

10          THE COURT:  You're matching up -- Mr. Quinlan is

11  making arguments about specific people.  You're telling me,

12  Well, the person he's referring to is referred to in the

13  affidavit as CR5 or CR8.

14          How do I know that?  How do I know that those are, in

15  fact -- that there's a link between the persons he's saying

16  weren't revealed and the people you say, No, they were

17  revealed.  There they are.

18          MS. STOKMAN:  Judge, I'm not really sure if there's a

19  missing link here, because the reason how Mr. Quinlan knows

20  about these informants is because they are listed in the

21  affidavit.  And so that information is listed in the

22  affidavit.

23          Again, specifically, with CRI8, it's indicated when

24  it talks about the phone call that was made that it was with

25  CRI8. CRI8 is then discussed in the informant section.  CRI5,

1    it doesn't specifically say what that informant was going to

2    try to get information from and about, only that informant had

3    previously made a controlled purchase that was successful, but

4    then showed up to the next controlled purchase with drugs in

5    their possession, and so they had been deactivated.

6         And so the point is that the affidavit does line out

7    and spell out the use of the potential informants that the

8    investigative team had at their disposal.  And it talks about

9    either why they're still using them, or why they are not still

10   using them.

11        MR. QUINLAN:  If -- thank you.  If you were to look

12   at the federal wiretap addressing Eversole and the first state

13   wiretap, and if you were to compare the allegations regarding

14   the informant, they're -- they're practically cut and paste

15   out of the federal affidavit into the state affidavit with the

16   sole exception being -- well, not the sole, but primarily the

17   difference being in the federal affidavit they're called CRs,

18   and in the state affidavit, they're called CRIs, reliable

19   informant.

20        But the allegations are the same in both, and so I

21   have problems with what counsel is representing.  But there's

22   no declaration from anybody that that's -- that's what

23   occurred, nothing from Mr. Phelps.

24        And the way that I found out about this was that we

25   went through discovery prior to the first wiretap, and I dug

1   up the original reports, which I've attached to my

2   declaration.

3           I've cited to the Court earlier today where they're

4   talking to the FBI informants, and where they're talking to

5   the person who can do a quarter pound meth deal with Mr. Bash.

6   And in those reports it says who's there.  And who's there is

7   the affiant, Mr. Phelps.  And this is occurring well before

8   the application for the first state wiretap.

9           I think, you know, if the government is going to

10  stand on what they're representing, then I think we need a

11  hearing to -- to flesh this out.  And I would like the reports

12  that would go with the witness that whoever is going to be

13  appearing.  Because I have looked through the reports, and I

14  don't see reports that say that.  We scoured the discovery

15  just to find the references that I've been able to cite to the

16  Court.

17          THE COURT:  All right.  I'm not taking the motion

18  under submission.  What I am taking under submission is

19  whether or not to hold an evidentiary hearing.

20          The hearing has been only somewhat helpful to me.  I

21  remain mystified in large part by the defense's motion.  Maybe

22  it's just because it's complex and there's a lot of affidavits

23  and a lot of wiretaps involved.

24          I'm a little bit concerned about the government's

25  argument that, Well, that the same informants that Mr. Quinlan

1   is saying were not revealed, they were revealed, because they

2   are identified by these numbers in the affidavit.

3          Without telling me how I link those two things, how

4   do I know that CR5 or CR8 is the person that Mr. Quinlan is

5   arguing wasn't revealed?

6          The government says because the information that they

7   could have provided is set forth in the affidavit itself.

8   That's where Mr. Quinlan learned about it.

9          He says that's not true at all.  None of it's

10  revealed in the affidavit in support of the search warrant

11  application in superior court.  It's buried elsewhere in the

12  discovery.

13         And there's no linkage between what it was that those

14  people could say, and how they have been identified in various

15  affidavits.  I ought to be entitled to cross-examine the

16  affiant about whether this information was omitted or not.

17         MS. STOKMAN:  Judge, if I may, I just want to clear

18  up that Mr. Quinlan is talking about -- I'm going to take them

19  separately -- CRI8 as someone who had a phone call with his

20  client and who was potentially going to follow up doing work

21  for Mr. Bash.  That's how that phrase came out of the

22  conversation.

23         That conversation and that information is listed in

24  the affidavit with an indication that that conversation was

25  had with CRI number 8.

1          Then CRI number 8 is discussed within the informant

2    section, and they talk about why that CRI is no longer active.

3          CRI number 5 is also discussed, and they discuss --

4    on -- all the informant discussions, they discuss when they

5    began working the team, facts that they've provided before to

6    the team that they've -- that they've figure had -- you know,

7    that the team has previously known, that they were either

8    successful or not at buys, and they're still active, if they

9    are any issues that there might be; if they're not, why.

10          The information that is not in the affidavit is the

11    fact that CRI5, became the informant, the fact that there was

12    a traffic stop, and when they went to talk with that

13    informant, that's when the informant starting giving

14    information.  That's not a material omission.  What facts a

15    judge is looking at information for the necessity of a wiretap

16    needs is the availability and knowledge of an actual

17    informant.  And --

18          THE COURT:  Ms. Stokman, I'm going to stop you.  I

19    don't think you understand my concern.

20          Mr. Quinlan is making an argument that there was an

21    informant who was willing to do a quarter pound deal with

22    Mr. Bash, and that that informant and his willingness --

23    Bash's willingness to deal with him was not disclosed to the

24    reviewing superior court judge.

