549

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

UNITED STATES OF AMERICA,      )
                               ) 1:20-cr-00238-JLT-SKO
          Plaintiff,           )
                               ) Jury Trial, Day 3
     vs.                       )
                               )
KENNETH BASH, et al.           )
                               ) Volume 3
          Defendants.          ) Pgs. 549 - 840, inclusive
_____ )


Fresno, California                  Thursday, January 16, 2025



REPORTER'S TRANSCRIPT OF PROCEEDINGS








REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**APPEARANCES OF COUNSEL**:

For the               **STEPHANIE STOKMAN**
Government:           Assistant U.S. Attorney
                      2500 Tulare Street, Rm. 4401
                      Fresno, California  93721

                      AND

                      **JARED ENGELKING**
                      Department of Justice
                      1301 New York Avenue, N.W.
                      Washington, DC 20005

                      AND

                      **JAMES ROBERT CONOLLY, GOVT**
                      U.S. Attorney's Office
                      501 I Street, Suite 10-100
                      Sacramento, CA 95814


For Defendant         Law Offices of Andrea Luem
Johnson:              Attorneys at Law
                      400 South Forth Street, Suite 500
                      Las Vegas, Nevada  89101
                      BY:  **ANDREA LEE LEUM, ESQ.**

                      AND

                      Law Offices of Ryan J. Villa
                      5501 Eagle Rock Avenue NE
                      Suite C2
                      Albuquerque, NM 87104
                      BY:  **RYAN J. VILLA, ESQ.**

For Defendant         Fisher & Byrialsen, PLLC
Clement:              Attorneys at Law
                      99 Park Avenue
                      New York, NY 10016
                      BY:  **JANE FISHER-BYRIALSEN, ESQ.**


**For Defendant**     **Law Office of Kenneth Alan Reed**
**Stinson:**          **406 W 4th Street**
                      **Santa Ana, CA 92701-4505**
                      BY:  **KENNETH ALAN REED, ESQ.**

Thursday, January 16, 2025                    Fresno, California

8:33 a.m.                                      Jury Trial Day 3

    (The following proceedings were held in open court:)

    (Jurors are identified by number only.  Any reference to

     personal identifiers regarding jurors has been redacted.

     Release of personal information requires motion and Court

     order.)

        THE CLERK:  Please remain seated.  Court is now in
session.

        THE COURT:  All right.  We're back on the record.

        Is there anything to discuss before we bring in the
jury members?

        MS. STOKMAN:  I'm sorry.  No.

        MR. REED:  No, Your Honor.

        MS. LUEM:  Your Honor, we have Mr. Johnson.  We would
like to make a record concerning something that we noticed
early on when we received the questionnaires in this case,
that there were a number of irregularities, and it looked like
and appeared kind of strange, but it looked like things had
been whited out and then written over and then perhaps
photocopied or scanned in before they were provided to us.

        During questioning of Juror Number 43, he indicated
to the Court that he wrote something in his questionnaire and
the clerk made him white it out.

        And so our concern, obviously, is that they were told

552

something, perhaps by the clerk or there was some communication with the clerk, that they not put any personal identifying information in their questionnaires, and then when they -- they did, they were reminded that they needed to take that out. Sort of reinforcing what led to Juror Number 18's concern, which is that he feared basically for his life and for retaliation from the Aryan Brotherhood or some other gang, perhaps.

And he said those comments, Juror Number 18, in front of the entire panel, basically that -- that he was frightened, that he felt intimidated, that he believed he may just return a verdict of not guilty for fear of harm coming to him or his family. He went on to say that, after the Court reminded him that the jury was anonymous, that anybody with money can find anybody and discover the identities of people these days with the internet.

Again, that was said after the comments by Juror Number 43, who told this Court that he was made to white out information, and then Juror Number 18, with those comments, I think at this point this entire panel needs to be excused and we should call in a new panel.

THE COURT: Comments by anyone else?

MS. FISHER-BYRIALSEN: We would join in in that motion, Your Honor.

MR. REED: Yes.

553

THE COURT:  Comments by the government?

MS. STOKMAN:  Judge, we don't think that's necessary. I mean, we'll defer to the Court on this, but there's been a lot of discussion and that's the nature of jury selection, where discussions are had in open court in front of the entire panel.

I think everybody is aware that their names were anonymous, and that it's probably not lost on them that that is just the way this Court is handling it.  The -- any lack of personal identifying information would go to the fact that they're only being referenced by jury number and not by their name, but the government does not believe an entire panel is necessary to bring in.

THE COURT:  All right.  The objection's overruled.

Anything else before we bring in the panel?

All right.  Let's go ahead and do that.

MS. LUEM:  I'm sorry.  I actually did have one other matter, and I don't know if it's something that we really need to address now.  We can definitely --

THE COURT:  I'm sorry.  I'm having trouble hearing you.

MS. LUEM:  Well, I'm not sure what's wrong with this microphone.  Maybe this one works.

Does this one work better?

THE COURT:  It sounds better, yes.

MS. LUEM:  Okay.  And we just want to note our objection to Mr. Bannick receiving daily transcripts.  He put in a request with --

THE COURT:  I've not approved that.

MS. LUEM:  Okay.  Thank you.

THE COURT:  Anything else?

MS. LUEM:  Not at this time.

THE COURT:  All right.  Let's go ahead and bring in the jury.

MS. FISHER-BYRIALSEN:  Your Honor, can I just -- I'm very sorry.  Can I just have one moment before we bring them in?

THE COURT:  Sure.

MS. FISHER-BYRIALSEN:  Your Honor, may I --

THE COURT:  Yes.

MS. FISHER-BYRIALSEN:  Mr. Clement is bringing to our attention that him and Mr. Stinson and Mr. Johnson are being X-rayed twice a day.  And he's concerned, for health reasons, that that is a lot of X-raying if that's going to keep going on.

THE COURT:  You mean he's going through the magnetometer?

DEFENDANT CLEMENT:  I don't know what it is.  It's an X-ray machine.

THE COURT:  When you say "an X-ray machine," an X-ray

555

machine is used in the hospital to look at your bones.

Are you talking about a security device that you have to go through?

MS. FISHER-BYRIALSEN:  Yeah.

THE COURT:  That's a magnetometer.  It doesn't have the same properties that you're concerned about.  On the other hand, that's exactly what jurors go through coming into the building, everyone comes in through the magnetometer.  Even our employees come in through the magnetometer.

DEFENDANT CLEMENT:  Is there a health risk if we do it twice a day for months?

THE COURT:  Our employees do that at least twice a day when they come in, go to lunch, come back.  That is just a typical experience.  It's what you do at the airport.

This is not the same thing as you're thinking about when you -- radiologist looks and has to wear lead to protect the rest of their body.  That's not the same type of technology.

MS. LUEM:  Your Honor, I think it's a body scanner is what the --

THE COURT:  I don't know what you're talking about, what a body scanner is or where that's occurring.

DEFENDANT CLEMENT:  It moves around the whole body.

THE COURT:  All right.  Maybe I can hear from the Marshals Service.

U.S. MARSHALL:  Good morning, Your Honor.  From my understanding, it is a full-body scanner, but from my understanding, it's the same as a magnetometer, it just shows if there's metal present on their body or a foreign object on their body.  It's not a full X-ray of.

THE COURT:  I'm kind of picturing like what you do when you go through the airport, you put your hands up.

U.S. MARSHALL:  Yes, Your Honor.

THE COURT:  All right.  That's a very typical thing we all experience.

And you're -- from the Marshals' perspective -- Mr. Clement is saying this is happening twice a day.

When is this happening?

U.S. MARSHALL:  Your Honor, it's Fresno County's policy that they -- prior to transport, they're going through it in the morning.  And then prior to reentering the facility at night, they're going through it.  It's the same equipment that any person that is brought into Fresno County is put towards.

So any inmate that's booked into Fresno County goes through the same equipment every time.

THE COURT:  Okay.  And is that in lieu of a body cavity search?

U.S. MARSHALL:  Yes, Your Honor.

THE COURT:  All right.  All right.  Again, that type

of technology is common practice.  It's what our own

employees --

DEFENDANT CLEMENT:  Okay.

THE COURT:  I'm not a doctor.

DEFENDANT CLEMENT:  No, I know, but the health risk

THE COURT:  Can we get the microphone a little closer

to Mr. Clement.

I think what you said is you're asking me whether

there's a health risk to --

DEFENDANT CLEMENT:  Yes.

THE COURT:  Well, I'll tell you that obviously I'm

not a medical professional, but at least at this time I don't

think anyone has concerns about that.  But of course we all

used to eat Bologna and now they tell us that causes cancer

too.

So I can't say ultimately what the determination is

going to be, but at this point I don't have reason.  I go

through those machines just like anybody else.

DEFENDANT CLEMENT:  Okay.

THE COURT:  But, I mean, you may -- if you've

consulted with your doctor and your doctor has some concerns,

based upon your unique circumstances, I think that's something

that I need to hear about.

MS. FISHER-BYRIALSEN:  Your Honor, we will look into

this more and --

THE COURT:  I mean, even counsel goes through the magnetometer when they enter the building, when they leave for lunch, when they come back in, so --

DEFENDANT CLEMENT:  I understand it.  And I don't know if it does or it doesn't.  I have no problems with them, you know, incorporating whatever security concern that is necessary, right, but my thing is every day for months and months, what kind of effect is that going to have on my personal situation, you know, on anybody.

THE COURT:  Yeah.  Yeah, I'm not sure.  Like I said, if you have the opportunity to consult with your doctor, otherwise, that's what we all do.  That's what our employees have to do all day.

DEFENDANT CLEMENT:  All right.

THE COURT:  Okay.  Anything else before we bring in the jury members?

MS. FISHER-BYRIALSEN:  No.  Thank you.

THE COURT:  All right.  Let's go ahead and do that.

(Prospective Jurors enter the courtroom.)

THE COURT:  All right.  Good morning, everyone.
Thank you for returning this morning.

Let's go ahead and fill those seats that we have open.

THE CLERK:  Juror 73, you will take Seat Number 8.

Juror Number 74, you will take Seat 11, second row

559

from the top.

Juror 75, you will take Seat Number 16.

Juror Number 76, you will take Seat Number 17.

Juror Number 77, you will take Seat Number 18.

Juror Number 78, you will take Seat 24.

THE COURT:  All right.  Thank you very much.

I think we left off yesterday with Juror 51 sitting
in Seat 27.

Good morning, sir.

PROSPECTIVE JUROR 51:  Good morning.

THE COURT:  In looking at your questionnaire it looks
like you are -- are you still employed, sir, as an engineer?

PROSPECTIVE JUROR 51:  Yes.

THE COURT:  And you've been doing that for quite some
time?

Can we, I'm sorry, give him the microphone.

THE CLERK:  You have to turn it on.

PROSPECTIVE JUROR 51:  Hello.  Yup.

THE COURT:  There we go.

And so I was saying you've been an engineer for quite
some time; is that right?

PROSPECTIVE JUROR 51:  Correct.

THE COURT:  But with your current employer, for a
shorter amount of time?

PROSPECTIVE JUROR 51:  No, it was 28 years.

560

THE COURT:  Oh, okay.  I misread it.

And how -- what type of engineering do you do?

PROSPECTIVE JUROR 51:  I'm an outside plant engineer for a phone company.

THE COURT:  Okay.  You mentioned, like some others, that you've watched a TV show that might have some -- where gangs are a topic of that show; is that right?

PROSPECTIVE JUROR 51:  Yeah, similar to the other people, same thing.

THE COURT:  And you're able to set aside your experience watching this TV show and judging this case only on the evidence presented here?

PROSPECTIVE JUROR 51:  Correct.

THE COURT:  And you understand the difference between what you see on Netflix and what happens in real life?

PROSPECTIVE JUROR 51:  Yes.

THE COURT:  You indicated that maybe you got some knowledge about gangs when you were young.

What -- what do you mean by that?

PROSPECTIVE JUROR 51:  The city that I lived in, the -- it's two different gangs in town, just hear rumors of that.

THE COURT:  You didn't really have any contact with any of the gangs; is that true?

PROSPECTIVE JUROR 51:  I mean, I am not sure.  A lot

of it's secret, so no.

THE COURT:  Okay.  But at least you were aware of
gang activity, but you weren't directly or really indirectly
involved in that; is that true?

PROSPECTIVE JUROR 51:  Correct.

THE COURT:  Okay.  You indicated that you have some
concerns about your work if you're selected on this jury.  And
you said that you're only one of two employees that handle
4500 jobs in this area.

Help me to understand how even when you're there you
can manage that kind of a work load.

PROSPECTIVE JUROR 51:  Yeah, about six months ago, I
got promoted where I'm in charge of the designs for all of
Northern California with another peer.  And -- but it's --
it's more of an inconvenience, after watching the orientation
film.  So it's -- I will have somebody there.  It's just going
to be an inconvenience for a few people.

THE COURT:  Where do you normally -- what city do you
normally report to work to?

PROSPECTIVE JUROR 51:  Bakersfield.

THE COURT:  Okay.  So for you, it's not a matter of
being able to go back to the office too easily every day.  Can
you do some of that work remotely?

PROSPECTIVE JUROR 51:  I -- I probably could get a
waiver from my boss.  I would talk to them about that, but

we've currently been ordered back to the office full time.

THE COURT:  The reason I ask is, of course, given that distance, you are entitled to stay over, if that's more convenient for you.  Or even if you choose to do that, sometimes that might be -- if your boss would allow you to work from here, at least that might give you that option.

PROSPECTIVE JUROR 51:  Yes.

THE COURT:  All right.  You also indicated some other, you know, like you have a positive attitude about law enforcement, but you haven't really had any experiences one way or the other; is that true?

PROSPECTIVE JUROR 51:  That's true.

THE COURT:  And then you've had a relative involved in the criminal justice system -- criminal justice system.

The fact that that person was involved in the system, do you think that that would impact your ability to be fair in this case?

PROSPECTIVE JUROR 51:  No.

THE COURT:  All right.  Anything in your questionnaire that you feel is -- should be a concern for your ability to serve here?

PROSPECTIVE JUROR 51:  No.

THE COURT:  Anything that I haven't asked you about or that the questionnaire didn't ask you about that you think is something we should know about?

PROSPECTIVE JUROR 51:  No.

THE COURT:  All right.  Thank you, sir.

If you could pass the microphone down to Juror 28.
All right.

I know we've spoken a little bit, but let me just
follow up a little bit.

You described your job as service coordinator and
case manager.  And we talked about this a little bit
yesterday, but would you tell me just generally what your
day-to-day work looks like, what you do?

PROSPECTIVE JUROR 28:  Uh --

THE COURT:  Hello?

PROSPECTIVE JUROR 28:  Okay.

THE COURT:  There we go.

PROSPECTIVE JUROR 28:  So I help children with
special needs from zero to three years old, and I also help
train and support other staff on my team.

THE COURT:  When you work with these children, do
they come to your office, or do you go to their homes
generally?

PROSPECTIVE JUROR 28:  Generally, I go to their
homes.

THE COURT:  Okay.  And these are children with
different types of developmental delays?  Is that --

PROSPECTIVE JUROR 28:  Correct, yeah, or high risk

564

for developmental disability.

THE COURT:  Okay.  And are you giving them actual --
well, I guess I'm thinking of, is it behavioral training
therapy?

PROSPECTIVE JUROR 28:  So what I do, we don't provide
direct therapy.  We actually pay other vendors to provide that
therapy for them.  So we just -- what I do is just navigate
services that they can receive.

THE COURT:  Oh, I see.  Okay.

You express some concerns about your work schedule.
Can you tell me a little bit about what that situation is?

PROSPECTIVE JUROR 28:  What -- that it would just
effect my schedule of -- of going in.

THE COURT:  And I'm sorry.  What city do you work in
again?

PROSPECTIVE JUROR 28:  In Fresno, but I do serve
Fresno County.  So I can go up -- I can drive up to, like, two
hours from here.

THE COURT:  Okay.  Are you able to schedule those
appointments yourself, or does somebody else schedule them for
you?

PROSPECTIVE JUROR 28:  I schedule them myself.

THE COURT:  Would you be able to set those in the
afternoons?

PROSPECTIVE JUROR 28:  Uh-huh, yes.

565

THE COURT:  Okay.  Are there other concerns about work that I haven't asked you about or that you feel like would be important to share?

PROSPECTIVE JUROR 28:  I think just possibly, like, the financial hardship.  My employer does pay two weeks of jury duty.  And I do have about two weeks of vacation that I could use, but if it goes after that, then I would have to go unpaid.

THE COURT:  I'm sorry.  Do you work for a public agency or a private agency?

PROSPECTIVE JUROR 28:  It's a private agency.

THE COURT:  All right.  Is there anything else that I haven't asked you about that you think would be important for us to know?

PROSPECTIVE JUROR 28:  No.

THE COURT:  All right.  Thank you very much.

PROSPECTIVE JUROR 28:  Okay.

THE COURT:  Let's see.  Juror 52, you indicate that you are a business banker.  Is that someone who helps finance businesses?

PROSPECTIVE JUROR 52:  Yes.  So taking the lending applications, working with start-up businesses, all the way to businesses that have been established for at least 30 years with system -- with everything, including lending.

THE COURT:  But sometimes there might be these

566

established businesses want to expand --

                PROSPECTIVE JUROR 52:  Yes.

                THE COURT:  -- or maybe even just short-term needs
for money management of some sort?

                PROSPECTIVE JUROR 52:  Correct.

                THE COURT:  Okay.  And do you work for a traditional
lender?

                PROSPECTIVE JUROR 52:  It's a local credit union.

                THE COURT:  Okay.  You say that you have a very
positive attitude about law enforcement.  It sounds like
that's just based on the nature of the work that they do; is
that true?

                PROSPECTIVE JUROR 52:  Yes.  And I have two family
members that work in Visalia and Bakersfield that are a
detective and a police officer.

                THE COURT:  The one in the Visalia, is -- is that
person the detective or the --

                PROSPECTIVE JUROR 52:  Yes.

                THE COURT:  How long has that person been in law
enforcement?

                PROSPECTIVE JUROR 52:  I want to say about five
years.

                THE COURT:  And what type of crime is -- is this
person assigned to investigate?

                PROSPECTIVE JUROR 52:  Uh, typical, just criminal.

THE COURT:  So this person, I say he, but he or she is not assigned to a particular bureau in the --

PROSPECTIVE JUROR 52:  I'm not too entirely sure. It's my sister-in-law.

THE COURT:  When you see your sister-in-law, does she talk about the work that she does?

PROSPECTIVE JUROR 52:  Not too much.  More when she speaks to my wife, it's her sister, sometimes she'll talk about certain investigations that she's dealing with or paperwork that she's working on.  I want to say she just recently bought a house where we live, and so she's going to be transferring to Bakersfield.

THE COURT:  Okay.  Was she in law enforcement before she went to Visalia?

PROSPECTIVE JUROR 52:  No.

THE COURT:  Okay.  That's a pretty quick advancement from entering a police department to detective.  I mean, usually that's a -- so she must be pretty advanced at what she's doing.

PROSPECTIVE JUROR 52:  Yeah.

THE COURT:  And you say that she -- has she already been hired by an agency in Bakersfield?

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  Okay.  And you also mention that you have another relative who works in law enforcement in Bakersfield.

PROSPECTIVE JUROR 52:  It's her husband.

THE COURT:  Oh, her husband.  Is it police department or the sheriff or something else?

PROSPECTIVE JUROR 52:  It's the sheriff.

THE COURT:  How long has that person worked for the sheriff?

PROSPECTIVE JUROR 52:  I want to say they went to the same -- about five years as well.

THE COURT:  Do you know what her husband's job is?

PROSPECTIVE JUROR 52:  Just a sheriff deputy.

THE COURT:  Is that person on patrol then?

PROSPECTIVE JUROR 52:  Yes, at night.

THE COURT:  Do you have opportunity to speak with that relative about his work?

PROSPECTIVE JUROR 52:  He doesn't talk too much about it, but, I mean, they live about five minutes away from us, so they're pretty close now.

THE COURT:  So they've already moved to Bakersfield?

PROSPECTIVE JUROR 52:  He's in the house, she's working on the transfer, the background investigation for her to get transferred usually can take a couple months, so she's just waiting for that process to finish.

THE COURT:  Okay.  Whatever information they've given to you about their work, do you think that that's something that you could set aside and decide this case only on the

evidence presented here?

PROSPECTIVE JUROR 52:  Of course.

THE COURT:  Sometimes people -- I guess I want to make sure that if you are selected on this jury and you come to a verdict, will you feel like you have to go home and explain yourself to these relatives?

PROSPECTIVE JUROR 52:  No.

THE COURT:  Would they expect you to do what you consider to be the right and correct thing in this case?

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  And if you hear testimony from law enforcement, would you evaluate that testimony just as you would any other witness?

PROSPECTIVE JUROR 52:  Of course.

THE COURT:  It looks like you had -- your brother had an experience quite some time ago in a theft-related crime; is that right?

PROSPECTIVE JUROR 52:  It was -- it was more of -- well, I had a family member that had dealt with -- they're gang affiliated.  It was, I guess, a few cousins of mine, but they are now deceased.

THE COURT:  All right.  Do you remember what gang that was?

PROSPECTIVE JUROR 52:  It dealt with one in Kern County.  I'm not too entirely sure, but just it was quite

a few of them there.

THE COURT:  And you're saying that the members of your family who were part of that gang have -- have all -- have died?

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  When they were involved in that activity, did you have any contact with them or know what was happening?

PROSPECTIVE JUROR 52:  No.

THE COURT:  Since that time have other family members talked to you about that incident or about the lifestyle they were involved in at that time?

PROSPECTIVE JUROR 52:  No, just during, I'd say during like when we met with the funeral or the wake, that's when we kind of got to understand a little more.

THE COURT:  All right.  So it was actually by the time they were already gone you learned about this?

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  You've also indicated that you have some basic information about the Aryan Brotherhood from movies; is that right?

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  Okay.  And you understand, of course, that movies are different than real life.

Is it fair to say that you can set that aside in this case and, again, decide the case only on the evidence

presented here?

PROSPECTIVE JUROR 52:  Of course.

THE COURT:  You've expressed that you have some concerns about your finances.  Because it sounds like you get only 20 days of pay; is that true?

PROSPECTIVE JUROR 52:  Yes.  So my job will cover 20 days.  With the three we've used now, it's about 17.  If trial starts next Wednesday, then it would be, you know, whatever remaining time from there.

I do have PTO, roughly about 157 hours.  80 hours of sick, and then I think -- we have floating holidays, so it's 16, so I think it came out to, like, 253, when I was doing the math.  But if I was selected, I could ask my supervisor to see if they would be willing to give me a laptop and I could work remotely, because most of my job can be done remotely.

But it would -- running the math, it would cover up to 12 weeks if I used it, but that was time that I was planning on using for bonding for -- I was planning on at least taking four weeks for my son that will be born in April.

THE COURT:  Okay.  Do you think if we -- when we take a break, you'd be able to give a call to your boss and ask whether you could work remotely if you're selected on the jury?

PROSPECTIVE JUROR 52:  Of course.

THE COURT:  Okay.  If you would do that for me and

then we can talk about this after the break.

PROSPECTIVE JUROR 52:  Okay.

THE COURT:  All right.  Thank you.

Let's see, anything else that I haven't asked you about that you feel like would be important to share?

PROSPECTIVE JUROR 52:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 52:  Yeah.

THE COURT:  Juror Number 30, you indicate that you are a program manager.

What type of work do you do?

PROSPECTIVE JUROR 30:  I manage -- so I work for the Navy.  I manage investment funding for ranges and testing facility bases.

THE COURT:  That's interesting.  I would never have thought that that's a thing that the Navy needs.

PROSPECTIVE JUROR 30:  Yeah, so there's different kind of funding that's available for these organizations that need to improve equipment, instrumentation, stuff like that so they can do their mission.  That funding doesn't come out of, you know, regular payroll and stuff like that.

THE COURT:  Okay.  And you are a non -- what do you call it -- a civilian employee; is that correct?

PROSPECTIVE JUROR 30:  Correct.

THE COURT:  Were you prior military?

PROSPECTIVE JUROR 30:  No.

THE COURT:  You indicate also that you have a positive attitude toward law enforcement, and you say, hey, you get it, sometimes there's bad people in every position, or every type of work, and that you will -- and you realize that.

Is that saying, too, that you would be able to evaluate the testimony of law enforcement just like you would any other witness?

PROSPECTIVE JUROR 30:  Yes.

THE COURT:  And looks like in 1992 you had your car broken into.

Did that matter ever resolve?

PROSPECTIVE JUROR 30:  No, it was when I was in college and somebody kicked the window in, stole a few things. It was -- it was nothing.

THE COURT:  Okay.  Probably -- did your insurance cover that and then you --

PROSPECTIVE JUROR 30:  Yes.

THE COURT: -- just moved on?

PROSPECTIVE JUROR 30:  (Nods head.)

THE COURT:  Okay.  You said that some years ago you had a relative, your husband's uncle, who was a victim of violent crime.

Was that -- was that murder ever solved?

PROSPECTIVE JUROR 30:  It was, actually.  I

574

remembered later the whole story and it was -- it was
basically the ex-boyfriend of his current boyfriend.

THE COURT:  Okay.  Do you know if that person was
prosecuted and convicted?

PROSPECTIVE JUROR 30:  I assume.  I really don't
know.  It was probably close to 30 years ago.

THE COURT:  Okay.

PROSPECTIVE JUROR 30:  It was a while ago.

THE COURT:  Were you married to your husband at the
time?

PROSPECTIVE JUROR 30:  It was right before we got
married.

THE COURT:  Do you remember at the time having
details about it?

PROSPECTIVE JUROR 30:  Uh, yeah.  I kind of know sort
of what happened.

I had met him a few times, so I did have somewhat of
a personal connection, but it was in Iowa, so we weren't
close, close by or anything, but --

THE COURT:  And given the nature of your relationship
with him and the years that have passed, do you think that's
something that would impact your ability to be fair in this
case?

PROSPECTIVE JUROR 30:  No.

THE COURT:  Okay.  You've indicated that you've also

gotten some information from the news or media related to gang

violence.  Is that just an interest of yours, is that just

because sometimes it pops up on the news?

          PROSPECTIVE JUROR 30:  Yeah, it just pops up on the

news.  I've never really lived anywhere -- I've never been

personally impacted or been around anything.

          THE COURT:  Okay.  All right.  Is there anything else

that I haven't asked you about that you feel would be

important to share?

          PROSPECTIVE JUROR 30:  I don't think so.

          THE COURT:  All right.  Thank you.

          Juror 53.

          Are you currently employed?

          PROSPECTIVE JUROR 53:  Yes.

          THE COURT:  Okay.  And you work at a restaurant; is

that right?

          PROSPECTIVE JUROR 53:  Yes, a cafe.

          THE COURT:  Okay.  And you cook and make pastries.

Is that your life calling or is that just what you're doing

now?

          PROSPECTIVE JUROR 53:  It's something that I enjoy,

yeah.

          THE COURT:  Okay.  You say that you have plans to

return to school.  Do you have -- are those plans that are in

place or is that just something you're considering for the

future?

          PROSPECTIVE JUROR 53:  Something that I'm
considering.

          THE COURT:  Do you know what type of course of study
you'd be interested in?

          PROSPECTIVE JUROR 53:  Uh, as of right now, maybe in
business.

          THE COURT:  Okay.

          PROSPECTIVE JUROR 53:  Yeah.

          THE COURT:  You say that your sister is a probation
officer and she works mostly with juveniles?

          PROSPECTIVE JUROR 53:  Yes.

          THE COURT:  How long has she been in that job?  You
said since 2015?

          PROSPECTIVE JUROR 53:  Yes.

          THE COURT:  And you said through 2025.  Does that
mean --

          PROSPECTIVE JUROR 53:  Well, she's still -- she's
still working there.

          THE COURT:  Just through present.

          PROSPECTIVE JUROR 53:  Yeah.

          THE COURT:  Okay.  And has that been something that
she always wanted to do as a kid or just she kind of fell into
that work?

          PROSPECTIVE JUROR 53:  Uh, I don't know.

577

THE COURT:  Okay.

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  Does she ever talk to you much about what she does?

PROSPECTIVE JUROR 53:  No, other than -- what is it -- sometimes she'll have, like, rough days, like she'll have to separate kids from fighting.  That's it, yeah.

THE COURT:  Does she work within a facility or does she go out and make contact with kids in their homes?

PROSPECTIVE JUROR 53:  She works in the facility, yeah.

THE COURT:  Is this with kids who have been in trouble with the law?

PROSPECTIVE JUROR 53:  Yes.  Or have been arrested of something, but I don't know, yeah.

THE COURT:  Okay.  And you said that you have sort of a neutral attitude toward law enforcement.  And that's not because you've had any good or bad experience, it's just maybe what you've seen on the media or just from your personal concerns; is that right?

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  Given your neutral attitude, are you able to evaluate evidence fairly in this case and set aside that attitude?

PROSPECTIVE JUROR 53:  Yes.

THE COURT:  You express that you have some concerns about if you're not able to work.

Tell me about who you are supporting with your income.

PROSPECTIVE JUROR 53:  Uh, so I'm helping my dad and my brother pay for the bills.  And my job does not pay for jury duty.  So I think that would be a problem if I didn't work.

THE COURT:  Does your dad and your brother work as well?

PROSPECTIVE JUROR 53:  Yes, they do.

THE COURT:  And are you supporting then yourself and help supporting your dad and your brother?

PROSPECTIVE JUROR 53:  Yes.

THE COURT:  In the cafe that you work for, is that -- is that a family business or is that just someplace you work?

PROSPECTIVE JUROR 53:  It's a family -- family business, yeah.

THE COURT:  Do your brother and your dad also work in that business?

PROSPECTIVE JUROR 53:  No.  That business is my -- I would say my in-laws'.  So my sister's husband's family.

THE COURT:  How many hours do you normally work per week?

PROSPECTIVE JUROR 53:  I work eight hours.

579

THE COURT:  Eight hours a day?

PROSPECTIVE JUROR 53:  Yeah, a day.

THE COURT:  How many days per week, five?

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  So basically a 40-hour workweek?

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  And the cafe, is that open for all three meals?

PROSPECTIVE JUROR 53:  What was that?

THE COURT:  Is the cafe open breakfast, lunch, and dinner?

PROSPECTIVE JUROR 53:  Just breakfast and lunch.

THE COURT:  And, I'm sorry, what is the city that your -- it's here in Fresno that you work?

PROSPECTIVE JUROR 53:  Yes.  Yeah, Fresno.

THE COURT:  And so you leaving work -- or jury duty at 1:30, you can't go -- or could you still go to work and do a half day of work?

PROSPECTIVE JUROR 53:  No, I can't.

THE COURT:  Normally, when -- what time do you start your day at the cafe?

PROSPECTIVE JUROR 53:  6:00 a.m. to 2:30 p.m.

THE COURT:  And can any of the work that you do in making pastries or anything be done after 2:30?

PROSPECTIVE JUROR 53:  No, because we close at 3:00.

So we spend that one hour to clean, so forth.

THE COURT:  And then when you get in in the morning at 2:30, that's when you start your preparation of the food?

PROSPECTIVE JUROR 53:  Yes.

THE COURT:  What time does the restaurant actually open?

PROSPECTIVE JUROR 53:  At 7:00 a.m.

THE COURT:  Do both your brother and your dad work full time as well?

PROSPECTIVE JUROR 53:  Yes, they do.

THE COURT:  And does it require all three -- the income from all three of you to be able to support your household?

PROSPECTIVE JUROR 53:  Yes.

THE COURT:  What would be the plan if you were selected on jury service to, you know, pay the bills?

PROSPECTIVE JUROR 53:  Uh, that I wouldn't know. Yeah, I'm going to have to talk to my family about that.

THE COURT:  How long have you been working full time?

PROSPECTIVE JUROR 53:  For, I would say, six months. I've been working there for nine months, but I haven't started full time until when I was in -- three months in.

THE COURT:  All right.  Is there anything else I haven't asked you about that you think is important for us to know?

PROSPECTIVE JUROR 53:  No, other than my mom and my dad do rely on me to help them pay the bills and that's it.

THE COURT:  Oh, I'm sorry, I didn't ask about your mother.

Your mother is also in the household?

PROSPECTIVE JUROR 53:  Yes, but she doesn't work.

THE COURT:  Is she unable to work?

PROSPECTIVE JUROR 53:  Uh...

THE COURT:  Or just she just hasn't worked outside the home?

PROSPECTIVE JUROR 53:  Yeah, she just hasn't worked. She watches my nieces and nephews for my other siblings whenever they work.

THE COURT:  Okay.  How old are those kids?

PROSPECTIVE JUROR 53:  I would say ages from one to five, to six.

THE COURT:  Okay.

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  All right.  Anything else that you think that we should know about?

PROSPECTIVE JUROR 53:  No.

THE COURT:  All right.  Thank you so much.

Let's see.  Juror Number 54 in Seat 32.

PROSPECTIVE JUROR 54:  Yes, good morning.

THE COURT:  We've talked quite a lot already, but I

didn't have a chance to ask you about what a medical
investigator is.

Is that somebody related to public health?

PROSPECTIVE JUROR 54:  Yes.  I work for the State of
California, Department of Public Health, and every
conversation that I have at work outside of the four walls
where I'm in would be considered sexual harassment.  I do STD
and HIV and monkeypox contact tracing trainings.  That's what
I do for a living.

THE COURT:  Okay.  And how long have you been in that
field?

PROSPECTIVE JUROR 54:  I was hired right out of
college in 1992.

THE COURT:  Okay.  Is your background then in public
health?

PROSPECTIVE JUROR 54:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR 54:  Yeah.  That's the only job
I've ever done, right.  So I can tell people that the only
thing I know how to do is talk about sex.

THE COURT:  Maybe that's not funny for everyone else.

PROSPECTIVE JUROR 54:  And I just say that for shock
value, but it is true, that's what I do every day.

THE COURT:  Oh, that's funny.

You also have indicated that you feel like there are

good and bad people in all occupations.

PROSPECTIVE JUROR 54:  That's correct, yeah.
Including ours.  Including mine, yeah.

THE COURT:  And you're able to set aside your
feelings about that and judge this case only on the evidence
presented here?

PROSPECTIVE JUROR 54:  Yes.

THE COURT:  You've indicated that, you know, in the
course of your work you say you work with drug users and
criminals on a daily basis.

PROSPECTIVE JUROR 54:  Yes.

THE COURT:  When you say that, you know, some of the
diseases you're talking about probably can be communicated
through needles or otherwise.

PROSPECTIVE JUROR 54:  Right.

THE COURT:  When you say "criminals," are you saying
that people who have come out of the criminal justice system
and you know that they have had convictions?

PROSPECTIVE JUROR 54:  Well, Kern County is top heavy
with reception centers for the state, CDCR.  They get screened
for mental health and communicable diseases, right.

So I haven't done this in a couple of years, but
other people do, but we -- if you test positive for HIV, we've
got to go in there and give you -- sometimes give you your
results and find out, you know, who did you share needles

with, who do you have sex with, did you have sex while incarcerated, you know.  So we have to find the source to stop the spread of the disease.

So I don't go into Chowchilla, but all of the -- our men, right, and obviously there they've been -- gone through a trial and have been convicted.  And, you know, you just can't have -- it's not a five-minute conversation, right.  You have to gain their trust, you know, confidentiality, have them open up.  What are you in here for?  Everything from, I got three DUIs, that's why I'm here; to, I'm doing life, right.

So, you know, you just -- everybody --

THE COURT:  So it sounds like you actually go into the facilities and talk --

PROSPECTIVE JUROR 54:  I haven't done it in a while because we've relegated that responsibility to the counties, right.  But if there's an outbreak -- like we had an HIV outbreak at CMC, which is in California's Men's Colony, right. We have documented men who went in negative.  Two, three years later, now they're positive.  How is that happening, right?

So we have to go in there and find out, do a bunch of interviews, you know, yeah.  Who do we need to, you know, notify, who needs to be on antivirals, right, to suppress your viral load so you don't spread it if you are having sex in the institution.

THE COURT:  And so you say you leave the counties to

handle their own contact tracing.

And so those are the local jails; is that right?

PROSPECTIVE JUROR 54:  For -- well, they -- for --
they get -- you don't get screened for STDs or for
communicable diseases at the county jail unless you have
symptoms.

THE COURT:  Okay.

PROSPECTIVE JUROR 54:  It's not until you get -- or
you go to the --

THE COURT:  The Wasco --

PROSPECTIVE JUROR 54:  -- get sentenced and you're
going to get screened, you go to one of the reception centers,
either Tehachapi, Wasco, or Delano, right, that that's where I
would go in.

THE COURT:  Okay.  And how long ago was it that you
said that you used to do that, where you would go into --

PROSPECTIVE JUROR 54:  We stopped doing that about
five years ago.  However, you know, right now we're having a
problem with methamphetamines, you know, homeless, right,
they're in and out of jail.  You know, they develop a rash,
they get screened, they get released, you've got to go find
them, bring them in for treatment, right.

So, yeah, so unfortunately, if you have
multidrug-resistant gonorrhea, TB -- no, multidrug-resistant
gonorrhea or syphilis, you either have been in jail, using

586

methamphetamine, or homeless.  Right?  That's the three, you
know, high-risk groups that we're dealing with.

        So they're all in and out of jail.  The first thing
they think of when I knock on their door or I call them, I'm
law enforcement, so --

        THE COURT:  So that's a -- like you say, you have to
establish that trust by first --

        PROSPECTIVE JUROR 54:  Absolutely, yeah, within the
first minute, you know.

        And I like the example that was given, that every
time they tell you something it's like a rose, right, you have
a bouquet.  I'm going to use that when I -- next time I do
a -- I interview someone, you know.

        THE COURT:  Now, given the way that it's set up, it
sounds like you are actually out on the street trying to find
people?

        PROSPECTIVE JUROR 54:  I'm stationed in Kern County,
and whenever there's a county that has -- that needs
assistance, you know, because they're -- they're
labor-intensive, right?  Who wants to go to San Diego?  I'll
go, right?  I mean, who doesn't want to go work in San Diego
or Sacramento, right?  So everywhere, I've responded to
disease outbreak throughout the entire State of California
since '92.

        THE COURT:  Okay.  And when you were going into the

facilities, are those the ones that you've mentioned already?

            PROSPECTIVE JUROR 54:  Yeah.

            THE COURT:  Okay.

            PROSPECTIVE JUROR 54:  Yeah.

            THE COURT:  And then if there's an outbreak, then you
would be dispatched to that particular facility?

