841

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON


|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 1:20-cr-00238-JLT-SKO |
| Plaintiff, | ) | |
| | ) | Jury Trial, Day 4 |
| vs. | ) | |
| | ) | |
| KENNETH BASH, et al. | ) | Volume 4 |
| | ) | Pgs. 841 - 1140, inclusive |
| Defendants. | ) | |
| | ) | |


Fresno, California                    Wednesday, January 22, 2025



REPORTER'S TRANSCRIPT OF PROCEEDINGS








REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

842

**APPEARANCES OF COUNSEL**:

| | |
|---|---|
| For the Government: | **STEPHANIE STOKMAN**<br>Assistant U.S. Attorney<br>2500 Tulare Street, Rm. 4401<br>Fresno, California 93721 |
| | **JARED ENGELKING**<br>Department of Justice<br>1301 New York Avenue, N.W.<br>Washington, DC 20005 |
| | **JAMES ROBERT CONOLLY, GOVT**<br>U.S. Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 |
| For Defendant Johnson: | Law Offices of Andrea Luem<br>Attorneys at Law<br>400 South Forth Street, Suite 500<br>Las Vegas, Nevada 89101<br>BY: **ANDREA LEE LEUM, ESQ.** |
| | Law Offices of Ryan J. Villa<br>5501 Eagle Rock Avenue NE<br>Suite C2<br>Albuquerque, NM 87104<br>BY: **RYAN J. VILLA, ESQ.** |
| For Defendant Clement: | Fisher & Byrialsen, PLLC<br>Attorneys at Law<br>99 Park Avenue<br>New York, NY 10016<br>BY: **JANE FISHER-BYRIALSEN, PHV** |
| | Ruhnke And Barrett<br>29 Broadway, Suite 1412<br>New York City, NY 10006<br>BY: **JEAN DESALLES BARRETT, PHV** |
| For Defendant Stinson: | Law Office of Kenneth Alan Reed<br>406 W 4th Street<br>Santa Ana, CA 92701-4505<br>BY: **KENNETH ALAN REED, ESQ.** |

843

1    Wednesday, January, 22, 2025              Fresno, California

2    8:30 a.m.                                Jury Trial Day 4

3        (The following proceedings were held in open court:)

4        (Jurors are identified by number only.  Any reference to

5         personal identifiers regarding jurors has been redacted.

6         Release of personal information requires motion and Court

7         order.)

8            THE CLERK:  Please remain seated.  Court is now in

9    session.

10           THE COURT:  All right.  We have everyone back in

11   their places.  Is there anything for the record before we

12   bring in the jurors?

13           MR. REED:  I did have a question, Your Honor.

14           THE COURT:  All right.

15           MR. REED:  With regard to the -- what -- once we're

16   actually in trial and, God forbid, we lose a regular juror,

17   are the -- is the alternate selected randomly or in the order

18   that we pick them?

19           THE COURT:  In the order.

20           MR. REED:  So Alternate Number 1 would know that they

21   are Alternate Number 1 and Alternate Number 6 will kind of

22   think, I'm never going to get called so I can just kind of do

23   what I do?

24           THE COURT:  I don't know what they think because

25   that's not my experience in long trials, but, yeah, that's the

844

1  order.

2           MR. REED:  All righty.  Thank you.

3           THE COURT:  All right.  Anything else, then?

4           One thing I do want to remind you; obviously, we have

5  one juror from last week who becomes -- is now seated in what

6  we're calling A1 chair.  That person has already been subject

7  to questioning, so when it's your opportunity to question,

8  that person is not on the table, so to speak.  I'm going to be

9  calling 11 more people, and we'll qualify 11.  So we will have

10 a total of 12.  So that's the goal, anyway.  All right.

11          MS. LUEM:  The person you're identifying, was that

12 Juror Number 53?  I just want to make sure that my --

13          THE COURT:  Yes.  Correct.  Yes.

14          All right.  Let's go ahead and bring in the jurors.

15      (Prospective Jurors enter the courtroom.)

16          THE COURT:  All right.  Ladies and gentlemen, thank

17 you so much for returning this morning.

18          Last week we did select 12 jurors to act as jurors in

19 this case.  Now we are working on selecting alternates.  We're

20 going to go ahead and call 11 more people up.

21          THE CLERK:  Juror Number 86.

22          You'll be seated at A2.

23          87.  87.

24          PROSPECTIVE JUROR 87:  Right here.

25          THE CLERK:  Seat Number A3.

845

1          Juror 88.  88.

2      (Discussion was had off the record.)

3          THE CLERK:  Good morning, Number 88.

4          PROSPECTIVE JUROR 88:  Yes.

5          THE CLERK:  You're going to take Seat Number A4.

6          Number 90?  Number 90, you're going to take A5.

7          93.  You'll seat at A6.

8          97.  You'll seat at A7.

9          99.  You'll seat at A8.

10          Juror Number 102.  Seat A9.

11          103.  Seat Number A10.

12          Juror Number 104.  Seat A11.

13          Juror 106.  You'll take Seat A12.

14          THE COURT:  All right.  Thank you so much for all of

15  you coming up here.  And for those of you who are new into the

16  box, those in Seats A2 through A12, did you hear all the

17  questions that I asked last week?  If you didn't, please raise

18  your hand.

19          No one has done that.

20          Is there any information that any of you feel like

21  you need to share in response to those questions?

22          PROSPECTIVE JUROR 86:  Not for those questions, but I

23  do need to talk to you privately.

24          THE COURT:  Let's get the microphone.  This is --

25  let's see, you're in Seat A4.  88?

846

1          PROSPECTIVE JUROR 86:  A2.

2          THE COURT:  Oh, sorry.  Juror 86.

3          PROSPECTIVE JUROR 86:  Yes.

4          THE COURT:  All right.  And you're saying you want to

5     talk privately?

6          Sorry, one more time.

7          PROSPECTIVE JUROR 86:  Yes, please.

8          THE COURT:  All right.  We will need to do that on a

9     break, thank you.

10         And could you pass the microphone in front.  Yeah.

11         Right next to you, did you -- did you both have

12    comments?

13         PROSPECTIVE JUROR 102:  I would also like to speak to

14    you in private.

15         THE COURT:  All right.  And you are Juror Number?

16         PROSPECTIVE JUROR 102:  102.

17         THE COURT:  All right.  And juror -- let's see,

18    you're Juror 99, ma'am?  You had something to say?

19         PROSPECTIVE JUROR 99:  (Nods head.)

20         THE COURT:  Yes.  What is that, please?

21         PROSPECTIVE JUROR 99:  It's probably better in

22    private.

23         THE COURT:  Okay.  We'll do that.

24         And Juror 97, did you have a comment?

25         PROSPECTIVE JUROR 97:  Yes.  In addition to having a

1  family member work in law enforcement, he also worked for the

2  DEA.  That was not -- I forgot to put that on my

3  questionnaire.  As well as I have testified as an expert

4  witness in the Eastern and Northern Districts of California

5  and the District of Nevada.

6          THE COURT:  In what topic?

7          PROSPECTIVE JUROR 97:  As part of my employment.

8          THE COURT:  And what is the nature of your

9  employment?

10          PROSPECTIVE JUROR 97:  With the federal government as

11  an analyst.

12          THE COURT:  What do you do?  Or what did you do when

13  you testified as an expert?  What were the topics that you

14  were asked to opine about in court?

15          PROSPECTIVE JUROR 97:  Financial in nature.

16          THE COURT:  What does "financial in nature" mean?

17          PROSPECTIVE JUROR 97:  All related to bankruptcy and

18  bankruptcy crimes.

19          THE COURT:  So you testified in criminal cases, is

20  that what you're saying?

21          PROSPECTIVE JUROR 97:  Some of them went on to

22  criminal, but they started off as civil.

23          THE COURT:  When you testified, it was -- they were

24  civil cases?

25          PROSPECTIVE JUROR 97:  Correct.

1          THE COURT:  And you're saying that some of it related

2    to bankruptcies that the people had filed?

3          PROSPECTIVE JUROR 97:  Filed, correct.

4          THE COURT:  And you were testifying related to the

5    legality of these bankruptcies; is that true?

6          PROSPECTIVE JUROR 97:  The financial discrepancies,

7    if you will, hiding of assets, and so forth.

8          THE COURT:  Okay.  And what is the -- what is your

9    background that gives you that expertise?

10         PROSPECTIVE JUROR 97:  I am an analyst.  I've been

11   with my employer -- I just retired earlier this month -- for

12   33 years, and prior to that I was in private practice as a

13   CPA.

14         THE COURT:  When you were an analyst, what is it that

15   you analyzed?

16         PROSPECTIVE JUROR 97:  Numbers.

17         THE COURT:  What -- where did you work?  What was the

18   type of business that you worked at?

19         PROSPECTIVE JUROR 97:  Department of Justice.  You

20   want to know the specific agency?

21         THE COURT:  Yeah.  Was it the IRS?

22         PROSPECTIVE JUROR 97:  U.S. Trustee's Office.

23         THE COURT:  Okay.  The fact that you have this

24   expertise in finance -- finances, that you're a trained CPA,

25   do you think that that experience would color how you received

849

1    evidence in this case, how you considered it, evaluated it?

2        PROSPECTIVE JUROR 97:  Well, the last 40 years, I've

3    been evaluating evidence, if you will, and coming to the most

4    reasonable conclusion based on the evidence.

5        THE COURT:  So what you're saying, though, is in this

6    trial, you're going to hear evidence and you're going to

7    evaluate it, and then ultimately -- I hear what you're saying

8    is that you're kind of comfortable doing that because that's

9    what you've been doing; is that true?

10       PROSPECTIVE JUROR 97:  Correct.

11       THE COURT:  And so the fact that you have this

12   expertise in finances -- I don't know if there's going to be

13   information that comes within that realm introduced in this

14   case.  But otherwise, are you able to set aside your expertise

15   as a CPA and evaluate the evidence in this case based on the

16   evidence presented here rather than saying, I'm going to

17   decide this case on something that I know that happened 20

18   years ago when I was in private practice?

19       PROSPECTIVE JUROR 97:  Oh, no.  But as far as drawing

20   my own conclusions, I mean, I am -- that's what I've been

21   doing for almost 40 years --

22       THE COURT:  Okay.

23       PROSPECTIVE JUROR 97:  -- is coming to my own -- the

24   most reasonable and likely conclusion based on what I just

25   reviewed or analyzed.

1          THE COURT:  And when you do your analysis at work and

2     you come to these conclusions, do you generally discuss, you

3     know, the information you're considering with others or was it

4     your responsibility to come to the decision yourself?

5          PROSPECTIVE JUROR 97:  I came to the -- I would

6     discuss it -- my findings and my conclusions with the

7     attorneys in charge of the case.

8          THE COURT:  Okay.  And so you might come to a

9     conclusion, but somebody else might go, Okay.  Well, yeah,

10    it's not that you're wrong or right, but maybe it doesn't rise

11    to the level of something actionable.  Or would you also have

12    to discuss your conclusions with someone else before you

13    presented it to the attorneys?

14         PROSPECTIVE JUROR 97:  Uh, no.  It was me directly

15    with the attorneys.

16         THE COURT:  Okay.  When you would discuss the matters

17    with the attorneys, was that in a collaborative fashion,

18    meaning they would say, What do you think about this, and you

19    would say, Well, I think this, and you would have conversation

20    back and forth?

21         PROSPECTIVE JUROR 97:  Yes.

22         THE COURT:  Okay.  So as a juror, that would be your

23    obligation too.  Obviously, you're all going to evaluate the

24    evidence as it comes in, but you can't make decisions about it

25    until after you're in the jury room and you're all discussing

851

1    that.

2            Is that something that you could do?

3            PROSPECTIVE JUROR 97:  I don't think I would have a

4    problem with it.

5            THE COURT:  It sounds very similar to what you have

6    done in the past; is that right?

7            PROSPECTIVE JUROR 97:  Yes.  But I have had to draw

8    conclusions based on -- it's like putting together a puzzle,

9    if you will.  If I had missing pieces, I would end up with a

10   conclusion, even though there were missing pieces, based on

11   what I did have before me.

12           THE COURT:  Right.  And that's -- you often see that

13   as an analogy in trial because, you know, as a puzzle piece,

14   you get the box and you see the cover of the box and you see

15   what it's supposed to look like ultimately, but you don't get

16   it preassembled.  What you get it is in pieces.

17           In this case there is a burden of proof that we

18   talked about, and the government bears that burden of proof of

19   proving all of the elements beyond a reasonable doubt.

20           So what that means is if there's an element that the

21   government doesn't prove beyond a reasonable doubt, then your

22   puzzle isn't complete, and you would find the defendants not

23   guilty.

24           Does that make sense?

25           PROSPECTIVE JUROR 97:  Yes.

852

1          THE COURT:  Does anyone have any problem with what I
2     just said?
3          All right.  No one has raised their hand.
4          Now, you also mentioned that you have a relative in
5     law enforcement -- or a couple relatives in law enforcement.
6          PROSPECTIVE JUROR 97:  Well, actually, it's just the
7     one.
8          THE COURT:  Oh, okay.
9          PROSPECTIVE JUROR 97:  He went from Border Patrol to
10    DEA to Customs, and then the State Department, and his role
11    was working with the U.S. Embassy in Peru for drug
12    eradication.
13         THE COURT:  Okay.  Let's start, I guess, in reverse
14    order.  Who is this relative to you?
15         PROSPECTIVE JUROR 97:  My father-in-law.
16         THE COURT:  How long ago was it that your
17    father-in-law -- or maybe he is still working.
18         How long -- is your father-in-law still working?
19         PROSPECTIVE JUROR 97:  No.  He retired sometime mid
20    to late '90s.
21         THE COURT:  And was he your father-in-law at that
22    time?
23         PROSPECTIVE JUROR 97:  Yes.  He's been -- yes.
24         THE COURT:  Okay.  When he was in the
25    State Department in Peru, you were married to your spouse at

853

1  that time?

2        PROSPECTIVE JUROR 97:  Yes.

3        THE COURT:  And how often did you see your

4  father-in-law when he was in Peru?

5        PROSPECTIVE JUROR 97:  Quite a bit.  I mean, he would

6  come home to -- his home was in Southern California, which is

7  where the rest of our family is.  So I would say initially,

8  two or three times a year he would come stay with us.  And

9  when he did come, he was here for a month or two at a time.

10        THE COURT:  It sounds like, though, during that time

11  you were also working out of the house, so you would probably

12  see him in the mornings, maybe at lunchtime, in the evenings,

13  on the weekends?

14        PROSPECTIVE JUROR 97:  Correct.  Vacationed with him

15  extensively.

16        THE COURT:  When he visited you for the month or two

17  at a time, was he also traveling to see other family during

18  that period or was he strictly in your home?

19        PROSPECTIVE JUROR 97:  In our home.

20        THE COURT:  Okay.  When he was working in Peru, did

21  he talk to you about what he did?

22        PROSPECTIVE JUROR 97:  Yes.

23        THE COURT:  Was he actually employed by the

24  State Department or was it the DEA at that time?

25        PROSPECTIVE JUROR 97:  No, State Department.

854

1          THE COURT:  Was he working with the DEA?

2          PROSPECTIVE JUROR 97:  He may have been.  I know he

3     still had contacts with the DEA at that time.

4          THE COURT:  Do you know what his duties were then?

5     You say it was eradication of drugs.

6          PROSPECTIVE JUROR 97:  He was coordinating field

7     operations.

8          THE COURT:  And did that include, then, aerial

9     spraying of illegal crops?

10         PROSPECTIVE JUROR 97:  Yes.  And also aerial

11    surveillance and aerial where they jump out of the planes.

12         THE COURT:  And that was -- I mean, it may still be,

13    but that was kind of a big thing back in the '90s.  And as I

14    understood it, it had a lot of involvement of the DEA at the

15    time.

16         PROSPECTIVE JUROR 97:  Correct.  But he was not

17    employed with the DEA at the time.

18         THE COURT:  Was that, to your knowledge, how he

19    obtained that job in the State Department was because of his

20    experience with the DEA?

21         PROSPECTIVE JUROR 97:  He was recruited, yes.

22         THE COURT:  How long did he work for the DEA?

23         PROSPECTIVE JUROR 97:  That I do not know.  I do know

24    he was with Border Patrol and Customs longer than he was with

25    the DEA.

855

1          THE COURT:  Were you married to his child when he was

2     working at the DEA?

3          PROSPECTIVE JUROR 97:  I think it was probably

4     shortly thereafter.

5          THE COURT:  How long did he work for the

6     State Department in Peru?

7          PROSPECTIVE JUROR 97:  He was over there, I'm going

8     to say, and I'm guessing, it was more than five years.

9          THE COURT:  Was it less than ten, or do you have a

10    range at all?

11         PROSPECTIVE JUROR 97:  I'll say between five and ten.

12         THE COURT:  Okay.  And at this time, you don't have

13    an estimate for how long he worked for the DEA?

14         PROSPECTIVE JUROR 97:  No.  More like all I know is

15    that it was shorter than he was with Customs and the

16    State Department.

17         THE COURT:  Okay.  Do you know how long he was, then,

18    with Customs?

19         PROSPECTIVE JUROR 97:  No.

20         THE COURT:  What about Border Patrol?

21         PROSPECTIVE JUROR 97:  That's where he met his wife,

22    so, no, I do not know how long.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR 97:  But his entire career he's

25    been with law enforcement since he got out of the military.

856

1    THE COURT:  Do you know what his job was in the
2  military?

3    PROSPECTIVE JUROR 97:  Paratrooper.

4    THE COURT:  Okay.  When he worked for the DEA, where
5  was he assigned, what location of the world?

6    PROSPECTIVE JUROR 97:  In San Diego.

7    THE COURT:  Do you know what his job was there in
8  particular?

9    PROSPECTIVE JUROR 97:  I do not.

10    THE COURT:  Did he ever talk to you about, Hey, when
11  I was in the DEA, this is what I did?

12    PROSPECTIVE JUROR 97:  He shared plenty of stories
13  with us.

14    THE COURT:  But at this time you don't recall what
15  his job was?

16    PROSPECTIVE JUROR 97:  No.  He was somebody in
17  patrol -- or excuse me, in -- I don't want to say management,
18  but he had several people below him that he was supervising.

19    THE COURT:  Okay.  And when he worked for Customs, do
20  you know where he was assigned?  Was that also San Diego?

21    PROSPECTIVE JUROR 97:  San Diego.

22    THE COURT:  Do you know what he was doing when he
23  worked for Customs?

24    PROSPECTIVE JUROR 97:  Similar to what he was doing
25  for Border Patrol, as far as he was -- he had several people

1    reporting to him.

2            THE COURT:  When he worked for Border Patrol, was he

3    actually working at the border?

4            PROSPECTIVE JUROR 97:  Yes.  He started in the field,

5    I guess, for lack of a better word, and then he moved up.

6            THE COURT:  When he was in the field, was that at the

7    border or someplace else?

8            PROSPECTIVE JUROR 97:  Border.

9            THE COURT:  Was it, you know, qualifying people

10   coming in and out of the country?

11           PROSPECTIVE JUROR 97:  Yes.  And drugs,

12   immigration -- or the illegal immigrants, as well as drugs.

13           THE COURT:  Okay.  And he did that -- was there any

14   break in federal service during this time --

15           PROSPECTIVE JUROR 97:  No.

16           THE COURT: -- to your knowledge?

17           PROSPECTIVE JUROR 97:  Not to my knowledge.

18           THE COURT:  Is it true to say that when you met him,

19   he was working at the DEA or was he still at Customs?

20           PROSPECTIVE JUROR 97:  I would say he was -- I

21   couldn't say for sure.

22           THE COURT:  Okay.  And approximately when did you

23   start dating your spouse, such that you had contact with your

24   father-in-law?

25           PROSPECTIVE JUROR 97:  In the '80s.

858

1       THE COURT:  So it sounds like then -- well, do you

2  have a -- was it mid '80s, late '80s, early '80s?

3       PROSPECTIVE JUROR 97:  Oh, when we first met, it

4  would be mid to late '80s.

5       THE COURT:  Approximately when did you marry?

6       PROSPECTIVE JUROR 97:  We were --

7       THE COURT:  Well, I guess more exact, you probably

8  know when you --

9       PROSPECTIVE JUROR 97:  I know exactly when I was

10  married.  '93 is when we finally got married.

11       THE COURT:  And then your father-in-law retired

12  within a few years after that?

13       PROSPECTIVE JUROR 97:  Correct.

14       THE COURT:  Okay.  After he retired, did he return to

15  San Diego or did he --

16       PROSPECTIVE JUROR:  He returned to San Diego.

17       THE COURT:  Okay.  And as a lot of retirees do, they

18  like to talk about what they did in their work.

19       Is that true?

20       PROSPECTIVE JUROR 97:  Correct.

21       THE COURT:  Okay.  Is he still living now?

22       PROSPECTIVE JUROR 97:  No, he is not.

23       THE COURT:  While -- while you still had contact with

24  your father-in-law and into his retirement, did he talk about

25  what he did at work?

859

1              PROSPECTIVE JUROR 97:  Yes.

2              THE COURT:  Okay.  And the types of things that he

3    did was to, at least in Peru, he tried to stop illegal drugs

4    coming to the country from Peru; is that right?

5              PROSPECTIVE JUROR 97:  Correct.

6              THE COURT:  And then for the DEA, you're not quite

7    sure what he did, but something to do with addressing illegal

8    drugs; is that right?

9              PROSPECTIVE JUROR 97:  Correct.

10             THE COURT:  And then Customs and the Border Patrol,

11   was that limited to illegal immigration and legal migration or

12   was there also some implications related to illegal drugs?

13             PROSPECTIVE JUROR 97:  There was also implications of

14   illegal drugs.

15             THE COURT:  Is that because he was, like, searching

16   vehicles and sometimes would come across drugs?

17             PROSPECTIVE JUROR 97:  Correct.

18             THE COURT:  Or did he -- or was he assigned

19   specifically to look for drugs?

20             PROSPECTIVE JUROR 97:  There were also cases that he

21   had some stories that it's my understanding that they would

22   target specific drug cartels, drug gangs.

23             THE COURT:  Okay.  And these were cartels and gangs

24   that were in existence in the '80s?

25             PROSPECTIVE JUROR:  Correct.

1          THE COURT:  Okay.  I don't suppose, during the time

2  you knew him, whether he kept up on the cartels and the groups

3  that were involved in drugs after he left the DEA or State

4  Department?

5          PROSPECTIVE JUROR 97:  He still had very close

6  contacts in federal agencies related to drug enforcement.

7          THE COURT:  Did he contract or consult after that?

8          PROSPECTIVE JUROR 97:  I think he did something with

9  specific to flying.

10         THE COURT:  In the U.S.?

11         PROSPECTIVE JUROR 97:  Yes.

12         THE COURT:  Did he ever talk to you about, Hey, you

13 know, this is the cartel that's, you know, most on the radar,

14 these are the gangs we're most concerned about, or anything

15 like that after he left employment?

16         PROSPECTIVE JUROR 97:  Uh, he would -- I want to say

17 his stories were - he kept a lot of names out of it, but he

18 would say, for instance, Oh, I just had lunch with so-and-so

19 and he's told me this, that, and the other was going on

20 related to certain events that were going on at the border or

21 in Peru.  He still has -- he has -- he married someone from

22 Peru, so he also had family there as well.

23         THE COURT:  Okay.  So he would tell you some

24 generalities about what they were doing.  It's my experience

25 with these types of people, they're pretty good about keeping

861

1    details secret because they tend to be secret operations.

2              Was he being told secret information or was he being

3    told, you know, this is generally what we're doing, this is a

4    problem, this drug is a problem, that type of thing?

5              PROSPECTIVE JUROR 97:  I think it was more general,

6    but he was -- I mean, he kept it general with his son and I.

7              THE COURT:  Okay.  And the last you heard from your

8    father-in-law about, you know, the types of drugs that were

9    coming in out of the country or in Peru or the gangs or

10   cartels that were involved in either his work or those of his

11   colleagues, when -- can you tell me when about the last time

12   it is that he told you that type of information?

13             PROSPECTIVE JUROR 97:  I would say in the -- probably

14   around 2019, 2020.

15             THE COURT:  Okay.  And was he deceased soon after?

16             PROSPECTIVE JUROR 97:  Yes.

17             THE COURT:  Okay.  And when he would tell you some

18   general information, in 2019, 2020, was he telling you --

19   well, I shouldn't say general.

20             When he was telling you that information, was he

21   telling you general information or was he telling specifics

22   about, you know, who the targets were, what the cartels were,

23   what the gangs were, that type of stuff?

24             PROSPECTIVE JUROR 97:  As far as stuff that was going

25   on in Peru, because he was still spending time there with his

1    wife's family, there were several incidents that had happened,
2    one of which, his wife's family, there was a murder due to
3    somebody just got in the middle of a drug war, drug fight.
4    But, again, it was -- he wasn't naming names.  He was just
5    telling us specific events that were going on.
6              THE COURT:  And this was after -- this was in the
7    2019, 2020 time period?
8              PROSPECTIVE JUROR 97:  Correct.
9              THE COURT:  Okay.  And this relative, do you know who
10   the relative who was killed?
11             PROSPECTIVE JUROR 97:  I do not know them personally,
12   no.
13             THE COURT:  Do you know who it -- just identify, you
14   know, it's my husband's third cousin twice removed?
15             PROSPECTIVE JUROR 97:  It was my husband's wife's
16   [sic] family member -- no, not my husband.  My father-in-law's
17   new wife -- not new wife, they were married for over 20 years,
18   but it was one of her family members.
19             THE COURT:  Do you know any more specifics than just
20   a family member?
21             PROSPECTIVE JUROR 97:  No.
22             THE COURT:  Okay.  Do you have any specifics about
23   the death itself?
24             PROSPECTIVE JUROR 97:  It was a homicide, murder.
25             THE COURT:  Right.  But did you have details about,

863

1  you know, how this person came to be in a situation where this

2  occurred or anything like that?

3          PROSPECTIVE JUROR 97:  No.  In my understanding, it

4  was on their property.

5          THE COURT:  The -- the person died on his or her own

6  property?

7          PROSPECTIVE JUROR 97:  Yes.

8          THE COURT:  And it's your understanding that it was a

9  killing related to a Peruvian gang of some sort?

10          PROSPECTIVE JUROR 97:  Yes.

11          THE COURT:  Okay.  And do you have any information as

12  to whether that Peruvian gang operates in the United States?

13          PROSPECTIVE JUROR 97:  I do not.

14          THE COURT:  Any of the gangs that your father-in-law

15  told you about, did he ever mention to you that these gangs

16  also operate in the United States?

17          PROSPECTIVE JUROR 97:  No, he did not mention that

18  specifically.

19          THE COURT:  All right.  This experience with your

20  father-in-law, obviously, you know, this was his career for a

21  long time.  And it sounds like maybe, you know, for you, he

22  was working, what, 15 years or so while you were married to

23  his child still; is that about right?

24          PROSPECTIVE JUROR 97:  Somewhere in there.

25          THE COURT:  And then even after that, he told you

864

1   information about what happened or what he was learning.

2   Would this experience cause you to favor one side or the other

3   in this case?

4           PROSPECTIVE JUROR 97:  I have a very high respect for

5   law enforcement.

6           THE COURT:  Sure.  I guess the question, though, is,

7   having -- sometimes when we have relationships with law

8   enforcement officers, you know, family or friends, you know,

9   we respect these people because we care for them, but that

10  doesn't mean we don't appreciate their foibles.  You know,

11  sometimes, you know, you -- you know their weaknesses more

12  than anyone because you know them intimately, which would not

13  suggest, I guess, anything more than you appreciate that these

14  are not perfect people; you realize that, right?

15          PROSPECTIVE JUROR 97:  Correct.

16          THE COURT:  I'm sure your spouse, on occasion over

17  his or her life, had disagreements with your father-in-law?

18          PROSPECTIVE JUROR 97:  My father-in-law is probably

19  the only person I've ever met that never embellished a story,

20  to my knowledge.

21          THE COURT:  Yeah, that's the key, though, right,

22  because you weren't there, it's hard to know.  I mean --

23          PROSPECTIVE JUROR 97:  That is right.

24          THE COURT:  -- I have relatives who can tell a story

25  you'd think, Wow, that's a great story.  But I don't know.  I

865

1    don't know if he really, you know, climbed up on the roof and

2    jumped through and, you know, did a Bruce Willis, landed on

3    his feet in broken glass.  I don't know that for sure.  It's a

4    great story.

5            Is that the same for you?  Are you saying, Yeah, you

6    know, if he said it, it's true?

7            PROSPECTIVE JUROR 97:  If he said it, I wouldn't -- I

8    wouldn't doubt it.

9            THE COURT:  You wouldn't have reason to doubt it?

10            PROSPECTIVE JUROR 97:  Correct.

11            THE COURT:  You knew him, you cared for him, you

12    trusted him?

13            PROSPECTIVE JUROR 97:  Correct.

14            THE COURT:  In this case, I am willing to bet none of

15    the people who testify will be somebody that you know and care

16    about.  Do you understand that?

17            PROSPECTIVE JUROR 97:  Uh-huh.

18            THE COURT:  And because of that, are you going to

19    still say, Hey, you know what, if you're in law enforcement, I

20    don't know you, I don't know anything about you, but because

21    you took that job, I'm going to assume everything you say is

22    true or accurate, or are you going to evaluate that testimony

23    as you would any other witness?

24            PROSPECTIVE JUROR 97:  I'll evaluate it.

25            THE COURT:  And just like any other witness, you're

1    going to evaluate, you know, does it make sense, was this

2    person in a position to hear or know this information, how

3    does it square with other evidence that you hear, was a

4    person -- you know, what was their demeanor in testifying?

5        I'm going to give you a lot of factors, but are you

6    going to evaluate each of those factors as to every witness?

7        PROSPECTIVE JUROR 97:  That's what I do; I suspect

8    everyone --

9        THE COURT:  Okay.

10        PROSPECTIVE JUROR 97:  -- outside of my circle of

11   friends and family.

12        THE COURT:  Okay.  So you might have a problem if,

13   you know, your father-in-law were called in this trial; but

14   otherwise, if it's a stranger, no matter what their job is,

15   you're going to consider their testimony in light of reason

16   and other factors; is that true?

17        PROSPECTIVE JUROR 97:  That's true.

18        THE COURT:  Okay.

19        PROSPECTIVE JUROR 97:  But I will also say, in the

20   last 40 years, if I investigated -- was asked to investigate

21   facts in a case, I can't recall one where there wasn't lying

22   going on.

23        THE COURT:  By the people --

24        PROSPECTIVE JUROR 97:  By the people who had filed

25   the bankruptcy case.

1          THE COURT:  In your -- in your work, I bet you you

2   went in with a, Hey, would you take a look at this and make

3   sure everything is correct or find out where the problems are;

4   is that true?

5          PROSPECTIVE JUROR 97:  That, or my own caseload that

6   I was assigned.

7          THE COURT:  Okay.  When you were assigned a caseload,

8   did you ever have cases where, there's nothing wrong with

9   this, this is perfect, they did the right thing, you know,

10   there might have been a mistake but there was no -- what you

11   found to be purposeful misstatements?  Did you ever have that?

12          PROSPECTIVE JUROR 97:  I would say that I found more

13   where something was done where I felt it was intentional.

14          THE COURT:  Was that the nature of your caseload,

15   though?  They wouldn't give you a -- you know, a case where

16   nobody needs you to look at that; is that true?  Or --

17          PROSPECTIVE JUROR 97:  No.

18          THE COURT:  -- maybe you can tell me more about

19   how -- what were the nature of the cases that were assigned to

20   you and how they came to be assigned to you.

21          PROSPECTIVE JUROR 97:  Random.  It was either by a

22   judge, by chapter, or the last two digits of the case number.

23          THE COURT:  So the bankruptcies would be filed and

24   they would come to you and you would look at them, and in all

25   of those years, very few of them didn't contain some material

868

1    misstatement?

2                    PROSPECTIVE JUROR 97:  That is correct.

3                    THE COURT:  Okay.

4                    PROSPECTIVE JUROR 97:  And there was always a

5    scope -- a dollar amount placed on it.  So if something came

6    in and it matched this set of -- it would get less of a review

7    than if something came in and it had a different set of facts.

8                    THE COURT:  Okay.  So there was a dollar amount and a

9    set of facts that would raise the suspicions of your office?

10                   PROSPECTIVE JUROR 97:  Correct.

11                   THE COURT:  And if it were a case that -- I guess,

12   when it came to you, did you already know that it had that

13   dollar amount or, you know, some set of facts that suspicions

14   had already been raised?

15                   PROSPECTIVE JUROR 97:  I mean, I would make that

16   determination.

17                   THE COURT:  Okay.  So you would be coming in going, I

18   don't know yet.  Let me look and figure this out, whether

19   there's something?

20                   PROSPECTIVE JUROR 97:  Correct.

21                   THE COURT:  Okay.  And you said you have a very

22   positive attitude toward law enforcement, as we've talked

23   about.  I mean, part of it is, it sounds like, because you

24   have this -- your father-in-law, this relative in the

25   business.

1          But you've never had a good or bad experience on your

2    own separate from your father-in-law that would bring you to

3    that attitude; is that true?

4          PROSPECTIVE JUROR 97:  I was pulled over once --

5    well, it didn't help that I was going three miles an hour.  I

6    let my foot off the brake, and the car I bumped happened to be

7    a police officer.  But that was my only other experience.

8          THE COURT:  Was that police officer understanding and

9    professional or like some of the other people?

10          PROSPECTIVE JUROR 97:  No, very professional.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR 97:  I provided him with his laugh

13    for the day.

14          THE COURT:  Okay.

15          PROSPECTIVE JUROR 97:  Oh, and the other -- my other

16    experience with law enforcement was my -- I have a family

17    member who was a victim of domestic violence.

18          THE COURT:  Okay.  And who is this family member to

19    you?

20          PROSPECTIVE JUROR 97:  My sister-in-law.

21          THE COURT:  Did that relationship with the person who

22    subjected her to that violence continue?

23          PROSPECTIVE JUROR 97:  Uh, no.  I mean, they are

24    divorced, and they have not --

25          THE COURT:  Was that as a result of the incidents --

1    incident or incidents you were thinking of?

2            PROSPECTIVE JUROR 97:  Yes.

3            THE COURT:  Okay.  How long ago was it that the

4    divorce occurred?

5            PROSPECTIVE JUROR 97:  Uh, probably 15 years ago.

6            THE COURT:  Do you know how long the domestic

7    violence went on before the divorce?

8            PROSPECTIVE JUROR 97:  About three years.

9            THE COURT:  And were you aware of those events going

10   on at the time?

11           PROSPECTIVE JUROR 97:  We were.  We highly suspected

12   it.  And it finally came to fruition when law enforcement got

13   involved.

14           THE COURT:  And was that in the end where there was

15   separation, divorce after that?

16           PROSPECTIVE JUROR 97:  Correct.

17           THE COURT:  Okay.  The fact that your sister-in-law

18   was involved in this violent relationship, do you think that

19   that would color how you evaluate evidence in this case?

20           PROSPECTIVE JUROR 97:  No.

21           THE COURT:  Okay.  And you could set that aside and

22   decide this case only on the evidence presented here?

23           PROSPECTIVE JUROR 97:  I believe so.

24           THE COURT:  Now, you have the unusual experience --

25   and actually, it's kind of shocking.  It's not quite that

1  unusual.  It happens on a fairly regular basis -- that you

2  actually work in this building, right?

3          PROSPECTIVE JUROR 97:  Correct.

4          THE COURT:  And as a result of your job, you know

5  bankruptcy judges; is that true?

6          PROSPECTIVE JUROR 97:  Correct.

7          THE COURT:  You know bankruptcy lawyers?

8          PROSPECTIVE JUROR 97:  Correct.

9          THE COURT:  And you know other people who work in

10 this building, at least maybe to say hi to?

11         PROSPECTIVE JUROR 97:  Yes.  And there were prior

12 attorneys in our office that are now with the -- another

13 agency in this building.

14         THE COURT:  The U.S Attorney's Office?

15         PROSPECTIVE JUROR 97:  Correct.

16         THE COURT:  I'm sorry.  Can I get you to bring that

17 microphone again up to your --

18         PROSPECTIVE JUROR 97:  Yes.

19         THE COURT:  So some people who worked in the

20 Trustee's Office as attorneys --

21         PROSPECTIVE JUROR 97:  Correct.

22         THE COURT:  -- and then went to the

23 U.S Attorney's Office?

24         PROSPECTIVE JUROR 97:  Correct.

25         THE COURT:  Is it anyone that's in this courtroom?

872

1          PROSPECTIVE JUROR 97:  I don't believe so.

2          THE COURT:  And the fact that you had these work

3    relationships in the past, did they continue after these

4    attorneys left and went to the U.S Attorney's Office?

5          PROSPECTIVE JUROR 97:  Yes.  I'm still friends with

6    them.

7          THE COURT:  Do you see them socially outside of work?

8          PROSPECTIVE JUROR 97:  One I have not seen for a

9    while.  The other one, his wife and I are in a hiking group

10   together, so --

11         THE COURT:  Okay.  Do you know the nature of the work

12   that that person does?

13         PROSPECTIVE JUROR 97:  His wife or --

14         THE COURT:  The person in your hiking group.

15         PROSPECTIVE JUROR 97:  Yes.  She is IT.  In fact, she

16   works for -- actually, she got a different job here in the

17   last few years.  She works remotely now for a company back

18   East, I believe.

19         THE COURT:  I'm sorry.  I must have misunderstood.

20   So it's the wife of someone you worked with that's in your

21   hiking group.

22         PROSPECTIVE JUROR 97:  Correct.

23         THE COURT:  And the person -- so the person that you

24   actually worked with, do you continue to have a social

25   relationship with that person?

873

1          PROSPECTIVE JUROR 97:  Yeah.  I've known him since

2   our kids were in elementary school.

3          THE COURT:  So you go hiking with his wife.

4          PROSPECTIVE JUROR 97:  Correct.

5          THE COURT:  Does he go too?

6          PROSPECTIVE JUROR 97:  No.  We just see them walking

7   in the neighborhood.

8          THE COURT:  When you -- do you go out to dinner with

9   them or have them over?

10          PROSPECTIVE JUROR 97:  No.

11          THE COURT:  It's just kind of a, Hey, good to see you

12   type thing?

13          PROSPECTIVE JUROR 97:  I have -- it's been a while

14   since I went to lunch with them, but we still keep in contact.

15          THE COURT:  Okay.  And when you have the hiking

16   events with his wife, does the wife say, Hey, you know, my

17   husband is working on this case, or, He's got this type of

18   work going on?  Does she talk about that work?

19          PROSPECTIVE JUROR 97:  Not specifics.  We just talk,

20   How is the job going?  How are the kids going?

21          THE COURT:  Okay.  The fact that you have these --

22   this social relationship, do you think that that would impact

23   how you evaluate the evidence in this case?

24          PROSPECTIVE JUROR 97:  No.

25          THE COURT:  Could you set that aside and decide this

874

1    case on the evidence presented here?

2             PROSPECTIVE JUROR 97:  I believe so.

3             THE COURT:  The fact that you know bankruptcy judges

4    and other attorneys who work for the bankruptcy court or the

5    Trustee's Office and work in this building, do you think that

6    would influence your ability to be fair or impartial in this

7    case?

8             PROSPECTIVE JUROR 97:  No.  And there's also one

9    former judge who's currently a district court judge.  He was

10   also part of the U.S. Trustee program.

11            THE COURT:  Judge Sherriff?

12            PROSPECTIVE JUROR 97:  Boone.

13            THE COURT:  Judge Boone.  Okay.

14            Do you feel like any of those people that you know

15   who work in this building who have worked with you would

16   expect you -- well, let me say this in a different way.

17            All of the people that you're thinking of, these

18   judges, attorneys, former attorneys in your office who now

19   work at the U.S Attorney's Office, do you think any of them

20   would expect you to be unfair in this trial?

21            PROSPECTIVE JUROR 97:  Not at all.

22            THE COURT:  They would all expect you to be fair and

23   impartial; is that true?

24            PROSPECTIVE JUROR 97:  Yes.

25            THE COURT:  The fact that you have these

875

1    relationships, again, do you think that you could set that

2    aside and decide this case according to your own conscience,

3    according to the evidence that you're presented, and after

4    listening to the arguments of counsel, as well as the

5    statements of your fellow jurors?  Could you do that?

6            PROSPECTIVE JUROR 97:  I believe so.

7            THE COURT:  You indicated that you were a little bit

8    uncertain as to whether the experience and information

9    provided to you about gangs or that you've learned through

10   television or podcasts or that type of media, that you're

11   uncertain whether or not you would be able to be impartial in

12   this case.

13           The information that you've gathered, does any of it

14   have to do with the Aryan Brotherhood?

15           PROSPECTIVE JUROR 97:  No, other than if they were

16   mentioned in a podcast.  I honestly didn't know they were

17   referred to as AB until --

18           THE COURT:  I don't know that they are.

19           PROSPECTIVE JUROR 97:  Okay.

20           THE COURT:  I don't know.

21           But do you remember hearing anything about AB or the

22   Aryan Brotherhood in any of the podcasts or media or other

23   sources of information?

24           PROSPECTIVE JUROR 97:  No.  I did watch the *Sons of*

25   *Anarchy*, though.

876

1          THE COURT:  Apparently that's a good show.  I'm going
2     to have to look that up.
3          And that had to do, I guess, with -- I think somebody
4     said it had to do with a motorcycle gang.
5          PROSPECTIVE JUROR 97:  Correct.
6          THE COURT:  And were there some racial overtones in
7     that movie?
8          PROSPECTIVE JUROR 97:  I would say some of the
9     episodes, yes.
10          THE COURT:  Was it your sense that that group was
11     based upon any gang that you had gathered information about
12     through the various sources?
13          PROSPECTIVE JUROR 97:  No.
14          THE COURT:  And you understood that that movie or
15     that show is an entertaining depiction of that type of
16     lifestyle?
17          PROSPECTIVE JUROR 97:  Correct.
18          THE COURT:  And when I say "entertaining," I don't
19     mean to mean that they are picking flowers all day, but it's
20     intended to be entertainment.  Do you understand that?
21          PROSPECTIVE JUROR 97:  Correct.
22          THE COURT:  Now, you also received information, like
23     you say, from TV, podcasts.
24          PROSPECTIVE JUROR 97:  My father-in-law.
25          THE COURT:  And your father-in-law, of course.

1          And in these sources of information, you learned
2  about gang violence to some extent; is that right?
3          PROSPECTIVE JUROR 97:  Correct.
4          THE COURT:  Did your father-in-law -- I should be
5  more specific -- did he ever talk to you about the Aryan
6  Brotherhood or any other group that you think is aligned with
7  the Aryan Brotherhood?
8          PROSPECTIVE JUROR 97:  Not specifically that I'm
9  aware of, no.
10          THE COURT:  Even in general did he talk about that
11  group?
12          PROSPECTIVE JUROR 97:  I don't recall him ever
13  mentioning that name.
14          THE COURT:  Okay.  And tell me the source of your
15  uncertainty as to whether you could be fair and impartial if
16  this trial involves the Aryan Brotherhood or a gang associated
17  with the Aryan Brotherhood.
18          PROSPECTIVE JUROR 97:  I'd rather discuss that in
19  private.
20          THE COURT:  Okay.  Anything else that I asked
21  questions about last week that you feel like you need to share
22  information on?
23          PROSPECTIVE JUROR 97:  I can't think of anything, no.
24          THE COURT:  Okay.  Thank you.
25          Is there anyone else who has this situation?

878

1          All right.  Can you pass the microphone down?  This
2     is -- let's see.

3          You're Juror 104; is that right?

4          PROSPECTIVE JUROR 104:  Good morning.

5          THE COURT:  And are you Juror 104?

6          PROSPECTIVE JUROR 104:  Yes, I am.

7          THE COURT:  Okay.  Tell me your information.

8          PROSPECTIVE JUROR 104:  Yes.  In addition to having a
9     relative in the law enforcement, I'm not sure if I mentioned
10    that I have a sister that works in a correctional facility.

11         And I also have an upcoming trip.  I don't know if it
12    will last for April -- until April, but I have an April 12th
13    to 19th trip.

14         THE COURT:  You have a trip April --

15         PROSPECTIVE JUROR 104:  Yes.

16         THE COURT:  -- 12th through April 19th?

17         PROSPECTIVE JUROR 104:  Correct.

18         THE COURT:  Okay.  Now, you say you have a relative
19    in corrections.  Who is the person in corrections?

20         PROSPECTIVE JUROR 104:  It's my sister.

21         THE COURT:  How long has your sister been in
22    corrections?

23         PROSPECTIVE JUROR 104:  She's probably almost on her
24    20th -- I'm not sure if 20th or tenth year.  She's waiting
25    until she gets that 100 percent.  So I mean, I think it's

879

1   20 years.

2           THE COURT:  You think it's either she's been there

3   ten years or she's been there 20 years?

4           PROSPECTIVE JUROR 104:  Yes.  I'm not -- I'm unsure

5   if it's ten years or 20 years.  She started as a nurse near

6   here in Chowchilla.  And then she moved to Corona and now

7   she's a consultant for the nurses under the medical facilities

8   at the correctional facility for California.

9           THE COURT:  She works for State Corrections; is that

10  right?

11          PROSPECTIVE JUROR 104:  That is correct.

12          THE COURT:  And during the time that she's worked for

13  State Corrections, has she always been in the medical field.

14          PROSPECTIVE JUROR 104:  Yes.

15          THE COURT:  So she's not someone who actually -- I

16  mean, she just provides medical care to people who are

17  incarcerated; is that true?

18          PROSPECTIVE JUROR 104:  True.

19          THE COURT:  Or she supervises those other nurses who

20  provide the medical care; is that true as well?

21          PROSPECTIVE JUROR 104:  At one point she does a

22  supervising position on a correctional facility.  Right now

23  she is a consultant for the supervisors, I think.

24          THE COURT:  As a consultant, does she still work for

25  the State of California or does she work for herself or a

880

1    different agency?

2         PROSPECTIVE JUROR 104:  She works for the State of

3    California still.

4         THE COURT:  But she -- does she go from facility to

5    facility or does she consult only at a particular facility?

6         PROSPECTIVE JUROR 104:  I'm not exactly sure how this

7    works, because right now most of her time is through hybrid.

8    And what she does is she evaluates the request from each

9    Department of Corrections facility, requests from -- I think

10   medical requests.  And evaluates them and sees if they will

11   approve it or not approve it, something like that.

12        THE COURT:  Excuse me.  She evaluates medical

13   requests from other medical professionals or from people who

14   are actually housed in the facility?

15        PROSPECTIVE JUROR 104:  The ones that are housed in

16   the facility.

17        THE COURT:  So these are people who are making

18   requests for maybe more specialized care; is that right?  Or

19   do you know?

20        PROSPECTIVE JUROR 104:  Some of it I know, it's just

21   out of the topic, but we don't really discuss it in detail.

22   But like, for example, someone thinks that they are female

23   when they are male and they want to change, and so those are

24   the things that comes to her office.

25        THE COURT:  Okay.  How -- is it true she's -- she's

881

1   worked first at Chowchilla and then you said she went to

2   Corona?

3           PROSPECTIVE JUROR 104:  Correct.

4           THE COURT:  And now she doesn't work at a specific

5   facility or she does work at a facility?

6           PROSPECTIVE JUROR 104:  She is an advisor for the

7   whole correctional facility in the State of California now.

8           THE COURT:  And you said it's hybrid.  Does that mean

9   she's -- sometimes she works remotely and sometimes she's at a

10  facility?

11          PROSPECTIVE JUROR 104:  She works remotely and

12  sometimes they met in person.  As far as if they go to a

13  certain correctional facility, I am unsure of that.

14          THE COURT:  Okay.  So she may have a meeting, you

15  just don't know if it occurs at a prison or if it just occurs

16  at a meeting room in a building someplace?

17          PROSPECTIVE JUROR 104:  That is correct.

18          THE COURT:  Okay.  And you said that she's getting

19  close to getting enough time to be able to retire; is that

20  right?

21          PROSPECTIVE JUROR 104:  Yes.

22          THE COURT:  Okay.  Other than what you know about it,

23  has she told you anything else about, you know, working in a

24  facility or anything about her work?

25          PROSPECTIVE JUROR 104:  Sometimes it's just a

882

1    brushing the topic for, like, medical requests that sometimes

2    she feels like, kind of -- like that, like I mentioned

3    earlier.  But aside from that, we don't really discuss

4    anything very specific.

5             THE COURT:  So she'll say, Oh, I got this request for

6    this particular medical condition, and does she say what she

7    thinks about the request?

8             PROSPECTIVE JUROR 104:  It's more like, okay, we talk

9    something about -- it's kind of like a brush off the topic of

10   the idea sometimes, yes, but not directly.

11            THE COURT:  Okay.  And then you also say you have --

12   your brother-in-law works for the police.  He's a -- he's the

13   retired chief of police for that city?

14            PROSPECTIVE JUROR 104:  For Tulare, yes.

15            THE COURT:  I think you wrote Exeter.

16            PROSPECTIVE JUROR 104:  He was in Exeter and then he

17   moved to Tulare.

18            THE COURT:  So when he worked in Exeter, he was --

19   what was his job?

20            PROSPECTIVE JUROR 104:  He's -- I'm not sure.  I

21   think it was -- he's a -- he's in the law enforcement.

22            THE COURT:  He was police, but you don't know what

23   his assignment was or what his duties were; is that true?

24            PROSPECTIVE JUROR 104:  That is correct.

25            THE COURT:  And then he moved to Tulare, you said.

883

1            Do you know what his job was there?

2            PROSPECTIVE JUROR 104:  I think it's in the head or

3    he's -- I'm not really sure.

4            THE COURT:  Okay.  You got the sense, though, he was,

5    if not the boss of all, he was at least in high management; is

6    that right?

7            PROSPECTIVE JUROR 104:  That is true.

8            THE COURT:  Do you have any more detail about what

9    your brother-in-law did while he was in law enforcement?

10           PROSPECTIVE JUROR 104:  No.

11           THE COURT:  And how long -- I know you said you

12   weren't sure when he was employed, but can you recall when he

13   stopped working as a police officer or in the police?

14           PROSPECTIVE JUROR 104:  He's retired in the -- this

15   is just more or less.  I think it will be about eight years.

16           THE COURT:  Did you -- was he your brother-in-law

17   when he worked in Exeter?

18           PROSPECTIVE JUROR 104:  Yes, uh, yes.

19           THE COURT:  And was he -- and so he was your

20   brother-in-law when he worked in Tulare as well?

21           PROSPECTIVE JUROR 104:  That is correct.

22           THE COURT:  And it sounds like he doesn't -- he

23   didn't really talk to you about his work; is that true?

24           PROSPECTIVE JUROR 104:  No, we are not really that

25   close, I just wanted to let you know about.

884

1      THE COURT:  Approximately how often did you see your
2  brother-in-law when he was working?
3      PROSPECTIVE JUROR 104:  I will say once a year.
4      THE COURT:  Okay.  And you say that you have a
5  positive attitude about law enforcement in part because of the
6  type of job that they do and that you got a speeding ticket
7  one time and it was fine; is that right?
8      PROSPECTIVE JUROR 104:  Yes.
9      THE COURT:  Anything -- any other experiences with
10 law enforcement that helped you to develop your attitude about
11 law enforcement?
12     PROSPECTIVE JUROR 104:  Not that I can recall of.
13     THE COURT:  Okay.  The fact that you've had a
14 generally positive experience with law enforcement, do you
15 think that that -- you would still evaluate the testimony of
16 law enforcement officers fairly and impartially just as you
17 would any other witness?
18     PROSPECTIVE JUROR 104:  Yes.
19     THE COURT:  You indicate that -- it looks like you
20 don't have a lot of information about gangs, but you've heard
21 about it either through reading or in the media, and what you
22 do know is a little scary; is that true?
23     PROSPECTIVE JUROR 104:  That is true.  I'm -- just
24 did not have any experience and have not encountered directly
25 somebody who is in a gang.

885

1          THE COURT:  So what you -- is it true that your

2    information comes from, you know, you see news reports and

3    they say, you know, there was a shooting, gang involvement is

4    suspected, or something like that?

5          PROSPECTIVE JUROR 104:  Yes, from TV, from watching

6    TV, from -- yeah.

7          THE COURT:  When you say TV, is it only news reports

8    or is it also entertainment shows?

9          PROSPECTIVE JUROR 104:  It's actually mostly

10   entertaining shows.

11         THE COURT:  Okay.  And as some of the other jurors

12   have mentioned, do you understand that entertainment, that

13   they, you know, they may make events different from reality in

14   order to make it entertaining.  Do you understand that?

15         PROSPECTIVE JUROR 104:  I do understand it.

16         THE COURT:  And are you able to separate what you

17   know about gangs from these shows from the evidence that would

18   be presented in this case?

19         PROSPECTIVE JUROR 104:  Yes.

20         THE COURT:  Do you think the fact that gangs may be

21   involved in this case would cause an impact on your ability to

22   serve on this jury because you have sort of a negative outlook

23   about gang members?  Is that what we've already talked about,

24   that, you know from the little bit you've learned, that, you

25   know, you don't like the idea of gangs, is that what you're

886

1    saying?

2            PROSPECTIVE JUROR 104:  I agree.  I -- just from how

3    I see on the movies and things even -- even if it's just for

4    entertainment, I have that idea that -- that in my mind

5    that that is negative.

6            THE COURT:  Okay.  Are you able to set that aside,

7    though, and be fair and impartial to these actual real people

8    here?

9            PROSPECTIVE JUROR 104:  Yes.

10           THE COURT:  What type of work do you do?

11           PROSPECTIVE JUROR 104:  I'm an architect and a

12   certified access specialist.

13           THE COURT:  So does that mean that you work on ADA

14   issues?

15           PROSPECTIVE JUROR 104:  Correct.

16           THE COURT:  Do you work at an office or do you work

17   remotely?

18           PROSPECTIVE JUROR 104:  I work in an office.

19           THE COURT:  Is it possible for you to work remotely?

20           PROSPECTIVE JUROR 104:  My programs are all in my

21   office, so --

22           THE COURT:  Yeah, that's what I was going to ask.

23   Because I know architects aren't what they used to be where

24   they have the huge pieces of paper and they're actually, you

25   know, with a pencil.  Now everything is done by computer

887

1  program, right?

2       PROSPECTIVE JUROR 104:  Yes.  We -- well, we do all

3  the works, instead of drafting it on a drawing board, we have

4  it on the computer.  It can be remotely, although if you have

5  a small screen, it's kind of not really that easy to work on

6  it.

7       THE COURT:  Have you talked to your employer about

8  being able to flex your hours?  Because as you know, if you're

9  selected on this jury, you'll be here between 8:00 and 1:30,

10 and then you would be free to go to your office for the rest

11 of the day and to work at that time.

12      Have you talked to your employer about that?

13      PROSPECTIVE JUROR 104:  I own my -- own the firm.

14      THE COURT:  Oh, oh.  It's your own business.

15      PROSPECTIVE JUROR 104:  Correct.

16      THE COURT:  Do you have any employees?

17      PROSPECTIVE JUROR 104:  Actually, my -- I have

18 someone that works abroad, so we -- we talk remotely.  And I

19 have one that works with me who is now going to San Diego.  I

20 have one that I'm training, and he couldn't start until --

21 until we have all this figured out.

22      THE COURT:  Now, the one employee who works abroad, I

23 expect that means that sometimes you're working unusual hours

24 in order to have contact with that person?

25      PROSPECTIVE JUROR 104:  Yes, we usually do our call

888

1   in the afternoon.

2           THE COURT:  And as a self-employed person, you know,

3   from my experience, self-employed people, they don't, you

4   know, clock in at 8:00 and leave at 5:00, they'll work as much

5   as needed.  Is that true for you as well?

6           PROSPECTIVE JUROR 104:  For me, I work more than just

7   the ordinary.  I work 7:00 to 7:00.

8           THE COURT:  Okay.  And you say if you don't work, you

9   don't get paid, but it's actually a little more complicated

10  than that, right?  Because that means what this would mean is

11  you're going to have to work later hours maybe than you

12  normally do and maybe you'd have to work weekends or you might

13  have to ask one of your colleagues to take on some work that

14  you would normally do.

15          Are all of those options for you?

16          PROSPECTIVE JUROR 104:  Well, the colleague part,

17  that's really -- because I work on my own, and I do -- will

18  have to work on the weekend and late at night.

19          THE COURT:  Okay.  Do you -- who do you support in

20  your household?

21          PROSPECTIVE JUROR 104:  I'm so sorry?

22          THE COURT:  Do you support anyone in your household

23  other than yourself?

24          PROSPECTIVE JUROR 104:  No.

25          THE COURT:  Is there anyone else in your household

889

1  who works?

2          PROSPECTIVE JUROR 104:  Well, my husband is retired

3  and he draws unemploy- -- he draws retirement.

4          THE COURT:  All right.  Thank you so much.

5          Is there anyone else who feels like they have

6  information they need to share from questions I asked last

7  week?

8          Okay.  Would you pass the microphone right behind

9  you, please.

10          What is your juror number?

11          PROSPECTIVE JUROR 88:  88.

12          THE COURT:  Okay.  And you're sitting in A4.  All

13  right.  Would you share with me what you feel is important.

14          PROSPECTIVE JUROR 88:  Yeah, I have a cousin who's a

15  correctional officer at Corcoran, and I have -- my brother is

16  a defense attorney.

17          THE COURT:  How long has your cousin been a

18  correctional officer?

19          PROSPECTIVE JUROR 88:  Probably 10, 12 years.

20          THE COURT:  Has your cousin always been assigned to

21  Corcoran?

22          PROSPECTIVE JUROR 88:  Yes.

23          THE COURT:  Which of the facilities at Corcoran is

24  your cousin assigned?

25          PROSPECTIVE JUROR 88:  Oh, I don't know.  I just know

890

1    he goes to Corcoran, uh-huh.

2            THE COURT:  Okay.  How often do you see your cousin?

3            PROSPECTIVE JUROR 88:  I talk to him regularly.

4    Texting -- by text mostly.

5            THE COURT:  Okay.  Do you -- does your cousin talk

6    about the work that he or she does?

7            PROSPECTIVE JUROR 88:  No, I don't -- huh-uh.

8            THE COURT:  And you said also that your brother is a

9    defense attorney.  In what city does your brother work?

10           PROSPECTIVE JUROR 88:  Fresno County.  He's a public

11   defender right now.

12           THE COURT:  The head cheese guy?  The very top of the

13   office, is that what you're saying, or just he is an

14   Assistant --

15           PROSPECTIVE JUROR 88:  I guess he's -- assistant, I

16   guess.  I don't know.

17           THE COURT:  Does he actually work in court?

18           PROSPECTIVE JUROR 88:  Yes.  Oh, yes.

19           THE COURT:  Okay.

20           PROSPECTIVE JUROR 88:  Yeah, sorry.

21           THE COURT:  So he --

22           PROSPECTIVE JUROR 88:  Yeah, he gets the worst of the

23   worst cases in Fresno County, him and his office partner.

24   Well, his -- he has a new office partner.  His partner

25   actually, which is one of his best friends, moved out of the

891

1  county, because it was kind of bad.  He gets the worst of the

2  worst cases.

3          THE COURT:  He's assigned to a particular unit in

4  that office, then?

5          PROSPECTIVE JUROR 88:  I think the most he gets is,

6  like, children that were victims.

7          THE COURT:  So when you say "worst of the worst,"

8  it's crimes that are difficult?

9          PROSPECTIVE JUROR 88:  Yes.  Like, he's in the news

10 probably once, twice a year.  He gets, like, the really bad

11 cases and --

12         THE COURT:  When you say "bad cases," these tend to

13 be child victims?

14         PROSPECTIVE JUROR 88:  Not always.  Because he's

15 done -- he does do murder, too, also.

16         THE COURT:  Of adults?

17         PROSPECTIVE JUROR 88:  Yes.

18         THE COURT:  It sounds like he's been a lawyer for

19 quite a while?

20         PROSPECTIVE JUROR 88:  Yeah.  He's been -- he was a

21 probation officer as he was going to law school, and then

22 he -- when he graduated, he became an attorney.

23         THE COURT:  And I don't think I asked you.  How long,

24 to your recollection, has he been an attorney?

25         PROSPECTIVE JUROR 88:  10 years.  At least 10 years.

1          THE COURT:  Do you remember how long he was a

2    probation officer?

3          PROSPECTIVE JUROR 88:  Probably the whole time he was

4    in college.  Probably four -- four or five -- well, he's --

5    probably like five years, five, six years, because I know he's

6    coming up to 20 soon for Fresno County.

7          THE COURT:  So he's a probation officer --

8          PROSPECTIVE JUROR 88:  While he went to law school,

9    yes.

10          THE COURT:  And also in college or just in --

11          PROSPECTIVE JUROR 88:  No, just in -- I think it was

12    just law school.

13          THE COURT:  Did he go here --

14          PROSPECTIVE JUROR 88:  I think he was a little bit

15    before he went to law school that he was a probation officer,

16    and then he went to law school as a probation officer.

17          THE COURT:  Did he go to law school here locally?

18          PROSPECTIVE JUROR 88:  Yes.

19          THE COURT:  Okay.  And I assume that -- well, first

20    of all, did your brother talk to you at all about his work

21    when he was a probation officer?

22          PROSPECTIVE JUROR 88:  A little, yeah, because I have

23    kids, so yeah, he always --

24          THE COURT:  Was he a juvenile probation officer?

25          PROSPECTIVE JUROR 88:  He actually was -- one year he

1   did juvenile corrections for one year, in between, I think, a

2   probation officer and attorney, somewhere in there.

3           THE COURT:  So when you say "corrections," that

4   means --

5           PROSPECTIVE JUROR 88:  He was at the juvenile, '99, I

6   didn't even know that's what he did, actually, because it was

7   only one year.  It was quick.

8           THE COURT:  After he was at that facility, then did

9   he -- or before or after, did he then go out and work with

10  adult probationers?

11          PROSPECTIVE JUROR 88:  Yes.  Yeah, yeah, before that

12  he did.

13          THE COURT:  When he did that, would he go out and

14  visit people on probation and people would come -- his

15  probationers would also meet with him in his office?

16          PROSPECTIVE JUROR 88:  Yeah.

17          THE COURT:  Did he talk about that work at all?

18          PROSPECTIVE JUROR 88:  A little.

19          THE COURT:  Was it just generalities?

20          PROSPECTIVE JUROR 88:  Just general.  Yeah, just

21  general.

22          THE COURT:  Okay.  And then he went to law school and

23  started working for the public defender.  Did he ever talk

24  about, Hey, you know, this is the type of work I want to do, I

25  want to defend people accused of crimes, or was it just a job

894

1   that was open?

2          PROSPECTIVE JUROR 88:  I guess it was just a job that

3   was open.

4          THE COURT:  At least to your knowledge, he never

5   expressed -- or did he ever express that he wanted to work in

6   defense?

7          PROSPECTIVE JUROR 88:  No.

8          THE COURT:  And yet, he's --

9          PROSPECTIVE JUROR 88:  I think he -- yeah.  I -- I

10  have no idea why he works there.  Because -- I have no idea.

11         THE COURT:  Does he express to you that he wants to

12  quit or he wants to go do something else?

13         PROSPECTIVE JUROR 88:  No.  He's very -- how to

14  explain him.  He just could, like, wipe it off and walk out of

15  the office.  He's very objective, like just doesn't judge.  I

16  don't know how he does that.  And I just don't get him.  I

17  don't understand how he does that, because he -- he hears a

18  lot of the junk.

19         THE COURT:  Sounds like he is committed to a fair and

20  impartial process?

21         PROSPECTIVE JUROR 88:  He -- yes, he is.

22         THE COURT:  And when you say he doesn't judge, he's

23  there to provide a fair and impartial and zealous

24  representation to his client?

25         PROSPECTIVE JUROR 88:  Yes, correct.

895

1          THE COURT:  He must believe in the process, then; is

2     that right?

3          PROSPECTIVE JUROR 88:  Correct.

4          THE COURT:  Do you also believe in the process?

5          PROSPECTIVE JUROR 88:  I don't know.

6          THE COURT:  Tell me what you mean about that.

7          PROSPECTIVE JUROR 88:  Because I've watched him in

8     court, I -- during COVID, I watched him on YouTube.  They had

9     the court sessions and I -- I was judgy.

10         THE COURT:  So you -- you would --

11         PROSPECTIVE JUROR 88:  I watched him a lot, yeah.

12         THE COURT:  You would you watch your brother in

13    court?

14         PROSPECTIVE JUROR 88:  Uh-huh.

15         THE COURT:  You said you were judgy about his

16    representation?

17         PROSPECTIVE JUROR 88:  Well, because he would make

18    victims look like they were the bad person.  It was crazy.  I

19    would just -- it was just a thing.  I just was really into it.

20         THE COURT:  So he was --

21         PROSPECTIVE JUROR 88:  He's good at his job, put it

22    that way.

23         THE COURT:  So what you're saying is you were

24    watching him and you would go, Hey, wait a minute, uh, you

25    made a judgment about what had happened in the case even

896

1 | though you were watching a bit at a time; is that true?

2 | PROSPECTIVE JUROR 88:  Yes.

3 | THE COURT:  And I -- I'm sure --

4 | PROSPECTIVE JUROR 88:  But I know, like, other cases,

5 | and he was like, Well, that girl lied.  And I was like, Whoa.

6 | And it -- you know, it turned out okay, you know, some -- you

7 | know, but that's just -- it's just a reaction, you're like,

8 | No, leave her alone, she's not -- you know, she's not lying.

9 | THE COURT:  And so you would learn that he was -- he

10 | had reason to think that this person had not been telling the

11 | truth?

12 | PROSPECTIVE JUROR 88:  Correct.

13 | THE COURT:  Okay.  And even though your first

14 | instinct was like, Wait, stop that --

15 | PROSPECTIVE JUROR 88:  Yeah, but there was other

16 | cases that -- that were true, you know.

17 | THE COURT:  So then you understand that people who

18 | are accused of crimes are simply accused and that you have to

19 | hear the evidence before there's any determination that could

20 | be made and all of the process to hear all of that before any

21 | determination can be made about guilt; is that true?

22 | PROSPECTIVE JUROR 88:  Uh-huh.

23 | THE COURT:  And I think the fact that your brother is

24 | involved in this process, you must have some faith in what

25 | he's doing, when he goes after a witness he's got to have

1   reason to do that, right?

2           PROSPECTIVE JUROR 88:  Correct.

3           THE COURT:  And are you willing also to evaluate

4   testimony of witnesses here fairly and impartially, no matter

5   what their job is?

6           PROSPECTIVE JUROR 88:  Yes.

7           THE COURT:  Is there any other information that you

8   would like to share about questions I asked before or that you

9   feel is important for us to know about?

10          PROSPECTIVE JUROR 8:  My cousin's husband was

11  involved in that Gilroy shooting.  He was a volunteer at the

12  Gilroy Garlic Festival and he was pulling out people who were

13  shot because he was -- he had a Gilroy truck, I guess.  He was

14  a volunteer.  And he was involved in -- we were there the day

15  before the shooting.

16          THE COURT:  Did he work there?

17          PROSPECTIVE JUROR 88:  He was a volunteer for the

18  Gilroy Garlic Festival.

19          THE COURT:  And so he was volunteering on the day

20  that the shooting occurred?

21          PROSPECTIVE JUROR 88:  Yes.

22          THE COURT:  And he helped to save some people?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Does he talk about that experience?

25          PROSPECTIVE JUROR 88:  No.  It's just he -- I know he

898

1  has PTSD.

2          THE COURT:  Does he receive therapy or any sort of

3  help with that?

4          PROSPECTIVE JUROR 88:  Yes, yes.

5          THE COURT:  Okay.  And so him being involved in that,

6  I mean, really it was an act of violence we see outside of,

7  you know, just in our normal-day lives.

8          PROSPECTIVE JUROR 88:  Uh-huh.

9          THE COURT:  Does he have -- he must have some

10  satisfaction in the fact that he was able to save some people?

11          PROSPECTIVE JUROR 88:  Yes, yes.  But I know -- yeah,

12  but it was hard on -- he's not working still from that.

13          THE COURT:  And I realize -- I realize that that has

14  an impact on your family, but do you think that that

15  experience would cause you to have doubt as to your ability to

16  be fair or impartial in this case?

17          PROSPECTIVE JUROR 88:  No.

18          THE COURT:  All right.  Is there anything else that I

19  should have asked you about that I have not?

20          PROSPECTIVE JUROR 88:  No.

21          THE COURT:  All right.  Was there anyone else who

22  felt there was -- yes, sir.

23          You must be Juror Number 87.

24          PROSPECTIVE JUROR 87:  Correct.

25          THE COURT:  And sitting in A3.  All right.

899

1          PROSPECTIVE JUROR 87:  Yes.

2          THE COURT:  Your situation, sir?

3          PROSPECTIVE JUROR 87:  So there's just three aspects

4    in the last however many years that may be pertinent.  I

5    didn't recall -- didn't put on the questionnaire that my

6    girlfriend's family's home was the site of a gang-related

7    shooting where a man died, precipitated them moving less than

8    a year later.

9          Also, my -- I work with prisoner correspondence on

10   occasion at my job.  And so I'll be exposed to kind of

11   documentation that they'd been submitting to prove their

12   identity and to review, make sure there's nothing handwritten

13   as an inquiry or a question.  And so there's kind of cursory

14   exposure to that.

15         And I believe there was -- my girlfriend's brother

16   was, for a number of years, working for the police department

17   as a dispatcher.  And the kind of stress of that job made

18   him -- actually, he's now a law student.  So an improvement, I

19   would assume, would be the view of this Court.

20         THE COURT:  You say that's an improvement?

21         PROSPECTIVE JUROR 87:  I personally think so, because

22   the stress of that job didn't really help him out.

23         The overall impact of those kind of three aspects,

24   kind of -- I personally feel kind of balance out my view of

25   law enforcement, as well as the criminal law enforcement, and

1    the prison system.

2         THE COURT:  Okay.  Let me just start with your job

3    where you review correspondence from prisoners.

4         What is the nature of your work that causes you to do

5    that?

6         PROSPECTIVE JUROR 87:  Would it be better if I just

7    mention the employer?

8         THE COURT:  It may be.  It's up to you, sir.

9         PROSPECTIVE JUROR 87:  As the previous gentleman,

10   he's been -- he worked here, like, 16 years.  I've only been

11   in for eight years at the IRS.

12        And so people that will -- still will be writing in,

13   even years later, for the stimulus payments and then -- or for

14   verifying their identity.  The prisoners are more at risk of

15   having people filing returns to get some refunds, identity

16   theft, tax-related identity theft, returns, and things of that

17   nature.

18        So they can't call and be on hold for hours at a

19   time.  I don't know how long.  I've heard different amounts of

20   time.  30 minutes is their phone time.

21        THE COURT:  I don't know.

22        PROSPECTIVE JUROR 87:  Depending on where they

23   particularly -- they are located, the correspondence would

24   be -- or sending in the documentation would be the primary

25   means of addressing those issues.

1         But I mainly handle -- lately, in the last seven

2    months, I'm a lead in my unit, so I'm more help coordinating,

3    answering technical questions, making sure any correspondence

4    from us gets to them.  Because there's particular aspects to

5    anything we send them; the prisoner number has to be there or

6    it will be undeliverable, and then that will not help them

7    out.

8         For years, since the stimulus payments went out,

9    those would be coming in in waves.

10         THE COURT:  Okay.  And so these are all people who

11    have --

12         PROSPECTIVE JUROR 87:  Prisoner -- are either

13    incarcerated or when they wrote the letter saying, Where's my

14    stimulus payment?  I only got the one for 2020, but I didn't

15    get the one for 2021.

16         They were in prison at the time.  And so that's the

17    primary means of communication.

18         THE COURT:  And in those correspondence, is it simply

19    focused on the stimulus payments, or is there a discussion

20    about, you know, Here, I'm in prison?

21         PROSPECTIVE JUROR 87:  90 percent of the time

22    other -- the other verification of identity aspects to it,

23    whether it be they'd be sending in, Here's my social security

24    card, my information from the prison with my picture, the

25    particular crimes I committed, or where I was stationed or

1    where I was -- stationed.  Excuse me -- the prison I was

2    located at or so on and so forth, here's my updated address.

3         And though that later aspect like that I don't

4    particularly handle, but I have to review it to make sure

5    there's nothing handwritten saying, I also want to know about

6    my 2021 X-Y-Z.  So --

7         THE COURT:  Okay.  All right.  I'm going to come back

8    with a few more questions from you after the break.  We're

9    going to take a break now.

10        I'm going to ask everyone to be prepared to return --

11   I'm going to say, for the most part, 15 minutes after the

12   hour.  But I'm also going to -- actually, let's say a little

13   bit later.  Let's say -- let's give us until 10:30.

14        But those of you who want to speak in private, I'm

15   going to call you in individually, and I'm going to ask you to

16   be prepared to return at ten minutes after the hour.  And

17   we'll bring you in one at a time so that we can talk.  Okay?

18        All right.  So those of you who want to speak in

19   private, that is -- I'll need you to be around the door.

20        All right.  Thank you very much.

21       (Prospective Jurors exit the courtroom.)

22        THE COURT:  All right.  The jury members have stepped

23   out.  Let's go ahead and take our break.  I'm going to ask

24   you-all to be back at ten after the hour.

25       (Recess held.)

903

1          THE COURT:  All right.  We're going to go ahead and

2    call in Juror Number 86.

3      (Prospective Juror 86 enters the courtroom.)

4          PROSPECTIVE JUROR 86:  Hi, Your Honor.

5          THE COURT:  Thank you for coming in.

6          So you had some information that you wanted to share.

7    And I would just -- we're outside the presence of the other

8    jurors.

9          What is it that --

10         PROSPECTIVE JUROR 86:  Well, I did not know this

11   until a few days ago.  I had a consultation with a neck

12   surgeon.  And I'm under the care of a pain management

13   specialist, and they are trying to give me another injection

14   that's set for the second week of February.  And then -- just

15   to get the inflammation down.  And then I'm going to be

16   preparing for neck surgery.

17         THE COURT:  Okay.  And you said in your questionnaire

18   that you can't sit for a long time.

19         Is there any way for that pain to be relieved by

20   standing up or --

21         PROSPECTIVE JUROR 86:  No.  Like, right now I'm in

22   severe pain.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR 86:  I couldn't take my medication

25   because now it's affecting my GI tract from one of the main

1    nerves.

2            THE COURT:  Okay.  And so you don't get relief

3    sitting, standing.  It's only with the medication, but you

4    don't even feel like you can take that now?

5            PROSPECTIVE JUROR 86:  I couldn't even take it this

6    morning.

7            THE COURT:  Is that -- do you normally take it?  Is

8    this the first day you don't take it?

9            PROSPECTIVE JUROR 86:  All depends on how my GI tract

10   is flaring up at that time.

11           THE COURT:  Has this been happening to you for a

12   while where you sometimes can't take it?

13           PROSPECTIVE JUROR 86:  It's actually -- it's getting

14   worse as the time progresses.  Like, I'm having numbness in my

15   right arm down to my hand.  And, like, right now it's -- my

16   hand is numb.

17           THE COURT:  Have you been talking with your doctor

18   about the fact that you can't take the medication?

19           PROSPECTIVE JUROR 86:  Yeah.

20           THE COURT:  And is the doctor not able to change

21   it or --

22           PROSPECTIVE JUROR 86:  They can't change it right now

23   because the insurance thing.  And I've been waiting three

24   months to get in for a second injection because the first

25   injection only lasted not even two weeks.

905

1           THE COURT:  Are you currently working?

2           PROSPECTIVE JUROR 86:  I am currently working.  And

3  I've been pushing through the pain.

4           THE COURT:  What do you normally -- what do you do

5  for work?

6           PROSPECTIVE JUROR 86:  I am an administrative

7  assistant/executive assistant.

8           THE COURT:  What does that entail?

9           PROSPECTIVE JUROR 86:  It's a lot of sitting.  But I

10  have a sit-stand, where that's even became a problem because

11  my arm, I'm right-handed, and my arm is going numb.

12           THE COURT:  So you have a sit-stand, but the stand

13  still doesn't help?

14           PROSPECTIVE JUROR 86:  Huh-uh.

15           THE COURT:  So how often are you missing work as a

16  result of your condition?

17           PROSPECTIVE JUROR 86:  I haven't missed any because

18  I've been pushing through it.  And I take care of my mom.

19           THE COURT:  What is your mom's condition?

20           PROSPECTIVE JUROR 86:  My mom had just had shoulder

21  replacement surgery on her right arm.

22           THE COURT:  When was that that she had the surgery?

23           PROSPECTIVE JUROR 86:  That was in May, so she's

24  still recuperating.

25           THE COURT:  What is it that you do for her?

906

1          PROSPECTIVE JUROR 86:  What was that?

2          THE COURT:  What is it that you do for her?

3          PROSPECTIVE JUROR 86:  Oh, I feed her, I get her up,

4    bathe her.

5          THE COURT:  You go over to her house in the morning?

6          PROSPECTIVE JUROR 86:  Actually, she's at my house

7    right now.

8          THE COURT:  Okay.  So you get her up in the morning,

9    and you bathe her and feed her?

10          PROSPECTIVE JUROR 86:  Uh-huh.

11          THE COURT:  What happens at the noon hour?

12          PROSPECTIVE JUROR 86:  At the noon hour, my husband

13    comes home, and he's home with her.  And then when I get home,

14    I take over again.  So even with my autoimmune diseases and my

15    neck, I've been -- and working, I push through.

16          THE COURT:  And then in the evening, you provide care

17    for your mother?

18          PROSPECTIVE JUROR 86:  Uh-huh.

19          THE COURT:  The fact that she -- I guess I need to

20    understand more about her situation.  She's had a shoulder

21    replacement, but that means she's not -- she has no ability to

22    provide self-care?

23          PROSPECTIVE JUROR 86:  She -- she has a little bit.

24    Since she's right-handed and her shoulder has been replaced,

25    we have to do a lot for her.

1          THE COURT:  So when you say you bathe her, does that

2    mean you assist her into the shower?

3          PROSPECTIVE JUROR 86:  I get her up, get her in the

4    shower.  She does her thing in the shower.  And I'm right

5    there on the outside of the door, wait for her to give me the

6    holler, get her out.

7          THE COURT:  When you say you get her up, does that

8    mean you physically have to help her --

9          PROSPECTIVE JUROR 86:  I have to help her get out

10   because it's not one of those walk-in showers or --

11         THE COURT:  Okay.  What I was going to say, though,

12   is when you say you get her up and get her into the shower,

13   are you saying you have to help her ambulate or it's just

14   simply she can't manage a towel and --

15         PROSPECTIVE JUROR 86:  Can't manage a towel.  Can't

16   manage to get dressed on her own.

17         THE COURT:  Okay.  And she doesn't have any sort of

18   in-home care assistance?

19      (Court reporter gains clarification.)

20         THE COURT:  I'm sorry.  Your answer was "no"?

21         PROSPECTIVE JUROR 86:  No.

22         THE COURT:  Is that something that you have sought

23   out and she hasn't -- she's not eligible?

24         PROSPECTIVE JUROR 86:  She's not -- she's not

25   eligible at all due to Medicare.

1          THE COURT:  Okay.  Do you have any other relatives

2    who could assist in her care?

3          PROSPECTIVE JUROR 86:  No.

4          THE COURT:  Do you have any other relatives in this

5    area?

6          PROSPECTIVE JUROR 86:  Her brother, but her brother

7    just had back surgery.

8          THE COURT:  Do you have any siblings?

9          PROSPECTIVE JUROR 86:  Stockton and Washington.

10          THE COURT:  Okay.  And they don't provide you any

11    assistance with your mom?

12          PROSPECTIVE JUROR 86:  They can't.  They can't

13    because my brother's work is a little bit stricter.  I'm

14    blessed with my job.  I got a great boss and I got a great job

15    that understands my situation.  Sometimes I come in a little

16    late, sometimes I have to leave early.  I take my mom to the

17    doctors' appointments.  I'm the only one that she relies on.

18          I have become the second -- or the third, I should

19    say, because I wait until everybody else is taken care of.

20          THE COURT:  When you have this complication with your

21    GI tract and you talk with your doctor, is your doctor giving

22    you -- I know you can't change medications.  Is your doctor

23    adding medications or adding any other therapies, diet, or

24    anything else that will assist you?

25          PROSPECTIVE JUROR 86:  No.  And I see my GI doctor

909

1    again in February.

2            THE COURT:  Okay.  What is the date for the -- your

3    scheduled injection?

4            PROSPECTIVE JUROR 86:  I think it's on the 11th.

5            THE COURT:  Do you know what time that is?

6            PROSPECTIVE JUROR 86:  No, because they don't call

7    you until the day -- the day before.  And usually it's a

8    morning thing.  But it all depends on the doctor's schedule.

9            THE COURT:  That's a Tuesday.  Does that sound right

10   to you?

11           PROSPECTIVE JUROR 86:  Yes.

12           THE COURT:  Okay.  And have you had this injection

13   before?

14           PROSPECTIVE JUROR 86:  Oh, yes.

15           THE COURT:  And does it give you relief?

16           PROSPECTIVE JUROR 86:  It only give me relief not

17   even two weeks.

18           THE COURT:  And is the injection into your spine?

19           PROSPECTIVE JUROR 86:  Into the nerves into the

20   spine, so they put you under.  I got one injection into the

21   spine, felt great for a while, and then not even two weeks, it

22   was back.

23           THE COURT:  How long ago was that, that you had that

24   injection?

25           PROSPECTIVE JUROR 86:  About three months ago.

910

1        THE COURT:  So they have to put you under a general

2  anesthesia to give you this injection?

3        PROSPECTIVE JUROR 86:  Yes.  Because it's right at

4  the cervical area.

5        THE COURT:  Okay.  I was going to ask you what level,

6  okay.

7        PROSPECTIVE JUROR 86:  So it's C4 to C6 that I'm

8  having issues with.

9        THE COURT:  And this affects your neck, your back,

10  and your arm?

11        PROSPECTIVE JUROR 86:  Uh-huh.

12        THE COURT:  That's a "yes"?

13        PROSPECTIVE JUROR 86:  Yes.  I'm sorry.

14        THE COURT:  Is there any other pain-relieving things

15  that you do; therapies, treatments, medications, anything like

16  that?

17        PROSPECTIVE JUROR 86:  Has not been so far.

18        THE COURT:  You are able to drive from your city of

19  residence to Fresno and you sit and stand all day.

20        What time do you normally have to report to work?

21        PROSPECTIVE JUROR 86:  7:30.

22        THE COURT:  And what time do you generally get off?

23        PROSPECTIVE JUROR 86:  4:30.

24        THE COURT:  What type of work does your husband do?

25        PROSPECTIVE JUROR 86:  He's building maintenance.

911

1          THE COURT:  Is that in Fresno or some other city?

2          PROSPECTIVE JUROR 86:  It is in Fresno.

3          THE COURT:  So he's able to drive from Fresno, back

4    to your home to care for your mom at lunchtime?

5          PROSPECTIVE JUROR 86:  Yep.

6          THE COURT:  Do you have any adult children?

7          PROSPECTIVE JUROR 86:  Nope.

8          THE COURT:  Okay.  So it's just the two of you doing

9    this?

10          PROSPECTIVE JUROR 86:  Yes.

11          THE COURT:  What are his normal hours?

12          PROSPECTIVE JUROR 86:  They vary.

13          THE COURT:  He doesn't have to be in a certain place

14    at a certain time?

15          PROSPECTIVE JUROR 86:  No.  They just vary.  Like

16    this morning he had to be there by -- he had to leave our

17    house by 4:00.

18          THE COURT:  Does he have a -- it varies, but he's

19    usually leaving the house at 7:00?

20          PROSPECTIVE JUROR 86:  It all depends.  Sometimes

21    it's at one o'clock in the morning, sometimes it's

22    four o'clock in the morning.  It all depends.

23          THE COURT:  When he has to do that, is he still able

24    to come home or is he going farther distance?

25          PROSPECTIVE JUROR 86:  He actually is able to go back

1    home, tend to my mom, and then he has to report back to work.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR 86:  And then it's like -- so I

4    have a neighbor kind of watching her in that meantime.

5            THE COURT:  What does that mean?  What does your

6    neighbor do?

7            PROSPECTIVE JUROR 86:  She goes over there and checks

8    on her.

9            THE COURT:  Would your neighbor be able to go over

10   there -- well, if we had trial starting at 8:00, this is

11   actually later than you normally go to work.

12           PROSPECTIVE JUROR 86:  Uh-huh.

13           THE COURT:  And your husband still could go home at

14   lunchtime.  It seems like the biggest concern then, or maybe

15   I'm putting words in your mouth, and it's just -- the biggest

16   concern seems to be your physical condition?

17           PROSPECTIVE JUROR 86:  (Nods head.)

18           THE COURT:  That's right?

19           PROSPECTIVE JUROR 86:  Yes.

20           THE COURT:  Okay.  You talk about that you have a --

21   you have relatives in law enforcement.  Some of them are still

22   employed in the sheriff's office and then one is retired

23   sometime ago.

24           The fact that you have an uncle and cousins in law

25   enforcement, do you think that that would impact your ability

913

1   to be fair in this case?

2             PROSPECTIVE JUROR 86:  No.

3             THE COURT:  Do you know, for example, the cousin who

4   works -- I'm not quite sure what it says.

5             PROSPECTIVE JUROR 86:  He was a sheriff for about a

6   year and then he went into probation.

7             THE COURT:  Oh, probation.

8             PROSPECTIVE JUROR 86:  And now he's a probation

9   officer.

10            THE COURT:  Okay.  And then you have another relative

11  at Madera Police Department?

12            PROSPECTIVE JUROR 86:  Correct.

13            THE COURT:  How often do you see your cousins?

14            PROSPECTIVE JUROR 86:  I see all of them about once

15  or twice a month.

16            THE COURT:  Do they talk about their work?

17            PROSPECTIVE JUROR 86:  My -- I call him my little

18  cousin, but he's not my little cousin anymore, probation

19  officer.  He just tells me just be aware about the cartels in

20  Madera County.

21            THE COURT:  Okay.

22            PROSPECTIVE JUROR 86:  He just -- he tells me not to

23  look -- you know, look at anyone particular cross-eyed,

24  basically.

25            THE COURT:  So he's concerned about gang activity

914

1    where you live?

2            PROSPECTIVE JUROR 86:  Correct.

3            THE COURT:  And in your city or when you travel to --

4            PROSPECTIVE JUROR 86:  It's -- it's in our city.  I

5    grew up in Madera.

6            THE COURT:  You don't live in Madera now, though,

7    right?

8            PROSPECTIVE JUROR 86:  I live in -- no.  Up in the

9    hills.

10           THE COURT:  And where you do live, is he giving you

11   that same advice?

12           PROSPECTIVE JUROR 86:  Same advice.  He says it's

13   actually spreading further.

14           THE COURT:  Has he mentioned to you having any sort

15   of clients up in where you live?

16           PROSPECTIVE JUROR 86:  No, no.

17           THE COURT:  Okay.  He's just saying in general you

18   need to be aware of your surroundings, be aware of gang

19   activity?

20           PROSPECTIVE JUROR 86:  Correct.

21           THE COURT:  You have a very positive attitude about

22   law enforcement.  It sounds like part of that is because of,

23   you know, the type of work that they do.  And you say because

24   they're helpful when you're in need.

25           Have you ever had a situation in which you were in

915

1  need of help from a law enforcement?

2          PROSPECTIVE JUROR 86:  Oh, a lot.  When I was growing

3  up, I got with a wrong crowd --

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR 86:  -- just basically, and I

6  snapped out of it.

7          THE COURT:  Was that through the assistance of law

8  enforcement?

9          PROSPECTIVE JUROR 86:  Of my uncles.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR 86:  My uncles.  And he was -- he

12  was in the transport for Madera.

13          THE COURT:  And he helped you to see that you were

14  going the wrong way?

15          PROSPECTIVE JUROR 86:  Correct.

16          THE COURT:  And so the fact that you had these

17  relatives in law enforcement, that's -- that's really the

18  source of your feelings about law enforcement; is that true?

19          PROSPECTIVE JUROR 86:  Correct.

20          THE COURT:  Okay.  Would you be able to evaluate the

21  testimony of law enforcement officers as you would any other

22  witness?

23          PROSPECTIVE JUROR 86:  Correct.

24          THE COURT:  You say that you have a lot of concern

25  about people who use firearms to hurt other people.

916

1           PROSPECTIVE JUROR 86:  Yes.

2           THE COURT:  Are you talking about criminal activity

3    related to firearms?

4           PROSPECTIVE JUROR 86:  Yes.

5           THE COURT:  Okay.  And you also have some concerns

6    about people drinking and driving?

7           PROSPECTIVE JUROR 86:  Yes.

8           THE COURT:  I don't think this case is going to

9    involve that.  But as to the use of firearms, I think in order

10   to know whether you're concerned about it, you'd have to know

11   whether a crime had been committed first?

12          PROSPECTIVE JUROR 86:  Yes.

13          THE COURT:  So in this case if you hear that there

14   are allegations that guns have been used but you determine it

15   wasn't in connection with a crime, you wouldn't have a problem

16   with that situation, correct?

17          PROSPECTIVE JUROR 86:  Correct.

18          THE COURT:  If it -- are you willing to make that

19   determination, whether the crime -- whether it was a crime --

20   or in essence, what I'm trying to tell you is -- or ask you

21   is:  Will you wait to hear the evidence before making a

22   judgment about what has happened in this case?

23          PROSPECTIVE JUROR 86:  Yes.

24          THE COURT:  You indicated that you have a relative

25   who was involved in a criminal justice system in the '90s.

917

1          PROSPECTIVE JUROR 86:  Yes.

2          THE COURT:  And he actually had a trial or he or she

3   actually had a trial and was convicted; is that right?

4          PROSPECTIVE JUROR 86:  Correct.

5          THE COURT:  Okay.  Has that person gone on to a

6   law-abiding lifestyle?

7          PROSPECTIVE JUROR 86:  Actually, he's turned his life

8   around.

9          THE COURT:  Okay.  Does he attribute any of that to

10  his involvement in the criminal justice system?

11         PROSPECTIVE JUROR 86:  It may be.  And he understands

12  that he was with the wrong crowd.

13         THE COURT:  Okay.  You say then at one point you were

14  also involved in the criminal justice system.  Is that what we

15  were talking about earlier?

16         PROSPECTIVE JUROR 86:  Yes.

17         THE COURT:  Okay.  And so there was an allegation,

18  but the charges were never filed, or if they were -- they were

19  dropped; is that --

20         PROSPECTIVE JUROR 86:  That was a -- that was an

21  employment that I was at.  The owner had stated that I stole

22  his gun, and I didn't know what he was talking about.  We

23  later found out who did.

24         THE COURT:  Okay.  So he accused you, you didn't

25  have --

918

1          PROSPECTIVE JUROR 86:  The sheriff showed up to my

2    door at 12:00 midnight.

3          THE COURT:  Okay.  So then you understand the

4    importance of having evidence rather than just accusations; is

5    that true?

6          PROSPECTIVE JUROR 86:  Yes.

7          THE COURT:  Okay.  It sounds like you have a lot of

8    responsibility at work and you're concerned about what -- you

9    know, what they would do to cover you.  And then you also have

10   concerns about your mom.

11         As to your mom, I know you said you have doctors'

12   appointments that she has to attend.  Would you be able to

13   take her to those in the afternoons?

14         PROSPECTIVE JUROR 86:  No.  Because it takes me an

15   hour to get home, then an hour back.  And a lot of her doctors

16   have now changed their time to where it's only at

17   three o'clock is their last appointment.

18         And with the traffic the way it has been coming from

19   where I live now, it's gotten really hectic.

20         THE COURT:  Would you be able to, instead of your

21   husband going home at noon, maybe go a little bit later, pick

22   her up, you meet, you take her, then, from that point?

23         PROSPECTIVE JUROR 86:  It's kind of hard because of

24   the wear and tear and the gas, the way it's been lately.

25   It's --

919

1          THE COURT:  Your husband goes back and forth

2     regardless?

3          PROSPECTIVE JUROR 86:  Yes, my husband does.  But for

4     me, it's been a little bit harder, especially with my -- I

5     have autoimmune disorders to where the fatigue hits me at a

6     certain time and I have to take several naps.

7          THE COURT:  And your employer allows to you do that?

8          PROSPECTIVE JUROR 86:  Yes.  Like I said, I'm very

9     blessed to have my employer.

10          THE COURT:  When you're at work and you're hit with

11     fatigue, do you have a place where you can lie down and take a

12     nap?

13          PROSPECTIVE JUROR 86:  Yes.

14          THE COURT:  How often do you do that per week?

15          PROSPECTIVE JUROR 86:  About -- well, per day,

16     probably twice a day.

17          THE COURT:  Okay.  How long do your naps last?

18          PROSPECTIVE JUROR 86:  It all depends.  One day it

19     lasted for about half an hour to 45 minutes.

20          THE COURT:  This is as a result of your condition or

21     your medication?

22          PROSPECTIVE JUROR 86:  Actually, my condition.

23          THE COURT:  And this is something that your doctors

24     are aware of as well?

25          PROSPECTIVE JUROR 86:  Correct, and I've been getting

1   treated.

2           THE COURT:  Okay.  Anything else that I haven't asked

3   you about that you feel like is important for us to know?

4           PROSPECTIVE JUROR 86:  No.

5           THE COURT:  All right.  Thank you so much for sharing

6   this information.

7           PROSPECTIVE JUROR 86:  Thank you.

8        (Prospective Juror 86 exits the courtroom.)

9           THE COURT:  Let's go ahead and bring in Juror 99.

10       (Prospective Juror 99 enters the courtroom.)

11          THE COURT:  All right.  Yeah, that's fine, right

12   there.  Thank you.

13          You indicated there's some information you need to

14   share as to questions that I asked you yesterday?

15          PROSPECTIVE JUROR 99:  Uh, I've had a lot of trauma

16   and abuse across multiple generations.  And as a result, I am

17   terrified of people.  Not that everyone is going to hurt me,

18   but I don't know who will.  The only way I function is by

19   turning it all off.

20          THE COURT:  Do you receive any sort of treatment for

21   this condition?

22          PROSPECTIVE JUROR 99:  I have a job that I literally

23   hide in a dark room for 10 to 14 hours, and all I do is I look

24   at pictures and I talk into a microphone.  And if anyone comes

25   into the office, this dark room, they can't see me, and if

921

1    they do, all they see is the back of my head.

2         THE COURT:  How long do you feel like you've suffered

3    from this condition?

4         PROSPECTIVE JUROR 99:  Since the beginning.  My

5    earliest memories were my brother telling me how he was abused

6    that day and that he tried to get out of it and the results of

7    his experiments for that day.

8         THE COURT:  I'm sorry, ma'am.  I'm not -- I don't

9    want to try to force you to relive these memories or the

10   concern or the -- that it raises in you.  It sounds like --

11   that you have felt threatened by people since you were a small

12   child?

13        PROSPECTIVE JUROR 99:  Yes.

14        THE COURT:  All right.  Were you able to complete

15   school even still?

16        PROSPECTIVE JUROR 99:  Yes.

17        THE COURT:  And that includes, you know, all of

18   elementary, high school, college?

19        PROSPECTIVE JUROR 99:  Med school, residency, yes.

20        THE COURT:  Has this condition gotten worse over

21   time?

22        PROSPECTIVE JUROR 99:  No, because I am more and more

23   insulated over time.  I don't deal with it.  I turn it off.

24        THE COURT:  When you say "turn it off," you mean you

25   isolate yourself from others?

922

1          PROSPECTIVE JUROR 99:  Yes.

2          THE COURT:  How long have you been isolating yourself

3    from others?  Because I'm assuming in school you were not able

4    to do that.

5          MS. STOKMAN:  Judge, I'm sorry to interrupt.  I think

6    counsel and the government have come to a stipulation due to

7    the -- already the information that's been given and the

8    demeanor of the juror.

9          MS. LUEM:  That is correct.

10          THE COURT:  All right.  Juror 99, thank you so much

11    for being here.  We're going to go ahead and excuse you.

12    Thank you so much.

13       (Prospective Juror 99 exits the courtroom.)

14          THE COURT:  Can we go ahead and have Juror Number 102

15    come in?

16       (Prospective Juror 102 enters the courtroom.)

17          THE COURT:  All right.  Good morning.

18          PROSPECTIVE JUROR 102:  Good morning.

19          THE COURT:  We spoke the other day, but it sounds

20    like there's some additional information that you'd like to

21    share?

22          PROSPECTIVE JUROR 102:  Yeah.  In fact it's just my

23    husband, he's having his second knee replacement surgery.  And

24    I have a letter.

25          THE COURT:  Okay.  When is he having his knee

1    replacement?

2            PROSPECTIVE JUROR 102:  That will be February 26th, I

3    believe.  Let me double-check.

4            Yeah, February 26th.

5            THE COURT:  Do you have a sense of how long he'll be

6    in the hospital?  Is it -- do they do it and release him?

7            PROSPECTIVE JUROR 102:  Probably overnight, and then

8    the -- you know, probably for the first week he will need some

9    help.  I think one, one and a half weeks, perhaps.  Maybe one

10   week.

11           THE COURT:  How long has this surgery been scheduled?

12           PROSPECTIVE JUROR 102:  This is -- he had his first

13   knee replacement -- replacement last September, and then it

14   was already planned that he had to wait at least three months

15   to have his second.

16           THE COURT:  All right.  So -- so after he waited the

17   three months, when did they select February 26th as the date

18   for surgery?

19           PROSPECTIVE JUROR 102:  I want to say perhaps the end

20   of December.

21           THE COURT:  And in the letter you have there, is that

22   the letter that sets up that surgery on the 26th?

23           PROSPECTIVE JUROR 102:  Yes.

24           THE COURT:  And I assume it was your plan to be there

25   while he has the surgery and to care for him; is that right?

924

1          PROSPECTIVE JUROR 102:  Yes.  I just didn't write it

2  down, because I had no idea the case was going to take this

3  long.

4          THE COURT:  Okay.  And I hate to say this, because I

5  don't really feel it, but is there anyone else who would

6  ordinarily help you with this kind of care four your husband?

7          PROSPECTIVE JUROR 102:  Well, my oldest daughter

8  helped last time, but she went back to college.

9          THE COURT:  So she's away, or is she here locally in

10  college?

11          PROSPECTIVE JUROR 102:  She's -- yeah, she's away.

12  She's in California, but it's about three, four hours out from

13  Fresno.

14          THE COURT:  And she probably helped you with helping

15  him to get his food, and that kind of thing, right?

16          PROSPECTIVE JUROR 102:  Yeah, or if I have to, you

17  know, leave and run errands, at least I will leave -- I have

18  another daughter, but she's in high school --

19          THE COURT:  When he --

20          PROSPECTIVE JUROR 102:  -- right now.

21          THE COURT:  -- had his surgery last time, were you

22  off work the entire time?

23          PROSPECTIVE JUROR 102:  I was off of work for the

24  first week.

25          THE COURT:  And in that situation, he needed your

925

1    care for about a week?

2          PROSPECTIVE JUROR 102:  Yes.  He was pretty much not

3    able to walk with a walker, maybe by the third day.

4          THE COURT:  Even with the walker, though, did he need

5    assistance, like, sitting down on the toilet and that kind of

6    stuff?

7          PROSPECTIVE JUROR 102:  Yes.  And then, you know,

8    with the medications, that will make him really high

9    basically.

10          THE COURT:  Little dizzy and --

11          PROSPECTIVE JUROR 102:  Yeah, dizzy, and not able to,

12    you know, care for himself, at least at meals and --

13          THE COURT:  And does he have to have things like ice

14    packs on his legs?

15          PROSPECTIVE JUROR 102:  Yes.

16          THE COURT:  And that's not something he can get for

17    himself if he's by himself?

18          PROSPECTIVE JUROR 102:  At least not for the first,

19    you know, few days, say three, four days.  And then by now, he

20    has more practice since he just did the first one.  So --

21          THE COURT:  Assuming it goes the same way, he --

22          PROSPECTIVE JUROR 102:  Yes.

23          THE COURT:  -- he knows what to expect?

24          PROSPECTIVE JUROR 102:  Uh-huh.

25          THE COURT:  But as you are standing here today, is

926

1    there anyone else that you can think of who could take your

2    place in this obligation to help your husband?

3         PROSPECTIVE JUROR 102:  Pretty much we both were not

4    born here, but -- so our families are not in the

5    United States, and --

6         THE COURT:  Okay.

7         PROSPECTIVE JUROR 102:  -- just our two daughters and

8    now they're adults -- well, the oldest.

9         THE COURT:  Okay.

10         PROSPECTIVE JUROR 102:  That's why -- and, actually,

11    he has a brother, but they work together and my husband has

12    his own business, so pretty much he's going to be taking over

13    at least for the -- those two weeks.  And --

14         THE COURT:  Okay.  All right.  Anything else about

15    that situation that you feel like we need to know about?

16         PROSPECTIVE JUROR 102:  No.

17         THE COURT:  Okay.  Thank you so much.  If you'll step

18    outside, we'll get back to you.

19         PROSPECTIVE JUROR 102:  Sure.  Would you like the --

20         THE COURT:  No.  Thank you.

21         PROSPECTIVE JUROR 102:  Thank you.

22         THE COURT:  Counsel, comments as to Juror Number 102?

23      (Prospective Juror 102 exits the courtroom.)

24         THE COURT:  I mean, I'll just say it seems unfair for

25    me to require her to be away from her husband while he has

1    that type of surgery.  Seems like everyone is shaking their

2    head.

3              Mr. Reed, do you agree?

4              MR. REED:  I agree.

5              THE COURT:  Ms. Stokman?

6              MS. STOKMAN:  Yeah.  And I was just looking at the

7    calendar.  It's right in the middle, it's not on a weekend or

8    any days that would not be in trial, so the government agrees.

9              THE COURT:  All right.  So I'll dismiss Number 102.

10             I'm going to call in 106 in a moment, who also asked

11   to talk.

12             But as to Juror 86, I mean, I can look at her and

13   looks like she's in pain to me.  Although, I don't understand.

14   She's able to go to work.  The thing that most troubled me was

15   she's able, at work, to stop and take naps, and I guess she

16   could put her head down during a break, but that's not when

17   she needs it, that's when we would take a break.  So that's a

18   concern for me.

19             MS. STOKMAN:  The government's concern is that as

20   well.  But also, since we were actually right behind her, her

21   hand does seem to be going numb, she's shaking it lot and

22   moving it.  And at the very minimum, she's going to need to be

23   able to take notes, and so that plus the pain, the government

24   believes she has a health hardship.

25             THE COURT:  And the defense?

928

1          MS. LUEM:  We agree.

2          MS. FISHER-BYRIALSEN:  We agree.

3          MR. REED:  We agree.

4          THE COURT:  All right.  So we'll let Number 86 go as

5    well.  I should have said this at the beginning.  We're -- you

6    know, we talked about it the other day, we're running out of

7    jurors.  And I hate to have to get to the point we're at a

8    mistrial and start over, but that's our situation.

9          MS. FISHER-BYRIALSEN:  Well, speaking of that,

10   Your Honor, Ms. Snyderson (phonetic) just reminded me, I think

11   106 also asked to come in.

12         THE COURT:  Yeah.  I said I'm going to bring her --

13   106 in at this point.

14         All right.  So let's go ahead and do that.

15         Oh, and, Irma, you can go ahead and let go 102 and

16   86.

17         THE CLERK:  Okay.

18      (Prospective Juror 106 enters the courtroom.)

19         THE COURT:  All right.  Good morning, sir.  We have

20   Juror 106 here.

21         PROSPECTIVE JUROR 106:  Good morning.

22         THE COURT:  Sir, you indicated that you had something

23   you'd like to discuss.

24         PROSPECTIVE JUROR 106:  Just because the nature of my

25   job and my security clearance, if, at possible, I can limit

1   the amount of people I talk about -- about my job.

2          THE COURT:  Sorry to tell you, this is the bare

3   minimum.

4          PROSPECTIVE JUROR 106:  Yup.  So that's why I wanted

5   to speak in private.

6          THE COURT:  This is as private as it gets.

7          PROSPECTIVE JUROR 106:  Yup.

8          THE COURT:  So you work at Edwards Air Force Base as

9   an analyst.

10          PROSPECTIVE JUROR 106:  Uh-huh.

11          THE COURT:  I guess, I don't need to know anything

12   top secret, but how do you think that that impacts what we're

13   doing here?

14          PROSPECTIVE JUROR 106:  So I don't believe that it

15   impacts what we're doing here, but I believe that my prior

16   job -- I worked in Afghanistan as a site manager from 2015 to

17   2021.  So anything that -- that deals with any sort of group

18   violent in nature would make me impartial.

19          You know, and that's just -- the fact of it is you

20   don't call the Taliban a gang, but it's a violent group.  And

21   as we've sat here last week, I acknowledge everything that

22   we've said, that the government has the burden of proof, that

23   the defendants are innocent until proven guilty by law.

24          It's just really hard for me to shake my initial

25   reaction to the questionnaire where I looked at it, said,

930

1   Well, if they're guilty and we say they're guilty, it's a

2   win-win.  If we say they're guilty and they're not guilty of

3   the evidence and somehow we convict them of that, potentially

4   violent people are in prison or still punished.

5           But if we say that they're not guilty and, you know,

6   there's a little bit of truth in what happened, we potentially

7   put bad people out in the public.

8           Obviously, I know that that's not how you're supposed

9   to look at it, that as a juror it's your responsibility to,

10  you know, judge only the facts and assume that they're

11  innocent.  It's just the devil on my shoulder will be saying

12  that the entire time, and I would rather disclose that now

13  than have it come up in question if I were selected.

14          THE COURT:  Let me start at the beginning of this.

15  So while you were working in Afghanistan, you obviously had

16  contact with people who are generally identified as enemies of

17  this country; is that right?

18          PROSPECTIVE JUROR 106:  Correct.

19          THE COURT:  And although the Taliban, in particular,

20  have a specific ideology that is wholly different from what we

21  see and traditionally think of, I think, as criminal gangs in

22  this country, you're saying that your experience with the

23  Taliban -- well, actually, I'm not sure.

24          Tell me, do you feel like that's going to make it so

25  that you could not be fair and impartial to these people who

1   have no connection to Afghanistan or the Taliban or anything
2   like that?

3        PROSPECTIVE JUROR 106:  Correct.  At the end of the
4   day, to me, I don't care about their ideologies.  You know,
5   are they more likely to kill me or buy me a drink?  And the
6   answer is, they're more likely to kill me.

7        Whether it's the AB for white supremacy, whatever --
8   and I understand that from the media or whatever documentaries
9   I've seen that a lot of it is on the prison side.  But again,
10  whether they share beliefs or not, the common denominator is
11  I'm not part of their group, so I would be an enemy.

12       THE COURT:  Where do you get this information?  And I
13  appreciate you have expertise as to Taliban, but you seem to
14  be suggesting that --

15       PROSPECTIVE JUROR 106:  So --

16       THE COURT:  Let me finish, please.

17       PROSPECTIVE JUROR 106:  Sorry.

18       THE COURT:  You seem to be suggesting that if you're
19  a member of a group, any sort of an organized group, whether,
20  let's face it, it's the Catholic Church, it's the Taliban,
21  it's a criminal street gang, if you're not in that group, then
22  you're a threat to that group; is that what you're saying?

23       PROSPECTIVE JUROR 106:  Yes.  And really, it's due
24  to -- so my uncle was the antiterrorism officer for the
25  Air National Guard at one point.  So he was extremely paranoid

Case 1:20-cr-00238-JLT-SKO   Document 1732   Filed 01/23/25   Page 92 of 300

932

1   about gangs and whatnot.  And he would always, basically,
2   said, Watch out for yourself.  You're Asian, and there are KKK
3   members out here, blah, blah, blah.  Don't be out in the
4   public.
5        I understand that this is not the KKK, it's the AB.
6   Different ideologies, I guess.  And again, we assume that, you
7   know, they probably -- the defendants are probably not even
8   proven to be affiliated with AB; however, it's just one of
9   those things where the paranoia of if it's a potential
10   possibility, then, yeah, they are guilty.
11        THE COURT:  I guess I'm trying to unpack that a
12   little bit.
13        So your uncle said, Don't be out in public.  But you
14   are out in public.  You work, you go to the grocery store, you
15   go out to dinner, you do things with your family, you go to
16   the movies.  You do all those things, don't you?
17        I'm trying to figure out what you mean by "don't be
18   out in the public."
19        PROSPECTIVE JUROR 106:  So where I lived at the time,
20   because I was stationed at March, you know, there was a lot
21   of, If you're in uniform, you know, take it off when you're
22   off base.  All right.  Cool.  If you don't have to be out and
23   about, don't be.
24        And, you know, I chalk it up to him being paranoid,
25   because that was his job.  He's plugged into the local

933

1    information of who's where, don't go here, don't go there.

2          THE COURT:  When he was with the Air National Guard,

3    where was he assigned?

4          PROSPECTIVE JUROR 106:  At March, so in the

5    Inland Empire.  So it wasn't just, you know, the KKK members,

6    but I guess they were down the street from where I was living,

7    one of their meeting points.  So he was always on me about

8    that.

9          But there was other, you know, gang members that --

10   or gangs that he would tell me, like, Stay away from this

11   area.  Stay way from that area.

12         THE COURT:  Okay.  And --

13         PROSPECTIVE JUROR 106:  I never looked into the

14   gangs -- sorry.  Go ahead.

15         THE COURT:  I was just going to say, so he told you

16   these things.  Did that control how you did things?  Did

17   you --

18         PROSPECTIVE JUROR 106:  Yeah.  I rarely ever went out

19   to eat.  If I wanted to drink with my friends, we were

20   drinking at the house.

21         I am pretty much a homebody.  If I don't have to be

22   out, I'm not.

23         THE COURT:  Okay.  But there are things that do

24   require you to go out, right?

25         PROSPECTIVE JUROR 106:  Yes.

934

1          THE COURT:  I'm trying to figure out the impacts of

2     what your uncle said to you -- because him being in the

3     Inland Empire, you being hours away from that, and now even

4     further hours away from that, I'm trying to translate how that

5     advice that he gave you at some point in the past impacts your

6     jury service.  That's -- that's what I'm trying to figure out.

7          PROSPECTIVE JUROR 106:  So the way I see it is that

8     that information just strengthens a bias that I'm going to

9     have a difficult time fighting.  And that bias is built off

10    of, you know, being an Asian American going through

11    post-Coronavirus, having family members threatened during the

12    pandemic, and plus my time in Afghanistan dealing with the

13    Taliban and whatnot.

14         I understand, you know, this case is not related to

15    the Taliban, but to me, all -- I'm generalizing it in my head

16    as there's a potential group of individuals that are violent,

17    and it has to deal with nationality.

18         THE COURT:  At this point, though, you haven't heard

19    any evidence, and so you don't know whether these people are

20    associated with the group.  That's the allegation.

21         PROSPECTIVE JUROR 106:  Yeah.

22         THE COURT:  And you say, No.  Are you willing to wait

23    and hear the evidence to consider whether that's even the

24    situation?

25         PROSPECTIVE JUROR 106:  I'm willing to.  Again -- and

935

1    I know that everybody is going to have difficulties with it

2    and that it's my responsibility as an American citizen to do

3    this.  I'm just simply saying that I know.  It's going to be

4    difficult for me.

5            And, you know, I'm already upset that I have to drive

6    three hours every day back and forth, and I'm going through

7    already a financial hardship.

8            So, you know, I can say that, yes, I will come here

9    and be diligent, listen.  But that devil on my shoulder is

10   going to be saying, like, You might as well just say guilty.

11   Because at least if they are guilty and the evidence doesn't

12   show it, they will be in prison, and that's less people out in

13   the public.

14           THE COURT:  All right.  So you're saying you have

15   this bias.  You're saying it's going to be difficult.  It

16   sounds like what you are saying, though, is you recognize the

17   bias.

18           Can you set it aside?  Can you be diligent?  Like you

19   said, can you listen, and can you be aware of this devil on

20   your shoulder and go, Wait a minute.  I'm not going to be that

21   person who sends someone to -- you know, convicts a person for

22   something they didn't do, or are you going to go, Yeah, I'm

23   just going to go with the flow?

24           PROSPECTIVE JUROR 106:  I can say that --

25           THE COURT:  I don't want you to say it.  I want to

936

1   know what the truth is.

2            PROSPECTIVE JUROR 106:  The truth is that I'm not

3   sure.  I want to say yes.  I've served my country.  I

4   understand the importance of jury duty.

5            I've talked it out with my boss, and, you know, they

6   are willing to pay me the entire time.  So to me, that's an

7   extra $300 a day that I get to do something worthwhile.

8            But I feel like if I don't say this now, then during

9   the entire process I'll still be conflicted.

10           THE COURT:  Yeah, I don't want that.  And I

11   appreciate your honesty.  I'm just -- you mentioned a couple

12   of things.  One is traveling three hours.

13           Is there a reason why you have to go home every

14   night, or do you just want to?

15           PROSPECTIVE JUROR 106:  Pets.  Plus financially, if I

16   stay out here, that's $215 a day versus $250 for mileage.

17   Plus I would have to pay for food while I'm out here.

18           THE COURT:  Well, you get a stipend from the Court.

19   You know that, right?

20           PROSPECTIVE JUROR 106:  The extra 50.

21           THE COURT:  You get your hotel covered.

22           PROSPECTIVE JUROR 106:  And I also don't have the

23   spending power to get a hotel now and still pay my bills.

24           THE COURT:  Okay.  And there's no one who could cover

25   caring for your pets?

937

1          PROSPECTIVE JUROR 106:  That's covered.  But I'd
2   still want to be there to help out because there's a lot of
3   them.
4          THE COURT:  Is there someone at your home now every
5   night?
6          PROSPECTIVE JUROR 106:  Yes.  So I live with my
7   mother.  We have six cats, two dogs.  If you can tell by the
8   scars on my arm, they are kind of a handful.  So --
9          THE COURT:  Are those your pets or her pets or both
10  of your pets?
11         PROSPECTIVE JUROR 106:  Both.
12         THE COURT:  Let me go back to this concern you had
13  because -- I mean, I appreciate your honesty.  That's all I'm
14  asking for.  I don't want you to just say something you think
15  I want you to hear -- what I want to hear.  I want you to tell
16  me the truth.
17         And you're saying you've got this concern based upon
18  your uncle's experience, based upon your experience in
19  Afghanistan, based upon your experience in -- during COVID and
20  your relatives being targeted that -- and based upon all of
21  that, you're saying, It's going to cause me every day to come
22  in here and have to fight against those biases.  It's going to
23  be hard for me.
24         But the answer I need to know is, are you going to do
25  that hard work, or are you going to say, You know what, I

938

1  don't know, I might just go, Forget it, I'm not even going to

2  listen?

3            PROSPECTIVE JUROR 106:  I'm going to do the hard work

4  to fight against it.  I'm not going to promise I'm going to

5  win, because those are built-in biases over years and years of

6  time.

7            And again, like, you know, in all fairness, I

8  understand that a lot of people put in work into this case

9  already, the counsel and whatnot.  I just don't want to be

10  that person who has these issues, knows about it, and doesn't

11  say something.

12            THE COURT:  Yeah.  I appreciate that, definitely.

13            I've kind of described the issue of being fair and

14  impartial by playing by the rules.  Playing by the rules means

15  I'm going to tell you the law.  You have to decide what the

16  facts are and apply the law to those facts.

17            And it's going to be hard.  It's hard work.  But what

18  I don't want is to put someone on the jury who goes, I'm just

19  not going to do the rules.

20            Because the purpose of the rules is to help you

21  overcome, you know, whatever comes in with you.  And you use

22  your common sense, but what you don't do is go, You know, we

23  had it hard during COVID, and because of that, I'm going to

24  not do the hard work, and I'm willing to convict someone for

25  something they didn't do because of something that happened to

1    a family member during COVID.

2            And I am not making light of that at all.  I'm just

3    trying to find out, is that going to happen, or are you going

4    to go, wait, a minute, no.  If these people are guilty because

5    the evidence convinces me of that fact and my conscience says

6    that's how I should vote, that's what I'm going to do.

7            If the evidence says they're not guilty, my

8    conscience is -- requires me to find that they're not guilty

9    and the law requires me.  I guess I just need to know, are you

10   going to follow those rules?  And if you're saying, I just

11   can't say, I don't know if I'm going to follow the rules; I

12   need to know that.

13           PROSPECTIVE JUROR 106:  Yeah, I'm saying I don't

14   know.  And I really do want to -- I'm not saying anything to

15   try to get out of this, but the fact is that I can tell you

16   what you want to hear.

17           THE COURT:  No, don't do that.

18           PROSPECTIVE JUROR 106:  But I know for a fact that

19   it's going to be an issue every day.  And if we're talking

20   10 to 12 weeks, impacted of driving every single day up and

21   down and hearing all this and still having to fight that, I --

22   I would be surprised if I was that noble to not let my biases

23   affect me.

24           THE COURT:  Okay.  You said that you live with your

25   mom.  Do you support her financially?

940

1          PROSPECTIVE JUROR 106:  Yes.

2          THE COURT:  Does she work?

3          PROSPECTIVE JUROR 106:  Yes.  She is a cashier for

4   the cafeteria on base.

5          THE COURT:  And so both of you work to contribute to

6   the cost of your household?

7          PROSPECTIVE JUROR 106:  Correct.  And my management

8   has already been understanding of my financial situation so

9   they've allowed me to work from home as much as I can, which

10  is usually about an hour.  That allows me to match up my

11  schedule with hers.

12         So my day starts at 1:00 in the morning.  We get back

13  to -- we get home around one o'clock in the afternoon.  So

14  they're willing to even work with me on this and pay me for

15  the entire time, which I appreciate, so I'm not too concerned

16  about the job issues there.

17         But as far as the financial hardship, I mean, paying

18  for gas every day is already rough.  And the reason why they

19  let me match with her was so I could carpool.

20         THE COURT:  Okay.  Ms. Stockman, do you have any

21  questions for Juror 106?

22         MS. STOKMAN:  No.  No.  Sorry.

23         THE COURT:  Ms. Byrialsen, do you have any comments

24  for -- I mean questions for Juror 106?

25         MS. FISHER-BYRIALSEN:  One moment, Your Honor.

941

1          Good morning, sir, still.  In your questionnaire you
2    wrote that you hate racists and they should be thrown in jail.
3          PROSPECTIVE JUROR 106:  Frustrations of somebody who
4    just drove three -- or three hours and was handed 14 pages of
5    paper without any context, right.  The general consensus,
6    yeah.  I'm -- when it comes to racism and groups of that
7    nature, regardless of, like I said, Taliban or AB, that's my
8    opinion.
9          MS. FISHER-BYRIALSEN:  So your opinion is that the AB
10   is a racist gang?
11         PROSPECTIVE JUROR 106:  They're not inviting me for
12   Thanksgiving dinner, I can be sure of that, but yes.
13         MS. FISHER-BYRIALSEN:  Okay.  And it sounds like
14   although you've sort of say those feelings come from
15   frustrations of having to drive here, those are extremely
16   strong feelings for you?
17         PROSPECTIVE JUROR 106:  Yes.  Yeah, I'm -- those are
18   built over just years of dealing with the subtle racism, books
19   that I've read in high school, stuff I've seen in the media.
20         I understand that's all entertainment and I can
21   separate that, but with all of these stories, there is a
22   little bit of truth and a little bit of that truth I have
23   lived.  And then I've dealt with being, you know, targeted for
24   six years of people who want to kill me.
25         MS. FISHER-BYRIALSEN:  Well, standing here today in

942

1   front of these men that are accused of being part of the

2   Aryan Brotherhood, do you feel that you could give them a fair

3   shake, that you could be fair and impartial towards them?

4   Because it sounds like you're having a lot of trouble with

5   that.

6           PROSPECTIVE JUROR 106:  I want to --

7           MS. FISHER-BYRIALSEN:  But that's not enough.  It's

8   not enough to want to.  You have to be able to assure us that

9   you can do that.

10          PROSPECTIVE JUROR 106:  And I can't.

11          MS. FISHER-BYRIALSEN:  You cannot?

12          PROSPECTIVE JUROR 106:  I cannot.

13          MS. FISHER-BYRIALSEN:  Okay.

14          PROSPECTIVE JUROR 106:  I'm sorry to be honest about

15  it.  I want to -- as an American citizen, this is my job, this

16  is -- if I were in that situation, I would want somebody to

17  give me a fair shot.  But I understand that people have their

18  biases.

19          I've lived through it and life isn't fair.  And it

20  wouldn't be fair for me to lie to everyone and say that I

21  would do it.  And I can assure everybody that whatever I

22  deliberate with the jurors, the other jurors at the end of the

23  trial, it will not be affected by bias, I really can't say

24  that.

25          MS. FISHER-BYRIALSEN:  You cannot say that?

943

1          PROSPECTIVE JUROR 106:  Correct.

2          MS. FISHER-BYRIALSEN:  Okay.  Thank you.

3          Nothing further, Your Honor.

4          THE COURT:  Ms. Luem, any questions?

5          MS. LUEM:  I don't have any followup to that.  Thank

6     you.

7          THE COURT:  Mr. Reed?

8          MR. REED:  Uh, just one or two.

9          So your problem with the AB is because obviously you

10    feel that they prejudge you, much like the Taliban did when

11    they saw you in your uniform, right?

12          PROSPECTIVE JUROR 106:  Yes.

13          MR. REED:  Without ever knowing you, not knowing

14    anything about you?

15          PROSPECTIVE JUROR 106:  And it -- not just me in

16    particular, but my issue is with any sort of group that --

17          MR. REED:  I get that part.  I get that part.

18          And prejudging is a bad thing, you would agree with,

19    right?

20          PROSPECTIVE JUROR 106:  I agree.

21          MR. REED:  Kind of like what you're doing today.

22          PROSPECTIVE JUROR 106:  Yes.

23          MR. REED:  Also a bad thing, right?

24          PROSPECTIVE JUROR 106:  Yup.

25          MR. REED:  So what's in your heart is in your heart,

944

1    that's all fine.  If you were back there with 11 other jurors
2    and you voted -- forget which way.  Just say they wanted to
3    know why you did what you did or why do you feel what you
4    feel, would this poison that's coming out of your mouth right
5    now, would that be part of what you would explain to the other
6    jurors?
7                PROSPECTIVE JUROR 106:  I don't think so.  I think
8    that during the trial I will be trying to frame anything that
9    the prosecution puts out as evidence and anything from their
10   witnesses as, yup, that fits, whatever the charges are, I'm
11   going to try my best to fit it that way.  Not deliberately,
12   but just knowing unconsciously, like, that's where I'll be
13   leaning.
14               MR. REED:  So you're saying you wouldn't follow the
15   law?  Because the Court doesn't tell you to do that, by the
16   way.  It doesn't tell you to follow what the prosecution says
17   and then vote accordingly.
18               PROSPECTIVE JUROR 160:  Uh-huh.
19               MR. REED:  In fact, the jury instructions are quite
20   the opposite.  So if the law -- if the Court's instructions
21   were not to do what you just said --
22               PROSPECTIVE JUROR 106:  Uh-huh.
23               MR. REED:  -- you would still do that because that's
24   how you feel?
25               PROSPECTIVE JUROR 106:  Probably.

945

1           MR. REED:  I have no further questions, Your Honor.

2           THE COURT:  All right.  Thank you, Juror Number 6

3    [sic].  If you'll go back outside, we'll get back to you.

4           PROSPECTIVE JUROR 106:  Thank you for your time.

5       (Prospective Juror 106 exits the courtroom.)

6           THE COURT:  All right.  There was a lot there, but

7    ultimately, he just won't commit to being fair.  And I don't

8    know what else to do about it.  I mean, my sense is a lot of

9    that is -- I'm going to try to be delicate -- BS, but I'm not

10   going to risk it.

11          So I think unless anyone has any strong feelings, I

12   think he should be excused.

13          MS. STOKMAN:  Government agrees.

14          MS. FISHER-BYRIALSEN:  We agree, Your Honor.

15          MR. REED:  I agree.

16          THE COURT:  All right.  So we're going to excuse 106.

17   And let's go ahead and bring in -- do we need a break first?

18   No?  Okay.

19          MS. FISHER-BYRIALSEN:  We're bringing in all the

20   jurors.

21          THE COURT:  Yes, that's what I was going to do.

22          Mr. Clement, do you need a break real quick?

23          MS. FISHER-BYRIALSEN:  Hold on one second.

24          We'll take a short break.  Is that okay?

25          THE COURT:  Yeah.  We can take ten minutes.

946

1        (Recess held.)

2            THE COURT:  All right.  We're back on the record.

3    And bring our other jurors back in.

4        (Prospective Jurors enter the courtroom.)

5            THE COURT:  All right.  We have the jury members

6    back.  If we can go ahead and fill our holes, please.

7            THE CLERK:  Juror Number 107, you'll come up to A2,

8    second row in the middle.

9            108, you'll take Seat A8.

10           Juror 109, you'll take Seat A9.

11           Juror 112, you'll take Seat A12.

12           THE COURT:  All right.  Thank you for joining us.

13           Those of you who are just called up, was there any

14   additional information or any information that you needed to

15   share in response to the questions I've asked last week?  If

16   so, please raise your hand.

17           Yes, sir.  All right.  Let's -- can we get the

18   microphone down to Juror 112.

19           PROSPECTIVE JUROR 112:  Can we speak in private?

20           THE COURT:  All right.  We'll do that on the break.

21           All right.  Yes, sir.  If we could pass that

22   microphone down.  And let's see, you are Juror 108?

23           PROSPECTIVE JUROR 109:  109.

24           THE COURT:  109, oh, sorry.  Okay.

25           PROSPECTIVE JUROR 109:  Yeah, just through work, we

947

1   do get referrals.  I'm the executive director for an

2   outpatient drug and alcohol treatment program.  We do get

3   referrals through probation, parole, drug court, DUI court.

4   Our focus is primarily on the clients.

5          So I feel like I have a balanced opinion of all of

6   that, but -- and I have done contracted services in juvenile

7   hall and the Fresno County boot camp over the years.

8          THE COURT:  Your clients are those who have been

9   involved in the criminal justice system, but you also work

10  with people who are -- on the other side of that, who are

11  actually law enforcement officers; is that true?

12         PROSPECTIVE JUROR 109:  Correct.

13         THE COURT:  In that experience, I am sure you've seen

14  people on both sides of that equation who have been acting

15  badly; is that true?

16         PROSPECTIVE JUROR 109:  Yes.

17         THE COURT:  Does that mean that when you hear

18  testimony, that you'd be able to evaluate the witnesses in the

19  same way no matter what their history is, no matter what their

20  jobs are, fair and impartially?

21         PROSPECTIVE JUROR 109:  I believe so.

22         THE COURT:  All right.  Was there anything else, sir,

23  that -- well, let me just ask you.  Let's see.

24         How long have you had that position?

25         PROSPECTIVE JUROR 109:  I've been the executive

948

1   director since 2014 and I've worked in the field since, I

2   guess, 2000 or thereabouts.

3           THE COURT:  Does that mean that you worked for the

4   same group since 2000?

5           PROSPECTIVE JUROR 109:  I've worked with this agency

6   twice.  I was there from -- actually, I was there from '95

7   until 2003, and then came back in 2013.  And I had different

8   duties off and on.

9           THE COURT:  Is it fair to say, though, throughout

10  this time period or two time periods, in general, though,

11  you're providing services to the same population?

12          PROSPECTIVE JUROR 109:  Yes.

13          THE COURT:  Is this your -- what was your background

14  to get you into this work?

15          PROSPECTIVE JUROR 109:  Uh, I just kind of wandered

16  into the field.  I started on the prevention side, which was

17  more school-based and community-based looking at events and

18  things like that, sober and drug-free activities, which was

19  kind of along the lines of more of what I was interesting in

20  doing.

21          Then I wandered over to the treatment side towards

22  the end and then became the executive director.  Well, I was

23  the program director and then the executive director.

24          THE COURT:  Did you do similar work during the period

25  between 2003 and 2013.

949

1    PROSPECTIVE JUROR 109:  I was doing more direct
2    services then.
3    THE COURT:  Okay.  I need to know what that means.
4    PROSPECTIVE JUROR 109:  Well, I was in -- it was -- I
5    contracted doing drug education in juvenile hall.  I was a
6    contracted provider out at the boot camp, working specifically
7    with the youth, doing some education and things like that.
8    THE COURT:  Some of that population that you've
9    worked with at any time in your career were some of those
10   people suspected gang members or admitted gang members?
11   PROSPECTIVE JUROR 109:  Yes.
12   THE COURT:  Did that give you more in-depth
13   information about gangs?
14   PROSPECTIVE JUROR 109:  Off and on, yeah, but we
15   weren't doing direct gang services.  We just had to consider
16   that as a factor for them receiving services.  So we might
17   take people that were from alter -- or from competing gangs
18   and put one in one group, another one in a different group.
19   So we may have a conversation about that, we weren't, like,
20   specifically talking about gangs, we were just talking about
21   keeping the environment safe.
22   THE COURT:  Did you -- do you get to know those
23   clients?
24   PROSPECTIVE JUROR 109:  Yes.
25   THE COURT:  And so I think probably some of the

950

1    people, even who are part of gangs, you probably get to know

2    and care about and are concerned about what they do going

3    forward; is that true?

4         PROSPECTIVE JUROR 109:  Yes.  On both sides.  I mean,

5    we deal -- we do staffings, we have individuals that come by

6    the agency to work with the clients and things like that.  So

7    I work with probation officers and things like that for

8    progress reports and follow-ups on clients and things like

9    that, so I see both sides.

10         THE COURT:  Sounds like you don't make judgments,

11   you're just there to help them with their substance abuse

12   issue; is that true?

13         PROSPECTIVE JUROR 109:  Yeah.  I've seen -- I've seen

14   bad behavior on both sides.

15         THE COURT:  Okay.  Given that experience that you

16   have, do you think that would influence your ability to be

17   fair or impartial in this case?

18         PROSPECTIVE JUROR 109:  I don't think it would impact

19   me.

20         THE COURT:  Okay.  You say you have a mostly positive

21   attitude about law enforcement.  Is that based upon what we've

22   talked about already?

23         PROSPECTIVE JUROR 109:  Yes.

24         THE COURT:  You say you have some general knowledge

25   about prison gangs and the Aryan Brotherhood also.  Is that

951

1    from contact with clients or was that from just, you know, you

2    watch TV or something else?

3            PROSPECTIVE JUROR 109:  Not so much from TV, although

4    it might be a little bit of that, but mostly just through my

5    work.  And, you know, sometimes you'll -- you'll have a

6    conversation, you don't know much about it and so I'll Google

7    it and look at, just kind of see, mostly for -- for my duties.

8            THE COURT:  Okay.  Do you remember having specific

9    information about the Aryan Brotherhood in particular?

10           PROSPECTIVE JUROR 109:  No.

11           THE COURT:  Okay.  But you do have maybe some more

12   particularized information about prison gangs or gangs outside

13   of prison?

14           PROSPECTIVE JUROR 109:  Some.

15           THE COURT:  And that's just only as it relates to the

16   population you're treating?

17           PROSPECTIVE JUROR 109:  Right.  There was a time -- I

18   think I only went down three times.  There was a group -- I

19   think it was organized by Fresno PD that was trying to do

20   outreach to current gang members.  They would invite them to

21   come, give a presentation, and then afterwards meet with the

22   providers and see if we can give them a packet of resources to

23   try to get them pointed in the right direction.  I only did

24   that three times, I think.

25           THE COURT:  And how long ago was that?

952

1        PROSPECTIVE JUROR 109:  It's probably been about
2   five, six years.
3        THE COURT:  I know you said that being in your
4   position makes it very difficult for you and that you have
5   experience in long trials before.  And I know your work is
6   important, especially just what you've told me, but would you
7   be able to accommodate this trial, given that you would be
8   finish by 1:30 in the afternoon?
9        PROSPECTIVE JUROR 109:  Yes.
10        THE COURT:  All right.  Is there anything about your
11   experience or anything at all that I haven't asked you about
12   that you think is important that the parties know?
13        PROSPECTIVE JUROR 109:  Not that I can think of.
14        THE COURT:  All right.  Thank you, sir.
15        Let's see, can you pass the microphone back to
16   Seat A12?  Juror 107, let's start there.
17        All right.  Good -- yeah, still morning.
18        PROSPECTIVE JUROR 107:  Good morning.
19        THE COURT:  Can you tell me a little bit -- oh, you
20   say you're a local truck driver?
21        PROSPECTIVE JUROR 107:  Yeah.
22        THE COURT:  Is it for a particular customer or do you
23   just do local truck driving for a lot of different people?
24        PROSPECTIVE JUROR 107:  We have a lot of different,
25   like, customers, mainly like ag stuff.

953

1          THE COURT:  Mainly ag customers?

2          PROSPECTIVE JUROR 107:  Yeah.

3          THE COURT:  You said you have sort of a neutral

4    attitude about law enforcement, there's good and bad law

5    enforcement.  And that you have had experience with law

6    enforcement officers acting badly; is that your experience?

7          PROSPECTIVE JUROR 107:  Yeah.

8          THE COURT:  And is it that -- it looks like you were

9    stopped for a ticket and you felt like you were not treated --

10   or that the law enforcement maybe was a little unprofessional;

11   is that right?

12         PROSPECTIVE JUROR 107:  That is correct.

13         THE COURT:  The fact that you've had this

14   experience -- I mean, even with that experience, it does sound

15   like you're still, like, sort of neutral, you appreciate

16   there's good and bad in all professions; is that true?

17         PROSPECTIVE JUROR 107:  Yeah.  Like I say, I'm

18   neutral.

19         THE COURT:  Okay.  And you would be able to evaluate

20   all of the witnesses, no matter what their jobs, are fairly

21   and impartially?

22         PROSPECTIVE JUROR 107:  Yes.

23         THE COURT:  You've had some experience in the past

24   where someone vandalized your car.  It looks like nobody was

25   caught for that, right?

954

1          PROSPECTIVE JUROR 107:  No.  It was completely
2    random, I think.
3          THE COURT:  And so did you have contact with law
4    enforcement at that time?
5          PROSPECTIVE JUROR 107:  Not directly, it was like
6    a -- I think I submitted -- submitted it online.
7          THE COURT:  That form online?
8          PROSPECTIVE JUROR 107:  Yeah.
9          THE COURT:  Okay.  Then you had the experience around
10   2018, I don't know if there's more that we need to talk about
11   that, or is that just part of your entire comments that you've
12   made so far that you could be fair and impartial to both
13   sides?
14         PROSPECTIVE JUROR 107:  That's something that
15   happened that I think I could look beyond, you know, just like
16   have a neutral attitude still.  So --
17         THE COURT:  Okay.  Looks like you feel like you have
18   a little bit of information about the Aryan Brotherhood.  Can
19   you tell me what source of this information is?
20         PROSPECTIVE JUROR 107:  Social media, news media,
21   stuff of that nature.
22         THE COURT:  Is this an interest of yours, or if it
23   just comes up, you happen to see it?
24         PROSPECTIVE JUROR 107:  No.  It's just random, you
25   know.

955

1          THE COURT:  And as you know, there's an allegation in

2     this case that Mr. Clement, Mr. Johnson, Mr. Stinson are

3     associated with this gang.  They say they're not, so that's

4     one of the issues you'll have to determine.  Is that something

5     that you could do fairly and impartially?

6          PROSPECTIVE JUROR 107:  Yes.

7          THE COURT:  And you have some other information about

8     gangs, it sounded like more local gangs; is that right?

9          PROSPECTIVE JUROR 107:  Yeah.  From my hometown, I

10    guess.

11         THE COURT:  Is that just because of what you see in

12    the news again?

13         PROSPECTIVE JUROR 107:  Yeah.  No direct interaction

14    with them, just, you know, you see on the news and stuff like

15    that.

16         THE COURT:  Okay.  And you said on your form that you

17    might have some difficulty being fair and impartial if you

18    found out that the defendants -- you know, the question is,

19    that they are alleged to be part of the Aryan Brotherhood.

20    And you're saying that, you know, that could cause you to have

21    some concern about your ability to serve.

22         Sounds like you're saying something different now

23    today that -- you wrote this down the other day that you're

24    concerned about it, but you could be fair; is that true?

25         PROSPECTIVE JUROR 107:  Yes.  I know I have a certain

1    bias, but I can -- I'm aware of it and I can put that to the

2    side.

3           THE COURT:  So when you were writing this the other

4    day, you were thinking, I know this about myself, but I can

5    handle it, is what you're saying?

6           PROSPECTIVE JUROR 107:  Yes.

7           THE COURT:  Okay.  And you are committed to being

8    fair in this case?

9           PROSPECTIVE JUROR 107:  Yes.

10          THE COURT:  Is there anything else that I haven't

11   asked you about that you think is important for us to know?

12          PROSPECTIVE JUROR 107:  Not that I can think of.

13          THE COURT:  Okay.  If you could pass that down, I

14   think we need to speak to Juror 90 in Seat A5.

15          Let's see, you say that you provide resources to

16   clients in the community.  Can you tell me a little bit about

17   what that means you do in your work?

18          PROSPECTIVE JUROR 90:  Yeah.  So I work for a

19   nonprofit in my hometown.  I've been a case manager -- well, I

20   was a case manager for a while for domestic violence clients.

21   Uh, I'm currently -- actually got promoted to supervisor

22   position for a new program that we're going to be developing.

23          But in regards to providing resources to -- for when

24   I was a DV case manager, I would actually advocate for clients

25   for -- during their court.  Well, I was just there to provide

957

1   emotional support or just prep them before their court.  I

2   would help them fill out restraining orders and just case

3   manage them.

4          THE COURT:  How long did you have that work?  Because

5   I know you say you're a supervisor of a new program now.

6          PROSPECTIVE JUROR 90:  Uh-huh.

7          THE COURT:  How long did you work with domestic

8   violence clients?

9          PROSPECTIVE JUROR 90:  So I did it for a year.

10  However, since there's currently no case manager, just last

11  week I had to work with a client because I'm the only one

12  that's trained to do that at the moment.

13         THE COURT:  How many people work at your nonprofit in

14  total?

15         PROSPECTIVE JUROR 90:  Oh, I'm not aware of that

16  because there's -- we have different offices in different

17  locations.  So I'm not sure how much there is in total.

18         THE COURT:  How far distant is, like, the closest

19  office to your office?

20         PROSPECTIVE JUROR 90:  Uh, like 20 miles.

21         THE COURT:  Okay.  And does that office also have

22  case managers there who can serve domestic violence clients?

23         PROSPECTIVE JUROR 90:  No.

24         THE COURT:  What's the closet office that has people

25  who can work with domestic violence clients?

958

1          PROSPECTIVE JUROR 90:  It's just me at the moment.

2          THE COURT:  In your entire company?

3          PROSPECTIVE JUROR 90:  Yeah.  There was me and

4    somebody else, but that person left not too long ago.  So

5    they --

6          THE COURT:  Are they -- I'm sorry, go ahead.

7          PROSPECTIVE JUROR 90:  They do want to hire, but they

8    haven't found anybody yet.

9          THE COURT:  Are they new into that process of hiring,

10   or is that something they've been trying for a while?

11         PROSPECTIVE JUROR 90:  Uh, so the funding for the

12   first time came to an end, but they recently got it back.  So

13   that's why they are looking for new people.

14         THE COURT:  Okay.  And the people who current -- who

15   were in that -- those positions in the past when you had that

16   funding, are those people who would come back possibly?

17         PROSPECTIVE JUROR 90:  No.  They've already found a

18   new job.

19         THE COURT:  Okay.  And the supervisor job that you

20   now have, is it a program unrelated to domestic violence?

21         PROSPECTIVE JUROR 90:  It's with youth.

22         THE COURT:  I'm sorry.  I didn't understand.

23         PROSPECTIVE JUROR 90:  It's with youth.

24         THE COURT:  Oh, youth.  Okay.

25         How long have you worked for this nonprofit?

959

1          PROSPECTIVE JUROR 90:  Three years.

2          THE COURT:  In your job as a -- or in your job as a

3   case manager, how often do you think you would have to go to

4   court to assist a client getting a restraining order or

5   otherwise?

6          PROSPECTIVE JUROR 90:  Uh, it would depend if the

7   restraining order was granted.  Uh, I went maybe a total of

8   five or six times within that year.

9          THE COURT:  Was that for the same client or different

10  clients?

11         PROSPECTIVE JUROR 90:  Different clients.

12         THE COURT:  How many different clients did that

13  involve?

14         PROSPECTIVE JUROR 90:  Two.

15         And it would also -- I had more clients, but some of

16  them felt confident going on their own.  It was just for those

17  that needed extra support.

18         THE COURT:  Do you have training in order to give

19  that type of emotional support?

20         PROSPECTIVE JUROR 90:  Yes.

21         THE COURT:  What is the nature of that training?

22         PROSPECTIVE JUROR 90:  Uh, well, it was just a

23  training that I was, uh -- that I had to attend in Clovis.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR 90:  It was a one-week training.

1          THE COURT:  Is it something that your company put on?

2          PROSPECTIVE JUROR 90:  It was another company.

3          THE COURT:  Okay.  The fact that you have had this

4     experience working with victims of domestic violence, do you

5     think you can set that aside and decide this case only on the

6     evidence presented here?

7          PROSPECTIVE JUROR 90:  Yes.

8          THE COURT:  You say that you know people or you did

9     know people who belonged to a gang at some point, as well as

10    people who have been victims of gang violence -- or of gang

11    crimes.  Sorry.

12         Can you tell me a little bit about that situation?

13         PROSPECTIVE JUROR 90:  Well, in the community that I

14    grew up in, there was a lot of gang-related crimes.

15         When I was younger, maybe like eight or ten, my

16    neighbors were gang related, so there was always shootings,

17    like, in front of my yard.  I wasn't allowed to go out on my

18    own.  Either one of my parents had to be outside with me.

19         When we moved to some apartments, somebody actually

20    got shot in front of our window.

21         THE COURT:  Was that something you witnessed or just

22    something you learned about?

23         PROSPECTIVE JUROR 90:  I saw.  I was in the kitchen,

24    so it was --

25         THE COURT:  You actually saw the event occur, or you

961

1    knew that it had happened outside of your window?

2              PROSPECTIVE JUROR 90:  I saw it occur because I was

3    washing dishes, and I was able to see through my window.  And

4    the person was running across the building, and I was able to

5    see because the window was there.

6              THE COURT:  So you saw the person running away from

7    the shooting?  Did you see the actual shooting?

8              PROSPECTIVE JUROR 90:  He -- well, I saw when he fell

9    to the ground.

10             THE COURT:  Okay.  Were you -- did you have to act as

11   a witness in that case?

12             PROSPECTIVE JUROR 90:  No.

13             THE COURT:  Do you know whether anyone was caught as

14   a result of that event?

15             PROSPECTIVE JUROR 90:  I don't know what happened.

16             THE COURT:  Okay.  So it sounds like you had someone

17   personal experience.  You had neighbors.  You saw this event.

18             This shooting that occurred that you witnessed, did

19   you learn from some source that that was gang related?

20             PROSPECTIVE JUROR 90:  Yes.

21             THE COURT:  How did you learn that?

22             PROSPECTIVE JUROR 90:  Well, actually, when we got

23   there, the manager did inform us that there had been previous

24   shootings due to gang related.  And she -- after that

25   happened, she was able to kick them out of the apartment

962

1    complex, when she informed all of us just to be aware.

2         THE COURT:  So you took that to mean that the

3    neighbors were the -- somehow involved in that shooting

4    incident, right?

5         PROSPECTIVE JUROR 90:  Uh-huh.

6         THE COURT:  Okay.  And then otherwise you probably

7    see stuff on the news --

8         PROSPECTIVE JUROR 90:  Yeah.

9         THE COURT:  -- or on the radio about gang violence in

10    your area?

11         PROSPECTIVE JUROR 90:  Yes.

12         THE COURT:  Okay.  You also said that you -- people

13    that you used to know who were involved in a gang, was that

14    your neighbors?

15         PROSPECTIVE JUROR 90:  No.  It was just, like, people

16    I went to school with.

17         THE COURT:  Like, in high school or something?

18         PROSPECTIVE JUROR 90:  Uh-huh, yeah.

19         THE COURT:  Were these people that you knew of, or

20    were they friends of yours?

21         PROSPECTIVE JUROR 90:  I just went to school with

22    them, like, through elementary, middle school, and high

23    school.  I didn't have, like, communication with them, like a

24    friendship.  I just knew of them.

25         THE COURT:  Okay.  Do you think the fact that you've

963

1    had this experience with -- you know, as a kid in this

2    situation, that you'd be able to set that aside and judge this

3    case fairly and impartially only on the evidence presented

4    here?

5            PROSPECTIVE JUROR 90:  I believe so.

6            THE COURT:  All right.  You say that -- you know, in

7    this case what will happen eventually is there will be

8    evidence presented, documents, testimony.  I'm not sure

9    exactly what it will look like.  And then you, as jurors, will

10   take that evidence with you back to the jury room.

11           But before you do that, I will tell you what the law

12   is, and the attorneys will argue to you how they feel the case

13   should turn out.  And then you'll go back and work with your

14   other jurors to figure the case out, to figure out what

15   happened, and how to apply what you determine the facts to be

16   to the law.

17           Is that something that you think that you could do?

18           PROSPECTIVE JUROR 90:  Yeah.

19           THE COURT:  On your questionnaire you said that you

20   weren't familiar with the laws regarding prisons or gangs in

21   prison.

22           So you're comfortable now understanding that I will

23   give you whatever law that you need?

24           PROSPECTIVE JUROR 90:  Yes.

25           THE COURT:  Okay.  And you will follow the law as I

964

1    give it to you; is that true?

2              PROSPECTIVE JUROR 90:  Yes.

3              THE COURT:  You say -- you know, obviously, in this

4    case there are three men who have been charged, but they are

5    each entitled to individual consideration.  Some evidence

6    isn't going to apply to -- or some evidence may apply only to

7    one, to two, maybe some will apply to all three.  It would be

8    your obligation, though, to make sure that you consider each

9    person individually.

10             And you say in response to that question that, I'm

11   afraid my judgment may take over the evaluation of the case.

12             I'm not sure I understand what you're saying in

13   response.

14             PROSPECTIVE JUROR 90:  Uh, maybe, like, I'll make my

15   own conclusion.  I'll come to my own conclusion besides, like,

16   the evidence that's being provided.  I don't know.

17             THE COURT:  In this case -- I think you might have

18   heard me tell someone the other day that when you go in the

19   jury room, the jurors have to make the decision based upon the

20   same evidence.  So what you can't say is, Hey, I remember when

21   I was a kid and my neighbor did this, that this means

22   something to this case, because it doesn't.

23             I mean, I don't know what -- the details about that

24   situation, but the parties are entitled to know what the

25   evidence is that the jury is considering.  And the way they do

1   that is because they have presented it to you.

2         So what you can't do is go back to the jury room and

3   talk about something that wasn't presented in evidence,

4   because sometimes what we think is true may be true, but until

5   it is tested through the trial process, meaning people ask

6   questions, they ask other questions, they bring out documents,

7   and they confront the witnesses to allow you to find out what

8   the truth is.

9         And in telling you this, what I'm telling you is you

10  can't bring into the jury room, or even into your own head in

11  making deliberations, evidence that hasn't been presented in

12  this trial.

13        Can you do that?

14        PROSPECTIVE JUROR 90:  Yes.

15        THE COURT:  And when you say, you know, I'm going to

16  come to my own individual conclusion, that's exactly what

17  you're supposed to do.  You have to hear what everybody has to

18  say, but you have to decide the case individually.

19        In fact, I will give you an instruction that says

20  that you have to listen to your fellow jurors, but you

21  shouldn't change your mind simply because the other jurors

22  think you should.  You have to come to your own conscientious

23  decision and make the decisions based upon how you see the

24  evidence and what your conscience tells you, in essence,

25  because you've evaluated the evidence.

966

1              Is that something that you can do?

2              PROSPECTIVE JUROR 90:  Yes.

3              THE COURT:  You say that you have some concerns about

4    not being able to -- or financial concerns about this trial.

5              Have you spoken to your boss about working maybe a

6    flex schedule or working part time?

7              PROSPECTIVE JUROR 90:  Uh, no.  And actually, on

8    Friday we had a meeting in regards to requesting time off.

9    We're either supposed to use our sick time or vacation time,

10   and I actually finished -- I used up all my vacation.

11   Thursday was, like, the last day.

12             And now if we request days off, there has to be a

13   good explanation as to why we're requesting that day off.

14             THE COURT:  You definitely would have that because

15   you'd have a federal judge ordering you to be here.  So that's

16   a good excuse.

17             But I guess I'm concerned about how that's going to

18   impact your finances.  Because, let's see, you work in a city

19   that's about an hour from here?

20             PROSPECTIVE JUROR 90:  Yes.

21             THE COURT:  So if we were to finish trial at 1:30,

22   you could get to your office at about 2:30; is that right?

23             PROSPECTIVE JUROR 90:  Yes.

24             THE COURT:  And would you be able to work from then

25   to the rest of the day?

967

1          PROSPECTIVE JUROR 90:  Well, it would only be up to

2     5:00.

3          And sometimes with this new position, I am required

4     to go to different towns, which I haven't been told of which

5     one specifically.  But I don't know if I would make it on time

6     to any of the other towns that I'm required to go to.

7          THE COURT:  You haven't -- have they told you which

8     towns you have to go to?

9          PROSPECTIVE JUROR 90:  No.  Because on Friday we were

10    supposed to meet about that, but we didn't.  I had another

11    training, so I wasn't there for a long time.  When I came

12    back, that's when we had the other meeting.

13         THE COURT:  Do you support anyone else in your

14    household?

15         PROSPECTIVE JUROR 90:  Well, I actually live with my

16    parents.  I do help my dad out with the -- half of the rent.

17    My mom is currently not working.  She only worked for, like,

18    two weeks in December, and now she's -- she works seasonal, so

19    we don't know when she's going to be working again.

20         THE COURT:  Has she worked in a seasonal position

21    before?

22         PROSPECTIVE JUROR 90:  Uh, yeah.

23         THE COURT:  How long has she worked in seasonal

24    positions?  I mean, how many years, basically?

25         PROSPECTIVE JUROR 90:  Uh, maybe, like, 26, 27 years.

968

1    I don't know.

2         THE COURT:  Is it typical that she's not working this

3    time of the year?

4         PROSPECTIVE JUROR 90:  No.  She's usually working

5    during this time.

6         THE COURT:  Does she work for the same employer or

7    different employer?

8         PROSPECTIVE JUROR 90:  Different employer.

9         THE COURT:  And at this time is she looking for work,

10   or is she choosing not to work?

11        PROSPECTIVE JUROR 90:  She's looking for work, but

12   there's just not -- nothing at the moment.

13        THE COURT:  Okay.  If you are not able to contribute

14   to the finances, will your dad's salary cover the costs of the

15   household for a period of time?

16        PROSPECTIVE JUROR 90:  Not for that long.

17        THE COURT:  If you work at your job for, you know,

18   three hours a day, would you still get three hours a day of

19   pay?

20        PROSPECTIVE JUROR 90:  I would.

21        THE COURT:  In addition to what the court provides

22   you?

23        PROSPECTIVE JUROR 90:  Uh-huh.

24        THE COURT:  All right.  Is there anything else I

25   haven't asked you about that you think is important for us to

969

1  know?

2           PROSPECTIVE JUROR 90:  Yes.  So actually, due to

3  those financial issues, I was supposed to start my Master's

4  this month, but, like I said, due to financial issues, I

5  wasn't able to.  So I have to put that on hold.  I know I'm

6  supposed to meet with an advisor in May to see what we can do

7  in regards to payment plans.

8           THE COURT:  What is your Master's degree, what course

9  of study?

10          PROSPECTIVE JUROR 90:  Counseling.

11          THE COURT:  And is it your hope to start your

12 Master's program in the fall?

13          PROSPECTIVE JUROR 90:  Yes.

14          THE COURT:  This advisory meeting in May is going to

15 help you with financial aid issues?

16          PROSPECTIVE JUROR 90:  I hope so.

17          THE COURT:  Okay.  Anything else then that we should

18 know about?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Okay.  Thank you.  Could you give the

21 microphone to Juror 93.

22          And you are a teacher?

23          PROSPECTIVE JUROR 93:  Yes.

24          THE COURT:  Do you -- have you always taught the same

25 grades, or do you teach different grades?

1          PROSPECTIVE JUROR 93:  I started out of college

2     teaching kindergarten and second grade for five years in

3     Sanger Unified.

4          Uh, I was fortune enough to stay home with my kiddos

5     for about ten years.  And then I went back to my current

6     school site in 2015.  And I've taught third grade since then.

7          THE COURT:  You say you have a very positive attitude

8     about law enforcement based upon, it looks like, just the

9     nature of their work; is that true?

10          PROSPECTIVE JUROR 93:  Yes, correct.

11          THE COURT:  And you know all the questions I'm going

12     to ask you, and that starts with:  Do you agree with some of

13     your fellow jurors, that there are both good and bad people in

14     every profession?

15          PROSPECTIVE JUROR 93:  Yes, of course.

16          THE COURT:  And are you willing to evaluate the

17     testimony of law enforcement officers just as you would any

18     other witness?

19          PROSPECTIVE JUROR 93:  Yes.

20          THE COURT:  You indicate you have some concerns about

21     the criminal justice system because criminals don't always get

22     enough consequences for their actions.

23          I think I said this at one point, that as you

24     understand, in this forum, Congress makes the law and I apply

25     the law, as you will.  And so what the consequences are is

971

1   something that's not for us to decide in this case.

2           And even though you have that as a general feeling,

3   that people sometimes aren't held to account sufficiently, is

4   that something that you think would impact your ability to be

5   fair in this case?

6           PROSPECTIVE JUROR 93:  No, it wouldn't.

7           THE COURT:  Are you thinking of a particular

8   situation or just a general impression?

9           PROSPECTIVE JUROR 93:  Just in general through

10  watching, you know, the news, you see cases come through, and

11  sometimes it's just surprising how little time they actually

12  serve considering, you know, what the crime was.

13          THE COURT:  Okay.  You said you've picked up a little

14  bit of information from the media about gangs and watching TV

15  shows.  And you say you have watched some true crime shows.

16          I love the description, true crime, because there's

17  always a slant that somebody puts on it, and I always wonder

18  what is the truth here.  But what is your experience with true

19  crime shows?

20          PROSPECTIVE JUROR 93:  Oh, just mainly documentaries,

21  shows like, you know, Dateline where there's a case or, you

22  know, something similar to that.  You know, no case in

23  particular or show in particular.

24          THE COURT:  Okay.  And so when you got a little bit

25  of information about gangs in that fashion, are you willing to

972

1    set that aside and consider the evidence presented here rather

2    than what you've seen on those shows?

3              PROSPECTIVE JUROR 93:  Yes, I can.

4              THE COURT:  It looks like you have a little bit of

5    information about the Aryan Brotherhood.  You think it has

6    something to do with white supremacy.

7              Can you tell me what the source of that information

8    is?  Is it the same source?

9              PROSPECTIVE JUROR 93:  Yeah, just shows, different

10   books I've read, fictional books mainly that mention it.  So

11   when I saw the name, that's just the first thing that popped

12   into my mind.  I don't have any specific information on it at

13   all.

14             THE COURT:  The fact that that is an allegation in

15   this case, do you think that that would impact your ability to

16   be fair and impartial in case?

17             PROSPECTIVE JUROR 93:  No, ma'am.

18             THE COURT:  And you've heard about some other gangs

19   that you may see in the schools.

20             Do you actually have students in third grade that are

21   involved in those types of activities?

22             PROSPECTIVE JUROR 93:  You know, I work at a

23   Title I school, so the population, you know, we have a wide

24   range of socioeconomic groups.  I haven't had any experiences

25   with students that, you know, overtly talked about gangs or

973

1  anything like that.  I just know that there are parents on

2  campus and other family members they have that are a part of a

3  gang.

4  THE COURT:  Have you had any experiences that you

5  considered to be, you know, outside of the norm?  I mean, I

6  know sometimes teachers have difficult parents, but have you

7  had an experience with any of these people that would be

8  outside of the norm of just how sometimes parents act?

9  PROSPECTIVE JUROR 93:  No.  No, nothing negative.

10  Nothing --

11  THE COURT:  I think the microphone died.

12  PROSPECTIVE JUROR 93:  I think it may have.

13  Can you hear me?  Oh, there we go.

14  No, nothing negative in particular, just knowledge

15  that, you know, we do have parents and family members.  And

16  we've seen some of these people on campus, but there's never

17  been something personally I was involved in with that.

18  THE COURT:  All right.  Do you receive training

19  specific to gangs as a result of your profession?

20  PROSPECTIVE JUROR 93:  No.

21  THE COURT:  Now, you talk about that it would be very

22  difficult to be away from school for this period of time and

23  worried about your students and the impacts it would have on

24  them.

25  I do have to appreciate that if you were here from

1    8:00 to 1:30, you getting back to your school at 2:30 doesn't

2    do you any good, or at two o'clock doesn't do you any good; is

3    that true?

4          PROSPECTIVE JUROR 93:  Right.  Yeah, by the time I

5    got back, it would probably be two o'clock and they leave at

6    2:35.  I know you said we aren't here Mondays; is that

7    correct?

8          THE COURT:  True.

9          PROSPECTIVE JUROR 93:  So best case scenario, I'm

10   thinking they would have to try to get a long-term sub, which

11   is better for the kids.  You know, they like their routine,

12   and someone who is also, you know, knowledgeable and can

13   handle the curriculum and somewhat planning on their own,

14   because that would be difficult for me to do as well.

15         I could work from the 1:30 to, you know, when I go

16   home.  It's just my concern is not being there to be their

17   instructor.  Because, you know, you do have that relationship

18   with your kids and that makes a big difference, as well as,

19   like, the teaching strategies used for their success.

20         THE COURT:  Right.  And bringing a substitute in

21   sometimes brings in a different personality, doesn't work the

22   same.

23         I do know, though, too, I mean, sometimes teachers

24   have to go on maternity leave or other medical reasons, and in

25   that event, the schools have to do what they have to do to

975

1    cover it.  It's not the best outcome, but that's not unusual.
2    Do you agree?
3              PROSPECTIVE JUROR 93:  Yeah, I agree with that.
4              THE COURT:  All right.  Is there anything else I
5    haven't asked you about that you feel like I should?
6              PROSPECTIVE JUROR 93:  No, ma'am.
7              THE COURT:  All right.  Thank you so much.
8              PROSPECTIVE JUROR 93:  Thank you.
9              THE COURT:  All right.  If you would pass the
10   microphone to Juror 108 seated in A8.
11             And I should say, ladies and gentlemen, I'm going to
12   talk with this juror and then we're going to take a lunch
13   break.
14             So let's see.  Juror 108, you are a courier?
15             PROSPECTIVE JUROR 108:  That is correct.
16             THE COURT:  What does that involve?
17             PROSPECTIVE JUROR 108:  Delivery.
18             THE COURT:  Oh, okay.  It sounded -- just like you
19   say, okay.
20             How long have you been in that type of work?
21             PROSPECTIVE JUROR 108:  This summer it will be
22   25 years.
23             THE COURT:  Oh, okay.  In high school you did the
24   police -- a police science training of some sort?
25             PROSPECTIVE JUROR 108:  Yes.

976

1           THE COURT:  And can you tell me a little bit about

2   that?

3           PROSPECTIVE JUROR 108:  Yeah, that was just a high

4   school course that I needed to take just because they offered

5   the extra credit to graduate.

6           THE COURT:  Oh, it wasn't an interest of yours?

7           PROSPECTIVE JUROR 108:  No.

8           THE COURT:  You have a neutral attitude about law

9   enforcement otherwise; is that right?

10          PROSPECTIVE JUROR 108:  Yes.

11          THE COURT:  You haven't had too much contact with law

12  enforcement.

13          PROSPECTIVE JUROR 108:  None at all, hardly.

14          THE COURT:  And are you willing to evaluate the

15  testimony of all witnesses, no matter what their jobs are,

16  fairly and impartially?

17          PROSPECTIVE JUROR 108:  Yes.

18          THE COURT:  You said that you had an aunt at some

19  point who was the victim of a crime.  When was that?  Do you

20  recall?

21          PROSPECTIVE JUROR 108:  You know, maybe four or five

22  years ago.

23          THE COURT:  Do you know, did they catch the person?

24          PROSPECTIVE JUROR 108:  Well, yes, they did.  As a

25  matter of fact, I think I answered that question twice.  It's

977

1   actually the same occurrence.

2            THE COURT:  Okay.  It was someone close to her then?

3            PROSPECTIVE JUROR 108:  Yeah, it was actually her

4   son.

5            THE COURT:  Did he actually -- was he convicted of

6   that offense?

7            PROSPECTIVE JUROR 108:  I just know he's put away for

8   now.

9            THE COURT:  Okay.

10           PROSPECTIVE JUROR 108:  I don't know, like, the

11  legality parts of it or --

12           THE COURT:  You didn't follow the details of what was

13  happening?

14           PROSPECTIVE JUROR 108:  (Shakes head.)

15           THE COURT:  Did you just hear about this from some

16  other relative?

17           PROSPECTIVE JUROR 108:  Pretty much all of the

18  family.

19           THE COURT:  It was a topic of conversation.

20           PROSPECTIVE JUROR 108:  Yes.

21           THE COURT:  Okay.  This event involving your aunt and

22  cousin, would that impact how you evaluate evidence in this

23  case or could you be fair and impartial?

24           PROSPECTIVE JUROR 108:  No, it wouldn't affect.

25           THE COURT:  Okay.  It looks like you've had some

978

1  friend involved in drug addiction.  Is that person still

2  involved in that culture?

3           PROSPECTIVE JUROR 108:  You know, I'm actually not

4  certain because we don't keep in contact like we used to.

5           THE COURT:  The fact that you know that this friend

6  had this involvement in drug use at some point, do you think

7  that that would impact your ability to be fair or impartial in

8  this case?

9           PROSPECTIVE JUROR 108:  No.

10          THE COURT:  All right.  Is there anything else that I

11  should have asked you about that I haven't asked you about?

12          PROSPECTIVE JUROR 108:  No.

13          THE COURT:  All right.  Thank you so much.

14          All right.  Ladies and gentlemen, we're going to go

15  ahead and take our lunch break.  I'm going to ask you all to

16  be prepared to return at 1:15.

17          In the meanwhile, I'm going to ask Juror 97 if you

18  would remain.

19          But otherwise, please don't form any opinions about

20  this case, please don't discuss the case or allow anyone to

21  discuss it with you, and please don't do any research on your

22  own, including searching the internet.

23          All right.  Thank you so much.

24     (Prospective Jurors exit the courtroom except Prospective

25        Juror 97.)

979

1          THE COURT:  Sir, we'll get back to you right after

2     the lunch hour.  Thank you.

3          All right.  The other jury members have stepped out.

4          I received a note that you wanted to talk in private

5     about something?

6          PROSPECTIVE JUROR 97:  Yes.

7          THE COURT:  Can I ask you to just grab that

8     microphone right behind you?  There we go.

9          PROSPECTIVE JUROR 97:  Hello.

10         THE COURT:  Yes, it works.  What was it that we

11    needed to discuss?

12         PROSPECTIVE JUROR 97:  One is a medical issue.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR 97:  And the other one has to do

15    with my concern about serving.

16         THE COURT:  Okay.  Let's start with your medical

17    concern.

18         PROSPECTIVE JUROR 97:  Uh, I have what's called

19    tachycardia.  And the older I get, the worse it gets.  And

20    this morning so far, I've had one episode.

21         THE COURT:  What do you do to address that?

22         PROSPECTIVE JUROR 97:  Uh, I have nitro that I carry

23    with me, nitroglycerine tablets.  I am on medication, but

24    there are some times it just sets off, no rhyme or reason.

25         THE COURT:  No, I understand tachy -- I can't say it,

980

1    but --

2            PROSPECTIVE JUROR 97:  Tachycardia.

3            THE COURT:  -- I can understand it.  If you have an

4    attack, you take a nitroglycerin pill?

5            PROSPECTIVE JUROR 97:  Yes.

6            THE COURT:  If that resolves it, it resolves it.  If

7    it doesn't within a period of time, you take a second one.

8    And then if it doesn't, you got to go to the hospital?

9            PROSPECTIVE JUROR 97:  Correct.

10           THE COURT:  The --

11           PROSPECTIVE JUROR 97:  And the nitroglycerin sets off

12   migraine headaches.

13           THE COURT:  Okay.  Did you have to take nitroglycerin

14   earlier, then?

15           PROSPECTIVE JUROR 97:  I did not but my resting heart

16   rate was 120.

17           THE COURT:  Okay.  What is it typically?

18           PROSPECTIVE JUROR 97:  68 to 70.

19           THE COURT:  Okay.  And you say you're under medical

20   care at this time as a result?

21           PROSPECTIVE JUROR 97:  That is correct.

22           THE COURT:  And how long have you been suffering from

23   this condition?

24           PROSPECTIVE JUROR 97:  I had full cardiac arrest

25   12 years ago.

981

1          THE COURT:  And then since that time, you've had this
2   condition -- see, I don't want to say it.  You've had this
3   condition since that time?
4          PROSPECTIVE JUROR 97:  Yes.
5          THE COURT:  How often in that 12-year period have you
6   had to go to the emergency room as a result of an attack?
7          PROSPECTIVE JUROR 97:  Emergency, none.  But urgent
8   care, five, six.
9          THE COURT:  When was the last time?
10          PROSPECTIVE JUROR 97:  It's probably been 18 months.
11          THE COURT:  Do you have any triggers or is there any
12   medical triggers to this?
13          PROSPECTIVE JUROR 97:  No.
14          THE COURT:  When was the last one you had before
15   today?
16          PROSPECTIVE JUROR 97:  About 18 months ago.
17          THE COURT:  So you haven't had even one where you had
18   to take a pill before then?
19          PROSPECTIVE JUROR 97:  No.
20          THE COURT:  Okay.  And the fact that you had this
21   attack today -- I guess I should ask, did you choose to not
22   take the pill because you were afraid of the migraine?
23          PROSPECTIVE JUROR 97:  I did not want the -- yes.
24          THE COURT:  How long does it take for that condition
25   to resolve without the medication?

982

1          PROSPECTIVE JUROR 97:  About 15 minutes.  The entire

2    time I was thinking that, this is it.

3          THE COURT:  When you've had them in the past, I'm

4    guessing you don't let it go 15 minutes, you just take the

5    pill.

6          PROSPECTIVE JUROR 97:  Uh, if my husband is home,

7    since he's the one that resuscitated me 12 years ago, I do

8    not.  I try to avoid it.

9          THE COURT:  You try to avoid taking the --

10         PROSPECTIVE JUROR 97:  Nitro, yes.  If I'm by myself,

11   I will take the nitro.

12         THE COURT:  Okay.  Because -- you wouldn't take it

13   because you don't want the migraine, is that what you're

14   saying?

15         PROSPECTIVE JUROR 97:  Correct.

16         THE COURT:  Okay.  Okay.

17         PROSPECTIVE JUROR 97:  Getting old is not fun.

18         THE COURT:  I agree with you, yeah.

19         Anything else about the medical condition that I

20   haven't heard about yet?

21         PROSPECTIVE JUROR 97:  No.

22         THE COURT:  Okay.  Does this interfere generally with

23   your life or your work or your family?

24         PROSPECTIVE JUROR 97:  No.

25         THE COURT:  All right.  And you said you have another

983

1    concern; let me hear about that.

2            PROSPECTIVE JUROR 97:  Uh, the -- my father-in-law,

3    there was retaliation for one of the operations he had in

4    Peru, where his partner at the time was shot as part of that

5    retaliation.

6            THE COURT:  And did that person die as a result?

7            PROSPECTIVE JUROR 97:  No.

8            THE COURT:  Do you recall about when this was that

9    this happened?

10           PROSPECTIVE JUROR 97:  No.

11           THE COURT:  Okay.  I -- the little I know about the

12   situation in Peru back in those days is that, you know, even

13   the locals who -- there were a lot of people who were

14   dependant upon the cocaine crops, as I understood it.

15           PROSPECTIVE JUROR 97:  That is correct.

16           THE COURT:  And so a lot of people -- I think as I

17   understood it, too, the DEA would come out and say, Clear your

18   crop or we're going to clear it for you by putting pesticides

19   on the ground, and that caused a lot of -- I don't know what

20   the word is, but they didn't -- the local people did not like

21   the DEA or, in fact, the U.S. at that time.  Is that your

22   understanding, as well?

23           PROSPECTIVE JUROR 97:  It is.  But this particular

24   incident, it was the -- gang related.

25           THE COURT:  Okay.

984

1              PROSPECTIVE JUROR 97:  They had shut down an

2    operation in the jungle, and they were not happy about it.

3              THE COURT:  I see.  In this, was anyone caught or

4    they just knew who it was?

5              PROSPECTIVE JUROR 97:  They knew who it was.

6              THE COURT:  And this is information, then, that your

7    father-in-law shared to you at the time or at some point

8    later?

9              PROSPECTIVE JUROR 97:  It was after.

10             THE COURT:  Okay.  And, I mean, that's a terrible

11   situation.  Was he in fear for himself as a result?

12             PROSPECTIVE JUROR 97:  He took extra precautions.  He

13   was assigned a security detail.

14             THE COURT:  Was he the only one assigned that detail?

15             PROSPECTIVE JUROR 97:  Other members of his team

16   were.

17             THE COURT:  Okay.  How long did he have that security

18   detail?

19             PROSPECTIVE JUROR 97:  I do not know.

20             THE COURT:  Do you remember knowing about this at the

21   time, or is this something you learned later?

22             PROSPECTIVE JUROR 97:  This was something I learned

23   after he had come back to the States.

24             THE COURT:  On a visit or after he left that

25   employment?

985

1          PROSPECTIVE JUROR 97:  After he left the employment.

2          THE COURT:  When he told you about that, was he sort

3   of like, Yeah, you know, this is -- this happened to me?  Uh,

4   did he have any lasting effects as a result or was he just

5   communicating, This is what happened to me?

6          PROSPECTIVE JUROR 97:  It was in one of his many

7   stories.

8          THE COURT:  The fact that your father-in-law suffered

9   this loss and had to have this security detail, do you think

10  that would impact how you evaluate the evidence in this case?

11         PROSPECTIVE JUROR 97:  Other than that I believe

12  retaliation is real.

13         THE COURT:  And in saying that, I'm trying to

14  translate that into how you feel like this impacts -- or I

15  want to know the full confines of what you're telling me and I

16  don't want to put words in your mouth.  So can you expand on

17  that at all?

18         PROSPECTIVE JUROR 97:  Well, even though to protect

19  our identity, we are numbers.  I have no doubt that if

20  somebody wanted to, they could find out anything they wanted

21  to know out on social media, identify anybody.

22         THE COURT:  Do you think that having that belief or

23  knowledge would impact how you consider the evidence or how

24  you deliberate in this case, assuming that you were ever

25  called to do so?

986

1    PROSPECTIVE JUROR 97:  It might only in that if I was

2    leaning one way or the other, it may make me go the other way.

3    THE COURT:  I think what you'd be saying, then, is if

4    were you leaning toward guilt and you weren't -- well, and

5    you're saying --

6    PROSPECTIVE JUROR 97:  I might lean further towards

7    guilt.  I was already leaning that way, yes.

8    THE COURT:  And that would be regardless of whether

9    the government had proven the case beyond a reasonable doubt,

10    in your opinion?

11    PROSPECTIVE JUROR 97:  Well there, again, based on me

12    analyzing the evidence, in my mind if I'm leaning more towards

13    guilt, I think I would just lean further.

14    THE COURT:  Okay.

15    PROSPECTIVE JUROR 97:  But I can't -- I can't -- as

16    my husband would tell you, I analyze the hell out of

17    everything.  My kids will tell you the same thing.

18    THE COURT:  Okay.  I guess what I need to find out,

19    though, is, knowing this about yourself, knowing that you have

20    this, you know, experience with your father-in-law, would you

21    be able to stop yourself and go, Wait a minute, I got to

22    check.  I got to check:  Am I making this decision because the

23    evidence tells me I should make this decision, or am I making

24    it for another reason.  Stop yourself, slow down, and then

25    decide what the law tells you you have to do.  Would you be

987

1   able to actually take that final step and do what the law

2   tells you you have to do?

3          PROSPECTIVE JUROR 97:  I think I would, especially

4   since, knowing me, I'd stand up and acknowledge what I was

5   doing.

6          THE COURT:  Okay.  So it's you just want to be open

7   to the information, but you are committed to being fair and

8   impartial?

9          PROSPECTIVE JUROR 97:  Yes.

10         THE COURT:  All right.  Anything else that we need to

11  know about at this time?

12         PROSPECTIVE JUROR 97:  No, that's enough.

13         THE COURT:  All right.  Thank you so much.  We'll see

14  you back after your lunch hour at a quarter after.

15      (Prospective Juror 97 exits the courtroom.)

16         THE COURT:  All right.  We are -- the jurors are all

17  away.  Is there anything for the record at this time?

18         Doesn't sound like it.  All right.  I'll see you back

19  here at 15 after.

20      (Lunch recess was taken from 12:10 p.m. to 1:17 p.m.)

21         THE CLERK:  Please remain seated.  Court is in

22  session.

23         THE COURT:  All right.  We're back on the record.

24  Let's go ahead and bring in Juror 112.

25         MS. DESALES BARRETT:  Excuse me, Your Honor.

988

1          THE COURT:  Yes.  I'm sorry.

2          MS. DESALES BARRETT:  Can we just address one thing?

3          THE COURT:  Yeah, uh-huh.

4          MS. DESALES BARRETT:  That is, that there have been

5     some newspaper articles about the case since the jurors first

6     came in last week, and we would ask that the Court inquire as

7     to whether or not anybody has read or heard about the case and

8     that the Court continue to admonish the jurors on a regular

9     basis, because we expect that there will be more publicity.

10          THE COURT:  Okay.

11          MS. DESALES BARRETT:  Thank you.

12          THE COURT:  All right.  Let's go ahead and bring in

13    Juror 112.

14          Ms. Barrett, I forgot to acknowledge that you're

15    back.  Are you all well now, over it?  Good.

16          MS. DESALES BARRETT:  I have tested negative.  It's

17    just the cough is going to be a problem for a while.

18          THE COURT:  For a while, yeah.

19          MS. DESALES BARRETT:  Yeah.  I'm sorry to have

20    interrupted.

21          THE COURT:  Not at all.

22       (Prospective Juror 112 enters the courtroom.)

23          THE COURT:  Hello, sir.  Thank you for coming in.

24          PROSPECTIVE JUROR 112:  Of course.

25          THE COURT:  I was understanding that there was

989

1    something that you had wanted to discuss in private.

2         PROSPECTIVE JUROR 112:  Yes, it's just to be more

3    comfortable.  I am a -- I work for the -- how to put it -- the

4    Department of Defense.  So my time is split in, basically, two

5    halves.  The first half, I am a systems engineer analyst, and

6    I develop products.  First product, it's due within the next

7    week, according to what my work has told me.  That's the first

8    part of it.

9         The second part of my job is I'm also -- I also do

10   research for materials.  So with that research and materials,

11   for me to take the three months off, because I only get

12   funding for a year, it cuts into the time that you do

13   research.  And I can't do it right after 1:30 every day

14   because I live a four-hour drive away, and I had to be there

15   to do it.

16        THE COURT:  Help me to understand how you do

17   materials and research.  How does that -- what is that?

18        PROSPECTIVE JUROR 112:  Okay.  And this is why I

19   wanted to make sure I was -- I'm not sure how much I can say,

20   but I know -- yeah.

21        Anyways, with that, what I currently do is I work

22   with a group that generates materials to work with, materials

23   to research into for the Department of Defense.  I help

24   develop and design with -- develop and design materials and

25   ways to analyze them in a new way.  So I'm responsible for --

990

1  so I'm responsible for developing that new software

2  capability.

3          And I'm the only one who knows how to do that part,

4  really.  But the material part, it's a group of us.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR 112:  I have to be there to do it.

7          THE COURT:  There's a group of you who are working on

8  this project, and there's part of it that only you can do?

9          PROSPECTIVE JUROR 112:  That's correct.

10         THE COURT:  What is the part that you do?

11         PROSPECTIVE JUROR 112:  I develop software that

12  provides a unique environment to analyze material in a

13  specific way that --

14         THE COURT:  And let me understand.  You're saying

15  you're creating a computer environment in which the

16  computer -- you're designing it so that the computer can do

17  this?

18         PROSPECTIVE JUROR 112:  No.  This is -- this is

19  software, and the software is going to analyze material in the

20  real world, and it's going to go -- traverse using

21  electromagnetic signals to hit that material in a certain way.

22         And then when it comes back, I have to adjust the

23  software that takes that raw data and analyzes it to give us

24  an accurate representation of the properties of that material.

25         THE COURT:  So you're saying as the material is being

991

1   analyzed, you have to make -- my technical term -- tweaks to

2   the software so that it gives you sensible data?

3          PROSPECTIVE JUROR 112:  Yes, sensible more accurate

4   data.

5          THE COURT:  Okay.  And you're the only IT person on

6   that group?

7          PROSPECTIVE JUROR 112:  I'm the one who developed the

8   software, so it's specific to that one -- one group I'm part

9   of for half the time.

10         THE COURT:  And, you know, I'm not a -- not a

11  computer person.  I know you push the button, and it does

12  this.  So I'm going to ask you, I mean, is this like an

13  elegant software system that no one except -- because you have

14  this -- you know, you're a computer genius can figure it out,

15  or are there other people that can come behind you and go,

16  Yeah, okay.  I can read this code.  It makes sense.  I got it.

17         PROSPECTIVE JUROR 112:  So it's the point where

18  someone can -- I'm trying to think of the best way to explain

19  this.  Give me a second.

20         It's at a point where it is operating, but with the

21  research and grant money we're given, we're supposed to make

22  continual updates to the capabilities and the materials it can

23  process, because we also are going to service this to

24  potentially other customers that allows us to get funding for

25  the next year and so on and so forth.

992

1          THE COURT:  And let me make sure I do understand.

2    You actually work for not a contractor, but the actual

3    Department of Defense, the federal agency?

4          PROSPECTIVE JUROR 112:  I work under the Navy, the

5    Department of Defense under the Navy.

6          THE COURT:  Okay.  The Navy.

7          PROSPECTIVE JUROR 112:  Just to clarify it a little

8    better.

9          THE COURT:  So it isn't, though, a matter of you

10   working for a contractor who is working for the Navy; you're

11   actually working for the Navy?

12         PROSPECTIVE JUROR 112:  Yes.  Civilian -- a civilian

13   government contractor -- not government contractor.  A

14   civilian government employee.

15         THE COURT:  Employee.  Yeah.  Got it.

16         Now, you said there's a second part of the job we

17   didn't talk about.  I wrote it down because it was very

18   complicated.  Systems engineer analysis.  Is that something

19   different than what you're talking about?

20         PROSPECTIVE JUROR 112:  Yes.

21         THE COURT:  Okay.  What's this?

22         PROSPECTIVE JUROR 112:  Hold on.  I got to think

23   about the best way to put this.

24         Are you familiar with the -- are you familiar with

25   the EA-18G Growler jet, the -- oh, just the Navy jet?  The

1    ones -- well, I'll give it to you one more time.  It's the

2    Growler.  Growler, yes.

3              THE COURT:  Do I look like I do?

4              PROSPECTIVE JUROR 112:  No.  Okay.

5              So okay.  I got one for you.  You know the movie

6    *Top Gun:  Maverick*?

7              THE COURT:  No.  I didn't see it.

8              PROSPECTIVE JUROR 112:  You didn't see it?

9              THE COURT:  Huh-uh.

10             PROSPECTIVE JUROR 112:  Okay.  Well, it's those jets.

11             THE COURT:  So fancy jet?

12             PROSPECTIVE JUROR 112:  Fancy jet, yeah.  Okay.

13   Yeah.

14             THE COURT:  So you work on this?

15             PROSPECTIVE JUROR 112:  I work on that, and I am an

16   analyst and a systems engineer.

17             For the part where I am a systems engineer, anybody

18   can pick it up.  They have other people to talk with.  That's

19   fine.  You know, someone else can eventually answer that

20   question -- those questions.

21             When it comes to the -- what do you call it?  When it

22   comes to the analyst, I am also -- I'm also developing

23   software that they also need me to keep working on.  And I

24   can't -- I can't work on it over here.  I've got to work on it

25   over there.

994

1          THE COURT:  What's the learning curve on that?  I

2     mean, if they bring in some, you know, super genius IT person

3     like yourself to step in, could that occur?

4          PROSPECTIVE JUROR 112:  It would take a while because

5     it's not just one particular thing I'm familiar with.  It's

6     the systems of systems.  There's physics and then there's the

7     computer engineering part of it.

8          Someone could be brought up to speed on it.  It would

9     just take a good amount of time is the problem.

10         THE COURT:  Have you spoken to your supervisors

11    about, Hey, I'm on this jury.

12         PROSPECTIVE JUROR 112:  They are aware.  But we also

13    kind of work on a priority scheme, if that makes any sense.

14    So if, for example, on the systems engineering side, if they

15    need something there, I'll stop my analysis on one end, and

16    I'll work on the systems engineering side until I'm told not

17    to.

18         THE COURT:  So when you told them, Hey, I'm on this

19    jury venire and, you know, maybe I get picked, and if I do,

20    it's three months, what do they say in response?

21         PROSPECTIVE JUROR 112:  Mostly the -- the message was

22    they have the money to pay for my time, but they need to try

23    get this analytic piece of software I have working as quickly

24    as possible, was kind of their statement.

25         THE COURT:  And -- and not to -- I mean, it sounds

995

1    like you have a very important job, but I work for the

2    government too.

3              PROSPECTIVE JUROR 112:  Yeah.

4              THE COURT:  And like I said the other day, I pretty

5    much know at the government, if I drop dead tomorrow, there's

6    going to be somebody warm in my chair next week.  And that's

7    just the reality of working for the government.

8              Sounds like your situation may be a little bit

9    different.  And I'm not saying -- it sounds like really

10   important work, but I guess if I have to pick between the two,

11   I think this is really important work too.

12             PROSPECTIVE JUROR 112:  It is.  I'm not saying it

13   isn't.

14             THE COURT:  No, no, no, of course not.

15             PROSPECTIVE JUROR 112:  I'm just trying to be honest.

16             THE COURT:  Yeah.  I appreciate the information.

17             Is there anything else about your work situation that

18   maybe we need to know about?

19             PROSPECTIVE JUROR 112:  Besides the four-hour drive

20   one -- three- to four-hour drive one way is -- kind of takes

21   me out of work for almost the entire week, except for one day.

22             THE COURT:  Right.  Because if you chose to do that,

23   that would be -- that would be difficult.  Obviously, you

24   don't have to do that because you could stay in a hotel

25   here --

996

1          PROSPECTIVE JUROR 112:  Right.

2          THE COURT:  -- at least the Tuesday through Thursday.

3          Is there any possibility to work on these things on

4     the weekend?

5          PROSPECTIVE JUROR 112:  On both sides they don't

6     really work on weekends.  Usually it's by special request, and

7     you have to get a whole slew of people's signatures and things

8     of that nature.

9          THE COURT:  And working for the federal government, I

10    know that you get paid for jury service.  So I'm not really

11    worried about that.

12         PROSPECTIVE JUROR 112:  Right.

13         THE COURT:  I'm more concerned about your project and

14    is it possible to do this analysis on these materials while

15    you're present on the weekend.  But it sounds like nobody else

16    is going to be working.

17         PROSPECTIVE JUROR 112:  No one else will be working

18    on the weekends for the -- what do you call it?

19         From the research portion, we're allowed to work --

20    they're allowed to work whenever, as long as the project gets

21    done.  The only issue is everyone you need to talk to is going

22    to be gone most weekends.

23         THE COURT:  Right.  Right.  Okay.

24         You know, when we talked earlier, you mentioned to me

25    about a trip that you were, you know, thinking of planning on

1    March 12th through the 14th.

2            Is there any update on that information?

3            PROSPECTIVE JUROR 112:  Yes.  I'm just waiting to

4    hear about what -- sorry.  Let me backtrack a bit.

5            I'm waiting to hear how this goes first before I make

6    any solid plans.  I haven't bought any tickets.  I have not --

7    or anything of that nature.  It's more of a coordination at

8    this point.

9            THE COURT:  Okay.  And again, it is those days during

10   the week?  It doesn't include the weekend or it does?

11           PROSPECTIVE JUROR 112:  Those days would include the

12   weekend.

13           THE COURT:  The 12th is a Wednesday.  The 14th is a

14   Friday.  And are you -- I can't remember.  Did you say it's

15   going to be one of those days, or it's the 12th through the

16   14th?

17           PROSPECTIVE JUROR 112:  It's the -- so it's on the

18   Wednesday on the 12th, going all the way, and I come back on

19   Sunday.

20           THE COURT:  The 16th?

21           PROSPECTIVE JUROR 112:  Yeah.

22           THE COURT:  I don't remember why I wrote down the

23   14th.

24           PROSPECTIVE JUROR 112:  Maybe I misspoke or things

25   changed again.

998

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR 112:  You know how it is.

3          THE COURT:  Okay.  While you're here, I might as well

4    just ask you the other questions I have.

5          You have a friend, a close friend, who worked in a

6    police department, looks like in the State of Montana?

7          PROSPECTIVE JUROR 112:  That is correct.

8          THE COURT:  And I'm not sure, in answer to job title,

9    you wrote, "none."  What is that?

10         PROSPECTIVE JUROR 112:  So she was the sheriff's

11   daughter, and she would -- she kind of grew up in the

12   environment all the time.  She would sit in the sheriff's

13   office a lot, and so she's very aware of all the things that

14   the police do, essentially, is kind of the gist.

15         THE COURT:  Okay.  So she's got -- she's got it in

16   her blood, so to speak.  And she --

17         PROSPECTIVE JUROR 112:  Yes.

18         THE COURT:  Does she -- so she didn't have a formal

19   position there, but she spent a lot of time in the police

20   department?

21         PROSPECTIVE JUROR 112:  That is correct.

22         THE COURT:  And this -- how do you know this person?

23         PROSPECTIVE JUROR:  Coworker's wife.

24         THE COURT:  Are you a coworker currently or --

25         PROSPECTIVE JUROR 112:  Currently, yes.  We've known

999

1    each other for about ten years.

2         THE COURT:  And during this ten years, well -- I

3    should ask you this, when she was hanging out at the police

4    department, was this when you knew her?

5         PROSPECTIVE JUROR 112:  No.

6         THE COURT:  Okay.  So the fact that she did this, did

7    she -- has she shared with you experiences in the

8    Montana Police Department?

9         PROSPECTIVE JUROR 112:  Nothing that's out of the

10   normal, kind of like the office ongoing, some things -- some

11   laws that I wasn't aware of.  Not related to gangs or anything

12   like that, just --

13        THE COURT:  Okay.

14        PROSPECTIVE JUROR 112:  -- anything like that.

15        THE COURT:  And did it relate to Montana law or

16   federal law, or what did you --

17        PROSPECTIVE JUROR 112:  It was mostly Montana law.  I

18   can't really say about federal because, you know, I'm not --

19   yeah.

20        THE COURT:  Okay.  All right.  And you say you have a

21   generally positive attitude.  You've had some reasonable

22   interaction with police.

23        Have you had any particular interactions with police?

24        PROSPECTIVE JUROR 112:  Not really.  It's been pretty

25   normal.  Any ticket that I've -- anybody around me has had a

1000

1  ticket or anything I've been around, it's usually been pretty
2  reasonable and not outside the -- anything unusual.
3         THE COURT:  Okay.  And if you, you know, like I ask
4  everyone, if you have to hear testimony from a law enforcement
5  officer, would you evaluate that testimony the same way as you
6  would any other witness?
7         PROSPECTIVE JUROR 112:  Yes.
8         THE COURT:  You had an experience in which a family
9  member suffered a violent crime.  How long ago was that?
10         PROSPECTIVE JUROR 112:  I'm trying to remember what I
11  wrote.
12         THE COURT:  It looks like a family member was
13  sexually assaulted.
14         PROSPECTIVE JUROR 112:  Oh, yes.  Yes, that would be
15  my wife.
16         THE COURT:  Okay.  How long ago was that?
17         PROSPECTIVE JUROR 112:  That would have been when she
18  was a child.
19         THE COURT:  Okay.  So this is something that -- did
20  you know her when she was a child?
21         PROSPECTIVE JUROR 112:  No.  I knew her when she was,
22  what was it, late teens or early 20s.
23         THE COURT:  And she shared with you that this
24  happened.  And as her spouse, you want to support her and that
25  is a sensitive issue for you?

1001

1     PROSPECTIVE JUROR 112:  Yes.  She does not bring that

2  up lightly either, so --

3     THE COURT:  Okay.  This experience, knowing that your

4  wife suffered this as a child, do you think that that would

5  impact whether you could be fair or impartial in this case?

6     PROSPECTIVE JUROR 112:  Uh --

7     THE COURT:  I don't --

8     PROSPECTIVE JUROR 112:  I'll go off the information I

9  know and I'll follow the law.

10     THE COURT:  Okay.  All right.  You've learned a

11  little bit about gangs, you say, from word of mouth, maybe

12  media outlets.  It says you don't really have any details

13  about it.  Is that true?

14     PROSPECTIVE JUROR 112:  Not really, yeah.

15     THE COURT:  Okay.

16     PROSPECTIVE JUROR 112:  I know they exist.  I just

17  don't know much detail beyond that.

18     THE COURT:  The only question I have is about, again,

19  the visit to your grandmother or -- grandmother.  Is there any

20  way that that trip could be put off a month?

21     PROSPECTIVE JUROR 112:  Yeah, I can put that off.

22  That's why I haven't bought anything yet because I was waiting

23  to hear what was going to be the call here.

24     THE COURT:  Okay.  Anything else, sir, that I haven't

25  asked you about that I should?

1002

1    PROSPECTIVE JUROR 112:  Those were the main things I
2    wanted to bring up to bring your attention to make the
3    decision as you see fit.
4    THE COURT:  Okay.  Thank you so much.
5    PROSPECTIVE JUROR 112:  Yeah.
6    THE COURT:  If you will just go out, we'll get right
7    back to you.
8    PROSPECTIVE JUROR 112:  Okay.
9    (Prospective Juror 112 exits the courtroom.)
10    THE COURT:  All right.  Our jury member has stepped
11    out.  Anything for the record at this time?
12    MS. STOKMAN:  Nothing from the government.
13    MS. FISHER-BYRIALSEN:  Yes, Your Honor, I think we
14    would move for a hardship application for 112 and also for 97,
15    who has been here a few times.
16    THE COURT:  I'm sorry, 112 and 97?
17    MS. FISHER-BYRIALSEN:  Yes, Your Honor.
18    THE COURT:  And the -- obviously 112 we just talked
19    about.  Does anyone else want to have any comments about 112?
20    All right.
21    Mr. Reed, you were struggling with that?
22    MR. REED:  Yes.  I mean, just listening to him, I
23    think he's kind of into what he does for a living.  My
24    question would be, three weeks into our trial, would he be
25    more into what he's not being able to do, what he gets paid to

1    do, what it sounds like is his life, as opposed to this trial?

2            I recognize what we're doing is important also, but

3    I've had DOD clients before.  They're a different breed.  Tend

4    to like what they --

5            THE COURT:  I, uh -- I don't think there's any one of

6    us here who doesn't have anything else that we have to do too.

7    And I think, unfortunately for him, what he does seems like a

8    very important thing, but I'm a lifetime government employee

9    and I know how that works, there's somebody else, I guarantee

10    you.

11            While he's special and unique, they will find another

12    special and unique person to fit his crucial that happens

13    during this trial.  I don't see it as hardship.  My concern

14    was his trip, but he says he can move that.  So at this point

15    I don't find it to be a sufficient hardship.

16            And I'll tell you, I told you the other day, my well

17    of sympathy is drying up.  And it's just the nature of what we

18    have here, 100 people saying they have a hardship and a --

19    when we have 120 jurors and we're getting so close to not

20    having enough.  I don't think there's anyone here who wants a

21    mistrial because we run out of jurors.

22            So I have to take the heat on that one.  So at this

23    point, I'm not going to find a hardship as to Juror 112.

24            As to Juror 97, Ms. Byrialsen, what is your comment?

25            MS. FISHER-BYRIALSEN:  Her hardship is based on her

1004

1    medical issues, that the medicine seems rather -- like her

2    condition seems rather serious and this stress seems to be

3    bringing it up a little bit.

4         THE COURT:  I don't know.  So I asked her if there's

5    a trigger and she said no.  Which I thought she was going to

6    say, yeah, you know, the stress of this event.  But she said

7    no.  She hasn't had a similar incident for 18 months.  It may

8    be another 18 months, it may be she has one and then we lose a

9    juror.  I don't know.

10         But given the sporadic nature of that medical

11   condition, I don't know that it's going to -- if she had said

12   stress is a trigger for me, yeah, I think we'd be talking

13   about that.  But I don't -- I don't -- that's how I see it,

14   but I'm happy to hear any other comments about her.

15         MS. FISHER-BYRIALSEN:  I mean, I think maybe she

16   doesn't recognize that this perhaps is a trigger because

17   she's -- it's been happening since she got here, right?

18   It's -- she hadn't --

19         THE COURT:  She said --

20         MS. FISHER-BYRIALSEN:  -- hadn't had one for a while

21   and then she had one.

22         THE COURT:  -- she had one today that lasted 15

23   minutes.  But this is her, you know, day five in trial too.

24         MS. FISHER-BYRIALSEN:  Yup.

25         THE COURT:  I -- anyone else have comments about 97?

1005

1    MR. REED:  I got the impression that what happened

2  today wasn't in here.  She was outside.

3    THE COURT:  I think that's what she said.

4    MR. REED:  And we're in a different world once we're

5  actually in trial.

6    THE COURT:  I'm sorry?

7    MR. REED:  We're in a different world once we are

8  actually in trial.  My worry is trying to undo something

9  happening to her while we were in this case.  And I don't know

10  how you do that.

11    Because it just changes -- I've never had it happen

12  before in a courtroom, but I also don't want it to -- I

13  just -- I mean, I don't suffer from what she does, but I

14  have -- I know heart things, and they happen when they happen.

15    THE COURT:  Right.  I mean --

16    MR. REED:  And that's my concern.

17    THE COURT:  I guess the thing is too, given how she

18  says it hasn't happened in 18 months, it happened today, but

19  she doesn't have any identified triggers.  You could have a

20  heart attack tomorrow too.

21    MR. REED:  Well, I take beta blockers, but --

22    THE COURT:  Okay.  I'm not going to pick on myself --

23    MR. REED:  That's a different question.

24    THE COURT:  Somebody else could -- yeah.  And that's

25  something I think -- I don't know.

1006

1    Anybody else have comments about 97?

2    MS. FISHER-BYRIALSEN:  Well, I just think that,

3    Your Honor, also she said that she wasn't taking her

4    medications.

5    THE COURT:  She said she chose not to take her

6    nitroglycerine because it causes a migraine and that when

7    she's at home, she doesn't either.

8    MS. FISHER-BYRIALSEN:  Because the husband is there

9    to save her.

10    THE COURT:  Yeah.  Here she could choose to take it

11    or not take it.  Obviously, there's a whole lot of people and

12    we have medical attention right in this room.  So I'm -- I

13    don't know.  I'm happy to hear more comments about her, but at

14    this point, I don't see that she's medically precluded.

15    MS. STOKMAN:  The government agrees with the Court.

16    We'll also point out that until she retired really recently,

17    she worked in this building so she's aware of any kind of

18    medical help that she could get here.

19    And I just want to mention that she's been up in

20    front of us multiple times since we started this last week,

21    and this was the first time this came up because of her

22    incident today.  So the government agrees with the Court.

23    THE COURT:  All right.  Let's go ahead and bring the

24    rest of the jurors in.

25    (Prospective Jurors enter the courtroom.)

1007

1    THE COURT:  All right.  We have all of our jury

2    members back in their places.  Could we get the microphone to

3    Juror 103, seated in A10.  Right behind you.  Thank you.

4        All right.  So you are a nurse.

5        What type of nursing do you do?

6        THE COURT REPORTER:  Can you bring that up?  It's

7    not --

8        THE COURT:  Hello?  Hello?

9        THE CLERK:  Touch the bottom.  Press the bottom.

10   It's a brand new mic.

11       PROSPECTIVE JUROR 103:  Hello.  Is it okay if I talk

12   in private?

13       THE COURT:  Sure.

14       PROSPECTIVE JUROR 103:  Thank you.

15       THE COURT:  Sorry, wait.  Actually, let's go ahead

16   and do it over at sidebar.

17       Counsel, if you can join me over there.

18   (Sidebar commences between the Court, all counsel, and

19    Juror 103.)

20       THE COURT:  All right.

21       PROSPECTIVE JUROR 103:  Hi.  So I'm a nurse, an LVN,

22   and I'm currently enrolled into an RN college.  Just waiting

23   for me to get a call if I'm enrolled or not.

24       But besides that, I've heard about Aryan Brotherhood,

25   and the symbol they use as a tattoo is kind of religious

1008

1    symbol in our culture, and I don't think I will be able to
2    make a fair decision based on that.
3            It's like a swastika symbol and it's a very sacred
4    symbol in our culture.
5            THE COURT:  Let me start with the LVN.  So you're
6    trying to reenroll in school?
7            PROSPECTIVE JUROR 103:  Yes, for RN.
8            THE COURT:  Where are you going to -- I mean, is it
9    here locally or someplace else?
10            PROSPECTIVE JUROR 103:  I applied in Merced, in
11    Madera College.  I'm waiting to hear about it, if I'm going to
12    be in the program or not.
13            THE COURT:  Is it a difficult program to get into?
14            PROSPECTIVE JUROR 103:  Yes.
15            THE COURT:  Is that why you applied to both of them?
16            PROSPECTIVE JUROR 103:  Yes.
17            THE COURT:  If you were accepted to one of them, when
18    would your schooling start?
19            PROSPECTIVE JUROR 103:  Around summer, in May.
20            THE COURT:  Well, would you have to do anything
21    before May to get ready for that?
22            PROSPECTIVE JUROR 103:  No.
23            THE COURT:  And so if you get word about that, that
24    you get in, you'll just be, yay, and you'll just wait until
25    May and you'll start?

1009

1    PROSPECTIVE JUROR 103:  Yes.

2    THE COURT:  Okay.  Is there anything about that that

3    you think impacts your ability to be a juror in this case?

4    PROSPECTIVE JUROR 103:  Just the symbol they

5    represent with.

6    THE COURT:  Right.  But I mean, I'm sorry --

7    PROSPECTIVE JUROR 103:  And like I said, my work,

8    they're going to pay only 10 days of jury duty.  And besides

9    that, I'm able to use my vacation hours, but I just went to

10   India a few months ago, so I don't really have that many

11   vacation hours.  And I do live with my mom and, kind of, about

12   to get divorced from my husband.  So I own a house as well, so

13   I'm the only one who's paying the mortgage and all the bills

14   and stuff and --

15   THE COURT:  You moved in with your mother, then?

16   PROSPECTIVE JUROR 103:  Yes -- not with my mother.  I

17   bought that house myself two years ago and my mother lives

18   with me.  She used to live in an apartment before.

19   THE COURT:  When she lived in an apartment, how did

20   she pay for her rent?

21   PROSPECTIVE JUROR 103:  She works for Foster Farms.

22   THE COURT:  Does she still work now?

23   PROSPECTIVE JUROR 103:  Yes.

24   THE COURT:  So she also pays, right?

25   PROSPECTIVE JUROR 103:  No, she does -- she helps my

1010

1     brother.  He's in India.  She helps him and my grandparents.

2              THE COURT:  So all of the money she earns, she sends

3     out of the country?

4              PROSPECTIVE JUROR 103:  Not all.  Most of it she use

5     it for herself over here.

6              THE COURT:  Okay.

7              PROSPECTIVE JUROR 103:  And then she supports my

8     brother because my dad expired two years ago, so he's over

9     there by himself.

10             THE COURT:  Okay.  In your questionnaire it said, you

11    know, this trial is expected to last three months, would you

12    suffer significant hardship?  And you said, No.

13             PROSPECTIVE JUROR 103:  Yeah.  I just -- I didn't

14    really want to say.  I thought I was not going to reach this

15    level of selection.

16             THE COURT:  I mean, it also said, Would it interfere

17    with any of your personal, family, or professional

18    obligations?  And you also said, No.

19             PROSPECTIVE JUROR 103:  I should have said yes.

20             THE COURT:  When did you learn about the financial

21    hardship?

22             PROSPECTIVE JUROR 103:  I already knew it before

23    only, but I was in a hurry to answer the --

24             THE COURT:  You remember signing it under penalty of

25    perjury, though, right?

1011

1    PROSPECTIVE JUROR 103:  Yes.

2    THE COURT:  Okay.  What hours do you currently work?

3    PROSPECTIVE JUROR 103:  I work 9:00 to 5:30 as a -- I

4  don't work the floor as a nurse, I work as an IP, infection

5  preventionist.

6    THE COURT:  And so are there other IPs who work?

7    PROSPECTIVE JUROR 103:  No, I'm the only one in the

8  building.

9    THE COURT:  Does the location where you work, is it a

10 24-hour a day --

11    PROSPECTIVE JUROR 103:  Yes.

12    THE COURT:  It possible for you to work a different

13 shift?

14    PROSPECTIVE JUROR 103:  They said they are able to

15 accommodate my hours, but it's kind of far from here.  By the

16 time I reach there, I would be so tired to go to work after

17 jury duty.

18    THE COURT:  What city do you work in?

19    PROSPECTIVE JUROR 103:  Merced.

20    THE COURT:  How long does it take you to get to the

21 courthouse?

22    PROSPECTIVE JUROR 103:  Uh.

23    THE COURT:  About an hour and a half?

24    PROSPECTIVE JUROR 103:  An hour and a half from

25 Livingston.  And from Merced, a little bit -- an hour and 15

1   minutes or something.

2           THE COURT:  All right.  Now, you also mentioned that

3   the swastika, as you understand it, is a symbol of the

4   Aryan Brotherhood; is that right?

5           PROSPECTIVE JUROR 103:  Yes.

6           THE COURT:  Where do you come to that understanding?

7           PROSPECTIVE JUROR 103:  I saw it in a video, it's

8   just a random video online.  And, like, they were showing the

9   tattoos and stuff.  I wasn't aware at that time, so when I

10  heard the case over here, then I was like, Oh, it represents

11  that gang or something.

12          THE COURT:  So the video you saw that had that symbol

13  also talked about this gang in particular?

14          PROSPECTIVE JUROR 103:  Well, they were saying, like,

15  AB, AB, but I didn't know AB means Aryan Brotherhood.  I

16  learned it coming over here that it means Aryan Brotherhood.

17          THE COURT:  And in your culture, your religion, that

18  symbol has significance for you; is that what you're saying?

19          PROSPECTIVE JUROR 103:  Yes, it's a sacred symbol.

20  Like Om and swastika, they are two symbols that we pray in

21  front of.

22          THE COURT:  And so tell me where your concern lies

23  about the symbol.

24          PROSPECTIVE JUROR 103:  I don't think I will be able

25  to make a fair decision over here because according to me, I

1  don't want our religious symbol to be represented as a gang

2  symbol.  It's already -- I'm not feeling good about it.

3          THE COURT:  So it would bother you to see that --

4          PROSPECTIVE JUROR 103:  It does.

5          THE COURT:  I guess my question would be, I know it

6  would bother you, but would you be able to set that aside and

7  say, Look, I don't know if these people have that tattoo, I

8  don't know if they --

9          PROSPECTIVE JUROR 103:  I don't think so.

10          THE COURT:  You're assuming, as you sit here today,

11  that is a symbol and that they --

12          PROSPECTIVE JUROR 103:  Yes.

13          THE COURT:  And that these three gentleman have that

14  symbol somewhere?

15          PROSPECTIVE JUROR 103:  I may or may not, but I know

16  the symbol represents that gang and I don't think I would be

17  able to make any kind of fair decision on this.

18          THE COURT:  Okay.  So if you learned that that, in

19  fact, symbol is associated from evidence in this trial, you're

20  saying seeing the symbol would be enough, you would not be

21  able to be fair after that; is that true?

22          PROSPECTIVE JUROR 103:  Yes.

23          THE COURT:  Okay.  Counsel, anyone have questions?

24          MS. FISHER-BYRIALSEN:  When did you see that YouTube

25  video?

1014

1     PROSPECTIVE JUROR 103:  It wasn't a YouTube, it

2  was -- I believe it was on Instagram or something.  It was,

3  like, a random video of guys showing the symbol.

4     MS. FISHER-BYRIALSEN:  When?

5     PROSPECTIVE JUROR 103:  I would say maybe not too

6  long ago.

7     MS. FISHER-BYRIALSEN:  Was it before or after you

8  came here?

9     PROSPECTIVE JUROR 103:  Before.

10     MS. FISHER-BYRIALSEN:  Okay.  Have you looked

11  anything up online about the Aryan Brotherhood or the AB or AB

12  symbols or anything like that?

13     PROSPECTIVE JUROR 103:  No.  I was just randomly

14  scrolling.  I didn't really care about it, but it came to mind

15  after that that this is what it means.  So to me, I don't want

16  our symbol to represent a gang, so I don't think I'm going to

17  make a fair decision according to that.  Because I grew up

18  praying in front of this symbol.  And if, at the end of the

19  day, it represents a gang, that's a whole new story.

20     THE COURT:  Anyone else have questions for this

21  juror?

22     All right.  Thank you so much.  If you would just

23  return to your seat.

24     PROSPECTIVE JUROR 103:  Okay, thank you.

25     (Prospective Juror 103 dismissed from sidebar.)

1015

1    MS. FISHER-BYRIALSEN:  We would move to strike her

2  for cause because we know the symbol is going to be an issue.

3    MS. STOKMAN:  Yeah, then we'll agree to that.

4    THE COURT:  All right.  So we'll strike 103.

5   (Sidebar ends.)

6    THE COURT:  All right.  Juror Number 103, thank you

7  so much for your honesty and the information you provided us.

8  I'm going go ahead and excuse you at this time.  This doesn't

9  sound like the trial for you.  I'm going to ask you to call

10  the 800 number after five o'clock on Friday.  Thank you very

11  much.

12    Let's go ahead and call the next juror.

13    THE CLERK:  Juror 113.

14    THE COURT:  Hello, sir.

15    PROSPECTIVE JUROR 113:  Hello.

16    THE COURT:  You're out in the audience thinking, I'm

17  almost done, and then we catch you, right?  Thank you for your

18  attention over the last few days.  Did you have the

19  opportunity to hear all the questions that I asked?

20    PROSPECTIVE JUROR 113:  I did.

21    THE COURT:  Was there information that you needed to

22  share in asking you those questions?

23    PROSPECTIVE JUROR 113:  There was one.  You mentioned

24  if we knew anybody that was in the LA County sheriff's.

25    THE COURT:  Okay.

1016

1    PROSPECTIVE JUROR 113:  And I have a cousin.  He was

2  a homicide detective.

3    THE COURT:  Do you remember when that was?

4    PROSPECTIVE JUROR 113:  Oh, years and years ago.

5  He's been retired probably 15 years.  And even before that, he

6  taught -- he was an older cousin, so I really didn't know him

7  well.  I just want to mention that I did have a relative.

8    THE COURT:  Are you saying that in the last period of

9  time in his career, he was in, like, the training bureau or --

10    PROSPECTIVE JUROR 113:  He trained, yes.  Yes.

11    THE COURT:  Do you know how long he was in the

12  training bureau?

13    PROSPECTIVE JUROR 113:  I couldn't tell you,

14  honestly.  The information I get from -- about him is

15  basically through my mom.  You know, just letting me how the

16  family is doing.

17    THE COURT:  Okay.  Anything about the fact that your

18  relative worked in that agency that you think would impact

19  your ability to be fair in this case?

20    PROSPECTIVE JUROR 113:  Not at all.

21    THE COURT:  Okay.  Looks like you were in the

22  military for a period of time; is that right?

23    PROSPECTIVE JUROR 113:  I was, yes.

24    THE COURT:  Were you in Vietnam?

25    PROSPECTIVE JUROR 113:  No, it was after.

1017

1    THE COURT:  Missed it, okay.

2    PROSPECTIVE JUROR 113:  Yeah, and before

3    Desert Storm.

4    THE COURT:  So you actually were never deployed to a

5    combat zone?

6    PROSPECTIVE JUROR 113:  No combat, no.  I was combat

7    trained, but I never was in any combat.

8    THE COURT:  Okay.  Did you have any law enforcement

9    role when you were in the military?

10    PROSPECTIVE JUROR 113:  I did.  I was a security

11    police for the Air Force.

12    THE COURT:  How long did you have that job?

13    PROSPECTIVE JUROR 113:  You know, I was in the

14    Air Force for four years.  And that was it.

15    THE COURT:  Okay.

16    PROSPECTIVE JUROR 113:  Yeah.

17    THE COURT:  And what type of work did you do as

18    security police?

19    PROSPECTIVE JUROR 113:  Honestly, all I did was guard

20    F-4 Phantoms that were nuclear loaded.  And then we had a

21    nuclear weapons facility storage unit that we guarded as well.

22    So we basically took care of the flight line.

23    THE COURT:  Okay.

24    PROSPECTIVE JUROR 113:  Yeah.

25    THE COURT:  All right.  So no responsibility for

1018

1  investigating crimes or --

2          PROSPECTIVE JUROR 113:  Nope.

3          THE COURT:  -- or any --

4          PROSPECTIVE JUROR 113:  Nope.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR 113:  Nope.

7          THE COURT:  All right.  Were there any thefts while

8  you were involved?

9          PROSPECTIVE JUROR 113:  No, not -- not on a flight.

10 I mean, there were two -- two divisions of security police:

11 my -- my unit, and then there was LEs, which were law

12 enforcement.  They were the ones who did all the -- all the

13 tickets, all the investigation of burglaries and that kind of

14 stuff and took care of the base while we took care of the

15 flight line.

16         THE COURT:  Okay.  Makes sense.  Thank you.

17         PROSPECTIVE JUROR 113:  Yup.

18         THE COURT:  Sir, you look like you have really no

19 information about gangs; is that true?

20         PROSPECTIVE JUROR 113:  That's true.  I -- I wasn't

21 around them.  Didn't really pay attention to it, yeah.

22         THE COURT:  Okay.  Anything else that I haven't asked

23 you about that you think would be important for us to know?

24         PROSPECTIVE JUROR 113:  I can't think of anything.

25         THE COURT:  Okay.  All right.  I think we're ready

1019

1    for you, Ms. Stokman.  Any questions?

2                MS. STOKMAN:  Just briefly.

3                Hey, everyone.  I'm not going to stay up here long

4    because I know we've been doing this for a while.  But is

5    there anything that I have asked the other group that you

6    remembered might have flagged something to you that you want

7    to bring up or that might be an issue for you showing up with

8    an open mind to this case?

9                Nobody is raising their hand.

10               Juror Number 88, I know you had mentioned that you

11   have family who's in the Public Defender's Office.

12               Do you come to this with any bias for one side or the

13   other because of that?

14               PROSPECTIVE JUROR 88:  No.

15               MS. STOKMAN:  Okay.  So you're able to have an open

16   mind to both sides and to hear the evidence and listen to the

17   judge's instructions and go from there?

18               PROSPECTIVE JUROR 88:  Yes.

19               MS. STOKMAN:  Okay.  Is there anyone else who feels

20   differently?  Now's your time -- kind of last chance to let us

21   know.

22               But I don't see any hands.  So thank you.

23               THE COURT:  All right.  Ms. Byrialsen, do you have

24   comment or questions?

25               I'm sorry.  We started with Mr. Reed, didn't we?

1020

1     Mr. Reed.  Thank you.  Do you have questions?

2     MR. REED:  Yes, one or two.

3     Juror Number 87, I -- I had cryptic notes on what you

4  do for a living.

5     You don't actually work for any government agency; is

6  that right?

7     PROSPECTIVE JUROR 87:  Internal Revenue Service.

8     MR. REED:  So they contract with your company?

9     PROSPECTIVE JUROR 87:  No.  Department of Treasury,

10  and I work at the IRS.

11     MR. REED:  Oh, you do work for the IRS?

12     PROSPECTIVE JUROR 87:  Uh-huh.

13     MR. REED:  But you're a lead contract representative

14  for them?

15     PROSPECTIVE JUROR 87:  Yes.  So there's a unit that

16  I'm -- I'm one of three leads in the unit.  It's equivalent of

17  an assistant manager, depending if the manager is there.  And

18  certain cases, give technical advice, assist with cases, work

19  my own as well.  So kind of --

20     MR. REED:  And your interaction with the prisons is

21  what?

22     PROSPECTIVE JUROR 87:  On occasion I'll speak to a

23  prisoner.  If I'm on a phone line, they'll be asking about a

24  return that came in that's -- that was flagged as identity

25  theft, I got this letter I don't know how to deal with.  I

1   can't call the off -- excuse me.  I can't do the online

2   methods to try to investigate it.

3           Or more often than not it's what I described as the

4   stimulus payment concerns; those are still being inquired

5   about.  But those sometimes include the documentation from the

6   prison system that I still have to review.  So it seemed

7   relevant to mention.

8           MR. REED:  Okay.  So that's a thing with the IRS.

9           PROSPECTIVE JUROR 87:  With respect to we receive

10  documentation in cases, letters from -- from individuals from

11  all, you know, swaths of the community, including those who

12  are in prison.  And so those come up on occasion, and we have

13  to address them, to answer your question.

14          MR. REED:  For lack of a better word, and you may

15  understand what I'm saying, there is an economic pandemic that

16  happened within the pandemic itself?

17          PROSPECTIVE JUROR 87:  I'm not sure what you mean.

18          MR. REED:  Well, you said you're looking at

19  documentation from the prisoners.

20          PROSPECTIVE JUROR 87:  Uh-huh.

21          MR. REED:  Unless I'm --

22          PROSPECTIVE JUROR 87:  That's the most common kind of

23  correspondence.

24          MR. REED:  Unless I'm mistaken, I don't think that

25  they leave the prison to work, right?  So they don't have that

1   kind of income.  I don't know if they file tax returns, but my
2   gut would be no.
3           PROSPECTIVE JUROR 87:  They can, whether they're
4   married, filing joint.  Or they could be -- have income before
5   they came into prison, an amended return, trying to get a
6   particular credit that's refundable, something of that nature.
7           MR. REED:  You're not talking about any kind of
8   fraud; you're talking about just regular ways --
9           PROSPECTIVE JUROR 87:  Fraud with respect to someone
10  that's coming in and saying, Hey, I am this taxpayer, and then
11  they file online or mailed-in return; and then the person then
12  comes in saying, I never filed the return for that year.  Why
13  am I getting these notices?
14          So that would be tax-related fraud.
15          MR. REED:  I got that.
16          So say for the sake of argument that happens --
17          PROSPECTIVE JUROR 87:  Yeah.
18          MR. REED:  -- and you get those documents.  What do
19  you do with that?  You talk to the person on the phone, or do
20  you do an investigation?
21          PROSPECTIVE JUROR 87:  More often than not I give
22  them, as I described, the limited time on the phone that
23  individuals can have if they are in prison.  It would be
24  getting a letter saying, I never got my stimulus payment.  I
25  never got my impact payment -- there's different ways to

1   phrase it -- for 2020 or 2021.  Or, I got this one for 2020,

2   but I didn't get the 2021 and I want to know what's going on

3   with it.

4          And then we have to translate that, see what they are

5   trying to drive at in the issue, and address the issue,

6   address the accounts and the letter.  It's a case-by-case

7   basis.

8          MR. REED:  Okay.  So there's a general concept --

9   although, the Court will tell you specifically what the law

10  is -- as to any and every issue that has to do with your case.

11  But there's a general concept that you leave your knowledge,

12  other than your common sense, at the door.

13         PROSPECTIVE JUROR 87:  Correct.

14         MR. REED:  So when you come in, you come in naked

15  without any preconceived understanding about certain things.

16  However, we're all human.

17         So if I know something that the other 11 jurors don't

18  know and I know more about that than other people, and when

19  this comes up, I'm probably going to say, Hey, I know about

20  this.  I'm not going to do it now when I'm in the box, but

21  when I go to the back, nobody -- I can guarantee you that no

22  one else knows about IRS stuff better than you, because you

23  guys -- you only get 1 out of 30 of you guys.

24         So are you the kind of guy that, Hey, I know that,

25  and in fact I've seen things like that, and I know that this

1   is that, and I'm drawing this conclusion?  Are you that kind

2   of person?

3          PROSPECTIVE JUROR 87:  No, no.  But I would follow --

4   at work I would follow the particular procedures,

5   Internal Revenue manuals, to address cases.  And so that if

6   I -- once I'm not in that scenario or situation, I wouldn't

7   bring that kind of knowledge in -- action, I should say, to a

8   court situation, something that's not related to my job at

9   all.  That's not professionally appropriate.

10         MR. REED:  That's what I'm talking about.  So you're

11  Juror Number 12 and I'm Juror Number 1 -- No, I don't want to

12  be Number 1.  I'm Juror Number 2, you're Juror Number 12, and

13  we're sitting in the back.  And I'm, Hey, dude, remember that

14  Wednesday that we came in?  Before we all sat down, this very

15  thing we're looking at you knew about.

16         How do you answer that question if I brought that up

17  to you?

18         PROSPECTIVE JUROR 87:  Not something I can talk

19  about.  That's -- that would be my response.

20         MR. REED:  Okay.

21         PROSPECTIVE JUROR 87:  It's a bland response.  I

22  apologize if that sounds as such, but --

23         MR. REED:  It's what?

24         PROSPECTIVE JUROR 87:  A very bland or kind of -- not

25  terse, but that's --

1    MR. REED:  That's all right.  A response is a

2  response.  That's okay.

3    When I read your -- your questionnaire, I didn't get

4  IRS from it.  It just sounded like something else, so --

5    PROSPECTIVE JUROR 87:  The questionnaire was worded,

6  in my -- correct me if I'm wrong -- was in words, Please don't

7  include the name of your employer.  And so I put the -- my

8  title.

9    MR. REED:  Okay.  How about the situation of working

10  with other people that you don't normally work with?  What do

11  you like when it comes to things like that?

12    PROSPECTIVE JUROR 87:  I'm not sure what you mean.

13    MR. REED:  Okay.  Well, I'm assuming you never sat on

14  a jury before, right?

15    PROSPECTIVE JUROR 87:  Yeah.  I have once.

16    MR. REED:  And you went all the way through?

17    PROSPECTIVE JUROR 87:  Yes.

18    MR. REED:  Okay.  I don't care what the verdict was,

19  but did you reach one?

20    PROSPECTIVE JUROR 87:  Yes.

21    MR. REED:  So you've done that experience, and you

22  know what it's like?

23    PROSPECTIVE JUROR 87:  Correct.

24    MR. REED:  The longer trials bring with them other

25  issues.  But would you consider yourself the type of person

1    that tends to take the lead when the lead is offered, or are

2    you the kind of person that kind of stays quiet and leaves it

3    alone?

4            PROSPECTIVE JUROR 87:  I'm an introverted individual,

5    but I'll do what I need to do if it's asked of me.

6            MR. REED:  Well, there's no -- there's no assigning.

7    I don't know what happens back there.  I think I said that

8    last time.  There's 12 people in the back.  I don't exactly

9    know how they determine who the foreman is.  Movies I've seen

10   say they select it.  I don't know if it happens that way.

11   Maybe it's they look for somebody that takes a lot of notes.

12   I have no idea.

13           But my question is, what kind of person are you when

14   it comes to that type of thing?  What did you do last time?

15           PROSPECTIVE JUROR 87:  I don't recall how the foreman

16   was selected.  I know that I wasn't.  And I gave my input when

17   the questions were broached or when the subjects were

18   mentioned about the case during deliberation.

19           It was in 2014, so my memory is a little hazy.

20           MR. REED:  You've had some family victims in -- or

21   victims [sic] in your family have been victims of crime; is

22   that correct?

23           PROSPECTIVE JUROR 87:  Correct.

24           MR. REED:  Okay.  And from what I understand, it

25   looks as though -- at least the way you wrote it -- there was

1  | no legal adjudication of what happened?

2  |       PROSPECTIVE JUROR 87:  My sister was assaulted by her

3  | friend and his -- her boyfriend.  They tricked her into being

4  | in the back seat of his car and drove to an isolated location

5  | and beat her up, and then she had to go to the hospital

6  | afterwards.

7  |       My recollection of that was she was -- she was

8  | treated for her injuries, and they -- they may have had a --

9  | some kind of a deal, or there was some kind of court process

10 | for the two of them individually, the two individuals that did

11 | that -- took that action.

12 |       MR. REED:  It was her boyfriend?

13 |       PROSPECTIVE JUROR 87:  Pardon me?

14 |       MR. REED:  One was her boyfriend?

15 |       PROSPECTIVE JUROR 87:  Her friend's boyfriend.  My

16 | sister was the one being assaulted.

17 |       MR. REED:  And your mom and dad's house was

18 | burglarized?

19 |       PROSPECTIVE JUROR 87:  Yes.  When they were moving

20 | right before the pandemic, the next door neighbor's boyfriend

21 | would come into their backyard, their front yard, tried to

22 | break into their garage and steal, like, paving stones, light

23 | fixtures, things of that nature.

24 |       MR. REED:  To circle back to my question, that didn't

25 | get itself to a court situation?

1028

1   PROSPECTIVE JUROR 87:  That one did not.  No, that

2   one did not.  They didn't report it because they were leaving

3   a couple weeks later, so they just wanted to wipe their hands

4   clean of that particular situation.

5   MR. REED:  And you didn't live there at the time?

6   PROSPECTIVE JUROR 87:  No.

7   MR. REED:  So someone else told you --

8   PROSPECTIVE JUROR 87:  Uh-huh.

9   MR. REED:  -- that our house was burglarized, and

10  these are the people who we think did it, right?

11  PROSPECTIVE JUROR 87:  Yes.

12  MR. REED:  And then when you wrote this form down for

13  the Court almost five years later, you said that your parents'

14  place was burglarized, and you actually didn't write down a

15  name, but you wrote down that a person did it; is that

16  correct?

17  PROSPECTIVE JUROR 87:  Correct.

18  MR. REED:  Okay.  You agree that that's different,

19  that is short of somebody establishing all the elements for

20  the commission of a crime and then that person being convicted

21  of that crime?

22  PROSPECTIVE JUROR 87:  Very much so, yeah.

23  But I would have to frequent my parents' house.  My

24  dad was significantly ill.  My mom had a knee replacement and

25  stuff.  So I was there every week, and I didn't want to, you

1029

1    know, confront the gentleman, but it was disconcerting.

2            MR. REED:  I'm with you on all that.  And that's the

3    natural way for a human to react.  However, what I'm trying to

4    draw is a distinction between convicted of a crime, having

5    gone through either an opulent court like this place or the

6    state courthouse where in their elements judges give

7    instructions and people plead guilty, and then that creates a

8    crime and, slash, criminal.

9            In your case it's just, I knew somebody did it.  My

10    mom and dad think it was this guy, but we didn't to any of the

11    legal stuff to get that conviction.

12            PROSPECTIVE JUROR 87:  I may have misread that

13    particular question for that entry.

14            MR. REED:  Well, the question doesn't put it that

15    way.  The question just talks about whether or not a victim of

16    a crime.

17            But you would agree there's a difference between

18    being convicted of a crime, i.e., you went through the

19    courthouse, and, I saw you steal something, and I believe

20    you're a criminal?

21            PROSPECTIVE JUROR 87:  Uh-huh, yes.

22            MR. REED:  Okay.  So I guess what I'm trying to get

23    at is, in order to get to the latter, which is the one where

24    you get a conviction, that doesn't always require a jury, but

25    that requires an entire legal procedure that may be wanting in

1   some set of facts that you hear about in this case.

2          I'm not talking about what they're charged with.

3   That's a different issue.  I'm talking about some other thing

4   you may hear.  Hey, that guy -- I committed a crime and that

5   guy had me do it or I committed a crime and he did too.

6          Do you see the difference --

7          PROSPECTIVE JUROR 87:  Yes.

8          MR. REED:  -- between going through the courthouse

9   and a guy just getting up and saying, Hey, I did something

10  wrong and that guy did it as well?

11         PROSPECTIVE JUROR 87:  Between some kind of hearsay

12  and versus the court procedures like --

13         MR. REED:  Yeah, I wanted to leave out the legal

14  part.  That's why I left out the word hearsay.

15         PROSPECTIVE JUROR 87:  Sorry.

16         MR. REED:  Go ahead.

17         PROSPECTIVE JUROR 87:  So --

18         MR. REED:  It's more important for you to talk, not

19  me.

20         PROSPECTIVE JUROR 87:  I understand there's a

21  distinction between hearing about something versus actually

22  going through the full scope and length of court procedures.

23         MR. REED:  Okay.

24         PROSPECTIVE JUROR 87:  If that answers your question.

25         MR. REED:  And the case you did was in 2014 or 2015,

1  that was the arson case?  That's the one that you did --

2          PROSPECTIVE JUROR 87:  Yes.

3          MR. REED:  I don't mean you did.  The case you --

4          PROSPECTIVE JUROR 87:  That I was a juror for, yes.

5  Sorry.

6          MR. REED:  You should have been a doctor.  Your

7  handwriting is interesting.

8          PROSPECTIVE JUROR 87:  I injured my -- I'm a

9  left-hand person.  I injured my hand through some home

10 repairs, so I had to write with my right, as you can tell.

11         MR. REED:  Well, I couldn't tell how you got it.

12         PROSPECTIVE JUROR 87:  It's not completely slanted,

13 so it was getting me that.  So --

14         MR. REED:  So how do you have a cursory knowledge

15 concerning the makeup and, I don't know what that other word

16 is, something beliefs of prison something.

17         PROSPECTIVE JUROR 87:  Gangs is probably what -- a

18 similar -- pardon?  Pardon, I'm sorry?

19     (Court reporter gains clarification.)

20         THE COURT:  Gangs.

21         PROSPECTIVE JUROR 87:  Gangs, sorry.

22         MR. REED:  I guess I speak like you write.

23         PROSPECTIVE JUROR 87:  So I have -- just what was --

24 has been previously mentioned, social media, you know,

25 *Law & Order* TV shows, things of that nature.

1    I don't have a particular interest, nor do I engage

2  in a lot of effort to try to go and research those topics.

3    MR. REED:  Not that it's important and not that we'll

4  ever get there, that issue is probably not relevant in this

5  case, but being in a gang is not a crime.

6    PROSPECTIVE JUROR 87:  I didn't suggest that.  I was

7  just saying that that --

8    MR. REED:  I understand that.

9    PROSPECTIVE JUROR 87:  -- that's been the subject

10  matter that's been brought up often, so --

11    MR. REED:  Yeah, it has.  And unless it comes in --

12  because of the context it comes in, we don't deal with it, but

13  people are worried about gangs.  But that in and of itself is

14  not a crime.  That's not what they're accused of.  They're

15  accused of committing crimes.

16    So knowing about gangs doesn't get you there.  There

17  are elements the Court -- the prosecutor will tell you what

18  they are in opening statement and -- well, maybe not in

19  opening statement, but in closing argument they definitely

20  will, and then the Court will apply the law.

21    The fact that they may or may not be in gangs and

22  those gangs may or may not be racist, eh, okay, I -- that's

23  just an assumption.  Okay?

24    PROSPECTIVE JUROR 87:  Uh-huh.

25    MR. REED:  The elements that the Court gives you are

1033

1    what you have to agree to beyond a reasonable doubt, and all

2    12 of you have to agree for the most part to every one of the

3    elements.

4            Is that something you can do and follow?

5            PROSPECTIVE JUROR 87:  Yes.

6            MR. REED:  Okay.  So when you talk about specific

7    cultural makeup, that's again, because of what you watched on

8    television and things like that?

9            PROSPECTIVE JUROR 87:  Exactly, yeah.

10           MR. REED:  I think that's what you wrote.  I'm

11   waiting -- I can't -- I'm -- come over there with you and find

12   out what this word is, but you're talking about, I know

13   about -- I've heard about the AB on TV and -- you know, I

14   don't know how people get AB from that motorcycle gang because

15   that's not what they were either, but --

16           PROSPECTIVE JUROR 87:  And I have not seen the show.

17   So, I mean, I wouldn't know either, so -- but --

18           MR. REED:  And would you agree with me that just

19   looking at me, and I'll do the same to you, I probably have no

20   idea what your cultural makeup is and your sensitivities.

21           PROSPECTIVE JUROR 87:  Uh-huh.  I agree.

22           MR. REED:  Would you agree the same about me?

23           PROSPECTIVE JUROR 87:  Yes.

24           MR. REED:  Absent you and I talking about it, we

25   would probably go through the rest of our lives, the short

1034

1    time that we're with each other, never knowing how the other

2    person feels about race or issues like that.

3              PROSPECTIVE JUROR 87:  Correct.  I agree.

4              MR. REED:  What in your mind would be the best way to

5    know about how a person looks and feels about I guess where

6    their racial sensitivities and/or beliefs?

7              PROSPECTIVE JUROR 87:  Either through what they've

8    put out in the world, writings, things of that nature, or if

9    that's more of a one-to-one kind of discussion or just

10   speaking to the individual.

11             MR. REED:  Talking to them is generally how --

12             PROSPECTIVE JUROR 87:  Getting information from them

13   about what that would be.  And then also nonverbal

14   communication, mannerisms, things of that nature.  Not just

15   their appearance.

16             MR. REED:  But usually speaking to them.

17             PROSPECTIVE JUROR 87:  Correct.

18             MR. REED:  Given the things that I've asked you, and

19   this case is a little different than your previous case, and

20   it sounds like it's going to take a lot longer than your

21   previous case did -- and I'll ask an open-ended question

22   that's actually very unfair, but, eh, it's late in the

23   afternoon.

24             What do you think the most difficult part of being a

25   juror would be for you?

1    PROSPECTIVE JUROR 87:  I have to clarify.  Is that
2    for this particular case?
3    MR. REED:  No.  In this case, what little bit you
4    know, what do you think would be the most difficult part for
5    you?
6    PROSPECTIVE JUROR 87:  Being certain about what --
7    the decision you make at the end of the case if you're
8    actually one of the jurors and not an alternate, being
9    confident in that choice.
10    MR. REED:  What about the interacting with other
11    jurors before you get to the back?  Because as the group gets
12    smaller, and as you can see it's not the size it was when you
13    guys started, and you kind of -- not everybody, but they kind
14    of break up into groups and they talk about what did you do
15    over the weekend, it's a natural thing for humans to do but
16    the one things that you're here for you don't ever get to talk
17    about.  Do you think that would be difficult for you?
18    PROSPECTIVE JUROR 87:  No.
19    MR. REED:  So you're not a sharing kind of guy in,
20    Hey, I really like the way that happened or, Boy, that witness
21    was this or that, you can go without doing that?
22    PROSPECTIVE JUROR 87:  If I am directed not to speak
23    about a particular issue, you know, in eight years on the job
24    I have right now and that's been one -- that's, you know, a
25    quarter of the job, not saying what you're not supposed to

1    say, or don't bring up topics when you're not supposed to, do

2    not disclose information, so I'm pretty used to doing that, to

3    being -- in being careful with what I say about certain things

4    about -- when I'm not in a scenario when I'm supposed to be

5    bringing up that subject matter.

6              MR. REED:  Okay.

7              PROSPECTIVE JUROR 87:  That's open-ended, I

8    apologize, because you gave me an open-ended question.

9              MR. REED:  No, that's okay.  It's a conversation.

10             And if somebody else did that, how would you deal

11   with that situation?

12             PROSPECTIVE JUROR 87:  I would follow the directions

13   of the Court because I don't know what -- how to deal with

14   that.

15             MR. REED:  I don't know that the Court requires you

16   to snitch anybody off.  I'm not sure but --

17             PROSPECTIVE JUROR 87:  I don't know about that

18   either.

19             MR. REED:  At any rate, how would you deal with it?

20             PROSPECTIVE JUROR 87:  I wouldn't let that impact how

21   I would decide on anything at the end of the case.

22             THE COURT:  Mr. Reed, I will require people to snitch

23   him off.

24             PROSPECTIVE JUROR 87:  Thank you.

25             MR. REED:  I stand corrected, Your Honor.

1037

1      Thank you.  I have no further questions.

2      THE COURT:  All right.  Ms. Byrialsen, comments -- or

3  questions?

4      MS. FISHER-BYRIALSEN:  Can you hand the microphone to

5  97, please.

6      Hi.

7      PROSPECTIVE JUROR 97:  Hello.

8      MS. FISHER-BYRIALSEN:  That works good.

9      You talked a little bit before about your

10  brother-in-law and that his job had caused there to be some

11  retaliation against him.  Do you remember that?

12      PROSPECTIVE JUROR 97:  My brother-in-law or my

13  father-in-law?

14      MS. FISHER-BYRIALSEN:  Your father-in-law, I'm sorry.

15  My bad.  Your father-in-law.

16      PROSPECTIVE JUROR 97:  Correct.

17      MS. FISHER-BYRIALSEN:  And you said, if I remember

18  correctly, that makes me lean further towards guilt.  What do

19  you mean by that?

20      PROSPECTIVE JUROR 97:  No, that would -- if the

21  evidence as presented, that I was leaning towards guilty, I

22  can't say that retaliation -- possible retaliation for guilt

23  or for a not guilty would come back to haunt me.

24      MS. FISHER-BYRIALSEN:  So you are thinking if you

25  were sitting on the jury and you voted not guilty, somebody

1038

1 | could retaliate against you?

2 | This is how I'm understanding you, but please correct

3 | me if I'm wrong.

4 | PROSPECTIVE JUROR 97:  No, no, no.  Yeah.

5 | If my interpretation of the evidence and I was

6 | leaning towards guilty, the possibility of retaliation, I

7 | would -- it may push me to feel more -- that -- be more

8 | inclined to vote guilty.

9 | MS. FISHER-BYRIALSEN:  Okay.  And just so I

10 | understand, you're talking about retaliation from our clients

11 | or from the government?

12 | PROSPECTIVE JUROR 97:  Not the government.

13 | MS. FISHER-BYRIALSEN:  Not the government, okay.  So

14 | that would be our clients then?

15 | PROSPECTIVE JUROR 97:  Correct.

16 | MS. FISHER-BYRIALSEN:  So you're saying if you voted

17 | not guilty -- or guilty, you would feel that there was

18 | retaliation against our clients -- or from our clients?

19 | PROSPECTIVE JUROR 97:  Possibility, yes.

20 | MS. FISHER-BYRIALSEN:  Okay.  And so as you're

21 | sitting here today, are you leaning towards guilt for our

22 | clients?

23 | PROSPECTIVE JUROR 97:  Not at all.  I haven't heard

24 | any evidence.

25 | MS. FISHER-BYRIALSEN:  But you're afraid that if you

1039

1   were to find them guilty, they would retaliate against you?

2          PROSPECTIVE JUROR 97:  That -- I can't say that that

3   would not cross my mind.

4          MS. FISHER-BYRIALSEN:  Okay.  And are you -- it

5   sounds like it's something you've thought about a lot.  You

6   came in here and you brought it up today.

7          Do you think that that affects your ability to judge

8   them fairly and impartially?

9          PROSPECTIVE JUROR 97:  I don't believe so.  But until

10  I start hearing evidence, I -- I honestly don't know.

11         MS. FISHER-BYRIALSEN:  I think you -- you need to

12  assure us that you can judge them fairly and impartially.

13         So are you sure you can do that despite your fear of

14  retaliation?

15         PROSPECTIVE JUROR 97:  Yes.

16         MS. FISHER-BYRIALSEN:  Just for the record, I'm

17  seeing you hesitate here, but you need to be honest with us

18  so --

19         PROSPECTIVE JUROR 97:  Everything is black-and-white,

20  so I can't -- I can say, yes, I would attempt to be impartial

21  and view the evidence and not have any biases as far as my

22  experiences.

23         MS. FISHER-BYRIALSEN:  But are you sure you can do

24  that?

25         PROSPECTIVE JUROR 97:  Yes.

1    MS. FISHER-BYRIALSEN:  Also on your jury

2 questionnaire you said that criminals don't get enough

3 consequences.  What do you mean by that?

4    PROSPECTIVE JUROR 97:  I put that?

5    THE COURT:  I think you're looking at the wrong one.

6    MS. FISHER-BYRIALSEN:  Oh, did I?  Well, I apologize,

7 then.

8    PROSPECTIVE JUROR 97:  I was going to say --

9    MS. FISHER-BYRIALSEN:  I think you then did say --

10 and again, correct me if I'm wrong, there's been a lot of

11 questionnaires in this case.

12    But you had a positive view of law enforcement; is

13 that correct?  Do you think you would credit the testimony of

14 law enforcement more than a non-law enforcement witness?

15    PROSPECTIVE JUROR 97:  Again, I would look at all the

16 evidence that's been presented.  And due to my career over the

17 last 40 years, I would come up with a conclusion based on the

18 evidence that I heard.  Who would I believe more?  Who is more

19 believable?

20    MS. FISHER-BYRIALSEN:  As you sit here today, do you

21 think law enforcement is more believable than other witnesses.

22    PROSPECTIVE JUROR 97:  It would depend on the other

23 witness, but there's just as many bad people in law

24 enforcement as there is in any other profession.

25    MS. FISHER-BYRIALSEN:  Well, what do you mean it

1   would depend on the other witness?  What would that -- what
2   would cause you to --
3         PROSPECTIVE JUROR 97:  If we were listening to
4   given -- or being given evidence by somebody that we knew had
5   done something else related to this case, that they are
6   testifying to this, but yet, we're given evidence that they
7   didn't -- that they did something else, that would lead me to
8   believe that they were not credible.
9         MS. FISHER-BYRIALSEN:  Do you think you are willing
10  to entertain the thought that law enforcement could be
11  dishonest?
12        PROSPECTIVE JUROR 97:  That has not been my
13  experience, but I've seen it on TV and I've read it in books.
14        MS. FISHER-BYRIALSEN:  Okay.  But are you able to
15  find a law enforcement officer incredible?
16        PROSPECTIVE JUROR 97:  If the evidence indicated
17  that, yes.
18        MS. FISHER-BYRIALSEN:  I have nothing further,
19  Your Honor.
20        THE COURT:  All right.  Ms. Luem?
21        MS. LUEM:  I just have a few questions.
22        Juror Number 13 [sic].  And I apologize again, I just
23  can't see you from back there, so your questionnaire said that
24  your parents were missionaries?
25        PROSPECTIVE JUROR 112:  Me?

1042

1    MS. LUEM:  Oh, that's you?  Yeah.  Sorry, I'm looking

2    at him.

3    PROSPECTIVE JUROR 113:  Are you --

4    MS. LUEM:  I think so, yeah.  Is that right?

5    PROSPECTIVE JUROR 113:  My parents were missionaries.

6    MS. LUEM:  Where?  Here in the United States?

7    PROSPECTIVE JUROR 113:  They were missionaries to the

8    Navajo and Hopi Indians in Arizona.

9    MS. LUEM:  Interesting.

10   PROSPECTIVE JUROR 113:  Yeah.  So I lived on a

11   reservation for probably about four years.

12   MS. LUEM:  Are they Christian missionaries?

13   PROSPECTIVE JUROR 113:  Yes, Christian.

14   MS. LUEM:  LDS or?

15   PROSPECTIVE JUROR 113:  Pentecostal.

16   MS. LUEM:  Oh, okay.  Interesting.  Were you involved

17   with that, as well, growing up?

18   PROSPECTIVE JUROR 113:  I was at the time.

19   MS. LUEM:  And are your parents still with us?

20   PROSPECTIVE JUROR 113:  My father passed away.  My

21   mom is still with us, yes.

22   MS. LUEM:  And --

23   PROSPECTIVE JUROR 113:  But they moved back to LA,

24   and so they've been in LA for now the last 15 years.

25   MS. LUEM:  Were you born in Arizona?

1043

1    PROSPECTIVE JUROR 113:  No, I was not.  I was in LA.

2    I was born in LA, yeah.  And then when I was about 14, they

3    moved to the reservation to become missionaries.

4    MS. LUEM:  Interesting.  Is your mother still

5    involved with the church?

6    PROSPECTIVE JUROR 113:  No, she's not.  She's in a

7    nursing home now, so --

8    MS. LUEM:  And that's not a problem for you serving

9    on this jury?

10   PROSPECTIVE JUROR 113:  No, not at all.

11   MS. LUEM:  She's taken care of?

12   PROSPECTIVE JUROR 113:  They're in LA, I'm here.  You

13   know, I visit as much as I can, as often as I can.

14   MS. LUEM:  Great, okay.  Thank you so much.

15   PROSPECTIVE JUROR 113:  Oh, you're welcome.

16   MS. LUEM:  Juror Number 107, back behind you right

17   there.  Yeah, sorry.

18   We didn't hear too much from you, so I just want to

19   ask a couple of questions -- general questions, I think, that

20   we've heard other people answer.

21   Do you think -- and I'm not talking about law

22   enforcement, I'm taking about people, just anybody at all.  Do

23   you think people will sit up there in the witness stand, swear

24   to tell the truth and then lie under oath?

25   PROSPECTIVE JUROR 107:  I think people would be able

1044

1   to do that, yeah.

2        MS. LUEM:  Okay.  Do you feel like you're a pretty

3   good judge of someone's character or credibility?

4        PROSPECTIVE JUROR 107:  Uh.

5        MS. LUEM:  Just in your day-to-day.  I'm not saying

6   as a juror because --

7        PROSPECTIVE JUROR 107:  I'm not sure.

8        MS. LUEM:  Okay, you're not sure.  I mean, when

9   you're talking to people, can you usually tell when somebody

10  is lying to you?

11       PROSPECTIVE JUROR 107:  I guess it depends on their

12  facial impressions and how they are moving their hands and

13  stuff.

14       MS. LUEM:  But that's something you would look for,

15  right?

16       PROSPECTIVE JUROR 107:  Sure, yeah.

17       MS. LUEM:  And if their story was inconsistent or

18  didn't make sense, that's something that might be a red flag

19  for you?

20       PROSPECTIVE JUROR 107:  Sure, yeah.

21       MS. LUEM:  Okay.  Back, I'm sorry, Juror Number 97.

22  You're in the hot seat.

23       Just to follow up in terms of retaliation, is that

24  just in this case that you would feel that there would be a

25  fear of retaliation if you came back with a guilty verdict, or

1045

1  in any criminal case if you sat as a juror?

2       PROSPECTIVE JUROR 97:  I think it would be, I'm

3  guessing any case that has the implication that gangs are

4  involved.

5       MS. LUEM:  Okay.  So it wouldn't matter if it's

6  prison gang, street gang?

7       PROSPECTIVE JUROR 97:  No.

8       MS. LUEM:  Okay.  What about, like, something more

9  like organized crime, like the mafia or something?

10      PROSPECTIVE JUROR 97:  That, too.

11      MS. LUEM:  That, too?  Okay.

12      So it's just gang-specific for you?

13      PROSPECTIVE JUROR 97:  Yes.  Any type of organized

14  crime, cartel, any of it.

15      MS. LUEM:  Okay, okay.  Thank you.

16      PROSPECTIVE JUROR 97:  Uh-huh.

17      MS. LUEM:  Do you think that that -- just one last

18  time, do you think that sort of moves the needle in favor of

19  the prosecution or can you -- can you --

20      PROSPECTIVE JUROR 97:  Prosecution.

21      MS. LUEM:  Okay.  And --

22      PROSPECTIVE JUROR 97:  If I was swayed that way by

23  what -- the evidence that I had seen.

24      MS. LUEM:  But, I mean, are you coming in here

25  already giving them an advantage?

1    PROSPECTIVE JUROR 97:  I don't believe so.  I mean,

2  my fears are what they are -- or, I should say, my concerns.

3    MS. LUEM:  Right.

4    PROSPECTIVE JUROR 97:  I don't think anybody has had

5  my colored past with my father-in-law.

6    MS. LUEM:  Yeah, yeah, I understand.  I guess our

7  concern, obviously, Mr. Johnson's concern is that -- that you

8  have sort of an idea coming in and you're not going to be able

9  to set that aside.  Can you say with assurance that you will

10  be able to set that aside?

11    PROSPECTIVE JUROR 97:  I'll say yes.  On the two

12  trials that I had served on, both in state, none of this came

13  up, one was criminal and one was civil.  But gangs were not

14  involved in either one of those two trials, and I did not have

15  any problems whatsoever.

16    MS. LUEM:  Okay.  But gangs are involved in this one,

17  so can you say with assurance that you will be able to set

18  that aside and judge the evidence and the witness?

19    PROSPECTIVE JUROR 97:  I believe so, yes.

20    MS. LUEM:  You keep saying "I believe so."  I really

21  want you to say "yes" or "no."

22    PROSPECTIVE JUROR 97:  I'll say yes.

23    MS. LUEM:  All right.  I feel like I beat you into

24  that, but thank you.

25    PROSPECTIVE JUROR 97:  You weren't the only one.

1047

1   It's okay.

2           THE COURT:  Before we move on, Juror 97, I'm sorry, I

3   should have asked, you indicated you've got some prepaid

4   travel coming up.  We haven't talk about that.  What is the

5   date -- what are the dates of your travel?

6           PROSPECTIVE JUROR 97:  I will be gone -- well, if

7   this goes in May, we leave May 20th and we do not get back

8   until the 25th, I believe.

9           THE COURT:  May?

10          PROSPECTIVE JUROR 97:  May.

11          THE COURT:  Okay.  I thought you said -- I thought it

12  said --

13          PROSPECTIVE JUROR 97:  Oh, there is -- yes, there's

14  another event.  It's March 21st.

15          THE COURT:  That's right, we did talk about this.

16          PROSPECTIVE JUROR 97:  Yes.

17          THE COURT:  I forgot.  Thank you very much.

18          Before we move on, ladies and gentlemen, since this

19  trial has begun, since you first came to this courthouse, has

20  anyone read any media accounts about this story?  If so,

21  please raise your hand.

22          Okay, here we go.  Did anybody see anybody else read

23  any -- all right.  Just kidding, all right.  Thank you very

24  much.

25          At this point, we are going to select the alternates.

1  And we're going to do it just like we did in the last

2  selection process.  And we're going to go off the record.  You

3  can stand up and chat if you'd like, and it should just be a

4  few more minutes.

5          THE CLERK:  Judge, they want a sidebar.

6      (Sidebar commences between all counsel and the Court.)

7          THE COURT:  Sorry, I should have asked.

8          MS. FISHER-BYRIALSEN:  No, it was just --

9          THE COURT:  -- cause challenges.

10          MS. FISHER-BYRIALSEN:  No.

11          THE COURT:  Okay.

12          MS. FISHER-BYRIALSEN:  It was just that we want to

13  not be out-towned again -- out-of-towners again, because we

14  want to make sure we really understand the pass.

15          THE COURT:  Okay.  So you don't forfeit a pass.

16  So --

17          MS. FISHER-BYRIALSEN:  Okay.

18          THE COURT:  -- you just write "pass," and the

19  government writes down a name, then you get to keep that

20  and --

21          MS. FISHER-BYRIALSEN:  Okay.

22          THE COURT:  -- write it down, but you write pass and

23  they write pass, we're done.

24          MS. FISHER-BYRIALSEN:  Okay.  We just wanted to make

25  sure it was not a double pass pass.  So one each.

1049

1    THE COURT:  I should have asked you, are there any

2    challenges for cause at this time?

3    MS. STOKMAN:  I think not.

4    MS. LUEM:  I don't know if we made one as to

5    Juror 97, but if we didn't, I'd make one; and if we did, I

6    would just renew it.

7    THE COURT:  Okay.  I -- I don't agree it's close, but

8    she has repeatedly been questioned and she's repeatedly

9    affirmed she would be fair.  So that is overruled.

10    All right.  Are you-all going to step out?

11    MS. FISHER-BYRIALSEN:  Yes, if that's okay.

12    THE COURT:  Sure.

13    THE CLERK:  One alternate just went to the restroom.

14    She didn't ask.  She just went.

15    THE COURT:  Do you-all need to see the faces?  Do you

16    want to wait?

17    THE CLERK:  Okay.  They can still continue.

18    (Sidebar ends.)

19    THE COURT:  All right.  We are back on the record.

20    What I'm going to do is call juror numbers.  If I

21    call your number, if you'd please stand up and return to the

22    audience.

23    Juror 53.  Actually, Juror 8- -- I'm sorry, 107.  And

24    Juror 87, Juror 90, 93, and 97.

25    All right.  Counsel for the government, are these the

1050

1   alternates that you selected?

2           MS. STOKMAN:  Yes.

3           THE COURT:  And for Mr. Reed, is this the alternates

4   that you selected?

5           MR. REED:  Yes.

6           THE COURT:  And Ms. Byrialsen?

7           MS. FISHER-BYRIALSEN:  Yes, Your Honor.

8           THE COURT:  And Ms. Luem?

9           MS. LUEM:  Yes.

10          THE COURT:  Ladies and gentlemen in the audience,

11  thank you so much for your attention over the last week.  You

12  are all excused.  You are free to go about your business.  I

13  can't thank you enough for your attention over the last few

14  days.  I appreciate you very much.

15          For those of you who are left, I'm going to ask you

16  to stand up and raise your right hand.  Afterward we're going

17  to take a break, but at this point, if you would do that

18  first.

19          And audience members, you are free to go.

20      (The jury was sworn.)

21          THE COURT:  All right.  Ladies and gentlemen, thank

22  you so much.  We're going to go ahead and take a break right

23  now.  While -- we're going to do this a little differently.

24          We're going to take you through the jury room.  When

25  you get there, we're going to give you your badges.  The

1051

1    badges will get you in and out of the jury deliberation room
2    where you will report after each break and in the morning and
3    after -- well, breaks and morning.  And then after that, we'll
4    go ahead and take a break.
5         So I'm going to go ahead and give us a little bit
6    more time.  I'm going to say -- because you'll need a little
7    bit of orientation.  So let's say ten minutes after
8    three o'clock.
9         All right.  Thank you so much.  If you'll go with the
10   court staff member, she'll come right around to you.  She'll
11   pop in through this door and take you to your room.
12        All right.  Thank you so much.
13      (Jury exits the courtroom at 2:47 p.m.)
14        THE COURT:  All right.  The jury members have stepped
15   out.
16        Counsel, have you had the opportunity to review the
17   preliminary instructions?
18        Any objections?
19        MS. FISHER-BYRIALSEN:  We have reviewed them,
20   Your Honor, and we have no objections.
21        MS. STOKMAN:  No objections from the government.
22        THE COURT:  All right.
23        MS. FISHER-BYRIALSEN:  There was just one thing that,
24   I think, Ms. Barrett believed to be a typo where there should
25   have been an S by --

1    THE COURT:  Okay.

2    MS. FISHER-BYRIALSEN:  -- the defendants, which I

3  think she did email your chambers about.

4    THE COURT:  Where are you looking?

5    MS. DESALES BARRETT:  Sorry, Judge.  I'm --

6    MS. LUEM:  And, Your Honor, while she's looking for

7  that, Mr. Johnson has no objection.

8    THE COURT:  Okay.

9    Is it Instruction Number 2?

10    MS. DESALES BARRETT:  Yes.  It's the last paragraph.

11    THE COURT:  The reason it's set forth that way is

12  because otherwise if you say the defendants have pleaded not

13  guilty, it suggests that there's supposed to be a joint

14  determination.  So I kind of like it this way, saying, you

15  know, "the defendant."  I can change it to "each defendant."

16    MS. DESALES BARRETT:  I would suggest that Your Honor

17  just change it to "each defendant."  And that way it

18  distinguishes them, but at the same time acknowledges -- yes.

19    (Court reporter gains clarification.)

20    MS. DESALES BARRETT:  Oh, I'm sorry.  I can't -- yes.

21  Yes.

22    I said that I thought that each would be a good

23  substitute because it would acknowledge there was more than

24  one person but distinguishing the individuals.

25    THE COURT:  I think what would make most sense, then,

1053

1    is to say "each defendant," because I don't want the

2    implication that it's an all-or-nothing situation.

3         MS. DESALES BARRETT:  Yes, Your Honor.  I agree.

4         THE COURT:  All right.  Anything else, then?

5         MR. VILLA:  Your Honor, it is the Court's intention

6    to proceed to opening after reading the preliminary

7    instruction?

8         THE COURT:  It was.

9         Ms. Stokman, which of your team is going to be doing

10   that?

11        MS. STOKMAN:  That will be Mr. Conolly.  We did have

12   some matters that we wanted to address with the Court before

13   any witnesses would go on.  So I'm not sure if the Court just

14   wants to let them go early and let us do that, so that we can

15   start fresh with all openings tomorrow at 8:00, or if we're

16   doing that tomorrow morning while they are here waiting.

17        But it would be the narrowing down of photos, as the

18   Court requested and counsel requested.  We have a couple of

19   other matters we would like to bring up with the Court as far

20   as 902s or other stipulations.

21        And we have some exhibits that we are requesting to

22   be added or amended, and so we just wanted to be able to

23   discuss that openly.

24        We're happy to do it however the Court wishes, but

25   just to know that we have that that we'd like to address

1054

1   before witnesses get on the stand.

2           THE COURT:  Let me ask you a couple things:  First,

3   what is the time estimate, Mr. Conolly, for your opening

4   statement?

5           MR. CONOLLY:  Roughly 20 minutes, Your Honor.

6           THE COURT:  And during that time, are you intending

7   to rely upon any of the evidence or anything that Ms. Stokman

8   is talking about, any stipulations?

9           MR. CONOLLY:  Sorry.  Could you repeat that?

10          THE COURT:  Yeah.  Were you intending to rely upon

11  any of the evidence or any stipulations in your open

12  statement?

13          MR. CONOLLY:  I don't believe so, Your Honor.

14          THE COURT:  You don't have any agreement from defense

15  to do that anyway, right?

16          MR. CONOLLY:  No.

17          THE COURT:  Okay.  I don't know if -- Counsel, among

18  yourselves, have you decided the order on how you want --

19          MS. FISHER-BYRIALSEN:  Yes, Your Honor.  And I think

20  we are ready to proceed to openings today.  And we don't

21  believe that any of us -- and I don't want to speak for

22  Mr. Reed or Mr. Johnson's team either, but I -- in the

23  discussions we've had, I don't believe Mr. Reed is -- he's

24  going to save his opening for later.

25          And our -- the other openings are not going to be the

1   full amount of time that Your Honor has given us, so perhaps
2   we could still do what the government is asking for after
3   that.
4           THE COURT:  All right.  Mr. Reed, have you decided to
5   reserve?
6           MR. REED:  I have decided.  I tend to reserve in long
7   trials.  That's my intention today.
8           THE COURT:  Okay.  Now, back to my original question,
9   that is, in making your presentations to the jury questioning,
10  do you have an established order how you want to proceed?  Is
11  it always going to be Mr. Reed?  I mean, who's going to go
12  first?  I do want to established order so it can be orderly.
13          MR. REED:  Actually, for the trial, I don't think
14  that would be the order.  I think it's one of them ahead of
15  Mr. Reed.
16          THE COURT:  Okay.
17          MR. REED:  Because otherwise I'll just be saying, No
18  questions, and then it moves on anyway.  So --
19          MR. VILLA:  Your Honor, we may alternate, but I don't
20  think there's going to be any problem with an agreement among
21  the parties.
22          THE COURT:  Yeah.  I just mean which team.  I don't
23  mean -- you don't have to tell me who it's going to be, just
24  which team is going to go first in questioning,
25  cross-examination, that type of thing.

1    MR. VILLA:  What I meant is there might be some

2    witnesses where Mr. Johnson would go first and others where

3    Mr. Clement would, if that's okay with the Court.  I don't

4    think there's going to be any fights or anything.

5    THE COURT:  As long as you agree, I don't really have

6    a big problem with that.  I just -- it is a long trial.

7    There's going to be a lot of witnesses.  I don't want to -- if

8    I don't ask for you to ask questions, please say, Oh, you

9    forgot me.  Because that's the benefit of an order is then I

10   can go boom, boom, boom, and I don't miss anybody.  If I miss

11   you, though, you're going to need to speak up if you change

12   the order up on me.

13   MR. VILLA:  Happy to, Judge.

14   MS. LUEM:  We can also let you know before the

15   witness testifies which team --

16   THE COURT:  Which might be three days beforehand.

17   So at this point, though, we'll have the

18   government -- hopefully we'll have some time.  So the estimate

19   is -- how much time are we talking for each team?

20   MS. FISHER-BYRIALSEN:  Our estimate is about

21   20 minutes for Ms. Barrett, Your Honor.

22   MR. VILLA:  Same, Your Honor.

23   THE COURT:  All right.  So that would leave us some

24   time to resolve those other issues.

25   All right.  Let's go ahead and take a break.

1057

1    (Recess held.)

2         THE COURT:  All right.  We're bringing our jury

3    members back in.  Thank you.

4         All right.  We have all of our jury members back in

5    their places.

6         Ladies and gentlemen, we're going to now begin this

7    trial.  The first thing that I do need to do is give you some

8    preinstructions.  If you can't hear me, if you need me to

9    repeat it, please raise your hand so that I can do that.

10        Unfortunately, I do have to read them to you, and so

11   I'm going to ask you to bear with me to try to keep your

12   attention on them as best you can.

13        Jurors, you now are the jury in this case, and I want

14   to take a few minutes to tell you something about your duties

15   as jurors and to give you some preliminary instructions.

16        At the end of the trial, I will give you more

17   detailed instructions that will control your deliberations.

18        When you deliberate, it will be your duty to weigh

19   and to evaluate all the evidence received in the case and, in

20   that process, to decide the facts.  To the facts as you find

21   them, you will apply the law as I give it to you, whether you

22   agree with it or not.

23        You must decide the case solely on the evidence and

24   the law before you.

25        Perform these duties fairly and impartially.  You

1058

1   should not be influenced by any person's race, color,

2   religious beliefs, national ancestry, sexual orientation,

3   gender identity, gender, or economic circumstances.

4          Also, do not allow yourself to be influenced by any

5   personal likes or dislikes, sympathy, prejudice, fear, public

6   opinion or biases, including unconscious biases.

7          Unconscious biases are stereotypes, attitudes, or

8   preferences that people may consciously reject but may be

9   expressed without conscious awareness, control, or intention.

10          Like conscious bias, unconscious bias can affect how

11   we evaluate information and make decisions.

12          This is a criminal case brought by the United States

13   government.  The government charges the defendant in Count 1

14   with conspiracy to participate in a racketeering enterprise in

15   violation of Section 1962(d) of Title 18 of the United States

16   Code.

17          The government charges Defendants Johnson and Clement

18   in Counts 2 and 3 with murder in aid of racketeering in

19   violation of Sections 1959(a)(1) of Title 18 of the

20   United States Code.

21          The government charges Defendant Clement in Counts 4,

22   5, and 6 with murder in aid of racketeering in violation of

23   Section 1959(a)(1) of Title 18 of the United States Code.

24          The charges against the defendants are contained in

25   the third superseding indictment.

1    The indictment simply describes the charges the

2 government brings against the defendants.  The indictment is

3 not evidence and does not prove anything.

4    Each defendant has pleaded not guilty to the charges

5 and is presumed innocent unless and until the government

6 proves each defendant guilty beyond a reasonable doubt.

7    In addition, each defendant has the right to remain

8 silent and never has to prove innocence or present any

9 evidence.

10    You are here only to determine whether the defendants

11 are guilty or not guilty of the charges for which you are

12 instructed.  The defendants are not on trial for any conduct

13 or offense not charged otherwise.

14    Although the defendants are being tried together, you

15 must give separate consideration to each defendant.  In doing

16 so, you must determine which evidence in the case applies to

17 each defendant, disregarding any evidence admitted solely

18 against another defendant or defendants.

19    The fact that you may find one of the defendants

20 guilty or not guilty should not control your verdict as to any

21 other defendant or defendants.

22    The evidence you are to consider in deciding what the

23 facts are consistent of:

24    One, the sworn testimony of any witness;.

25    Two, the exhibits which are received in evidence; and

1    Three, any facts to which the parties agree.

2    In reaching your verdict, you may consider only the

3    testimony and exhibits received into evidence.  Certain things

4    are not evidence and you may not consider them in deciding

5    what the facts are.

6    I will list them for you:

7    One, arguments and statements by counsel are not

8    evidence.  The lawyers are not witnesses, what they may say in

9    their opening statements, closing arguments, or at any another

10   time is intended to help you interpret the evidence, but it is

11   not evidence.  If the facts as you remember them differ from

12   the way the lawyers have stated them, your memory of them

13   controls.

14   Two, questions and objections by the lawyers are not

15   evidence.  Attorneys have a duty to their clients to object

16   when they believe a question is improper under the rules of

17   evidence.  You should not be influenced by the objection or by

18   the Court's ruling on it.

19   Three, testimony that was excluded or stricken or

20   that you've been instructed to disregard is not evidence and

21   must not be considered.

22   In addition, some evidence may be received only for a

23   limited purpose.

24   When I instruct you to consider certain evidence only

25   for a limited purpose, you must do so and you may not consider

1    that evidence for any other purpose.

2           Four, anything you may see or hear when the Court is

3    not in session is not evidence, even if what you see or hear

4    is done or said by one of the parties or by one of the

5    witnesses.  You are to decide the case solely on the evidence

6    received at trial.

7           Evidence may be direct or circumstantial.  Direct

8    evidence is direct proof of a fact, such as testimony by a

9    witness about what that witness personally saw or heard or

10   did.

11          Circumstantial evidence in indirect evidence; that

12   is, it is proof of one or more facts from which one can find

13   another fact.

14          You are to consider both direct and circumstantial

15   evidence.  Either can be used to prove any fact.  The law

16   makes no distinction between the weight to be given to either

17   direct or circumstantial evidence.  It is for you to decide

18   how much weight to give any evidence.

19          By way of example, if you wake up in the morning and

20   see that the sidewalk is wet, you may find from that fact that

21   it rained during the night.  However, other evidence, such as

22   a turned on garden hose, may provide a different explanation

23   for the presence of water on the sidewalk.

24          Therefore, before you decide that a fact has been

25   proved by circumstantial evidence, you must consider all the

1    evidence in light of reason, experience, and common sense.

2           There are rules of evidence that control what can be

3    received in evidence.  When a lawyer asks a question or offers

4    an exhibit in evidence and a lawyer thinks that it is not

5    permitted by the rules of evidence, that lawyer may object.

6           If I overrule the objection, the question may be

7    answered or the exhibit received.  If I sustain the objection,

8    the question cannot be answered or the exhibit cannot be

9    received.  Whenever I sustain an objection to a question, you

10   must ignore the question and must not guess what the answer

11   would have been.

12          Sometimes I may order that evidence be stricken from

13   the record and that you disregard or ignore the evidence.

14   That means when you're deciding the case, you must not

15   consider the evidence that I told you to disregard.

16          In deciding the facts in this case, you may have to

17   decide which testimony to believe and which testimony not to

18   believe.  You may believe everything a witness says or part of

19   it or none of it.

20          In considering the testimony of any witness, you may

21   take into account:

22          One, the opportunity and the ability of the witness

23   to see or hear or know the things testified to,

24          Two, the witness's memory,

25          Three, the witness's manner while testifying,

1   Four, the witness's interest in the outcome of the

2   case, if any,

3   Five, the witness's bias or prejudice, if any,.

4   Six, whether other evidence contradicts the

5   witnesses's testimony,.

6   Seven, the reasonableness of the witness' testimony

7   in light of all the evidence, and

8   Eight, any other factors that bear on believability.

9   Sometimes a witness may say something that is not

10  consistent with something else he or she said.  Sometimes

11  different witnesses will give different versions of what

12  happened.  People often forget things or make mistakes in what

13  they remember.  Also, two people may see the same event but

14  remember it differently.

15  You may consider these differences, but do not decide

16  that testimony is untrue just because it differs from other

17  testimony.  However, if you decide that a witness has

18  deliberately testified untruthfully about something important,

19  you may choose not to believe anything that witness said.

20  On the other hand, if you think the witness testified

21  untruthfully about some things but told the truth about

22  others, you may accept the part you think is true and ignore

23  the rest.

24  You must avoid bias, conscious or unconscious, based

25  upon a witness's race, color, religious beliefs, national

1    ancestry, sexual orientation, gender identity, gender or

2    economic circumstances in your determination of credibility.

3         The weight of the evidence as to a fact does not

4    necessarily depend on the number of witnesses who testify.

5    What is important is how believable the witnesses were and how

6    much weight you think their testimony deserves.

7         I will now say a few words about your conduct as

8    jurors.

9         First, keep an open mind throughout the trial and do

10   not decide what the verdict should be until you and your

11   fellow jurors have completed your deliberations at the end of

12   the trial.

13        Second, because you must decide this case based only

14   on the evidence received in the case and on my instructions as

15   to the law that applies, you must not be exposed to any other

16   information about the case or to the issues it involves during

17   the course of your jury duty.

18        Thus, until the end of this case, or unless I tell

19   you otherwise, do not communicate with anyone and do not let

20   anyone else communicate with you in any way about the merits

21   of the case or anything to do with it.

22        This includes discussing the case in person, in

23   writing, by phone, or electronic means via email, text

24   messaging, or internet chatroom, blog, website or application,

25   including, but not limited to, Facebook, YouTube, X, formerly

1   known as Twitter, Instagram, LinkedIn, Snapchat, TikTok, or

2   any other form of social media.

3        This applies to communicating with your fellow jurors

4   until I give you the case for deliberation, and it applies to

5   communicating with everyone else, including your family

6   members, your employer, the media or press, and the people

7   involved in the trial, although you may notify your family and

8   your employer that you've been seated as a juror in the case

9   and how long you expect the trial to last.

10       But if you are asked or approached in any way about

11  your jury service or anything about this case, you must

12  respond that you've been ordered not to discuss the matter and

13  report the contact to the Court.

14       Because you will receive all the evidence and legal

15  instruction you properly may consider to return a verdict, do

16  not read, watch, or listen to any news or media accounts or

17  commentary about the case or anything to do with it.

18       Although I have no information that there will be

19  news media about this case, do not do any research, such as

20  consulting dictionaries, searching the internet, or using

21  other reference materials, and do not make any investigation

22  or in any other way try to learn about the case on your own.

23       Do not visit or view any place discussed in the case

24  and do not use internet programs or other devices to search

25  for or view any place discussed during the trial.

1066

1    Also, do not do any research about the case, the law,

2  or the people involved, including the parties, the witnesses,

3  or the lawyers until you've been excused as jurors.  If you

4  happen to read or hear anything touching on this case in the

5  media, turn away and report it to me as soon as possible.

6    These rules protect each party's right to have the

7  case decided only on the evidence that has been presented here

8  in Court.  Witnesses here in court take an oath to tell the

9  truth, and the accuracy of their testimony is tested through

10 the trial process.

11    If you do any research or investigation outside the

12 courtroom or gain any information through improper

13 communications, then your verdict may be influenced by

14 inaccurate, incomplete, or misleading information that has not

15 been tested by the trial process.

16    Each of the parties is entitled to a fair trial by an

17 impartial jury, and if you decide the case on information not

18 presented in court, you will have denied the parties a fair

19 trial.

20    Remember, you've taken an oath to follow the rules,

21 and it is very important that you follow these rules.  A juror

22 who violates these restrictions jeopardizes the fairness of

23 the proceedings, and a mistrial could result that would

24 require the entire trial process to start over.

25    If any juror is exposed to any outside information,

1  please notify the Court immediately.

2        At the end of the trial, you will have to make your

3  decision based on what you recall of the evidence.  You will

4  not have a written transcript of the trial.

5        I urge you to pay close attention to the testimony as

6  it is given.  If at any time you cannot hear or see the

7  testimony, evidence, questions, or arguments, let me know by

8  calling out or raising your hands so I can correct the

9  problem.

10        If you wish, you may take notes to help you remember

11  the evidence.  If you do take notes, please keep them to

12  yourself until you go to the jury room to decide the case.

13        Do not let notetaking distract you.  When you leave,

14  your notes should be left in the jury deliberation room.  No

15  one will read your notes.  Whether you take notes, you should

16  rely on your own memory of that evidence.

17        Notes are only to assist your memory.  You should not

18  be overly influenced by your notes or those of other jurors.

19        The next phase of the trial will now begin.

20        First, each side may make an opening statement.

21        An open statement is not evidence.  It is simply an

22  outline to help you understand what that party expects the

23  evidence will show.  A party is not required to make an

24  opening statement.

25        The government will then present evidence, and

1068

1   counsel for the defendants may cross-examine.  Then, if a

2   defendant chooses to offer evidence, counsel for the

3   government may cross-examine.

4          After the evidence has been presented, I will

5   instruct you on the law that applies to the case and the

6   attorneys will make closing arguments.

7          After that, you will go to the jury room to

8   deliberate on your verdict.

9          All right.  Is the government prepared to make its

10  opening statement?

11         MR. CONOLLY:  Yes, Your Honor.

12         THE COURT:  All right.  Mr. Conolly, you may begin.

13         MR. CONOLLY:  This is a case about a violent

14  California prison gang, the Aryan Brotherhood, also known as

15  The Brand.

16         It's a case about three of the Aryan Brotherhood's

17  made members or brothers, Defendants Kenneth Johnson,

18  Francis Clement, and John Stinson.

19         It's also a case about the associates that they

20  controlled.

21         It's a case about a long series of crimes that these

22  defendants directed and committed as part of the

23  Aryan Brotherhood enterprise:  murders, drug trafficking,

24  robberies, and fraud, all ordered and committed in prisons and

25  on the streets by these defendants.

1    The various crimes you'll learn about here are not

2    random or isolated acts.  They are all connected because they

3    are all gang crimes.  They are all Aryan Brotherhood, or AB,

4    crimes.

5    Johnson, Clement, and Stinson directed these crimes

6    from prison.  As you will hear, at all times relevant to this

7    case, all three defendants were serving time in California's

8    prison system.

9    But they kept cell phones hidden in their cells.

10   This is how they carried out AB business on the streets.

11   This, like everything I tell you now, will be shown

12   to you through the witnesses and the evidence that you will

13   see and you will hear throughout this trial.

14   As you will see, the violence, the murders is what

15   gives the defendants power in the AB.  The violence instills

16   fear.  Fear gives the Aryan Brotherhood control over the white

17   inmates in California prisons and over AB associates who serve

18   as foot soldiers on the streets.

19   In the prisons, all white gang members answer to the

20   AB.  The foot soldiers on the outside are also mainly other

21   white gang members.  As you will hear, all of these people

22   take orders from the Aryan Brother -- the Aryan Brotherhood

23   leadership, from the brothers, to stay in good standing.

24   And when you're in good standing, you can even try

25   and promote to brother yourself, provided you're willing to

1   put in more work for the AB, and part of that work involves
2   committing murders.
3            The AB's violence goes hand in hand with all of its
4   other crimes, the drug trafficking, the robberies, and the
5   fraud.  The defendants recruited successful criminals and
6   commanded a share of their professions because they are feared
7   Aryan Brotherhood members.
8            Without the AB's reputation for violence, the
9   defendants would not have had nearly the success that they
10  had.
11           The evidence will show how the AB maintained that
12  reputation by ordering more violence.  The evidence will show
13  also that their goals -- power, money, and control -- are what
14  the Aryan Brotherhood and these defendants are all about.
15           All three defendants, Stinson, Johnson, and Clement,
16  are charged with agreeing to or participating in crimes for
17  the AB enterprise.  That is Count 1, the RICO conspiracy.
18           Clement and Johnson are also charged in Counts 2 and
19  3 with ordering people to commit murders for the AB
20  enterprise.
21           Clement is also charged separately in Counts 4, 5,
22  and 6 for ordering additional murders for the benefit of the
23  AB enterprise.
24           Now, John Stinson is not charged in connection with
25  any of those murders.  But as you will see, he remains a

1   member of the AB enterprise and a knowing participant in it.

2       I'm now going to give you an overview of some of the

3   facts that you'll learn during the course of this trial.

4   Don't worry about getting the details right now.  This will be

5   the big picture to help you understand the evidence and to put

6   it into context as it comes in.

7       I'm going to cover just two main topics:  First, I'm

8   going to talk about the types of crimes in this case and give

9   you a few examples; and second, I'll discuss briefly the types

10  of witnesses that you'll hear from and how they fit together.

11      Let's start with the first main topic, which will be

12  the crimes.  Now, the judge will instruct you on the law at

13  the end of this case, but for now, you can think about the

14  crimes as falling into three main buckets or types of crimes.

15      First is the running of the Aryan Brotherhood

16  enterprise.  This is the racketeering or RICO conspiracy

17  charge that all three defendants are charged with.  All the

18  evidence that you will hear in this case falls into this first

19  bucket because all of the crimes you will learn about were

20  committed by and for the Aryan Brotherhood, for the

21  enterprise.

22      The second type of crime is the violent crimes, the

23  murders and the robberies.

24      And the third type is the moneymaking crimes.  Think

25  of these as the street business of the AB, the drug

1  trafficking and the fraud.

2          So let's talk about each of these briefly.  First is

3  the running of the gang.  You will learn that Johnson,

4  Clement, and Stinson were made members of the Aryan

5  Brotherhood.  You'll learn that as made members, or brothers,

6  they considered themselves part of a fraternity of violent

7  criminals.

8          Every AB brother is a boss in his own right.  Each

9  brother is expected to be influential in his prison.

10          This includes controlling the white inmates in

11  prison, in the prison yard, collecting money, and enforcing AB

12  expectations and demands by ordering violence and by ordering

13  murders.

14          But every order a brother gives must be something he

15  is willing to do himself, including murders.

16          Brothers are expected to be killers.  Each brother

17  must be willing and able to kill for the AB when called upon.

18          And as mentioned, the AB's control extends to outside

19  the prisons as well, because their orders extend outside the

20  prison.  Brothers direct their foot soldiers on the streets to

21  carry out their orders.  These soldiers, these associates,

22  carry out those orders because they know it is what the AB

23  expects of them.  In this way, the AB operates its enterprise

24  outside of the prisons.

25          But whether it's a brother giving orders or an

1    associate carrying out those orders, they are all members of

2    the enterprise because they all agreed to carry out its

3    business.

4           So that is how the AB runs its gang, how it runs the

5    enterprise.  So I'm now going to move to the other types of

6    crimes, the violence and the moneymaking crimes, because the

7    easiest way to understand the Aryan Brotherhood is to see what

8    it does.

9           The violence.  As mentioned, the evidence will show

10   that the AB uses violence to maintain control.  And for the

11   Aryan Brotherhood, violence includes murder.

12          The AB orders much of its violence to be done by

13   people close to the victims, by their friends and their fellow

14   gang members, people who are part of the enterprise who can

15   get to you, whether you're in prison or whether you're on the

16   streets.

17          And when the AB orders violence, those orders get

18   carried out.  The foot soldiers obey those orders.  In fact,

19   they obey all orders to increase their status within the AB.

20   But they also carry out those orders out of fear.  Do your job

21   right, and you can improve your standing within the

22   Aryan Brotherhood, but if you fail, you can be beaten, you can

23   be robbed, you can be killed.

24          AB violence and murder send a terrifying message:  If

25   anyone crosses the Brotherhood, even those close to it, he,

1 | too, will end up dead.

2 |       You're going to hear about a lot of murders over the

3 | course of this trial, but let's talk just about the murders I

4 | mentioned earlier, the ones charged in Counts 2 through 6.

5 |       First, the Pomona murders.  This was a double murder

6 | in Pomona in March of 2022.  The evidence will show that

7 | Defendant Francis Clement ordered the murder of Ronald Ennis

8 | and James Yagel, two AB associates who the AB decided had

9 | failed to follow orders properly.

10 |       So under orders from Clement, four AB foot soldiers

11 | drove the two men out to a side road in Pomona.  There, Ennis

12 | and Yagel were shot and killed.

13 |       You'll see photographs from the scene.  You'll see

14 | photographs of the victim's bodies and of the bullet casings.

15 | You'll hear from men who were there.

16 |       Second is the Lancaster murder.  The murder of

17 | Michael Brizendine, another AB associate.  He was an AB

18 | associate who messed up the orders he was given in February of

19 | 2022.  And like the Pomona murder victims, he was working for

20 | the AB enterprise.

21 |       The AB had ordered him and others to break into and

22 | rob a home in Hollywood.  But instead of sticking to the plan,

23 | he kicked in the front door, setting off the alarm, and he

24 | botched the robbery.

25 |       After that, the AB decided he should be killed.

1    Clement ordered another AB associate to do it, and

2    when the time was right, that AB foot soldier shot Brizendine

3    in the head.

4    This is the consequence for messing up AB business,

5    for harming their enterprise.

6    Again, you will hear from those who were there.  You

7    will see the photographs of the crime scene.

8    And finally, the Lomita murders.  This was another

9    double murder a little less than two years earlier in Lomita.

10    In October of 2022, Defendants Johnson and Clement

11    ordered the killing of Allan Roshanski.  Now, Roshanski was

12    not associated with the AB, but he did owe them money, or at

13    least they thought he owed them money.

14    Two AB associates were ordered to meet with Roshanski

15    with orders to kill him.  And at that meeting, Roshanski

16    showed up with a friend.  The AB foot soldiers shot and killed

17    them both.

18    The message was clear.  If the AB says you owe them

19    money, they have people who will come to collect.  And if you

20    refuse to pay up, you'll be killed.

21    And during this trial you will hear about other

22    violent acts or conspiracies to commit violent acts.  Every

23    act you'll hear about is evidence against all of the

24    defendants for the RICO conspiracy charge because all of those

25    acts were done for the benefit of the Aryan Brotherhood

1    enterprise.

2          And keep in mind that each act of violence, each

3    brutal murder benefits the entire enterprise.  Every time the

4    AB sheds blood, it enforces its violent reputation.  It

5    enforces what anyone working with or for the AB knows; the

6    Aryan Brotherhood will hunt down and kill anyone who

7    challenges its authority or breaks its rules.

8          You heard me mention Defendants Johnson and Clement

9    several times in connection with the orders -- with the

10   murders that they ordered.  People carried out these orders in

11   part because of Johnson and Clement's violent reputations,

12   their violent reputations, however, as AB brothers.

13         Keep in mind that John Stinson is also a brother.  He

14   did not order the murders I just discussed, but you will hear

15   how he was a long-time member of the AB and an active

16   participant in it.

17         He ordered fraud schemes for the enterprise, and when

18   John Stinson gives orders, like for the other AB brothers,

19   those orders still carry the weight of the AB's

20   representation.

21         So in short, the violence is a key part of how the AB

22   runs its enterprise.  And at the end of trial, we'll have an

23   opportunity to make -- oops, sorry.  Pardon me.

24         As mentioned, the violence is a key part of how the

25   AB runs its enterprise and how it gets people to obey its

1  orders, orders to carry out their business.

2          Which brings us to the third and final type of crime

3  I wanted to mention, the moneymaking crimes.  These include

4  the robberies, the drug trafficking, and the fraud.  These are

5  the crimes that put money into the Aryan Brotherhood's

6  pockets.

7          The AB expects a part of the profits that white

8  criminals make from their criminal activity.  The AB also

9  takes money from its own associates.  They refer to this as

10  "taxing" them.

11          Failure to pay means consequences.  It could mean

12  getting beat up.  It could mean getting killed.

13          And you will also hear about the drug trafficking

14  that the AB directs from prison.  They set up deals on the

15  outside for their foot soldiers on the street to carry out.

16          They then direct the associates either to smuggle the

17  drugs into the prisons or to sell them on the outside and

18  funnel the money back towards the AB members.

19          And lastly, you'll hear about the AB's fraud schemes.

20  These are unemployment fraud schemes, typically.  Now, for a

21  criminal, this type of fraud is a fairly easy way to make

22  money.  You file a claim with the Employment Development

23  Department, otherwise known as the EDD, saying you've lost

24  your job and you need employment benefits.

25          The AB filed many such claims in other people's names

1   inside and outside prison and collected the money.  They

2   carried this on for some time.  It was a big moneymaker for

3   them.

4           So that's a brief description of the crimes that

5   you'll hear about.

6           So that brings us to the final main topic, the types

7   of evidence you will hear in this case.  And I'll briefly

8   mention the types of witnesses that you will hear from and

9   give you a glimpse into what you can expect to learn from

10  them.

11          Now, during jury selection you heard a long list of

12  witnesses.  We're not going to be calling all of those

13  witness.  We'll be as efficient as we can with your time while

14  still getting in all of the evidence that we need to get in,

15  but you will hear from quite a few witnesses throughout the

16  course of this trial.

17          Let me say, also, at the outset, that we will do our

18  best to present the evidence in an orderly and logical way.

19  But because of scheduling issues, there will be times where we

20  might have to take a witness out of order.  And so don't worry

21  about the witness order as they are presented.  Just take in

22  the testimony as it comes and know that at the end of this

23  trial we'll have an opportunity to make a closing argument.

24          Now, also at the end of the trial, the judge will

25  explain the law of these particular crimes to you.

1    And so in our closing argument, my colleagues will
2    tie all of the evidence together and explain how the facts
3    prove each element of the charged crimes.
4    So as for the witnesses, the witnesses you'll hear
5    from will include law enforcement officers and everyday
6    people, but they will also include people who worked for the
7    enterprise, the foot soldiers that I've mentioned to you a few
8    times.
9    For the law enforcement officers and the everyday
10    people, many of them had no particular knowledge of or
11    experience with the Aryan Brotherhood before this case.  In
12    the case of everyday people, they may have happened to have
13    witnessed an Aryan Brotherhood crime.
14    For the law enforcement personnel, these are the
15    witnesses who investigated those crimes.  They are the ones
16    that pieced together the evidence that their defendants and
17    their fellow gang members left behind.  These will be the fake
18    IDs, the credit cards, the drugs, the bullet casings, and the
19    bodies.
20    And you will also hear from witnesses who are a part
21    of the Aryan Brotherhood enterprise.  They will give you an
22    inside look at the defendants and their crimes because they
23    were part of those crimes.  They will provide details that
24    only someone who was there could know about.
25    In some cases, they got the order to kill right from

1   the mouth of one of the defendants.  They knew the defendants

2   personally, the defendants trusted them, and some of these

3   people did horrible things.

4        Some of them spent years working for the AB, and they

5   will tell you about that.  They will tell you what its like,

6   what the rules are, and how the AB enterprise operates.

7        Along with the witnesses, you will also hear what I

8   will call the "investigative evidence."  This will include

9   evidence you may be familiar with, drug testing, surveillance

10  video, and physical evidence collected at the crime scenes.

11       You will also hear about electronic evidence.  So

12  this is evidence that investigators took from cell phones and

13  cell phone towers.  You will hear how the calls and text

14  messages between the defendants and their associates establish

15  who was involved with the murders and the moneymaking crimes.

16       You will hear how location data from cell phones was

17  used to chart the location of the foot soldiers used to carry

18  out the AB's orders.

19       You will also hear wiretap evidence.  Now, a wiretap

20  allows law enforcement to secretly listen in and record phone

21  calls.  As mentioned, the defendants and other AB members and

22  associates used cell phones they had hidden in the jail cells.

23  At times, law enforcement was able to listen to those calls.

24       These recordings give a glimpse into how the AB

25  members discuss AB business when they think no one else is

1 listening.

2          So those are the types of evidence that you will hear
3 in this case.

4          To sum up, this evidence will show that the
5 defendants in this case, Johnson, Clement, and Stinson, and
6 the AB enterprise, were about three things:  power, money, and
7 control.

8          Their violence as AB members gave them power.  It
9 earned them both fear and respect as dominant figures in
10 California's prison system and on the streets.

11          They use that control to commit a long series of
12 serious crimes:  running the Aryan Brotherhood, drug
13 trafficking, fraud, plots to murder, and murder.

14          And at the end of this trial, we'll ask you to return
15 a verdict -- we'll ask you to return a verdict of guilty on
16 all counts for all three defendants.

17          THE COURT:  Thank you, Mr. Conolly.

18          Let's see.  Mr. Reed, are you wishing to make an
19 opening statement at this time?

20          MR. REED:  No, Your Honor.  The Stinson defense will
21 reserve opening.

22          THE COURT:  All right.  Thank you, sir.

23          Ms. Barrett?

24          MS. DESALES BARRETT:  Yes, Your Honor.  Thank you.

25          THE COURT:  All right.  Thank you.

1      MS. DESALES BARRETT:  Good afternoon, ladies and

2   gentlemen.  My name is a Jean Barrett.  I'm sorry for being

3   delayed in my arrival.

4      Along with Ms. Byrialsen, we represent Frank Clement,

5   who is seated right between us.  And we have the privilege of

6   representing him.

7      If this case were as clear cut as we just heard, we

8   wouldn't be here.  But we are here because our system of

9   justice doesn't rely on prosecutors or judges to decide

10  whether someone is guilty.  No.  It relies on ordinary

11  citizens like you to make that decision unanimously beyond a

12  reasonable doubt.

13     Every one of the prosecution's witnesses who accuses

14  Frank Clement in this case is a convicted felon.  Just because

15  they take an oath when they sit on the witness stand to tell

16  you the truth, does not make them believable.  In fact, we

17  submit that there's nothing about what they say that you

18  should believe.

19     Frank has pleaded not guilty, and he is very

20  fortunate to have you as a jury.  He's grateful for your

21  willingness to serve on a jury who will decide his fate.

22     Jury service, as you've heard, is a privilege.

23  Indeed, it's the highest form of public service that we could

24  possibly give.  And we thank you very much for participating

25  in this particular trial.  All of us truly, truly appreciate

1083

1  your service as jurors, and we know it's a sacrifice on your

2  part.

3          Before this case began, you took an oath to well and

4  truly try the case according to the law and the evidence.  And

5  we know that you will abide by that oath because you raise

6  your hand and you said, I will.

7          At the end of the case, you will be performing a

8  weighty function, and that is passing on the judgment on

9  fellow human beings.

10          So what are the tools that you have to guide you in

11  this particular endeavor?  They are the tools grounded in the

12  law that Judge Thurston has given you.  It starts with the

13  presumption of innocence.

14          And that means that as we sit here today and

15  throughout this trial up until the very, very, very moment

16  that you are sent into the jury room, Frank Clement is not

17  guilty.  And because that is the law, it is not our burden to

18  show his innocence or to prove his innocence to you.  In fact,

19  even if you heard nothing from us -- and I'm not saying that's

20  what will happen, but even if you heard nothing from us, it's

21  the prosecutor's job to prove to you their case.

22          Unless the prosecutors prove their case beyond a

23  reasonable doubt, Frank Clement is not guilty.

24          That obligation to prove the case beyond a reasonable

25  doubt means that if something is probably true, that's not

1   enough.  It has to be beyond a reasonable doubt.  So if it's

2   probably true, that's not enough.  It has to be that higher,

3   higher burden.

4        By the end of the case, if you are not sure beyond a

5   reasonable doubt that Frank Clement is guilty as charged in

6   this case, you must return a verdict of not guilty.  That's

7   what the law requires.

8        During jury selection, Judge Thurston explained these

9   principles of law to you and asked all of you if you could not

10  follow those principles.  None of you raised your hand, and,

11  you know, you would not be here if you had.

12       You demonstrated your commitment to abide by these

13  precious protections that we all benefit from.  And now we ask

14  you to keep those principles uppermost in your mind as you

15  listen to the evidence in the case.

16       One of your duties as fact finders is to judge the

17  credibility of witnesses.  None of us are human lie detectors,

18  none of us.  We look at demeanor, sure.  But mostly, we look

19  for context when we decide whether or not we're going to

20  believe someone.  We look at what kind of life they have led.

21  We look at how they have behaved.  Have they behaved in a way

22  that is worthy of belief?  Have they something to gain by what

23  they are telling you?

24       In this case we will ask you to focus on credibility

25  because the only witnesses the government will call who

1085

1    connect Frank to these crimes in this case are criminal

2    cooperators out to save their own skin.  They are all

3    convicted criminals, and they are all hoping to improve their

4    lives from their testimony.  Some of them have already even

5    been rewarded.

6           One, you will hear, has admitted to being involved in

7    a double murder in Lomita, among other major crimes, but is

8    actually walking the streets.  The prosecutors didn't demand

9    that he plead guilty and do time for those murders.  Nope.

10   They never charged him.

11          In addition, prosecutors convinced the local district

12   attorney to reduce charges against that witness' family and

13   even dropped charges against some of the family members

14   because the witness insisted on it.

15          Two more cooperators have admitted to multiple

16   murders but have entered into agreements with the prosecutors

17   to testify here.  Their sentences could be cut in half.

18          Other cooperators are serving lengthy sentences for

19   murder, other violent crimes, and/or serious drug charges and

20   could get sentence reductions as a result of their testimony.

21          There are other witnesses whom the government

22   threatened with prosecution who you will hear from.

23          It is logical to conclude that the witnesses with

24   criminal backgrounds who are seeking leniency don't care one

25   wit about an oath that they take on the witness stand.

1    Does that make sense to you?  We submit that if any

2    single fact elicited in this case or any conclusion which

3    derives from the facts that depends on the witness' testimony

4    should be rejected.

5    Now, the prosecutors have told you that the version

6    of events testified to by these criminals is backed up.  But

7    as you listen to the testimony of these criminal witnesses,

8    ask yourself this question:  What piece of evidence have you

9    seen or heard that does not rely on the credibility of those

10   criminal witnesses?

11   We submit the answer is nothing.  The prosecutors

12   will claim that these cooperators have to be truthful in order

13   to get leniency.  We expect the witnesses will actually say

14   the same thing.

15   However, one thing they all understand is that the

16   prosecutors decide if they are truthful.  So it's the

17   prosecutor's truth that counts.

18   All these cooperators have led lives of crime.

19   Several of them had pled guilty to federal crimes.  Each of

20   them faces severe punishment, with two of them facing life

21   without parole.

22   But they get their reduced sentences, or even no

23   prosecutions, as long as the prosecutors believe them.

24   The testimony of these individuals should be examined

25   with great care and caution.  There are murderers, thieves,

1087

1  drug dealers.  Theirs is the basic instinct of

2  self-protection.  It's either give the prosecutors information

3  or spend a large portion of their life, if not all their

4  lives, in prison.

5        The context -- and I say context again -- when it

6  comes to these witnesses is that it's a whole lot of

7  he said/she said on the part of some amazingly bad actors.

8        Ask yourselves, why would individuals who have lived

9  lives of total disregard for society's norms now suddenly be

10  telling the truth?

11        As I said in the beginning, the burden of proof that

12  the prosecutor bears is beyond a reasonable doubt.  Excuse me.

13        "Probably did it" is not enough, neither is "more

14  likely than not."  Not even clear and convincing evidence is

15  sufficient for a guilty verdict.  To convict, it must be that

16  much higher, beyond a reasonable doubt.

17        We submit that whether the prosecution meets the

18  burden depends on the credibility of their cooperating

19  witnesses.

20        So as you listen to their testimony, ask yourselves

21  what you know about them.  Think about the context, have they

22  lived lives that warrant your trust?  Do they have something

23  to gain by their testimony?  Would you trust them enough to

24  give any one of them a key to your home in order to water your

25  plants while you were away?

1     We make decisions all day every day, like what to

2  wear, what to eat, and none of those are particularly

3  important.  Sometimes they are, if you happen to be allergic

4  to something that you were going to buy or wear.  But mostly,

5  our day-to-day decisions are not critical ones.

6     But then we all make decisions that begin with a

7  capital D, decisions to marry, decisions to start a family, to

8  buy a house or an apartment, to choose a profession or a

9  school.  These are important decisions because the wrong

10  decision could be life changing.

11     At the end of this case, you will be called upon to

12  make a decision with a capital D.  If you make the wrong

13  decision, that, too, could have life-changing consequences.

14     Frank has pleaded not guilty to each and every one of

15  these crimes, and that is why we are having this trial.

16     At the end of the case, Ms. Byrialsen will address

17  you and lay before you all the reasons why you should return a

18  verdict of not guilty.  Thank you very much.

19     THE COURT:  Thank you.

20     For Mr. Johnson?  Mr. Villa.  Thank you.

21     MR. VILLA:  Thank you, Your Honor, may it please the

22  Court.

23     Good afternoon, ladies and gentlemen.

24  Kenneth Johnson is not guilty because the government cannot

25  prove beyond a reasonable doubt that he's guilty of Counts 1

1089

1  through 3, the counts for which he's charged, and he's pleaded

2  not guilty as such.

3          Now, as you heard from the government,

Kenneth Johnson was in prison at the time of the crimes for

which he's accused.  And I'm not here to tell you that he's an

angel or that he hasn't committed the crimes for which he was

put in prison, but he's not guilty of the crimes for which

he's charged in this trial.

9          Now, my name is Ryan Villa, and along with

Andrea Luem, we represent Kenneth Johnson.  And all of us

thank you for your time.

12          I know I'm the only one standing between you and

leaving for the day.  You've been through sort of a gruelling

process of jury selection that started last week, continued

today, and we appreciate you, Ken appreciates you, because

you're going to have to pay attention real close to the

government's evidence in this case.  And I'm going to tell you

why.

19          First, as the Judge told you, and you'll get more

detailed instructions at the end of this case from the Judge,

you have to consider each of these crimes for which Kenny is

charged separately, and you have to consider each defendant

separately when evaluating the evidence.

24          It's going to take some compartmentalization on your

part and attention to detail.  And you heard from Mr. Conolly

1   you may not get the evidence all in the same order.

2          I'm going to try to put some of that evidence

3   together for you now and give you a preview of what to expect.

4   But one thing that is true for all of the government's case is

5   that it relies heavily, almost exclusively, on the testimony

6   of unreliable witnesses.  And these are folks, as you heard

7   from Mr. Byrialsen, who are criminals accused of crimes,

8   convicted of crimes, who agree to tell you a story in exchange

9   for leniency.

10          In some cases they committed extraordinary amounts of

11  crimes and -- including murder, including a substantial amount

12  of fraud, and were given incredible leniency in order to

13  accuse Mr. Johnson.  These are essentially witnesses

14  incentivized to lie.

15          Now, I want to talk to you first about Counts 2

16  and 3.  Those are the two homicides that occurred in Lomita.

17  And you heard Mr. Conolly talk about that.  That occurred

18  October 4th, 2020, and the two individuals who were killed

19  were Allan Roshanski and Ruslan Magomedgadzhiev.  And they

20  were killed in Lomita, California down in South Bay near San

21  Pedro, Redondo Beach in Los Angeles County, on the streets of

22  Lomita.

23          Kenny, at the time, was in prison in Kern County,

24  hundreds of miles away.

25          Now, the government will claim that he ordered these

1    murders or approved of these murders or somehow was involved

2    in these murders.  But first, I want to talk to you about the

3    evidence you aren't going to see.

4          So think about this.  We've got this allegation that

5    Kenny ordered these murders.  That usually comes in some form

6    of communication, right?  You'd say it out loud, you write it,

7    you text it, you heard about cell phones, maybe somebody

8    overheard it.

9          What you will not hear in this trial is -- from any

10   uncompromised witness who, say, heard Kenny give the order.

11   What do I mean by an uncompromised witness?  Well, he's in

12   prison.  So a corrections officer who is down the hall and

13   overheard it.

14         You heard about wiretap evidence.  You're not going

15   to hear from someone who was listening to a wiretap, a police

16   officer that heard some sort of order from Kenneth Johnson

17   about the Lomita homicides.

18         You won't hear from an inmate who is not involved in

19   any way, shape, or form with the Aryan Brotherhood or gangs or

20   any of this stuff, just who happened to be passing by and

21   heard this information.  You're not going to see any of that

22   evidence.

23         You heard about cell phones and how there's evidence

24   that there were phones inside the prison.  You're not going to

25   see a phone from Kenny Johnson.  You're not going to see any

1   messages from Kenny Johnson.  You're not going to hear about

2   any phone calls, as I said, that were recorded, overheard

3   where Kenny Johnson is asking that these murders be committed.

4          You won't see any written evidence.  You'll hear in

5   this case about something called a kite.  And that's a note,

6   something written down by someone in prison typically to

7   provide a message to another person, usually another inmate.

8   And oftentimes those kites have instructions or orders to do

9   something, such as carry out a murder.  You won't see anything

10  like that for Kenny with respect to Counts 2 and 3, these

11  homicides.

12         In fact, the only evidence at all that you will hear

13  that Kenny was in any way involved with this murder, the

14  reason we're here, is from a witness by the name of

15  Robert Eversole.  And Mr. Eversole is an incentivized witness,

16  incentivized by the government to tell you a story and claim

17  that Mr. Johnson was involved.

18         He's a career criminal.  He was in prison himself at

19  the time this took place.  And not only was he incentivized,

20  but Mr. Eversole gave a number of statements after he was

21  incentivized.  And in those statements he didn't say that

22  Kenny ordered the Lomita homicides.  He didn't say it at all.

23         In fact, it wasn't until a series of statements later

24  that he was prompted by the government, by United States

25  Attorney Stephanie Stokman, to say that Kenny was involved,

1  that Kenny ordered this murder.  And that was the first time

2  that Robert Eversole said that Kenny had anything to do with

3  the Lomita homicides.

4          Now, I want to tell you a little bit more about

5  Mr. Eversole.  As you will learn -- you'll get to hear his

6  testimony and hear about him in great detail.  But he's an

7  admitted criminal.  He's been a criminal his whole life.  He's

8  been in and out of prison most of his life.

9          He knows how to take advantage of situations that

10  he's in.  He's what they refer to in prison as somebody who

11  could get a lot of things done.  While he was in prison, he

12  was operating lots of things on the street, selling drugs,

13  selling guns, doing fraud, doing the EDD fraud, manipulating

14  anybody he could to get what he wanted, he was a criminal, and

15  including his own family.

16          You'll hear that his own family, his wife, his

17  daughter, his stepdaughters were caught in some of these

18  crimes, including at least accusations by the federal

19  government that they might be charged with federal crimes and

20  charges by the State of California as well.

21          And Mr. Eversole gets caught red-handed by the

22  federal government on a wiretap doing what he does, his

23  criminal work.  He's also caught because he sends somebody --

24  the father of his daughter -- his daughter's child, excuse me,

25  Geoffrey Guess, to sell a gun to an undercover agent out on

1094

1    the streets and they catch him.

2              And so he's got federal charges on him and the

3    federal government decides to arrest him and bring him in.

4    And around November of 2020, he's brought in and he meets with

5    ATF Agent Gonzalez and some other police officers and says to

6    them -- you know, he's three years to the gate.

7              What does that mean?  He's going to get out of state

8    prison in three years.  And he's told by Agent Gonzalez, you

9    know, your family is caught up in this too.  Your wife, we

10   were going to arrest her, but she had had surgery so, you

11   know, we didn't arrest her because she was still recouping

12   from surgery.  And that, you know, his daughter and

13   stepdaughters were involved too.

14             He's told he's going to go to federal prison and do

15   serious time.  And what does he do?  He decides to cut a deal

16   for himself and for his family.  And he makes it very clear

17   before he says anything, before he tells any story, you know,

18   I want my family out of this thing.  They can't go to prison.

19   You need to help me.  That's what -- that's what I want.

20             And not only is he told that in making this deal that

21   the federal government won't prosecute his wife and his

22   daughter, but they say to him, Well, we're going to give you a

23   deal too.  We're going to help you out too.

24             And what's more is there were state charges pending.

25   There were state charges pending against Mr. Eversole's

1  daughter Callie, and his stepdaughters who were Karie and

2  Katie Gunter.  And Ms. Stokman told him, Well, I'm going to

3  help you with that.  We're going to work on the state, we're

4  going to talk to the district attorneys in those states and

5  see what we can do.

6          And sure enough, the charges against Callie, which

7  was a felony, got reduced to a misdemeanor, which was very

8  important to Mr. Eversole, because she needed housing because

9  she had children and she needed to qualify for Section 8

10 housing and she couldn't do that with felony charges.  And so

11 he made it very clear she's got to have misdemeanors.

12         And Ms. Stokman talked to the DA and said, We got you

13 misdemeanors.

14         The federal government also helped getting the

15 Gunters', his stepdaughters, charges dismissed, and they

16 agreed not to prosecute his wife.  And you'll see the evidence

17 throughout this trial how they were involved in various

18 aspects of the crimes that Mr. Eversole was committing while

19 he was in prison.

20         And Mr. Eversole was also an admitted murderer.  He

21 admitted to participating in the conspiracy that involved the

22 Lomita homicides.  He claimed he was involved.  You'll get to

23 decide for yourself whether he really knew anything at all

24 about that.

25         But he claims to have been involved in those

1   homicides, to have helped, to have assisted, and he didn't get

2   charged for that.  He never got charged for any homicide

3   charges at all.

4            But like I told you before, despite all that, despite

5   getting the deals for himself, getting the deals for his

6   family, he didn't say the first couple times when he told the

7   story that he had about Lomita that Kenny was involved in any

8   way, shape, or form.

9            He said he talked to the man -- who you'll later hear

10  who's name is Justin Gray -- who claimed to have done the

11  murders and that he told him how to do the murders and how to

12  get away with the murders, what to do, how to protect himself

13  to get away with it, and gave him direction and advice that

14  clearly qualifies as Mr. Eversole himself being a participant

15  in the murder.

16           But he never says in the first time he tells the

17  story to Agent Gonzalez and others, he never says, Kenny told

18  me to do it or, Kenny ordered these murders.  He never says

19  that at all.

20           And then the second time around he tells the story.

21  And this time there are some detectives from Los Angeles

22  County, because they're trying to solve the Lomita homicides.

23  And they come in and they ask, Mr. Eversole, Do you know who

24  committed these murders?  And he says, Yes.

25           And he tells this story about how from prison he

1   talked to this man Justin Gray about how to carry out this

2   murder.  And even in that point in time, he doesn't say that

3   Kenny did it.

4           And mind you, ladies and gentlemen, he is out for a

5   deal.  And not only did he get a deal, he's out of prison.  So

6   this goes down in 2020.  Mr. Eversole gets charged for all --

7   a slew of crimes, admits to being involved in a murder, and

8   today, January of 2025, he's walking the streets for what he

9   did.

10          But he still didn't say that Kenny ordered the Lomita

11  homicides.  In fact, it wasn't until months and months later

12  in yet another session where Ms. Stokman says to him, You

13  know, this thing sort of sounded like K was involved.  Was K

14  involved?  And he's, Oh, yeah, yeah.  K was involved -- K,

15  being Kenny.  And that's how we got here.

16          Well, that's not the end of the story.  Because

17  you're going to hear from another man by the name of

18  Brandon Bannick.  And Brandon Bannick was accused by the

19  government of participating in the Lomita homicides.

20          They say he went along with Justin Gray, he was in

21  the car with him, and when they came up to the two gentlemen

22  and got out of the car, Mr. Gray supposedly shot these two

23  guys and they left.  So Mr. Bannick was accused as an

24  accessory being involved in that.

25          Mr. Bannick is also an incentivized witness.  He was

1098

1    facing charges of murder in this case and decided, Well, I'm

2    going to testify, I'm going to tell a story to this jury, to

3    you, in hopes that I get a deal when I go to my sentencing so

4    I don't have to spend the rest of my life in prison.

5         And even though Mr. Bannick has that incentive to

6    tell you a story, he himself will say, you know, I don't know

7    if Kenny was involved in this.  I just -- I don't know.

8         That's Count 2 and 3, the two Lomita homicides.

9    That's the evidence against Mr. Johnson that we expect you to

10   hear.

11        Now, also with respect to Count 1, that's the

12   racketeering, the RICO as we call it.  There's a -- what's

13   called a predicate act homicide.  And what that means is as

14   part of the RICO, the government claims that Mr. Johnson was

15   involved in ordering the murder of somebody in prison by the

16   name of Lowrey.

17        And they're going to ask that you find Mr. Johnson

18   guilty of ordering that murder of Mr. Lowrey.  Now, the

19   witness you're going to hear from who says that that happened

20   is another criminal who was in prison whose name is

21   Timothy True.  And he will claim that this was an AB ordered

22   hit, that Mr. Johnson ordered them to kill Mr. Lowrey.

23        But, in fact, what the evidence is that you'll hear

24   is that a man by the name of Thrasher Holmeyer was in the cell

25   with Mr. Lowrey, and Thrasher Holmeyer killed Mr. Lowrey in

1099

1  the cell.

2          And the government is not going to call

3  Thrasher Holmeyer to tell you that, Yeah, that's why I killed

4  him, I killed him because I was ordered to do so by Kenny.  In

5  fact, you won't hear from Thrasher Holmeyer in the

6  government's case.

7          But Mr. Holmeyer will tell you, when we call him as a

8  witness, that he committed the crime because it was -- it was

9  a personal beef.  It was just a fight between cellmates that

10  got out of control and he killed him.  And he actually pleaded

11  guilty to that crime in California state court and he says

12  that that was why he did it.

13          So ladies and gentlemen, as you heard through voir

14  dire and from the Judge's instructions, Kenny is presumed

15  innocent.  Just because he's in prison for other crimes

16  doesn't mean he's not presumed innocent for these crimes.

17          And you were all asked and you all swore and you

18  promised that you could listen to the evidence and presume

19  Kenny innocent and that you would not find him guilty unless

20  the government proved that he was guilty beyond a reasonable

21  doubt.

22          And to do that, what the government has to do is

23  present to you elements.  Every crime has an element.  The

24  government has to prove each element of the crime beyond a

25  reasonable doubt.

1    You'll hear from the Judge instructions about what

2    does reasonable doubt means.  She's going to tell you that

3    reasonable doubt is proof that leaves you firmly convinced

4    that Kenny is guilty.

5    And so for Counts 2 and 3, and this murder of

6    Mr. Lowrey in prison, which is associated with Count 1, the

7    government is going to have to prove beyond a reasonable doubt

8    that Kenny either committed these murders -- and you won't

9    hear that he committed these murders.  The allegation is that

10   he ordered them.  I talked to you about what that evidence

11   was.

12   So what the government will have to prove, the

13   element that they'll have to prove to you, is that he ordered

14   the murders, he directed the murders, or he somehow aided --

15   assisted or aided in the murders.

16   And that requires that he have knowledge about the

17   murders before they were committed.  It's not enough that the

18   government can say, Oh, he's involved in the Aryan

19   Brotherhood.  It's not enough that the government can say that

20   this was an Aryan Brotherhood murder.  That's not enough.

21   They have to prove that Kenny knew that these murders

22   were going to happen and that he somehow had advance knowledge

23   and intended to help those who carried the murders out.

24   And I submit to you, based on what I've just told

25   you, the evidence I expect you to see is that you will not be

1  firmly convinced, you will have a reasonable doubt.  That you

2  will not be firmly convinced when you hear the evidence about

3  Kenny with respect to those three murders.

4          And that there is simply no reliable evidence that

5  Kenny Johnson was involved in any way with those who actually

6  did carry out the murders in Lomita, California or in prison

7  involving Mr. Lowrey.

8          And at the end of the trial, we will ask that you

9  find him not guilty of those charges.  Thank you.

10          THE COURT:  All right.  Ladies and gentlemen, thank

11  you for your attention today.  We are going to break at this

12  time.

13          I'm going to ask you before you leave today to return

14  to the jury deliberation room.  We need you to fill out some

15  forms to get you reimbursed.  And then otherwise, I'll see you

16  tomorrow morning at eight o'clock and we'll go till 1:30 from

17  now on.

18          All right.  Thank you so much.

19          Oh, before we do, let me remind you.  Please don't

20  discuss the case, please don't let anyone discuss it with you,

21  please don't form any opinions about this case, please don't

22  do any independent research, and please do not consult any

23  media or review anything related to this case.

24          Thank you so much.

25      (Jury exits the courtroom.)

1102

1     THE COURT:  All right.  We're outside the presence of

2 the jury.

3     Ms. Stokman, you had some issues to discuss?

4     MS. STOKMAN:  Yes, Judge.  There were --

5     MS. FISHER-BYRIALSEN:  I'm sorry to interrupt, your

6 Honor, but may Mr. Clement just step out?  We can keep going

7 but -- okay?

8     THE COURT:  Oh, sure.  Yeah.

9     Okay.

10     MS. STOKMAN:  First, we wanted to seek the Court's

11 permission to add exhibits and to amend exhibits as we have

12 them.

13     There are photographs that come from the Hollywood

14 robbery incident that we'd like to add to the exhibit list as

15 Exhibits 1435 to 1445.

16     THE COURT:  Comments about that from the defense?

17     MS. FISHER-BYRIALSEN:  Your Honor, we would object at

18 this point considering we've already done openings.

19     THE COURT:  You haven't seen these documents before

20 now?

21     MS. LUEM:  They were provided to us maybe a few days

22 ago?  Or yesterday.  I think they're untimely, frankly,

23 discovery for this robbery that happened, I don't know, maybe

24 even 2021.  It should have been provided to us a long time

25 ago, so.

1    THE COURT:  Why were they -- what was the delay in

2    providing this?

3    MS. STOKMAN:  Judge, I think we provided them at the

4    end of last week.  If not, it would have been Monday.  Maybe

5    it was yesterday.  But it was at least last week that we

6    gathered them.

7    We did not have these before.  And then when we

8    started to prep the witnesses who might be called, we were

9    able to obtain the photographs.  We had not been able to

10   obtain them before.  So they are photographs of the home that

11   the robbery occurred in.

12   THE COURT:  When you say couldn't obtain them before,

13   where did you get them from now?

14   MS. STOKMAN:  From the crime scene -- I don't know if

15   it's a CSU or what they call them at LAPD, but the crime scene

16   technician who took the photographs.

17   THE COURT:  What was the impediment in getting them

18   before?

19   MS. STOKMAN:  We had requested through the prior

20   LA Sheriff detectives who were involved in the Lancaster

21   investigation, and they provided us with limited resources or

22   evidence discovery when it came to the Hollywood.  So these

23   are just photographs of the home.  We can point counsel to the

24   Bates numbers.  There's --

25   THE COURT:  Let me understand.  You made a request

1    from the sheriff's office for evidence held by the LAPD?

2        MS. STOKMAN:  Yes, because they were in charge of

3    getting that evidence because it was part of the Lancaster

4    investigation.

5        In any event, the government did request it late, of

6    course, when we had the witness list for the LAPD officers who

7    were coming in at trial, and we were able to gather that from

8    them last week, I believe, or the week before.

9        THE COURT:  So you made the request early on with the

10   sheriff's office, they produced what they had, and then you

11   spoke to witnesses, and they said, Well, there's some

12   pictures?

13       MS. STOKMAN:  Yes.

14       THE COURT:  And up to that point, you didn't know

15   there were pictures?

16       MS. STOKMAN:  We didn't know what the extent of those

17   were, no.  We had some photographs which were discovered in

18   the original report that we provided -- I think back in 2023,

19   but photographs of the house, we did not have.

20       THE COURT:  Did the law enforcement report refer to

21   the photographs taken in the house?

22       MS. STOKMAN:  I'm not sure.

23       THE COURT:  I think we're going to need to look at

24   that.  Usually, at least my experience with law enforcement

25   reports, they do document that.

1105

1     And so when you made the request of the sheriff's

2  office -- sheriff's officers, their response was, Here's

3  everything we have?

4     MS. STOKMAN:  Yes.

5     THE COURT:  Let me take a look at the photos.

6     Mr. Stokman, are you going to ultimately be asking to

7  admit these, or are these simply demonstrative?

8     MS. STOKMAN:  To admit them.

9     THE COURT:  And who's going to be authenticating

10 these?

11    MS. STOKMAN:  The officer who arrived at the scene at

12 the time of the robbery call.

13    THE COURT:  The LAPD officers?

14    MS. STOKMAN:  Correct.

15    THE COURT:  What was the extent of the discovery

16 presented as to the Hollywood robbery?

17    MS. STOKMAN:  As far as what was produced prior?

18    THE COURT:  Yeah.

19    MS. STOKMAN:  There was a report from the detective.

20 I'm not sure if there were other reports within that from any

21 of the patrol officers, but a report of the -- from the

22 detective assigned to the robbery about the incident, about

23 his follow-up, about an arrest of one of the individuals who

24 was a suspect in that robbery.

25    And then there were some photographs within that that

1   captured the individuals who arrived at the house to commit

2   the robbery.  And that was the extent of the photographs we

3   had from that -- at that point.

4          THE COURT:  All right.  Any other comments for the

5   defense?

6          MS. FISHER-BYRIALSEN:  I mean, Your Honor, I think we

7   just maintain our objection.

8          THE COURT:  All right.  At this point I'm going to

9   add them.  Whether they are going to be admitted is something

10  I think we need to talk about a little bit more.  I want to

11  know exactly -- I want to know if the law enforcement reports

12  referred to these.

13         And I guess what you're saying, Ms. Stokman, is you

14  never made the request of the LAPD for the original file in

15  this?

16         MS. STOKMAN:  That is correct.

17         MS. LUEM:  Your Honor, I'm looking at Bates 23790,

18  which is the report for the Hollywood robbery.  And it says

19  right in there "photographs," "recordings," "video,"

20  et cetera.  And it lists that there were -- that Sallaberry,

21  P Number N3637, responded and took crime scene photos.

22         So it looks like they were -- there was a lot of

23  notice that there was photos out there.

24         THE COURT:  Well, they said that they received some

25  photos.

1      Does it say anything more about where the photos were

2  taken?  I mean, usually they detail that.

3      MS. LUEM:  It says "crime scene photos."  And there

4  was additional photos of the victim's fanny pack and phone.

5  Uh, yeah, it's -- it's -- they also say that there was

6  surveillance video provided.

7      THE COURT:  Any picture -- any reference to photos of

8  the house, the exterior of the house, the interior of the

9  house?

10      MS. LUEM:  I assume that's what they mean by "crime

11  scene photos" because that is the crime scene, the house.

12      THE COURT:  I don't know.  I haven't seen the report.

13      Is the report -- has the report been marked?

14      MS. STOKMAN:  No.  It's not an exhibit.

15      THE COURT:  All right.  Ms. Stokman, can you or

16  someone email me a copy of the report so I can take a look at

17  that?

18      All right.  Next issue.

19      MS. STOKMAN:  Yes.  And, Judge, I'll just add, as is

20  typical in a case like this, that when there is witness prep,

21  sometimes there are exhibits that are added.

22      We did provide this as soon as we were able to obtain

23  them.  And this was in the course, again, of preparing for

24  witness testimony that we were able to obtain these.

25      I'll just leave it at that.  That this was obtained

1108

1    as soon as we were able to get them from the crime scene

2    officer.

3            THE COURT:  I guess that's where I'm having trouble,

4    though, is because if it's important to the case, important to

5    the defense, too.  And what I'm trying to figure out is why it

6    wasn't sought earlier.  And, you know, the fact that their

7    sheriff office had some documents, I'm just not convinced at

8    this point that that was the source to get this.

9            If you want to talk about the Hollywood robbery, I

10   guess I don't understand why the documents weren't -- weren't

11   obtained from the LAPD originally.  So I want to know -- I

12   want to see the report.

13           All right.  What's the next issue?

14           MS. STOKMAN:  There is an updated laboratory

15   result -- of a result of laboratory examination that is

16   Exhibit -- now it is Exhibit 1342.

17           We've just provided an updated lab.  Those drugs were

18   retested.  They had already been tested back in, I believe,

19   2022 or 2023.  But in order to save time in the witnesses

20   presented, we had two different sets of drugs.  They were

21   tested by two separate people.  So we had these drugs tested

22   again so that one chemist could testify about both drugs

23   instead of two.

24           So it's the same report, basically.  It's just a

25   retest of the drugs that were already examined and were the

1109

1   original Exhibit 1342.

2           So we would just like to update it with the

3   laboratory results from the witness who is going to testify

4   about the other drugs.

5           THE COURT:  Comments by the defense?

6           MS. FISHER-BYRIALSEN:  Same objections with the prior

7   exhibits, Your Honor, they are untimely.

8           When was this lab report done or this retesting done?

9           THE COURT:  When was it done, Ms. Stokman?

10          MS. STOKMAN:  It was done at the beginning of last

11  week.

12          THE COURT:  And you already had the results from

13  the -- and they say the same thing?

14          MS. STOKMAN:  Correct.

15          THE COURT:  You had the results of the drug test.

16  They're just now asking one witness to testify to both.

17          All right.  I'm going to amend the list to identify

18  1342.

19          And wait a minute.  Are we pulling the old one and

20  just putting this in the place?

21          MS. STOKMAN:  Yes.  That was the intention, unless

22  the Court wants us to mark it otherwise.

23          THE COURT:  I don't know if the defense has any

24  desire to keep --

25          MS. FISHER-BYRIALSEN:  That's fine, Your Honor.

1110

1     THE COURT:  Okay.  All right.  So we'll do that.

2  We'll pull the old 1342 and add the new one.

3     MS. STOKMAN:  And then additionally, Exhibit 1434 is

4  a summary chart from Danielle Ponce De Leon, who is going to

5  testify as an expert in the data analysis from the Pomona

6  incident.  It's an updated chart that adds analysis from a

7  phone number that was not included in her original chart.

8     And so it's an exhibit that she prepared from the

9  discovery that has already been provided in order to summarize

10  that data for her -- her expert testimony during the trial.

11     THE COURT:  And when was this new -- this phone

12  number identified?

13     MS. STOKMAN:  This phone number was identified by

14  Pomona Police Department in, I believe, 2022 during the course

15  of the investigation.  But in her original analysis, it was

16  missed in the summary chart, and so we asked her to provide

17  that phone number again.

18     So the data has been in discovery since 2023.

19     THE COURT:  She just overlooked it in her summary?

20     MS. STOKMAN:  Correct, the original one.

21     THE COURT:  Comments from the defense?

22     MS. FISHER-BYRIALSEN:  Your Honor, we've been asking

23  that the -- at the sum of the first exhibit list the

24  government sent us, it said "Ponce De Leon Lomita chart" and

25  "Ponce De Leon Pomona chart."  And we've asked for those --

1  and I can check the dates exactly -- since November, I

2  believe.  We've been asking for these charts, and we didn't

3  get them until very recently.

4      So they knew they were going to make these charts and

5  have them ready.  But now to have done another one, we also

6  object to timeliness on that.

7      THE COURT:  Was the information presented in the

8  report otherwise but just not -- it just didn't make it to the

9  summary?  Is that what you're saying, Ms. Stokman?

10     MS. STOKMAN:  So the data was all obtained from

11 search warrants.  That data has been discovered since 2023.

12     In the course of preparation for her expert testimony

13 on the analysis of that data, Ms. Ponce De Leon has created

14 summary charts, as she would for her expert testimony, in

15 order to clearly explain the analysis of the data that is

16 otherwise in a form that is not readily accessible for a jury

17 to see.

18     So it's a summary of what her investigation -- or her

19 analysis of the data, which is part of her expert opinion.

20     THE COURT:  Did she express an opinion in her

21 disclosure about this phone?

22     MS. STOKMAN:  I do not believe that she was specific

23 about which phones or items that were going to be tracked.

24     But since the beginning of the initial exhibits --

25 and I forget what day that was.  But pursuant to this Court's

1112

1   order, we have been giving defense notice of where in the

2   Bates range the data that has been now analyzed by

3   Mr. Ponce De Leon fell so that they knew.  And this phone was

4   part of that data.  It just got missed in her original summary

5   chart.

6           THE COURT:  All right.  What is the purpose of the

7   chart?  Is it going to be admitted, or is it simply

8   demonstrative?

9           MS. STOKMAN:  Judge, I believe as an expert it can be

10   admitted as far as what she prepared in order to give her

11   expert opinion.  But it does show the location of the devices

12   that were in question at the time of that homicide and where

13   they were on the historical ping location, which is what we've

14   discussed when we were discussing her expertise in the motions

15   that had already been ruled upon.

16           THE COURT:  When you say "summary chart," are we

17   talking about a picture with a circle and, you know, this is

18   here and that's there?  Is that what we're talking about?

19           MS. STOKMAN:  Yes, the direction of either the tower

20   or the phone and the -- you know, the range that that would

21   have been within and where those phones moved in the course of

22   a time frame.

23           THE COURT:  All right.  Any further comments by the

24   defense?

25           MS. FISHER-BYRIALSEN:  No, Your Honor.

1    THE COURT:  All right.  I'm going to add that to the

2  exhibit list, 1334.

3    Anything else?

4    MS. STOKMAN:  Judge, there have been numerous audio

5  exhibits that we have marked and provided.

6    We have been working to narrow those down.  There are

7  many -- of the limited calls now or audio that we plan on

8  using, there are some that are just very, very long, and we've

9  now clipped to the areas we plan on presenting to make it a

10  shorter presentation.

11    So we would like to put the clip into the exhibit

12  list as maybe that exhibit number -1 so that we have the clip.

13    Counsel can see what those clips are.  I think they

14  have already either been provided of it or notified of that.

15  That way what goes into evidence is only the clip and not the

16  entire call, unless there's another reason why that would be

17  admitted.

18    But that's the government's plan to narrow it down,

19  and we would just like to add the clips to the exhibits

20  already marked with each call that exists.

21    THE COURT:  All right.  Comments by the defense?

22    MS. FISHER-BYRIALSEN:  Your Honor, we're going to

23  have to have time to review those clips.  Have we been

24  provided those at all?

25    MS. STOKMAN:  I'll have to check, but I thought -- I

1114

1   thought they were provided it or at least given notice that

2   they would need a drive to put those on.  But they are clips

3   of the calls that have already been marked and identified as

4   exhibits for quite a long time.

5               THE COURT:  All right.  So, in essence, it's sort of

6   a reduced -- or redacted, reduced version of the exhibits

7   already in?

8               MS. STOKMAN:  Correct.

9               THE COURT:  So basically you're just wanting to

10  authenticate the entire thing and then go, But this is what

11  we're going to listen to?

12              MS. STOKMAN:  Yes.

13              THE COURT:  All right.  I need you to confirm,

14  Ms. Stokman, that it's been provided.  If it hasn't, then you

15  need to provide those to the defense, I mean, like right away.

16  They need it tomorrow.

17              MS. STOKMAN:  Yes.

18              THE COURT:  Okay.  Those will be marked with a -1.

19              MS. FISHER-BYRIALSEN:  Your Honor, may I --

20              MS. DESALES BARRETT:  Your Honor, do you know what

21  the numbers of those exhibits are?

22              THE COURT:  Do you have those offhand?

23              MS. STOKMAN:  I may, but I may not.  But if not,

24  we'll -- they are identified by exhibit.

25              MS. FISHER-BYRIALSEN:  What does that mean,

1    Your Honor?  I don't understand, because we -- for example,

2    tomorrow, Your Honor, I believe they want to put on

3    Troy Clowers, who has hours of interview.  And if we have to

4    prepare tonight for that, we need to know what the clips are.

5             THE COURT:  Right, I agree.

6             MS. STOKMAN:  The clips are not of audio interviews,

7    since that is not evidence, but it's of wiretap calls and

8    recorded calls with an informant.

9             THE COURT:  Is it going to be with any witness that's

10   going to be produced tomorrow?

11            MS. STOKMAN:  Not this week, no.

12            THE COURT:  All right.

13            MS. LUEM:  So, Judge, I'm looking at what was -- we

14   were asked to provide thumb drives to the government last

15   week, I believe, or the week before for the -- for the

16   exhibits, and they are audio -- audios on the thumb drive that

17   I received, but it doesn't look like they are reduced in size.

18   It looks like they are the same length as the originals, so I

19   don't -- I don't know that we have them.

20            So I just want to make that note that it looks like

21   they were -- the calls were reproduced on this thumb drive

22   that we got from the government, but it doesn't look like they

23   were clipped.

24            THE COURT:  All right.  So you need to get those

25   clipped and get them to the defense tomorrow.

1116

1    MS. DESALES BARRETT:  Your Honor, can we -- I may

2    just be dense, but I'm trying to figure out here whether or

3    not the government intends to offer just the clips in evidence

4    or these entire audio recordings?  Because if we have an audio

5    recording that has things on it that are objectionable, we

6    want to be able to object and not have it in front of the

7    jury.  If there's -- if the clips have nothing objectionable

8    on them as is, then that's a whole different story.  But we

9    need to know what -- what's going in to the jury.

10    You know, a lot of times, Judge, you'll get audio,

11    and I know it's happened in big-time cases like in the

12    Menendez case, the jury accidentally got a whole audio instead

13    of clips.  So we need to know exactly what the evidence is

14    here.

15    THE COURT:  I don't see a point in admitting the

16    larger file, if you're only going to want them to hear the

17    little bit.  You're shaking your head, you agree, Ms. Stokman?

18    MS. STOKMAN:  That was -- if I didn't state that

19    clearly, that's the government's intention.

20    THE COURT:  So the original exhibit will be marked,

21    but the clip is what's going -- the government's going to seek

22    to admit?

23    MS. STOKMAN:  Correct.

24    THE COURT:  All right.  That makes sense,

25    Ms. Barrett?

1    MS. DESALES BARRETT:  Yes, thank you, Your Honor.

2    THE COURT:  All right.

3    MS. STOKMAN:  And just to point out, there are some

4    not clipped because they're short in nature, but we had tried

5    to take the longer ones to clip them down to what we believed

6    we would want to play.  And so once defense has those clips,

7    if they don't already, then they can listen those.

8    THE COURT:  All right.  Next issue?

9    MS. STOKMAN:  We had listed on our preliminary

10   exhibit list items of physical evidence that has been booked

11   in the ATF property vault.  We omitted those in error as far

12   as marking them as an exhibit.  They are not physically here

13   yet until we need them for whichever witness they'll come in

14   through, but we're asking to be able to mark those with an

15   exhibit number and to add those to the list.

16   THE COURT:  You're saying that on your list you

17   identified them as items?

18   MS. STOKMAN:  ATF property number, which is what

19   defense had viewed them as under -- when the viewing of the

20   physical evidence was done.

21   THE COURT:  Okay.  And so you want to bring them in

22   physically and you want to mark them at that time?

23   MS. STOKMAN:  Yes.  I just wanted the Court to know

24   that, in error, we forgot to leave a place for them as a

25   premarked number and so we're just asking to do that.

1          THE COURT:  What you're -- are you taking, then,

2     something that you called earlier ATF property and you're

3     expanding that to be ATF property, you know, marked as 23,

4     Items A through B or something like that?

5          MS. STOKMAN:  Yeah, it would be -- for instance, if

6     it was ATF Property Number 1, that item, then, would get an

7     exhibit number that fell in line with the exhibit numbers that

8     are on the government's exhibit list.

9          THE COURT:  All right.  Defense, you-all have seen

10    these items, it sounds like?

11         MS. LUEM:  Well, we've seen the items live at ATF,

12    but on the thumb drive that I was provided by the government,

13    I don't see anything listed as ATF property number, I just see

14    numbers.  So I don't know if there was photographs included in

15    place of that or -- I don't see anything listed as an ATF

16    property number on this disc, but maybe Ms. Byrialsen sees

17    something different.

18         MS. FISHER-BYRIALSEN:  No, I don't Your Honor, but we

19    should just note that in the letter that we wrote the

20    government about our conferral or whatever you want to call it

21    about the exhibits, we notified them that ATF Number 106 and

22    108, we did not believe that we ever viewed those at the

23    evidence viewing.  So we alerted them to that back in

24    December 13th.

25         THE COURT:  Are you seeking to admit ATF 106, 108?

1       MS. STOKMAN:  Yes.  And those are -- one is the new

2   updated drug laboratory result, and the other one is the other

3   drug items that were identified or analyzed prior.  So those

4   we did not have because they were with the lab and those have

5   been sent back now, so we have -- we will be able to show

6   counsel those prior.  But we didn't have them at ATF at the

7   time.

8       THE COURT:  You're saying the actual physical drugs?

9       MS. STOKMAN:  Correct.

10      THE COURT:  Because they were at the actual lab being

11  tested?

12      MS. STOKMAN:  Correct, or they were at the ATF, like,

13  Glendale office getting in transit to the DEA laboratory.

14      THE COURT:  But you provided the test results of

15  those drugs?

16      MS. STOKMAN:  Correct.

17      THE COURT:  Did you provide them access to be able to

18  test them themselves?

19      MS. STOKMAN:  Nobody asked except Mr. Quinlan, and

20  then his client pled, so at that point we were discussing

21  whether or not and how he could do that.  But no counsel of

22  this group asked to retest them.

23      THE COURT:  All right.  Comments by the defense?

24      MS. FISHER-BYRIALSEN:  No, we would want to view them

25  before we make any further objections, Your Honor, but it

1   would have been helpful if somebody had responded to that in

2   December and told us that was what was happening.

3        THE COURT:  When were you told that they had these

4   physical -- the drugs?  I mean, it sounds like you knew about

5   that because Mr. Quinlan knew about it.

6        MS. FISHER-BYRIALSEN:  I don't know what Mr. Quinlan

7   knew or what drugs it even is referring to.  All I know is

8   when we get the exhibit list and they said ATF numbers and

9   they listed 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 ATF numbers, all of

10  us who had been at the evidence viewing went back and looked

11  at all the photographs we'd taken during those three or four

12  days of evidence viewing, and we alerted them that we had not

13  seen those numbers, the 106 and 108, and we got zero response.

14       THE COURT:  So the government didn't say, This is

15  drugs that's at the lab?

16       MS. FISHER-BYRIALSEN:  No.  It just says ATF Property

17  Number 108 and 106.

18       THE COURT:  And when you went to see the property

19  initially during these days of viewing, were you under the

20  impression that -- in advance of what you would be seeing?

21       MS. FISHER-BYRIALSEN:  For the evidence viewing, we

22  were given a list and then we were put in room with agents who

23  knew nothing about the case and who couldn't answer any

24  questions.  So when we asked if this was everything, we were

25  told that that was everything.  So --

1    THE COURT:  I need to back up, because what I was

2  asking you, I think, is what you said at the beginning.  You

3  were you given a list and then you were given evidence and at

4  that time you go, Hey, wait, I didn't see 107, 109?

5    MS. FISHER-BYRIALSEN:  No.

6    THE COURT:  So associated with 107 and 109 was a --

7  or 108, 106 was a description of what 108 and 106 was or it

8  just says 108?

9    MS. FISHER-BYRIALSEN:  No, the -- we were alerted to

10  106 and 108 when we got their exhibit list.

11    THE COURT:  So I'm going back, because I -- what my

12  question was, when you went to see the property initially, in

13  advance of seeing the property or with the property was there

14  a list of, you know, Exhibit 1 is going to be --

15    MS. FISHER-BYRIALSEN:  No.

16    THE COURT:  -- a photo, Exhibit 2 -- so you just went

17  and you didn't know how many exhibits you were going to see or

18  what the exhibits were going to be, so you didn't know what

19  was missing?

20    MS. FISHER-BYRIALSEN:  No.

21    THE COURT:  And then you get this list in December

22  and you say, Hey, we didn't see anything that's says 10- --

23    MS. FISHER-BYRIALSEN:  -6 and 108.

24    THE COURT:  106 or 108, and the government doesn't

25  respond.

1122

1    MS. FISHER-BYRIALSEN:  Correct.

2    THE COURT:  All right.  Ms. Stokman, what's your

3    account of that situation?

4    MS. STOKMAN:  Judge, all I can say is that the lab

5    results for these drugs have been provided within discovery

6    for years at this point, and other drugs that were recovered

7    from the same incident were actually viewed at ATF, except for

8    106 and 107 because they were not in the ATF Fresno's

9    possession -- I'm sorry.  106 and 108 were not in Fresno ATF

10   custody at that time.

11   THE COURT:  So then the defense received drug testing

12   results related to these particular drugs that were, at least

13   at the time they were tested, in the possession of the ATF,

14   right?  They provided it to the lab.  Did the test results

15   indicate, brought by ATF?

16   MS. STOKMAN:  I don't think so.  I don't believe

17   the -- it links the ATF number of the case.  I don't think it

18   lists who drops it off, it's just the laboratory examination

19   results.

20   THE COURT:  Can you tell from results that it came

21   from the ATF?

22   MS. STOKMAN:  Yes.  Based -- yes, there is an area, I

23   believe, that it says it came from the ATF Glendale office.

24   THE COURT:  Ms. Stokman, when they asked you, Hey,

25   what is 107 -- or 106, 108, why was there no response to what

1   106 and 108 is?

2          MS. STOKMAN:  That was just an oversight, Judge.  It

3   was within a long questioning of the exhibit list.  And at

4   that point, the government was attempting to figure out if

5   there were any joint exhibits or any preadmitted exhibits that

6   everyone agreed upon, and this got lost within the very long

7   letter of the objections to the exhibits that we had

8   identified prior to the final exhibit list coming out.

9          THE COURT:  Where is 106 and 108 now?

10         MS. STOKMAN:  They should be at ATF Fresno today.

11         THE COURT:  All right.  And the defense is seeking to

12  test those drugs?

13         MS. FISHER-BYRIALSEN:  I don't know, Your Honor.  We

14  haven't seen them.  We don't know what they are.  We don't

15  know --

16         THE COURT:  Well, if you see a pack of drugs, do you

17  want to test them or --

18         MS. FISHER-BYRIALSEN:  Maybe.

19         THE COURT:  Okay.  I'm going ask that those drugs be

20  made available to the defense for the purposes of having it

21  tested on their own.

22         The fact, though, that the test results have been

23  produced, and it sounds like attributed to the ATF, I think

24  that's enough to allow the actual 106 and 108 to be added.

25         All right.  So as to the other exhibits, you're going

1124

1    to identify them by their own exhibit numbers?

2              MS. STOKMAN:  Yes.

3              THE COURT:  All right.  Anything else?

4              MS. STOKMAN:  Judge, and just so the Court's aware,

5    we'll be filing a new amended exhibit list with now these

6    additional exhibits on it.  And as far as amending the exhibit

7    list, that is -- that is everything that we have at this

8    point.

9              THE COURT:  Okay.  So what I need to know is when

10   is -- when are the drugs available to the defense to take a

11   split sample to test?

12             MS. STOKMAN:  I believe we could -- Judge, we could

13   have the drugs physically here for them to view on Friday.

14   But it is fentanyl, so the sampling of that is going to be

15   problematic, so we'll probably have to come up with some sort

16   of agreement or order.  But they can view the drugs

17   physically.  We could have them here Friday.

18             THE COURT:  All right.  Who -- and when is this

19   evidence are you intending for this to be brought before the

20   jury?

21             MS. STOKMAN:  Physically those drugs, maybe at the

22   end of next week or the beginning of the next week.  We don't

23   anticipate the chemist potentially testifying until the end of

24   next week or early February, the first week of February.

25             THE COURT:  So you guys need to move this more

1125

1    quickly.

2           Can you get these drugs here tomorrow?  Because the

3    defense needs to have some time.  If they choose to test it, I

4    don't know what turnaround is typically for something like

5    that.

6           Do you-all know how quickly you can turn that around?

7           MS. FISHER-BYRIALSEN:  No, because we haven't looked

8    into this yet.

9           THE COURT:  Have you tested any of the drugs seized

10   in this case?

11          MS. FISHER-BYRIALSEN:  No.

12          THE COURT:  And you just think it's --

13          MS. FISHER-BYRIALSEN:  I want to at least have the

14   opportunity.  And I --

15          THE COURT:  And I want to grant you that opportunity

16   too.  I'm just trying to find out from a procedural

17   perspective whether you have a lab identified and whether you

18   have any idea of how quickly things can be turned around.

19          MS. FISHER-BYRIALSEN:  No, we don't.  And this could

20   all have been avoided if they would have conferred with us

21   about -- the order --

22          THE COURT:  Let' jut -- I get that.  I appreciate

23   that.  I'm just trying to figure out how to put you in the

24   best position.

25          Are you going to go and try to find a lab tonight?

1  What's the plan?  Because if you want to wait until Friday to

2  see the physical pills, that's just burning off two days.

3        If you can have your investigator identify a lab, you

4  can start working on, Hey, can you take a sample?  How quickly

5  can you turn it around?  Then I would have some information to

6  be able to help you out on this.  But I can't -- I mean,

7  minutes, unfortunately, now are going to count.

8        So is that something that you're willing to do now?

9        MS. FISHER-BYRIALSEN:  I have an investigator here

10  who can go view them with us tomorrow afternoon after court.

11        THE COURT:  Can the drugs be available, then, at ATF

12  tomorrow afternoon?

13        MS. STOKMAN:  Yes.

14        THE COURT:  Okay.  Let's do that.  We'll go from

15  there.

16        All right.  Anything else from the government?

17        MS. STOKMAN:  Yes.  Judge, we wanted to -- oh, sorry.

18  My microphone was off.

19        We wanted to -- before any witnesses came on that

20  were putting in crime scene photos from the Pomona incident,

21  potentially tomorrow -- to narrow down the photographs that we

22  intend to offer or admit into evidence, as the Court

23  requested.

24        And just so the Court and counsel are aware, our plan

25  is to lay the foundation and authenticate all of the photos we

1   have marked but only admit the ones that we will be giving the

2   prior notice for.

3           So that if something comes up in the future and we

4   want to use one of those photographs, the witness doesn't have

5   to come back to lay that foundation, authenticate those again.

6           THE COURT:  All right.  What photos are you wanting

7   to admit?

8           MS. STOKMAN:  So the Pomona crime scene photos start

9   at Exhibit 1064.  Of those, we would like to admit 1064, 1066,

10  1069, 1076, 1083 through -85, 1087 through 1096, 1103 and

11  1104, 1119, 1126, and that's it.

12          And a lot of those are the crime scene itself, and

13  we've tried to limit the amount of the actual victims.

14          THE COURT:  All right.  Let me pull those up.

15          All right.  Let me understand.  For sure you're not

16  going to be offering the autopsy photos?  This is the entirety

17  of the Pomona?

18          MS. STOKMAN:  This will come in -- these are the

19  crime scene photos.  I don't believe we're going to be able to

20  make it to the medical examiner, but if we do, then we will be

21  able to identify which autopsy photos, so that will be a

22  witness next week, potentially.

23          THE COURT:  Comments as to these photos for the

24  defense?

25          MS. LUEM:  I'm sorry, Judge.  It's taking me a little

1   bit to pull them all up, so I have to do it, like, one at a

2   time.  So I want to get out of here, could we be given the

3   opportunity to look at these tonight and make a record

4   tomorrow?

5            THE COURT:  I'll tell you, in looking at them, there

6   are very few photos of the actual victims.  The photos of the,

7   you know, the shell casings, whatever, I don't think there's

8   really any objection that could be lodged as to that.

9            MS. LUEM:  Right.  I agree.

10           THE COURT:  My concern is just simply, you know,

11  overly, you know, horrifying photos, and I don't see that any

12  of these are.  They are what they are.

13           But at this point, uh, that's the notice.  I think

14  the government, at least at this point, preliminary, without

15  further showing by the defense, it seems like what they've

16  done is taken a lot of photos and reduced it to a reasonable

17  amount.

18           But if you want Ms. Luem to take the evening, we can

19  talk about this in the morning.

20           MS. DESALES BARRETT:  Your Honor, I'm not sure the

21  procedure that we're going through here, because there are a

22  ton -- you know, there are at least three times that many

23  photos.

24           THE COURT:  Right.

25           MS. DESALES BARRETT:  We're going to have this jury

1129

1    sitting here while we identify, you know, 50 photographs?

2          THE COURT:  Well, maybe, but I doubt it's going to

3    happen that way.  Usually I've seen them say, Look at Photos,

4    you know, 1046 through whatever it is, 1150.  Do you recognize

5    these?

6          Yes, I do.

7          You know, What do these appear to be photos related

8    to?

9          Whatever.  I don't know if there's going to be

10   something more.

11         Ms. Stokman, are you intending to go through and ask

12   specifically as to which photo it is?  I mean, the foundation

13   as to each photo?

14         MS. STOKMAN:  No.  I think it would be the blanket

15   crime scene photos and then ask the appropriate questions and

16   then narrow it into the ones we want to admit, as far as

17   asking the Court to admit those.

18         THE COURT:  I do agree.  If it turns out you want

19   something more like Ms. Barrett's talking about, we'll have to

20   do that outside the presence of the jury.

21         MS. STOKMAN:  That's what we expect, but we want to

22   make sure we're not bringing back witnesses unnecessarily if

23   we can avoid it.

24         THE COURT:  Okay.

25         MS. LUEM:  And right now, Judge, I would -- I would

1  lodge an objection to 1126 because it appears to be just

2  another victim -- or one of the victims just rolled over and a

3  picture of his back.

4         There's already a picture of him as he was found.  I

5  think if they want to demonstrate the crime scene as they came

6  upon it, then --

7         THE COURT:  I assume there's -- no, I'm sure that's

8  not what it is.

9         MS. LUEM:  176 is, you know, sufficient.

10        THE COURT:  I didn't hear anyone say they just wanted

11 to show what the crime scene looked like when they appeared.

12        I image what they want to show is something to do

13 with these tattoos or something about the nature of where the

14 wound is.  I don't know.

15        But there's nothing overly gory about this.  What it

16 is is a whole bunch of tattoos.

17        MS. LUEM:  Right.  But it's sort of unnecessary as

18 far as --

19        THE COURT:  I don't know.  I don't know what the

20 evidence would be in that.  I don't know if an expert is going

21 to come in and say, you know, This guy with -- the guy in the

22 middle here, he has some symbol or something.  I don't know.

23        But at this point, the motion in limine in my ruling

24 on it had to do with, you know, we're not going to bombard

25 people with just horrifying, prejudicial photos, but that's

1   not what this is.

2        But I do appreciate your objection.  Do you want to

3   talk about that further tomorrow, or is there something -- do

4   you need some time to continue to look at the photos before

5   you can --

6        MS. LUEM:  I think I've been able to look through

7   them all, and at this point, that's really, I think, the only

8   one that I would object to.  Because it looks like they took

9   his coat off, they took his shirt off, they rolled him over,

10  and they took a picture of his back.

11       THE COURT:  I think that's what happened too.

12       All right.  So the objection to that photo -- I guess

13  to the extent the objection is it's irrelevant maybe -- I

14  don't know what your objection is.

15       MS. LUEM:  I think it's relevance.  I mean, I guess

16  if they lay a foundation that it shows, like, an entry wound

17  or something to that effect, but he had -- he had a jacket on

18  and a shirt on and they took it off and it's just to show the

19  tattoos.  I think the witness can testify as to what the

20  tattoos are.  They just look like kind of like a monster's

21  face or maybe -- I don't --

22       THE COURT:  All right.  I don't think that they're

23  not relevant.  That objection is overruled.

24       Anything else, Ms. Stokman?

25       MS. STOKMAN:  I'm going to let Mr. Engelking discuss

1  some 902s and a stipulation -- or a finding of fact, except I

2  just want to allow counsel to know and the Court to know that

3  tomorrow we plan on using Exhibit 1428, a demonstrative.

4        THE COURT:  How much longer do you have Ms. Stokman?

5        MS. STOKMAN:  I'm sorry.  What was that?

6        THE COURT:  How much longer are we going to go?

7  Because otherwise we're going to need take a break.

8        MS. STOKMAN:  I think it should be fairly short with

9  the rest that we have to ask the Court.

10       THE COURT:  Okay.  All right.  Mr. Engelking.

11       MR. ENGELKING:  Yes, Your Honor.  So a while ago we

12  asked for stipulations to authenticity for Facebook data, some

13  Google data, T-Mobile data, Flock, and a 9-1-1 call.  But we

14  couldn't come to an agreement with the defense counsel on

15  stipulating to authenticity for this data.  But they didn't

16  indicate why they believed the data was untrustworthy.

17       We have 902 business records certifications that came

18  with the data, which was provided by those companies.  And,

19  obviously, these exhibits can be self-authenticating with the

20  business records certification under 902(11) and 803(6),

21  unless defense counsel shows circumstances indicating a lack

22  of trustworthiness.

23       And so I guess we just ask Your Honor, in the absence

24  of a stipulation, to confirm with defense counsel as to what

25  their basis is for challenging the trustworthiness in light of

1   the 902s.

2          THE COURT:  When are these documents going to be used

3   at trial?

4          MS. STOKMAN:  Judge, this would be in order to avoid

5   the custodians of record coming to testify.

6          THE COURT:  Right.  When do you need this evidence,

7   though?

8          MS. STOKMAN:  I believe one might be utilized next

9   week with the witness.  But if we have the stipulations, then

10  this would go -- or, sorry, the Court's admission of this

11  evidence, it would go to towards mostly Danielle Ponce

12  De Leon's.  The bulk of it goes towards her testimony.  The

13  Facebook accounts will be through other witnesses, but only

14  one of those would show up potentially next week.

15         THE COURT:  All right.  Counsel, let's be prepared to

16  talk about these issues tomorrow after trial, and we can

17  address that at that time.

18         MR. VILLA:  Judge.

19         THE COURT:  Yes.  Anything else, Mr. -- oh, I'm

20  sorry.  Did Mr. Villa say something?

21         MR. VILLA:  Yeah, I just had one thing before you go.

22         THE COURT:  Are you finished, Mr. Engelking?

23         MR. ENGELKING:  One more thing, Your Honor.  We also

24  asked for a stipulation regarding UTC, that UTC is eight hours

25  ahead of Pacific Standard Time, but for some reason we

1134

1    couldn't come to an agreement on that.  So I just ask

2    Your Honor -- we will be asking Your Honor to take judicial

3    notice of that fact.  We can draft up a brief statement for

4    you.

5            THE COURT:  Is there really any objection to that?  I

6    mean, that's just what it is.

7            MR. VILLA:  I mean, we don't have objection to the

8    Court issuing judicial notice.

9            THE COURT:  All right.  I'll go ahead and do that, if

10   you'll prepare that Mr. Engelking.

11           MR. ENGELKING:  Yes, Your Honor.

12           THE COURT:  Anything else, Mr. Engelking?

13           MR. ENGELKING:  Uh, no.

14           THE COURT:  All right.  Mr. Villa?

15           MR. VILLA:  Judge, I -- this may come up tomorrow

16   because the government has told us they might call

17   Troy Clowers.  And I emailed him this morning, but a lot has

18   happened since then.

19           I think there may be a statement or a report that we

20   don't have.  You know, the first debrief we have is from July

21   of 2021, and in it ATF Agent Gonzalez tells Mr. Clowers, When

22   I talked to you at Clovis PD, you know, you told me X, Y, Z.

23   And Mr. Clowers was arrested by Clovis PD in April of 2021, so

24   I assume that that's when that interview took place.

25           So I sent an email this morning because I discovered

1   it late last night in re-reviewing this transcript.  But I

2   don't know where that statement is or if -- we confirmed that

3   we don't have it.

4       THE COURT:  All right.

5       MS. STOKMAN:  There's no recording or report.  It was

6   a non-interview of the defendant to see if he had any interest

7   in cooperating federally, and at that point he did not.

8       THE COURT:  So Mr. Gonzalez just had a conversation

9   with him and said, Hey, what you told me last time was

10  whatever.  But there was no other documentation of that?

11      MS. STOKMAN:  There's no documentation.

12      THE COURT:  All right.  Mr. Villa, does that -- I

13  know that doesn't satisfy you, but does that address your

14  issue?

15      MR. VILLA:  It addresses it.

16      THE COURT:  All right.  Anything else, then, from

17  anyone at this time?

18      MS. LUEM:  Your Honor, I had one issue.  In

19  Mr. Conolly's opening statement, he referred to Mr. Johnson's

20  and Mr. Clement's violent reputations.

21      And I didn't want to object during opening statement,

22  but I think that I would like the Court to caution the

23  government, in terms of questioning witnesses, going into, you

24  know, that type of character evidence or reputation for

25  violence.  It's classic 404(b) and should not be admitted.

1136

1       THE COURT:  Comments?

2       MS. STOKMAN:  If that comes up, it's part of ongoing

3  enterprise activity, which would be established by the time

4  that -- if that even comes up, it would be a established at

5  that point that it's not 404(b), it goes to directly the

6  racketeering enterprise activity.

7       THE COURT:  If that's going to happen, then let's

8  talk about that in advance.

9       All right.  Anything else, then?  Ms. Byrialsen.

10      MS. FISHER-BYRIALSEN:  Your Honor, we just would like

11  to know when we're getting these new exhibits so Heidi, our

12  paralegal, can upload them up into Trial Director.

13      THE COURT:  I thought you said you produce these

14  already?  Well, the clips, there's going to be some, either

15  they've gotten them or you're going to get them to them

16  tomorrow.  The updated drug test, has that been provided?

17      MS. STOKMAN:  Yes.  And now that the Court has

18  approved us amending the exhibit list, we will provide an

19  exhibit-stickered copy of each of the new exhibits that we've

20  discussed today.

21      THE COURT:  But it has been produced already?

22      MS. STOKMAN:  The original under a Bates number,

23  correct.  It just isn't marked yet as an exhibit.

24      THE COURT:  What about the summary chart, that's been

25  produced?

1       MS. STOKMAN:  Yes.

2       THE COURT:  I guess maybe I should just ask, what do

3  you feel like you're missing, Ms. Byrialsen?

4       MS. FISHER-BYRIALSEN:  Our paralegal needs to upload

5  the ones with the exhibit stickers into Trial Director.

6       THE COURT:  Oh, the stickers themselves.

7       MS. FISHER-BYRIALSEN:  Yes.

8       THE COURT:  Okay.  So we're going to get those

9  tomorrow?

10       MS. STOKMAN:  Yes.  Or tonight, yes.

11       THE COURT:  Okay, or tonight.

12       Anything else, then?

13       MS. FISHER-BYRIALSEN:  The clips, the same thing?

14       THE COURT:  Yeah.  I told -- I told her that they

15  have to be to you tomorrow.

16       MS. FISHER-BYRIALSEN:  And then one final thing, we

17  asked the government again -- like Mr. Villa said, it's been a

18  long time since this morning, but I think yesterday or this

19  morning we asked them about all of Agent Gonzalez's

20  handwritten notes that he's taken throughout the

21  investigation, which we can see on the videos and he refers to

22  them, as well, himself.  We don't have those yet.  We'd like

23  to have them.

24       THE COURT:  All right.

25       MS. STOKMAN:  Judge, case law is clear, this is not

1    covered under Jencks as it -- as it pertains to witness

2    interviews.  And they are not something that is necessary in

3    the sense that every interview, except for one, I believe, was

4    recorded.  So the notes are of no consequence when the entire

5    recording is what defense has of the witness who will testify.

6           The one that was not recorded that I can think of off

7    the top of my head, there was an extensive report, eight to

8    ten pages, maybe even more, that was written up about that

9    interview.  So, again, the notes are not considered Jencks

10   material, they are just potentially work product or otherwise

11   not discoverable when other means of that information has been

12   discovered.

13          THE COURT:  Additional comments on that?

14          MS. FISHER-BYRIALSEN:  Well, Your Honor, for example,

15   Mr. Bannick is one of the people who was not recorded, so

16   that -- that's of huge consequence in this case.

17          THE COURT:  What's been produced as to Mr. --

18          MS. FISHER-BYRIALSEN:  As well as Timothy True.

19          THE COURT:  All right.  What's been produced as to

20   Timothy True and Mr. Bannick?

21          MS. STOKMAN:  An extensive report with Mr. Bannick,

22   and a report with Mr. True that was from an interview.

23          And I apologize, I forgot about that one, that that

24   wasn't recorded as well.  So those two have reports written

25   about them.

1    THE COURT:  All right.  So I guess, defense, you can
2  produce to me your authorities that these notes are something
3  that are required to be produced.  I mean, I would have some
4  trouble with, if you have an actual recording, why he has to
5  produce the notes.  But maybe you have some authority for
6  that, and I'll take a look at it.
7    MS. FISHER-BYRIALSEN:  Well, there's two where we
8  don't have recordings, and then also there's many --
9    THE COURT:  Right, right.  And I said I'd be happy to
10  see your authorities on that as well.
11    And I don't know when Mr. Bannick or Mr. True are
12  going to testify, but obviously we're going to need that
13  pretty quickly.  So I need it when you can get it.
14    MS. FISHER-BYRIALSEN:  We will do it quickly.
15    THE COURT:  All right.  Anything else then?
16    MS. STOKMAN:  Nothing from the government.
17    THE COURT:  All right.
18    MS. FISHER-BYRIALSEN:  Nothing.
19    THE COURT:  If there's something you need to discuss
20  with me beforehand, be prepared to do that before
21  eight o'clock.  So be here at least 15 minutes early.  And
22  then you can alert someone we need to talk, because I don't
23  want to keep the jury waiting.  All right?  Okay.
24    (Proceedings were adjourned at 5:19 p.m.)
25

1140

1    I, RACHAEL LUNDY, Official Reporter, do hereby certify the

2  foregoing transcript as true and correct.

3

4  Dated:  January 23, 2025            /s/ Rachael Lundy_____
                                       RACHAEL LUNDY, CSR-RMR
5                                      CSR No. 13815

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25