25          You say, Oh, yes, it was.  That was CR8.  Where in

1   the affidavit does it establish that the informant that

2   Mr. Quinlan is talking about is CR8?  Because, as I understand

3   it, you have never told me, Here it is, in the affidavit,

4   Judge.  CR8 -- CR8, had contact with Bash.  Bash was willing

5   to do a quarter pound meth deal with him, but then that --

6   that CR8 fell off the face of the earth.  You've never

7   drawn -- you haven't pointed me to anything in the affidavit

8   that links what Mr. Quinlan is saying was not disclosed and

9   what you are saying with what was disclosed other than

10  essentially, Trust me, Judge, it's the same person.

11          How am I supposed to know that?

12          MS. STOKMAN:  I understand, Judge.

13          And I think that the disconnect is that, I don't know

14  where the quarter pound information is coming from, but --

15          THE COURT:  Well, neither do I.  That has to do with

16  where we started this conversation.  Where I said to

17  Mr. Quinlan, What's the specific false statement?  What is the

18  evidence that it was false?  How have you made a substantial

19  preliminary showing entitle you to a *Franks* hearing?  None of

20  which was address satisfactorily in the opening conversation,

21  in my view.  I mean, I feel like -- like you know, I said at

22  the beginning, all the spaghetti has been thrown against the

23  wall, and I feel like, Here, you figure it out.

24          But I am tired.  I don't -- I'm not sure I'm going to

25  advance the ball much more by talking about it.  I'm not

1    taking the motion under submission.

2          Mr. Quinlan, do you understand what I'm having

3    trouble with?

4          MR. QUINLAN:  I'm having trouble -- no.  And the

5    reason is that I -- in my moving papers, I've provided the

6    Court with the informants that I'm talking about and the

7    quarter pound meth conversation.  And I reference that in my

8    moving papers that this is something that was not -- not

9    disclosed that they had available.  So I'm -- I'm not trying

10   to hide the ball here, you know.  It's -- it's attached.  I've

11   got all the stuff and Bates numbers chronological or

12   sequentially.

13          And first one with the -- or at least the FBI

14   informant, that's 5380 attached to my declaration, but the

15   more important conversation to me is the quarter pound meth

16   deal, and that's 9701 attached to my declaration.  So you

17   know, I've attached this stuff.

18          I see you shaking your head, you know, what --

19          THE COURT:  Just not helping me.  What would have

20   been helpful is:  Here's the false statement.  Here's the

21   evidence that it was false.  If you correct it, here's why the

22   warrant would not have issued.

23          I don't see that anywhere in that opening motion.

24   The reply helps me a little bit more.  I don't know.  I guess

25   I just need to search through here for myself and see if I can

1  figure out what your position is on these points, which I
2  guess I will eventually do.

3  Right now I'm not taking the motion under submission.
4  I'm taking under submission the question of whether or not
5  you've at least established an entitlement to an evidentiary
6  hearing.  After I decide that, I'll either hold a hearing, or
7  I'll take the motion under submission.

8  MR. QUINLAN:  I wanted to just close off by
9  referencing that it's Bash Bates stamp 66 wherein the
10  affidavit -- the first affidavit, state affidavit -- or
11  actually, this is the federal one, it says (as read):

12  "Confidential human source, CHS8, began assisting the
13  investigative team in May of 2020.  CHS8 completed a
14  recorded phone call, Eversole."

15  And they're now saying that was Bash.

16  "...but completed a recorded phone call with Eversole
17  and confirmed identities and phone calls for other
18  several lower-level targets of the investigation
19  approximately one month ago.

20  "CHS informed the investigative team that Eversole
21  had contacted CHS8 about doing more work.  However,
22  the investigative team has not been able to contact
23  CHS8 since that time.  The investigative team
24  considered CHS8 to be an inactive CHS at this time."

25  So --

1          THE COURT:  See, that -- I mean, you telling me that,

2     tells me that if the government links Confidential Informant 8

3     to what you're saying wasn't revealed, and that was in the

4     state court warrant, then  you haven't made a substantial

5     preliminary showing of anything.  And you are not entitled to

6     a *Franks* hearing.  And the motion to suppress is denied.

7          And the only question I have in my mind right now is,

8     where's -- how do I -- how do I link -- how do I link your

9     allegations with the government's representations?  Is there

10    any evidence of it, or do I need an evidentiary hearing to

11    hear from the affiant to establish the link?  That's it.

12    That's all I can say I've taken out of this hearing.

13         MR. QUINLAN:  Well, I don't think that they've

14    established that this CHS8 is the same person that talked to

15    Mr. Bash.  And I don't think they've addressed at all the FBI

16    affiant, which I've also cited to.

17         THE COURT:  All right.  The request for evidentiary

18    hearing is taken under submission.  An order of some type with

19    issue.

20         MR. QUINLAN:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MS. STOKMAN:  Thank you, Judge.

23         MR. WILSON:  Thank you, Your Honor.

24         MS. MOSES:  Thank you, Your Honor.

25     (Proceedings concluded at 1:07 p.m.)

1

2      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

3   foregoing transcript as true and correct.

4

5   Dated:  July 23, 2022              /s/ Rachael Lundy
                                       RACHAEL LUNDY, CSR-RPR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25