            PROSPECTIVE JUROR 54:  They usually ask for
volunteers, right?  And since I don't have, you know, anything
holding me down, I -- I'll do it.  You know, I have been doing
it so long that it's almost like if they -- I'm volun-told,
you know.

            THE COURT:  Yeah, I do know that concept.

            PROSPECTIVE JUROR 54:  Yeah.

            THE COURT:  All right.  So you then have some
familiarity of the layout of the institution?

            PROSPECTIVE JUROR 54:  Absolutely, yeah.

            THE COURT:  And how to enter and exit, that type of
thing?

            PROSPECTIVE JUROR 54:  Exactly.  I would be -- once
you get your -- you pass a background check, right, I know who
I'm going in.  So I'll go into -- you know, I'll say, Reyes,
you know, 152, upper.  Grab your ID.  Come in for an
interview.  Reyes hears me, They get out their ID.

            And I'll do the interview either in the -- in a broom
closet, if there isn't any -- because sometimes there's too

many correctional officers in the office and, you know, I can't kick them all out, right?  And it's going to be an -- you know, at least an hour or half hour or -- you know.  Yeah.

THE COURT:  So it sounds like that you've had -- you obviously have experience in going in these facilities, and your experience is pretty recent.  But you appreciate also that facilities change, missions change, layouts change, security requirements change.  Would you be able to set aside your past experience in these facilities and evaluate the evidence as it comes in in this case?

PROSPECTIVE JUROR 54:  Our mantra is to be nonjudgmental, okay?  Yeah.  That's a -- you know, I -- because I speak to everyone under the sun from, you know, judges, to lawyers, to --

THE COURT:  Wait.  We've never met, right?

PROSPECTIVE JUROR 54:  Yeah, right.  That is correct. That is correct, yeah.  But, yeah, so our mantra is you have to be nonjudgmental, right?

THE COURT:  Okay.

PROSPECTIVE JUROR 54:  Yeah.  Because obviously, you need to have them be open and share with you basically their deepest, darkest sexual secrets, right?  I need to get it out of you.  What's going on, how did you get this disease.  It's very emotional, right?  So it's not a five- or ten-minute conversation.

I do get a lot of people hang up, but then you have
to go to their home.

THE COURT:  Okay.  So you --

PROSPECTIVE JUROR 54:  I'm working with your
physician.  It's -- it's important that we have this
conversation.  How do we get your wife, how do we get your
husband.  Let's start there, right?

THE COURT:  Okay.

PROSPECTIVE JUROR 54:  Especially if it's HIV or
monkeypox.

THE COURT:  Okay.  Now, you said that it's your job
to be nonjudgmental, to receive information.  Now, in this
case, it's very similar to that.  During the trial process,
during the presentations of evidence, you will need to receive
the evidence and then withhold judgment until after the
presentation of evidence, after attorneys have argued --

PROSPECTIVE JUROR 54:  Correct.

THE COURT:  -- and then after you listen to the views
of your fellow jurors and you express your own.  And then that
is the time when you'd have to make a judgment.

PROSPECTIVE JUROR 54:  Absolutely, yeah.

THE COURT:  And you're able to do that, you think,
sir?

PROSPECTIVE JUROR 54:  Yes, yeah.

THE COURT:  And I don't know that I asked you.  You

work for a public agency; is that right?

          PROSPECTIVE JUROR 54:  Yeah, the Department of Public
Health.

          THE COURT:  Okay.  Given your experience, you've
gotten some information about gangs it sounds like; is that
right?

          PROSPECTIVE JUROR 54:  Yeah.  Well, you know, you --
you have to ask, you know, everybody, you know, Are you
associated with any gang?  What are you known on the street?
What do they call you, right?

          And then after a while, you know, I can pretty much
say, Okay, where do they live, the ZIP Code and the census
tract, their age, or they belong to this gang.  Or chances are
very high that they, you know, are here, you know.

          THE COURT:  And that's because you go into these
areas that --

          PROSPECTIVE JUROR 54:  You know, you just -- you
know, it -- you -- you have to become familiar with the area
that you serve, right?  I mean, for example, if I were to --
if you were to get a monkeypox case in a certain ZIP Code or
census tract, you're like, Hey, this doesn't fit the profile.
What's going on?  This is a priority.  We need to go in.

          THE COURT:  Okay.  All right.  We talked to you
before.  Is there anything else that you feel like we need to
talk about that we haven't talked about thus far?

PROSPECTIVE JUROR 54:  I just received a phone call from a physician, and I'd like to speak to you, the Court, during break.

THE COURT:  Okay.  All right.  We are going to go ahead and take our first break.  Let's go ahead and plan that for, let's say, a quarter till.

And then, sir, what we'll have you do is we'll bring you back about five minutes early, if you'll be outside.

All right.  Again, ladies and gentlemen, please don't form any opinions about this case.  Please don't discuss the case.  Please don't allow anyone to discuss it with you.  And please don't do any research on your own, including searching the internet, or viewing any media.

All right.  Thank you very much.

(Prospective Jurors exit the courtroom)

THE COURT:  All right.  Our jury members have stepped out.  Let's go ahead and plan to be back at -- you know, in -- in 15 minutes.  Thank you.

(Recess held from 9:25 a.m. until 9:44 a.m.)

THE COURT:  Okay.  We have everyone back.  Let's go ahead and bring back in Juror Number 54.

(Juror 54 enters courtroom.)

THE COURT:  Oh.  Wherever, sir, is more comfortable.

PROSPECTIVE JUROR 54:  Good morning.

THE COURT:  Good morning.  So when we last left off,

you indicated that you received a call from your medical provider?

PROSPECTIVE JUROR 54:  Yeah.  So in October, I had a ruptured appendix that required two emergency surgeries.  They were not able to remove it completely, and I was told recurrences are common, okay?

I spent all day at Kaiser on Monday.  All the test results came back negative.  No blood, no infection on -- the CBC was normal.  Urine test was normal.  Everything was normal.  MRI was normal.

I'm talking to the doctor, Then what do I -- what's causing the pain?

He says, Well, we did cultures.  Take up to three days.  Just like when, like, my appendix ruptured.  I got a call yesterday.  He says, I've been trying to get ahold of you all day.

I says, My phone has been off.  I'm at jury duty. And it came back positive for one.

And I go, What does that entail?

He says, Well, it's highly unusual based on your MRI that you would test -- cultures would test positive.  So I want you to get another one.

So I drove yesterday all the way to Bakersfield, provided another urine.  I talked to the doctor.

He says, If this one tests positive, it's an IV

medication, it's every four hours, you have to be hospitalized.

When will I know?

In three days.

Well, is that what's causing the pain?

More than likely, but you don't fit the profile at this point, right?

So he -- all my results came back negative again, like on Monday, okay?  But we're waiting for the three days to find out what the culture is.  If it's positive, then that -- well, what else is causing the pain, right?

It's in the -- like it's an IV antibiotic, and I'll be in the hospital until I have -- just like, I'll be released until you get two consecutive negative cultures before they let you go home.

So I told the doctor, You mean I'm going to be in the hospital like if my appendix had ruptured?

He says, Pretty much.

THE COURT:  So it's the same type of effect as a ruptured appendix?

PROSPECTIVE JUROR 54:  He said it's possibly associated with a leaky appendix, because with this MRI that they -- it's a -- they call it a stump.  So it's like a tree. They knock it all down.  When the -- the -- it ruptured so much, and I waited five days before I went in, right?  It --

594

because it wasn't painful at all.  My body and encapsulated,
right?

I had a great immune response, so that's why I didn't
go in until it was like, Okay, I -- I need to go in.  That's
why I developed an abscess, okay?  Yeah.

So he says, It could be a leaky gut, but it's highly
unlikely because nothing showed up in the MRI.  So that's why
they opted to do a second culture.

So I won't know if I'm available.  Now I'm thinking,
I don't want to go in the hospital.  I want to serve.  You
know, because -- you know, six days in the hospital, it's
the -- the food was horrible.  The bed is uncomfortable.  I
didn't sleep.

And it's -- you know, you can't go nowhere, right?  I
was at my wits' end after day two when it originally ruptured.
So I can imagine now just sitting in the hospital for, you
know, six days until you get two consecutive, if that's what
it is.

If it comes back negative, then I'm going to be
referred out to a specialist.  What the heck is going on, why
do I have the pain, and why do I have this original test that
came back positive?  So -- and, you know, that's it.

THE COURT:  So you -- you did the sample yesterday,
and they are expecting results.  Will they do it over the
weekend, or they'll expect the results Monday?

PROSPECTIVE JUROR 54:  It takes three days.  It takes three days.  So I -- so it -- the culture was taken on Monday, right?  And I got a call on Wednesday, right?  So --

THE COURT:  So then you got -- you did it Wednesday, and you're thinking --

PROSPECTIVE JUROR 54:  Thursday, Friday.  So maybe by Saturday, I should know, right?  Because I was prepared to call Monday, the court, and say, Hey, I thought I was going to be put back in the hospital.  Because when the doctor explains to you, like, if you get the appendicitis again, right, and it's -- and it's there, then we have to go in and remove it, right?

Unfortunately, they don't do those surgeries in Bakersfield.  They -- they would send me out to L.A. because it's considered reconstructive surgery.  So I won't even be doing it here.  I'll be doing it in L.A.  So I'm thinking, Great.

THE COURT:  Okay.  Okay.  Anything else about that situation?

PROSPECTIVE JUROR 54:  No, no.

THE COURT:  Okay.  All right.  Thank you, sir, if you'll just step out.

    (Juror 54 exits courtroom.)

THE COURT:  All right.  Any comments about Juror 54?

MS. STOKMAN:  It sounds like no matter what, he's

596

going to be potentially missing some days of service.

THE COURT:  It's hard to say.  I suppose if it turns out this is nothing and he's referred to a specialist, it could be months before you get to a specialist.  So I guess I just don't know.

If it turns out it is something, then we will lose a juror right way if he is ultimately selected.  That's how I see it, but comments from the defense, Ms. Byrialsen?

MS. FISHER-BYRIALSEN:  We agree with the Court.  I don't think it's time to let him go yet.

THE COURT:  Okay.

MS. LUEM:  I think we agree with the Court as well.  It's --

THE COURT:  Okay.  So, Mr. Reed?

MR. REED:  I agree with the Court, Your Honor.

THE COURT:  We'll hold off.  And if it turns out he sits on the jury, then we may end up losing our first alternate next week or -- yeah, having to use our first alternate next week.

All right.  Counsel, do you want to speak about 28, 52, and 53?  They all talked about hardship due to no pay.  I don't have a lot of -- I mean, I have sympathy for them, but I -- I'm more concerned about what you have to say, Ms. Stokman.

MS. STOKMAN:  Government believes that 28 and 53 have

clearly made a financial hardship due to the fact that they
don't get paid for the entire service.

52 potentially qualifies for that, but I think the
Court was waiting for him to get some more information during
the break.  And so we're holding off on that at the moment.

THE COURT:  Okay.  For the defense?

MS. FISHER-BYRIALSEN:  May have we have a moment,
Your Honor?

THE COURT:  Sure.

(Discussion off the record.)

MS. FISHER-BYRIALSEN:  Your Honor, I think jointly we
don't find a hardship on any of those jurors.

THE COURT:  I need to get you closer to the
microphone.

MS. LUEM:  It's on and off.  I can't tell when it's
on and when it's off.

Is that good?

THE COURT:  I can hear you now.  Yes.

MS. LUEM:  Specifically, with respect to the young
woman who works in her family bakery, she says she helps out
with the family bills.  I don't -- it doesn't sound like
they're dependent on her to actually pay the bills.  So I -- I
don't think that's -- rises to the level of a hardship.

And at this point we're getting pretty low on jurors.
I think, again, Number 52 is going to check with his employer

at the break.

THE COURT:  Right.  So we're talking about 28?

MS. LUEM:  Yeah, and 28, Judge, she did say she only had the two weeks' pay, plus two weeks' vacation, but she didn't express that it would be a particular hardship for her and that it would impact her ability to sit and fairly consider the case.  So I don't think it really rises to the level of some of the other people that said that were -- would be desperate or destitute or wouldn't be able to pay their bills.

THE COURT:  All right.  We'll leave them on at this time.

Anything else then before we bring in the jury?

Let's go ahead and do that then.

(Prospective Jurors enter the courtroom.)

THE COURT:  All right.  We have all of our jury members back in their places.

Juror Number 73, you're sitting in Seat 8.  Thank you for joining us.

When you were in the audience, did you listen to all the questions I asked?

PROSPECTIVE JUROR 73:  Yes, ma'am.

THE COURT:  Can we get the microphone back to her?  In the very back row to the end.

PROSPECTIVE JUROR 73:  Yes, ma'am, I did.

THE COURT:  Was there any information that you felt like you needed to share in response to those questions?

PROSPECTIVE JUROR 73:  (No response.)

THE COURT:  And you're saying no?

PROSPECTIVE JUROR 73:  No.

THE COURT:  Are you committed to being fair and impartial in this case?

PROSPECTIVE JUROR 73:  Yes.

THE COURT:  You indicate in your questionnaire that you are a strong supporter of law enforcement.  Is that just based upon the nature of the work that they do?

PROSPECTIVE JUROR 73:  Yes, it is.

THE COURT:  Will you be willing to evaluate the testimony of law enforcement officers just as you would any other witness?

PROSPECTIVE JUROR 73:  Yes, ma'am.

THE COURT:  You indicated when you were 21 that you were involved in a crime and that the matter went to trial and the person was convicted and sent to trial -- or I'm sorry, sent to prison.

Did you actually have to testify in that case?

PROSPECTIVE JUROR 73:  Yes, ma'am, I did.

THE COURT:  Did you feel like you were being treated fairly in that process?

PROSPECTIVE JUROR 73:  Yes, I did.

THE COURT:  Is there anything about that experience that you think would impact your ability to be fair in this case?

PROSPECTIVE JUROR 73:  No, ma'am.

THE COURT:  Did you suffer any sort of lasting effects as a result of that incident?

PROSPECTIVE JUROR 73:  No, I didn't.

THE COURT:  You also indicated that you had a cousin who had had a child murdered in 1985.

PROSPECTIVE JUROR 73:  Yes, ma'am.

THE COURT:  Was that a situation that you were aware of at the time?

PROSPECTIVE JUROR 73:  Yes, ma'am.

THE COURT:  And you also said that that case was resolved, the person was convicted and punished as a result; is that true?

PROSPECTIVE JUROR 73:  Yes, ma'am.

THE COURT:  Although that was obviously a very difficult thing for your family, is that something that you can set aside and decide this case only on the evidence presented here?

PROSPECTIVE JUROR 73:  Yes.

THE COURT:  You indicate that your work is the sole provider of income to your family, but as much as it would be difficult, you feel like you might be able to manage it if

601

you're selected on the jury; is that right?

         PROSPECTIVE JUROR 73:  Yes.  The girl that I was
going to use was just diagnosed with breast cancer on
Thursday, so she's going to be starting chemotherapy really
quick.  It's advanced, so I can try to work it out.

         THE COURT:  Okay.  And are those residences in
Kern County?

         PROSPECTIVE JUROR 73:  Yes.

         THE COURT:  And that's where you live as well?

         PROSPECTIVE JUROR 73:  Yes, ma'am.

         THE COURT:  And so it -- do you provide all of the
service to those locations, including cleaning them, getting
them ready?

         PROSPECTIVE JUROR 73:  Yes, ma'am.

         THE COURT:  So it's not only just what you do online,
you actually have to be there in person too?

         PROSPECTIVE JUROR 73:  Correct.

         THE COURT:  And so you're thinking that you might
have somebody else who might be able to assist you?

         PROSPECTIVE JUROR 73:  I'm working on -- she was
going to do it, but she won't be able to now for a while.

         THE COURT:  Okay.

         PROSPECTIVE JUROR 73:  My guests check out at 11:00,
and are back at 3:00, so --

         THE COURT:  How often are these homes rented?

PROSPECTIVE JUROR 73:  Every day.

THE COURT:  Wow.  And that's -- okay.

So you -- I guess to make it more profitable, you don't use a cleaning services typically?

PROSPECTIVE JUROR 73:  No.

THE COURT:  Who all do you support from this business?

PROSPECTIVE JUROR 73:  Myself and my daughter.

THE COURT:  Is your daughter an adult?

PROSPECTIVE JUROR 73:  Yes, she just turned 18.

THE COURT:  Does she work as well?

PROSPECTIVE JUROR 73:  No, she's in school still.

THE COURT:  Okay.

I'm sorry.  I misunderstood what you said.  Okay.

When you say "she's in school," she's still in high school --

PROSPECTIVE JUROR 73:  She's a senior in high school.

THE COURT:  Okay.  All right.  Anything else that I haven't asked you about that you think we should know?

PROSPECTIVE JUROR 73:  No.

THE COURT:  All right.  Thank you.

Juror 74 seated in Seat 11.

Let's see.  Are you currently working?

PROSPECTIVE JUROR 74:  Uh, no, ma'am.

THE COURT:  Are you being supported by somebody else?

PROSPECTIVE JUROR 74:  Yes.

THE COURT:  Okay.

You indicate that you have a very positive attitude related to some law enforcement, but that you had an experience with law enforcement getting a ticket.  It sounds like that wasn't a terrible experience, though.

PROSPECTIVE JUROR 74:  Oh, it was positive.

So I went to college when I was 18.  I'm currently 22 right now.

And basically what ended up happening was I was, uh, going through a period -- rough period of my life at the time. And when I got that traffic ticket, it made me realize that I need to focus on my mental health, also my time management, especially when it came to college.

So I actually view law enforcement, like, in a positive way, because I feel like it was one of the first episodes to get my life back together.

THE COURT:  And was the officer aware of this for you, or is it just a coincidence this is the trigger for you that turned things around?

PROSPECTIVE JUROR 74:  It was a huge coincidence, a positive one.

THE COURT:  Okay.  And then you feel like as a result of this, it put you on a different track and that you're going to be better able to handle when you go back to college?

PROSPECTIVE JUROR 74:  Correct, most definitely.

I'm actually -- I'm -- this isn't answering your question directly, but originally I was going to work, but I also had an option to study, so originally I was going to work first, and then study, but whenever this came up, I decided to go study.

I'm perfectly available to serve here.  I have nothing conflicting that would, you know, yeah.

THE COURT:  Okay.  Thank you.

You talked about an incident, gosh, in 2006 in which sounds like your father lost some money as a result of some -- an accountant who stole some money from him.

In 2006 you were pretty young, did you remember the situation or is that something you heard about later?

PROSPECTIVE JUROR 74:  It was real little.  I have no recollection of -- of the events at all.  I just knew it happened.

THE COURT:  Okay.  And like a lot of people, you received some information about gangs on the news when it comes up; is that right?

PROSPECTIVE JUROR 74:  Yes, ma'am.

THE COURT:  Have you had any personal experience related to gangs?

PROSPECTIVE JUROR 74:  Not directly to me, but I did have an aunt -- who I'm not sure.  But, like, I think she

might have, like, helped him out, but I never was really
connected with her.

THE COURT:  Okay.

PROSPECTIVE JUROR 74:  And in any certain form.

THE COURT:  So you think it was possible your aunt
was involved in some way in a gang.

Do you remember what the gang was, or did your ever
know that?

PROSPECTIVE JUROR 74:  No, I never talked to her.

THE COURT:  Okay.

PROSPECTIVE JUROR 74:  Basically.

THE COURT:  Okay.  So when you receive evidence in
this case, you're able to evaluate it without the baggage of
what's happened in the past or what a relative may be in
involved in; is that true?

PROSPECTIVE JUROR 74:  Correct, yes, ma'am.

THE COURT:  Okay.  Is there anything else that I
should ask you about that I haven't asked you about?

PROSPECTIVE JUROR 74:  Uh, no.

THE COURT:  All right.  Thank you, sir.

Juror 75 in Seat 16.

And, sir, you are also in the mental health field; is
that right?

PROSPECTIVE JUROR 75:  Yes.  I was.  I am, but I
would like to ask the Court to -- to be questioned in private.

THE COURT:  Sure.  We'll do that on the next break.
Thank you, sir.

PROSPECTIVE JUROR 75:  Okay.  Thank you.

THE COURT:  Let's see.  Juror 76.

PROSPECTIVE JUROR 76:  Good morning.

THE COURT:  And you are a project manager in
construction?

PROSPECTIVE JUROR 76:  Correct.

THE COURT:  You've been in that for quite some time?

PROSPECTIVE JUROR 76:  Over 20 years, yes.

THE COURT:  Where -- what city do you typically work
in?

PROSPECTIVE JUROR 76:  I work from home.  I travel a
lot overseas for the projects.

THE COURT:  Okay.  What type of projects -- I guess I
was thinking construction of, you know, building houses, but
you're talking about a whole different scale.

PROSPECTIVE JUROR 76:  Warehouses, like Costco would
be a typical client for us.

THE COURT:  Okay.

PROSPECTIVE JUROR 76:  Uh-huh.

THE COURT:  Okay.  And how often are you away for
work?

PROSPECTIVE JUROR 76:  I typically leave Sundays and
come back home on Fridays.

THE COURT:  That's every week?

PROSPECTIVE JUROR 76:  Not every week.  Every other week.

THE COURT:  Every other week.

And if you were selected on this jury, is this something that your work could accommodate?

PROSPECTIVE JUROR 76:  Well, I've been hearing the other jurors and their problems seem -- my problems seem minors compared to them.

THE COURT:  It is amazing how this process puts things in perspective, right?

PROSPECTIVE JUROR 76:  Yes.  Just for the record, Your Honor, I didn't put it as a hardship on the paperwork, but I will only get paid for a week of jury duty.  It's not something that is -- it's just discomfort, it's not something that is critical.  I've been fortunate to have the means to support myself after that.

THE COURT:  All right.  Thank you for sharing that, sir.

You have the experience of having some relatives who work in law enforcement, it looks like --

PROSPECTIVE JUROR 76:  Yeah, myself as well.  I was a deputy for a period of time.

THE COURT:  How long were you a deputy?

PROSPECTIVE JUROR 76:  For over a year, just --

THE COURT:  And in what city was that -- or county, I mean?

PROSPECTIVE JUROR 76:  Fresno County.

THE COURT:  And you did it for about a year?

PROSPECTIVE JUROR 76:  Correct.  It was -- it was, yes, a short time because I found out that I'm really not wired for it.  I was having issues at home and decided to find something else.

THE COURT:  Okay.  But you went through the academy and you got on the job, and then you're like, yeah, this isn't for me.

PROSPECTIVE JUROR 76:  My wife convinced me that I should find something else to do.

THE COURT:  And you know what they say, happy wife, happy life, so --

PROSPECTIVE JUROR 76:  Amen.

THE COURT:  You're a smart man, obviously.

But you still have other relatives in law enforcement.

PROSPECTIVE JUROR 76:  I do.  My wife's sister and husband are deputies for Kern County.  They retired recently -- well, not recently, preCOVID.

I grew up in that environment.  I have multiple friends, my generations.  I have a soccer team which the bulk of them were in law enforcement.  A district attorney played

with us.  I have many close relationships with them.  We're
pretty good friends.

        We don't see each other that much anymore.  We got --
all got old, but, yeah, have a good relationship.  Whenever we
see each other, it's like back to normal.

        THE COURT:  When you see these friends -- and it
sounds like they are friends; is that right?

        PROSPECTIVE JUROR 76:  They are, yes.

        THE COURT:  And even the soccer team people, those
were friends too?

        PROSPECTIVE JUROR 76:  Oh, yeah, yeah.

        THE COURT:  Do you talk about work?

        PROSPECTIVE JUROR 76:  Sometimes.  We used to.  We
kind of outgrew that stage in our lives.  We're now more
catching up as, How's the family, What's new.  Most of them
are already retired, so yeah.

        THE COURT:  Given your experience being a deputy, and
I don't want to put an age on you, but that sounds like that
might have been quite sometime ago?

        PROSPECTIVE JUROR 76:  It was.  It's another life
ago.

        THE COURT:  Can you give me an estimate of how many
years we're talking?

        PROSPECTIVE JUROR 76:  My son is 32, so it's been
about 30 years.

THE COURT:  Okay.

PROSPECTIVE JUROR 76:  Uh-huh.

THE COURT:  So despite these relationships you have with people who are in or have been in law enforcement and your own experience, do you think that that would cause you to be more inclined to one side or the other in this case?

PROSPECTIVE JUROR 76:  I definitely have a bias in favor of the deputies and the government -- well, yes.

THE COURT:  And when you say you have a bias in favor of them, is that something that you can recognize and then be prepared to address when you make your decisions?  Meaning, like I said many times, having a bias is one thing, but letting it control you is a different thing.

PROSPECTIVE JUROR 76:  Yeah, understood.  Yeah.  I do try to -- I'll tell you that I will try, but I definitely have a strong bias leaning one way.

THE COURT:  Okay.  If you were selected on this jury, would you feel like you'd have to explain yourself to any of your friends?

PROSPECTIVE JUROR 76:  Oh, no, no, no.

THE COURT:  Would your friends and your relatives in law enforcement expect that you would do the right thing according to the evidence and what you judge the evidence to be?

PROSPECTIVE JUROR 76:  Of course.

THE COURT:  So when you say that you, you know, have a definite bias, are you saying that if an officer or a law enforcement officer were to testify, you would be like, I accept everything that person says, I'm not going to weigh it against any of the other evidence, I'm just going to accept it as true?  Or are you going to put them through the same process as you would every other witness?

PROSPECTIVE JUROR 76:  I would put the same process as the other jurors as well -- witness, sorry.

THE COURT:  I guess I should just cut to it.

Are you committed to being fair in this case even though you know that you have this in the back of your mind.

PROSPECTIVE JUROR 76:  I am.  But my biases are pretty strong and I want it on the record, yes.

THE COURT:  Okay.  But again, you know, we all have biases as we've talked about.  Yours is in the front of your mind which makes it easier to deal with.

PROSPECTIVE JUROR 76:  Let me answer it this way.  I have served as a juror before and I was able to work through it.  I just -- so I've done it before so I can do it.

THE COURT:  Okay.  And how long ago was it that you served on a jury?

PROSPECTIVE JUROR 76:  In a case -- I sat in a case about, I'd say five years ago, I don't remember the exact date.  And last year I serve as a -- in a jury for a criminal

case.  I was not -- I was not of the 12.  I was one of the
alternates.

THE COURT:  So you ultimately were not required to
deliberate?

PROSPECTIVE JUROR 76:  I didn't deliberate, but I sat
through the whole trial, yes.

THE COURT:  And then five years ago, was that a
criminal or a civil case?

PROSPECTIVE JUROR 76:  Yes, it was criminal small
theft case.  We found them guilty and I was part of the jury.

THE COURT:  Okay.

PROSPECTIVE JUROR 76:  Uh-huh.

THE COURT:  Anything else, sir, that I haven't talked
to you about that you think is -- well, actually, I do need to
ask you.

You indicate that if someone is a member of a gang,
that you would assume they're guilty of something.  But would
you convict someone of a specific charge if the evidence does
not convince you that they are guilty of that offense?

PROSPECTIVE JUROR 76:  Not correct.  But it's just
the bias that I mentioned earlier, yes.

THE COURT:  Okay.  You say that if you understood
that a person was involved in a gang, you would need to be
convinced overwhelmingly of their innocence.  It sounds like
maybe that's something you wrote now, but you're saying

something a little bit different then.  Now you think, yeah,
okay, I need to have evidence of this crime before I convict
anybody of that crime; is that true?

        PROSPECTIVE JUROR 76:  Yes.

        THE COURT:  And that's regardless of what their
background is, what their national origin is, what their race
is, or what their belief system is?

        PROSPECTIVE JUROR 76:  Correct.

        THE COURT:  All right.  Sir, is there anything else
that I haven't asked you about that you think would be
important for us to know?

        PROSPECTIVE JUROR 76:  No, ma'am.

        THE COURT:  All right.  Thank you, sir.

        Juror 77.

        PROSPECTIVE JUROR 77:  Good morning.

        THE COURT:  Good morning.  What type of company do
you work for where you do this marketing -- is it marketing
supervision or market --

        PROSPECTIVE JUROR 77:  Market supervision.

        THE COURT:  Like stock market?

        PROSPECTIVE JUROR 77:  Yes.  So it's wealth
management.  Cover market all the way from Pasadena,
Bakersfield, Fresno, Visalia.

        I do pretty much -- and I deal with compliance,
anything with compliance, making sure all of our financial

advisors are following rules and regulations.  And, of course, monitor anything that comes to me for alerts, you know, have those conversations with associations.

It's just dealing with that on a daily basis.

THE COURT:  Okay.  How long have you been in that type of work?

PROSPECTIVE JUROR 77:  This is actually my third year doing this, but I've been in the financial industry since 2013.

THE COURT:  Is compliance the part of that work that you want to be in or is that just where you're starting or?

PROSPECTIVE JUROR 77:  No, actually, compliance has always been something that I've enjoyed and that's where I'm leaning towards.

THE COURT:  Okay.  I just remember that movie *Boiler Room*.  Did you ever see that movie?

PROSPECTIVE JUROR 77:  No.

THE COURT:  Okay.  Well, you have to see that on your own time.  It's just the compliance person in that movie was not popular with the brokers.  Is that how it is?

PROSPECTIVE JUROR 77:  Very, very.  Either they -- it's two ways.  It's more about -- my approach is always in a positive way.  It's how to make sure you keep your job.  It's more of a -- you know, I'm here to help them.  So it's just taking it that way rather than a negative.

THE COURT:  Yeah.  I mean, truly, you can't have very long of a career if you're not complying.  And, in fact, then your company would get in trouble, too, if the broker is not doing the right thing, true?

PROSPECTIVE JUROR 77:  Right.  So I'm here -- I'm pretty much there to protect them.

THE COURT:  Okay.  You say you have a very positive attitude about law enforcement based upon the nature of the work; is that right?

PROSPECTIVE JUROR 77:  Yeah.

THE COURT:  You haven't had any positive or negative experiences that --

PROSPECTIVE JUROR 77:  Mostly positive, honestly. You know, when I -- I did work as a financial center manager as well.  So, of course, dealing with burglaries and all of that stuff, you know, I had to deal with law enforcement.

THE COURT:  In those events, were they able to ever find the person who had done them?

PROSPECTIVE JUROR 77:  I mean, we have camera footage and all that stuff and here and there, but it was just always slipped.

THE COURT:  Yeah, okay.  And that experience is something that isn't going to influence any decision you make in this case; is that true?

PROSPECTIVE JUROR 77:  No.

THE COURT:  It looks like you've been on jury service
before and you also have a relative who's been involved in
substance abuse.

Does -- are you able to set aside the experiences
that you've listed on your questionnaire and decide this case
only on the evidence presented here?

PROSPECTIVE JUROR 77:  Yes.

THE COURT:  Is there anything else that we haven't
talked about that you think is important for us to know?

PROSPECTIVE JUROR 77:  Nope.

THE COURT:  All right.  Thank you, sir.

Let's see.  Juror 78 that's seated, yes, in Seat 24.

And so you have an interesting job title that tells
me nothing about what you do.

Tell me what it is that you do day to day.

PROSPECTIVE JUROR 78:  Okay.  So I manage programs
for the IRS.  So those programs were used by the employees who
work on their -- the wage and investment area.  Mostly dealing
with accounts, tax accounts that -- or just anything that
comes in from taxpayers.

THE COURT:  When you say manage the programs, does
that mean --

PROSPECTIVE JUROR 78:  We're -- we're kind of like
the -- like myself and my team, we're kind of like the point
of contact from -- between headquarters and the sites.  So

pretty much, we want to make sure that everything works smoothly during -- during the whole year.  So we're always in communications with headquarters and also with our management staff.

THE COURT:  Is that like the technical IT side of it, or is it --

PROSPECTIVE JUROR 78:  No.

THE COURT:  It's programmatic, then?

PROSPECTIVE JUROR 78:  Right.

THE COURT:  And are you also giving training to fellow employees?

PROSPECTIVE JUROR 78:  We have -- some of my coworkers that deal with -- with that.

THE COURT:  Okay.  How long have you worked for the IRS?

PROSPECTIVE JUROR 78:  For, like, 16 years.

THE COURT:  Have you been in that type of assignment the entire time?

PROSPECTIVE JUROR 78:  I've been a manager before. And I was also, like, the assistant manager when I was hired, right after when I got my B.A. in business administration. And then, you know, I've been growing up within the organization.

THE COURT:  Okay.  And you say, like some experience others -- jurors have had that you have sort of a neutral

attitude toward law enforcement because some of your contacts have been positive.  And some of them, you know, the people have been unprofessional that you've had contact with; is that true?

PROSPECTIVE JUROR 78:  Yes.  I mean, it's just like everybody else.  Sometimes you get people that are really professional on their duties and some that maybe they're just having a bad day, and you get to be that person, you know, dealing with -- with them that specific day.  That's -- that's been my experience.

THE COURT:  And given this experience, like the others, are you able to set that aside and evaluate the evidence here without regard for that past personal experience?

PROSPECTIVE JUROR 78:  Yes.

THE COURT:  You said that -- looks like maybe it was back in school that you got -- you were attacked by another student.  Did you have the sense at that time that the person was a gang member?

PROSPECTIVE JUROR 78:  Yeah, because it was outside of school.  I -- I was in sports.  I was, you know, involved in school.  And I -- I would walk from my house to school and, you know, back and from.  And it was, like, after the practice or after school, sometimes I was by myself and/or with another friend.

619

So in that situation, I was -- I was at this track meet.  And some of the people that -- that I played with or that they ran, they were -- I don't know.  Maybe they were involved with gangs.  And these people that attacked me, they -- they thought that I was part of it.  And that's -- that's why it happened.

So I -- the only thing that I did -- or my only action was just to -- to try and run before it got, you know, worse.  But every time during that -- during those years in high school, it was -- there was a lot of gang activity going on.  And if you were out there walking, you know, you might be in a -- end up being a victim.

So I was traumatized to go out, because every time I would go out, something happened.  Like I will -- I will probably get -- I think one time I was going to get my bike stolen.  So I was just riding it as fast as I could to back home before they catch me.

And it was -- it was hard to deal with -- with that during that time.  And that kind of, like, traumatized me during my years because I didn't want to go out any -- anymore.  I was just home.

And I didn't want to be playing sports either because my only alternative was to walk after, and it was dark.  And I didn't have any ride home.  There was no bus for me because I was within the town but, like, at the other end of the town.

THE COURT:  Because of this experience, did you actually stop being involved in sports, or was it just really --

PROSPECTIVE JUROR 78:  Yeah, I -- I stopped.

THE COURT:  How much of this sports career did you miss in high school as a result?

PROSPECTIVE JUROR 78:  Well, for example, I didn't play my senior year.  I was just away from that.  My coach asked me because I was -- I was in varsity since I was a sophomore.  I played soccer, and -- and then I used to do track -- track and field.  But I was just, you know, on my own just trying to be safe.  And I tried just to -- to stay home.

I mean, you know, I -- I would try to go with the rest of the students right after school just so I can go home and avoid, you know, staying after when I would be walking by myself.

THE COURT:  Did you feel like you were a target or just basically anybody out after dark would be a target?

PROSPECTIVE JUROR 78:  I think mainly because I was just, you know, wandering the streets at that -- at that time. And sometimes I noticed that there was fights all the time, like after school.  And -- and I think one of the reasons that I thought was because maybe they saw it.  Or they would -- they will see me, like, talking to some of the soccer players or people that -- that were in track that --

Like I said, maybe they had some type of involvement with -- with some gangs over -- over there. And that's what I think. But I also heard during that time there was other people that they didn't even play sports. Or, you know, they didn't even have anything to do with people like that, and they also got -- they were victims of that too.

THE COURT: Kind of sounds like -- like some of us that you were living in an area that had a lot of gang activity in your --

PROSPECTIVE JUROR 78: During that time.

THE COURT: -- schools too?

PROSPECTIVE JUROR 78: Yeah. During that time, I -- I remember it was -- it was really heavy on -- on that.

THE COURT: Was it one particular gang, or was it different gangs that you had some --

PROSPECTIVE JUROR 78: I think it -- well, I think there were several there. I don't know which one was which. That was not part of my conversations with -- with people that I -- that I know at that time.

The only involvement that I had with some people was just, you know, sport-wise because they -- you know, they don't question that. People, they -- they just join, and they feel good. You know, you're -- you're on it. So I was -- that's how it worked.

THE COURT: And so this experience has been 20 years

ago or so?

PROSPECTIVE JUROR 78:  Yeah.

THE COURT:  And despite that -- I mean, obviously, that was a difficult time for you; is that true?

PROSPECTIVE JUROR 78:  Yes.

THE COURT:  Have you been able to you -- well, then you left that area, and you started going to college; is that right?

PROSPECTIVE JUROR 78:  Yeah.

THE COURT:  Did you have any other experience with gangs after high school?

PROSPECTIVE JUROR 78:  No.  I mean, I was mostly -- at that time, I didn't -- I didn't play any sports at all.  At that time, I was driving, and I was just focusing on school.

THE COURT:  Okay.

PROSPECTIVE JUROR 78:  But before high school -- my high school time, I still lived in the Bay Area.  I had experience over there too.  So, you know, everything was just following.  And I will tell my wife sometimes, like, I will see people going to the store and we're going to that same store, I will tell her, you know, you go in because I don't want to go.

And I don't know.  I was just in fear after -- after, you know, having experiences like that.  I was always trying to avoid certain places; going certain areas; or go out, you

know, just overall to certain locations.

THE COURT:  Did you have any sense of which gangs they were?

PROSPECTIVE JUROR 78:  No.

THE COURT:  And it sounds like, though, you could see somebody on the street.  And based upon how they are dressed or something else, you might be concerned that the person --

PROSPECTIVE JUROR 78:  I was just trying to avoid that and go, you know, the other way or something.

THE COURT:  Was it -- is it true that -- I mean, you realize that the people involved in this case aren't the people who were involved with you back in high school; is that true?

PROSPECTIVE JUROR 78:  Right, yeah.

THE COURT:  Are you able to separate that experience from this case and say, Yeah.  You know, I'm not a fan of gangs, but I need to hear what the evidence is in this case before I can decide, you know, anything about what happened; is that true?

PROSPECTIVE JUROR 78:  Yes.

THE COURT:  Do you have any doubt as your -- as to your ability to be fair or impartial?

PROSPECTIVE JUROR 78:  I don't think so.

THE COURT:  And then despite the fact that this may have reminded you of that time back in high school, are you

624

able, again, to focus only on the evidence here and to be fair to both sides in this case?

        PROSPECTIVE JUROR 78:  I can try to do that.

        THE COURT:  I actually need a little bit more than that.  I need you to commit to being fair.  Is that something that you're willing to do?

        PROSPECTIVE JUROR 78:  Yes.

        THE COURT:  Okay.  And I'm sorry.  I should have asked this of everyone else.  Actually, I do need to ask you. You've indicated you have some concerns about your finances. You mentioned already a spouse.  Is there anyone else that you're supporting at this time?

        PROSPECTIVE JUROR 78:  I have two children and my wife, but I'm the only one that works.  I have two jobs.

        THE COURT:  And what other job do you have?

        PROSPECTIVE JUROR 78:  I work for the Home Depot.

        THE COURT:  Your job with the IRS, it's my understand that you get paid regardless or whether you're in jury service; is that true?

        PROSPECTIVE JUROR 78:  Yes.

        THE COURT:  What are the hours that you have at your second job?

        PROSPECTIVE JUROR 78:  In the evening, I normally try to go during closing hours, like from 6:00 to 10:00 just to allow some time to go home and eat, change, and -- and go.

THE COURT:  All right.  So you would still be able to do that job if you chose to if you were on this -- this panel, correct?

PROSPECTIVE JUROR 78:  Yeah.

THE COURT:  Okay.  Sir, I didn't ask you earlier. You were in the audience for most of the questions that I asked yesterday.  Is there any -- were you able to listen to all the questions that I was asking?

PROSPECTIVE JUROR 78:  Yes.

THE COURT:  Is there anything that you needed to share on any of the topics that I asked about before?

PROSPECTIVE JUROR 78:  No.

THE COURT:  All right.  Anything else that I haven't asked about that you feel it's important for us to know?

PROSPECTIVE JUROR 78:  No.

THE COURT:  All right.  Can I go back to Juror 76? Also 75, 74?  I just want to make sure that you -- all three were listening to the questions that I asked as a group before you got called up in the box.

Were -- were all of you able to listen to those questions that I asked?  If not, raise your hand.

All right.  No one has.

Was there anything that you needed to share as to those questions that I asked before you were called up in the box?  If so, please raise your hand.

THE COURT:  All right.  They have not done that.

All right.  Ladies and gentlemen, let's go ahead and take another break.  Let's be prepared to return at a quarter till.

And then, sir -- we will talk with Juror 77 at the beginning of that break -- oh, yes.  Sorry.  75.

(Jurors exit the courtroom at 10:29 a.m. with the exception of Juror 75.)

THE COURT:  All right.  The other jurors are -- have stepped out.  We have Juror 75 here.

And, sir, would you tell us a little bit about your work?  You mentioned something called BH Court?

PROSPECTIVE JUROR 75:  So I'm a BH Court case manager.  I work for my county mental health -- Health and Human Services.

THE COURT:  What is exactly is "BH Court"?

PROSPECTIVE JUROR 75:  Behavioral Health Court.  So clients that come out of prison or come out of jail that have mental health issues, I'm their case manager.  And we only see clients that are severely mentally ill.  So schizophrenia, borderline personality disorder, schizoaffective, we -- those are the -- those are the type of clients that we target in this behavioral health court.

And the Behavioral Health Court is set up so -- we try to keep these -- we -- we let them come out of jail or

627

prison early to -- and -- and my job is to try to keep them
out of jail or prison, not to get them back in there.

I have to make sure they're med compliant.  I have to
make sure they stay clean and sober.  I have to link them to
all the resources, services, try to find them housing,
basically social security cards, birth certificates.  Pretty
much anything that they can't do navigating the system.

THE COURT:  Now these people, are they identified
based upon a diagnosis or is it based upon -- I know sometimes
they have different tools to analyze who's at higher risk of
recidivism.

PROSPECTIVE JUROR 75:  Yeah, they are -- they are --
how do we put it?  They do have a level of care.  So they
have -- they have to go to be evaluated for level of care.
And once the level of care comes back, there's a letter that's
sent to the Court that states whether they meet criteria or
not to be in that program.

The judge, the presiding judge actually is the one
who determines that.  Sometimes they'll let them go in if they
don't quite meet the level of the care and he knows the need
is there.  He'll do that.

I have clients that rely on me to be made compliant.
I have clients that are schizophrenic.  If they do not get
their shot every month -- they cannot take a pill, because if
they were on pills they wouldn't be successful.  So they have

to get the shot, an injection.  I have to call it in.  If they
don't get the injection, it's a whole other level of fun.

So I'm not sure if you're familiar what schizophrenia
and how it affects somebody, but it can be severe.  And they
won't -- if they don't stay med compliant, they will not pass
this Behavioral Health Court.

Behavioral Health Court is a yearlong program.  The
first three months I see these clients three to five times a
week.  The second three months is Phase 2, I see them twice a
week.  It just depends on the -- it just depends on the need,
actually.

THE COURT:  What county is it that you work in?

PROSPECTIVE JUROR 75:  I work in -- excuse me, I'm
getting over a cold.

I work in Mariposa County.

THE COURT:  Okay.  What happens when you go on
vacation, do you have someone else that covers for you?

PROSPECTIVE JUROR 75:  You know, my job, I cover so
much of my county, it is very difficult when I go on vacation.
When I come back, my clients have went downward.

I also am a crisis intervention worker.  I'm also an
outreach manager, so I go out in the field and I find people,
bring them in, make sure they stay, you know, engaged.

I -- yeah, we are so short staffed, I work under
probation, my immediate supervisor is the assistant chief of

629

probation.

I do transports out of jail, out of prison to different facilities.  I bring them in to get ankle bracelets. If we're short staffed, I'll go out in the field with probation officers, try to find somebody.  A lot of times when I go out, they don't feel as threatened, I guess you could say, because I don't have a badge, I don't carry a gun, so they feel more relaxed.

If somebody's like high needs, has a high -- you know, is severely mentally ill, I show up, I'm able to keep them calmer than a probation officer that's showing up alone.

THE COURT:  It does sound like your job is somewhat probationary type, somewhat social work, and then also mental health because you're kind of doing everything for these people.

PROSPECTIVE JUROR 75:  I do everything for the county.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  Yeah.  I've been doing this for seven years.  I'm very good at it.  If I'm not there, my clients are going to go downhill.

THE COURT:  How many people are in the same role that you have for the county?

PROSPECTIVE JUROR 75:  I'm the only one.

THE COURT:  The entire behavioral health --

630

PROSPECTIVE JUROR 75:  Nope.

THE COURT:  No, no.  Let me just finish.

Court, you're the only officer in that court?

PROSPECTIVE JUROR 75:  I'm the only mental health staff in law enforcement.

THE COURT:  Is there -- are there other team members for behavioral health court other than you?

PROSPECTIVE JUROR 75:  Yes, there is.  There's a supervisor and a clinician both.

THE COURT:  But that is still from your own agency?

PROSPECTIVE JUROR 75:  Yes.

THE COURT:  There's not, like, someone from probation?

PROSPECTIVE JUROR 75:  Yeah, so behavioral health court, when we go to behavioral health court, we have the presiding judge, we have the district attorney of the county, we have -- the case manager will be me, we have the probation officer, and we have one other staff that's going to be behavioral health, which will either be my supervisor or a clinician.

THE COURT:  How many people are in -- or how many clients do you have at this time in that court?

PROSPECTIVE JUROR 75:  In the court right now, I think I have six.

THE COURT:  Are they in various stages of that

yearlong program?

PROSPECTIVE JUROR 75:  They are.

THE COURT:  And how often do they come to court?

PROSPECTIVE JUROR 75:  Every week, every Wednesday.

THE COURT:  They come in every Wednesday, but then you're seeing them at times other than Wednesday obviously?

PROSPECTIVE JUROR 75:  Yeah, I see them -- I see them sometimes like if somebody's, like, starting to get suicidal or not being compliant or having a difficult time, I might see them five times a week.  I might see them twice a day.  I might -- yeah, it's just all over the board.

THE COURT:  Do they also have interaction with other members of the mental health team?

PROSPECTIVE JUROR 75:  They have interaction with the clinician, so all the clients that I see -- I actually see other clients that aren't in BH Court.

But all the ones that I see in BH Court, they're under FSP, which means full service partnership.  So they see a psych counselor, they see a mental health counselor or clinician, and they see me.  They see a probation officer, they get drug tested three times a week.  I have to bring them to those to make sure they're successful at it.

We have one ATM meeting a month, that means everybody on this client's team gets together and we talk over what the client -- what the client thinks they need the most.

They -- I'm the one that sets all that up.  I set up pretty much everything for the client.  That's my job.

THE COURT:  Of the six people who are in the Behavioral Health Court now, what are the stages of, you know, are three of them at the beginning, three of them at the end?  Can you kind of break that down for me?

PROSPECTIVE JUROR 75:  So they move around.  If they're in Stage 1, which is three months, and they go to Stage 2.  If they throw a dirty drug test, they go back to Stage 1.

THE COURT:  How many do you have in Stage 1 at this time?

PROSPECTIVE JUROR 75:  I have two.  They're actually in Stage 2, but they're doing Stage 1 because they've -- they've had a bad test.

THE COURT:  Okay.  How many do you have in Stage 2?

PROSPECTIVE JUROR 75:  I have one in Stage 2 and I have one in Stage 3 and I have one in aftercare.

THE COURT:  Aftercare, is that after the yearlong program?

PROSPECTIVE JUROR 75:  Aftercare is the last three months of the year -- of their year.  The one -- the one I have in aftercare is not doing good.

The one I have in aftercare is on a medication that's not helping him with his schizophrenia and he wants to get on

the injection and he has an appointment on the 22nd.  If he misses that appointment, he won't get on that injection.  The medication he's taking is not working for him.

THE COURT:  Okay.  It sounds like these six people are sort of like your, I kind of picture them as intensive care, and then you have these other people who don't rise to that same level, but you're still providing services for; is that true?

PROSPECTIVE JUROR 75:  I do.  All -- all of my clients, I see a lot of them that aren't in BH Court.  I can't even give you a number.  It just depends.  They're all severely mentally ill.  All of them.

THE COURT:  In your experience with Behavioral Health Court, is it generally you have about six people or does that vary?

PROSPECTIVE JUROR 75:  It varies.  It's varied from 4 to 22.  I could go back to work tomorrow and have three more. You just -- you just don't know.

THE COURT:  During the time you've been in that court, has it always been the same judge presiding over it?

PROSPECTIVE JUROR 75:  There's two different judges. Both county judges preside over it.

THE COURT:  And has it always been the same DA or has that person --

PROSPECTIVE JUROR 75:  The DA changes at times or an

assistant DA will show up.

THE COURT:  And I'm sorry.  Is there also defense attorneys involved?

PROSPECTIVE JUROR 75:  No, there's not.

These are clients that have already been found guilty.

THE COURT:  Right.

PROSPECTIVE JUROR 75:  And have came out.

THE COURT:  Their -- their conduct in this court, though, could have legal implications for them returning to custody though, right?

PROSPECTIVE JUROR 75:  Yes.

THE COURT:  In that event are they given counsel, or is that an agreement that they have in entering this court that if, you know, if something goes wrong, flash incarceration or something else?

PROSPECTIVE JUROR 75:  Yeah, we flash them for ten days, they come out.  I've got one right now, he's probably going to prison.  He came out, he was high violent.  He came out doing the same thing and is now going back, but his court date keeps getting moved.

So that's actually seven.  I didn't count him.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  I don't -- I don't go to his court date with him.

THE COURT:  Okay.  How many other people are on your caseload that are not of these six or seven?

PROSPECTIVE JUROR 75:  I have two, but I oversee Mental Health Assistant 1s, so I make sure that they stay on top of their job.

Sometimes they'll have clients that -- I mean, we're training them.  So sometimes we'll have clients that are falling through the cracks and I have to pick that up.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  And then kind of explain to them, Hey, you know, this client, you've got to call in their medication, you can't let this slack, or you're going to have a lot more work to do.

So, yeah, I'm pretty involved with it.

THE COURT:  How many Mental Health Assistant 1s do you supervise?

PROSPECTIVE JUROR 75:  All of them that we have.

THE COURT:  And how many is that?

PROSPECTIVE JUROR 75:  Right now we have three.

I supervise 2s.  I don't really -- wouldn't really say I supervise them, though.  It's kind of -- they kind of shadow me, you know.

THE COURT:  Okay.  Anything else about your work that we haven't discussed yet?

PROSPECTIVE JUROR 75:  Yeah, I'm a crisis

636

intervention worker.  So if somebody's -- somebody's having struggles with -- with suicide, I'll go out and evaluate them.

        THE COURT:  Are there other people for the county who do that as well?

        PROSPECTIVE JUROR 75:  There's three others.

        THE COURT:  How do you divide up the week?  Is it one week on, three weeks off?

        PROSPECTIVE JUROR 75:  No, it's not like that. There's -- there's a crisis team, and I'm kind of like a backup.

        But -- when you meet clients and they get to know you and you build that rapport, sometimes there'll be a client that they're like, Matt, we need you to come out, we need you to work on this client.

        THE COURT:  Because they know you and they're comfortable with you?

        PROSPECTIVE JUROR 75:  Yes, they know me, they know I know them.  I know what to expect.  They know what to expect from me, you know.  And they're not -- they're going to -- we're going to be more successful at it.

        THE COURT:  How far is your office from this courthouse?

        PROSPECTIVE JUROR 75:  80 miles.

        THE COURT:  Sounds like, though, you do most of your work out of the office; is that true?

PROSPECTIVE JUROR 75:  I do.  And I also go to the northern part of the county, which is a good 45 minutes from my office and it's a long drive on a windy road.

THE COURT:  How often do you do that?

PROSPECTIVE JUROR 75:  Once or twice a week.

THE COURT:  Is that to see clients?

PROSPECTIVE JUROR 75:  It is.

THE COURT:  Do other people go to that same area?

PROSPECTIVE JUROR 75:  They do.

THE COURT:  But they have their own caseload?

PROSPECTIVE JUROR 75:  They do.

THE COURT:  I know from my experience that sometimes in that event someone's going to be driving that kind of distance another person will say, Hey, can you stop by and see my clients?

Do you ever do that for each other?

PROSPECTIVE JUROR 75:  We do not.

THE COURT:  All right.  Anything else about your work that we haven't discussed yet?

PROSPECTIVE JUROR 75:  There's so much to my work, so I'm sure I'm missing something, but I did tell you that I do transport, so I'll transport clients, even out of the county, to facilities.  So if they're -- if they're being seen in, like, a treatment program or something, we do -- we do have facilities outside of the county all the way from Yuba to LA.

THE COURT:  Those types of facilities, are those
inpatient programs, you're dropping them off --

PROSPECTIVE JUROR 75:  Yup.  And once they're in that
facility, if they're on my caseload, I have to see them
weekly, I have to go there weekly.

THE COURT:  Okay.  You indicate that at work you
oftentimes work with law enforcement.

Is that in connection with both your behavioral
health court as well as just your normal caseload?

PROSPECTIVE JUROR 75:  Yeah.  My normal caseload, no,
but if -- if I go out on a crisis call, the sheriff of the
county shows up first and they secure the scene before I go in
and evaluate the client.

THE COURT:  Okay.  How often do you have to do that?

PROSPECTIVE JUROR 75:  Once, twice a week.  It can --
that's so -- that's so -- it can be -- it cannot happen for
two weeks and then it could happen seven times in one week.
It's just -- it's so random it's hard to, like, put a number
on it.

THE COURT:  Yeah, I imagine you can't schedule mental
health crises.

PROSPECTIVE JUROR 75:  No, you can't.

THE COURT:  All right.  And in your interactions with
law enforcement, you've been -- you've had positive
experiences, you're saying.

PROSPECTIVE JUROR 75:  I have.  But when I filled that questionnaire out, I was pretty dang sick when I came in here.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  I did not complete that at all.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  I apologize for that.  I felt terrible when I came in here.

THE COURT:  Okay.

PROSPECTIVE JUROR 75:  I have had one negative that has really bothered me for a long time, and it's something that -- it's the reason I didn't want to talk about this in front of a -- everybody.

I found my step dad -- he committed suicide.  And I found my dad three months later.

THE COURT:  Okay.  And you felt that that was --

PROSPECTIVE JUROR 75:  During that time, they detained me.

THE COURT:  In the course of investigation?

PROSPECTIVE JUROR 75:  Yeah, they were like, well, wait a minute, you found one and then you found another, you know, that looks -- what are the chances of that, right?

And in a three-month period.

THE COURT:  When you say "detained," were you

640

actually taken into custody?

          PROSPECTIVE JUROR 75:  I was put in handcuffs and I
was put in a patrol car.

          THE COURT:  And obviously, given the emotional state,
what you had encountered, that must have been incredibly
insulting to --

          PROSPECTIVE JUROR 75:  Yeah, I was very, very --
yeah.

          THE COURT:  Basically, it is an insult to the injury
that you were already suffering.

          PROSPECTIVE JUROR 75:  Exactly.

          THE COURT:  Is that an officer that you -- I don't
know if it was more than one.

          PROSPECTIVE JUROR 75:  It was not an officer that I
knew.

          THE COURT:  Was it in the same county where you work?

          PROSPECTIVE JUROR 75:  No, it was not.

          THE COURT:  Okay.

          PROSPECTIVE JUROR 75:  It was -- it was almost 30
years ago.

          THE COURT:  Okay.  And despite that -- obviously,
that experience is not something I imagine that you easily
forget; is that true?

          PROSPECTIVE JUROR 75:  I've come to the realization
that I understand now why it happened.

THE COURT:  It would be easier to understand if it happened to somebody else.

PROSPECTIVE JUROR 75:  Well, I understand why they did it.  You know, the circumstances and that happening and me finding both of them in such a short amount of time, I mean, that's -- that's -- you know, like I can understand.

THE COURT:  And despite these experiences, would you be able to set them aside and decide the evidence in this case based only -- or despite what happens in this case based only on the evidence presented here?

PROSPECTIVE JUROR 75:  The -- I do have bias towards gang members, but that's not from it.  I do not have any bias against law enforcement at all.

My bias against gang members is due to the fact that my son has been recruited into a gang that he'll never get out of.  He's either going to get murdered or he's -- he's either going to die doing something or he's going to go to prison. It's a matter of time.

He's definitely doing stuff that's criminal.

THE COURT:  Okay.  And do you know the name of that gang?

PROSPECTIVE JUROR 75:  I do not.  All I know is it's a biker gang.  And I really don't want to know.  I'm like, I don't want to know.  I don't want to know.  It just really bothers me bad that he's chosen that path.

And if you looked at my family history -- and, I mean, my family is a bunch of outlaws.  So if you look at my family history, the way I was raised, I tried to raise him different, it just -- I don't know, it's in our blood or something.  I don't know.

THE COURT:  And given that your son is currently involved in that lifestyle and the feelings you have about it, would you be able to be fair and impartial in this case?

PROSPECTIVE JUROR 75:  It would be very difficult for me to be fair and impartial in this case.

THE COURT:  And that's -- I mean, you realize that the people here --

PROSPECTIVE JUROR 75:  I do realize that they have nothing to do with that.  I just have this bias that I don't know if I can get past that.

THE COURT:  At this time, there hasn't been any evidence presented and the defendants have denied involvement in these offenses.

Would you be willing to listen to the evidence and make the decisions as to what you think the evidence shows?  And that would require you to be aware of the bias and to stop yourself and go, Wait, is this about my child or is this about the evidence here?  Would you be able to do that?

PROSPECTIVE JUROR 75:  Yeah, if I was -- if I was aware I was doing that.

643

THE COURT:  It would require you to, every time you form an opinion, to go, Wait a minute, let me stop again and check myself.

Because, I mean, truly, the way our brains work, and you probably know this better than I do, is our brains are efficient because we rely upon past experience and that's what helps us to move quickly.

This would require you to stop, slow down, and go, wait a minute, no, you know, when I think about it, I'm not thinking about the evidence, I'm thinking about something else.

Do you feel like you'd be able to do that?

PROSPECTIVE JUROR 75:  I want to be honest with you. I do not.

THE COURT:  Okay.  And that's because of the experience with your son is ongoing and it's a source of --

PROSPECTIVE JUROR 75:  It's ongoing and it's just something that's just -- it's killing me.

THE COURT:  How long has your son been involved in that lifestyle?

PROSPECTIVE JUROR 75:  Ten years.

THE COURT:  How old is he now?

PROSPECTIVE JUROR 75:  He'll be 36.

THE COURT:  So he was actually pretty old to get into that lifestyle.

644

PROSPECTIVE JUROR 75:  He was.  And I was very
surprised.  But he was with the wrong guys and they recruited
him.

THE COURT:  Is that in the same area where you live,
or does he live someplace else?

PROSPECTIVE JUROR 75:  He doesn't live in the same
state.

THE COURT:  And so what you know about it is every so
often you hear something or he tells you or --

PROSPECTIVE JUROR 75:  I quit asking a long time ago.
He would never tell me the truth, but he's my son.  I know.  I
know, you know.  If you have kids, you know.  If you're asking
them questions, you can tell if they're telling you the truth
or not.

THE COURT:  And are you convinced then, even though
you no longer talk about that with him, that he is still
involved in that lifestyle?

PROSPECTIVE JUROR 75:  Oh, I know he is, yep.
Because I try to -- I try to -- I try to have a relationship
with him and I try to, like, see him, you know, and he's
always busy with them.

THE COURT:  Okay.  And I guess I just want to make
sure that I'm -- you and I are on the same page, and you're
saying you'd like to say that you could be fair and impartial
in this case but you can't commit to doing that.

PROSPECTIVE JUROR 75:  That's exactly right.

THE COURT:  Okay.  You indicate that some of your clients have been involved in or are victims of domestic violence.  Is that your understanding?

PROSPECTIVE JUROR 75:  Yes.  Domestic violence.  Some of them have been sex trafficked.  Some of them are not even here -- not even here legally.  They've been sex trafficked into the United States.  They're not here legally.

THE COURT:  Okay.  The experience with your clients, though, is that something that you can set aside in deciding this case?

PROSPECTIVE JUROR 75:  I can, yeah.

THE COURT:  Just to make sure I do understand, it seems like your source of concern then is simply your personal relationship with your son and his circumstance, but it's not your professional relationships or what your clients have told you; is that true?

PROSPECTIVE JUROR 75:  That's true.

THE COURT:  All right.  Is there anything else, sir, that I haven't asked you about that you think would be important for us to know?

PROSPECTIVE JUROR 75:  I had a heart attack eight months ago.  I still have chest pain from it.  The last day I had chest pain was Tuesday here in the courtroom.

I've been to the ER two times.  The last time I was

at the ER was in November.  And there was nothing -- they couldn't find anything.  I was just having a lot of chest pain.

I do get snowed in usually in February or March. Last year I got snowed in for four days.  The year before I got snowed in for 16.

THE COURT:  Okay.  The chest pain that you had this week, did you go and get medical treatment for that?

PROSPECTIVE JUROR 75:  I did not.

THE COURT:  Are you on the ongoing care of a cardiologist?

PROSPECTIVE JUROR 75:  I am for one year, yeah.

THE COURT:  How often are you seeing that doctor?

PROSPECTIVE JUROR 75:  I haven't seen him for a couple months.  Everything has been going pretty good.

THE COURT:  Have you determined whether your chest pain, is it triggered by anything or is it just comes and goes?

PROSPECTIVE JUROR 75:  It just comes and goes.  They told me it would do that.  I just have to be very careful for like a year.

THE COURT:  What does that mean, being very carful?

PROSPECTIVE JUROR 75:  So if I have chest pain, I take nitroglycerine.  If it doesn't go away in five minutes, I take another one.  If I take another one, then it goes away, I

don't go to the ER.  If it does -- I mean, if it does go away, I don't go to the ER.  If it doesn't go away, I go to the ER immediately.

THE COURT:  You said the last time you had to go was in November.

How many times since your heart attack have you had to go to the ER?

PROSPECTIVE JUROR 75:  I've only went twice.

THE COURT:  All right.  Anything else, sir, that you feel it's important for us to know about?

PROSPECTIVE JUROR 75:  Not that I can think of right now.

THE COURT:  All right.  Thank you for this information.  I'm going to let you go out and take a break and we'll come back in about 15 minutes.

Thank you so much, sir.

PROSPECTIVE JUROR 75:  All right.  Thank you.

(Prospective Juror 75 exits the courtroom at 10:56 a.m.)

THE COURT:  All right.  Our jury member has stepped out.  Let's go ahead and take the break.  We'll come back and talk before we call the jury members back.

(Recess held from 10:57 a.m. until 11:13 a.m.)

THE COURT:  All right.  We have everyone back in their places.

Let's talk about Juror Number 78.  I'm sorry, 75.

Comments?  Ms. Stokman?

MS. STOKMAN:  Sorry, Judge.  I didn't know you were waiting for me.  We think he's created an issue for cause.

THE COURT:  And the defense?

MS. FISHER-BYRIALSEN:  Your Honor, I think it's both a cause --

THE COURT:  Hold on.

THE CLERK:  I turned off your microphone because cell phones can't be turned on or it's going to make a loud noise.

MS. FISHER-BYRIALSEN:  Oh, because that's how we're getting Wi-Fi.  Okay, hold on.

THE COURT:  I'll tell you, I was very sympathetic to his work situation.  He obviously is very important to these clients that he works with, but I wasn't quite -- I wasn't there yet on hardship because it's a county agency.

Unfortunately, those of us who work for the government, drop dead tomorrow, there's somebody in our seat the day after.  So it's -- that's how I saw the hardship.

The cause is my bigger concern.

MS. FISHER-BYRIALSEN:  We would agree to cause as well, Your Honor.

THE COURT:  Ms. Luem?

MS. LUEM:  We agree.

THE COURT:  Mr. Reed?

MR. REED:  Agreed, Your Honor.

THE COURT:  All right.  So we'll let Juror 78 -- I'm
sorry.  I keep saying 78 -- 75 go for cause.

That brings us to Juror 79.  I do have some concerns
already about this one, and we will explore them with the
juror.  But the juror indicates that the spouse has already
been selected on a jury to start on the 29th.  So that's --

MS. FISHER-BYRIALSEN:  79?

THE COURT:  Number 79 who will be called to replace
75.

MS. FISHER-BYRIALSEN:  Oh, I'm sorry.  You mean the
one that's going to come in and take --

THE COURT:  Yeah.

MS. FISHER-BYRIALSEN:  Okay.  Sorry.

THE COURT:  So that's an issue we're going to -- all
right.  Anything else to discuss, then, before we bring in the
juror -- jurors?

MS. FISHER-BYRIALSEN:  Your Honor, we -- we would
like to discuss Jurors 76, 48, and 43.  76, 48, and 43.

There -- there was an oversight on our part.  We
should have brought 43 up this morning.  But we do believe,
based on his lengthy comments yesterday, that he probably does
have a hardship with his mom and her medical issues and seemed
quite concerned about that.

THE COURT:  He does seem concerned about it, but I
don't find that to be a significant hardship.  What it is is

an inconvenience, because what he talked about was they have
to -- she has to have her medication in the morning.

And while it would be difficult to say, Mom, I'm
sorry, you got to get up early and you got to eat because I
need to -- I need to be able to give you your medication
before I leave at 8:00, that's an inconvenience.

That is not -- there is no indication that she needs
to sleep to the point where she can't eat and then have her
blood evaluated before he would need to be here.  And then he
can be home in the evenings.  So I don't see that at this
point to be a significant hardship.

He did make a comment that causes me some concern,
but my sense of him is he just really wants off this jury.
And I -- you know, I don't -- I don't under -- I don't
minimize his situation, but I don't see it yet as hardship.
That's my comments.

Ms. Luem, you have something to say?

MS. LUEM:  I just do in terms of -- is this working
now?  Okay.

In terms of cause, Judge, with that juror, he -- he
repeatedly said in front of the -- the entire panel that these
gentleman are holding him hostage, that he blames the defense
for him having to be here.

And I -- that is -- even if he says he can be fair
and impartial and he can set aside that bias, I don't believe

he can.  He -- that's a firm, deep-seated anger and -- and --
that he has towards the defense already.  He's expressed it
over and over again.  And I think that really does rise to the
level of cause.

        Even if he claims he can't be -- he can be fair and
impartial, he can't.  He said he can't set that aside and that
he's resentful.  And I feel like if we go back into individual
questioning with him during -- during our time, he might
further taint the panel with information about his complete
refusal to understand or identify with the presumption of
innocence.  He's completely rejected that idea.

        He said on his -- yeah.  I think Ms. Byrialsen just
pointed out, too, his repeated reference to prehistoric
behavior, like these men are already criminal.  So in my eyes,
it's doesn't matter, and it's wasting my time personally.  I
mean, he -- he feels personally victimized by the defendants
in this case.  And at this point, I think he -- he's showed us
that he's -- he's got to go for cause.

                THE COURT:  Mr. Reed, do you have comments?

                MR. REED:  No.  I would agree with the counsel.

                THE COURT:  Ms. Stokman, do you have comments?

                MS. STOKMAN:  He -- I think that, though, he touched
upon the -- some of those comments, it wasn't as -- it didn't
go to the depths that's being characterized right now.  And
the Court did ask the questions that were appropriate to

determine whether that was just him not really wanting to be here or it really went to his ability to be fair and impartial.

THE COURT:  Uh, I also -- I recognize he used the word "prehistoric," and he also indicated on his questionnaire that he strongly disagrees with conduct that's racist in nature, or belief systems that are.

On the other hand, he reaffirmed to me repeatedly that he could be fair.  He -- he could set that aside at the same time saying basically, I don't want to be here.  And I don't -- I don't feel like it's fair that I have to be.

But he also said that I was being inflexible.  And so the fact that he's got some targets of his -- his concern about being here, I think he's sharing that -- you know, he hasn't mentioned the government, but I fully feel his hostility that's directed towards me.

So I don't think it's cause.  I think it is that she [sic] really doesn't want to be on jury service.  So at this point, I don't think it rises to the level of cause for him.

You also mentioned, I'm sorry, another juror.  Who was the other one?

MS. FISHER-BYRIALSEN:  76 and 78.

THE COURT:  Okay.  76 said, Hey, I want you to know the situation.  I understand that I have this bias.  I am going to set it aside.  In fact, has been on two juries

despite this -- these relationships and has come to a verdict
at least in the one.  In the other one, he was an alternate.
This suggests to me he wants to be transparent but that he
understands his role and will do what he needs to do.

        So that's my take on 76, but I'll hear any other
comments about him.

        MS. FISHER-BYRIALSEN:  Your Honor, frankly, I don't
believe him in the way -- and I think part of what we're doing
here is -- is also judging their credibility in what they say.

        On his questionnaire, he said, I assume he's guilty
of something.  That's the direct quote from his questionnaire.
And then he said in answer to Question 44 about finding
somebody not guilty, the, quote, Proof of innocence needs to
be overwhelming.

        THE COURT:  Yeah, we talked about that.

        MS. FISHER-BYRIALSEN:  I understand that, but the
atmosphere in here is he's being asked questions that are
leading, that are -- where he knows what he needs the answer
to be.  And when he was in private on the questionnaire, he
was saying things that were very different in a very strong
matter -- manner.  I'm sorry.

        And I think that, you know, part of what we have to
do here is weigh what he said then compared to what he said
now.  And I don't think just saying to him, Well, you can
listen to me and be fair, is sufficient to truly believe that

he's going to.

    THE COURT:  Comments, Ms. Luem?

    MS. LUEM:  I concur.

    THE COURT:  Mr. Reed, do you have comments?

    MR. REED:  No, Your Honor.  Thank you.

    THE COURT:  Ms. Stokman, do you have comments?

    MS. STOKMAN:  Judge, I'll just add to the Court's comments that you did press him on being fair and impartial, and he was telling the Court that he was bringing this bias up because he was trying to be honest, as the Court has asked everybody.  And he mentioned that he's also served as a juror before, and he was able to set that aside before.  And he's going do that again.  The government doesn't believe it's -- it's risen to a level of cause at this point.

    THE COURT:  I think if there weren't any additional questions, what he says in the questionnaire would be sufficient.  But as I expressed, when we talked about a questionnaire early on, my experience with people who come in in that context, either here in this building or at home, their primary concern is, I don't want to be on jury service.

    And when they come in, as you saw, you saw one guy said, You know what?  I said some stuff about I'm so concerned about work, but I've now heard what other people say; and it's going to be hard for me, but I'm going to do it.  Because there's a difference between what you write on paper and then

when you come in and you start appreciating the seriousness of
what the job requires, people say different things.  And
I've -- I appreciate that you didn't believe him, but I -- I
did believe him.  And I think he's committed to being fair.
And he is doing exactly what we asked him to do and say, Here,
you know, this is a hot spot for me.  And I'm going to be
aware of it and deal with it.

     So I don't think that's cause.  So that's denied.

     And then as to --

     MS. FISHER-BYRIALSEN:  Number 78, Your Honor.

     THE COURT:  Oh, I'm sorry.  I wrote down 48.  It's
78.

     MS. FISHER-BYRIALSEN:  Yup.

     THE COURT:  The IRS agent?

     MS. FISHER-BYRIALSEN:  No.  The young man who had
been traumatized -- yes.  He's an IRS agent traumatized by
gang violence.

     THE COURT:  Right.  He did talk extensively about
that.  Do you have comments that you want me to hear?

     MS. FISHER-BYRIALSEN:  Well, Your Honor, I think
again, he -- he indicated he was very traumatized by the event
that had occurred for him.  But it would -- didn't sound like
it was just one incident.  It was something that happened to
him over an extremely long period of time to the point where
he was sending his wife into stores instead going in there

himself because he was scared.

I don't think that that's something you let go, and
the kind of case that this is and the kind of things that
jurors are going to see would certainly also be something that
triggers him.  So I think that that is enough to strike him
for cause.

THE COURT:  Ms. Luem, comments?

MS. LUEM:  Judge, I -- I agree.  And -- and I would
add it -- it really impacted his formative years as well.  He
was -- he dropped out of sports and stayed in his home to
avoid having to -- to have any confrontation whatsoever
with -- with gang members.  And I think that's just not the
right case for somebody like that.

THE COURT:  Mr. Reed, your comments?

MR. REED:  I have no comments on that, Your Honor.

MS. FISHER-BYRIALSEN:  Your Honor, just to add to the
record, that in -- in his questionnaire, he wrote, The case
brings up memories of the past and creates anxiety.  I don't
think that's something that's going to dissipate.

THE COURT:  Ms. Stokman, do you have comments?

MS. STOKMAN:  Only to point out that Your Honor did
press him and did get to a place where he was saying, Yes,
this -- this was in the past, and I'm coming here.  And I can
be fair and impartial.

THE COURT:  That's the -- that's -- the experience I

had with him is I gave him every opportunity to go, Yeah, you know what, this is not for me.  I can't do this.  Instead, he said the complete opposite.  He said, You know what?  Yeah, that happened.  I have concerns.  This happened to me in the past.  But I understand these are different people, and I -- I can do it.

I mean, I pretty much said to him, Just tell me and you're off.  And he went the other way and said, No, I can do it.

So I don't think it's cause for him either.  In fact, he seems like he is willing to do what the law requires of him.

Did you say 48 and 43, or did I just make that up?

MS. FISHER-BYRIALSEN:  No.  I said 43, but we already addressed that one.

THE COURT:  And 48?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  Was that one raised too?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  Okay.  I must have written 48 when you said 78.

All right.  Anything else then to discuss before we bring in the jurors?

MS. FISHER-BYRIALSEN:  No.

THE COURT:  All right.  Let's go ahead and do that.

658

THE CLERK:  Can I tell --

THE COURT:  Yeah, you can tell 75 he is excused.

(Prospective Jurors enter the courtroom.)

THE COURT:  All right.  We have all of our jury members -- nope, we don't -- no, yes, we do.  We have everyone back.

Let's go ahead and fill the seat.

THE CLERK:  Juror 79.  You'll take Seat Number 16.  Second row.  Thank you.

THE COURT:  All right.  Thank you so much.

I'm going to start kind of in reverse order with you.  You indicate what strikes me as an incredibly weird situation and that is that your spouse has been selected for jury service.

Tell me about that.

PROSPECTIVE JUROR 79:  He won't be serving until the end of the month.  And I don't know much more about it.

THE COURT:  When you say "serving," does that mean he's been called like you have to --

PROSPECTIVE JUROR 79:  Yes.

THE COURT:  -- or he's actually been seated on a jury?

PROSPECTIVE JUROR 79:  No, not seated yet.

THE COURT:  Okay.  And so you're saying, Hey, you know, somebody's got to be home because we have a child who

has some needs; is that right?

       PROSPECTIVE JUROR 79:  Right.

       THE COURT:  And your child has to be taken to school and then to after-school programs; is that right?

       PROSPECTIVE JUROR 79:  That's right.

       THE COURT:  And is it usually you or your spouse who does that?

       PROSPECTIVE JUROR 79:  That's right.

       THE COURT:  If you are selected on this jury, is your spouse able to do that?

       PROSPECTIVE JUROR 79:  Since his is more local in Tulare County, he could drop her off, and then if we're out early enough, I could pick her up.

       THE COURT:  Okay.  And just to be clear then, at this point we don't know what the situation is with your husband, he's just got to report and find out?

       PROSPECTIVE JUROR 79:  That's right.

       THE COURT:  And is also -- is that in Tulare County?

       PROSPECTIVE JUROR 79:  Yes.

       THE COURT:  Has he been told what time he has to be there on the 29th?

       PROSPECTIVE JUROR 79:  No, not what time.

       THE COURT:  And what time does your child have to be dropped off at school?

       PROSPECTIVE JUROR 79:  7:25.

THE COURT:  Okay.  And how long does it take you to get to the courthouse from your location?

PROSPECTIVE JUROR 79:  An hour and 15 minutes.

THE COURT:  All right.  And you do currently --

Well, you no longer work outside the home, is that right, or you do?

PROSPECTIVE JUROR 79:  That's right.

THE COURT:  That was a bad question.

Do you work outside of the home now?

PROSPECTIVE JUROR 79:  No, I don't.

THE COURT:  Okay.  And has it been since becoming a foster parent that you stopped working outside the home?

PROSPECTIVE JUROR 79:  That's right.

THE COURT:  Okay.  Do you currently have other foster children in your home?

PROSPECTIVE JUROR 79:  No, I don't.

THE COURT:  In your home is it just you, your daughter, and your husband then?

PROSPECTIVE JUROR 79:  I also have a 20-year-old son who has developmental disabilities.

THE COURT:  Do you have to provide some assistance to him?

PROSPECTIVE JUROR 79:  No.

THE COURT:  You say that in general you have a positive attitude about law enforcement.  And it sounds like

that's based upon the nature of their work; is that true?

          PROSPECTIVE JUROR 79:  That's right.

          THE COURT:  You haven't had any experiences that are bad or good that influence that decision?

          PROSPECTIVE JUROR 79:  No.

          THE COURT:  Are you able to set aside that feeling and to decide this case only on the evidence presented here?

          PROSPECTIVE JUROR 79:  Yes.

          THE COURT:  You said that as a foster parent that you received periodic training over the years about gangs and gang signs.

          Can you tell me, was that to help you in helping the kids in your home or was that for a different reason?

          PROSPECTIVE JUROR 79:  It was in the line of foster parent training.  And the Tulare Sheriff Department came out to our parent group and gave a presentation, and just -- there were specific questions that other parents had.  I dealt with -- personally I had drug -- drug affected children, infants, so it didn't really apply at that point.  So --

          THE COURT:  So you just have some knowledge because of your job?

          PROSPECTIVE JUROR 79:  That's right.

          THE COURT:  But it didn't actually help you on your job?

          PROSPECTIVE JUROR 79:  No.

THE COURT:  Okay.  And obviously, whatever training
you received in that, I assume was directed more toward
that -- that environment, maybe what your kids would be seeing
or, you know, to help you do your job, although it didn't
really help you.

Would you be able to set that training aside and
listen to the evidence presented here and decide this case on
that evidence and not on your training?

PROSPECTIVE JUROR 79:  Yes.

THE COURT:  Sometimes, as an example, people have
legal training, for example, like in college they take a class
in business environment -- or legal environments of business
or something like that, and I always ask the question like,
you know, if I give you the law and tell you this is the law,
you have to follow it, despite what your instructor may have
said to you, even if you think what I'm telling you is
different, could you follow what I say and, you know, we have
that discussion.

So I'm kind of asking you the same thing.  If you
hear testimony in this case that's different from what your
training was, could you set aside that training then and
consider only the evidence here?

PROSPECTIVE JUROR 79:  Yes.

THE COURT:  Other than what we've talked about, is
there anything else that you feel like I should ask you that

we haven't talked about yet?

          PROSPECTIVE JUROR 79:  Yes, I recalled an incident
when I was working insurance, and I was asked to cooperate
with Homeland Security to provide specifics regarding a
client, and it's very similar to this case.

          THE COURT:  Okay.  A client that you had was being
investigated by Homeland Security?

          PROSPECTIVE JUROR 79:  That's right.

          THE COURT:  And this was a person who was not in
custody at the time; is that right?

          PROSPECTIVE JUROR 79:  Right.

          THE COURT:  And did the Homeland Security officers
tell you what the nature of the offenses were?

          PROSPECTIVE JUROR 79:  Yes, because they needed
specific information regarding the properties.

          THE COURT:  All right.  And so you provided that
information?

          PROSPECTIVE JUROR 79:  Yes, the owner of the company
asked me to provide the information.

          THE COURT:  Were you working directly with the
Homeland Security officers or was your -- the owner of the
company doing that?

          PROSPECTIVE JUROR 79:  The call was authorized by the
owner of the company and then he had turned it over to me to
supply the information.

THE COURT:  Did you have the actual -- did the -- did you then have conversations with the Homeland Security officers about, Hey, what's this about?  Why do you need this?

PROSPECTIVE JUROR 79:  No, they did not provide that. Although it was publicized, and we had to follow along because it was a commercial property, and there's diligence to the insurance company itself, and as an agent, we had to communicate what was going on.

THE COURT:  Okay.  How long ago was this experience?

PROSPECTIVE JUROR 79:  16 to 17 years ago.

THE COURT:  Did you follow the case -- or did it go any further than just the gathering of information, to your knowledge?

PROSPECTIVE JUROR 79:  Uh, yes.  It -- it went to trial and they were convicted.  And as an agent, we had to notify the company.  And the company cancelled the property due to criminal activity on a commercial property that they insured.

THE COURT:  Oh, you were like a broker, an insurance broker?

PROSPECTIVE JUROR 79:  Yes.

THE COURT:  So you got this information, and you told the actual insurance company here's the deal --

PROSPECTIVE JUROR 79:  Right.

THE COURT:  -- and they cancelled the policy on

the --

PROSPECTIVE JUROR 79:  Correct.

THE COURT:  -- on the property?

Did you follow beyond that to determine what happened to that property ultimately?

PROSPECTIVE JUROR 79:  No.

THE COURT:  Did you have contact with the person who was the subject of that investigation?

PROSPECTIVE JUROR 79:  I don't recall.

THE COURT:  Did anyone in your company have contact with that person and then they shared information with you about that person?

PROSPECTIVE JUROR 79:  No.

THE COURT:  Was there anything about this experience that you think would impact your ability to be fair or impartial in this case?

PROSPECTIVE JUROR 79:  No.

THE COURT:  Before you were called up in the box, over the last day or so I've asked a lot of questions, was there anything --

First, did you listen to all the questions that I asked?

PROSPECTIVE JUROR 79:  Yes, I did.

THE COURT:  Was there any information that you feel like you need to share about any of the questions I asked?

PROSPECTIVE JUROR 79:  The only question that came to mind was in regard to interaction with courts, and I have done that through the foster system.  I have provided documents on the children, on their behavior and health.

THE COURT:  And that was in juvenile court?

PROSPECTIVE JUROR 79:  Right.

THE COURT:  Was that in Kings County or Fresno County or --

PROSPECTIVE JUROR 79:  Tulare County.

THE COURT:  Oh, Tulare.

Would you go to the periodic hearings that they would have in juvenile court?

PROSPECTIVE JUROR 79:  The social worker did not need that.  She -- she had paperwork from me that she presented.

THE COURT:  And as a foster parent you generally periodically have to document what you're seeing and the developments and everything about what's going on with the child, right?

PROSPECTIVE JUROR 79:  Right.

THE COURT:  And then you would give that to the social worker who would include it or not include it to the Court; is that right?

PROSPECTIVE JUROR 79:  That's right.

THE COURT:  And were there occasions when you would have to go to court related to a foster child?

PROSPECTIVE JUROR 79:  I did not have to, no.

THE COURT:  And you said mostly these were babies.

PROSPECTIVE JUROR 79:  Yes, that's right.

THE COURT:  And then you also have an adoptive child. Did you go to court related to that adoption proceeding?

PROSPECTIVE JUROR 79:  Yes, I did.

THE COURT:  And was that -- do you feel like you were treated fairly in that process?

PROSPECTIVE JUROR 79:  Most definitely.

THE COURT:  And as a foster mother, I know from my experience, sometimes there's social workers who aren't so great and maybe you had an experience where you weren't satisfied with that -- the service that your kids were getting or that you were.

Did you ever have that type of experience?

PROSPECTIVE JUROR 79:  Uh, there's just procedures. They're following procedures.  And sometimes it takes a long time, but I'm pretty neutral about it.

THE COURT:  So by and large, you don't have any grievance against the government or anything like that?

PROSPECTIVE JUROR 79:  No.

THE COURT:  Anything else that I haven't asked you about that you think would impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 79:  No.

THE COURT:  Okay.  Counsel, can we speak at sidebar, please.

(Sidebar commences:)

THE COURT:  All right.  So at this point, it's my intention to turn it over to you all to ask questions, but I don't want to do that if you see an obvious hole that we need to address now.

Is there anybody else we haven't talked about that you feel like we should before we move to that next phase?

MS. FISHER-BYRIALSEN:  No.

MS. STOKMAN:  (Shakes head.)

MR. REED:  I think we're starting here.

MS. FISHER-BYRIALSEN:  Can -- can we do a -- do you guys have anything?

MS. STOKMAN:  No.

MS. FISHER-BYRIALSEN:  Can we take a 30-minute break before we do that, so we can then make sure it goes smooth and we're not repeating each other?  Because we haven't had that opportunity to sort of coordinate that.

THE COURT:  We're going to start with the government. And we're pretty close to the lunch hour anyway.

MS. FISHER-BYRIALSEN:  Okay.

THE COURT:  So we'll get started with the government and then you all can have your confab over lunch.

MS. FISHER-BYRIALSEN:  Okay.

(End of sidebar.)

THE COURT:  All right.  Ms. Stokman, do you wish to inquire of the jury?

MS. STOKMAN:  Yes.

Good morning, everyone.

So again, my name is Stephanie Stokman.  Along with my colleagues that I introduced to you guys before, we're the prosecutors in this case.  And I am going to keep this as short as I can because I know we've been asking a lot of you -- but I had some follow-up questions.

With Juror Number 21, we talked a lot about your hesitation and with the issue of guilt and what that requires.

Have you had some time to really process and think about what your role is as a juror and that's causing you to have some hesitations about that concept?

PROSPECTIVE JUROR 21:  So if there is substantial evidence that this person is guilty, I don't think my conscious would say, okay, you know, he's -- you know, he can be let go or whatever.  It just depends what the law says.

But I also have to be -- I have to be sufficiently satisfied of the evidence so that I can actually find that person guilty.  But to -- on the other hand, I -- if I -- if I don't feel that there is substantial evidence to prosecute that person, then I -- I don't want to find that person guilty.

MS. STOKMAN:  So you're using the term "substantial evidence," and the Judge is going to explain to everybody who becomes a juror what the government's proof is, beyond a reasonable doubt, what that means.

I know you don't know what that means at this moment, but it's, you know, proof beyond a reasonable doubt.

Does that term come to mind to you as something that you're going to need more than that?  You're going to need more than whatever that proof is in order to reach what you think is a sufficient place to say, Yes, this person is guilty?

PROSPECTIVE JUROR 21:  I haven't thought of that. I -- that's a really good question.  I'm sorry, I --

MS. STOKMAN:  That's okay.

PROSPECTIVE JUROR 21:  -- don't know how to answer it.  If you want to go to the next person while I think about it --

MS. STOKMAN:  You want to think about that?

PROSPECTIVE JUROR 21:  Yes, please.

MS. STOKMAN:  Okay.  So just hand the mic right over to 67, if you can.

So you've heard, I think, a lot about -- the Judge was saying that you guys aren't going to be considering punishment, so that's not something that you need to be worried about.

But given your background, do you believe that it weighs heavily on you to even consider finding somebody guilty or is that not a consideration?

PROSPECTIVE JUROR 67:  No.  I understand what my role is as a juror, not a judge.

MS. STOKMAN:  Okay.  And so if the evidence was proven beyond a reasonable doubt, you would find yourself in a position where you had no problem saying guilty; is that correct?

PROSPECTIVE JUROR 67:  Yes.

THE COURT:  Okay.  Going to 65.

It sounds like there was a difficult experience with your relatives and their interaction with the criminal justice system, right.  Does that cause you a hesitation in coming to terms with whether or not you are able to find guilt beyond a reasonable doubt or at all?

PROSPECTIVE JUROR 65:  I don't think I would have a problem.

THE COURT:  Yesterday when the Judge asked you if you had any issues being fair and impartial, I saw you hesitate a little.  Is there a reason why you hesitated a little before you answered that question?

PROSPECTIVE JUROR 65:  I don't recall.

MS. STOKMAN:  Okay.  So sitting here today, do you believe that you'll be fair and impartial despite the history

with your family?

         PROSPECTIVE JUROR 65:  Yes.

         THE COURT:  Okay.  And would you require the
government to prove the case more than beyond a reasonable
doubt in order to find guilt?

         PROSPECTIVE JUROR 65:  Can you rephrase that?

         MS. STOKMAN:  Sure.  That was not a greatly phrased
question.

         So do you think that it would take more than the
proof required of the government for you to find guilt in this
case?

         PROSPECTIVE JUROR 65:  If the proof is there, I
should have a verdict for it.

         MS. STOKMAN:  Okay.  So you're perfectly okay
following the instructions that the Judge is going to give you
and following that?

         PROSPECTIVE JUROR 65:  Yes.

         MS. STOKMAN:  Okay.  Thank you.

         21, have you thought about it?

         PROSPECTIVE JUROR 21:  So I guess it goes into lying
too, but the same way that you asked her.

         MS. STOKMAN:  Uh-huh.

         PROSPECTIVE JUROR 21:  So if -- do I need anything
more to find the person guilty.  Uh, so I guess just like she
answered, if the evidence is there, then -- to be honest with

you, I don't want to be placed in that position where I decide, so --

          MS. STOKMAN:  Is that because you have a hesitation just judging someone else and being able to come to a guilty verdict?

          PROSPECTIVE JUROR 21:  Yes.

          MS. STOKMAN:  Okay.  Thank you for -- no, that's the whole point of this, right?  I mean, it feels invasive, I know, but the whole point is to find the right jurors and to get through all of these so that you don't feel like you're in that position if you're -- if you actually get there.  So thank you.

          Can you hand the microphone to Juror 28, please.

          THE COURT:  Actually, Ms. Stokman, before you move on, let me just make sure I understand so that we're on the same page.

          I'm willing to say nobody here wants to do this.  So the question is not really whether you want to do it, but are you willing and able to do it.

          PROSPECTIVE JUROR 21:  Am I willing to do it?

          THE COURT:  Yes.

          PROSPECTIVE JUROR 21:  So in other words, I have an option?

          THE COURT:  No.

          PROSPECTIVE JUROR 21:  No?

THE COURT:  No.  I should be more specific.

PROSPECTIVE JUROR 21:  Okay.

THE COURT:  Because then I know the answer everybody has to that question too.

I guess what I'm saying is, I mean, I asked you yesterday if anyone has any moral, religious, or other belief system that makes it impossible to sit in judgment.  So that's -- that's one end of it.  And the other one is, Gosh, I just really wish somebody else would do this.  And that's the other end.

So what I'm trying to find out is, are you just saying, I really wish I didn't have to do it, but if I am picked, I will do my duty; is that true?

PROSPECTIVE JUROR 21:  True.

THE COURT:  All right.  Thank you.

MS. STOKMAN:  If you could please hand it to Juror 28, thank you.

So similar question about your family's experience. Is that -- I know you spoke about it with the Judge, but do you find that to be a situation that might -- is just so close in time that it might be hard for you to sit on the jury and determine guilt or innocence?

PROSPECTIVE JUROR 28:  No.

MS. STOKMAN:  No?

PROSPECTIVE JUROR 28:  No.

675

          MS. STOKMAN:  Okay.  So let's talk a little bit about
the pay, the financial potential of no pay through your work.

          Are you the sole provider in your house?

          PROSPECTIVE JUROR 28:  No, but I am the breadwinner
in my household, you could say.

          MS. STOKMAN:  So if you are not getting paid and
you're on this jury, is that going to be a significant burden
to your family financially?

          PROSPECTIVE JUROR 28:  It will be.  I can try to work
around my schedule.  I haven't talked to my employer, like,
specific, because I -- like everything is kind of unknown at
this point.  But I think they're flexible enough to where I
could probably still maneuver my schedule.

          MS. STOKMAN:  So you think that you'll be able to
make it so that you can get paid?

          PROSPECTIVE JUROR 28:  I think so, yeah.  Uh-huh.

          MS. STOKMAN:  Okay.  Do you know that for sure?  Will
you be able to tell us at some point?

          PROSPECTIVE JUROR 28:  I can call my manager and ask,
yeah.

          MS. STOKMAN:  Okay.  Thank you.

          PROSPECTIVE JUROR 28:  Yeah.

          MS. STOKMAN:  And then that same question for
Number 53.

          I just want to clear up, you had mentioned that your

family relies on your income in order to provide for the household.  If you are not getting paid to serve on the jury, is that going to be a significant hardship or a burden financially for your family?

PROSPECTIVE JUROR 58:  Yes.

MS. STOKMAN:  Okay.  Is there anyone else who -- I know we kind of just went to specific things that I wanted to clear up, but is there anyone else who, as we've been sitting here, heard questions a little differently, changes, anything, something comes to mind that we should discuss in order to make sure that you're the appropriate person that we put on this jury if that's what happens?

Nope?  Okay.  Thank you.

THE COURT:  All right.  Juror 53, let me follow up with that question too.

You said earlier that you would probably have to talk to your dad about, you know, figuring out what the finances would be if you're selected on this jury.  Is that it?  Would you do that?

PROSPECTIVE JUROR 53:  Yeah.

THE COURT:  When you've been here the last couple of days, have you had the opportunity to talk to your dad about, Hey, if I have to be there, I'm not going to be able to work?

PROSPECTIVE JUROR 53:  No, I haven't.

THE COURT:  Okay.  Is your dad at work now?

PROSPECTIVE JUROR 53:  Yes, he is.

THE COURT:  Okay.  But you still -- do you feel like if you were to be able to talk to your dad, that he would be able to assist you and your brother in figuring it out, your finances?

PROSPECTIVE JUROR 53:  Can you ask that again?

THE COURT:  Yeah.  Do you feel like you would be able to talk to your dad and that he and your brother and you would be able to figure out the finances if you're here?

PROSPECTIVE JUROR 53:  Yeah.  I think we can.

THE COURT:  I guess what I'm trying to figure out is if you don't work, does that mean that you don't eat, or is it -- is it -- are we talking about that type of situation?

PROSPECTIVE JUROR 53:  No.  It's just that we wouldn't be able to pay the bills on time and, yeah, that would be hard.

THE COURT:  As it is now, does it take all three of your incomes just to pay the bills and there's nothing left over?

PROSPECTIVE JUROR 53:  It will be for my dad and my brother, yes.  So whatever my dad cannot pay, like for car insurance, I help him pay, and same for electricity, yeah.

THE COURT:  And is that true, too, if your dad can't pay the insurance, then your brother will pay?

PROSPECTIVE JUROR 53:  Uh, yeah.  He can only help a

little bit though.

THE COURT:  Is that -- does he get to keep some of his income for himself, your brother?

PROSPECTIVE JUROR 53:  Uh, yeah.

THE COURT:  Do you --

PROSPECTIVE JUROR 53:  They work in the same job, so they get paid around the same thing.

THE COURT:  And so he contributes some and then he keeps some money for himself?

PROSPECTIVE JUROR 53:  Yes.  If he can, yeah.

THE COURT:  Do you do the same, where you contribute some and you keep some money for yourself?

PROSPECTIVE JUROR 53:  Yes, if I can.

THE COURT:  All right.  Ladies and gentlemen, we're going to go ahead and take our lunch break at this time.  I'm going to ask for everyone to be prepared to return at, let's say, ten minutes after 1:00.

And again, if you would please not discuss the case, please don't do any research, please don't search the internet or read any news articles, and please don't form any opinions about this case.

Thank you very much.

(Prospective Jurors exit the courtroom.)

THE COURT:  Okay.  We have Juror 21, and was I -- what I understand is that you've been called for jury service

next week in Tulare.

          PROSPECTIVE JUROR 21:  I -- I -- you know what?  I
just remembered when she mentioned it, another juror that was
called earlier.  And I've been called for jury duty in my --
in my county.

          THE COURT:  On the --

          PROSPECTIVE JUROR 21:  On the 29th, the same day that
her husband got called.

          THE COURT:  Okay.  You don't have to do both, so
that's the --

          PROSPECTIVE JUROR 21:  Okay.

          THE COURT:  -- that's the good news for you.  Is that
something Aracelli can take care of, or is that something I
have to take care of?

          The CLERK:  If she gets selected, then she tells the
other county's jury.

          THE COURT:  Okay.  So let's kind of wait and see what
happens.  If you're selected on this jury, then we will work
together to let the other county know about that.  If you are
selected, you can certainly tell them, Hey, I was just on jury
duty, and that should be enough.  But that's -- let's take it
one step at a time.  Does that make sense?

          PROSPECTIVE JUROR 21:  Okay.  Do I have to bring the
letter or --

          THE COURT:  No.

PROSPECTIVE JUROR 21:  Okay.  I just wait.  Okay.
Thank you.

THE COURT:  Okay.  Thank you very much.

(Prospective Juror 21 exits the courtroom at 11:54 a.m.)

THE COURT:  All right.  The jury members have stepped
out.  Anything for the record at this time?

All right.  Doesn't sound like it.  I will see you
back at 10 after.

(Lunch recess was taken from 11:55 a.m. to 1:02 p.m.)

THE COURT:  All right.  We have everyone back in
their places.

Counsel, are you -- have you had enough time to
discuss your tactics moving forward?

MS. FISHER-BYRIALSEN:  Yes.  Thank you.  We're going
to go try to be as efficient as we can, Your Honor.

THE COURT:  I would appreciate that.  I mean, if we
can get this jury picked today, that would be ideal.

All right.  And who is going to start us off?

MR. REED:  I will, Your Honor.

THE COURT:  All right.  Thank you, Mr. Reed.

Anything before we bring the jury back in?

MR. REED:  No, Your Honor.

THE COURT:  All right.  Let's go ahead and do that.

(Prospective Jurors enter the courtroom.)

THE COURT:  Looks like we're still missing a couple

of jurors.  We're going to need to wait.

You-all can be seated, if you'd like.  There we go.

(Remaining Prospective Jurors enter the courtroom.)

THE COURT:  All right.  We have all of our jurors back in their places.

Mr. Reed, would you like to inquire?

MR. REED:  Yes, Your Honor.

Good afternoon, ladies and gentlemen.

For three days, that's the only thing I've ever said to any you, except I kind of nod when you guys say hello.  But it's uncomfortable for us to speak back to you, so I either nod or look away.  I'm not being rude, that's just the way -- after you've been doing this for a while, that's one of the things you learn.

So I have come away with a thought.  And we don't talk about it often, but being a juror in a criminal case in federal court is advanced citizenship.  In my opinion, it just doesn't get any harder because you get that letter from the federal government and, then, in your case, you got a questionnaire to fill out, you had to turn that information in.

And then we ask you to do the impossible, in some ways.  We ask you to tell us about yourself and to be honest about yourself and, if you are being serious, to kind of look inward, because we ask the question:  Can you be fair and

impartial?

And if you were not sitting in the jury box or in front of the jury box or want to go in front of the jury box, the first thing you would ask the person that asked you, Can you be fair, you would say, About what, right?  Because everybody -- and I've been doing this a long time -- everybody says they are fair and impartial.  Everyone says, I'm the fairest person there is.

But we all know that can't be -- possibly be true because there are situations where we are not fair, where I would prejudge.  If my kids were involved in something, easy. I love my daughters, more likely than not, I'm going to prejudge any issue that has to do with them, probably my mother and father, maybe even my in-laws, but definitely my kids, okay?

So the question becomes not so much can you be fair and impartial, it's can you be fair and impartial in this situation?  And I'm going to pile on a little bit more.

I'm not going to tell you what the law is.  I'm going to ask you this question without ever telling you anything about what the law is.  You don't get that until the end. That's in every courtroom.  The judge instructs the jury on the law after the lawyers have -- well, depending -- around the time the lawyers have argued but definitely after the evidence has come in.

So the question of I used the wrong law, that doesn't ever happen because the Court gives you the law to use.

You are the judges of the facts, which means judges of credibility of people, judges of -- and that's -- that's why we ask questions about, Do you always believe police officers?  If your answer is "yes," then that's going to be a problem for some people.  I think if you put "always" in front of anything, it's going to be a problem.

So the question becomes -- and this is the part you have to do on your own, inside yourself -- can I stand up and kind of sort of embarrass myself and say not, I got other things to do, Question 47, that's the easiest one to answer, right?  I've got other stuff to do.  I've got job stuff.  I've got my mom to take care of.  I've got my brother to take care of.  I've got my kids to take care.  And what I need to do for me is a heck of a lot more important than you making me sit here and not paying me.

That's the easy question.

The dig-deep question, the advanced-citizenship question is, after everything I've heard today or the last three days, I don't know that I can be fair to either side or to one or the other side.  Because we're afraid of the next question that comes, is she going to make me embarrassed?  Is she going to scare me?

We don't care about that part.  Just be honest.  Just

say how you feel.  You can't go to jail for it.  It's not
under oath.  Well, you are, but not for that reason, okay?

So just -- just be straight.  I've got to be -- so in
the be-straight world that I've got to lay up,
Aryan Brotherhood gang, probably going to hear something about
people being in prison.  No one has talked about that.

For a lot of different reasons, lawyers are not
allowed to talk about the facts of the case.  But I'm going to
ask you a question:  Can you set aside the fact that a witness
who claims to something that occurred may himself be in prison
at the time he saw this?

Ms. 21, can you do that?

PROSPECTIVE JUROR 21:  I'm so sorry.  Can you repeat
the question?

MR. REED:  I hate when that happens because that
means you weren't listening to me the first time.

THE COURT:  It's -- let's get the microphone, please.

MR. REED:  Sure.  That's all right.  That's my fault.
Yeah.  Sure.  I'll make it clearer.

Not every witness that comes in here -- although
they'll all testify from that chair over there, not every one
of them will be priests and police officers and lawyers and
doctors.  None of them -- more likely than not, they won't be
the guy that lives down the street from your house.

Some of the witnesses who aren't police, doctors, and

things like that may be people who are -- who are currently or
were doing time in a prison.

      And I drive here from Los Angeles, and when I'm
driving on the 99, every prison I've ever heard of is off
this -- the freeway here as I'm coming up.  Corcoran, I found
out where all of them are now.  They are all off the 99.

      So do you judge people by, Geez, that guy is a
prisoner.  I'm not going to believe anything he says?  Or do
you think about the prisoner or the guy who has been to prison
who was your friend who went to church with you when you guys
were kids?  Well, do you judge the person based upon what you
hear?

            PROSPECTIVE JUROR 21:  You're asking me?

            MR. REED:  Yes.

            PROSPECTIVE JUROR 21:  I judge people by their
character.

            MR. REED:  You can't judge.  You -- how do you -- how
do you know what their character is?

            PROSPECTIVE JUROR 21:  Just by --

            THE CLERK:  Wait.  I think that -- hold on.

            MR. REED:  I'm sorry.

            THE CLERK:  That one died.  Testing.

            MR. REED:  All right.  I'll tell you -- I'll give a
another hint.  For a whole lot of reasons, no lawyer is going
to ask anyone who is on the witness stand about their

character.

PROSPECTIVE JUROR 21:  By their character, I mean by
the evidence that is shown.  Like if there is -- like I was
trying to explain to the other -- to the attorney is if -- if
it -- if I have enough evidence where I don't doubt, like
somebody --

I actually asked my -- another juror, but it was
separate from this.  And I hope -- and she made me understand
this.  If you look at a picture and it's right there in front
of you, how can you deny that that's what it is?

If somebody says it's a flower or, you know, and
another person says, No, it's -- you know, it's an animal, you
know, but the evidence is right there in front -- in front of
me, it's -- it wouldn't be right for me to just turn the other
cheek and say, You know, I agree with you that it's an animal
instead a flower.  And I know that this is -- I don't know if
I'm explaining myself because I --

MR. REED:  You're being perfect because you hit on a
couple of very key issues.  The first thing, and I forgot to
tell the other thing that makes it an advanced citizenship,
you don't get to talk to the jurors about anything that has to
do with this case for two months.  Because the only time
you're allowed to deliberate, which is decide, is when all 12
of you -- and look, there's way more than 12, so you've got to
wait until you're whittled down to 12, the 12 of you have to

be in that room that says you can do that.

And if somebody wants to go to the restroom, you've got to stop.  You can't do it with 11.  You can't do it with 10.  And you definitely can't do it by talking to another friend of yours who's a juror.

People do this natural thing, when we're thrown together, I -- I don't talk to you but I watch you, and you guys have lunch together, you guys break up into small groups, and that becomes your friend.

PROSPECTIVE JUROR 21:  Well, let met clarify.  The thing is that, because I have to be fair to the -- to the attorney that was before you, because she asked me a question if the law says that, you know, this person is -- there's evidence that this person did something, am I going to be in my conscience or my feelings or whatever it is -- words you guys want to use to find this person guilty, then yes, if that is my duty, I have to.  I can't turn the other way either.

But so to answer your question, like, when I was talking to my friend, we weren't talking about the case.  I was trying to make myself, like, understand if I could do this or not.  Honestly, I don't even know if all these people -- how the other people feel about it, but in my position, I'm still like, Am I able to do this or am I not able to do this?

MR. REED:  And that's --

PROSPECTIVE JUROR 21:  And I know that everything has

to do with evidence and things like that, but I'm just trying
to be honest with you.

I'm -- you know, giving the facts -- like, I am here
right now, but I just don't know what I am capable of.  All I
know is that -- so when I spoke to her we weren't talking
about this case, we were talking in general.

And so that's why we were saying, you know, What
would you do in my position -- or not my position, but if you
get selected as a juror, you know, what is, you know -- I've
never been to a jury -- I've never been called for jury duty.
All of a sudden this month I got called twice, and so this is
completely new for me and this is not a simple case I hear.
This is something that could take up to three months.

So I don't know exactly what it is, I'm just --

MR. REED:  Okay.  Well, again, I can't -- I'm not
going to lecture you on what the law is and what it isn't
because what the prosecutor was talking is correct.  If the
law tells you X, then that's what the law is.  If you think
that that has been established, then yes, and if you don't,
no.

As far as character, it's what a person sees, they're
testifying what they see, what they heard, the five senses
basically, the average person testifies, and that's what you
judge.  Okay?

PROSPECTIVE JUROR 21:  So --

MR. REED:  I say it's raining outside, somebody else comes in and says it wasn't raining at the exact same time.  I don't know if that's a character question or not.  You just decide which one I believe.

PROSPECTIVE JUROR 21:  But like the Judge said, though, we don't come here with the presumption that that person is guilty, so they would actually have to prove that.  So right now their character is their innocence, right, that's what their --

MR. REED:  Yeah, but guilt is -- that's down the road.

PROSPECTIVE JUROR 21:  So, that's -- see, that's what I mean, like, I don't understand what you're -- like what you want from me, like, or what answer --

MR. REED:  It's not what I want from you.

Do you have kids?

PROSPECTIVE JUROR 21:  Yes.

MR. REED:  How many do you have?

PROSPECTIVE JUROR 21:  One.

THE COURT:  Okay.  Well, see, one kid is not enough because you can't get the fight going.  If you've got two kids, then you understand what I'm talking about.

PROSPECTIVE JUROR 21:  I guess I'm not good enough to be here then.

MR. REED:  No.  You have sisters and brothers, right?

PROSPECTIVE JUROR 21:  Yes.

MR. REED:  Okay.  Then you were the kid.

Who broke the cookie jar?  I didn't do it.  I don't know what your first name is, but she did it.  You say, No, it wasn't me; it was him.  Your mom and dad decide who they think it is or like my parents they whoop both of us, okay.

So Judge -- we don't get to that in court but that's -- that's -- you do this every day.

PROSPECTIVE JUROR 21:  But this is a big case, so I think that's the responsibility of the Judge, not my responsibility, right?

MR. REED:  Yeah.  And I'm not going to lecture you, but if I were, I would tell you that there is no jury instruction that says this is the big case standard and this is the small case standard.  It's just a case.

If it's too much, then it's too much, then move on. Just say, Look, I don't know if I can do that.

PROSPECTIVE JUROR 21:  Okay.  Then --

MR. REED:  Not right now.  There's another point when you get to do that, but not right now.  Okay.

PROSPECTIVE JUROR 21:  No.

MR. REED:  We can't tell what is in your head, only you know that.  And to be honest with you, the person that stands up and says "I can't do this" is probably the most honest person in the room.

PROSPECTIVE JUROR 21:  Well, thank you, maybe you just took it out of me and I didn't know how to say it.  You know, maybe I can't do this.

MR. REED:  Okay.  Well, the "maybe" part is the problem.  But that's -- anyway that's something that you decide.  That's the advanced citizenship part.

I don't know any of you people and none of you know me.  The idea of me standing up and telling -- if I was sitting in that box and say, Aryan Brotherhood, yeah, I've only heard bad things about them.  I saw the movie, didn't like that.  No, Judge, I can't be fair.  I'm prejudging.

I am or -- you know, either 39 or 59, one of you two was sitting in the chair of the person that said the criminal justice system is -- is stacked against us and there's no way it's going to be okay and I don't want to be here.

I understand that, but then the answer to that -- it wasn't either of you, it was before you guys got here.  It was somebody sitting in your chair.

The answer to that question, we don't get to do the lecture part, we don't get to do the lawyer part, I don't get to do the Jack McCoy part, which is to get up and explain, which is unless you're willing to sit there it ain't ever going to get any better.  Okay.

PROSPECTIVE JUROR 21:  So --

MR. REED:  So -- but if it's too much, it's too much.

Just say so.  No one's going to tell you you're wrong about
what's too much and what isn't.  Okay?  Just be yourself.

          PROSPECTIVE JUROR 21:  And I think I have.  I just,
you know, like I don't know anything about Aryan Brothers.  I
don't know anything about gangs.  I know the definition of it.
You know, I don't have negative feelings about enforcement.  I
can't really say that I've had, you know, big encounters with
them.  So I can't side with either, like I don't have -- if I
have any biases, I honestly -- I mean whether you guys believe
me or not, I don't know what they are until I'm faced with
them.  So --

          MR. REED:  That's okay.  And we wouldn't know that
unless you tell us.  That's all just -- but it's difficult.
Because you have an expectation of what you think we want from
you.

          We just want you to be yourself and just talk.  It's
all it is.  It's as simple as that, but it's hard to do.

          You would agree, right?

          PROSPECTIVE JUROR 21:  It is.  This is very
intimi- -- for me, this is very intimidating.

          MR. REED:  I'm sure the person next to you feels the
same way.

          66, do you think this is difficult?

          PROSPECTIVE JUROR 66:  Can be.

          MR. REED:  Can be.  Okay.  Do you think that you can

listen to a trial and then sometime in March -- hold your

decisionmaking until you get to March?

        PROSPECTIVE JUROR 66:  I think I can.

        MR. REED:  Really?  So you're not the guy that reads

a book and kind of looks at it and you kind of figure out, I

think I know who did it, and you just kind of read along, but

in your mind you know who it is that did the murder in the

book.  You know who Hercule Poirot was really supposed to be

chasing, or whatever character he is in your book, okay.  Most

of us do that.

        PROSPECTIVE JUROR 66:  Yeah, yeah.

        MR. REED:  Most of us read books and we -- in our

mind, we come to conclusions as we go.  In fact, that's how

our minds work.  It builds upon what you already know and

takes you to the next step.

        PROSPECTIVE JUROR 66:  Agree.

        MR. REED:  Okay.  However, in this courtroom, and

every other courtroom in this country, the prosecution goes

first, the prosecution puts their evidence on, and if you've

already decided for either -- for or against either side in

the middle of the prosecution case, that's the exact opposite

of what the law says you should do.  You deliberate at the

end.

        Going back again, I mean, I'm going to ask the

question again.

Wouldn't you agree with me that's difficult to do?

PROSPECTIVE JUROR 66:  I believe so.

MR. REED:  Can you do that?

PROSPECTIVE JUROR 66:  Yes, that's what I meant when I said I can do -- hold my judgment until March.  Of course, I'm going to form my thoughts as we're going along, and I mean chronologically, if the prosecution is going to go first, I won't hear the other side until afterwards, but from my case, I can obviously -- I think that I can keep an open mind to hear both sides and then I can make my decision then.

MR. REED:  I put another wrinkle on it.  The prosecutor puts their evidence on, I argue or fight about that evidence, but -- so you have the two different extremes, right?

PROSPECTIVE JUROR 66:  Uh-huh.

MR. REED:  It doesn't mean anything until the Court gives you the thing that you have to use to test it against, which is the law, which are the jury instructions.

So you don't just wait until after she gets done with her case and I start talking, you have to actually wait until the Court gives the instructions and then even past that.  You have to wait until you're sitting there with the other 11, and the only thing I know about jury selection -- or jury deliberation is what I watch on TV so I don't know if that's true, but my mindset is 12 people get back there and they

start talking.  That's when the deliberating part happens.

Can you do that?

PROSPECTIVE JUROR 66:  Yes.

THE COURT:  Ms. 67, can you do that?

PROSPECTIVE JUROR 67:  Yes.

THE COURT:  Ms. 62, can you do that?

PROSPECTIVE JUROR 62:  Yes.

THE COURT:  Would you agree with me that's difficult?

PROSPECTIVE JUROR 62:  Yes.

MR. REED:  So every day you come in to this trial, from the time that it starts, you're going to hear some evidence, and either the mountain gets higher or it gets lower, however you want to do it.  There's more sand in the boat -- in the jar.

But that doesn't necessarily mean that you can start deciding.  That's the advanced citizenship part.

Mr. 39, would you agree that that's difficult?

PROSPECTIVE JUROR 39:  (Nods head.)

MR. REED:  Mr. 59?

PROSPECTIVE JUROR 59:  (Nods head.)

MR. REED:  Can you do that?

PROSPECTIVE JUROR 59:  Yes, sir.

MR. REED:  Even if I add in the part that the people involved in this case, not all of them, but some of them, I mean, for the most part actually I can say 110 percent but I'm

just going to say "for the most part," people who live in prison in a cell more likely than not have been convicted of a crime.

Okay. And in our world, we judge people based on that, right? Some of you that are old enough to have kids don't want your daughter marrying somebody who's been in prison. Some of you that have brothers and sisters, you don't want your sister marrying somebody that's been in prison. Am I saying anything out of school? Am I saying something that's totally foreign to all of you? That's true, isn't it?

We judge people by what we think they've done in their past. Is that a fair statement? Okay. It doesn't mean they can't tell the truth. But it is something that we cannot ignore. Would you all agree with that?

Is there anybody that doesn't agree with that? You're Number 9 -- you're not in Number 9, but you are Number 9, would you agree with that, sir?

PROSPECTIVE JUROR 9: Yes.

MR. REED: Was the fact that some of the witnesses in this case may have, probably were, or more likely than not have been convicted felons, is that a factor that's going to bother you when you're hearing this case, Number 9?

PROSPECTIVE JUROR 9: No.

MR. REED: All right. How about -- and I don't know this is a fact or not yet, this is going to come in or not

come in or this is going to happen or not happen.

How about the fact that someone who has committed a crime in the past -- and by the way, you cannot go to prison without having comitted a felony.  So not just a crime, right?  Some of you already know this.

How about the fact that that person now wants to say, I'm telling the truth about something else, about what I saw, what I heard, what I felt or what I smelled?  I'm going through the five senses again.

Would the fact that that person is a convicted criminal, a convicted felon, Number 9, would that be something that you would think is at least reasonable for you to factor in to whether or not they're telling the truth?

PROSPECTIVE JUROR 9:  No.

MR. REED:  Okay.  No, it wouldn't be reasonable?

PROSPECTIVE JUROR 9:  No, oh, yes, I don't know.

MR. REED:  Well, see, no, there's no "I don't know" because it's you.  I'm not talking about me.  I know what I would do but I'm talking about you.

THE COURT:  Mr. Reed, let's go ahead and get that microphone back there.

PROSPECTIVE JUROR 9:  No.

MR. REED:  So you don't think it would be relevant at all?

PROSPECTIVE JUROR 9:  Maybe slightly.

698

            MR. REED:  Okay.  I understand.

            Let's see.  You don't have your name number on.

            PROSPECTIVE JUROR 74:  It kept falling off.  I do
apologize, sir.

            MR. REED:  Do you know what name number you are?

            PROSPECTIVE JUROR 74:  74.

            MR. REED:  74, Mr. 74.

            What's your answer to that question?

            Well, you know what, hold on a second because I'm
going to add another thing there.

            Let me go back to Number 9.  Let's make -- yeah, look
at what I did.  I'm going to add something to that.

            PROSPECTIVE JUROR 9:  Yes.

            MR. REED:  I don't know if you're Catholic, but say
for the sake of argument you might be.  Let's make that same
person a priest.

            Would you factor in the fact that the person is a
priest as to whether or not they're telling the truth?

            PROSPECTIVE JUROR 9:  Probably not.

            MR. REED:  A police officer?

            PROSPECTIVE JUROR 9:  No.

            MR. REED:  Police officers can lie, in your mind?  Or
they can be mistaken?

            PROSPECTIVE JUROR 9:  Anybody can lie.

            MR. REED:  Okay.  Or be mistaken?

PROSPECTIVE JUROR 9:  Yes.

MR. REED:  Okay.  Or not remember things.

PROSPECTIVE JUROR 9:  Correct.

MR. REED:  Would you agree that anyone can be mistaken when it comes time to testify or tell what they saw or heard from some time in the past?

PROSPECTIVE JUROR 9:  Correct.

MR. REED:  Would you agree with me that people can be motivated by numerous things when they are communicating a story?

PROSPECTIVE JUROR 9:  100 percent.

MR. REED:  Okay.  You have friends and I'm sure you hang out with your buddies, and they sometimes tell stories that you guys were all present at, but you tell that same story a year later, it's a little bit different, isn't it? Suddenly that guy was the hero of the story, right?  I don't know if that's just a guy thing, but it happens, right?

PROSPECTIVE JUROR 9:  Yes.

MR. REED:  Mr. 77, [sic] your experience is the same?

PROSPECTIVE JUROR 74:  Yup.

MR. REED:  Okay.  So that's why you guys are the judges of the facts, not the law, listening to what they have to say and then weighing that information.  And the Court allows you to take notes.  And nobody checks to see what's in your head as to whether or not you really deliberated when you

weren't supposed to, but that's why you have to wait until the end.

Now, Mr. 74, does it make a difference to you what a person does for a living as to whether or not they're telling the truth?

PROSPECTIVE JUROR 74:  Oh, yes, most definitely.

THE COURT:  It does make a difference to you, right? Okay.  What does your dad do for a living?

PROSPECTIVE JUROR 74:  He's a truck driver.

MR. REED:  Okay.  So my natural way of doing things, if, you know, my dad, he's long dead now, but my dad worked for the City of Los Angeles.  So if -- if there was another person who did the same thing that my dad did for a living, I automatically liked that person because that's what my dad did.  We're weird like that.

So your dad is a truck driver.  You don't know anything about the witness but you hear that that guy drove trucks just like your dad did.  That person is going to be a couple points ahead, isn't he, in your world as to whether or not he's telling the truth?

PROSPECTIVE JUROR 74:  Yes, most definitely, I could like definitely agree to that.  I would think, like, even self-consciously, like, I think you could argue that, like, I would have a personal bias in favor of that.

MR. REED:  Okay.  Now, the question becomes:  In this

world, the courthouse world, the deliberation world, are you able to take that off and not do that when it comes time to determine whether or not that person is being -- telling the truth?

PROSPECTIVE JUROR 74:  Yes, I will, because, you know, for example, once during deliberation, I can take that into account and ensure that whatever I'm thinking, whatever I'm saying, you know, I'd remove those biases beforehand.

MR. REED:  Have you ever been a juror before?

PROSPECTIVE JUROR 74:  No, this is actually my first time.

MR. REED:  Well, then how do you know if you're going to be able to do it that way then?

PROSPECTIVE JUROR 74:  I believe in myself, you know.

MR. REED:  All right.

PROSPECTIVE JUROR 74:  I give hope.

COURT REPORTER:  And can I get your number just once more, please?

MR. REED:  77 -- 74, I'm sorry.  Somebody else is 77. Yeah, there we go.

So I didn't want to keep you up here.  I would love to talk forever but I'm not allowed to.  So I wanted to do this quickly, and I wanted to just bring out some of the things that have to be, that you have to wait till the end. And that's hard.  For me, it would be pretty much impossible.

If someone asked me -- if the Judge asked me could I do that, even though I'm an attorney, I'd probably have to say I'm not sure if I can do that.  Because as I gather information, I start to build my conclusions about people.

We do this in our daily lives all the time.  I know for a fact as I sit here right this moment, all of you go back to when you were single, it didn't take you more than five minutes to decide whether or not that was the girl you were going to go out with or that's the guy you were going to let get your phone number.

It didn't take you anything.  You didn't spend an hour and a half letting him talk to you before you give your phone number.  You -- it's a feeling you have besides he's cute or she's cute, right?

And just statistics say 50 percent of us were wrong because we got divorced.  So we're not always right about our first impression of things.  Can we all agree on that?

Now, can you -- and I'm talking to you, Mr. 74 -- or actually, no, not you, because you already said you could.

You took your number off.

PROSPECTIVE JUROR 21:  21, I'm sorry.

MR. REED:  Okay.  But I know you're sitting in that seat, 21, right?

PROSPECTIVE JUROR 21:  Uh-huh.

MR. REED:  Can you put aside all of your preconceived

703

notions that you may or may not have and wait until the end to deliberate?  And if you can't, just -- like you said, this may be too much for me and then move on.

PROSPECTIVE JUROR 21:  Yes, absolutely.

MR. REED:  So now you can?

PROSPECTIVE JUROR 21:  Because that's not how you asked it at the beginning.  So it's -- you said that if I can put everything -- so see, I notice the way you've asked people differently.  You didn't ask them the same way you were asking me.  So that kind of twisted things around.

But let me just go back to what the Judge said when he asked number -- I don't know, the juror right there.  If you were -- you know, if you were in that position, would you want somebody like you sitting in the jury?  And I would say definitely yes.

Because I know the way -- the type of person that I am.  I just can't come up with a conclusion without -- first of all, I don't know the defendant.  All I know is whatever is going to be presented to me.  But of course that's not going to be enough until I actually see everything.

And the good thing is that, I guess, from what you said, is that at the end you actually have to talk to everybody.  So I'm not going to be making that decision on my own.  There's going to be people like -- I'm assuming, I don't know, that there's going to be some kind of, like, a little

conference call and, you know, maybe they picked up something that I didn't pick up.

And so I guess that kind of help gives me a little piece of mind.

MR. REED:  I have no personal knowledge of what happens back there because lawyers don't get to go back there. But for all I know, you guys ask for a vote and if the tote is X, then that's how it is.

If everybody says "not guilty," then I don't know if you want to know why you agreed not guilty.  Because there's somebody keeping track of the vote.  The foreman counts the vote, and if there's 12 in one direction -- I don't know that you -- hey, why do you guys all think that's the number.  I don't not how that works, but -- so you're -- I don't --

PROSPECTIVE JUROR 21:  I don't know either.

MR. REED:  Okay.  Well, there we go then.

So I suspect that there's conversation, but I've never been there so I don't know for sure.  But I have a general idea.  Probably more than you do, but I don't know what happens.

PROSPECTIVE JUROR 21:  All I know is that if I wasn't somehow accused of something and they found me guilty even though in my heart I knew that I wasn't, I would want a juror to decide and say, you know what, I know that they found this person guilty, but let's just hear what they have to say in

order to make sure that, you know, this person is -- whether guilty or not guilty.

MR. REED:  Okay.

PROSPECTIVE JUROR 21:  And if I'm really innocent, then I would really want a fair trial.  I would want somebody to, like, just not come up with an answer and say yes.

MR. REED:  Okay.  So I'll let you in on a sad truth. Fairness depends on who you're asking.

PROSPECTIVE JUROR 21:  That's what I'm saying. That's why I -- I don't want to put myself in this spot.  This is a very comfortable spot for me.  But if I -- you know, but I would want somebody like me to help me, you know, get out of that situation where I'm at, that could possibly influence the situation where I'm at where I feel like I'm not guilty.

MR. REED:  Okay.  That makes sense.

I think -- I have a bunch of other questions, but I'm not going to do those questions.  I have cocounsel in the back and they're going to ask questions of each of you or some of you.

I want to thank you for your time.  I will not speak to you directly again for months or at least a month and a half.  So I want to thank you for coming, and I guess we'll start and do what we're going to do.  Thank you so much.

THE COURT:  Thank you, Mr. Reed.

Ms. Byrialsen is going to ask some questions.

        MS. FISHER-BYRIALSEN:  Good afternoon, everyone.
We're nearing the end.  My name is Jane Fisher-Byrialsen and I
represent Mr. Clement.

        I'm going to pick on some of you a little bit, so I
apologize for that, but if I'm asking somebody else a question
that you want to add to or pipe in on or have an opinion
about, just raise your hand and interrupt me, that's totally
fine.

        I'm going to start with you, Juror 10, in the corner
over there.  Hi.  So you mentioned earlier today that you had
sat on a grand jury; is that right?

        PROSPECTIVE JUROR 10:  Yes.  Yes, that's correct.

        MS. FISHER-BYRIALSEN:  And am I remembering
correctly, it was for about a month?

        PROSPECTIVE JUROR 10:  I believe it was a month, yes.

        MS. FISHER-BYRIALSEN:  And you said that before you
sort of got into the cases, you were educated by the DA a
little bit about gangs?

        PROSPECTIVE JUROR 10:  Yeah.  I believe at the
beginning we sort of had an initiation about the gangs in
Fresno County and around this area.  And I believe he kind
of -- he did that on several occasions, as I remember.

        MS. FISHER-BYRIALSEN:  Okay.  And did you learn
anything about the Aryan Brotherhood?

        PROSPECTIVE JUROR 10:  I don't recall that.

MS. FISHER-BYRIALSEN:  And --

PROSPECTIVE JUROR 10:  I don't recall a lot -- there were many different gangs.  I don't recall that, no.

MS. FISHER-BYRIALSEN:  Did you find the information you were given reliable and useful?

PROSPECTIVE JUROR 10:  Yes, yes.

MS. FISHER-BYRIALSEN:  And accurate?

PROSPECTIVE JUROR 10:  Yes.

MS. FISHER-BYRIALSEN:  Did you do any of your own research?

PROSPECTIVE JUROR 10:  No, not during -- not during the -- not during that month.

MS. FISHER-BYRIALSEN:  Have you at other times?

PROSPECTIVE JUROR 10:  I believe I probably looked some information up after my grand jury service.  It was more about curiosity about where these -- the -- the territories that they pointed out.  It kind of made you -- you -- gave you the impression that these gangs operated all over the place, and there are certain areas like -- I'd -- I'd like to avoid this area on my way home, you know.

But just more just kind of how prevalent are they.  I don't -- personally, I haven't encountered any gang.  I haven't run into them.  I haven't encountered any violence or --

MS. FISHER-BYRIALSEN:  But you were doing some

research to avoid the neighborhoods or the areas that they were in; is that right?

PROSPECTIVE JUROR 10:  Yes.  And the only instance I can think of is one time someone tried to steal a vehicle from our driveway.  And we saw the individual run off, and it -- my -- my thought was this could have been like -- like a gang initiation thing or something.  I'm not sure.

MS. FISHER-BYRIALSEN:  So it's fair to say you find gangs somewhat concerning?

PROSPECTIVE JUROR 10:  Yes.

MS. FISHER-BYRIALSEN:  And knowing that our client is sitting here today are -- are accused, charged with, or alleged to be in the gang called the Aryan Brotherhood, I'm sure you would find that somewhat concerning too; is that right?

PROSPECTIVE JUROR 10:  Yes.

MS. FISHER-BYRIALSEN:  And is that something that would color the way you see them?  And -- and please be honest.  We're here to -- to learn exactly what you think, and there's no right or wrong answer.

PROSPECTIVE JUROR 10:  I mean, it would be a factor to consider.  I believe I can fairly weigh the evidence. And -- and I guess that's just one factor to consider, among, you know, everything else, I guess.  I don't know.

MS. FISHER-BYRIALSEN:  And how would you consider it?

In what way?

PROSPECTIVE JUROR 10:  Yeah, I'm not really sure how I would express that.

MS. FISHER-BYRIALSEN:  Is it fair to say it would be in a negative way?

PROSPECTIVE JUROR 10:  I think so.

MS. FISHER-BYRIALSEN:  And would it make you a -- hard for you to presume that they are innocent knowing that they are accused of being in such a gang?

PROSPECTIVE JUROR 10:  Yeah, again, I'm not really sure how -- I mean, I -- I -- yeah.  Could you repeat that?

MS. FISHER-BYRIALSEN:  Would it make it hard for you to presume -- knowing that they are accused -- that they are in prison and they're accused of being in this gang called the Aryan Brotherhood, would it make it hard for you to sort of cover them in the veil of the presumption of innocence?

And it's totally fine if that's -- the answer is yes, because I see you hesitating.

PROSPECTIVE JUROR 10:  Yeah, I mean, I -- I still think I would consider the evidence.

MS. FISHER-BYRIALSEN:  Let met ask it to you this way.  When you got here and you came in the courtroom, did you walk in here looking around kind of like, oh, where -- where are the guys that are accused here?  Because that -- I mean, that would be pretty natural.  Were you looking around like

looking at the table saying like.  Oh, is that the defendant?
Or is that the defendant?  Is that fair to say you did that?

PROSPECTIVE JUROR 10:  No, not when I first walked
in.  No.

MS. FISHER-BYRIALSEN:  No?  Oh.  You weren't
wondering who was accused?

PROSPECTIVE JUROR 10:  Well, not when I first walked
in.  I mean, I guess after I sat down, perhaps.

MS. FISHER-BYRIALSEN:  Okay.  Were you ever
wondering, Where is that person who is presumed innocent who
the government has to prove beyond a reasonable doubt?  Was
those -- were those thoughts in your mind?

PROSPECTIVE JUROR 10:  Wait.  Isn't that the same
question?

MS. FISHER-BYRIALSEN:  No.

PROSPECTIVE JUROR 10:  Wait.

MS. FISHER-BYRIALSEN:  I'm asking what came to your
mind first, if the person was -- was guilty or innocent.

PROSPECTIVE JUROR 10:  Oh.  I --

MS. FISHER-BYRIALSEN:  It's not a trick question.

PROSPECTIVE JUROR 10:  I thought you just meant did
you wonder who the defendant was.

MS. FISHER-BYRIALSEN:  Uh-huh, meaning the accused.
Or did you wonder where the presumed innocent person was?
Which one of those thoughts was in your mind?

PROSPECTIVE JUROR 10:  The accused.

MS. FISHER-BYRIALSEN:  Okay.  I assume also as your experience with the grand jury, you heard a lot of testimony from law enforcement; is that right?

PROSPECTIVE JUROR 10:  Yes.

MS. FISHER-BYRIALSEN:  Was it mostly law enforcement?

PROSPECTIVE JUROR 10:  Yes.  It was police and sheriffs.

MS. FISHER-BYRIALSEN:  And --

PROSPECTIVE JUROR 10:  Detectives.

MS. FISHER-BYRIALSEN:  Was there ever a time when you were sitting there hearing testimony from law enforcement that you thought, Oh, these -- these cops are lying?

PROSPECTIVE JUROR 10:  I believe -- because some of the cases were rather -- from quite a while ago, I did have questions about how much they actually remembered.  I think it was mainly based on what they had written down at the time.

So I -- I remember thinking, Are they remembering everything correctly?  They're certainly confident about what they stated as fact.  And I did have questions about how much of that was actually true because sometimes there would be contradictions in other witnesses.  They -- you know, they saw something differently.

MS. FISHER-BYRIALSEN:  And who did you tend to believe, law enforcement or the other witnesses who saw

something differently?

PROSPECTIVE JUROR 10:  Well, in this case, it was --
they were both law enforcement.  But it was just they -- you
know, their description of the -- of the scene seemed like
they were contradictions.

MS. FISHER-BYRIALSEN:  But do you -- would you say in
general, having the experience with being on the grand jury
gave you a favorable feeling of law enforcement and their
credibility?

PROSPECTIVE JUROR 10:  I believe so.  Again, we were
only hearing one side.  And so it was -- it was -- we were
really trying to determine whether there was enough evidence
to bring the case forward, whether it was strong enough to
bring the case forward, so --

MS. FISHER-BYRIALSEN:  I'm going to ask you to pass
the microphone right behind you to Juror 3.

PROSPECTIVE JUROR 3:  Hi.

MS. FISHER-BYRIALSEN:  Hi.  I think I said on your
jury questionnaire that you had a difficult time being fair
and impartial because of your knowledge of gangs; is that
right?

PROSPECTIVE JUROR 3:  Well, I wouldn't say that I
have a deep knowledge of gangs.  But just where I work and the
community that I work in, you know, just that experience has
led me to have a negative, you know, view of gangs.

MS. FISHER-BYRIALSEN:  And how does that make it hard for you to be fair and impartial?

PROSPECTIVE JUROR 3:  I -- I think, like, what you -- you know, just coming in with that idea maybe just starts them -- starts off on the negative foot.

MS. FISHER-BYRIALSEN:  I just am trying to think -- to ask you to elaborate a little bit on what does that mean that it starts them on a negative foot?

PROSPECTIVE JUROR 3:  You know, I'm trying -- I'm trying to think.  You know, I -- I can -- I can look at evidence and look at it against the -- the law and make that decision.  But I think initially having that information just -- maybe puts things -- puts people on a different starting line.

MS. FISHER-BYRIALSEN:  And have you heard about the Aryan Brotherhood before?

PROSPECTIVE JUROR 3:  I've heard of it, but I don't have a detailed knowledge of it, no.

MS. FISHER-BYRIALSEN:  And does that invoke negative feelings for you?

PROSPECTIVE JUROR 3:  Yeah.

MS. FISHER-BYRIALSEN:  And is it fair to say that knowing that our clients are accused of being in the Aryan Brotherhood makes it difficult for you to be fair and impartial towards them?

PROSPECTIVE JUROR 3:  I think initially.  But, you know, again, one -- once the process gets started and -- and all of that, then a decision could be made impartially.  But, again, just being aware of that, I guess, in the beginning.

MS. FISHER-BYRIALSEN:  I think you also said in your questionnaire that you had a hard time considering each person individually.  I think you referred to them as codependent.  What do you mean by that?

PROSPECTIVE JUROR 3:  I don't -- I don't know -- remember specifically what I meant by that term.  But just the idea the culture of a gang being, you know, like just as a group and, you know, they -- together with the same ideals, I guess.

MS. FISHER-BYRIALSEN:  And -- and what ideals do you think that these gangs would have?

PROSPECTIVE JUROR 3:  It -- I would think it would depend on the gang.

MS. FISHER-BYRIALSEN:  Do you know what ideals the Aryan Brotherhood would have?

PROSPECTIVE JUROR 3:  Somewhat.

MS. FISHER-BYRIALSEN:  I need you to tell me what you think.

PROSPECTIVE JUROR 3:  Like -- like racism.  I think racism at first.

MS. FISHER-BYRIALSEN:  Okay.  Anything else?

PROSPECTIVE JUROR 3:  No.

MS. FISHER-BYRIALSEN:  Okay.  You may in this case see photographs of crime scenes and deceased bodies.  And how would you feel about having to -- to see that and -- and weigh that kind of evidence?  Is -- would that be hard for you?

PROSPECTIVE JUROR 3:  It's hard, but I could do it.

MS. FISHER-BYRIALSEN:  Is that something that would bother you?

PROSPECTIVE JUROR 3:  Not particularly, I guess.

MS. FISHER-BYRIALSEN:  Okay.  Can you pass the microphone to Number 73 in the back right, I believe?

Hi.  You were a little -- little late into the room for us, so we don't know so much about you.  So I'm going to ask you a couple questions.

On your questionnaire, you wrote that you back the blue 100 percent.

PROSPECTIVE JUROR 73:  I -- that's just how I feel about the -- the -- the policemen and stuff.  I've always had positive interactions with them when I have had it.  So I wasn't -- I just -- I think they do a good job.

MS. FISHER-BYRIALSEN:  Do you think you would be more inclined to believe a police officer than other --

PROSPECTIVE JUROR 73:  No.

MS. FISHER-BYRIALSEN:  No?  Okay.

Do you think that police officers can make mistakes

716

or be wrong?

   PROSPECTIVE JUROR 73:  Definitely.

   MS. FISHER-BYRIALSEN:  Do you think that there are
police officers that could be dishonest?

   PROSPECTIVE JUROR 73:  Definitely, yes.

   MS. FISHER-BYRIALSEN:  Have you ever experienced
that?

   PROSPECTIVE JUROR 73:  No.

   MS. FISHER-BYRIALSEN:  How do you feel about the
presumption of innocence for people who are -- you said you
had a positive feeling for -- for law enforcement, right?  So
it's law enforcement who arrests people.  How do you feel
about presuming people innocent who have been arrested and
charged like here with really serious crimes?

   PROSPECTIVE JUROR 73:  I think everyone should be --
should be presumed innocent until proven guilty.

   MS. FISHER-BYRIALSEN:  And how would you do that?

   PROSPECTIVE JUROR 73:  With -- by the evidence and
then the -- going by the law.  I have had -- had to judge the
evidence.

   MS. FISHER-BYRIALSEN:  And same thing I asked
Juror Number 3.  If you are going to see a lot of pictures of
crime scenes and -- and people who are deceased, maybe some
autopsy photos, how do you feel about having to look at that
and -- and -- and weigh that evidence?

PROSPECTIVE JUROR 73:  I -- I'm okay with it.

MS. FISHER-BYRIALSEN:  Have you ever seen anything like that before?

PROSPECTIVE JUROR 73:  I sat through an autopsy before.

MS. FISHER-BYRIALSEN:  Oh.  Where?

PROSPECTIVE JUROR 73:  At -- in Bakersfield when I went to school.

MS. FISHER-BYRIALSEN:  And in -- oh.  In what context?

PROSPECTIVE JUROR 73:  Pardon me?

MS. FISHER-BYRIALSEN:  In what context was that?

PROSPECTIVE JUROR 73:  I was in the -- the -- the room, you know, like where -- with the window and stuff, with -- with -- for one of my classes.

MS. FISHER-BYRIALSEN:  Oh, wow, that must have been interesting.

You did also say on your questionnaire, that specifically to the Aryan Brotherhood was something that concerned you very much.  What is it about them that concerns you?

PROSPECTIVE JUROR 73:  Well, like 30 years ago my uncle was involved with the Aryan Brotherhood.  I don't know -- I don't remember any of it.  I just heard, you know, I heard some stories and stuff about it.  But I really, honestly

didn't -- when I seen the name, I really couldn't even put
anything with it.  I didn't understand what it was about at
first.  Until, you know, later in the -- whenever the Judge
told us.

But honestly, I really didn't know anything about
the, you, know the Aryan Brothers at first.

MS. FISHER-BYRIALSEN:  Do you know anything now?

PROSPECTIVE JUROR 73:  Well, just what the Judge has
told us basically.  And like I said, my uncle was, 30 years
ago, involved in it, so -- and I don't really know any details
and stuff about it.  It's just what I've heard through the
years.

MS. FISHER-BYRIALSEN:  What are your thoughts about?

PROSPECTIVE JUROR 73:  Uh, I mean, it's a
difficult -- it's a difficult -- I can't explain it.  It's
really difficult in some ways because I know how -- from what
I've heard, you know, from my family is that -- at how some
stuff goes down, but like I said, I would be -- I could
definitely look at the evidence and make an honest decision.

MS. FISHER-BYRIALSEN:  So it sounds like what you're
saying, even though you have some knowledge about them, you're
still willing to presume them innocent, and you're also
willing to accept that everything that's been said about this
case so far is only an accusation and that they have to prove
it beyond a reasonable doubt?

PROSPECTIVE JUROR 73:  That's correct.

MS. FISHER-BYRIALSEN:  I'm going to move to -- if you can hand the microphone forward to Mr. 76.

PROSPECTIVE JUROR 76:  Yes.

MS. FISHER-BYRIALSEN:  I'm also going to ask you a quick couple of questions about your questionnaire.  When asked if the Aryan Brotherhood would impact your service, you said, "I assume he's guilty of something."

PROSPECTIVE JUROR 76:  Correct.

MS. FISHER-BYRIALSEN:  And then today the Judge asked you a lot of questions about your ability to accept the presumption of innocence.  It sounds like, you know, there's some inconsistency there that when you answered these questions --

PROSPECTIVE JUROR 76:  Not in my mind.  I can have some biases towards them that I can put aside and listen to you guys.  If you present a good case, a valid case, and the other lawyers do not do their job, then I'm open to that, consider that.  But I do have a bias, make a lot of assumptions, that I come with, but I can recognize them and put them aside into light.  And I can listen to all the evidence.

MS. FISHER-BYRIALSEN:  I think that I hear you say if we put on a good case.  You could do that?

PROSPECTIVE JUROR 76:  Yeah, yeah.  If you prove them

wrong, yes, I'll definitely listen to you, your argument.

          MS. FISHER-BYRIALSEN:  Okay.  And you also said in
the questionnaire that you needed -- the proof of innocence
needs to be overwhelming.

          PROSPECTIVE JUROR 76:  Correct, yeah.  I do take into
account the factor, again, the lifestyle, I'll tell you, there
is a lot of things that come with that that I will take into
account.  And I will look at the evidence as if you remove
that -- the predisposition in my mind that, yeah, maybe this
guy didn't do it, even though he -- I'm assuming he did other
stuff in the past.  If you get me to that point, then I will
go with you.

          MS. FISHER-BYRIALSEN:  So you would need me, for my
client, to sort of give you an overwhelming amount of evidence
and then you'd be willing to presume him innocent?

          PROSPECTIVE JUROR 76:  Yeah.

          MS. FISHER-BYRIALSEN:  Okay.  I'm going to move to
78, who's down here, right?

          Hi.

          PROSPECTIVE JUROR 78:  Hi.

          MS. FISHER-BYRIALSEN:  I'm sorry to have to bring
this up again, because I'm sure it's not something you enjoy
talking about at all.  But you mentioned that you had been
jumped by gang members and it sounded like that was something
that kind of happened a lot in your childhood, and I'm really

721

sorry to hear that.

But, you know, I'm here to represent my client and I just want to know a little bit more about that to see if you truly can presume him innocent and not have your childhood experiences affect this case.

So knowing that -- that they're accused of being part of a gang, does that make you have negative feelings towards them or be fearful of them?

PROSPECTIVE JUROR 78:  Well, since the first time I knew about the case, I was just thinking about my past and just in general.

I wasn't thinking about this specific gang.  But I was just, you know, I've been nervous, and having anxiety about it.  But I can always make, you know, judgment, good judgment based on the evidence that's presented.

But this still doesn't take my anxiety away, and just thinking about it.  Because it's -- it was something that affected my -- my personal life, you know, since then.  But --

MS. FISHER-BYRIALSEN:  You've heard me ask the other jurors, you may see some evidence in this case that's graphic and crime scenes and photographs of people who are deceased. How would you feel about seeing those kind of things, would that be hard for you?

PROSPECTIVE JUROR 78:  Probably.

MS. FISHER-BYRIALSEN:  Yeah.  You look like you're

722

getting upset.  I'm -- you look like this is hard for you even just to talk to me about it.

PROSPECTIVE JUROR 78:  I mean, the whole situation, being here on a case here like that, it's hard.  It's hard for me.

MS. FISHER-BYRIALSEN:  How do you think you'll put that aside or will you even be able to put that aside to be able to judge this case fairly?

PROSPECTIVE JUROR 78:  To be honest, it's hard.  I know it's our duty to be here and do our best that we can.  But when it's something like that, something, you know, real personal, it's hard to, to put it aside.

Even though, like, I try to be fair.  I try to be a good citizen, it's always hard.  I mean, I never went to therapy or anything like that to help the whole situation.  But I know it's -- it's hard, it's a hard situation.

MS. FISHER-BYRIALSEN:  So is it fair to say that it would be really hard for you to presume our client's innocent?

PROSPECTIVE JUROR 78:  Probably, yeah.

MS. FISHER-BYRIALSEN:  I'm going to ask you to give it to 25 who I think is right next to you.

PROSPECTIVE JUROR 25:  Sorry, I lost my tag.

MS. FISHER-BYRIALSEN:  You had indicated that your brother had been addicted to drugs or is; is that right?

PROSPECTIVE JUROR 25:  Brother-in-law.

MS. FISHER-BYRIALSEN:  Brother-in-law, okay.

PROSPECTIVE JUROR 25:  He was.  He overdosed a year and a half ago.

MS. FISHER-BYRIALSEN:  Did he pass away?

PROSPECTIVE JUROR 25:  Yes.

MS. FISHER-BYRIALSEN:  I'm very sorry to hear that.

In this case you may hear evidence about people using drugs and dealing drugs.  How do you think your experience will affect how you view that?

PROSPECTIVE JUROR 25:  It won't affect me.  There's drugs everywhere.  It's -- people who do them, who are involved with them, I -- that's the life they want to live.  It's not the life that I'm going to live, and so I can look -- doesn't make them a bad person.  It's just something that doesn't bother me.  I'm not going to be like, Oh, since they're on drugs, dealing drugs, they're a bad person.

I will look at the evidence and make my -- you know, if evidence is proved or not proved, that's how I'll make my decision.  Drugs is not -- being a drug user, drug possession is not going to make -- it's no big deal to me.

MS. FISHER-BYRIALSEN:  I appreciate your honesty about that.

I think, was it yesterday, or at least on your questionnaire, you talked about how if a person's found guilty of a crime they have to be held accountable.

724

What do you mean by that?

PROSPECTIVE JUROR 25:  Well, if the evidence shows that person did the crime, they need to do the time, I think. If the evidence shows that they were not found guilty, they don't need to -- I mean, they obviously were innocent, people found them innocent, so the evidence was proven -- not proven, and so they don't have to do the time.

MS. FISHER-BYRIALSEN:  What do you think about people who are arrested?

PROSPECTIVE JUROR 25:  What do you mean?

MS. FISHER-BYRIALSEN:  Like, do they need to be held accountable for anything?

PROSPECTIVE JUROR 25:  If they did the crime, yes.

MS. FISHER-BYRIALSEN:  But you would be willing to keep an open mind until --

PROSPECTIVE JUROR 25:  Absolutely, yes.

MS. FISHER-BYRIALSEN:  Now we're going to go back to 72, which I think is in the back, in the middle.  72.

So you said you worked with probation; is that right?

PROSPECTIVE JUROR 72:  No, I did my internship.

MS. FISHER-BYRIALSEN:  Okay.  Just did an internship there?

PROSPECTIVE JUROR 72:  Yes.

MS. FISHER-BYRIALSEN:  And your sister was working for probation; is that right, am I remembering that right?

        PROSPECTIVE JUROR 72:  No, she's working for
Kern County Sheriffs.

        MS. FISHER-BYRIALSEN:  Okay.  And you mentioned that
you had talked to your sister a little bit about gangs and
things like that; is that right?

        PROSPECTIVE JUROR 72:  When she mentions things about
work, yeah.

        MS. FISHER-BYRIALSEN:  And did she -- did you ever
talk to her about gangs in a negative way?  Was it positive or
negative information you were getting?

        PROSPECTIVE JUROR 72:  It's just related to her job.
I don't -- we don't go into specifics or I don't know anything
about what gangs belongs to what territory in Bakersfield or
anything like that.

        MS. FISHER-BYRIALSEN:  So what would you guys talk
about?

        PROSPECTIVE JUROR 72:  Like if an inmate misbehaved
or said something negative to her, something like that.

        MS. FISHER-BYRIALSEN:  Can you give me an example?

        PROSPECTIVE JUROR 72:  She had to write up a gang
person because he called her the -- a bad word, obviously.  So
that's what we talk about.

        MS. FISHER-BYRIALSEN:  Okay.  And do you know what
gang member that was or type?

        PROSPECTIVE JUROR 72:  I can't -- I don't recall

because she writes up people all the time.  So --

       MS. FISHER-BYRIALSEN:  Okay.  So it's a common occurrence in her work that people are -- in gangs are misbehaving; is that fair to say?

       PROSPECTIVE JUROR 72:  I'm assuming, yes.  It's her job.  I don't know.

       MS. FISHER-BYRIALSEN:  And what do you think about that?

       PROSPECTIVE JUROR 72:  She has to do what she has to do.

       MS. FISHER-BYRIALSEN:  And you also talked a little bit about your uncle being murdered and that that involved drug-related issues, right?

       PROSPECTIVE JUROR 72:  Yes.

       MS. FISHER-BYRIALSEN:  And where was that?

       PROSPECTIVE JUROR 72:  That was in Mexico.

       MS. FISHER-BYRIALSEN:  Okay.  And knowing that charges in this case and that it also involves allegations of murder, does your personal experience with your uncle being murdered affect the way you feel about this case?

       PROSPECTIVE JUROR 72:  No.

       MS. FISHER-BYRIALSEN:  Not at all?

       PROSPECTIVE JUROR 72:  No.

       MS. FISHER-BYRIALSEN:  Okay.  And like I've asked other people, you are going to see autopsy photos and crime

scene photos, do you think that would be hard for you?  How do you feel about that?

            PROSPECTIVE JUROR 72:  I can do it.

            MS. FISHER-BYRIALSEN:  Okay.  Judge, I have nothing further.

            Oh, wait.  No.  Yeah.

            PROSPECTIVE JUROR 70:  That will be hard for me. I'll just warn you.

            COURT REPORTER:  I'm sorry.  Who was that?

            MS. FISHER-BYRIALSEN:  Okay.  Great.  Can we just get you the microphone?

            PROSPECTIVE JUROR 70:  I'm sorry.  That will be -- looking at pictures will be difficult for me.  I get emotional.  I can't help it.  I'll probably cry, that's just my response to it.

            And on the other question, you asked the question when we came into the room were we looking for the accused or -- I was.  You asked the question:  Were you looking for the innocent people?

            MS. FISHER-BYRIALSEN:  Uh-huh.

            PROSPECTIVE JUROR 70:  And that never crossed my mind.

            MS. FISHER-BYRIALSEN:  Okay.

            PROSPECTIVE JUROR 70:  So it's my bias.  When I hear about gang -- gangs or gang-related things, it's always in a

negative way.

        MS. FISHER-BYRIALSEN:  Uh-huh.

        PROSPECTIVE JUROR 70:  I've had friends who were in a gang.  I've had family that were in a gang.  Of course I got to know them so I knew whether -- what they were doing, you know, things were good or not good.  That has never changed my way of seeing gangs, the light in which I see these -- the people who are, you know, related to gangs.

        And I would like to think that if I were in that position, you know, there will be a juror that would look at me like that, but unfortunately, if we were in that position, we would -- it will be looked in a negative light.

        And as I want to think that I can put it aside, I want to think that I -- I can try and be fair, but it is going to be difficult for me.  So I just want that --

        MS. FISHER-BYRIALSEN:  Well, let me ask you this:  As you sit there in that chair right now, are you presuming Mr. Stinson, Mr. Johnson, and Mr. Clement are innocent?  It doesn't sound like --

        PROSPECTIVE JUROR 70:  Not really.

        MS. FISHER-BYRIALSEN:  No?

        PROSPECTIVE JUROR 70:  When I came in, no.

        MS. FISHER-BYRIALSEN:  Okay.

        PROSPECTIVE JUROR 70:  Because like other jurors have mentioned, if they're in that position, they already did

something.

      MS. FISHER-BYRIALSEN:  Okay.

      PROSPECTIVE JUROR 70:  So I'm trying to keep an open mind and I've been listening to the Judge, I've been listening to everybody else.  I want to think that I can put it aside.

      I want to think that I want to -- I can be fair, because if I were in that position, I would want someone to have an open mind too.  But I just want you to know it's -- I do have that bias.

      MS. FISHER-BYRIALSEN:  Okay.  But I think what we're looking for here, it's not whether or not you want to put it aside, it's whether or not you're actually able to, and you have to be able to tell us that you are.

      PROSPECTIVE JUROR 70:  Like, honestly, how can anybody say that you really can't?  I can tell you that I can.  But honestly, like how can you really tell if -- if I'll be able to do that?  And that's with anybody.  Like I'm not just saying about me.

      I'm just saying in general, we can say that we can put it aside, but whether or not we like it, our biases effect the way we see things, the way we listen to things.  Like I said, I want to think that I can because I would want, if I were in that situation --

      MS. FISHER-BYRIALSEN:  Right.

      PROSPECTIVE JUROR 70:  -- for people to have an open

mind.

But when you asked that question, when you came into
the room, did you think, where -- you know, where are the
innocent people, you know, that are being accused, I never
thought of that.

MS. FISHER-BYRIALSEN:  Right.

PROSPECTIVE JUROR 70:  I didn't think of it that way.

MS. FISHER-BYRIALSEN:  So what I think I'm hearing
you saying is that if you're going to be completely honest
right now, you're not really holding them under the
presumption of innocence?

PROSPECTIVE JUROR 70:  No.

MS. FISHER-BYRIALSEN:  Okay.  Thank you, Judge.
Nothing further.

THE COURT:  All right.  I just want to ask an
additional question.

Let's see.  Juror 76, you have that microphone in
front of you.  I don't remember if you were sitting in the box
at the time that I asked the question that says that:  In this
case the government has the burden of proof.  That means the
government has to prove this case beyond a reasonable doubt.

The defendants don't have to prove anything.  They
don't have to testify.  They don't have to call a witness.
They don't have to convince you of anything.  And if they
don't and the government doesn't prove the case, the law would

say, you must find that they are not guilty.

Does that make sense, sir?

PROSPECTIVE JUROR 76:  It does.

THE COURT:  Because I think when you were responding to some questions, the trouble is we're lawyers and we use different words that aren't usually used in normal language.

You said, you know what, if you do your job and the government doesn't do your job, if you convince me -- speaking to the defense attorney -- then I'll go your way, the trouble is in this case, in every case, no defense ever has to do anything.

And so the question I have is:  If the defense doesn't put up any witnesses and the government does not prove the case beyond a reasonable doubt, would you be comfortable finding the defendants not guilty?

PROSPECTIVE JUROR 76:  Yes.

THE COURT:  And some of the questions that were asked of you all relate to when you came into this courtroom, did you look for the innocent people?

Before you came into this courtroom, had anybody refreshed their recollection about criminal law, about what the Constitution requires of you?  You mean you-all didn't read your Constitution before you came to court?  You mean you don't carry around a pocket Constitution with you?

I mean, I -- that's ridiculous, right?  I think -- I

mean, I have one.  I mean, I think a lot of lawyers do.  But
had any of you already -- if you even knew, remembered that
there was a presumption of innocence in our system?  Did
anyone remember that?  If so, raise your hand.

        A couple people remembered that.

        Some of you, maybe you're like, wait, I didn't know
that, or when I hear it, yeah, it makes sense but -- if you
came into this courtroom and you weren't looking for the
innocent people, did that mean that you were assuming someone
was guilty?  If that was you, please raise your hand.

        All right.  No one has raised their hand.

        If you came in and you're looking at where are the
accused sitting, had you already made a decision that somebody
was guilty when you were looking for those who were being
accused?  If so, raise your hand.

        All right.  No one has done that.

        A couple of you were asked questions about, Would it
be hard to see autopsy photos and crime scene -- and a couple
of you said, Yeah, it's going to be hard.

        Is there anyone who can't do it?  And again, like
Counsel said, if you can't, just tell us that.  You know,
maybe it will bring tears to your eyes, maybe it will be
distressing to you, but is there anyone who can't do it?

        All right.  Can we pass the microphone up?  This is
Juror 54.

          PROSPECTIVE JUROR 54:  So I was 17.  My favorite

cousin passed away.  I took a look at him, you know, in the

box, I told myself, Never again.  Right?  Never again.

          I have gone to dozens of funerals, I don't go to the

front at all.  Right?  When I die, it's going to be a closed

casket.  There's a photo of me when I'm 30, that is the last

image I want people of me -- when they think of me.

          I think back at Javi, oh, it's -- I'm sweating right

now.  That last image I have of Javi still -- is still seared

in my mind.  I didn't see my grandma.  I didn't see my aunts.

I didn't see my uncle.  I didn't see my best friend who

drowned.  Uh-huh.

          THE COURT:  These are all people that you knew --

          PROSPECTIVE JUROR 54:  Maybe that's -- maybe, you

know, I've seen dead bodies in movies.  You know, I enjoy a

good slasher film, right?  But that's Hollywood.  You know,

I -- you know, so I'm just letting you guys know that.

          Who knows, maybe it's like -- I don't know.  I'm

just -- you know, I just -- that just -- you know, when she

said the -- you know, dead bodies, that's the first person I

thought of, Javi.

          THE COURT:  Yeah.  And I think when it's a loved one

and you see someone who's --

          PROSPECTIVE JUROR 54:  Yeah.

          THE COURT:  -- who's died who you knew in life --

PROSPECTIVE JUROR 54:  Yeah.

THE COURT:  -- and, I mean, any of us who have been to a funeral and seen that, we know it's -- you don't look the same.

PROSPECTIVE JUROR 54:  Yeah.  Of course, yeah.  I was expecting something totally -- you know, I was 17, right?  Oh, it just -- yeah, to this day, I think, why did I go up front and see Javi?  I just -- you know, and that's just -- and it -- and his -- yeah, I still see him, you know.  So anyways.

THE COURT:  We have a culture, too, where death is a difficult thing for us, it's not something we talk about a lot.  We are not -- I mean, the reality is, like you say, we're all going to -- we're all going to be there at some point.

I hope I have a 30-year-old picture too.  Thank you.  That's a great idea.

PROSPECTIVE JUROR 54:  Yeah.  And it will be a closed casket, a big, large photo of me when I'm 30, right?  You know, my side profile, right?  And you know, that's the -- because that's the last image I want everyone to have of me.

THE COURT:  And I think probably part of the reason that it's so hard for us is because there's so much emotion involved in losing a loved one.  And you -- when you see someone who's died that you loved, you want to see that same thing.  And life has a quality that doesn't survive a dead

body.  And we know that.

In this case, these are not people that you know. And I'm not going to say that's an easy thing.  But I will say, if that is the evidence presented, then you would be obligated to look at it and to evaluate it like any other evidence.

And if there are autopsy photos, I don't know if there will be, but if there are, it would come along with a doctor explaining the significance of those photos and what they're trying to show you.

If someone -- so Juror 54 in particular, I'm not going to say you're going to like it, I'm not going to say it's going to be easy, but can you do that?

PROSPECTIVE JUROR 54:  Yes.

THE COURT:  Is there anyone who feels -- I know it's going to be hard, but is there anyone who's going, Ugh, I just -- I don't have it in me?

If that's you, please raise your hand.

All right.  No one has done that.

Let's go ahead and take a break at this time.  Ladies and gentlemen, if you will be prepared to return at 20 minutes to the hour.  Same admonitions I've been giving you:  Please don't form any opinions, don't discuss the case, don't do any independent research on your own, please don't search the internet or any media about it.

Thank you very much.

(Prospective Jurors exit the courtroom.)

THE COURT:  All right.  All the jury members have stepped out.  Let's go ahead and take our break.

I'm sorry, actually, before we do that.  Counsel, I am actually surprised I have to mention this to you.

You -- I thought I was clear about this.  If you want to give equipment, digital devices, a laptop, a pen to your clients, it needs to be something that the Marshals have approved.

I didn't realize that Counsel had been providing laptops to Mr. Clement and Mr. Johnson.  What we will do is on -- next week, we will have a closed universe laptop for them to use.  But you're not allowed to give them things like that.

I don't know how more specific I need to be.  If you want to give them something, then let's talk to the Marshals about that before you do it.  And if they don't give you approval, then the answer must be brought to me and we can talk about it further.

MR. VILLA:  Mr. Johnson's is the Marshal-approved device that they brought us today.

THE COURT:  Is that true?  I think there was some confusion, then, because I was told they were not the devices.

U.S. MARSHALL:  Your Honor, Mr. Johnson's computer

is.  Clement and Stinson, they worked -- those laptops were
here the day that we started.  Those were not provided from
the Marshals Service.

THE COURT:  All right.  Where did those laptops come
from, for Mr. Clement and Mr. Stinson?

MR. REED:  Stinson's laptop came from me.

THE COURT:  Okay.  So we'll provide Mr. Stinson a
laptop next week that's a closed universe type.  And I don't
know if it's to look at discovery or whatever you want, but
that's what we're going to have to do for Mr. Clement and
Mr. Stinson.

Since Mr. Johnson does have an approved device, then
that's fine.  And we will -- he can continue on that.

MS. LUEM:  Judge, what -- what we were told by the
Marshals Service is that they are not going to transport it
back and forth to and from the jail for him.  It's just going
to be left here in the courtroom.  I don't know if I'm allowed
to take it.  But maybe if it is left here in the courtroom,
just if we can make sure that it's secured, however the Court
secures it.

THE COURT:  Well, we're not going to be able to leave
things in the courtroom because we will have Criminal Calendar
in -- in here.

MS. LUEM:  Okay.

THE COURT:  So we'll have to make arrangements to

secure it.

U.S. MARSHALL:  I believe the Marshals Service would be able to secure it.  It's just not going to be able to -- Fresno County doesn't want the -- the added --

THE COURT:  Makes sense.

U.S. MARSHALL:  -- back and forth, so --

THE COURT:  Okay.  Perfect.  Okay.  Anything else, then?

All right.  Let's take our break.

(Recess held.)

THE COURT:  Let's go ahead and bring in Juror 62 first, and then we'll bring everyone else in.

(Prospective Juror 62 enters the courtroom.)

THE COURT:  All right.  Ma'am, thank you for coming in.  And maybe I -- I didn't see what I thought I saw, but it seemed like maybe you got kind of emotional at the end.  Was that as a result of, you know, thinking of a loved one or something else?

PROSPECTIVE JUROR 62:  Yeah, my brother committed suicide a year ago.  I was going to go visit him after today.

THE COURT:  Okay.  And so having to talk about what we were talking about just brought that up to you?

PROSPECTIVE JUROR 62:  Yeah.  I don't want to see that.

THE COURT:  Okay.  So you're saying that you don't

739

think you would be able to look at those types of photos?

          PROSPECTIVE JUROR 62:  No.

          THE COURT:  Okay.  So if a photo came up, you
wouldn't feel like you would be able to examine it and make
decisions about it?

          PROSPECTIVE JUROR 62:  No.

          THE COURT:  Okay.  All right.  Thank you for sharing
that with us.

          If you would just step right back outside.  Thank
you.

          PROSPECTIVE JUROR 62:  Yeah.

     (Prospective Juror 62 exits the courtroom at 2:54 p.m.)

          THE COURT:  All right.  Juror 62 has stepped out.  I
mean, the truth is she's got to be able to examine the
evidence.  Any comments about this?

          MS. STOKMAN:  No.

          THE COURT:  From the defense?

          MS. LUEM:  Well, I guess my comment would be that
she -- she -- she clearly said that she can't, so she's not
going to be able to follow the Court's instructions.  And
we --

          THE COURT:  Right.  That's what I was saying.

          MS. LUEM:  Yeah.

          THE COURT:  You -- you -- so you're just agreeing
with me?

          MS. LUEM:  I'm agreeing with you, Judge.

          THE COURT:  All right.  Mr. Reed, any comments?

          MR. REED:  No, Your Honor.

          THE COURT:  And, Ms. Byrialsen, any comments?

          MS. FISHER-BYRIALSEN:  No, Your Honor.

          THE COURT:  Well, we're going to let go of 62.  Okay.

    All right.  Let's go ahead and bring the jury in.

    And, Irma, can you tell her that she can leave?

          THE CLERK:  Yes.

          MS. FISHER-BYRIALSEN:  Your Honor, do you want to

    address any of her cause issues before?

          THE COURT:  No, I think it's probably too late,

    sorry, but I -- I know what your issue is.

          MS. LUEM:  Judge, I'm sorry.  Did you want to

    question 81 before I begin questioning?  The replacement

    juror?

          THE COURT:  Yeah.

          MS. LUEM:  Okay.

       (Prospective Jurors enters the courtroom.)

          THE COURT:  All right.  We have all of our jurors

    back in their places.  Let's call an extra up.

          THE CLERK:  Juror 81.  You'll take Seat 14.

          THE COURT:  All right.  Thank you for joining us.

    Juror Number 81, let me ask you just a couple questions.

          As this jury selection process has been going on,

have you listened to the questions that I've asked?

        PROSPECTIVE JUROR 81:  Yes.

        THE COURT:  Are there any topics or questions that you feel like you would -- should respond to?

        PROSPECTIVE JUROR 81:  No.

        THE COURT:  Okay.  Looking at your questionnaire, I noticed that you say -- you know, you kind of have a generally positive attitude about law enforcement.  They are helpful people.  They have life, like everyone.  I'm -- maybe you can explain to me what you meant by that.

        PROSPECTIVE JUROR 81:  Everyone is just doing their job.

        THE COURT:  Can we get her the microphone?  I'm sorry.  I forget about that.  Thank you.

        PROSPECTIVE JUROR 81:  Everyone is just doing their job, basically.

        THE COURT:  Okay.  And I -- I think you may understand, like everyone else, that sometimes you run into a police officer that's having a bad day who lacks some professionalism.  Have you ever had an experience like that?

        PROSPECTIVE JUROR 81:  No.

        THE COURT:  Have you had any positive experiences with law enforcement?

        PROSPECTIVE JUROR 81:  No.

        THE COURT:  Okay.  Would you evaluate the testimony

of a law enforcement officer in the same way as any other witness?

PROSPECTIVE JUROR 81: Yeah.

THE COURT: And what I mean by that is you're not going to automatically believe or disbelieve them simply based on their job; is that true?

PROSPECTIVE JUROR 81: Yes.

THE COURT: And it looks to me like you really don't have any experience or knowledge about any gang activity; is that true?

PROSPECTIVE JUROR 81: Yes.

THE COURT: And you indicate that you have some concerns about gangs outside of prison. What is the source of that type of concern?

PROSPECTIVE JUROR 81: Repeat that again.

THE COURT: Yeah, I'm just wondering. You say that you're somewhat concerned about gangs. Why do you have that feeling?

PROSPECTIVE JUROR 81: Maybe nothing.

THE COURT: It's -- do you sometimes hear about gangs on media --

PROSPECTIVE JUROR 81: No, not really.

THE COURT: It -- is true that, you know, you don't really think about it very often?

PROSPECTIVE JUROR 81: Yeah.

THE COURT:  But if you were to think about it, you would be like, Hey, you know, I'm not overly concerned, but I have some concern; is that true?

PROSPECTIVE JUROR 81:  Yeah.

THE COURT:  Okay.  Would you be able to set aside the concern that you do have and judge this case fairly and impartially?

PROSPECTIVE JUROR 81:  Yes.

THE COURT:  And whatever experience or information you've learned about gangs in the past, would you be able to set that aside and consider this case on the evidence presented here in this court?

PROSPECTIVE JUROR 81:  Yes.

THE COURT:  And, again, what I mean is we all have experience.  We all have common sense.  And I'm not asking you to forget that, but I am asking you to not bring evidence from outside and keep that in your mind.  And -- because when you're back in the jury room, we all have to have an idea of what the evidence was that you heard because we all have to hear the same evidence.  Does that make sense?

PROSPECTIVE JUROR 81:  Yes.

THE COURT:  And so if we were to rely upon our own experience or other information we got from some source that wasn't presented in this trial process, that wouldn't be fair to the parties because they need to have an opportunity to

address the evidence you consider.  Does that make sense?

        PROSPECTIVE JUROR 81:  Yes.

        THE COURT:  All right.  There has been a lot of questions and a lot of information about the fact that the defendants in this case are presumed to be innocent.  Do you have any trouble with that concept?

        PROSPECTIVE JUROR 81:  No.

        THE COURT:  And do you also understand that in this case, the government has the burden of proving this case beyond a reasonable doubt?  Do you understand that?

        PROSPECTIVE JUROR 81:  Yes.

        THE COURT:  And if the government doesn't do that, you would be obligated to find that the defendants are not guilty?

        PROSPECTIVE JUROR 81:  Yes.

        THE COURT:  And if the government does do that, you would be obligated to find the defendants are guilty.  Do you agree to doing that?

        PROSPECTIVE JUROR 81:  Yes.

        THE COURT:  Okay.  Is there anything I haven't asked you about that you think would be important to share?

        PROSPECTIVE JUROR 81:  No.

        THE COURT:  All right.  Thank you.

        Ms. Luem, would you like to inquire at this time?

        MS. LUEM:  Yes.  Thank you, Your Honor.

        Good afternoon.  My name is Andrea Luem, and my
co-counsel, Ryan Villa, represent Kenneth Johnson in this
case.  Some of you up here, I haven't really been able to see
from my seat way back there in these obstructions.  So I'm
sorry, but I'm going to have to pick on a couple of you.

        So Juror Number 51, I can't see you at all.  So this
is probably the first time I've seen -- seen your face.

                PROSPECTIVE JUROR 51:  Right here.

                PROSPECTIVE JUROR 6:  Oh, you?

                MS. LUEM:  Thank you.

        I -- from your questionnaire, it says that you were
in the military; is that right?

                PROSPECTIVE JUROR 51:  Correct.

                MS. LUEM:  Thank you for your service.

        And you were deployed overseas; is that right?

                PROSPECTIVE JUROR 51:  Yes.

                MS. LUEM:  Okay.  Can you tell us a little about that
experience?

                PROSPECTIVE JUROR 51:  Yeah, I was in communications
where we had vehicles that we took around the war zone to
provide service to the -- the commanders.  I was there about
18 months from Desert Shield and into Desert Storm.

                MS. LUEM:  Were you in Afghanistan or --

                PROSPECTIVE JUROR 51:  No, it's Iraq.

                MS. LUEM:  Iraq.

PROSPECTIVE JUROR 51:  And my -- the Kuwait -- the three-way border.  Kuwait and Saudi Arabia and Iraq.

MS. LUEM:  Okay.  And did you continue your military service after you were deployed?

PROSPECTIVE JUROR 51:  Yes.  Oh, when I came home?

MS. LUEM:  Yes.

PROSPECTIVE JUROR 51:  Yeah.  Yeah.  I mean, I came home, and there was some re-ups that were taking place with some bonuses.  But I decided just to get out and work with what I knew.

MS. LUEM:  Okay.  And I -- I imagine you saw some pretty -- pretty --

PROSPECTIVE JUROR 51:  Not too bad because of what -- my job.  I didn't fight.  You know, I -- we -- we provided communications to the commanders that did run fighting groups, and we had fighting groups come through.  But I never saw any -- any dead bodies or anything out there.

MS. LUEM:  So you weren't actively in combat?

PROSPECTIVE JUROR 51:  No, I wasn't fighting.

MS. LUEM:  Okay.  Is there anything about the fact -- and -- and -- and just so I can make this totally clear to everyone, you're going to hear about gangs in this case. You're going to hear about murder.  You're going see pictures of -- of dead bodies.  You're going to hear very graphic language.  You're going to hear racist remarks, probably --

maybe misogynistic comments.

And I think we just need to put that out there because we've sort of tippy toed around this like we're -- we're just talking about a gang case here.

This is a murder case.  I mean, this is a very serious case, and I think the judge read off to you the names of five victims.  And it's -- now is kind of it, right?  This is the end of jury selection.

And if there's -- if you're really thinking like, This is not the case for me, I cannot be fair to -- to these gentlemen sitting over here, you're not going to get another chance to say that.

So I'm just going to put that out there and -- and leave it and let you think about it.

Now with that said, Juror Number 3 -- I'm sorry to make you move that quickly across.

PROSPECTIVE JUROR 51:  No, that's fine.

MS. LUEM:  You mention that you had a negative view towards gang membership, right?

PROSPECTIVE JUROR 3:  Yeah.

MS. LUEM:  And I think that's shared by a lot of other fellow jurors.  Would you -- and you also sort of said that you sort of would favor or -- or the government would sort of start a little bit ahead of the defense in your mind?  And if I'm taking that -- taking words out of your mouth or --

PROSPECTIVE JUROR 3:  I think -- I think it's, you know, first impressions.  And if -- if you have a negative view towards something that, you know, it's -- it's the first impression sort of thing.

MS. LUEM:  Yeah.  Okay.  Do you think that the government -- I guess the first impression thing, I mean, we're talking a little bit about presumption of innocence.  I guess I want to focus more sort of on the burden of proof here.

You're saying that you come in and you think, you know what, that's negative connotations, you know, they're the defendants, they're on trial.  They must have done something.  Do you feel like the government's a little bit ahead and we're going to have to play catchup or are you going to be able to hold them to the burden that they've got to prove this case?

PROSPECTIVE JUROR 3:  I can hold them to that.

MS. LUEM:  Okay.

PROSPECTIVE JUROR 3:  Uh-huh.

MS. LUEM:  Okay.  The Judge explained this a little bit and we'll hear about it again.  But they have to do all the proving, right?  Everybody understands, like, this is where the information comes from.  We can sit over here this whole trial, do absolutely nothing, and if they don't prove the case, then you are still required to find them not guilty.

As long as they prove their case beyond a reasonable

doubt.  I don't want to misstate that.

Is that something you think you can do?

PROSPECTIVE JUROR 3:  Yes.

MS. LUEM:  Okay.  So gang culture and things like
that is not going to be an impediment necessarily to our side?

PROSPECTIVE JUROR 3:  No.

MS. LUEM:  Okay.  Thank you.

Juror Number 10.  If you can hand it down to this
gentleman.

And just real quick, show of hands, who here is so
tired and just wants to go home?  It's okay.

Yeah.  So I'm going to try to be really brief, but
like I have to ask you about this grand jury service, and you
mentioned yesterday I think MAGEC task force.

Do you recall that?

PROSPECTIVE JUROR 10:  Yes.

MS. LUEM:  Did you hear from somebody in that task
force or did you just get educated about the task force?

PROSPECTIVE JUROR 10:  Well, I believe the DA was the
head or had started the task force.

MS. LUEM:  Okay.  And the DA that was overseeing the
entire grand jury that you brought up for those months.

PROSPECTIVE JUROR 10:  Yes.

MS. LUEM:  Is that somebody that you came to respect
or admire?

PROSPECTIVE JUROR 10:  Yeah, I think I respected him, yes.

MS. LUEM:  Okay.  If you hear in this case that that task force, MAGEC, was involved, and possibly hear from -- from somebody who works on that task force, do you think you're going to give them a little bit more credibility than you would maybe, say, just an ordinary witness?

PROSPECTIVE JUROR 10:  I don't believe so.  Again, like I said, we were only hearing one side of the story.

MS. LUEM:  But you want to hear both?

PROSPECTIVE JUROR 10:  Yes.

MS. LUEM:  Okay.  But you know from what I just said that you don't necessarily get to hear two sides of the story.

Oh, you mean the grand jury you only hear one side.

PROSPECTIVE JUROR 10:  Yes, on the grand jury.

MS. LUEM:  Okay.  I thought you meant over here.

PROSPECTIVE JUROR 10:  No, I'm just saying that --

MS. LUEM:  Okay.

PROSPECTIVE JUROR 10:  It's -- I mean, it's a lot easier to make a decision on a grand jury because you only hear one side and you can judge whether it's strong or not, but that doesn't mean that it's correct.

MS. LUEM:  Right.

PROSPECTIVE JUROR 10:  Because you haven't heard the other side argue.  So --

MS. LUEM:  What if we don't, what if you don't hear anything from us?

PROSPECTIVE JUROR 10:  Well, then it depends on the evidence that was presented and how strong that is.

MS. LUEM:  And if you're convinced beyond a reasonable doubt of the guilt?

PROSPECTIVE JUROR 10:  Then, yes, you would vote to convict, yes.

MS. LUEM:  Okay.  And what about the fact that -- that you may hear evidence that my client is an alleged member of the Aryan Brotherhood?  I mean, can you still parse that out and say, Look, he might be a member of this gang, but he's not guilty of these crimes?

PROSPECTIVE JUROR 10:  Yes, I believe I can do that.

MS. LUEM:  Okay.  Are you sure you can do that?

PROSPECTIVE JUROR 10:  Yes.

MS. LUEM:  Okay.  All right.  Fair.

Juror Number 39, please.

And I mostly want to follow up with you about your -- your work and your life.  Because it sounds like you're pretty busy with your businesses commuting to the Bay Area, your family.  Will you be able to pay attention, listen to the evidence, judge the quality of that evidence despite everything that you have going on?

PROSPECTIVE JUROR 39:  My employer will cover the

whole jury duty, so that takes one out.  The other one is after 1:00 p.m.

        MS. LUEM:  Okay.  So all morning really you can just shut down everything, and just focus on what's going on here.

        PROSPECTIVE JUROR 39:  Yeah, I owe it to the victims, so.

        MS. LUEM:  What about to the defendants?

        PROSPECTIVE JUROR 39:  Both.

        MS. LUEM:  Okay.  I mean, that's an interesting thing to say, right, from my perspective, for you to say that you owe it to the victims.

        I mean, you're not here to -- for justice for the people who -- who died.  You understand that, right?

        PROSPECTIVE JUROR 39:  Yeah.

        MS. LUEM:  You're not here to, like, right a wrong.

        PROSPECTIVE JUROR 39:  Correct.  It's not for right a wrong, but I think what everybody's here for is, whether those individuals have participated or not, the person who died would love to correctly find the person who got them killed, correct?

        MS. LUEM:  And would they equally not want the wrong person to go to prison?

        PROSPECTIVE JUROR 39:  Of course.

        MS. LUEM:  Okay.  Okay.  That's fair.

        PROSPECTIVE JUROR 39:  I'm not --

MS. LUEM:  Do you believe that police officers make mistakes?

PROSPECTIVE JUROR 39:  100 percent.

MS. LUEM:  I know you have a pretty positive view of law enforcement.

PROSPECTIVE JUROR 39:  Yes, but that's -- I also lived abroad and we bribed police, we bribed judges.  I've seen war, so I understand exactly what humans can do on both sides.

MS. LUEM:  Do you think that those sorts of things happen here?

PROSPECTIVE JUROR 39:  Here where?

MS. LUEM:  In the U.S.

PROSPECTIVE JUROR 39:  What you do mean by "here"?

MS. LUEM:  Bribing the police, bribing judges.

PROSPECTIVE JUROR 39:  Not that I know of.

MS. LUEM:  Do you think that a police officer would testify falsely?

PROSPECTIVE JUROR 39:  They can.

MS. LUEM:  What is your opinion, though?  Do you think that's something that happens ever or would it be a very --

PROSPECTIVE JUROR 39:  It's definitely happened in the past and we would judge based on the circumstances and the questions.  And I think that's where your talent comes in,

right?

            MS. LUEM:  You're assuming I have some.

            What about what Mr. Reed asked you, he said there's
going to be some witnesses who are -- are inmates, that are
prisoners, are currently serving prison sentences.

            Do you think you can evaluate the credibility of
those people the same way?

            PROSPECTIVE JUROR 39:  Yeah.

            MS. LUEM:  Okay.  What about witnesses who are
currently serving sentences that received benefits from the
government in exchange for their testimony.

            PROSPECTIVE JUROR 39:  So in what context would we
see that differently?

            MS. LUEM:  They're going to get out of prison early,
right, in exchange for this testimony.  I mean, is that
something that you can -- that you think that person might be
telling the truth but also they're pretty incentivized, I
mean, does that make sense to you?

            PROSPECTIVE JUROR 39:  I wouldn't know incentives, so
everybody who comes here could have an incentive.  That's not
what we're judging on.  Like, we wouldn't know this person is
coming into this with an incentive, that they're going to get
a plea deal.

            MS. LUEM:  What if you do know that?

            PROSPECTIVE JUROR 39:  Then we would evaluate what

they're saying based off the facts.  I don't think that would change -- same as a police officer, that wouldn't change their incentive.

MS. LUEM:  Okay.  I'm going to ask you to pass that down to Juror Number 52 in Seat 29.  I think -- there they are.

And, again, I'm sorry, I just can't see you.

PROSPECTIVE JUROR 52:  No worries.

MS. LUEM:  So I feel like I know nothing about you.

Your wife is having a baby in a couple of months.

PROSPECTIVE JUROR 52:  Less.

MS. LUEM:  And you have other kids at home?

PROSPECTIVE JUROR 52:  Yes.

MS. LUEM:  Did you find out -- I'm not sure if we asked you -- about your PTO?

PROSPECTIVE JUROR 52:  Yes, I actually have a letter I can either email to the Judge or I can show you guys.  Unfortunately, they said that due to my position, that this one is required to be in -- in office, so they would only cover the 20 days and from there, you know, I'd have to either use the PTO that I have saved or, you know -- but I do have the letter for -- to show.

MS. LUEM:  Okay.  Okay.  Is that something that's going to be weighing heavily on you?

PROSPECTIVE JUROR 52:  Yes.  We just moved into a new

house to prepare for our child.  So as far as expenses and just within the last few months, the savings that we did have has pretty much been used.  So it would be a significant hardship if I'm out because I'm probably about 90 percent of the income in the household.  My wife does some work, but she more takes care of our child.

MS. LUEM:  And she's pretty far along in her pregnancy?

PROSPECTIVE JUROR 52:  Yes.

MS. LUEM:  You said is it early April or late April?

PROSPECTIVE JUROR 52:  April 5th is the due date.

MS. LUEM:  Okay.  April 5th.

I believe -- I'm just going to go back a little bit to something Juror 76 said earlier about if the defense puts on a good case, right, or proves their innocence, then he would be okay finding them not guilty.

Do you understand the sort of nuance, difference between the burden of proof being on the government and --

PROSPECTIVE JUROR 52:  Yes.

MS. LUEM:  -- the presumption of innocence just stays over there kind of like a big beautiful white cloud with a rainbow until and unless they prove guilt beyond a reasonable doubt?

PROSPECTIVE JUROR 52:  Yes.

MS. LUEM:  And you're okay with that concept?

            PROSPECTIVE JUROR 52:  Absolutely.

        MS. LUEM:  Even though they might be members of a
prison gang?

            PROSPECTIVE JUROR 52:  It doesn't matter.  The burden
of proof is on the prosecutors.

        MS. LUEM:  Okay.  Thank you.  Will you pass that over
to Juror 30.  Oh, you're right next door.  Sorry.

            Again, I can't see you, so it's hard.

            Do you have any thoughts about convicted felons
testifying and judging their credibility?

            PROSPECTIVE JUROR 30:  No, I think -- I mean, you
have to go based on the facts.  I mean, all we're going to
know is what we hear in this courtroom, and that's what we
have to go by.  So I don't believe I will take the account,
you know, into their background, where they're coming from.
It's just what happens in here is -- is what we go by.

        MS. LUEM:  Okay.  Okay.  Would you tend to believe a
law enforcement witness over an inmate witness?

            PROSPECTIVE JUROR 30:  Not necessarily.  In my mind,
people are people.  It really doesn't matter whether they wear
a badge or, you know, a black-and-white jumpsuit.  You know,
it's -- we all come from the same insides.  You know, to me, I
know there's -- there's bad people in every walks of life.  I
know people have committed crimes, but, you know, that doesn't
mean they're going to lie.  It's -- it's -- people are people.

MS. LUEM:  Do you think you're a good judge of somebody's character or credibility?

PROSPECTIVE JUROR 30:  I don't know.

MS. LUEM:  Only you know that.

PROSPECTIVE JUROR 30:  Yeah, I mean, I -- for the most part I think so.  I'm not a super worldly person.  I haven't been out in the world, you know.  So I think within my own little bubble I judge fairly well.  I don't have a lot of contact in my day-to-day life with people that are without, you know, outside my bubble I guess, you know.

MS. LUEM:  What do you mean by your bubble, your family or --

PROSPECTIVE JUROR 30:  Well, that and just, you know, the type of people that I'm around, I guess.  I don't know how to explain.

MS. LUEM:  Law-abiding people.

PROSPECTIVE JUROR 30:  Not necessarily, I -- so the town we live in, it's a poor town.  It's actually got a lot of crime.  And I know that people that live nearby us are doing certain things.  But, you know, we've had people come to our door that have needed our assistance, and they've come from houses that I know probably are doing things that they shouldn't, however, we assist these people.

So, you know, I don't -- I try to not judge, I guess.  Based on -- because I feel, uh, I don't know, there's a lot of

759

circumstances that causes people to get to where they are in life.

    MS. LUEM:  Yeah.

    PROSPECTIVE JUROR 30:  I guess.

    MS. LUEM:  Okay.

    PROSPECTIVE JUROR 30:  So I -- I can't tell whether or not I'm a good judge of character.  I feel like I am but --

    MS. LUEM:  Sure.  Sure.

    Well, one of the jurors who just left us had said something earlier about she felt like there's this sort of guilt by association thing when it comes to gangs or gang membership.

    What do you think about that?

    PROSPECTIVE JUROR 30:  I mean, it's hard not to assume that if you're hanging around people that are doing certain things, you know, you're doing those certain things.  But I also, I kind of believe not everybody ends up in a gang for the same reason.  And so, you know, perhaps it -- just because this person is doing something, that doesn't necessarily mean that because you associate with those people you were doing the exact same thing.

    MS. LUEM:  Okay.  And the defendants that are on trial here, are -- there's different charges for different people, and how do you feel about evaluating the different charges for the different gentlemen?  They might look a little

bit alike, but they're very different, and do you have any
issue listening to the evidence as to each one and considering
it independently from the other?

        PROSPECTIVE JUROR 30:  No.

      MS. LUEM:  Okay.  You think you can do that?

        PROSPECTIVE JUROR 30:  Yeah.

      MS. LUEM:  Is there anybody that doesn't think they
can do that?

      Nobody really wants to raise their hand anymore.  I
understand that.

      PROSPECTIVE JUROR 30:  There was one thing the
previous attorney was talking about.  She was asking if we had
assumed that, you know, we called them accused when we walked
in.  So to me, and forgive me but I have an English degree so
words are kind of my thing, but to me "accused" does not mean
guilty.  That word does not -- they're accused, that's why
we're here, right?

      MS. LUEM:  Right.

      PROSPECTIVE JUROR 30:  We wouldn't all be here if
somebody had not accused them of doing something.  But that
doesn't mean they're guilty, so I just -- in my mind I'm like,
Wait a minute, that doesn't mean just because we associate
them as being accused doesn't mean we associate them as being
guilty.  In my mind.

      MS. LUEM:  That's a very good distinction and I

appreciate you making that.

And let me see if I have much else.

I would like to talk to Juror Number 74 who's behind you just a couple in the gray, and that's just because you haven't been with us very long -- wait.  Isn't that you?

79.  I'm sorry.  I wrote the wrong number down.  Actually, it's my handwriting that's bad.

How do you feel about that, different charges evaluating evidence?  I mean, you may hear some evidence that has nothing to with Mr. Johnson at all.

Are you okay sort of looking at the -- the evidence, listening to the witnesses, applying the law as to each defendant separately?

PROSPECTIVE JUROR 79:  Yes, I could do that.

MS. LUEM:  Okay.  Is there anything in your -- in your life or your mind that would prevent you from doing that or giving each guy a sort of fair shake?

PROSPECTIVE JUROR 79:  No.

MS. LUEM:  Okay.  And you're a foster parent, right?

PROSPECTIVE JUROR 79:  Previously, yes.

MS. LUEM:  Oh, okay.  Okay.

And so do you have any special bias towards, against, I should say, people -- people who end up in prison or end up in gangs or end up committing crimes, just based on your life experience?

PROSPECTIVE JUROR 79:  No, like others have stated, people end up in -- incarcerated because of different things, like disabilities or they've fallen with the wrong people. There's many different reasons, so I try not to judge.

MS. LUEM:  Okay.  You'll hold the government to their burden?

PROSPECTIVE JUROR 79:  Yes.

MS. LUEM:  I just want to make sure I didn't forget anybody.

Number 81.  You just -- you just came aboard.  And we don't know a lot about you.  I know you work at The Gap.  You live with your family, it looks like, and you help take care of your parents?

PROSPECTIVE JUROR 81:  Grandma.

MS. LUEM:  Your grandmother, okay.

Do you feel like -- are you the sole caregiver of your grandmother or grandfather, I'm sorry?

PROSPECTIVE JUROR 81:  Mainly after work then I go visit her, make sure she's taken care of.

MS. LUEM:  Okay.  So you check in?

PROSPECTIVE JUROR 81:  Yeah.

MS. LUEM:  All right.  Do you feel like there's anything about anything that anybody has said that you feel strongly about, either way?

PROSPECTIVE JUROR 81:  No.

MS. LUEM:  All right.  Well, let me ask you this then, if you're selected to be on this jury, and you're back in the jury deliberation room, and 11 jurors think one thing and you feel something else very strongly, are you going to stand up for yourself?

PROSPECTIVE JUROR 81:  Yeah.

MS. LUEM:  Okay.  You're not going to let anybody bully you, push you around, tell you what you should think?

PROSPECTIVE JUROR 81:  No.

MS. LUEM:  Not at all?

PROSPECTIVE JUROR 81:  No.

MS. LUEM:  Okay.  Thank you.

PROSPECTIVE JUROR 81:  You're welcome.

MS. LUEM:  Nothing further.

THE COURT:  Ms. Stokman, we did have a new juror. Did you have any questions for the new juror?

MS. STOKMAN:  No.

THE COURT:  Mr. Reed?

MR. REED:  No, Your Honor.

THE COURT:  Ms. Fisher-Byrialsen, do you have any questions for the new juror?

MS. FISHER-BYRIALSEN:  No, thank you.

THE COURT:  All right.  Counsel, can I speak to you at sidebar?

    (Sidebar commences:)

764

THE COURT:  Is there any -- well, I guess any
comments about any hardships to raise at this time?

MS. STOKMAN:  I'm going to renew on 53.  She said
it's -- her income is part of --

MS. LUEM:  What number?

MS. STOKMAN:  53.

Part of her family is a financial hardship, a
substantial burden if she's not there.  She's 19 and part of
her income is going to her family, and she's already in a
tough spot, she's not getting paid.  So I'll renew that one.

THE COURT:  Refresh my recollection.  This is the
woman that works at the restaurant?

MS. LUEM:  Bakery.

MS. STOKMAN:  The bakery.  Her income contributes to
putting food on the table basically.

THE COURT:  Although she said some money goes, she
keeps some.

MS. STOKMAN:  If she can, she said.

THE COURT:  Her brother keeps some.

I guess it depends on what the bills are that month
or something.  That's how I understood it.

Comments from the defense?

MS. LUEM:  I stand by my previous objection.  I don't
think it's a substantial hardship.

THE COURT:  Mr. Reed?

MR. REED:  I thought the hardship has to be to the juror, not their family.  It's like saying my boss won't make any money if I'm not here.  I mean, as a technicality, I don't think it's actually to the family.  It's to the person.

MS. STOKMAN:  Well, she's part of that family.  She's part of living in that household and she's saying her income goes to running that household and keeping it going.  She mentioned electricity, she mentioned other items.  I mean, that's pretty significant to her if she's not getting paid.

THE COURT:  Right.  I have to agree with defense that it's sounds like a problem, difficulty, but it doesn't sound like -- I mean, I said, Does this mean you're not going to eat?  And she didn't adopt that.

So that objection is overruled.

Anyone else?

MS. FISHER-BYRIALSEN:  Are you only asking hardships?

THE COURT:  Yeah.

MS. FISHER-BYRIALSEN:  No.

THE COURT:  Then let's talk about --

MS. FISHER-BYRIALSEN:  Sorry.

MS. LUEM:  It's Juror Number 52 who said he called his boss and he doesn't get the extra time, his wife is pregnant.

THE COURT:  Right.

MS. LUEM:  I think he said 90 percent of the income

is his and --

      THE COURT:  52.

      MS. STOKMAN:  Yeah, I think he's --

      MR. CONOLLY:  I'm sorry.

      If this trial goes for more than 20 court days, he's the one that starts to eat into his PTO.  We're all thinking about the same person?

      THE COURT:  Yeah.  He's having -- expecting the baby, just got the new house, and eating up his savings and has a letter from his mean boss.

      MR. REED:  Right.

      THE COURT:  Okay.  So there's an agreement on 52?

      MS. LUEM:  Yes.

      THE COURT:  Okay.

      Cause challenges.

      If you're going to speak, let's get you up to the microphone so we can get a good record.

      MS. FISHER-BYRIALSEN:  One was 78.  The one that had been the victim of gang violence.

      THE COURT:  Okay.  All right.

      Any comments about 78?

      MS. STOKMAN:  I think you asked the question to the panel and he seemed to then understand.  And didn't seem like that cause issue was in existence anymore.

      MR. CONOLLY:  He did express ongoing anxiety, but he

also said despite that, I can do my job.  I mean, everybody here has life experiences.  Everybody here has triggers and anxiety, all that sort of stuff.  We're all human.

He's been very upfront about his.  It's true but he has said quite firmly, I can put that aside and I can be impartial.

MS. FISHER-BYRIALSEN:  I think he said that he would not presume them innocent.  I think what he said --

THE COURT:  I don't think that --

MS. FISHER-BYRIALSEN:  I can read that back.

THE COURT:  -- was 78.

I looked at the record.  The trouble is he stopped one question short.  You said, Would it be hard?

He said, Yeah, it would be hard.

But you didn't say, Can you?  And he already had affirmed that he could.  I can follow up with another question of him, but yeah, you stopped one question before he said.

MS. FISHER-BYRIALSEN:  Okay.  Well, if you'd feel it out, we would appreciate that.

THE COURT:  Sure.

Any other cause challenges?

MS. FISHER-BYRIALSEN:  70.

THE COURT:  Yeah, 70 caused me some concern.

Comments?

MS. STOKMAN:  What was her comment?

THE COURT:  That she -- let me look at it again.

So the question was whether you are presuming the defendants to be innocent and she said no.

MS. STOKMAN:  I didn't catch that part.

MR. CONOLLY:  For Number 70?  I mean, I thought Your Honor was, sort of, questions to the group generally was the presumption of innocence in many ways a term of art, but --

THE COURT:  Right.  And she affirmed, but then when she just was questioned again she's like, you know, I'm just going to be honest, no.

So, yeah, I agree 70 is a cause challenge.  That will be sustained.

Any other cause challenges?

MS. LUEM:  I have a concern about Juror Number 10, just that he has already sat through a grand jury that used the same task force that started this investigation and was in charge of, like, all the initial wiretaps, the arrest and initial prosecution of one of the primary corroborators.  I just think it potentially could become an issue.

THE COURT:  I'm sorry.  I need to hear what you said more.

MS. LUEM:  Juror Number 10.

THE COURT:  I know that.  Let me clarify.

You're saying his grand jury in 2021 started this

investigation as to --

            MS. LUEM:  No.

            THE COURT:  Okay.

            MS. LUEM:  It was involving the same task force that
started the investigation in this case.

            THE COURT:  Yeah.

            MS. LUEM:  So I imagine that the Fresnecks and some
of those other local Fresno area gangs were covered by that
grand jury and that's -- that's who's -- who started this --
MAGEC started the investigation into Samantha Booth and
Kenneth Bash and Derek Smith, and one of the main -- the
primary investigator, Carrie Phelps, who was running MAGEC at
the -- at the time, was involved in the arrests of all of
those people.

            And Robert Eversole, who's one of the primary
cooperators, at least against our client, and I'm just
concerned that he's going to hear that and give more
credibility to that investigation and this prosecution than
the other jurors, based on his prior knowledge of that
particular task force, which, like I said, is the same that
was involved in this investigation.

            THE COURT:  Any other comments about Juror 10?

            MS. FISHER-BYRIALSEN:  No, we agree.

            MS. STOKMAN:  There's no one from MAGEC who's on the
witness list from the government, so we don't anticipate this

coming up to be an issue.

THE COURT:  I would also note he was -- he heard testimony he thought was inconsistent between police officers, he understood he heard only one side, and that he would not give more credence to somebody who was a member of MAGEC.  I don't think there's a cause.

I will sustain that objection.

Any other cause challenges?

MR. CONOLLY:  Sorry.  One second.

I think we have conferred and I don't think we have any others.

THE COURT:  All right.  Any other cause challenges for the defense?

MS. FISHER-BYRIALSEN:  No, Your Honor.

THE COURT:  All right.  So what I'm going to do is -- sorry.

Number 52 and 70 we're going to excuse, I'm going to ask another followup as to 78.

MS. FISHER-BYRIALSEN:  Okay.  Can I just have one moment?

THE COURT:  Yeah.

MS. FISHER-BYRIALSEN:  Nothing further.  Thank you.

THE COURT:  Okay.  Thank you.

(End of sidebar.)

THE COURT:  All right.  Ladies and gentlemen, I do

have a few more questions.

Let's start with Juror 78.  You said something earlier, and I should have followed up and I forgot to do that.

Can I get the microphone down?

You're sitting in Seat 24.  All right, sir.

Earlier when one of the attorneys was asking you a question, I don't recall who it was, it was a question that said -- asked you whether you presume that the defendants were guilty -- I'm sorry were innocent, and you said something like, It would be hard.

She's -- I think their question was, Would it be hard for you to do that?

And you said, Yeah, it would be hard.

Despite that it's hard, can you look at these men and say, I understand the law presumes them to be innocent and I'm going to presume that they are innocent?  Are you going to do that, sir?

PROSPECTIVE JUROR 78:  Can you repeat that question or, you know, say it a little differently?

THE COURT:  So, even though it may be hard, you know, we heard some people talk about, you know, there's a first impression, then you sat here a couple days and we've talked about the burden of proof and what the Constitution requires.

And so you've heard that the Constitution says these

men are presumed innocent and when you were asked a question about can you presume them to be innocent, I think you said it would be hard, but what I didn't hear was whether you could do it even though it's hard.

PROSPECTIVE JUROR 78:  I mean, it's not hard for me to say that they're innocent.  I know right now they're innocent until they -- it's proved that they are, you know, in all the ways.

I'm just saying that my situation, based on my experiences, it's just hard to be here, to experience this whole case, and be, you know, 100 percent to, you know, make good judgment and just be concentrating.  And make decisions.

THE COURT:  And you're saying because of what happened to you in high school, and it's bringing up -- you're recalling those things now, is that what you're saying?

PROSPECTIVE JUROR 78:  Right.

THE COURT:  And it's going to be hard for you to take on this role and, again, it's hard, it is a hard job.

Are you able to do that, though, sir?

PROSPECTIVE JUROR 78:  I don't think so.  I don't think I can do it.

THE COURT:  So you're saying that you think that your experience in high school is going to make it so that you cannot be fair to these gentleman?

PROSPECTIVE JUROR 78:  It's not that I cannot be

fair, it's just I can't do it, like, this time.  Be here and
go through the whole case for all this time.  I think it's --
I'm going to be stressful this whole time, and it's going to
cause, you know, I don't know, a lot of stress to me, and I'm
already having a lot of stress on my -- in my house for other
differences -- other things that I put on my -- on my form.

So this is going to be adding to that, to the whole
hardship thing.

THE COURT:  Yeah.  I just need to understand that a
little bit more, because it is stressful work, because of the
seriousness of this role.

Life is hard and there's stress involved, and I
understand it sounds like you have some other personal
stressors.  And that you would prefer not to do this.  You'd
prefer not to take on this task and you'd prefer not to have
the added stress of doing so.

But can you do it?

PROSPECTIVE JUROR 78:  I mean, like, I can, I can do
it.

THE COURT:  And you said earlier that it's, you know,
it's bringing up some memories --

Well, first of all, I should ask how long ago were
you in high school?

PROSPECTIVE JUROR 78:  About 20 years or so.

THE COURT:  Okay.  And despite the passage of 20

years -- well, maybe I should ask you this:  After you left
high school, did you just tend to forget about the involvement
you had with the gangs after school?

PROSPECTIVE JUROR 78:  I mean, I was just trying to,
you know, do my things, do whatever I needed to do.  I -- I
always try to avoid, you know, like I said, places or just
going out in general.  You know, I didn't encounter any other
situations similar to that, but like I said, it's always been
a thing that I tried to avoid anything related to that.

THE COURT:  And so having come here and learned about
this case a little bit, it's kind of bringing up those
memories again that you -- of those experiences in the past?

PROSPECTIVE JUROR 78:  It's just uncomfortable to me.
I get anxiety, you know, about just being here.

I mean, I've been in -- got selected for jury duty
for other cases.  I've been through the whole process, but it
was not the same thing.  It was different.  Different cases
and I was fine with it.

THE COURT:  So you've been on jury duty.  Was it
other criminal cases?

PROSPECTIVE JUROR 78:  I don't remember what was the
type of cases, but it wasn't gang related.  It was through the
county.

THE COURT:  Okay.  And -- but in any event, you're
saying that, you know, you had these experiences and those

experiences have followed you into adulthood, to the point where, you know, if you see somebody in a store that might make you think, Wow, I think that might be a gang member, honey, you go in the store.  I'm going to stay in the car.

PROSPECTIVE JUROR 78:  Yeah, I try to avoid going there.

THE COURT:  And I guess I'm sorry I keep asking you the same question because I'm not sure I understand enough because -- are you going to be able to set that anxiety and stress aside?  Are you going to be able to work through that stress and anxiety and listen to the evidence?  Or are you going to be the whole time thinking, I'm so stressed, I'm anxious, I remember these things that happened to me?

How do you think that's going to work going forward?

PROSPECTIVE JUROR 78:  I don't think it's going to be easy just to be here.  I'm going to be --

THE COURT:  I know it's not going to be easy.  Unfortunately, the easy test doesn't work for us.  It has to be something more, that it's going to interfere with your ability to do your job here.

Will it do that?

PROSPECTIVE JUROR 78:  Yeah.

THE COURT:  Okay.  All right.

Counsel, let me speak to you one more time.

///

(Sidebar commences:)

THE COURT:  All right.  Let me hear your comments, Ms. Stokman or Mr. Conolly.

MS. STOKMAN:  There's no objection in letting him go.

THE COURT:  All right.  We're going to let -- all right.  Thank you.

(End of sidebar.)

THE COURT:  All right.  Ladies and gentlemen, actually, I'm going to go ahead and excuse Juror Number 52, Number 70, and Number 78.  Thank you so much for your attention the last few days.

And then just ask you to call the 800-number after five o'clock on Friday.  Thank you very much.

Let's go ahead and call up three more jurors.

THE CLERK:  Juror 82, take Seat 23.

Juror 83, take Seat 24.

Juror 84, take Seat 29.

THE COURT:  All right.  Thank you so much for joining us.

Let me start with Juror 82.

Well, actually let me ask all three of you.  I've asked a whole lot of questions over the last few days.

Did each of you hear the questions I asked?  If not, please raise your hand.

All right.  None of the jurors have done that.

Was there anyone who felt like any of the questions that I asked brought up something that you feel like is important to share with us?  If so, please raise your hand.

All right.  None of the jurors have done that.

Starting with the Juror 82.  Sir, I'm sorry, actually, let me make sure we're -- all right.

Sir, do you own your own business?

PROSPECTIVE JUROR 82:  No.

THE COURT:  Maybe I'm misread it.

What is it that you do for work, sir?

PROSPECTIVE JUROR 82:  I'm a civil engineer.

THE COURT:  Yep, I'm looking at the wrong one. Sorry.

PROSPECTIVE JUROR 82:  It happens.

THE COURT:  All right.  And you say it's civil engineering in land development.

Tell me what that means.  What do you do?

PROSPECTIVE JUROR 82:  Uh, some design processes and stuff like designing bridges, roadways, buildings, stuff like that.

I'm in an entry-level position since graduating last May.  So I kind of do very preliminary design work and then it goes up the chain through, you know, higher-ups and stuff like that.

THE COURT:  Are you -- do you have to get a certain

number of hours before you can take your -- what is it, a PE?

        PROSPECTIVE JUROR 82:  Initially -- first you take -- you would take your FE exam.  And then you would -- after, I think, two years of work experience or various graduate level classes, that you can then take the PE exam.

        THE COURT:  Okay.  How are you enjoying this work?

        PROSPECTIVE JUROR 82:  It's cool.  I like it.  Yeah, I've always been fond of math and various sciences.

        THE COURT:  See, the rest of us are going, ugh.

        PROSPECTIVE JUROR 82:  Yeah, I heard it.

        THE COURT:  All right.  You said that you have a negative attitude about law enforcement and that you think that sometimes they misuse power.

        Did that come from a particular event or where did that attitude come from?

        PROSPECTIVE JUROR 82:  More so influenced from what you see in the media, but as we've talked about biases a lot, I kind of have since removed myself from that and acknowledged that -- you know, the sentiment that's been shared, that there are just bad batches, you know.

        So that previous notion when I first filled out the questionnaire has since kind of subsided.  It's not the case now.

        THE COURT:  And we've said it a lot of times.  You know, having a bias isn't the problem.  Having the bias that

you don't recognize is the problem.

          And you're saying, you know, if just asked, you would say, Yeah, you know, I have some concern about somebody who misuses their authority.  But then you're saying, The more I think about it, I'm going to be concerned about -- or I'm going to be aware of that bias and I'm going to consider the testimony of law enforcement the same as I would any other witness.  Is that right?

          PROSPECTIVE JUROR 82:  Exactly.

          THE COURT:  And so of course that means they don't get a leg up, you don't automatically believe them, but you don't automatically disbelieve them.

          Can you do that, sir?

          PROSPECTIVE JUROR 82:  Absolutely.

          THE COURT:  And it looks like you don't really have any information about gangs.  Is that true?

          PROSPECTIVE JUROR 82:  Uh --

          THE COURT:  No, actually, I'm sorry.  You did know people who had been part of a gang.

          PROSPECTIVE JUROR 82:  Yeah, some cousins, but no one that I was close in contact with.  It was because they were involved in that that there wasn't much contact.  We had very different kind of paths.

          THE COURT:  Did -- do you recall or did you ever know what gang they were involved in?

PROSPECTIVE JUROR 82:  No specifics.

THE COURT:  And your information about gangs in general, does it come simply from the media, like a lot of us?

PROSPECTIVE JUROR 82:  Yeah.  What you see in local news outlets, you know, that's kind of where I obtain all of my -- or most of my information pertaining to gang activity and such.

THE COURT:  When your -- when you had heard that your relatives were involved in this gang, it sounds like maybe your family kind of separated yourself from that other part of the family; is that right?

PROSPECTIVE JUROR 82:  We didn't see one another too much prior, and then it was, you know, I heard, as all of us grew up, Oh, yeah, so-and-so is involved with something, you know.  Oh, okay, well that sucks.  But I haven't spoken to them in years and it kind of has no effect on me at that moment and, you know, same thing now.

THE COURT:  And you think it wouldn't have any effect on you if you were selected as a juror in this case?

PROSPECTIVE JUROR 82:  Not at all.

THE COURT:  Okay.  You said that you have a bit of information about the Northerners, which is a gang outside the prison, at least according to what you know.

Is that information you just got from the media as well?

PROSPECTIVE JUROR 82:  That's more so like location based, like where I live.  It's kind of prevalent in that area throughout Tulare County, stuff like that, you know.  Again, what you see in the news, especially watching very local news outlets, that's a name that comes up a lot.

THE COURT:  Okay.

PROSPECTIVE JUROR 82:  But personal experience, none.

THE COURT:  Okay.  And you understand the fact that someone is involved in a gang, at least in the types of charges we're talking here, that would be not enough in and of itself to convict someone of a crime.

Do you understand that?

PROSPECTIVE JUROR 82:  Yeah.

THE COURT:  You said that you have some family members who have been involved in drug use.

The fact that they have had that situation in the past or are recovering from that, do you think that that would impact how you evaluated evidence or how you decided the case here?

PROSPECTIVE JUROR 82:  No, that will not impact my judgment.

THE COURT:  All right.  Is there anything else, sir, that I should have asked you about and I haven't?

PROSPECTIVE JUROR 82:  No.

THE COURT:  Okay.  Let's see.  If you could pass the

microphone to Juror 84 seated -- actually, it's in Seat 24.
Unless I wrote that down wrong.

PROSPECTIVE JUROR 83:  Yeah, it should be me, 83.

THE COURT:  Yep.  Yes, you're right.  Sorry.  Thanks
for keeping track.

And if I remember right, aren't you planning law
school?

PROSPECTIVE JUROR 83:  Yes.  Yeah, I am.

THE COURT:  And what is your interest in the law or
how did you come to that?

PROSPECTIVE JUROR 83:  So originally, I started my
college career as a biology major.  But I like the more
analytical side of it.  But -- a lot of it too is just, like,
equation based.  And then I just kind of always had a cursory
knowledge of the law.

I took one class and then I kind of just gravitated
towards it and kind of understood it.  And then just seems
like something I can see myself doing, and it feels like real
work that has, like, an impact.  That doesn't involve math.

THE COURT:  That's how a lot of people end up in this
field.

You said that you took a class on the law.  Was that
in college?

PROSPECTIVE JUROR 83:  Yeah.  For my Bachelor degree,
I took an applied legal skills course, which involved, like,

dealing with real rap sheets, felony erections [sic] with PC
17(b), Prop 64, like, records clearances, things like that.

THE COURT:  You said it's an applied legal skills
course.

Does that mean you were actually working with people
or that you were given, you know, here's a case file, these
are actual real files, but you didn't see the people
associated with them.

PROSPECTIVE JUROR 83:  We were working under my
professor's bar number directly.  We were supposed to get in
contact with clients and mine never reached out.  But we
had -- that was the intention, to actually talk and meet with
them.

THE COURT:  But you never had that occur for you?

PROSPECTIVE JUROR 83:  No.  I called, they didn't
answer.

THE COURT:  Okay.  Did you work, then, with any other
teams that had had contact with people needing assistance?

PROSPECTIVE JUROR 83:  Only in that class.  But the
ones that we were handling, they never really got dealt with
during the course of the class.  A lot of them were prior to
our enrollment.

THE COURT:  I'm sorry, you said a lot of them were
what before?

PROSPECTIVE JUROR 83:  Oh sorry, yeah.  Some of the

cases that were dealt with were done prior by the professor before we enrolled in the course.  So we never had access to the materials that she -- or the materials or the people she represented in court.

All of the ones we handled were either just not really followed up on or followed up after my tenure in the course was done because it was just semester based.

THE COURT:  Okay.  And so the idea behind this class was that you were going to contact people and try to have their record expunged?

PROSPECTIVE JUROR 83:  Yeah.  So depending on what their offense was, we'd either reply with a PC 17(b) like the Wobbler, reduce the felony to a misdemeanor, or just fill in Prop 64 and kind of get their records cleared.

And it would eventually culminate in them having a hearing, which we would then, you know, prep them for and just advise them what to say, how to conduct themselves, what they're going to ask.

And my portion of the course never went that far because they never responded, but that was the idea and that was what we were learning throughout the course.

THE COURT:  And so you didn't get to do most of that stuff?

PROSPECTIVE JUROR 83:  No.

THE COURT:  Did your professor give lectures in that

course as well?

PROSPECTIVE JUROR 83:  Yes.

THE COURT:  And was that about what the law was and how to apply it?

PROSPECTIVE JUROR 83:  Yes.  Yeah, like what to look for on the rap sheets, what offenses are eligible to be reduced or, you know, covered.  And basically just what to look for and how to perform the process using those real world examples.  But I never got to carry out my project, as it were.

THE COURT:  Okay.  And it sounds like then whatever information your teacher gave you was very specific to the skills and the work that you were doing; is that right?

PROSPECTIVE JUROR 83:  Yeah.  We had the rap sheets redacted for the most part, but eventually when we were assigned specific clients, it was two for me, and that's when we got the fully unredacted, you know, transparent document.

THE COURT:  Okay.  And most of those documents, that's public information.

PROSPECTIVE JUROR 83:  These ones specifically, no. Because we had to sign, like, information releases and we had to make sure, like, our documents were sealed and protected, because these ones were the ongoing expungement cases and things like that.  So they were sensitive material.

THE COURT:  Okay.  And the other people who were --

other students in your class, what were the nature of their courses of study?

PROSPECTIVE JUROR 83:  I believe most everyone in that course was doing the same thing I was doing, a criminal justice major with a criminal legal studies concentration.

THE COURT:  Oh, so before you even took that class, you were a criminal justice -- I thought you were biology?

PROSPECTIVE JUROR 83:  Oh, this was -- I switched biology in my undergraduate, like in my junior college, and then this course took place in my Bachelor university degree.

THE COURT:  Was this at the onset of your career at the four-year college?

PROSPECTIVE JUROR 83:  This was about, like, halfway through.  So this is about, like, a semester or two into my transfer for my bachelor's.

THE COURT:  Is that when you changed your major then?

PROSPECTIVE JUROR 83:  I changed it early before my associate's.  Because this course took place after I had gotten my associate's.

THE COURT:  Okay.

PROSPECTIVE JUROR 83:  Sorry about that.

THE COURT:  So now you had a professor, sounds like maybe a member of the California bar?

PROSPECTIVE JUROR 83:  Yes.

THE COURT:  Obviously, as you have heard in this

case, it's my obligation to tell the jury what the law is.
And I do that, as you've heard also, I give you some
instruction at the beginning, but most of the substantive law
comes at the end.

And sometimes people who have had some training will
be like, wait a minute, I thought my teacher said something
else.

Would you be able to say she probably -- I don't know
what my teacher was saying, but Judge Thurston is saying this,
I'm going to apply the law that Judge Thurston gives?  Are you
able to do that, sir?

PROSPECTIVE JUROR 83:  Yes.

THE COURT:  You said that you have sort of a neutral
attitude about law enforcement, and that is based on some
experience?

PROSPECTIVE JUROR 83:  Uh, the direct experience I've
had has been positive.  I've only ever had one speeding
ticket, but that was, you know, it was warranted.

Mainly, the negative kind of weight of I've had just
comes from reading stuff like that Ferguson report, like the
LAPD scandals in, like, the '90s.  But I understand that's --
I can separate that entity from the individual.

THE COURT:  Okay.  And even if it is the entity, you
said that this is a report that related to events that
occurred in the 1990s, what caused you to read a report like

that?

        PROSPECTIVE JUROR 83:  It was just assigned for the
courses.  Like a lot of the courses I took for my bachelor's
degree involved around the philosophy of law, kind of like the
sociology of law and the aspect.  So we were looking into the
injustices and all that stuff, but --

        Personally, I believe even if the system can be
abused, that doesn't mean the system is inherently flawed.

        THE COURT:  And you're saying that you're going to
wait and hear the testimony of the witnesses before you make
decisions as to who you're going to believe, who you're not
going to believe?

        PROSPECTIVE JUROR 83:  Yeah.

        THE COURT:  And the fact that you've done this study,
again, can you set aside what you've learned in school and
decide the case only on the evidence here?

        PROSPECTIVE JUROR 83:  Yes.

        THE COURT:  And I'm sure you understand the
importance.  Again, I've sort of mentioned it, and that is, we
all have to be thinking the same thing.  We all have to have
heard -- let me start that over.

        We all have to have heard the same evidence.  It
wouldn't be fair for you to come in in the jury room and go,
Oh, but you know what, I read this report in school, and that
report said, because the parties have to have the opportunity

to confront the evidence and to present the evidence.

        But if you bring something into the jury room that was never tested through the trial process, that -- that's basically a mistrial and we have to start over.

        Do you understand that?

        PROSPECTIVE JUROR 83:  Yes.

        THE COURT:  All right.  And so your feelings about the criminal justice system, that's what you've expressed already, sir?

        PROSPECTIVE JUROR 83:  Yeah, just, like I said, some of the more sociological and philosophical takes, just kind of like represent how sometimes there's inequities, but if I were to serve on the jury, I think knowing that would kind of be a good bulwark against whatever concerns I would have.  That would be --

        THE COURT:  It's kind of like what Mr. Reed was saying earlier, is if you think there's a problem, the best way to address it is to actually be part of the solution and be on the jury.

        PROSPECTIVE JUROR 83:  Yes.

        THE COURT:  All right.  Thank you, sir.

        You also said that you had an incident of vandalism a couple years ago.

        And did they ever find out who did it?

        PROSPECTIVE JUROR 83:  No.  Because my car was

stolen.  But we found it later.  Obviously scrapped and everything, but there was no suspects found, no trial or anything like that.

THE COURT:  Did you form any opinions about law enforcement or the investigation as a result?

PROSPECTIVE JUROR 83:  No.  I think they handled it well.

THE COURT:  It says that you've maybe gained some information about gangs through the media and that maybe you learned some information about that from your course work; is that right?

PROSPECTIVE JUROR 83:  Yes.  Yeah, I have a new saying, I just kind of learn bits and pieces from like, you know, media, whatever's on, like the newspaper, TV, anything like that.

But one of my professors, my advisor actually, he works very closely with the Hell's Angels as their kind of like -- one of the dedicated, like, defense attorneys.  He did that kind of like Southern California and Bay Area, just kind of all around.

THE COURT:  And so your professor, was he give -- from my experience, lawyers tell so many stories.

Was that the kind of thing your teacher was doing?

PROSPECTIVE JUROR 83:  Yes.  Yeah.

THE COURT:  And was that, I had this case one time in

which whatever happened?

PROSPECTIVE JUROR 83:  Yeah, kind of incidental.
Like not going into specifics, but just kind of saying, like,
oh, I represented this guy one time and this is kind of what
happened.  Enough to kind of glean the context, but not enough
to make any sort of value judgment.

THE COURT:  Now, Mr. Reed also made another point
earlier, and that is, you know, sometimes you hear a story and
a year later the same guys tells the story and all of the
sudden they become the hero of the story.

And you know, we have counsel here.  I'm a lawyer
too.  But I'll tell you that lawyers never tell stories where
they come off badly.  They're almost always the hero of the
story.

Was that the situation with your teacher?

PROSPECTIVE JUROR 83:  I would assume, yeah.

THE COURT:  And so are you willing to recognize that
whatever your teacher told you has nothing to do with this
case at all?

PROSPECTIVE JUROR 83:  Yes.

THE COURT:  And whatever you've learned about the
gang that he represented, you will recognize that you may have
heard a tiny bit of the story, you may have heard an entirely
different view of the story than you'll hear in this case, and
again, you're willing to decide this case only on the evidence

presented here?

PROSPECTIVE JUROR 83:  Yes.

THE COURT:  You indicate that you're planning to take the LSAT at some point.

Have you gotten a date for that yet?

PROSPECTIVE JUROR 83:  I have it scheduled for April. The scheduling window opens, I believe, March 25th, but I have not chosen a specific date.  But I am locked into the April month time frame.

THE COURT:  They don't have a specific date yet?

PROSPECTIVE JUROR 83:  I believe they have a Friday, a Thursday for sure.  I won't know absolutely until the scheduling opens until -- which is March 25th, I believe.

THE COURT:  Okay.  All right.  Is there anything else, sir, I should have asked you about but I have not done so yet?

PROSPECTIVE JUROR 83:  In between the time of doing my questionnaire and now, I was informed my work -- I believed that they were going to cover my jury time, but I have found out that they won't because I'm technically part time.  But I work, like, 32 to 35 hours, so I don't qualify for the full-time benefits.

I was going to say that does kind of provide an inconvenience for me because I need the -- I can't afford to lose the hours, but I live in Merced, so during the week, I'll

have to close only.  And those shifts are usually 3:30 to
11:30.  So if I were to get out at, like, 1:30, I would get
into Merced around, like, 2:30, 3:00, and then I would get off
work at 11:30 and then have to go to bed basically
straightaway and then wake up at 5:30 to get here on time at
8:00.

        THE COURT:  Does that business work only during the
week or does it also operate during the weekends?

        PROSPECTIVE JUROR 83:  I work weekends as well.  But
to, like, maintain the wage that I have, I need to work
weekends and weekdays.

        THE COURT:  And does it operate Saturday and Sunday?

        PROSPECTIVE JUROR 83:  Yes, yeah.

        THE COURT:  Are you able to work Saturday, Sunday,
and Monday, for example?

        PROSPECTIVE JUROR 83:  Yes.  I originally do
Saturday, Sunday, Monday, Tuesday, and then I would do a
Friday, Saturday.  So I'd only have like the Wednesday,
Thursday off.

        THE COURT:  Would you be able to arrange it so maybe
you worked Friday night, Saturday, Sunday, and then, you know,
Monday, because we wouldn't be in session on Monday?  Would
you be able to work something out like that?

        PROSPECTIVE JUROR 83:  I would.  It's just like
the -- like I said, the wage I would lose, it's kind of

important right now, because my brother recently got
unemployed and my mom's hours got cut in half.  So I'm kind
of -- it's me and my fiancee and then my dad living in the
house with my mom and brother.  But us three are kind of the
primary, like, I guess, breadwinners.  They're kind of like --
we're the ones bringing in the most money, as it is.

          THE COURT:  I guess I was thinking that if you were
to work Saturday, Sunday, and Friday evening, as well as
Monday, wouldn't that give to you enough hours to equal the
32?

          PROSPECTIVE JUROR 83:  For us, it's -- resets on
Sundays.  So it's -- the week starts on Sunday.  So it would
be Sunday, Monday, and then it would be Tuesday, and then it
would start again Friday, Saturday, just kind of roll over
like that.

          THE COURT:  Could you avoid working Tuesday, though,
and instead work Friday and Saturday?

          PROSPECTIVE JUROR 83:  Usually I do both.  Like
usually I have it Sunday, Monday, Tuesday, and then the only
days I would have off would be Wednesday, Thursday.

          THE COURT:  And it's still, though, a total of 32
hours?

          PROSPECTIVE JUROR 83:  Yeah, because on the weekends,
usually it's like a half shift because I'm a supervisor.  So I
usually close and open.

795

THE COURT:  Okay.

PROSPECTIVE JUROR 83:  And so on the weekends if we're short on hours or I'm going to hit the 40 hours, usually they'll give me, like, five and a half or five hours just kind of like get it right under.

That's why I was under the assumption I would get paid for it, but because they have that weird kind of setup.

THE COURT:  Okay.  But have you talked to your employer about, Hey, you know, can I bump some other people's shifts so that I can get as many hours as I can outside of the jury time?

PROSPECTIVE JUROR 83:  I -- yeah, I talked with them. They -- yeah, they said like it's kind of a hard limit, because for the full time, it's a whole process and everything.

I do have some sick time I can use, but that's pretty limited.  I've already used, like, two this week.  And then they cap us out at a certain amount of time.

THE COURT:  All right.  Anything else, sir, that I haven't asked you about that you think I should?

PROSPECTIVE JUROR 83:  No.  I just want to say to you I do have that LSAT scheduled in April, so I'd like to try to give myself at least two hours a day to practice.

I just -- I'm kind of concerned between, like, the work time, the travel time, and like the driving time, that I

wouldn't be able to give my -- or give this trial the attention and energy that it deserves based on, like, kind of like the studies that I have and everything.  But that's about it.

THE COURT:  I'm just going to make a little pitch to you, and that is, once you become a lawyer, it's almost impossible to get on a jury.

PROSPECTIVE JUROR 83:  That's what my professors say, yeah.

THE COURT:  I say almost impossible, but I've been on it twice, so -- but it's not -- they tend to kick attorneys off.  But -- all right.

Let me turn my attention now to Juror 85.  Oops, I'm sorry, it's 84.  I keep doing that.

PROSPECTIVE JUROR 84:  Is it possible to speak in private about it too?

THE COURT:  Your situation, sir?

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  Yes.

Would you join us and counsel over at sidebar?

Counsel.

  (Sidebar commences:)

THE COURT:  You are Juror 84?

PROSPECTIVE JUROR 84:  84, yes.

THE COURT:  And you -- do you own your own business?

PROSPECTIVE JUROR 84:  I do, yeah.

THE COURT:  Does that mean --

PROSPECTIVE JUROR 84:  It's a car detailing.

THE COURT:  And what hours do you normally work?

PROSPECTIVE JUROR 84:  Right now, I'm 12:00 to 6:00 Monday through Friday because I have a one-year-old at home, and the babysitter don't get there until, like, 11:45, 12:00. And then they have the -- they watch my baby from, basically, 12:00 until 6:00.

THE COURT:  Is this person who acts as your babysitter the only babysitter you have?

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  Is that a relative or someone else?

PROSPECTIVE JUROR 84:  It's someone else.

THE COURT:  Do you have any assistance with any family members with your baby?

PROSPECTIVE JUROR 84:  My mom watches him on Monday, but that's it.

THE COURT:  And that's the only relative you can ask to assist you?

PROSPECTIVE JUROR 84:  Yeah, that's kind of the only one, like, close to me that will -- that can help out.

And then I want it make a note.

Number -- Juror Number 56, and I don't know if it's a conflict of interest or what, but he kind of knows my whole

family and everything like that.  I just wanted to obviously
be clear about everything here.

      THE COURT:  Juror 56 knows you.

      Do you know Juror 56?

      PROSPECTIVE JUROR 84:  I mean, I've heard of him,
like, through my family and everything, I just haven't
obviously -- haven't communicated with him on -- you know,
outside of here.  You know what I mean?

      THE COURT:  And what's the situation with Juror 56?

      PROSPECTIVE JUROR 84:  I just don't want to, like --
I'm just trying to make sure that, obviously, we're clear
here.  And then, like, there's no conflict of interest, you
know, if we're both picked for the jury and we're both in the
back, whether -- you know, if I view them, you know, totally
not guilty and he views them guilty, that there's no, I guess,
kind of backlash between it getting back to my family, and
then I have to go back and kind of explain it.

      THE COURT:  Do you feel -- well, tell me the
relationship between Juror 56 and your family.

      PROSPECTIVE JUROR 84:  I don't -- I don't know how
great the relationship is.  I just know that they -- kind of
they've known each other for a while.

      THE COURT:  When you say "they," who are we talking
about?

      PROSPECTIVE JUROR 84:  My mom and my dad.

THE COURT:  Your mom and your dad knew Juror 56?

PROSPECTIVE JUROR 84:  Yeah, and my uncle.

THE COURT:  Do you know the context, how they know each other?

PROSPECTIVE JUROR 84:  Uh, he works in the city that I'm from.

THE COURT:  What's -- your city is pretty big --

PROSPECTIVE JUROR 84:  No, I'm small.  Dos Palos.

THE COURT:  But it has more than two families.  So how is it that they came in contact just from working in the same city?

PROSPECTIVE JUROR 84:  Everyone kind of knows everyone in a small city.  We have one stoplight and I think 5,000 total population there.

THE COURT:  And is your mom and your dad and your uncle friendly with Juror 56?

PROSPECTIVE JUROR 84:  To that extent, I don't know. I haven't really -- I don't -- I haven't asked questions, you know, I don't want to overstep boundaries or whatever.

THE COURT:  How is it that you know that they know Juror 56?

PROSPECTIVE JUROR 84:  Because he -- he approached me the other day.  He asked -- he said I looked familiar and he asked where I was from and I told him I'm from Dos Palos, and he said, Oh, I work there and then he said, Is your last name?

And I said, Yes it is.

And he said, Oh, well, I know your dad.

And then he's like, your -- he said my dad's name and my uncle's name and I'm like, Oh, well, how do you know them?

So he said that he's known them for years and they have mutual friends together.

THE COURT:  Okay.  Would you feel like you would have to -- if you're in the jury deliberation room that you would have to view the evidence in the same way as Juror 56?

PROSPECTIVE JUROR 84:  I just feel like there might be some kind of conflict if we don't see obviously eye to eye on something.  Whether it would persuade him one way or me the other.

THE COURT:  You've lived in that city how long?

PROSPECTIVE JUROR 84:  23 years.

THE COURT:  Is that your whole life?

PROSPECTIVE JUROR 84:  Yeah.

THE COURT:  So in 23 years you've never met him before?

PROSPECTIVE JUROR 84:  No.

THE COURT:  And yet you're concerned that because he works in your city that you --

PROSPECTIVE JUROR 84:  That it might -- that it might -- like he might, I guess, say something towards my family about, you know, whatever the outcome is and then I

have to kind of like explain my view of it towards them.

THE COURT:  Would your mom or your dad or your uncle expect you to do what you think is the right thing to do?

PROSPECTIVE JUROR 84:  I hope not, but, you know, I hope not.

THE COURT:  Let me ask the question differently.

PROSPECTIVE JUROR 84:  I wouldn't think so.

THE COURT:  They would expect you to do what you think the evidence showed; is that right?

PROSPECTIVE JUROR 84:  Correct, yes.

THE COURT:  And if Juror 56 came to them and said, Hey, he saw it differently than I did, wouldn't they just be like, So what?

PROSPECTIVE JUROR 84:  I would hope so, yeah.

THE COURT:  So were you feeling pressure in that way?

PROSPECTIVE JUROR 84:  Not necessarily.

THE COURT:  Well, I'm just concerned.  I don't want you to get back into the jury room and not be able to stand up for yourself --

PROSPECTIVE JUROR 84:  Right.

THE COURT:  -- or feel like you're going to be bullied by somebody.

PROSPECTIVE JUROR 84:  Right.  It's hard to say.  I wouldn't think so.  I wouldn't think so.

THE COURT:  And you think your family would support

you?

PROSPECTIVE JUROR 84:  Yeah.

THE COURT:  Okay.  Any other concerns about Juror 56
or the fact that --

PROSPECTIVE JUROR 84:  No.  Like I said, I just want
it on the record.

THE COURT:  Sure.

You said you generally have a positive attitude
towards law enforcement?

PROSPECTIVE JUROR 84:  Yeah.  So, aside from what's
on the paper, because I didn't know the exact years that my
family was in law enforcement, but if you split my family down
in half, my whole mom's side of the family is all law
enforcement.

My aunt, she was a sheriff deputy for a while and
then she became a district attorney, and then my uncle was an
undersheriff, he retired in 2021.  I got two cousins, one in
Merced, sheriff, and then one for Los Banos.  I think I put
those two on the paper and then one more cousin that's a
correctional officer up in Susanville.

THE COURT:  The fact that you have those relatives in
law enforcement, do you think that would affect how you viewed
the evidence in this case or whether you could be fair and
impartial?

PROSPECTIVE JUROR 84:  I just -- I have, obviously,

all these -- the law enforcement people around me, I'm just --
I would say I respect them very well.  Really well mannered
towards that, obviously.

THE COURT:  If you saw a law enforcement officer
testify, would you automatically assume that they're telling
the truth simply because they're in law enforcement.

PROSPECTIVE JUROR 84:  Obviously there's good and bad
ones.  I mean, you know, you see a hundred law enforcement
officers testify, you know, there's bound to be one or two bad
ones in there, so I mean, I'm going to evaluate each one
individually.

THE COURT:  Okay.  You said that you have an uncle
who is an undersheriff, is that the same uncle we've been
talking about that knows Juror 56?

PROSPECTIVE JUROR 84:  No, different one.

THE COURT:  Okay.  Do you -- when you see your
relatives in law enforcement, do they talk about their work?

PROSPECTIVE JUROR 84:  Uh, mainly just my cousins.
The one up in Susanville, the correctional officer, but they
don't, you know, they stay -- they stay pretty private.  We
just talk about if it's going good or bad.  They stay pretty
private about, you know, what goes on in their areas.

THE COURT:  Is there anything about the experience of
your cousins being in corrections that you think would impact
your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 84:  Uh, I think that I would obviously have a falling edge towards law enforcement due to the whole background.  I mean, obviously, you know, the defendants aren't guilty.  You know, if they were guilty, we wouldn't be sitting right here.

Obviously they're here for a reason or else we also wouldn't be here.  They -- it's not like you picked three random people off the street and said, Okay, you guys are going to fill in this spot.

So I do think I have a partial leaning edge towards law enforcement on that perspective due to me, you know, literally growing up around them.

THE COURT:  Let me just understand what you said.  I mean, the reason the defendants are here is because they've been named in an indictment.

PROSPECTIVE JUROR 84:  Correct.

THE COURT:  They say it's not true.  And so we're here to figure out what is true.

Do you understand that?

PROSPECTIVE JUROR 84:  Correct.

THE COURT:  And the fact that you have relatives in law enforcement, if they're good at their jobs at all, I assume what they would say to you is, Hey, you got to do the hard work and figure this out.

PROSPECTIVE JUROR 84:  Yeah, correct.

        THE COURT:  And that's also toward whether the
officers who testified are telling the truth, have made
mistakes, have purposely done something wrong --

        PROSPECTIVE JUROR 84:  Right.

        THE COURT:  You would consider that evidence and try
to figure that out?

        PROSPECTIVE JUROR 84:  Yes, I would consider it, but
like I said, I'm, you know, I'm going to -- you know, as soon
as they get up on the stand I'm going to believe them, but,
you know, as they go on I could be like, okay, you know,
obviously they're not telling the truth about something,
something here is not adding up.

        THE COURT:  Okay.  Let's say, then, someone comes on
the stand who you know has got some criminal history, are you
going to, say, automatically going to start with you're not
telling the truth and prove to me that you are?

        PROSPECTIVE JUROR 84:  I mean, they lied once, they
can lie again.  They lied and now they're trying to tell the
truth and turn their lives around.  It's kind of case by case
I would say.

        THE COURT:  So you're going that if you're convicted
of a crime you must also be a liar?

        PROSPECTIVE JUROR 84:  No, not necessarily.
Obviously, you know, there's people that's been wrongfully
convicted in the past.

THE COURT:  Or maybe the conviction has nothing to do with whether you tell the truth or not.

PROSPECTIVE JUROR 84:  Yes, correct.

THE COURT:  With an instruction on how to evaluate the testimony of all witnesses, are you willing to follow that instruction?

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  Okay.  And I guess I just need to understand more.  It wouldn't be fair to assume, you know, some witnesses are truthful before they even speak and some witnesses are not truthful before they even speak.

Do you understand that?

PROSPECTIVE JUROR 84:  Yeah, I would say so.

THE COURT:  And are you willing to wait and listen to testimony and do what you say, you know, does this make sense in light of everything?

PROSPECTIVE JUROR 84:  Uh, yeah, but like I said, I'm -- you know, if there's law enforcement up there, I'm -- initially there's always that belief in the back of my head that, you know, they're telling the truth.  I've been around them for so long, but, you know, if I can decipher what -- what they're telling me to be a lie, then, you know.

THE COURT:  You've talked a lot about having family in law enforcement.  I'm trying to figure out exactly how it's going to impact you in this trial.  Because your relatives are

not going to be testifying in this case.

        PROSPECTIVE JUROR 84:  Yes, yes, correct.

        THE COURT:  And probably no one you know --

        PROSPECTIVE JUROR 84:  Right.

        THE COURT: -- is going to be testifying in this case.

        PROSPECTIVE JUROR 84:  Correct.

        THE COURT:  So I guess I kind of wonder how your experience of your family will impact your decisionmaking.

        PROSPECTIVE JUROR 84:  It wouldn't -- it wouldn't impact my decisionmaking.

        THE COURT:  I think what you're saying to me is, I may have a bias in favor of law enforcement; is that true?

        PROSPECTIVE JUROR 84:  Yeah, I would say so.

        THE COURT:  Having now recognized that bias, are you able to question, you know, why am I thinking this, is this because of my bias or is it because the evidence supports it? Would you be able to do that?

        PROSPECTIVE JUROR 84:  Yeah, I should be able to.

        THE COURT:  You said that you had some strong feelings about the criminal justice system.  You seem to be concerned that defendants should not have to show that they're innocent but instead the system should be focused on determining whether or not they're guilty.

        Is that a fair summary?

        PROSPECTIVE JUROR 84:  Yes.

THE COURT:  And so you feel like sometimes the
justice system improperly tries to force a defendant to prove
innocence when instead the government has to prove that
they're guilty; is that true?

PROSPECTIVE JUROR 84:  Correct.

THE COURT:  And in this case you understand as a
juror you ultimately would have the -- you would have the
power in this case to determine what happened, what the facts
are, and to make your conclusions based upon the law as I give
it to you.  Does that make sense?

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  You said that in 2022 you had some
vandalism to your car?

PROSPECTIVE JUROR 84:  It wasn't to my car.  It was
just what what we saw.

THE COURT:  Okay.  To your knowledge that crime was
never solved.

PROSPECTIVE JUROR 84:  No.

THE COURT:  Now what is the situation with this car
you mentioned about somebody bringing a car?

PROSPECTIVE JUROR 84:  They asked me to detail a car,
and then I obviously looked at it, looked inside, and then I
saw, like, a big red stain, and then, you know, I asked them,
what happened, they said that someone got stabbed and then
immediately I just turned it away, and I didn't want to deal

with, you know, being any part of that.

THE COURT: Okay. So you didn't say, I don't want to know anything more --

PROSPECTIVE JUROR 84: Correct.

THE COURT: -- I'm just out?

PROSPECTIVE JUROR 84: Yes.

THE COURT: Okay. You look like you've gotten some information about gangs from the media; is that true?

PROSPECTIVE JUROR 84: Yes.

THE COURT: Is that just passing interest as it comes up or --

PROSPECTIVE JUROR 84: Passing, yeah.

THE COURT: Okay. It's not something that you purposely seek out information about?

PROSPECTIVE JUROR 84: No.

THE COURT: And you said that gangs have embedded themselves in your head for some time as being negative. And despite that belief in your head that gangs are negative, do you understand that in this case, even if the evidence is that the defendants are members of a gang, that that in and of itself would not be enough to convict them?

PROSPECTIVE JUROR 84: Yes.

THE COURT: And would you be able to look at the evidence and decide whether the charges that are -- actually been brought have been proved?

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  And not say, well, you know, if you're on a gang, I'm just --

PROSPECTIVE JUROR 84:  Yeah, not -- guilty by association, yeah.

THE COURT:  Okay.  Now, it sounds to me like your biggest concern is you're a single dad trying to support your baby.

PROSPECTIVE JUROR 84:  Yes.

THE COURT:  And it sounds like you have a whole lot of relatives.

PROSPECTIVE JUROR 84:  Yeah, but none of them are -- like I said, none of them are real local to me, just my mom.

THE COURT:  And so none -- your father and your uncle don't --

PROSPECTIVE JUROR 84:  Well, my father is with my mom, but he works 24-7 almost.

THE COURT:  Okay.  And what about your uncle?

PROSPECTIVE JUROR 84:  He's not local to me.  He's, like, an hour from me.

THE COURT:  Okay.  And so the only relatives that you have in the -- in your town is your mom and your dad?

PROSPECTIVE JUROR 84:  Yeah.

THE COURT:  Do they live with you and your child?

PROSPECTIVE JUROR 84:  No.  They're close to me,

though.

THE COURT:  If you were selected on this jury, would they be able to give you any financial support?

PROSPECTIVE JUROR 84:  Not really, no.

THE COURT:  If you are selected on this jury, tell me how that would impact your finances.

PROSPECTIVE JUROR 84:  I'm 23.  I don't have a lot of money saved up.  I have a baby at home and I got to -- I'm trying to make, obviously, enough money to, you know, keep the lights on for me and my son.

And being here, it kind of limits that because, you know, I only have a babysitter from 12:00 to 6:00.  So as -- that's already playing a part, because me being here, I have to try to -- my mom is covering for me at home right now.  And then I would just have to try to move everything around.

But the -- my current babysitter, she doesn't have -- she can't watch my son in the mornings, the morning time.  So I kind of have him until, like I said, around 11:30, 11:45.

THE COURT:  So you -- even if you could leave here and then work afterward, you still need somebody to care for your child during the morning.

PROSPECTIVE JUROR 84:  Right, yeah.

THE COURT:  And you normally do that?

PROSPECTIVE JUROR 84:  Yeah.

THE COURT:  All right.

Counsel, do you have any -- anyone have questions for this juror?

MS. FISHER-BYRIALSEN:  No thank you.

MS. LUEM:  No.

THE COURT:  All right.  Thank you, sir.

PROSPECTIVE JUROR 84:  Thank you.  Do I still -- just to make it clear, do I still have to call or anything or am I just --

THE COURT:  I'm just going to have to go back to your seat.

PROSPECTIVE JUROR 84:  I'm just making sure, yeah. Thank you.

(Sidebar commences:)

THE COURT:  Comments about Juror 84?

MS. STOKMAN:  Judge, it sounds like he might have the hardship with his child, but other than that --

THE COURT:  For the defense?

MS. LUEM:  I agree.

MS. FISHER-BYRIALSEN:  (Nods head.)

THE COURT:  Yes?

MS. FISHER-BYRIALSEN:  Yes.

THE COURT:  Mr. Reed.

MR. REED:  (Nods head.)

THE COURT:  All right.  Any other -- and we also had 83 and 82.

813

Any comments about them?

MS. FISHER-BYRIALSEN:  No.

MS. LUEM:  No.

THE COURT:  Let's go ahead and bring 55 over.

THE CLERK:  55.

MR. CONOLLY:  Your Honor, we can save our comments for 83 until after.

THE COURT:  Okay.  I understand that you needed to tell me something?

PROSPECTIVE JUROR 55:  Yeah.  My work is not going to be paying me.  So my partner and I split our financials.  So he's in sales, it varies what he -- you know, what he can contribute with.  So then that's where, you know, my contribution would -- if he can't -- if he can't sell, then he can't, you know, so.

THE COURT:  And you have a regular job --

PROSPECTIVE JUROR 55:  I do.  I have an 8:00 to 5:00 job as a dental assistant, so it's constant.  Yeah.

THE COURT:  And so the dentist you work for says you --

PROSPECTIVE JUROR 55:  Two days, and they are maxed out.

THE COURT:  So anything beyond the -- and you've already been here more than that.

PROSPECTIVE JUROR 55:  Right.

814

THE COURT:  So they're saying you're on your own, no pay?

PROSPECTIVE JUROR 55:  Yeah.

THE COURT:  Is it possible for you to flex your time so that you could still see patients after the day?

PROSPECTIVE JUROR 55:  So -- well, no, because my -- I'm the dental assistant.  So, you know, I'm assisting the dentist.  So our -- you know, our patients are scheduled 8:00 to 5:00.  It's not a clinic where I can just change shift.

THE COURT:  Are there other dental assistants in the office?

PROSPECTIVE JUROR 55:  Yes.  They are two other dental assistants.

THE COURT:  And you always have to work with the dentist?  I guess I'm kind of wondering.  Are you a hygienist or -- okay.

PROSPECTIVE JUROR 55:  No.  I'm a dental assistant.  So -- yeah.  So I pass instruments.  I -- you know, I assist him while the procedure is happening.  Like for -- for example, a filling, I'll pass instruments back and forth.  A crown prep --

THE COURT:  Okay.

PROSPECTIVE JUROR 55:  So I can't independently work without him.

THE COURT:  Okay.  And what are the hours of the --

PROSPECTIVE JUROR 55:  8:00 to 5:00

THE COURT:  That's Monday through Friday?

PROSPECTIVE JUROR 55:  That's Monday through --
Monday through Thursday.  8:00 to 1:30 on Fridays.

THE COURT:  And no weekends?

PROSPECTIVE JUROR 55:  No.  We're not a clinic.

THE COURT:  Okay.  And so you just had this recent
conversation with the dentist?

PROSPECTIVE JUROR 55:  I did.  I was under the
impression that they were going to pay.  That's why I said it.
I didn't know in my questionnaire.  So, yeah, I was told.

THE COURT:  Okay.  All right.  Thank you very much.

PROSPECTIVE JUROR 55:  Okay.

MS. STOKMAN:  Sorry, I missed how that effects, like,
how her -- pay affects that.

THE COURT:  She said that her income is basically
the -- it's kind of like that's the baseline.

PROSPECTIVE JUROR 55:  Yeah.  So my partner is in
sales, so he -- you know, a wage varies for him.  Mine is set,
so we split the cost of our household, and --

MS. STOKMAN:  So --

PROSPECTIVE JUROR 55:  If I can't -- if I can't meet
my -- my income of the finance, then it's hard for him to pick
it up because if it's -- it's sales.

THE COURT:  Do you -- if you're not able to bring in

your income, do you have any savings that would be able to cover the --

PROSPECTIVE JUROR 55:  No.  It just would be like we're late on --

THE COURT:  And your partner -- when your partner is selling, you have extra money.  But when he's not, you don't?

PROSPECTIVE JUROR 55:  That's right.

THE COURT:  How often is your partner's income sufficient to cover all of the bills?

PROSPECTIVE JUROR 55:  So he sells cars, so it's -- it's just -- you know.  If he can make a sale, he can make a sale.  If he can't --

THE COURT:  How long has he been selling cars?

PROSPECTIVE JUROR 55:  He's been doing that for 12 years.

THE COURT:  And in the -- how long have you been with your partner?

PROSPECTIVE JUROR 55:  I've been with him for 14.

THE COURT:  Of the 12 years he's been selling cars, how often is he able to cover your costs of your household?  You know, how often is his salary sufficient?

PROSPECTIVE JUROR 55:  To cover his portion?  Oh, my --

THE COURT:  No, the entirety.

PROSPECTIVE JUROR 55:  The entire thing?  We -- we

haven't, because I've been working the whole entire time that I've been with him.

THE COURT:  What I mean, though, is sometimes maybe he sold three cars.  So this month, he has got extra money.

PROSPECTIVE JUROR 55:  Right.

THE COURT:  So how often is it --

PROSPECTIVE JUROR 55:  How often does that happen? Maybe three, four times a year.

THE COURT:  Okay.  All right.  Thank you very much.

PROSPECTIVE JUROR 55:  Uh-huh.

THE COURT:  Any comments about -- first, I'm sorry, about Juror 55 sitting in Seat 4?  We're obviously going the wrong direction here.

MS. LUEM:  Here.  Yeah, yeah.  I -- I don't really find that that's really a hardship.  She sat here for the last -- through the four days and didn't say anything.  And so it's a little contrived to me, but --

THE COURT:  Comments?

MS. FISHER-BYRIALSEN:  We agree.

THE COURT:  Mr. Reed?

MR. REED:  Agree.

THE COURT:  Do you have any comments?  Okay.

Ms. Stokman?

MS. STOKMAN:  What was the comment?  I'm sorry.

THE COURT:  Basically that hardship hasn't been

818

shown.

MS. STOKMAN:  Yeah, I don't know if it fully meets that either if that's -- because we've -- yeah.

THE COURT:  Okay.  All right.  At this time, then, we're going to let it 84 go.

As to -- and no one had any comments about 82 or 83, right?

MR. CONOLLY:  There are a few.  83 was the one who said that he -- he wouldn't be able to make up his hours --

THE COURT:  Oh, right.

MR. CONOLLY:  -- for the shifts that he would have to.

THE COURT:  Well, I don't know.

MR. CONOLLY:  So, I mean, that was what he said, but I don't know.

THE COURT:  Yeah, but he says he can work Friday, Saturday, Sunday, Monday.  And then something about how the workweek starts again on -- which didn't make any sense to me.  But I -- I think that probably he's going to suffer a wage loss.  And he's not going to make the same money, but I don't think it's to the point where he's not going to eat.

MS. LUEM:  Agreed.

MS. FISHER-BYRIALSEN:  Agreed.

THE COURT:  All right.

(End of sidebar.)

THE COURT:  All right.  Juror 84, thank you so much
for sharing that information.  I'm going to go ahead and
excuse you at this time.  Let's go ahead and fill Juror 84's
seat

THE CLERK:  Juror 85.  All right.  Good morning.

PROSPECTIVE JUROR 85:  Good morning, or good
afternoon.

THE COURT:  Way past that even.

All right.  So it looks like -- are you still working
at this time?

PROSPECTIVE JUROR 85:  Yes.

THE COURT:  And you do medical billing?

PROSPECTIVE JUROR 85:  Yes.

THE COURT:  You're also a care provider for your mom.
Will you tell me about that?

PROSPECTIVE JUROR 85:  Yeah.  Back in 2014 my mom had
a stroke and still is partial paralyzed from the left side.

So I do care for my mom, and I work from home except
one day out of the week I do have to go into the office.

THE COURT:  And you're -- do you work regular 8:00 to
5:00 Monday through Friday?

PROSPECTIVE JUROR 85:  I work from 6:00 in the
morning to 2:30 in the afternoon.

THE COURT:  And you said one day a week you go into
the office?

PROSPECTIVE JUROR 85:  Yes.

THE COURT:  Which day is that?

PROSPECTIVE JUROR 85:  On a Thursday.

THE COURT:  Okay.  And then tell me how often you are providing care to your mom.

PROSPECTIVE JUROR 85:  Every day.

THE COURT:  You go over to her house?

PROSPECTIVE JUROR 85:  My mom lives with me.

THE COURT:  Oh, okay.

Is there anyone else in your household?

PROSPECTIVE JUROR 85:  Yes.  I have my daughter, but she works.  And then my two granddaughters.  Well, they're barely in seventh and eighth grade, so.

THE COURT:  Okay.  The type of assistance that you give your mom, is she generally able to care for herself?

PROSPECTIVE JUROR 85:  Yeah, she can like shower by herself.  But she also has Alzheimer's so that's another thing.  And she walks -- she struggles to walk a lot.  So she -- we try to get her to use that left leg, but she drags it more than her actually using it.

THE COURT:  When you do go in the office on Thursdays, is she able to stay home by herself?

PROSPECTIVE JUROR 85:  No, I have my sister come in and watch her while I'm -- my sister comes in Monday through Friday, and watches my mom, basically while I work, because

I'm always locked up in my office.

And then when I leave the house on Thursdays, you know, she'll come and watch my mom.

THE COURT:  Okay.  Is she an IHSS provider?

PROSPECTIVE JUROR 85:  Yes.

THE COURT:  Okay.  And so you still can work at home despite the fact that your mom needs care and then it sounds like maybe you provide her care in the evening; is that right?

PROSPECTIVE JUROR 85:  Yes, yes.

THE COURT:  Is that a matter of, you know, giving -- getting dinner ready and that kind of --

PROSPECTIVE JUROR 85:  Yeah, just making sure she takes all her medications and, you know, make sure she gets in the shower and stuff like that, so yeah.

THE COURT:  Is her Alzheimer's advanced at this point?

PROSPECTIVE JUROR 85:  Uh, I would -- I like to say I just do things day by day with her because she has her good days and she has her bad days.

THE COURT:  Okay.

PROSPECTIVE JUROR 85:  So there's days where she's fine, like she can remember more or less, and then there's times where she doesn't even know who I am, so.

THE COURT:  Okay.  You said you have sort of a neutral attitude toward law enforcement.  You basically

believe in the Golden Rule, treat me the way you want to be treated.

PROSPECTIVE JUROR 85:  Exactly.

THE COURT:  You haven't had any experience one way or the other with law enforcement that was, you know, particularly good or bad?

PROSPECTIVE JUROR 85:  (Shakes head.)

THE COURT:  Okay.

If you are selected on this jury, as you know, the hours will be 8:00 to 1:30, which would cut into some of your work time, would you be able to flex your time and work later?

PROSPECTIVE JUROR 85:  Yeah, I would be able to probably like leave here and go straight into the office and work until 6:00.

THE COURT:  And that's just on the Thursdays when you have to be there?

PROSPECTIVE JUROR 85:  That could be, like, Monday through Friday.  If I was to be selected, you guys don't do Mondays, right, you only do Tuesday through Friday, so leaving here I would go straight into the office because it's here in Fresno.

THE COURT:  Oh, okay.

Is there anything else that I haven't asked you about that you think would be important for me to know?

PROSPECTIVE JUROR 85:  No.

823

THE COURT:  All right.

Counsel, do either -- or do any of you, beginning with Mr. Reed, have -- I'm sorry, beginning with Ms. Stokman, have questions for any of our new jurors?

MS. STOKMAN:  Yes, just one second.

Just quickly, Number 82, it says that you live in Long Beach.  Are you -- I'm assuming that you're here because you grew up in the area within our district?

PROSPECTIVE JUROR 82:  Yeah, I live in Long Beach, but yeah, I grew up born and raised in the Central Valley. Moved there for school, and my employer is based out of the Central Valley, so I do a lot of travel between either meetings coming to the Central Valley, family and friends coming to the Central Valley.  So I pretty much have addresses both in Long Beach and locally here.

MS. STOKMAN:  And my question was only that you're not going to need to be -- either you would get a hotel or you're not going to have to travel from --

PROSPECTIVE JUROR 82:  Well, I also work remotely, so, you know, I'd go back home and I can just work in the office once the trial concludes.

THE COURT:  Let me ask a question about that because you actually have to live in this district to be a juror in this district and I'm not sure I understand.

You live in Long Beach or you live here?

PROSPECTIVE JUROR 82:  I live there, but I come back and forth, like summers I'll be here for about three months. So I do a lot of back and forth between being here and being there.  I've spent the past -- like I've been here since October, haven't gone back to Long Beach because all my obligations have been here for a while and then I'll go back at some period and then I'll come back.  So.

THE COURT:  How do you define "I live" -- you know, when someone says, So, where do you live?

And you go I live -- how do you decide it's Long Beach or is it here?  Because, you know, I mean there's some legal definitions, but I'm kind of wondering how you say I live in Long Beach given that situation.

PROSPECTIVE JUROR 82:  Uh, given that question I would say prior Long Beach just because that's where I was going to school, like I kind of had to be there.  Since graduating, that's when a lot of this flexibility has been happening back and forth and the intention was to move back after school, which that is still the intention but some hardships kind of came up since graduation, that has been delaying and delaying that process.  So.

THE COURT:  When you were living in Long Beach, that was because you were a student and that was in essence a temporary residence while you were in school?

PROSPECTIVE JUROR 82:  Yeah.

THE COURT:  And you always have considered this to be your permanent residence where you intend to always return?

PROSPECTIVE JUROR 82:  Yeah.

THE COURT:  Okay.

Go ahead.  I'm sorry, Ms. Stokman.

MS. STOKMAN:  No, no.

I just wanted to make make sure that that was clear. And that you were coming more locally.

PROSPECTIVE JUROR 82:  Oh, yeah.

MS. STOKMAN:  Yeah.  Okay.

PROSPECTIVE JUROR 82:  Absolutely.

MS. STOKMAN:  Can you pass that to 83?

So you're taking the LSAT, or you're planning to in April, and you're busy with work, sounds like juggling your schedule.

Is it fair to say that if you are selected for this jury you're going to be able to manage all of that or do you find that that's going to pose some difficulties?

PROSPECTIVE JUROR 83:  I would do my best, but with like the prep time I want to do for the LSAT it kind of cuts into that a little bit.  Just because, you know, my thing is, like, the drive time, because I live in Merced, I think from here to the courthouse is, like, an hour drive, you know, on a good day.  So usually, like, by the time I get home I study and go to bed and have to wake up pretty early.  Luckily I've

been able to call in sick these past two days and get paid for it, but just kind of juggling that, yeah, may be difficult to kind of focus, at least to the standard I would hold myself to as a juror.

MS. STOKMAN:  What do you mean by that as far as your service here?

PROSPECTIVE JUROR 83:  I wouldn't want to be, like, groggy or -- I would want to be fully lucid and fully alert. Like I said, just kind of like the sleep, the study time, all that would kind of like cut into energy and dedication I would give to the trial, especially as we talked about several defendants, multiple elements, all that stuff.

And so just kind of like -- as being educated in that field, I would hold myself to a certain standard I would want to meet, and I don't know if I'd be able to meet that, juggling, studying, and all of that.

MS. STOKMAN:  Does that -- am I hearing that you're saying that you think all of that other responsibility is going to cause you to not be able to focus and pay attention as well as you think you need to do -- to be a juror to the standards that you're holding -- that you're talking about?

PROSPECTIVE JUROR 83:  Yes.

MS. STOKMAN:  Okay.  That was a lot, yes.

So how does that then affect the work hours that you spoke of before that -- the juggling of all of these things

we're speaking of?

PROSPECTIVE JUROR 83:  It kind of affects the work hours because, like I said, originally I thought I was going to get paid for it and then they told me that I wouldn't actually get paid for it and so that kind of prompts me to take on extra shifts during the week, like closing shifts.

And like I said, it would just be tight because I would get home, go straight to work, get off work, and then have to go straight to bed.  I can work on the weekend, as we discussed, but usually those are kind of like half shifts and just the way that the pay cycles come up, like Sunday starts a new week for us and so --

Sorry.  So like, yeah, to maintain the pay that I'm getting, I would have to do those kind of like all-nighters in a way where I would have to, like, go straight from jury duty to work and then go straight from work to bed to jury duty.

MS. STOKMAN:  And before you said you were -- the LSAT prep was from here to there.  If you're mixing in work, I'm just trying to figure out how you're planning on managing that or where you believe any kind of failures in your own, either through financial or through as what you discussed as being here and being able to pay attention, or even the ability to prepare for this test in April.

PROSPECTIVE JUROR 83:  Yeah, I apologize.  Yeah, originally the only hardship I had written down was the LSAT

because I was under the belief that I would still get paid for my time here, but taking that pay away, I have to factor in the work as well.  Because I was fully prepared to be, like, I'll be able to serve and go home, you know, take the LSAT and then work on the weekend while I got paid for the days I missed during the week, but because I had to factor in the work during the week, it kind of cuts into that study time that I don't have.  So now I have to cram it in there and then I'll be -- my mind will be there, when it should be fully here.

        MS. STOKMAN:  So you think it'll just affect the way that you're able to take in the information here and maybe concentrate on it?

        PROSPECTIVE JUROR 83:  Yes.  Yeah, because I think I'd be kind of focused on the test, trying to get the studying done when I could.

        MS. STOKMAN:  Just to ask, are you planning on going to law school in the fall?

        PROSPECTIVE JUROR 83:  Yes.

        MS. STOKMAN:  So if you don't -- if you have to defer this April test, how does that effect that decision?

        PROSPECTIVE JUROR 83:  I'm kind of cutting it close already.  And it's my fault.  The deadline to apply for most places, at least the ones I have lined up, is June 30.  And then the scores would release late April.

So I would have to get that in order and then just do all that in basically, like, all through May. And I believe April is the last spring LSAT. Then it doesn't start again until, like, August, September, I believe.

MS. STOKMAN: So it sounds like you have to take this April LSAT and do well enough to get into the law schools you want to go?

PROSPECTIVE JUROR 83: At least 160.

MS. STOKMAN: And then just a couple more questions. Knowing that you're -- you've had these criminal justice classes or prelaw classes, do you think that you'll be able to follow the instructions and the law that the judge gives you and not be able to think about anything that you've learned that might conflict with that? Or even be similar, but to follow the laws given here and to push the other information you have aside?

PROSPECTIVE JUROR 83: Yes, yeah. I would kind of view it as like a learning experience just to kind of come here with an open mind and just kind of forego that previous stuff and focus only on this.

MS. STOKMAN: Okay. And then sitting here, do you come with any preconceived notions or biases that you have? I know we've been talking about this in general with everybody as a group. But do you see any that you might show up with here?

PROSPECTIVE JUROR 83:  No.

MS. STOKMAN:  Okay.  Thank you.  Thank you everybody.

PROSPECTIVE JUROR 28:  The answer you asked about my employer.

MS. STOKMAN:  Yes.  Do you want to grab the microphone?

PROSPECTIVE JUROR 28:  So I did speak to somebody.  I spoke to somebody else, but what they did tell is I just have the two weeks.  Then I would have to use my vacation and sick to compensate the other hours.

MS. STOKMAN:  So you get paid for two weeks?

PROSPECTIVE JUROR 28:  For two weeks, ten days.

MS. STOKMAN:  And you had mentioned before that you only have about two weeks of vacation?

PROSPECTIVE JUROR 28:  Two weeks of vacation, yeah.  And then it will allow me to flex my schedule, but I will only -- because I work nine hours.  And most of the day would be completed here.  Since I work at 7:00 a.m., I would only work probably three hours in the afternoon.

MS. STOKMAN:  So how is this going to affect the financial situation in your home?

PROSPECTIVE JUROR 28:  I -- I think after I use all that up, it would definitely affect my ability to at least be able to pay all of my bills.

MS. STOKMAN:  Judge, do you want to further inquire

into that?  So are you saying that this would be a significant

burden financially for you if you had to serve the full term

that we're telling you this might last?

        PROSPECTIVE JUROR 28:  Yes, uh-huh.

        MS. STOKMAN:  Okay.  Thank you.

        PROSPECTIVE JUROR 28:  Okay.

        THE COURT:  Mr. Reed, do you have any further

questions?

        MR. REED:  No, Your Honor.  I do not.

        THE COURT:  Ms. Byrialsen?

        MS. FISHER-BYRIALSEN:  No, Your Honor.

        THE COURT:  Ms. Luem?

        MS. LUEM:  No, thank you.

        THE COURT:  All right.  Counsel, can I speak to you

once more at sidebar?

    (Sidebar commences:)

        MR. VILLA:  I thought she was coming this way.  I

think she just needed a restroom break.

        THE COURT:  Restroom?  All right.  Comments about the

jurors we've heard from.  Anything about hardship or cause for

the remaining jurors we haven't addressed?

        MS. STOKMAN:  Government doesn't believe there's

cause, but I think 83 is going to have some hardship either

with finances or studying.  Or he's not being able to pay

attention here juggling all this.  It seems pretty

significant.

MS. LUEM:  He lives with his parents.  He's -- he's going to be driving back and forth.  And let me tell you, I studied for two bar exams driving back and forth from a full-time job.  So I think there's no better way to study than listening to those things on your Audiobook, but --

THE COURT:  Well, a LSAT is a thing onto itself, but you can.  I have sympathy, but my well is getting very low.

MS. STOKMAN:  Well, I think the concern is more of the focus here that was an issue.

THE COURT:  Yeah, I -- I found that to be a little more manipulative than anything.

MS. FISHER-BYRIALSEN:  I think he's a very conscientious and smart kid and --

THE COURT:  All right.  And -- so I don't find hardship for 83.

What about -- we just heard from --

MS. STOKMAN:  28.

THE COURT:  -- 28.  Comments about 28?

MS. STOKMAN:  She's now said that she needs the -- the pay, and she's not going to get it.

THE COURT:  She also said, you know, it's going to be hard.  She's not going to be able to pay all of her bills. That also is a -- I -- I have sympathy.  But like I said, my well is drying up, and I don't -- I don't see that I would let

833

her go at this time.

          MS. STOKMAN:  No.

          MS. FISHER-BYRIALSEN:  No.

          THE COURT:  All right.  Anything else, then?

          We're going to start -- we're going to start
circulating the strike sheet now.  What we're going to do is
go to the prosecution, and I don't know.  Do you want us to
just come to you as a group as the defense?

          MS. LUEM:  We can move to the back.

          THE COURT:  Okay.

          MR. LUEM:  If we can just maybe have a few minutes to
confer.

          THE COURT:  We don't have minutes.  And you can
confer, sure.

          MS. LUEM:  We have to confer with Mr. -- he's been
over there, so we'll have to --

          THE COURT:  Yeah, that's -- that's great.  The
government is going to have the first sheet.  I ideally want
you to identify who your list is because I really want to get
as many people out today as we can, because I think we're
going to have to come back for more selection next week for
our alternates unless by some miracle we have enough people at
this time.

          MS. LUEM:  Okay.

          THE COURT:  Mr. Reed, do you have something?

834

        MR. REED:  No, I was listening.  Thank you, Your

Honor.

    (End of sidebar.)

        THE COURT:  All right.  Ladies and gentlemen, we're

going to start the jury selection process now.  My hope in

keeping us as late as we are is that I can release as many

people as I can today.  Ideally, we will have our -- our

alternates selected today, but I cannot promise that.

        We do it a little differently.  In federal -- in

federal court, we do it on paper.  So what you're going to see

is a courtroom deputy clerk moving a piece of paper back and

forth.  At the time -- after that has concluded, we'll at

least know who our 12 are.  And then we will go from there

with what the schedule will be.

        So let's go ahead and do that.  We are going to be

off the record.  Feel free to stand up and be comfortable and

talk among yourselves.  But I'm going to ask you to remain in

the courtroom at this time.

        All right.  Thank you.

        And we'll otherwise be off the record.

    (Recess held.)

        THE COURT:  All right.  I've been given the strike

sheet.  So I understand that the defense has an objection to

the government exercising its last strike.

        MR. REED:  Well, I didn't understand the -- the pass

835

thing and then unpass.

          MS. STOKMAN:  Oh, no.  We should just have said pass
and not written it there.  I didn't realize this was going in
order, but we only used six strikes of our --

          MS. FISHER-BYRIALSEN:  Why would you get to pass?  I
mean, make a --

          MS. STOKMAN:  Because we liked the panel as it was
situated when we were in that position.

          MS. FISHER-BYRIALSEN:  I've never heard of that.
But, I mean, this is --

          THE COURT:  Let's look at the rules on this,
though --

          MR. REED:  I have heard of that.  And when you
explain it, it's different.  I thought you did something
different.

          MS. STOKMAN:  No.  I just -- I just didn't realize
that these were -- that I shouldn't have written pass.  I
should have just told her that we were passing.

          THE COURT:  Just because there's not a line?

          MS. STOKMAN:  Line, yeah.  So -- but it's -- still we
have one more to use.

          THE COURT:  Any other comments on that issue?  I
think it's a, *Yepiz* case talks about we can't force an
exercise.  It's in the context of a defendant being forced to
use it or lose it.  But in general, the Ninth Circuit finds

use it or lose it to be plain error.

        MS. FISHER-BYRIALSEN:  So we could have just -- we could have also just, like, skipped five and then done the five at the end?

        THE COURT:  Sure.

        MS. FISHER-BYRIALSEN:  Oh, okay.  Learn something new every day.

        THE COURT:  One more.

    (End of sidebar.)

        THE COURT:  All right.  Ladies and gentlemen if I call your number, would you please stand up and return to the audience?

        MS. LUEM:  Your Honor, can we see that strike sheet?

        THE COURT:  Oh, yes.

        THE CLERK:  Sorry, I did not do that.

        THE COURT:  All right.  Juror Number 3, Juror Number 7, Juror Number 9, Juror Number 10, Juror 21, Juror 26, Juror 28, Juror 39, Juror 43, Juror 51, Juror 54, Juror 65, Juror 67, Juror 72, Juror 73, Juror 76, Juror 77, Juror 79, and Juror 83.

        All right.  Counsel for the government, does this appear to be the jury that you selected?

        MS. STOKMAN:  Yes.

        THE COURT:  And for Mr. Reed -- I mean Mr. Reed?

        MR. REED:  Yes.

THE COURT:  Ms. Fisher-Byrialsen?

MS. FISHER-BYRIALSEN:  Yes.

THE COURT:  Ms. Luem?

MS. LUEM:  Yes.

THE COURT:  All right.  Those of you whose numbers I've called, you don't have to sit down.  Don't get comfortable.  You are all excused from jury service.  Thank you very much.

And do they have to call the 800 number?

THE CLERK:  No.

THE COURT:  Okay.  All right.  Thank you very much for your jury service.

Now those of you who are still in the audience, I'm sorry to tell you that unfortunately, despite what I thought would happen, we do still need to continue jury selection until Wednesday at which time we will select six more of you to serve as alternates on this case.

And I'm -- I -- I don't know how to say how sorry I am about this continuing into next week.  I do hope -- Wednesday.

So I am going to tell all of you -- those that have been left up in the box, as well as those still in the audience -- to -- that you are ordered to return for jury service next Wednesday at 8:30.

In the meanwhile, I know we're going to be separated

for some time.  I'm going to remind you please don't form any
opinions about case.  Please don't discuss the case with
anyone.  Please don't allow anyone to discuss it with you.
Please don't form any opinions about this case.

        Please don't do any independent research.  And what
that means is don't try to visit any location you think may be
involved in this case.  Don't do any research on the internet.
Don't look up any media articles that may have -- touch on
this issue or this case in particular.

        If any -- if you run into any such media attention
over the weekend, we'll talk about that on Wednesday.  Please
bring it to my attention immediately.

        All right.  Thank you so much for your attention thus
far.

        Again, when you return on Wednesday, please report to
the jury coordinator who will take roll.

        All right.  Thank you so much, and enjoy your long
weekend.

        PROSPECTIVE JUROR 2:  Your Honor, you said 8:30 on
Wednesday, right?

        THE COURT:  Correct.

    (Prospective Jurors exit the courtroom.)

        THE COURT:  All right.  We have the jury members out.
Is there anything for record at this time?

        MS. LUEM:  I don't know that if the Court will plans

839

on having --

THE COURT:  I think your microphone dropped off
again.

MS. LUEM:  Oh.  If the Court planned on having more
people come in to fill out questionnaires, I'm just worried,
but --

THE COURT:  No, we have the panel that we have.
We --

MS. LUEM:  No, I mean for the -- for the alternates.
I just -- the way we burned through cause challenges with the
big panel, I -- it didn't look like there were that many
people left.  I think --

THE COURT:  There's not a lot left, unfortunately.
We're going to have to take that as it comes because, you
know, it's not state court where you have hundreds of people
coming in every day.  We don't have that.

So if we -- ideally, we'll still -- we need to
qualify 12 jurors.  It's going to be tight.  I hope that we
will be able do that.  And we'll have to see what happens.

If we can't get a panel out of what we have, then,
yeah, we're going to have to recess, bring in more jurors, and
start that process, so --

All right.  Anything else, then, to discuss this
evening?

MS. STOKMAN:  Nothing from the government.

840

             THE COURT:  All right.  Then I'll see you Wednesday

morning.  Thank you.

     (Proceedings were adjourned at 5:40 p.m.)


     I, RACHAEL LUNDY, Official Reporter, do hereby certify the

foregoing transcript as true and correct.


Dated:  January 17, 2025              /s/ Rachael Lundy_____
                                      RACHAEL LUNDY, CSR-RMR
                                      CSR No. 13815