3061

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON


UNITED STATES OF AMERICA,　　)
　　　　　　　　　　　　　　　) 1:20-cr-00238-JLT-SKO
　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　) Jury Trial, Day 15
　　　vs.　　　　　　　　　　 )
　　　　　　　　　　　　　　　)
KENNETH BASH, et al.　　　　　) Volume 15
　　　　　　　　　　　　　　　) Pgs. 3061 - 3239, inclusive
　　　　　　Defendants.　　　　)
_____)


Fresno, California　　　　　　　　　Tuesday, February 11, 2025



REPORTER'S TRANSCRIPT OF PROCEEDINGS









REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

3062

**APPEARANCES OF COUNSEL**:

For the
Government:

**STEPHANIE STOKMAN**
Assistant U.S. Attorney
2500 Tulare Street, Rm. 4401
Fresno, California  93721

**JARED ENGELKING**
Department of Justice
1301 New York Avenue, N.W.
Washington, DC 20005

**JAMES ROBERT CONOLLY, GOVT**
U.S. Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814

For Defendant
Johnson:

Law Offices of Andrea Luem
Attorneys at Law
400 South Forth Street, Suite 500
Las Vegas, Nevada  89101
BY:  **ANDREA LEE LEUM, ESQ.**

Law Offices of Ryan J. Villa
5501 Eagle Rock Avenue NE
Suite C2
Albuquerque, NM 87104
BY:  **RYAN J. VILLA, ESQ.**

For Defendant
Clement:

Fisher & Byrialsen, PLLC
Attorneys at Law
99 Park Avenue
New York, NY 10016
BY:  **JANE FISHER-BYRIALSEN, PHV**

Ruhnke And Barrett
29 Broadway, Suite 1412
New York City, NY 10006
BY:  **JEAN DE SALLES BARRETT, PHV**

For Defendant
Stinson:

Law Office of Kenneth Alan Reed
406 W 4th Street
Santa Ana, CA 92701-4505
BY:  **KENNETH ALAN REED, ESQ.**

1   Tuesday, February 11, 2025                    Fresno, California

2   8:00 a.m.                                    Jury Trial Day 15

3        (The following proceedings were held in open court:)

4        THE COURT:  Okay.  So we are still waiting on a

5   couple of jurors, but I will tell you that they have decided

6   to keep the same schedule in deliberations, 8:00 to 1:30.

7        Is there an estimate as to your closing argument,

8   Ms. Stokman?

9        MS. STOKMAN:  Judge, it seems to be right about an

10  hour.  So if it starts to hit at the hour place, it's pretty

11  much going to wrap up very quickly after that.

12       THE COURT:  So the likelihood is what will happen is

13  I'll give preliminary instructions, they'll argue, we'll take

14  a break, and then who is going to be up next?

15       MS. FISHER-BYRIALSEN:  I am, Your Honor.

16       THE COURT:  All right.  And your estimate of your

17  argument?

18       MS. FISHER-BYRIALSEN:  I think like 30 to 40 minutes.

19       THE COURT:  Okay.  And then who is after

20  Ms. Byrialsen, Ms. Luem?

21       MS. FISHER-BYRIALSEN:  Ms. Luem and then Mr. Reed, if

22  that's okay.

23       THE COURT:  I'm just trying to think of scheduling.

24       Ms. Luem, how long is your --

25       MS. LUEM:  I anticipate I won't take a full hour.

3064

1      THE COURT:  All right.  So probably then we'll do

2 those two arguments, take a break, and then, Mr. Reed, we'll

3 go to you.

4      How long do you think yours will be?

5      MR. REED:  Around a half hour, but probably less.

6      THE COURT:  Okay.  All right.  So then we'll probably

7 do that and then go to the government and final instructions

8 and then move from there.

9      Before we begin, I received the request for the

10 special interrogatories.  Let me start with Mr. Johnson.  I

11 think that's probably the easier one.

12      I'm not sure I understand the rationale of asking the

13 same questions for the third time.

14      Ms. Luem, your comments.

15      MS. LUEM:  I was going to have Mr. Villa address it,

16 but, essentially, it's the same argument that Ms. Barrett is

17 making in terms of delineating the overt acts, as they go to

18 the -- well, I mean, the government has to prove two predicate

19 acts, and those are the two that, uh, Mr. Johnson is charged

20 with.

21      I think it is -- I think it's a little bit easier for

22 the jury to understand if they have the special interrogatory

23 in terms of the case law.  I believe it's cited at the bottom

24 of Ms. Barrett's request.

25      THE COURT:  All right.  Anything else on that topic?

1    MS. LUEM:  No.

2         THE COURT:  All right.  As to Mr. Johnson, because

3    these exact questions are already asked as to Questions 2 --

4    2(c) and 2 -- well, I don't know where the October 1st date

5    comes in, but I'm assuming you're referring to Questions 2(a)

6    and 2(b).

7         So they were already asked, they're already set forth

8    because they are a duplicate of the sentencing factors

9    questions.  So it just doesn't -- I don't understand at all

10   that situation in requesting that determination for a third

11   time.  So that's not going -- we're not going to do that.

12        As to Mr. Clement's, I have the same issue as to the

13   murder questions because they're asked twice already, and then

14   I would be more inclined as to the robbery question and the

15   methamphetamine question.

16        Comments, Ms. Barrett?

17        MS. DE SALES BARRETT:  Yes, Your Honor.

18        Your Honor, this is -- I've cited the cases that have

19   made endorsements of the special interrogatories, and I would

20   note that they're all RICO cases and all would have required

21   special findings with regard under *Apprendi*.

22        It is -- it's a different issue and the jury does not

23   have to go through the verdict sheet in the order in which it

24   appears.  They can read the whole thing first and then make

25   their determinations as to what direction they want to

3066

1   deliberate and not the direction necessarily from the verdict

2   sheet going 1, 2, 3, et cetera.

3        So I would submit, Your Honor, that it -- that while

4   they're asking a similar question, it's not identical, for one

5   thing.

6        And the other thing is that the verdict sheet itself

7   is something that does not control the deliberations of the

8   jury.  And the reality is that the courts that have actually

9   addressed this have basically said that they've approved

10  special interrogatories with regard to predicate acts in RICO

11  cases.

12        And as I cited, the Third Circuit has model

13  instructions to this effect, and all of it is included in the

14  Third Circuit model instruction, including the findings

15  necessary for the *Apprendi* issue and the special

16  interrogatories.

17        This is not new stuff.  This is not taking this to

18  Mars.  This is something that is happening regularly in

19  racketeering cases in federal courts across the country.

20        THE COURT:  Right.  That's why I suggested special

21  interrogatories.  But the issue, though, is what I said on --

22  the other day on Friday and what I still think is appropriate

23  in this case is that determination only if there is a guilty

24  finding as to Count 1 and answers of no as to all the

25  questions under 2 and not guilty as to all of the other

3067

1    questions.

2         Because otherwise, the purpose of this -- the utility

3    is only for purposes of appeal.  There is not a necessity.

4    And even the cases you cite don't say it's necessary.  They're

5    saying it's not error, which is not my concern because I

6    already have a verdict form that is not error.

7         So that's where I'm at.  And my thinking is -- my

8    question really -- I don't see the point in asking the jury to

9    make the same finding three times.  And if you want those

10   different questions, I would be willing to do that, but only

11   in -- on the terms that I've said.

12        Because there's no -- it's simply, to me, an issue of

13   an appeal.  And I haven't heard anything different.  Because

14   on purposes of appeal, if there is not a finding as to -- if

15   there is a not guilty and no finding as to the murders, then I

16   could understand on appeal that you would want to know where

17   to focus the argument.

18        Otherwise, if there are guilty findings and yes

19   findings as to the murder, doesn't really do much.  So

20   that's -- that's the thinking.

21        The question that I have is simply whether the

22   interrogatories should go to the jury at the same time as the

23   verdict form, which is typical.  And it brings people what

24   they have -- they don't come to a verdict and then have to be

25   slapped with something else to do.

3068

1          So there is an expectancy issue, but I'm kind of

2     indifferent.

3          What is your preference, Ms. Barrett?

4          MS. DE SALES BARRETT:  Your Honor, if the -- all of

5     the interrogatories don't go in with regard to the charges in

6     the indictment, uh -- then, uh, it makes no sense to me to,

7     uh, single out the two interrogatories having to do with the

8     robberies.

9          THE COURT:  Okay.

10         MS. DE SALES BARRETT:  Uh, and in -- but, Your Honor,

11    I would ask that -- I know that we have been doing this

12    informally with regard to submissions, because we've sent the

13    charged requests and things like that by email, but I would

14    request that the Court either mark this or give me permission

15    to tonight file it in PDF on the docket.

16         THE COURT:  Sure.  Yeah.  Go ahead and file it.

17         MS. DE SALES BARRETT:  Thank you.

18         THE COURT:  All right.  Anything else before we --

19         MR. VILLA:  Your Honor, with respect to the

20    information we received about Mr. True from CDCR --

21         THE COURT:  Yes.

22         MR. VILLA:  -- I'd ask that the Court make it an

23    exhibit for the record.

24         THE COURT:  It's already marked, and it's already

25    been filed.  It's just under seal.

3069

1    MR. VILLA:  And, Your Honor, there's a redacted

2    version and, I suppose, an unredacted version.  Is the

3    redacted version what's marked and under seal?

4    THE COURT:  Yes.

5    MR. VILLA:  And those are the Court's redactions,

6    correct?

7    THE COURT:  Correct.

8    MR. VILLA:  And just, you know, for our record, I

9    think there is information in there that was inconsistent with

10   Mr. True's direct trial testimony.  And that's also our

11   position that, although we subpoenaed this information and

12   obtained it, that the United States was obligated, knowing

13   they were going to call Mr. True as a witness, to have

14   produced this information prior to trial.

15   THE COURT:  And what authority are you relying on for

16   that?

17   MR. VILLA:  *Brady* and *Giglio*, Your Honor, and

18   *Kyles v. Whitley*, which says that anything within the law

19   enforcements teams --

20   THE COURT:  That's where I'm going with -- this is a

21   state agency, so I'm more interested in your authority for the

22   proposition that the federal prosecutor must -- has control

23   over what's contained by the state agency.

24   MR. VILLA:  So, Your Honor, one of the authors of the

25   autobiography was Cope, who I think is part of CDCR.  He was

1    on the government's original witness list and part of the law

2    enforcement team with the ATF and local authorities.

3          THE COURT:  Do you have Bates number on that?

4          MR. VILLA:  For the --

5          THE COURT:  For the --

6          MR. VILLA:  Which part?

7          THE COURT:  The proposition that this person, Cope,

8    was on the investigation team?

9          MR. VILLA:  I mean, Your Honor, he's on the

10   witness -- the government's witness list.

11         THE COURT:  I understand that, but you said he was

12   part of the investigation team.  And so I'm trying -- or he or

13   she.  So I'm trying to figure out where you're -- what the

14   source is for that information.

15         MS. DE SALES BARRETT:  Your Honor, we have received

16   in discovery -- as a result of the *Jencks* material on

17   Mr. Cope, we have received reports in *Jencks* with regard to

18   the investigation conducted here authored by him.

19         THE COURT:  All right.  So then you know whether --

20   you know, what that -- what's contained in that.  I don't.

21         So anything else, then, for the record on that topic?

22         MS. STOKMAN:  Judge, just from the government, I want

23   to clear up, Cope was not part of the investigative team in

24   this investigation.

25         The reports that are in discovery were reports

1   because he was part of the CDCR staff that responded to one of

2   the prison murders.  I believe it was the Hargrave murder that

3   we didn't end up proving.  But he was never a part of the

4   investigative team for the federal case that's here today.

5        Uh, and in addition, as we made the argument at

6   sidebar and the statement at sidebar, we did not have access

7   to Timothy True's information.  That came through CDCR.  And

8   so the government was not obligated to produce that.

9        I just want to close the loop that defense had

10  Mr. True up for a recall, but they rested.  They did not

11  recall him.  And I just want to make sure that's clear on the

12  record.

13       THE COURT:  All right.  Anything else on this topic

14  for the record?

15       MS. DE SALES BARRETT:  Yes, Your Honor.  With regard

16  to whether or not the government has the obligation, with

17  regard to the homicide that we're talking about, the murder of

18  Mr. Lowrey, that particular homicide, the government is

19  relying -- has relied for investigative purposes completely on

20  the CDCR's investigation and the State of California's -- the

21  investigation of that murder with the exception of any

22  conversations that Agent Gonzalez has had with Mr. True in

23  preparation for his testimony.

24       Mr. True testified in a probable cause hearing in the

25  State of California.  That was -- we were provided that in

3072

1    discovery, and the entire investigation underlying that

2    homicide was conducted by the CDCR and the District Attorney's

3    Office and not by the government in this case.

4         The -- even the autopsy report offered into evidence

5    with regard to this gentleman was done at the request of the

6    state and at the request of the CDCR, not at the request of

7    the government in this case.

8         And the only reason they have it is because they got

9    the autopsy report in the documents that they got from the

10   CDCR and the State of California.

11        THE COURT:  Anyone else want to make comments on

12   that?  I mean, I would just note that there was evidence other

13   than what you've described on that topic presented here as to

14   other witnesses, but I appreciate your point.

15        All right.  Has the jury -- do you know, Irma, if the

16   jury is all here?

17        THE CLERK:  They are ready.

18        THE COURT:  All right.  Let's go ahead and bring in

19   the jury.

20    (Jury enters the courtroom at 8:17 a.m.)

21        THE COURT:  All right.  Thank you.  We have all of

22   our jury members back in their places.

23        Ladies and gentlemen, as I indicated on Friday, we

24   are going to begin the morning with me giving you some

25   instructions, then we're going to turn to argument of counsel

1  and a few more instructions, and then deliberation will occur

2  at that point.

3          Like before, I do have to read the question -- the

4  instructions to you, so if at any time you can't hear me, if

5  I -- if you need me to repeat it, raise your hand and I will

6  do that.

7          Members of the Jury, now that you have heard all of

8  the evidence, it is my duty to instruct you on the law that

9  applies to this case.  A copy of these instructions will be

10  available in the jury room for you to consult.

11          It is your duty to weigh and evaluate all the

12  evidence in this case, and in that process, to decide the

13  facts.  It is also your duty to apply the law as I give it to

14  you to the facts as you find them whether you agree with the

15  law or not.

16          You must decide the case solely on the evidence and

17  the law.  You will recall that you took an oath promising to

18  do so at the beginning of the case.

19          You should also not be influenced by any person's

20  race, color, religious beliefs, national ancestry, sexual

21  orientation, gender identity, gender, or economic

22  circumstances.

23          Also, do not allow yourself to be influenced by

24  personal likes or dislikes, sympathy, prejudice, fear, public

25  opinion, or biases, including unconscious biases.

1          Unconscious biases are stereotypes, attitudes, or

2    preferences that people may consciously reject but may be

3    expressed without conscious awareness, control, or intention.

4          You must follow all these instructions and not single

5    out some and ignore others.  They are all important.  Please

6    do not read into these instructions or into anything I may

7    have said or done as any suggestion as to what verdict you

8    should return.  That is a matter entirely up to you.

9          The indictment is not evidence.  The defendants have

10   pleaded not guilty to these charges.  The defendants are

11   presumed to be innocent unless and until the government proves

12   the defendants guilty beyond a reasonable doubt.

13         In addition, the defendants do not have to testify or

14   present evidence.  The defendants do not have to prove

15   innocence and the government has the burden of proving every

16   element of the charges beyond a reasonable doubt.

17         A defendant in a criminal case has the constitutional

18   right not to testify.  In arriving at your verdict, the law

19   prohibits you from considering any manner that the defendant

20   did not testify.

21         Proof beyond a reasonable doubt is proof that leaves

22   you firmly convinced the defendant is guilty.  It is not

23   required that the government prove guilt beyond all possible

24   doubt.

25         A reasonable doubt is a doubt based upon reason and

1    common sense and is based purely on speculation -- oops,

2    sorry.  Let me start that over.

3            A reasonable doubt is a doubt based upon reason and

4    common sense and is not based purely on speculation.  It may

5    arise from a careful and impartial consideration of all the

6    evidence or from lack of evidence.

7            If after a careful and impartial consideration of all

8    the evidence you are not convinced beyond a reasonable doubt

9    that the defendant is guilty, it is your duty to find the

10   defendant not guilty.

11           On the other hand, if after a careful and impartial

12   consideration of all the evidence, you are convinced beyond a

13   reasonable doubt that defendant is guilty, it is your duty to

14   find the defendant guilty.

15           The evidence you are to consider in deciding what the

16   facts are consist of:

17           One, the sworn testimony of any witness.

18           Two, the exhibits received in evidence.

19           Three, the facts accepted by the Court through

20   judicial notice.

21           And four, any facts to which the parties have agreed.

22           In reaching your verdict, you may consider only the

23   testimony and exhibits received into evidence.  Certain things

24   are not evidence and you may not consider them in deciding

25   what the facts are.  I will list them for you.

1          One, arguments and statements by the lawyers are not

2     evidence.  The lawyers are not witnesses.  What they may

3     say -- what they have said in their opening statements, what

4     they may say in closing arguments and at other times is

5     intended to help you interpret the evidence, but it is not

6     evidence.

7          If the facts as you remember them differ from the way

8     the lawyers have stated them, your memory of them controls.

9          Questions and objections by the lawyers are not

10    evidence.  Attorneys have a duty to their clients to object

11    when they believe a question is improper under the Rules of

12    Evidence.  But you should not be influenced by the objection

13    or the Court's ruling on it.

14          Three, testimony that is excluded or stricken or that

15    I have instructed you to disregard is not evidence and must

16    not be considered.  In addition, some evidence may be received

17    only for a limited purpose.  When I instruct you to consider

18    evidence only for a limited purpose, you must do so, and you

19    may not consider that evidence for any other purpose.

20          Four, anything you may see or hear when court is not

21    in session is not evidence even if what you have seen or heard

22    is done or said by one of the parties or by one of the

23    witnesses.  You are to decide the case solely on the evidence

24    received at the trial.

25          You have heard recordings that have been received in

3077

1    evidence.  Displayed to you while listening was a transcript
2    of the recording to help you identify speakers and as a guide
3    to help you listen to the recording.  However, bear in mind
4    that recordings are the evidence, not the transcript.  If you
5    heard something different from what appeared in the
6    transcript, what you heard is controlling.

7            Evidence may be direct or circumstantial.  Direct
8    evidence is direct proof of a fact, such as testimony by a
9    witness about what that witness personally saw or heard or
10   did.  Circumstantial evidence is indirect evidence, that is,
11   it is proof of one or more facts from which one can find
12   another fact.

13           You are to consider both direct and circumstantial
14   evidence.  Either can be used to prove any fact.  The law
15   makes no distinction between the weight to be given to either
16   direct or circumstantial evidence.  It is for you to decide
17   how much weight to give any evidence.

18           During trial, certain charts were shown to you to
19   help explain the evidence.  These charts were not admitted
20   into evidence and will not go into the jury room with you.
21   They are not themselves evidence of proof or -- or proof of
22   any facts.  If they do not correctly reflect the facts or
23   figures shown by the evidence in the case, you should
24   disregard these charts and determine the facts from the
25   underlying evidence.

1          You heard testimony from the following witnesses who

2     testified about his or her opinions and the reason for the

3     those opinions:  One, Dr. Paul Gliniecki; two,

4     Fracia Martinez; three, Daniel Ponce de Leon; four,

5     Benjamin Mendoza; and five, Dr. Eugene Carpenter.

6          This opinion testimony is allowed because of the

7     specialized knowledge, skill, experience, training, or

8     education of these witnesses.  Such opinion testimony should

9     be judged like any other testimony.

10          You may accept it or reject it and give it as much

11     weight as you think it deserves, considering the witness's

12     knowledge, skill, experience, training, or education, the

13     reasons given for the opinion, and all other evidence in the

14     case.

15          In deciding the facts in this case, you may have to

16     decide which testimony to believe and which testimony not to

17     believe.  You may believe everything a witness says or part of

18     it or none of it.

19          In considering the testimony of any witness, you may

20     take into account:

21          One, the opportunity and ability of the witness to

22     see or hear or know the things testified to.

23          Two, the witness's memory.

24          Three, the witness's manner while testifying.

25          Four, the witness's interest in the outcome of the

1   case, if any.

2          Five, the witness's bias or prejudice, if any.

3          Six, whether other evidence contradicted the

4   witness's testimony.

5          Seven, the reasonableness of the witness's testimony

6   in light of all the evidence.

7          And eight, any other factor that bears on

8   believability.

9          Sometimes the witness may say something that is not

10  consistent with something else he or she said.  Sometimes

11  different witnesses will give different versions of what

12  happened.  People often forget things or make mistakes in what

13  they remember.

14         Also, two people may see the same event but remember

15  it differently.  You may consider these differences, but do

16  not decide that testimony is not untrue just because it

17  differs from other testimony.

18         However, if you decide that a witness has

19  deliberately testified untruthfully about something important,

20  you may choose not to believe anything that witness said.

21         On the other hand, if you think the witness testified

22  untruthfully about some things but told the truth about

23  others, you may accept the part you think is true and ignore

24  the rest.

25         You must avoid bias, conscious or unconscious, based

1   upon a witness's race, color, religious beliefs, national

2   ancestry, sexual orientation, gender identity, gender, or

3   economic circumstances in your determination of credibility.

4        The weight of the evidence as to a fact does not

5   necessarily depend on the number of witnesses who testify.

6        What is important is how believable the witnesses

7   were and how much weight you think their testimony deserves.

8        You've heard evidence that Robert Eversole,

9   Brian Rapinoe, Daniel Rubin, Brandon Bannick, Lana Haley,

10  James Field, Kaylen Chandler, Troy Clowers, and Timothy True,

11  witnesses who have testified at this trial, each have prior

12  convictions for felony offenses.  You may consider this

13  evidence in deciding whether or not to believe each witness

14  and how much weight to give the testimony of that witness.

15       You've heard testimony from Brandon Bannick and

16  James Field, witnesses who pleaded guilty to crimes arising

17  out of the same events for which each of the defendants is on

18  trial.  Their guilty pleas are not evidence against any of the

19  defendants.  You may consider them only in determining each

20  witness's believability.

21       You've heard testimony from Robert Eversole,

22  Brandon Bannick, James Field, Troy Clowers, and Timothy True.

23  Their testimony was given in exchange for favored treatment

24  from the government in connection with this case.

25       You've heard testimony from Kaylen Chandler, a

3081

1   witness who received immunity.  That testimony was given in

2   exchange for a promise by the government that the witness will

3   not be prosecuted and that the testimony will not be used in

4   any case against the witness.

5        Finally, you heard testimony from Brian Rapinoe, a

6   witness who received compensation from the government in

7   connection with this case.

8        For these reasons, in evaluating the testimony of

9   these witnesses, you should consider the extent in which or

10  whether each witness's testimony have been influenced by these

11  factors.  In addition, you should examine the testimony of

12  these witnesses with greater caution than that of other

13  witnesses.

14       A separate crime is charged against one or more of

15  the defendants in each count.  The charges have been joined

16  for trial.

17       You must decide the case of each defendant on each

18  crime charged against that defendant separately.

19       Your verdict on any count as to any defendant should

20  not control your verdict on any other count as to any other

21  defendant.

22       All of the instructions apply to each defendant and

23  to each count unless an instruction states that it applies

24  only to a specific defendant or count.

25       You've heard testimony that the defendants were

3082

1    members of the Aryan Brotherhood.  Gang membership alone

2    without more does not prove that someone has entered a

3    criminal agreement.  As a result, you must not infer from the

4    alleged gang membership alone without more that Mr. Clement,

5    Mr. Johnson, or Mr. Stinson committed the crimes charged.

6           You have heard that each defendant has been convicted

7    of a crime.  You may not consider a prior conviction as

8    evidence of guilt of the crimes for which the defendants are

9    now on trial.

10          The indictment charges that the offenses were

11   committed on or about or in or about certain dates.  Although

12   it is necessary for the government to prove beyond a

13   reasonable doubt that the offense was committed on a date

14   reasonably near the date alleged in the indictment, it is not

15   necessary for the government to prove that the offense was

16   committed precisely on the date charged.

17          An act is done knowingly if the defendant is aware of

18   the act and does not act through ignorance, mistake, or

19   accident.  The government is not required to prove that the

20   defendant knew that his or acts or omissions were unlawful.

21          You may consider evidence of a defendant's words,

22   acts, or omissions, along with all other evidence, in deciding

23   whether the defendant acted knowingly.

24          I will now explain to you the general law regarding

25   conspiracies.

1          Every count has instructions.  In addition to those,

2     this instruction on conspiracies generally applies to the RICO

3     conspiracy charged in Count 1.

4          First, beginning and ending on about the dates set

5     forth in the counts below, there was an agreement between two

6     or more persons to commit at least one crime as charged in the

7     indictment and explained below.

8          And two -- or second, the defendant became a member

9     of the conspiracy knowing of at least one of its objects and

10    intending to help accomplish it.

11         A conspiracy is a kind of criminal partnership, an

12    agreement of two or more persons to commit or one or more

13    crimes.  The crime of conspiracy is the agreement to do

14    something unlawful.  It does not matter whether the crime

15    agreed on was committed.

16         For a conspiracy to have existed, it is not necessary

17    that the conspirators made a formal agreement or that they

18    agreed on every detail of the conspiracy.

19         It is not enough, however, that they simply met,

20    discussed matters of common interest, acted in similar ways,

21    or perhaps helped one another.  You must find that there was a

22    plan to commit at least one of the crimes alleged in the

23    indictment as an object of the conspiracy with all of you

24    agreeing as to the particular crime which the conspirators

25    agreed to commit.

3084

1          One becomes a member of a conspiracy by willfully

2     participating in the unlawful plan with the intent to advance

3     or further some objective or purpose of the conspiracy even

4     though the person does not have full knowledge of all the

5     details of the conspiracy.

6          Furthermore, one who willfully joins an existing

7     conspiracy is as responsible for it as the originators.  On

8     the other hand, one who has no knowledge of a conspiracy but

9     happens to act in a way which furthers some object or purpose

10    of conspiracy, does not thereby become a conspirator.

11         Similarly, a person does not become a conspirator

12    merely by associating with one or more persons who are

13    conspirators or merely by knowing that a conspiracy exists.

14         Count 1 charges a violation of Section 1962(d) of

15    Title 18 of the United States Code, that the defendants

16    Kenneth Johnson, Francis Clement, and John Stinson, along with

17    others known and unknown, knowingly and intentionally

18    conspired with at least one other person to conduct or to

19    participate in the conduct of the affairs of the racketeering

20    enterprise.

21         Specifically, the indictment alleges that the

22    enterprise is the Aryan Brotherhood, including its leaders,

23    members, and associates.  This offense is called "RICO

24    conspiracy."

25         "RICO" refers to the Racketeer Influenced and Corrupt

1    Organizations Act found at Sections 1961 and 1962 of Title 18

2    of the United States Code.

3          For a defendant to be found guilty of this charge,

4    the government must prove each of the following elements

5    beyond a reasonable doubt as to each defendant:

6          First, that the charged enterprise existed.

7          Second, the charged enterprise was or would be

8    engaged in or its activities effected or would effect

9    interstate or foreign commerce.

10         Third, that beginning at a time unknown, but no later

11   than in and around 2015 and continuing to at least on or about

12   March 1st of 2023, the defendant knowingly agreed that a

13   conspirator was or would be employed by or associated with the

14   enterprise.

15         Fourth, the defendant knowingly agreed that a

16   conspirator would conduct or participate either directly or

17   indirectly in the conduct of the affairs of the enterprise.

18         And fifth, the defendant agreed that a conspirator

19   did or would knowingly participate in the conduct of the

20   affairs of the enterprise through a pattern of racketeering

21   activity; that is, a conspirator did or would commit at least

22   two acts of racketeering activity.

23         The defendant must have been aware of the essential

24   nature and scope of the enterprise and intended to participate

25   in it.

3086

1          The government is not required to prove that the

2     defendant personally committed any act of racketeering

3     activity or agreed to do so.

4          The government is not required to prove that the

5     parties to or members of the conspiracy were successful in

6     achieving any or all of the objects of the conspiracy.

7          You may consider the evidence presented of

8     racketeering acts committed or agreed to be committed by any

9     coconspirator in furtherance of the enterprise's affairs to

10    determine whether the defendant knew that at least one member

11    of the conspiracy would commit two or more racketeering acts.

12          To establish the first element of the RICO conspiracy

13    in Count 1, the government must prove that an enterprise

14    existed that was engaged in or had an affect on interstate

15    commerce.

16          An enterprise is a group of people who had associated

17    together for a common purpose of engaging in a course of

18    conduct over a period of time.

19          This group of people, in addition to having a common

20    purpose, must have an ongoing organization, either formal or

21    informal.  The personnel of the enterprise, however, may

22    change and need not be associated with the enterprise for the

23    entire period alleged in the indictment.

24          This group of people does not have to be a legally

25    recognized entity such as a partnership or a corporation.

3087

1    This group may be organized for a legitimate and lawful

2    purpose or it may be organized for an unlawful purpose.

3          Therefore, the government must prove beyond a

4    reasonable doubt that this group of people:

5          One, associated for a common purpose of engaging in a

6    course of conduct.

7          Two, the association of these people was an ongoing

8    formal or informal organization.

9          Three, the group was engaged in or had an effect upon

10   interstate or foreign commerce.

11         And four, the group had longevity sufficient to

12   permit the associates to pursue the enterprise's purpose.

13         The government need not prove that the enterprise had

14   any particular organizational structure.

15         Interstate commerce includes the movement of goods,

16   services, money, and individuals between states.  These goods

17   can be legal or illegal.  Only a minimal effect on commerce is

18   required and the effect need only be probable or potential,

19   not actual.

20         It is not necessary to prove the defendant's own acts

21   affected interstate commerce as long as the enterprise's acts

22   had such an effect.

23         You are instructed that drug trafficking, even local

24   trafficking, has a substantial effect on interstate commerce.

25         The government must prove that the enterprise was

1    engaged in racketeering activity.  Racketeering activity means

2    the commission of certain crimes.  These include acts of

3    murder, robbery, fraud, and drug trafficking in violation of

4    state or federal law.

5        The government must prove beyond a reasonable doubt

6    that the enterprise was engaged in at least one of the crimes

7    listed above.

8        To establish a pattern of racketeering activity, the

9    government must prove each of the following beyond a

10   reasonable doubt:

11       One, at least two acts of racketeering were committed

12   within a period of ten years of each other.

13       Two, the acts of racketeering were related to each

14   other, meaning that there was a relationship between or among

15   the acts of racketeering.

16       And three, the acts of racketeering amounted to or

17   posed a threat of continued criminal activity.

18       With respect to the second element above, acts of

19   racketeering are related if they embraced the same or similar

20   purposes, results, participants, victims, or methods of

21   commission, or were otherwise interrelated by distinguishing

22   characteristics.

23       Sporadic, widely separated, or isolated criminal acts

24   do not form a pattern of racketeering activity.  Two

25   racketeering acts are not necessarily enough to establish a

1    pattern of racketeering activity.

2            The RICO statute defines a racketeering act to be any

3    of a list of certain crimes, some of which are federal crimes

4    and some of which are state crimes.

5            I will now list the racketeering acts charged in this

6    case and describe them.

7            The pattern of racketeering alleged in this case

8    consists of acts involving:  i, murder; ii, conspiracy to

9    commit murder; iii, attempted murder; iv, robbery; v,

10   conspiracy to commit robbery; vi, conspiracy to distribute and

11   possess with the intent to distribute a controlled substance;

12   vii, distribution of a controlled substance and intent; and

13   viii, fraud.

14           I will now instruct you on the definition of each of

15   these racketeering activities and -- that the leaders,

16   members, and associates of the enterprise are alleged to have

17   contemplated as part of their conspiracy.

18           The crime charged in Count 1 is RICO conspiracy,

19   which is the agreement to conduct the affairs of the

20   Aryan Brotherhood through a pattern of racketeering.  No

21   racketeering act need to have been committed or even attempted

22   by anyone.  Rather, it is sufficient that you find that the

23   defendant knew or contemplated that one or more members of the

24   conspiracy, not necessarily the defendant, would commit at

25   least two acts of racketeering in furtherance of a conspiracy.

1          To convict the defendant of the RICO conspiracy

2    offense, your verdict must be unanimous as to the racketeering

3    activity the defendant knew or contemplated would be

4    committed.  For example, at least two acts of murder,

5    conspiracy to commit murder, robbery, conspiracy to commit

6    robbery, drug trafficking, fraud, or one of each or any

7    combination thereof.

8          I will instruct you on the specific racketeering acts

9    alleged in this case.

10         To prove that a defendant is guilty of murder under

11   California law, the government must prove that:

12         One, the defendant committed an act that caused the

13   death of the alleged victim.

14         And two, when the defendant acted, he had a state of

15   mind called malice aforethought.

16         The defendant has malice aforethought if he

17   unlawfully intended to kill.

18         Malice aforethought does not require hatred or ill

19   will toward the victim.  It is a mental state that must be

20   formed before the act that causes death is committed.  It does

21   not require deliberation or the passage of any particular

22   period of time.

23         An act causes death if the death is the direct,

24   natural, and probable consequence of the act and the death

25   would not have happened without the act.

3091

1          A natural and probable consequence is one that a

2     reasonable person would know is likely to happen if nothing

3     unusual intervenes.  In deciding whether a consequence is

4     natural and probable, consider all of the circumstances

5     established by the evidence.

6          To prove that a defendant is guilty of conspiracy to

7     commit murder under California law, the government must prove

8     that:

9          One, the defendant intended to agree and did agree

10    with one or more persons to intentionally and unlawfully kill.

11         Two, at the time of the agreement the defendant and

12    one or more persons in the conspiracy intended that one or

13    more of them would intentionally and unlawfully kill.

14         Three, one of the persons committed at least one

15    overt act alleged to have accomplish the killing.

16         And four, at least one of these overt acts was

17    committed in California.

18         To decide whether the defendant committed this overt

19    act, consider all of the evidence presented about the overt

20    act.

21         Conspiracy to commit murder requires an intent to

22    kill.

23         The members of the alleged conspiracy must have an

24    agreement and intent to commit murder.  It is not necessary

25    that any of the members of the alleged conspiracy actually met

3092

1    or came to a detailed or formal agreement to commit the crime.

2            An agreement may be inferred from the conduct if you

3    conclude that members of the alleged conspiracy acted with a

4    common purpose to commit the crime.

5            An overt act is an act by one or more of the members

6    of the conspiracy that is done to help accomplish the

7    agreed-upon crime.

8            The overt act must happen after defendant has agreed

9    to commit the crime.  The overt act must be more than an act

10   of agreeing or planning to commit the crime, but it does not

11   have to be a criminal act itself.

12           A member of a conspiracy does not have to personally

13   know the identity or roles of all the members of the

14   conspiracy.

15           To prove that a defendant is guilty of attempted

16   murder under California law, the government must prove that:

17           One, the defendant took at least one direct but

18   ineffective step toward killing another person.

19           And two, the defendant intended to kill that person.

20           A direct step requires more than merely planning or

21   preparing to commit murder or obtaining or arranging for

22   something needed to commit murder.  A direct step is one that

23   goes beyond planning or preparation and shows that a person is

24   putting his or her plan into action.  A direct step indicates

25   a definite and unambiguous intent to kill.  It is a direct

1   movement toward the commission of a crime after preparations

2   are made.  It is an immediate step that puts the plan in

3   motion so that the plan would have been completed if some

4   circumstance outside the plan had not interrupted the attempt.

5             To prove that a defendant is guilty of soliciting

6   another person to commit murder under California law, the

7   government must prove that:

8             One, the defendant requested or asked another person

9   to commit or join in the commission of murder.

10            Two, the defendant intended that the crime of murder

11  be committed.

12            And three, the other person received the

13  communication containing the request.

14            To prove that a defendant is guilty of robbery under

15  California law, the government must prove that:

16            One, the defendant took property that was not his

17  own.

18            Two, the property was in the possession of another

19  person.

20            Three, the property was taken from the other person

21  or his or her immediate presence.

22            Four, the property was taken against that person's

23  will.

24            Five, the defendant used force or fear to take the

25  property or to prevent the person from resisting.

1          And six, when the defendant used force or fear, he

2    intended to deprive the owner of the property permanently or

3    to remove the property from the owner's possession for so

4    extended a period of time that the owner would be deprived of

5    a major portion of the value or enjoyment of the property.

6          A person takes something when he or she gains

7    possession of it and moves it some distance.  The distance

8    moved may be short.

9          Fear, as used here, means fear of injury to the

10   person himself or herself.

11         An act is accomplished by fear if the other person is

12   actually afraid.  The other person's actual fear may be

13   inferred from the circumstances.

14         Property is within a person's immediate presence if

15   it is sufficiently within his or her physical control that he

16   or she could keep possession of it if not prevented by force

17   or fear.

18         An act is done against a person's will if that person

19   does not consent to the act.  In order to consent, a person

20   must act freely and voluntarily and know the nature of the

21   act.

22         To prove that a defendant is guilty of attempted

23   robbery under California law, the government must prove that:

24         One, the defendant took a direct or ineffective step

25   toward committing robbery as defined in the previous

3095

1    instruction.

2            And two, the defendant intended to commit robbery.

3            A direct step requires more than merely planning or

4    preparing to commit or obtaining or arranging for something

5    needed to commit.

6            A direct step is one that goes beyond planning or

7    preparation and shows that a person is putting his or her plan

8    into action.  A direct step indicates a definite and

9    unambiguous intent to commit.  It is a direct movement toward

10   the mission of a crime after preparations are made.  It is an

11   intermediate step that puts the plan in motion so that the

12   plan would have been completed if some circumstance outside

13   the plan had not interrupted the attempt.

14           To prove that a defendant is guilty of conspiracy to

15   commit robbery under California law, the government must prove

16   that:

17           One, the defendant intended to agree and did agree

18   with one or more persons to commit robbery.

19           Two, at the time of the agreement, the defendant and

20   one or more persons in the conspiracy intended that one or

21   more of them would commit robbery.

22           Three, one of the persons committed at least one

23   overt act alleged to accomplish the taking of property.

24           And four, at least one of these overt acts was

25   committed in California.

1          To decide whether the defendant committed this overt

2     act, consider all of the evidence presented about the overt

3     act.

4          Conspiracy to commit robbery requires an intent to

5     commit robbery.

6          The members of the alleged conspiracy must have had

7     an agreement and intent to commit robbery.  It is not

8     necessary that any of the members of the alleged conspiracy

9     actually met or came to a detailed or formal agreement to

10    commit that crime.

11         An agreement may be inferred from conduct if you

12    conclude that members of the alleged conspiracy acted with a

13    common purpose to commit the crime.

14         An overt act is an act by one or more of the members

15    of the conspiracy that is done to help accomplish the

16    agreed-upon crime.

17         The overt act must happen after the defendant has

18    agreed to commit the crime.  The overt act must be more than

19    the act of agreeing or planning to commit the crime, but it

20    does not have to be a criminal act itself.

21         A member of a conspiracy does not have to personally

22    know the identity or roles of all the other members.

23         To prove the defendant is guilty of conspiracy to

24    distribute or possess with the intent to distribute a

25    controlled substances under federal law, the government must

1    prove that:

2            One, there was an agreement between two or more

3    persons to distribute and possess with the intent to

4    distribute methamphetamine or fentanyl.

5            And two, the defendant joined in the agreement

6    knowing of its purpose and intending to help accomplish that

7    purpose.

8            To distribute means to deliver or transfer possession

9    of methamphetamine or fentanyl to another person, with or

10   without any financial interest in that transaction.

11           To possess with the intent to distribute means to

12   possess with the intent to deliver or transfer possession of

13   methamphetamine or fentanyl to another person, with or without

14   any financial interest in the transaction.

15           To prove that a defendant is guilty of attempt to

16   distribute or control substance -- a controlled substance

17   under federal law, the government must prove that:

18           One, the defendant intended to distribute

19   methamphetamine or fentanyl.

20           And two, the defendant did something that was a

21   substantial step toward committing the crime.

22           A substantial step is conduct that strongly

23   corroborated a defendant's intent to commit the crime.

24           To constitute a substantial step, the defendant's

25   acts or actions must unequivocally demonstrate that the crime

1  will take place unless interrupted by independent

2  circumstances.

3        Mere preparation is not a substantial step toward

4  committing the crime.

5        To prove that the defendant is guilty of fraud in

6  connection with identification documents under federal law,

7  the government must prove that:

8        One, the defendant knowingly possessed an

9  identification document.

10        Two, the identification document was or appeared to

11  be an identification document of the Department of Motor

12  Vehicles, the DMV.

13        Three, the identification document was produced

14  without lawful authority.

15        And four, the defendant knew that the identification

16  document was produced without lawful authority.

17        Identification document means a document made or

18  issued by or under the authority of the United States

19  government, a state, political division of a state, a

20  sponsoring entity of an event designed as a special event of

21  national significance, a foreign government, political

22  subdivision of a foreign government, an international

23  governmental or an international quasi-governmental

24  organization which, when completed with information concerning

25  a particular individual, is of a type intended or commonly

1    accepted for the purpose of identification of individuals.

2          To prove that a defendant is guilty of mail fraud

3    under federal law, the government must prove that:

4          One, the defendant knowingly participated in a scheme

5    or plan to defraud for the purposes of obtaining money or

6    property by means of false or fraudulent pretenses,

7    representations, or promises.

8          Two, the statements made as part of the scheme were

9    material; that is, they had a natural tendency to influence or

10   were capable of influencing a person to part with money or

11   property.

12         Three, the defendant acted with the intent to

13   defraud, that is, the intent to deceive and cheat.

14         And four, the defendant used or caused to be used the

15   mails to carry out or attempt to carry out an essential part

16   of the scheme.

17         A mailing is caused when one knows that the mails

18   will be used in the ordinary course of business or when one

19   can reasonably foresee such use.  It does not matter whether

20   the material mailed was itself false or deceptive so long as

21   the mail was used as part of the scheme, nor does it matter

22   whether the scheme or plan was successful or that any money or

23   property was obtained.

24         If you decide that the defendant was a member of a

25   scheme to defraud and that the defendant had the intent to

3100

1   defraud, the defendant may be responsible for other

2   co-schemers' actions during the course of and in furtherance

3   of the scheme, even if the defendants did not know what the

4   other co-schemers said or did.

5           For the defendant to be guilty of an offense

6   committed by a co-schemer in furtherance of the scheme, the

7   offense must be one that the defendant could reasonably

8   foresee as a necessary and natural consequence of the scheme

9   to defraud.

10          A person may be found guilty of a crime in two ways:

11          One, he may have directly committed the crime.  I

12   will call that person the perpetrator.

13          Two, he may have aided and abetted a perpetrator who

14   directly committed the crime.

15          A person is guilty of a crime whether he or she

16   committed it personally or aided and abetted the perpetrator.

17          Under California law, to prove that a defendant is

18   guilty of a crime based on aiding and abetting that crime, the

19   government must prove that:

20          One, the perpetrator committed the crime.

21          Two, the defendant knew that the perpetrator intended

22   to commit the crime.

23          Three, before or during the commission of the crime

24   the defendant intended to aid and abet the perpetrator in

25   committing the crime.

1        And four, the defendant's words or conduct did, in

2   fact, aid and abet the perpetrator's commission of the crime.

3        Someone aids and abets a crime if he or she knows of

4   the perpetrator's unlawful purpose and he or she specifically

5   intends to and does, in fact, aid, facilitate, promote,

6   encourage, or instigate the perpetrator's commission of that

7   crime.

8        If all of these requirements are proved, the

9   government does not need to actually have been present when

10  the crime was committed to be guilty as an aider and abettor.

11       If you conclude that defendant was present at the

12  scene of the crime or failed to prevent the crime, you may

13  consider that fact in determining whether the defendant was an

14  aider and abettor; however, the fact that a person is present

15  at the scene of a crime or fails to prevent the crime does not

16  by itself make him or her an aider or abettor.

17       Counts 2, 3, 4, 5, and 6 charge certain defendants

18  with committing a crime of violence, specifically, murder and

19  aid of racketeering in violation of Title 18, United States

20  Code Section 1959(a)(1).

21       For a defendant to be found guilty of that charge,

22  the government must prove each of the following elements

23  beyond a reasonable doubt:

24       One, on or about the time period described in each of

25  Counts 2 through 6, an enterprise effecting interstate

1   commerce existed.

2           Two, the enterprise engaged in racketeering activity.

3           Three, the defendant committing or aided and abetted

4   the following crime of violence:  murder, as defined in

5   earlier instructions under California law.

6           And four, the defendant's purpose in committing or

7   aiding and abetting that murder was to gain entrance to or to

8   maintain or increase his or another person's position in the

9   Aryan Brother enterprise -- I'm sorry, Aryan Brotherhood

10  enterprise.

11          It is not necessary for the government to prove that

12  his motive was a sole purpose or even the primary purpose of

13  the defendant in committing the charged murder.  You need only

14  find that gaining entrance to or maintaining or increasing his

15  or another person's position in the enterprise was a

16  substantial purpose of the defendant or that he committed the

17  charged crime as an integral aspect of membership in the

18  enterprise.  An incidental motivation, however, is not enough.

19          In determining the defendant's purpose in committing

20  the murder, you must determine what he had in mind.  Since you

21  cannot look into a person's mind, you have to determine

22  purpose by considering all the fact and circumstances before

23  you.

24          The specific murders alleged in this case are listed

25  below.

1    In deciding each count, you must make a separate

2    determination as to each count as well as each defendant.

3    As to Count 2, the indictment alleges that

4    Defendants Kenneth Johnson and Francis Clement aided and

5    abetted the murder of Allan Roshanski on or about October 4th

6    of 2020.

7    As to Count 3, the indictment alleges that the

8    Defendants Kenneth Johnson and Francis Clement aided and

9    abetted the murder of Ruslan Meg- -- okay, I'm just going to

10    spell it.  M-E [sic] -G-O-M-E-D-G-A-O-Z-H-I-E-V  on or about

11    October 4th of 2020.

12    As to Count 4, the indictment alleges that

13    Defendant Francis Clement aided and abetted the murder of

14    Michael Brizendine on or about February 22nd of 2022.

15    As to Count 5, the indictment alleges that

16    Defendant Francis Clement aided and abetted the murder of

17    Ronald Ennis on or about March 8th of 2022.

18    As to Count 6, the indictment alleges that

19    Defendant Francis Clement aided and abetted the murder of

20    James Yagle on or about March 8th of 2022.

21    Pursuant to Section 2(a) of Title 18 of the

22    United States Code, a defendant may be found guilty of murder

23    in aid of racketeering as charged in Counts 2, 3, 4, 5, and 6,

24    even if he personally did not commit the act or acts

25    constituting the crime, but aided and abetted the commission

1  of the act or acts.

2       To aid and abet means to intentionally help someone

3  else commit a crime.

4       To prove a defendant guilty of murder in aid of

5  racketeering by aiding and abetting, the government must prove

6  each of the following beyond a reasonable doubt:

7       One, someone other than the defendant committed

8  murder in aid of racketeering as defined in the previous

9  instruction.

10       Two, the defendant aided, counselled, commanded,

11  induced, or procured that person with respect to at least one

12  element of murder in aid of racketeering.

13       Three, the defendant acted with the intent to

14  facilitate murder in aid of racketeering.

15       And four, the defendant acted before the crime was

16  completed by the other person.

17       It is not enough that the defendant merely associated

18  with the person committing the crime or unknowingly or

19  unintentionally did things that were helpful to that person or

20  was present at the scene of the crime.

21       The evidence must show beyond a reasonable doubt that

22  the defendant acted with the knowledge and intent of helping

23  that person commit murder in aid of racketeering.

24       A defendant acts with the intent to facilitate the

25  crime when the defendant actively participates in a criminal

1   venture with advanced knowledge of the crime.

2           The government is not required to prove precisely

3   which defendant acted -- actually committed the crime and

4   which defendant aided and abetted.

5           All right.  Ladies and gentlemen, we're now going to

6   start the closing arguments.  Before we do that, why don't we

7   stand up and take a quick stretch and we'll let the government

8   set up.

9           All right.  Is counsel for the government prepared to

10  begin?

11          MS. STOKMAN:  Yes.

12          THE COURT:  All right.

13          MS. STOKMAN:  The Aryan Brotherhood is about power,

14  money, and control.  You heard that throughout this trial, and

15  all of those go hand in hand.

16          The defendants in trial here, John Stinson,

17  Kenneth Johnson, and Francis Clement, were all AB brothers,

18  made members, who exerted control over white inmates within

19  the prison system and whites on the street.

20          The power is inherent in the AB.  You heard from

21  witnesses that this is how the AB operates.  With that power

22  comes control, control over what AB associates do and control

23  over the decisions those AB associates make.

24          You heard from numerous witnesses that if you don't

25  fall in line with AB rules, if you don't follow AB orders, you

1   can be up to be hurt or even killed.  Obeying an order from an

2   AB member is nonnegotiable.

3         You heard that violence is very important because

4   these defendants were in prison.  Violence is how the

5   defendants were able to maintain that control.  So they used

6   contraband cell phones to conduct AB business and to order AB

7   orders.

8         Ultimately, control was important because the

9   defendants were relying on other people to make money.  And

10  money was a big goal.

11        With power and violence, the AB exerted control and

12  fear over those working on their behalf in order to keep the

13  money flowing.  Because that, at the end of the day, is what

14  kept the enterprise going.

15        It gave the defendants what they needed in prison,

16  including the phones that they were using to communicate with

17  the outside world, with other AB brothers in other prisons,

18  and more importantly, with the people that they were giving

19  orders to to commit the crimes for them.

20        I'm going to do a couple of things during my time up

21  here with you.  I'm going to tell you a little bit more about

22  the law as the Judge read it to you.  And I'll walk you

23  through how what you heard during this trial proves the

24  elements of the law and the guilt of these defendants beyond a

25  reasonable doubt.

1              So let's talk about the charges.

2              Count 1 is the RICO conspiracy.  Count 2 and 3 are

3      the murder in aid of racketeering charges that pertain to the

4      Lomita murders.  Count 4 is the murder and aid of racketeering

5      charge for the Lancaster murder.  And Counts 5 and 6 are the

6      murder and aid of racketeering charges for the Pomona murders.

7              Count 1 is the conspiracy to participate in a

8      racketeering enterprise, and what you've heard over and over

9      from numerous witnesses in this case is the RICO conspiracy.

10             The enterprise is the Aryan Brotherhood, the AB.  As

11     my colleague told you at the beginning of this trial,

12     everything you heard here falls under this charge.

13             In order for you to find the defendants guilty of

14     Count 1, and all three of them are charged in this, you have

15     to find the five elements that the Judge read to you.

16             So what are elements?  Elements are just a

17     requirement that the government has to prove beyond a

18     reasonable doubt in order to find the defendants guilty.

19     These are requirements, they're steps.  So I'm going to walk

20     you through what to do with those requirements, with those

21     elements.  But basically, you go through each element one at a

22     time.

23             First element, once you've found that the government

24     has met its burden and the evidence has shown you that the

25     first element has been proven, you check that element off and

3108

1   you move to the next one.

2        Once you've gone through all elements of the crimes

3   charged here in Counts 1 through 6, you've found the defendant

4   guilty of those -- of those crimes.

5        So let's talk about how the evidence proves each of

6   the elements beyond a reasonable doubt.  The first element

7   here is that the charged enterprise, the Aryan Brotherhood,

8   existed.  This just means that the Aryan Brotherhood exists

9   and it existed during the time of the conspiracy.

10       You heard a lot of evidence that the AB exists.  It's

11  a white gang.  A group of white people who associate together

12  to commit crimes over time.  And here, the enterprise is more

13  than just the AB made members.  It's the associates on the

14  streets and the white inmates that the AB controls in the

15  prison system.

16       The enterprise is the gang.  It's the AB members and

17  those associates, the foot soldiers on the street, and the

18  people who testified before you about what the AB was.

19       AB members are intertwined despite being incarcerated

20  in various locations.  You heard that.  They're using

21  contraband cell phones to communicate, and these defendants

22  were doing the same.  Those phones allowed them to know what

23  other AB members and other AB associates were doing.

24       You heard that there are three AB brothers that form

25  a three-man council and that these brothers had a more

1   influential role than the other AB brothers.  But again, the

2   enterprise is just this gang, AB members and the people who

3   you heard from and the other associates who were doing the

4   work for them.

5          You also heard about common purposes of the AB, the

6   money, the power, the control, and about rules and codes of

7   conduct, that there's absolutely to be no cooperation with law

8   enforcement, that you're not supposed to lie to an AB brother,

9   that you have to follow orders.  Again, following those orders

10  is nonnegotiable because you've seen what happens when you

11  don't.

12         You heard about the expectation about making money

13  and how a third of the proceeds when money is made within the

14  prison system go back to AB brothers.  And also, that portions

15  of the money made outside prison go back to them as well.

16         But mostly, you heard about an expectation of

17  violence.  You're expected to commit violence when asked when

18  you're part of this gang.

19         You heard that from multiple witnesses and you heard

20  it from Robert Eversole and Daniel Rubin, that violence is

21  used for intimidation, for that fear, because that's a control

22  tool.

23         Violence is used to keep other whites in check, to

24  make examples of the people who disobey the AB rules and their

25  orders, and then you heard about that unquestionable automatic

1  violence against certain individuals like people who cooperate

2  with law enforcement.

3          Mostly, you heard that the rules of the AB are

4  enforced through violence.  And you saw many examples of this

5  and heard a lot of testimony about how the AB rules are

6  enforced through violence, that the gang commits violence with

7  a purpose.

8          And you heard that because the rules are enforced

9  through violence, orders from AB members like the defendants

10  are nonnegotiable.  They must be followed or that violence is

11  used against those who disobey the orders and the rules.

12          The murders that you heard about are some examples of

13  rules being enforced through violence because the victims in

14  those murders broke some AB rule.  They either owed money to

15  the AB, they failed to follow an AB order, they lied to an AB

16  brother, or they lost money.

17          So that takes care of Element 1, Aryan Brotherhood

18  exists.  And you heard a lot of testimony that it did.

19          Let's look at Element 2, that the Aryan Brotherhood

20  was engaged in activity that effected interstate or foreign

21  commerce.  The Judge told you that that just means it's the

22  movement of items between states.  And you heard that drug

23  trafficking has a substantial effect on interstate commerce

24  even when it's done locally.

25          The fact that the AB engages in drug trafficking is

1    enough alone to satisfy this element.  You heard about how the

2    AB deals drugs within the prison and how they deal drugs on

3    the outside of the prison.

4         You saw the fentanyl that James Field was trafficking

5    for AB member Waylon Pitchford.  This is enough to meet that

6    element.  But you also heard more.

7         You heard that there was drug trafficking going on

8    from California to other states, crossing state lines.  And

9    also, Robert Eversole told you that when he was doing that, he

10   was sending drugs to other states, he was also bringing

11   firearms back into California, crossing states lines.  This is

12   enough to meet this element.

13        But finally, you also heard that cell phones were

14   being used a lot.  And the use of cell phones is a way to use

15   interstate commerce.  It goes with interstate commerce because

16   they are a facility of interstate commerce.  So any one of

17   these things satisfies this element and you can check off

18   Element 2.

19        The third element is that the defendant knowingly

20   agreed a conspirator was or would be associated with the

21   enterprise.  This just means that the defendant was associated

22   with the enterprise, with the gang.

23        For this element all you need to find is that the

24   defendant agreed that someone else, in other words, a

25   coconspirator, another AB associate, another AB member, was

1    associated with the AB.  But the evidence proves so much more

2    to you.

3         The evidence proved that all three defendants

4    themselves were part of this gang because all three defendants

5    are, in fact, made members of the Aryan Brotherhood.  They ran

6    this gang.  And you heard this from multiple witnesses from

7    different street gangs, different parts of the state,

8    different prison experiences, that don't all know one another.

9         So let's talk a little bit about conspiracy.

10         Conspiracy is when two or more people agree to do

11   something illegal.  The crime is the agreement.  And the

12   defendants became members of the conspiracy to participate in

13   the conduct of the affairs of the Aryan Brotherhood, which

14   simply means that they agreed to be a part of this gang to

15   carry out gang business.

16         Here are other coconspirators that you heard about

17   during the trial.  These are the AB brothers ordering and the

18   AB associates carrying out the crimes.  They were all part of

19   the conspiracy.  And these aren't all of them.  These are just

20   some names you heard over and over.

21         The top line are the AB brothers you heard about,

22   some of them.  The second line, you either heard from or heard

23   about.  These individuals were individuals that themselves

24   were up for membership or wanting to become AB brothers.  And

25   then people on the bottom line, like Brandon Bannick,

1    Evan Perkins, Justin Gray, you didn't hear that they

2    necessarily wanted to become an AB brother, but they were part

3    of the foot soldiers on the street.  They were part of this

4    gang as well.

5            All the AB associates that you heard from testify

6    that they knew who the AB was, they knew they were working for

7    the AB, and they knew how the AB worked.  They were part of

8    the gang.  And the defendants knew this as well because they

9    are made members.  This is their gang.

10           You heard a lot of witnesses tell you that

11   John Stinson is an AB brother.  You also heard that

12   John Stinson was part of the three-man council, or the

13   commission.

14           You heard that from Daniel Rubin, who spoke with

15   Stinson about it, and from Robert Eversole, from Troy Clowers,

16   and from James Field.

17           This meant that John Stinson was aware of what other

18   AB brothers and what other AB associates were doing.

19           You also heard that John Stinson knew what other

20   coconspirators in this gang were doing because they were

21   working for him, like Troy Clowers, Daniel Rubin,

22   Brian Rapinoe, and, in fact, that John Stinson sponsored

23   Clowers and Rubin for membership, as well as Andrew Collins,

24   Misfit, who did become a member.

25           You also heard from a lot of witnesses that

1   Francis Clement, or Frank, is an AB member.

2          You also heard that Frank had coconspirators or other

3   AB associates working for him, such as Robert Eversole,

4   Brandon Bannick, Justin Gray, James Field, and Timothy True.

5          Defendant Kenneth Johnson, who you heard goes by the

6   nickname Kenwood, you also heard a lot of witnesses tell you

7   that he's an AB brother and that he had other AB associates

8   and coconspirators working for him, like Eversole,

9   Evan Perkins, Gray, Bannick, and True.

10         So that checks off the third element.

11         Let's look at the fourth, that the defendant

12  knowingly agreed a conspirator would conduct or participate in

13  the affairs of the enterprise.

14         This just means that the defendant participated in

15  the AB business, gang business, or the defendant agreed that a

16  coconspirator or one of these other people who's a part of

17  this gang would participate in that gang business.

18         The evidence showed you that the defendants

19  themselves participated in the AB business, but they also knew

20  other people were participating as well.

21         So some of that testimony and evidence that you saw

22  during the course of this trial as it pertains to

23  John Stinson's conduct, you heard wiretap calls that show that

24  he was involved in the enterprise's affairs, that he was part

25  of the gang business.  Those calls show that he had knowledge

1   of the AB crimes and what other AB members were doing.

2          For example, you heard a wiretap call in Exhibit 1810

3   where John Stinson informed the other AB brothers on the call

4   that an individual called Trigger got his rock, that he had

5   become a made member.  The rock is a shamrock.

6          Stinson said during that call that he made that

7   happen.  Also in that same call, Stinson wanted other

8   AB brothers to find out if an individual named Bobby Stockton

9   was a snitch.

10          That conference call between AB brothers about AB

11  business also included a discussion about an individual that

12  Defendant Kenneth Johnson told other AB brothers "needed to

13  put down a real one," which Rubin told you means kill someone.

14          You hear it in these calls and in John Stinson's own

15  voice that he's aware of and involved in the activities of the

16  gang.

17          He holds a higher status in this gang, as you heard

18  from many witnesses who testified before you, and of course he

19  knows the gang business.  He's directing others to conduct it,

20  and he's ordering the investigation of someone he thinks might

21  be a snitch in that call that you heard.

22          You also heard extensive evidence about

23  Francis Clement's conduct, his dealings with AB business.  You

24  heard about the murders that he ordered, that he was part of

25  the Hollywood robbery, that he was ordering assaults, and that

1    he was involved in drug trafficking.

2           You also heard that Defendant Kenneth Johnson himself

3    was involved in the gang business.  He was involved in drug

4    trafficking with various witnesses that you heard from.  He

5    was involved with EDD fraud, he ordered murders, and, in fact,

6    you heard that one of Frank's connections when he was trying

7    to get Brian Rapinoe drugs was one of Kenwood's connections.

8    He was involved personally in the AB business.

9           So that checks off Element Number 4.

10          Let's go to the fifth element.  This is that the

11   defendant agreed that a conspirator would participate in the

12   conduct and the affairs of the Aryan Brotherhood through a

13   pattern of racketeering, a pattern of racketeering activity,

14   which the Judge told you just means committing certain crimes

15   that relate to each other and are carried out over a certain

16   period of time.

17          You'll hear, and you heard, that those crimes are

18   what you learned about during the course of this trial:  the

19   drug trafficking, the murders, the robberies, the fraud.  They

20   were carried out by AB brothers and associates over the period

21   of time that you heard about during the trial.

22          To summarize those crimes, you heard about murders.

23   The murders are racketeering activity.  The double murder in

24   Lomita, the Lancaster murder, the double murder in Pomona, and

25   the prison murder you heard about where they killed

1  Brandon Lowrey.

2         But also part of the acts that you heard the Judge

3  tell you that are racketeering activities acts are:  The

4  Hollywood robbery; the drug trafficking, in the prison, to

5  other states; the fentanyl that James Field was trafficking

6  for Waylon Pitchford; the methamphetamine that

7  Defendant Clement was trying to traffic with Brian Rapinoe.

8  You heard about John Stinson trafficking drugs with

9  Daniel Rubin to Tennessee.

10         You also heard about fraud, EDD fraud, identification

11  fraud, and conspiracies to murder.  These are all racketeering

12  acts that you can find under that fifth element.

13         The evidence shows you and has proven to you that all

14  of these defendants have met all five elements of Count 1,

15  that the evidence has proven beyond a reasonable doubt that

16  they are guilty of participating in a RICO conspiracy.

17         So we talked about, then, Count 1, but I want to go

18  into a little bit more detail on the murders because those are

19  also charged in Counts 2 through 6, the murders in aid of

20  racketeering.

21         You heard on October 4th, 2020, Allan Roshanski and

22  Ruslan Magomedgadzhiev were shot once in the head.

23         You heard that Kenneth Johnson and Francis Clement

24  ordered the hit because Roshanski disrespected the AB.  Their

25  order enforced the gang's conduct, their code.  It's an

3118

1    example of the use of violence with a purpose.

2            So let's talk about what led up to this murder and

3    why it occurred.  Roshanski was committing EDD fraud.

4    Lana Haley told you that, Robert Eversole told you that, and

5    Detective Maciel told you that.

6            You also know this is true from the EDD paperwork

7    that was found in Roshanski's possession the night he died.

8    Roshanski wasn't part of a white gang.  So what that meant is

9    that he had to kick up, what you heard witnesses say meant

10    giving proceeds of that criminal activity to AB brothers.

11            Because that's how it works if you're a white

12    criminal, your money isn't yours alone because you're part of

13    the AB gang.  And those AB brothers, they are entitled to some

14    of that money.

15            As Bannick and Eversole testified, Roshanski

16    disrespected Frank Clement, and disrespect gets you killed, as

17    you have learned.  So Roshanski's use was no longer about

18    making money for the AB, but rather an example to set about

19    respect.

20            You heard that Kenneth Johnson, Kenwood, said this.

21    He said that Roshanski was going to be smoked, which meant he

22    was going to be murdered.  You heard from testimony that

23    Kenwood told Eversole that Roshanski was going to be killed

24    and that Eversole needed to talk to Frank and do what Frank

25    asked of him.

1        And after that, Frank ordered Eversole to walk

2   Justin Gray through the murder.  You heard that Justin Gray

3   was involved with this plan because his brother owed a debt to

4   the AB.

5        Brandon Bannick also told you that Gray's brother

6   owed a debt to the AB.  Gray's motivation was getting his

7   brother out of trouble with the AB.

8        But you also heard from Brandon Bannick that he was

9   in debt to Kenwood and that Frank said that if Bannick helped

10  Gray with this murder, that Bannick's debt to Kenwood could be

11  cleared.  That was Bannick's motivation, to get himself out of

12  trouble with the AB.

13       And Bannick's Facebook messages with Gray are

14  consistent with his testimony that Gray told him they needed

15  to do something.  And the messages are consistent with where

16  Gray was before the murder, at the hotel Eldorado, which

17  Bannick told you he met Gray there and learned that Gray had

18  been ordered to kill somebody.  You know that that someone was

19  Allan Roshanski.

20       That night cell phone forensics confirmed that

21  Roshanski traveled from San Diego, where he lived, to Lomita.

22  And cell phones forensics from Roshanski's and Gray's phones

23  match the testimony about what happened that night, that

24  Gray's phone was near the location of the murders, because

25  Brandon Bannick told you that the Eldorado was close to where

3120

1    the murders occurred, and the cell phone forensics confirm

2    that, and that Gray was in contact with Roshanski up until

3    close to when Roshanski was killed.

4         Bannick told you that while they were in the hotel,

5    Gray received some type of communication that Roshanski was in

6    the area.  And you know this is true because the last call

7    from the victim to Gray is in the area of the murders and

8    right before the murders occurred.

9         The crime scene evidence also matches what

10   Brandon Bannick told you, that Brandon pulled up and picked --

11   and parked right in front of Roshanski's vehicle, that

12   Roshanski was not alone, that Bannick and Gray walked up to

13   the two men, and that Gray shot and killed both victims,

14   leaving them dead on the side of a residential street in

15   Lomita.

16        Bannick told you he didn't take out his gun.  It

17   stayed in the waistband of his pants because it happened too

18   quickly.  And Eversole also confirmed this is what happened,

19   because he told you that Gray informed him that two people

20   showed up instead of one and that Gray had to shoot them both,

21   and Bannick didn't shoot anybody.

22        Brandon Bannick told you that Gray used a 9mm that

23   night.  And you know this is true because Detective Maciel

24   told you that a shell casing was found that came from a 9mm

25   gun.

1          The evidence shows you that the accounts you heard

2     about the murder and what led to the murder are accurate.

3          You also heard that Detective Maciel found

4     methamphetamine and EDD paperwork in Roshanski's car.  The EDD

5     documents in other people's names confirms that he was doing

6     EDD fraud.  This is consistent with the testimony you heard

7     from Eversole and Lana Haley.  The evidence tells you that

8     their account is accurate.

9          And similar to the items that were in Roshanski's car

10    the night when he was killed, recall that Lana Haley told you

11    when she sold -- stole a vehicle from Roshanski in Wisconsin,

12    he also had methamphetamine in that car.  And there was a

13    laptop and devices that I submit to you he was likely doing

14    EDD from.

15         But also, she told you that a motorcycle helmet was

16    in there that she later sold to Brandon Bannick and then stole

17    off of his boat.  And Brandon Bannick told you that's what

18    happened with that helmet as well.

19         Lana Haley had a conversation with Frank after the

20    murder, and Frank told her that they took care of that

21    situation.  And she knew what he was referring to, to Allan's

22    death.

23         So we discussed already two of the elements that you

24    have to find for murder in aid of racketeering.  The AB

25    existed, and they affected interstate commerce, and they

1    engaged in racketeering activity.  So you can check those two

2    elements off.

3        The third element of Counts 2 and 3 is that the

4    defendant committed or aided and abetted the murder.  And

5    aiding and abetting, as you heard from the Judge, just means

6    that you helped somebody or you ordered the crime.

7        And most of us think of aiding and abetting as

8    helping commit a crime.  And that's true.  But as you were

9    instructed, it also means the ordering of the crime.

10       It means that if you order someone to commit a crime

11   and then that person goes to do it, then you've aided and

12   abetted, and you're just as legally guilty of that murder, of

13   that crime as the person who committed it.

14       You heard that Justin Gray was the person who

15   committed this murder and that individuals who aided and

16   abetted him included Brandon Bannick and Robert Eversole, but

17   they included the defendants Kenneth Johnson and

18   Francis Clement.  Because those two AB brothers are who gave

19   the order and who decided that this murder should occur.

20       So let's look at the fourth element now, the purpose

21   in committing this murder or aiding and abetting this murder.

22       The Judge told you that it's not necessary for the

23   government to prove that this was the only purpose, this

24   maintaining status, or even the primary purpose, but only the

25   defendants committed the murder as an integral or important

1 | aspect of their membership in the gang, in the

2 | Aryan Brotherhood, and the evidence proves that to you.

3 | The purpose was to maintain their position or status

4 | within the AB, to further the goals of the AB, and enforce

5 | those rules.  Maintaining status is maintaining control.  It's

6 | maintaining that power that comes with being an AB member.

7 | The murders here were to exert fear and control over

8 | others who did not follow AB rules.  Roshanski disrespected

9 | the AB, wasn't paying the AB, and so Defendants Johnson and

10 | Clement ordered and aided and abetted in his murder because

11 | they were maintaining their status and because that meant they

12 | were retaining their power and control.

13 | The murder of Ruslan, because it was the result of

14 | the order to kill Roshanski, falls in line with that too.

15 | These murders are examples of AB members Johnson and Clement

16 | using violence to control what was happening on the street.

17 | So you've gone through all the elements for Counts 2

18 | and 3 and the evidence has shown you that the Defendants

19 | Johnson and Clement are guilty beyond a reasonable doubt of

20 | those counts.

21 | Let's look at Count 4.

22 | You heard that on February 22, 2022,

23 | Michael Brizendine was shot once in the head and once in the

24 | arm.  Francis Clement and Jason Weaver ordered the murder

25 | because Brizendine failed to follow AB orders and he lost AB

1   money.  Their order enforced the gang's code and it's another

2   example of the use of violence with a purpose.

3        So let's talk about Brizendine's actions and the

4   events that led to that order.

5        James Field told you that Frank, Jason Weaver, and

6   AB brother Waylon Pitchford were on a conference call with

7   Field, Michael Brizendine, and others.  That Frank and the

8   other AB members wanted a robbery to occur in Hollywood.

9        And during that call, Frank told them to get

10  construction clothes to dress like utility workers so that the

11  victim would open the door for them.

12       Frank also sent the guys from PENI, James Yagle and

13  Ronnie Ennis, to help.  They were present for that call too.

14  And Brandon Bannick confirmed that on the day of the robbery,

15  Frank ordered him and Ennis and Yagle to go to Hollywood for

16  the robbery, but before they made it there, they heard that

17  something had happened and it was over.

18       The day after the conference call Frank sent James

19  Field a picture of where they were to go in Hollywood.  And

20  Field told you that the photo in Exhibit 1284 is the picture

21  Frank sent.

22       You heard from Benjamin Mendoza that this photo with

23  the writing on it came from Waylon Pitchford's cell phone, a

24  phone that had been seized in 2022, which is consistent with

25  the time frame around this robbery.  The photo from

1  Pitchford's phone is consistent with the testimony that

2  Pitchford was also involved in the robbery.

3          At that house Brizendine kicked the door in.  You saw

4  photos from the house that confirm this, the footprint on the

5  door.  And Officer Hale told you that the door jamb was

6  splintered, which is consistent with someone kicking in the

7  door.

8          You know that what happened at the house is how James

9  Field told you it happened.  Because only someone who was

10 there would know those details.

11         THE COURT:  I'm sorry, Ms. Stokman.  We're actually

12 going to have to take a break.

13         MS. STOKMAN:  Yes.

14         THE COURT:  Ladies and gentlemen, let's go ahead and

15 take a break.  Let's go ahead and take 20 minutes.  So that

16 will put us -- 20 minutes-ish.  Let's put us at ten minutes to

17 10:00.

18     (Jury exits the courtroom 9:32 a.m.)

19         THE COURT:  All right.  Anything for the record at

20 this time?

21         MS. STOKMAN:  Nothing from the government.

22         THE COURT:  All right.  Let's take our break.  Thank

23 you.

24     (Recess held.)

25         THE COURT:  Anything for the record at this time?

1          MS. STOKMAN:  No.

2          MS. DE SALES BARRETT:  No, Your Honor.

3          THE COURT:  All right.  Let's go ahead and bring in

4    the jurors.

5       (Jury enters the courtroom at 9:52 a.m.)

6          THE COURT:  All right.  Thank you.  We have everyone

7    back.

8          Ms. Stokman, you may continue.

9          MS. STOKMAN:  Yes.

10         When we breaked, we were speaking about the home

11   during the Hollywood robbery.

12         You also heard that the victim in that home was zip

13   tied and that the DVR system in the house had been taken out.

14   And you know that that's true because Officer Hale told you

15   that zip ties were found on the kitchen floor and that the DVR

16   system that had cameras around the house had been ripped out.

17         Give me one second.  Our break made technology kind

18   of stop here.  There we go.

19         Receipts were also found in Michael Brizendine's

20   truck and his backpack, and those are consistent with the

21   testimony you heard from James Field and Kaylen Chandler about

22   Brizendine being in the Long Beach area around the time of the

23   robberies.

24         Detective Aguia told you that the hotel key that

25   Brizendine also had in his possession was the hotel in

1   Long Beach where Brizendine rented a room in the days before

2   and surrounding the robbery and the murder.  That is also

3   consistent with the testimony you heard.  And you know that

4   that room is where that video conference call about the

5   robbery took place.

6           This evidence shows you that the account of the

7   robbery and the days surrounding the robbery and the murder of

8   Michael Brizendine is accurate.  The purpose of the robbery

9   was simply for money.  There was supposed to be a financial

10  gain, which is why Frank and Weaver accused Field of burning

11  the brothers.

12          Frank thought that Field was trying to cut him out of

13  the profits from the robbery.  And you heard that Field

14  explained that he thought the cops were being called, that

15  Michael Brizendine kicked the door of the house in, and that

16  wasn't the plan.

17          For Brizendine to have caused the robbery plan to be

18  botched is a big deal to Weaver and Clement.  Brizendine

19  failed to follow orders and he caused those AB brothers to

20  lose money.  So Frank ordered Field to take care of him, which

21  you heard meant to kill him.  And Weaver ordered the same.

22          After the calls where Field was told to kill

23  Brizendine, he followed Brizendine to the house in the remote

24  part of Lancaster.  Brizendine was leading the way, and

25  surveillance footage at the house confirms this.  It shows two

1    vehicles entered the property, Brizendine in the lead and

2    Field in the Mercedes behind him.

3         The orders to kill Michael Brizendine were given to

4    Field, and James Field told you that he wanted to become an AB

5    brother.  He wanted to prove his worth.  And so he took those

6    orders and he shot and killed Michael Brizendine.  He told you

7    how he did it with Weaver on the phone by asking Brizendine to

8    take the call from the brother.

9         When Brizendine leaned over to grab the phone, James

10   Field shot him in the head and left Brizendine in the truck, a

11   truck that you heard James Field had previously driven because

12   he showed you where he had crashed the front end.

13        The photos and the autopsy and the conclusion that

14   you heard from Dr. Gliniecki about the close-range gunshot

15   wound to Michael Brizendine's head is consistent with the

16   testimony that you heard about what happened.

17        The casings from a 9mm gun that were found by the

18   Detective Aguia are also consistent with what you were told.

19   James Field told you that he used a 9mm gun to kill

20   Michael Brizendine.  That gun was later broken down and

21   Brandon Bannick got rid of it.

22        The same camera that showed the headlights of the two

23   vehicles approaching the house also showed one vehicle

24   leaving.  And you know that vehicle was the Mercedes being

25   driven by James Field.  He told you that he was still on the

3129

1    phone with Weaver and that Weaver wanted him to turn around

2    and get pictures but he refused.

3        After the murder, you heard that Frank told Field,

4    Good job.  You did a good job.

5        So that takes care of the first -- the first two

6    elements, again, of Count 4 because we talked about the fact

7    that the AB exists, it's engaged in interstate commerce

8    activity, and in racketeering activity.

9        So let's talk about the third element for this count,

10   Count 4, that the defendant committed or aided and abetted the

11   murder.  And you heard evidence that showed you that.

12       James Field shot Michael Brizendine because he was

13   ordered to do so by Francis Clement and Jason Weaver.

14       The fourth element, the purpose of this.  Again, the

15   government needs only to prove that the defendant committed

16   the murder by aiding and abetting, by ordering that murder, as

17   an integral or important aspect of the membership in the

18   Aryan Brotherhood, and the evidence proved that to you.

19       By ordering the murder, Frank was enforcing AB rules,

20   which again, is maintaining his status as a brother.

21       Brizendine botched a robbery and cost the AB money.

22   That couldn't go unpunished.  Maintaining order, control, and

23   fear by killing somebody who failed to follow and carry

24   through orders, that's why this murder was ordered.  It's

25   another example of how AB members like Francis Clement

1    controlled whites on the street with violence.

2            You've checked off now all of the elements of Count 4

3    and you can find that Defendant Francis Clement is guilty

4    beyond a reasonable doubt of that murder.

5            So let's talk about Counts 5 and 6.

6            You heard that on March 8, 2022, James Yagle and

7    Ronnie Ennis were shot and killed.  Francis Clement ordered

8    the murders because Yagle and Ennis failed to follow AB

9    orders.

10            This order enforced the gang's code and it's another

11    example of the use of violence with a purpose.

12            Let's talk about why this was a gang murder and what

13    led up to it.

14            Both Brandon Bannick and James Field told you that

15    Evan Perkins was doing EDD fraud and that he owed Kenwood

16    money from that fraud.  And Frank sent James Field to Perkins'

17    apartment to help collect that money.

18            The apartment had been ransacked.  And Frank said

19    that Ennis and Yagle weren't supposed to take anything, but

20    you heard that they had taken items that belonged to

21    Evan Perkins.

22            Brandon Bannick also testified to the same.  He said

23    that Ennis filled up bags with Perkins' stuff and -- when he

24    wasn't supposed to do so, and that Frank knew about this.

25            Field and Bannick both told you the reason why Ennis

3131

1   and Yagle were in trouble.  They were blamed for what happened

2   at Perkins' apartment during this incident, for taking

3   Perkins' things.  But also, they were in trouble for the

4   Rick Rainey and Shifty incident, that kidnapping you heard of.

5        Brandon Bannick told you that Frank ordered violence

6   against Rick Rainey when Rainey and Shifty were tied up in

7   Perkins' apartment.  Frank wanted Bannick and the others to

8   kill Rick Rainey, but Rick Rainey and Shifty escaped.

9        Signal messages from Frank confirmed this, that

10  Shifty and Double R, who I submit to you is Rick Rainey, had

11  escaped because the PENI guys had let them do the escape.  And

12  Frank told Field that he needed to get back to Long Beach to

13  take care of this.

14       So you heard that Field made his way back to

15  Long Beach.  And on the morning of March 8, 2022, Frank said,

16  "We have to dome them too because I think Ronnie is a traitor,

17  homie.  Thank you."

18       The Signal message confirms that Ennis and Yagle were

19  to be killed.

20       That night Evan Perkins, Brandon Bannick, James

21  Field, and Matt O'Day met at the Starlite Motel in Bellflower.

22  You know this is true because cell phone forensics for Bannick

23  and Field's phones show them at the Starlite Motel.

24       The cell phone forensics for Evan Perkins' phone also

25  confirmed that testimony.  As does the Signal message at

1   7:36 p.m. where Field told Frank that Bannick, O'Day, and

2   Perkins had come to the hotel.  He said, "Bam just pulled up

3   and Matt and Soldier."

4           You heard that at the motel all four of those

5   individuals, those foot soldiers on the street, got on a call

6   with Frank and Frank told them that Ennis had messed up and

7   said to take care of him.

8           You heard in testimony that the four individuals then

9   drove to Yagle's house in Perkins' Charger, a car that both

10  Field and Bannick identified and that the Pomona detectives

11  told you they seized when they executed that search warrant at

12  Perkins' house.

13          Cell phone forensics confirm that Bannick, Field, and

14  Perkins went to Yagle's house, which you were told is on

15  Palo Verde.  At the house Frank ordered both Ennis and Yagle

16  to leave with them.  Frank also said to, Smoke those dudes

17  right now.  But Field and Perkins believed it was a bad idea

18  to kill them in front of Yagle's family at his house.

19          Before leaving, you heard that Ennis gave Field his

20  9mm because Ennis believed he would take whatever was coming

21  to him.  They knew that something was going to happen.  And

22  Bannick confirmed that, that Ennis gave his 9mm to Field.

23          Cell phone forensics show that the phones went back

24  to Bellflower before heading to Pomona.  Perkins drove his

25  Charger with Brandon Bannick and Ronnie Ennis in it and the

3133

1    Mercedes was being driven by James Yagle, and James Field and
2    Matt O'Day were in that Mercedes.
3          On the way, Frank gave orders about what to do and
4    where to go.  The Signal messages confirmed that Frank said to
5    them, "Make sure you guys have your gun pulled, and put a seat
6    belt on in case he tries to do some funny maneuvers in the
7    car," referencing the fact that he knew Yagle was driving the
8    Mercedes that Field was riding in.
9          He said, "Head towards Mount or Mount Clairmont,
10   okay, Montclair, something like that.  Okay.  Head that
11   direction.  We'll find a spot along the way."
12         And cell phone forensics confirm that they left the
13   Starlite Motel, obeying Frank's orders.
14         Then you heard that Frank was on speakerphone because
15   he wanted to talk to Yagle.  And he told Yagle, You have one
16   chance to tell the truth or you're done.
17         Shortly after that, Frank told Yagle he was lying.
18   And this, James Field told you, confirmed that Yagle was
19   supposed to be killed.
20         The Signal messages also show that the plan was to
21   kill both James Yagle and Ronnie Ennis, and that was confirmed
22   with Frank.  Frank was told that Yagle believed he was
23   supposed to kill Ronnie.  And Field told you that he told
24   Yagle that because he wanted to gain an advantage, because
25   remember, his ankle was broken.

1       You heard about that where he broke that ankle in

2  that car pursuit, that car crash that happened a little bit

3  after the Lancaster murder.

4       And Signal messages confirmed that Field would kill

5  Yagle first and get one of them, referring to Bannick or

6  Perkins, to kill Ronnie.  And you heard testimony that Perkins

7  was told this as well.

8       Again, this is confirmed with cell phone forensics

9  where Perkins' phone moved from the Starlite Motel to the area

10  of Pomona where the victims' bodies were found.

11       James Field's phone also traveled that same path.

12       Ultimately, Frank got impatient that the murder was

13  taking so long to happen.  And Signal messages confirm that he

14  said to hurry up, to find a dark quiet place now.

15       The Signal messages show that Frank was asked if he

16  wanted to be live during that murder, which you heard various

17  AB brothers requested to be live during the commission of

18  crimes so that they could see that things were happening the

19  way they expected them to happen, again, because control is

20  everything to them.

21       The license plate readers captured the cars traveling

22  in tandem, and so did the cameras facing the street where the

23  murder occurred, showing the Charger first and then the

24  Mercedes.

25       Then the cars turned around in that cul-de-sac near

1  where the murder took place.  And just four minutes after

2  Frank said to hurry up and find a dark place -- a dark, quiet

3  place now, both cars stopped.

4          Both Field and Bannick told you that they stopped in

5  a really dark area.  And cell phone forensics from Perkins'

6  and Field's phones confirm this is what happened.

7          Dr. Gliniecki testified that James Yagle died from a

8  single gunshot wound to his chest.

9          You heard that James Field shot Yagle once, and

10 Brandon Bannick saw that happen.

11         According to cell phone forensics, the murders

12 happened between about 10:18 and 10:21 p.m., and the Signal

13 messages indicate that Frank was on the phone at 10:19 p.m.

14         This matches the testimony that you heard.  Frank was

15 on the phone, and he heard Ronnie screaming.  This is also

16 consistent with what Brandon Bannick told you, that Ennis was

17 screaming after he had been shot by Perkins.

18         Dr. Gliniecki told you that Ronnie Ennis sustained

19 multiple gunshot wounds, and you heard testimony about the

20 same, that Perkins shot Ennis before his gun jammed, and then

21 Bannick shot Ennis three times after that.

22         And Bannick also told you that he'd shot Ronnie Ennis

23 three -- or a couple more times on the way as the cars drove

24 out of that area because he saw that Ennis was still moving.

25         Both James Field and Brandon Bannick told you the

1    types of guns that everybody had that night, that Bannick was

2    caring a 9mm, and, in fact, the casings found at the scene

3    matched this.

4        Field initially had a .45 from Bannick, but he used

5    Ronnie Ennis' 9mm to shoot James Yagle.  And this is

6    consistent with that 9mm bullet that was found at the scene

7    that popped out of James Field's gun when he had to rerack it

8    when he told you that it had jammed initially.

9        You also heard that Evan Perkins had a .40 caliber on

10   him, and this is consistent with casings at the scene near

11   Ennis' body.  The evidence shows you that the accounts of what

12   happened that night are correct.

13       The cameras at the market on the corner also showed

14   the vehicles coming and then leaving.  And in this shot where

15   the Mercedes is behind the Charger on the way from the murder

16   scene, you heard that now James Field is driving that

17   Mercedes, that he's with Matt O'Day, and that they stopped for

18   gas before heading back to the motel.  And cell phone

19   forensics match that, showing that they stopped at the ARCO

20   for gas.  And you also saw video surveillance that shows that

21   as well.

22       After the murders, Frank instructed them to go back

23   to the motel.  He said that he's proud of them for committing

24   the murders.  And Field confirmed that they were okay, that

25   they were heading back to the motel.  And cell phone forensics

1   confirm that that's what they did.

2           You heard testimony that at the motel they were on a

3   call with Frank.  And you heard that when Bannick questioned

4   why Jimbo got shot, why James Yagle was killed, Field told him

5   that Frank had ordered it.  And messages from Frank on Signal

6   are consistent with that, that Frank gave the orders to kill

7   both Ennis and Yagle.

8           The next morning Frank said to get rid of the

9   evidence, the guns and the phones.  And you heard that Bannick

10  collected those guns and tossed them between rocks that went

11  into the ocean.

12          Again, the first two elements of murder and aid of

13  racketeering, we've talked about those.  The third is that the

14  defendant committed it by aiding and abetting.

15          You heard evidence that James Field, Evan Perkins,

16  and Brandon Bannick are the ones who shot and killed Ennis and

17  Yagle, but they did so under the orders of Frank Clement.

18          Here, too, the evidence proved that the purpose of

19  defendant ordering and aiding and abetting the murders was to

20  maintain his status in the AB.  Yagle lied to Clement, which

21  is against the rules, Ennis stole from the AB, and Frank

22  blamed them both for not following orders.  Consistent with

23  the other murders, the purpose of ordering both Yagle and

24  Ennis to be killed was to maintain status within the gang, to

25  promote power, control, and fear in order to keep other whites

3138

1    in line with the orders of the AB members.

2          The murders of these white gang members by their

3    friends is yet another example of how AB member

4    Francis Clement controlled white street gang members,

5    AB associates, and coconspirators with violence.

6          And that gives you all the elements of the counts

7    for -- sorry, for the Counts 5 and 6.

8          So once you've checked through all those elements,

9    you can find Defendant Francis Clement guilty of Counts 5

10   and 6.

11         Briefly, before I'm finished -- and I know it's been

12   long, so I'm going to try to get through this.  I want to talk

13   a little bit more about that racketeering activity that

14   Judge Thurston told you about.

15         The murders that are in Counts 2 through 6, again,

16   are part of the acts of the racketeering activity that you can

17   find in Count 1.  But also, as we talked about earlier, are

18   those other acts that you heard about during the course of

19   this trial.

20         You heard about drug trafficking, extensive testimony

21   that the AB was engaged in drug trafficking.

22         Troy Clowers told you that he was bringing drugs into

23   the prisons, and he also had people making money from selling

24   drugs on the outside.

25         He told you that due to his sponsorship for

1    membership by John Stinson, that some of the proceeds from

2    what Clowers was doing in his drug trafficking venture went to

3    Stinson.

4        Daniel Rubin also told you about smuggling drugs into

5    the prison and making money from the sale of drugs on the

6    street.  He was giving some of those proceeds to John Stinson

7    as well because, again, he was sponsored to become an

8    AB brother by Stinson.

9        But he also told you that that drug trafficking

10   venture where they were sending drugs to Tennessee, that

11   John Stinson was a partner with him in that, that they had

12   discussions about what was happening with the drugs going out

13   of state, and that John Stinson confirmed that he was making

14   money from that activity.

15       You also heard testimony from Robert Eversole about

16   drugs being sold within the prison system and outside of the

17   prisons.  And he told you that Kenwood and Frank were getting

18   a profit from that drug trafficking.

19       You heard also in wiretap call in Exhibit 1809,

20   Kenwood confirmed with AB member Todd Morgan that Kenwood had

21   people on the street dealing drugs for him, that woman Dixie

22   that they were speaking of.

23       You also heard about AB member Waylon Pitchford

24   ordering Field to pick up fentanyl in Bakersfield.  You heard

25   about the drugs that were in Field's vehicle when he crashed

1    it in San Fernando Valley, and you know that it was fentanyl

2    because DEA Chemist Martinez told you that there was fentanyl

3    powder in the brick that was recovered, and the pills, those

4    blue pills, contained fentanyl.

5         You also heard Frank Clement in his own words

6    arranging a drug deal with Brian Rapinoe.  In the text

7    messages that Clement sent to Rapinoe, a picture of the

8    methamphetamine that was supposed to be purchased was provided

9    by Frank.

10         You heard also that Rapinoe recorded the phone calls

11    around this because he was working as a confidential informant

12    with the ATF at that time.

13         You heard some of the calls between Frank and Rapinoe

14    that discussed, among other things, the price of the drugs,

15    the fact that they were coming from Kenwood's connection, and

16    ultimately that that connection couldn't get the drugs

17    together, and so the deal never went through.

18         You also heard from multiple witnesses that a lot of

19    fraud was being committed by the AB, specifically, a lot of

20    EDD fraud during 2020 when COVID hit.

21         Troy Clowers told you that he was committing fraud

22    and that he was sending some of that money to John Stinson.

23    He also told you that Kenwood had taught him and others how to

24    commit EDD fraud.

25         Robert Eversole told you that he was also committing

1  EDD fraud and that whatever money he was making, some portion

2  of it was going to Johnson and Clement.

3       You also heard from Eversole, Field, and Bannick,

4  Evan Perkins was committing fraud.  He was committing fraud

5  for Kenwood, that EDD fraud you heard about, that Evan was

6  making fake IDs to help facilitate that fraud, and that

7  Perkins owed a lot of money to Kenwood because of issues that

8  came up during that EDD fraud.

9       In Perkins' apartment, Pomona detectives found a ton

10  of items that Perkins was using to commit the fraud, including

11  fake IDs, credit cards in other people's names, and, in fact,

12  they told you that Perkins was in the middle of making a fake

13  California driver's license on the TV when they walked into

14  that apartment and they executed that search warrant.

15       You also heard that Brian Rapinoe was committing

16  fraud too, a lot of EDD fraud, by using the internet to fill

17  out EDD applications, which you saw in Stinson's name.  And he

18  would receive benefit cards from this fraudulent

19  representation through the mail from EDD.  He spoke to you

20  about how Andrew Collins gave him names and social security

21  numbers to run EDD and how he spoke with both Collins and

22  John Stinson about that EDD fraud.

23       Rapinoe was arrested with Stinson's EDD card in his

24  pocket, and that caused Andrew Collins, Misfit, to accuse him

25  of stealing.

3142

1        In wiretap call in Exhibit 1811, it picked up a

2   conversation between AB member Todd Morgan and Andrew Collins,

3   and they were speaking about Rapinoe.

4        When Collins was talking about that Nazi Lowrider

5   felon who would eventually come back to prison where Collins

6   could finally get him because he had stolen money, that was

7   Brian Rapinoe that he was talking about.  And that call

8   matches what Brian Rapinoe told you was going on with the EDD.

9        The EDD verification that Megan Garza also told you

10  about confirms this, that EDD cards were going to the address

11  that Rapinoe used in San Diego and that those contained cards

12  for John Stinson and others.

13       Daniel Rubin also told you that he was running EDD

14  with Collins and that he had conversation with Collins and

15  John Stinson about the EDD.

16       He told you that in conversations with Stinson,

17  Stinson confirmed he was making money from Collins' EDD.

18       Lastly, let's go over the conspiracies to commit

19  murders and the other murder that you heard testimony about,

20  because these are all acts under the racketeering activity.

21       You heard about conspiracies to kill AB members

22  Ronnie Yandell and Andrew Collins.  Daniel Rubin told you that

23  orders came from Stinson and another member of the three-man

24  council.

25       He told you that orders to kill an AB brother could

3143

1  only come from members of the council.  Because AB rules said

2  that only the council could sanction the death of another AB

3  brother.

4         So Rubin told you that he raised his hand to kill

5  Yandell when John Stinson and that other council member said

6  that Yandell needed to die.  But he also told you that he

7  never had the chance to kill Yandell.

8         Rubin also was on a phone call with John Stinson and

9  another council member when Stinson ordered the death of

10 AB member Andrew Collins.

11        Steps were taken to carry out that murder.  Rubin

12 told you that he asked around to see if any whites were on the

13 same yard as Collins who could commit this murder but that

14 nobody was, that there wasn't someone they could trust to do

15 that.

16        And he told you that John Stinson also tried to see

17 if members from other races could be involved in this plot to

18 kill and this conspiracy to kill Andrew Collins.

19        But you heard that that also never happened, that

20 Collins was never killed.

21        One of the last witnesses you heard from was

22 Timothy True, and he told you about the murder of

23 Brandon Lowrey, that it was an order from Kenneth Johnson and

24 Francis Clement.  That when they got to the Kern Valley State

25 Prison yard, the yard had been a mess and Johnson and Clement

1   and other AB brothers wanted it cleaned up.

2          True testified that after a list was compiled of all

3   the whites who owed money for drug debts, that

4   Brandon Lowrey's name was on the list for owing $500 and that

5   at that point, Johnson and Clement ordered that Brandon Lowrey

6   needed to be killed.

7          You heard that ultimately, Thrasher Holmeyer

8   volunteered to kill Lowrey.  And Thrasher said that he would

9   put the area of the IE, the Inland Empire, on the map.  And

10  True told you that this was an area that he was also from

11  where he was part of that core street gang.

12         Thrasher didn't have issues with Lowrey but was

13  raising his hand after an AB order went out.  The plan was for

14  Thrasher to move into the same cell as Lowrey, which you heard

15  CDC Officer Medley say that on January 24, 2016, the day that

16  Lowrey was killed, Lowrey's cellmate was, in fact,

17  Thrasher Holmeyer.

18         True told you about conversations with Johnson and

19  Clement where they agreed that Holmeyer should kill Lowrey

20  after Holmeyer volunteered.  And he told you that they said

21  this couldn't be just an assault.  This had to end in death.

22         And Thrasher Holmeyer stabbed Brandon Lowrey ten

23  times in his neck and chest.  Dr. Carpenter said that one of

24  those wounds was fatal because it immobilized Brandon Lowrey

25  and it cut into his spinal cord.

1    After the murder, Johnson and Clement laughed about

2  Thrasher's willingness to commit the murder.

3    Kenneth Johnson and Francis Clement ordered this

4  murder so that an example would be made out of Lowrey to the

5  other white inmates to fall in line with the orders of the AB

6  and the rules that the AB had established.  And True told you

7  that's exactly what happened.  That after Lowrey was killed,

8  that the whites on his yard were in fear and were wanting to

9  clear up their debts.

10    You heard from Robert Eversole that he was friends

11  with Lowrey and that after Lowrey died, Eversole spoke with

12  Thrasher.  Thrasher told Eversole that he killed Lowrey and

13  that he got him to drink moonshine and stabbed him in the neck

14  several times.

15    The autopsy results show that morphine was in

16  Lowrey's system.  Recall that Eversole was telling you what

17  Thrasher told him.  Never said that he tried to get him to

18  drink alcohol, and we don't know what happened for sure in

19  that cell.  But you do know from Dr. Carpenter that morphine

20  can have the same effect, and there was morphine in the

21  Lowrey's system.

22    Both True and Eversole told you that

23  Thrasher Holmeyer killed Lowrey because he was told to do it.

24  Thrasher said that the order came from Johnson and that

25  Thrasher liked Lowrey.  And True told you the same.

1          You've heard from multiple witnesses and seen

2     evidence throughout this trial that AB usually sends your

3     friends to kill you.  And that's exactly what happened here.

4          So let's talk, just wrapping up, about that pattern

5     of racketeering activity.  You heard that you have to find

6     that each defendant knew that two acts were going to be

7     committed and they didn't have to be involved personally, that

8     someone else, another AB associate, another one of those

9     coconspirators, would be committing acts that the Judge read

10    to you.

11         But you have so much more than that.  You heard about

12    acts that the defendants themselves were participating in as

13    well as acts that they knew other coconspirators were

14    participating in, such as the EDD fraud with Collins through

15    Rapinoe for John Stinson, the Rubin EDD with John Stinson, the

16    drug trafficking with Rubin to Tennessee.

17         John Stinson was involved in the conspiracy to murder

18    Andrew Collins, the conspiracy to murder Ronnie Yandell, and

19    he knew that others were committing acts as well.  You heard

20    that from Clowers, from Rubin, that he knew they were doing

21    drug trafficking, that he knew Kenwood was drug trafficking,

22    he knew about Eversole's activity, and the activities that

23    were involved with fraud, assaults, and other AB business,

24    that gang business.

25         There's more than enough for you to find that the

1    pattern of racketeering activity existed and that John Stinson

2    was part of it.

3         Same is true for Defendant Francis Clement.  You

4    heard that he ordered the Lomita murders, which were two

5    separate murders.  He ordered the Pomona murders, which

6    involved two separate victims.  He ordered the Lancaster

7    murder, the Hollywood robbery, the assault and murder of

8    Rick Rainey.  Drug trafficking evidence came through where he

9    was personally involved with Brian Rapinoe.

10        You also heard that he ordered the Lowrey murder.

11   And he also knew that others, other coconspirators, were

12   committing fraud, drug trafficking, murders, and assaults.

13        There is enough here, again, for you to find that

14   Francis Clement was part of the racketeering activity of the

15   AB.

16        Finally, Kenneth Johnson.  He too was part of the

17   racketeering activity that the AB was committing, that gang

18   business.  You heard that he was personally involved in drug

19   trafficking with Clowers, he had EDD fraud with Clowers, he

20   ordered the Lomita murders, ordered the Lowrey murder,

21   Evan Perkins was doing fraud for him, that he was aware and

22   engaged in Eversole's drug trafficking, that he had drug

23   trafficking going on his own through that woman Dixie, and

24   that he knew others were committing fraud, assaults, drug

25   trafficking, and murders.

1         Again, that gives you a check for all of the elements

2    for Count 1, the RICO conspiracy.  And the evidence has shown

3    you that Defendants John Stinson, Kenneth Johnson, and

4    Francis Clement are guilty of Count 1.

5         The evidence has also shown you that Kenneth Johnson

6    and Francis Clement are guilty of Counts 2 and 3 and that

7    Francis Clement is guilty of Count 4, 5, and 6.

8         Thank you.

9         THE COURT:  All right.  Thank you.

10        MS. FISHER-BYRIALSEN:  May I have a moment?

11        THE COURT:  Yes, thank you.

12        MS. FISHER-BYRIALSEN:  Good morning, ladies and

13   gentlemen.  Can you hear me?

14        The problem with all these green checkmarks you've

15   just seen in the government's closing argument is that they

16   all depend on the witnesses they put on the stand.  They all

17   depend on these cooperators, thieves, fraudsters, drug

18   dealers, and killers.

19        In her opening, Ms. Barrett told you that the

20   government witnesses were going to be people that you would

21   never trust with the keys to your house to water your plants

22   if you were out of town.  And that's exactly what you've seen

23   here for the last five weeks.

24        There's a lot of evidence about homicides.  And you

25   saw autopsy pictures and crime scene pictures and heard from

1   cell phone experts and cops.  But we're not saying that

2   Michael Brizendine and Ruslan and Roshanski and Ennis and

3   Yagle weren't killed and that there wasn't evidence of a

4   robbery in Hollywood Hills or pictures of drugs that

5   Brian Rapinoe never received.

6          However, the government has not proven that

7   Francis Clement is the person who ordered any of those

8   murders.  Because to believe that, you have to believe the

9   thieves, fraudsters, and drug dealers that were lined up on

10  the stand here for you.

11         You have to believe that Mr. Clement is the person

12  behind those Signal messages.  And the only person you have

13  telling you that is these fraudsters, thieves, drug dealers,

14  and killers.

15         The witnesses in this case were already gang members,

16  lifelong gang members.  You heard the list:  Public Enemy

17  No. 1 Death Squad, Nazi Lowriders, COORS Family Skins,

18  Lakeside Gangsters, Supreme Power Skins, just to name a few.

19         These gang members were committing gangs -- or sorry,

20  were committing crimes long before they did anything for the

21  AB.  But now they have a chance to blame the AB and act like

22  they were intimidated and are now coming forward because

23  they've somehow seen the light and changed their lives.

24         You heard from James Field, also known as Suspect.

25  He was a Lakeside Gangster, a Supreme Power Skins on the

1    streets.  He's been in and out of the correction facilities

2    since he was 14.

3           And during the three months you heard him testify

4    about from when -- about December 2019 until he got arrested

5    in his last car crash, he was on a crime spree.  He was

6    crashing cars.  He broke his ankle.  He was in the hospital,

7    then got out.  Crashed another car.  He's moving drugs, doing

8    robberies, killing people.

9           In this case he was charged in this RICO conspiracy

10   with three homicides.  He's the one who killed Brizendine

11   point blank.  He killed James Yagle and Ronnie Ennis.  And

12   what was his penalty?  What was he facing?  Three mandatory

13   life sentences.  But he got a cooperation agreement.

14          You also heard from Robert Eversole, street name

15   Rage, also involved in the criminal justice system since he

16   was 7 or 8 years old.

17          And you saw him sit up there and get teary-eyed,

18   and -- but when you think about that, I want you to think

19   about who he was, who he is.  He's someone that got away with

20   murder.  He testified about having people stabbed in prison

21   and he couldn't even remember if those people he ordered

22   stabbed survived or not.

23          He had a cooperation deal that he also got very

24   emotional about because supposedly it got his family out of

25   trouble, his daughter and his wife and everybody.  But those

1    are the same people that he set up to do crimes for him.

2         Ask yourselves if that tearful display is consistent

3    with somebody who feels bad or has changed their lives or

4    wants to do the right thing or somebody who's just coming in

5    here to tell you what the government wants you to hear.

6         Mr. Eversole made a career out of lying and

7    threatening and manipulating people, including his own family.

8    Don't let him manipulate you.

9         And what did he get in return?  He got the farm.  He

10   got a ten-year sentence reduction.  I mean, you saw him walk

11   in here.  He came right in here from the street.

12        So ask yourself, when you consider all these peoples'

13   testimony, who they are, what their backgrounds are, what

14   their motivations are to be in here.

15        You heard from Brandon Bannick, Bam Bam, also in and

16   out of prison since age 13, PENI, Public Enemy No. 1, Death

17   Squad.  He violated parole, committed fraud, stabbed people in

18   prison he talked about.  But he didn't seem too concerned

19   about that because he wasn't caught for those.

20        He's charged with murders in this case.  He

21   testified, he was asked:  What kind of acts of violence did

22   you do in prison, assaults?

23        Yeah, mainly.  Battery, assaults and battery on a

24   prisoner, fighting, mutual combat, that type of thing.

25        We asked:  Any stabbings?

1          I was never caught for any, no.

2          In his mind if you're not caught, it doesn't matter.

3     But he was caught here.  And that's why he came in here and

4     testified, to get out of it.

5          And what did he get out of it?  Same thing as

6     Mr. Field, out of life in prison, gone.

7          You heard from Brian Rapinoe, also in and out of

8     correction facilities, associated with the Peckerwoods and

9     Skin Woods and Nazi Lowriders, fraudster, tricked people,

10    tricked the EDD for years.  Don't let him trick you.

11         Mr. Rapinoe on the stand talked about how he also had

12    a sudden epiphany and changed his life and now he's different

13    since he got arrested.  That's not why he did this.  He didn't

14    come in here and testify because he suddenly turned his life

15    around.

16         He came in here because he got caught and then he got

17    paid $4,400.  He just found another way to get paid, paid by

18    the ATF.  Not just in this case, but others.

19         And what else did he get out of it?  A cooperation

20    agreement in the Southern District of California.  He's not

21    being prosecuted for the federal crimes he did down there.

22         And then we have Kaylen Chandler.  She's been

23    involved in a life of crime I think she said her whole life,

24    and this is another person that they want you to believe.  I

25    mean, these are the people you have to believe to find

3153

1   Mr. Clement guilty.  And you have to believe it beyond a
2   reasonable doubt.
3         Think about her actions when she found her -- her
4   boyfriend and the father of her child in the red truck.  She
5   didn't call the police.  She ran because she had a warrant.
6   And then when she was contacted by the police, she lied to
7   them.
8         But then she got an immunity agreement, and here she
9   is.  And you heard her testify about her benefits.
10        I asked her (as read):  What does immunity agreement
11  mean to you?
12        That anything I say can't incriminate me.
13        And I asked her:  Did they give you immunity for
14  everything you testify about?
15        Yup.
16        Just like that.  They pick who sits there and who
17  sits there.
18        An example of why you can't believe her is about the
19  red truck.
20        So I say to her (as read):  So let's talk about the
21  red truck that Michael was found in.
22        Okay.
23        Do you remember you testified in the grand jury and
24  you were asked whose truck it was?
25        Yes.

3154

1          And you answered, That was our truck.  It was the
2     rental that we got.
3          She says, Correct.
4          I say, And when you testified there, you were under
5     oath, right?
6          Correct.
7          But that wasn't the whole truth about the truck,
8     right?
9          She says, Yes, it was.
10          Well, that's not just a rental, correct?
11          That's the whole truth, yes.
12          It was a rental you got in a fake name, right?
13          Right, she says.
14          But she doesn't seem to think there was anything
15     wrong with that.
16          (As read):  And you ripped the GPS out of it, right?
17          Did I?  No.
18          Well, someone did, right?
19          Probably.
20          Well, yes or no?
21          If they did, I wasn't there for that.
22          But you know it was ripped out?
23          I'm sure it was.
24          Because that's why the rental company never got --
25     came back, and you got it when you were -- didn't return it,

3155

1  right?  You never returned the rental car, right?

2        I did not.

3        So it's actually stolen, right?

4        Yes.

5        Does she strike you as someone who understands what

6  telling the truth is?  Someone who understands what being

7  under oath is?

8        These are people who have nothing to trade in their

9  lives other than lies.  Lies are the only currency they know.

10        And how do you know it's lies?  Because not a single

11  one of them came forward until they were caught.  They didn't

12  come forward until they were in trouble, and they didn't come

13  forward and sit here on the witness stand until they got some

14  benefit for it.

15        And like I mentioned to you earlier, they all want

16  you to believe that they had some moment of clarity and they

17  suddenly became good honest law-abiding people; they finally

18  saw the light and gave up the life of their thieving and

19  frauding and drug dealing and assaulting and killing.  But

20  that's not what happened.

21        What happened, like I said, is that they were caught,

22  and they got benefits, and they got away with their drug

23  crimes, their gun crimes, their fraud, and their murders.

24        So think back on what these incentivized victims --

25  or witnesses all had to say.  How else do you know they aren't

3156

1    telling the truth?  Because they couldn't tell the same

2    stories.

3              Let's compare Ms. Chandler and Daniel Rubin, Nutty.

4              (As read):  Have you ever committed crimes on the

5    behalf of the AB?

6              No.

7              Have you ever committed crimes to benefit the AB in

8    some way?

9              Uh, I mean, no.

10             Had Daniel Rubin or Nutty ever asked you to do

11   anything unlawful?

12             Yes.

13             Well, that doesn't make any sense.

14             (As read):  What did he ask you to do?

15             To basically hook some people up that have came out

16   of prison with drugs.

17             What were you doing for Daniel Rubin?

18             Just like I said, I was helping out with drugs with

19   people that were getting out.  I was connecting people with

20   drugs.

21             Well, that's not exactly what Daniel Rubin said.

22             (As read):  Were you sending Kaylen to pick up and

23   deliver -- or were you sending Kaylen to pick up drugs and

24   deliver them to people who had recently been released from

25   prison?

1          No.

2          That's not true?

3          No.  She did everything for me.  That was just one of

4     the things she did.

5          Well, she certainly didn't tell you the others?

6          Well, obviously, yeah.

7          I don't think I understand what you mean by

8     'obviously.'

9          I trusted no men in my area.  Everything that came

10    through my area went through her.

11          Okay.  So she was committing crimes on your behalf?

12          Yes.

13          Compare the testimony of Justin Field and

14    Brandon Bannick about what happened in Pomona.

15          (As read):  When you arrived back at the hotel -- and

16    this is after they shot Ennis and Yagle in Pomona.

17          Matt -- I mean Bannick and Soldier were there when we

18    came upstairs, says Field.

19          And what, if anything, happened when you were in the

20    hotel?

21          We went in and sat down and Frank called.

22          And what, if anything, did Frank say?

23          I had him on speaker.  He said, What happened to

24    Jimbo?  Why did Jimbo get shot?

25          And did you respond?

1          I told him, yeah, you told me that if he lied, that
2   you wanted him taken care of.
3          Well, that's not how Brandon Bannick explained it.
4          (As read):  So what happened when you were all back
5   in the hotel room?
6          I ask the same question, but you get a different
7   answer.
8          (As read):  We were just kind of confused, I mean,
9   you know, about everything that happened.  And -- sorry I
10  can't see that part of the screen -- and Suspect was on the
11  phone with Frank and --
12         "QUESTION:  Could you hear what Frank was saying?"
13         "Yeah."
14         "What did he say?
15         "I just heard him say, Why did Jimbo get shot?
16         "And what, if anything, did Suspect say?
17         "Oh, something different than Suspect said.  He
18  explained that he had given Jimbo Ronnie's gun, or a gun, and
19  he got worried that Jimbo was going to shoot him, and he
20  panicked and shot Jimbo."
21         So here you have two people explaining the same thing
22  very differently.  And these are the two people that you have
23  to believe are telling you that the person on the end of that
24  have Signal line is Francis Clement.
25         Then we go to Rage.  He's talking about the Kern

3159

1    murder, the murder of Brandon Lowrey.

2                And he said (as read):  Oh, yeah.

3                He gives a lot of details here.

4                They got some moonshine, white Lightning, and they

5    got him drunk.

6                -- meaning Brandon Lowrey.

7                And he said (as read):  He was about half drunk, but

8    he wasn't -- Thrasher wasn't -- he didn't drink as much.

9                Thrasher being the person who killed Brandon Lowrey.

10               (As read):  And they had someone come to the door and

11   call him so that he was looking out the window talking to him,

12   and he stabbed him through the back of the neck several times.

13               All right.  So Eversole, Rage, is here on the stand,

14   got a lot of detail here.  But we know this isn't true because

15   compared to the testimony of the coroner, Dr. Eugene

16   Carpenter -- he's got no skin in the game here -- he testified

17   that there was no blood -- I'm sorry, no alcohol in the blood,

18   and his report confirms that.

19               And then you have the corrections officer,

20   Ethan Medley, who was the one that walked up to the cell.

21               And he said (as read):  I looked in, and I saw Lowrey

22   laying under the bunk.

23               Well, if Eversole's detailed account of him being

24   told to stand by the door and talk to someone outside the door

25   and then gets stabbed in the back, he would have been by the

3160

1    door, not under the bunk.  So another reason you can't believe

2    Eversole.

3           Why the inconsistencies?  Lies, drugs, incentives

4    from the government.

5           When we were questioning Field, we asked him if he

6    was on drugs, and he says yeah.

7           (As read):  So during the time leading up to when you

8    killed Michael Brizendine, you were on drugs?

9           Yes.

10          You weren't sleeping much.

11          And I think him and I have a different understanding

12   of what sleeping much means.

13          But he says (as read):  No.  I was getting regular

14   sleep.

15          You were?  Weren't you staying up for days?

16          Two at a time maybe.

17          You would stay awake two days at a time?

18          Yeah.

19          And the same thing in the period that you were

20   killing Jimbo, you were on drugs?

21          Yeah.

22          And I want you not just to think about what these

23   people said, but how forthcoming and smooth they were, all

24   these cooperators, when they were being asked questions from

25   the government compared to how they were when they were asked

1   questions from the defense.

2          And use your common sense to evaluate their demeanor.

3   Use your own common sense to evaluate how methamphetamine and

4   heroin use affects people's memories or their behavior.  Use

5   your common sense about how staying awake for days affects

6   somebody's behavior and memory of events.

7          And who didn't you hear from?  You heard a lot from

8   Field about the Hollywood robbery and the Lancaster killing

9   and the Pomona killing.  You heard from Bannick about Lomita

10  and Pomona killings.

11         But what about all the other people that were there

12  that you didn't hear from, Sabrina Beck, Haily Chappell,

13  Josh Cornett, Aaron Fogle, Nick, or they called him Scrappy,

14  Matt O'Day?  We didn't hear from them because they wouldn't

15  tell you the same story.  It would be more inconsistencies.

16         All you got were the cooperators who benefitted from

17  being here.  You heard from Timothy True about the Kern

18  murder.  He's got a background of burglary and attempted

19  murder.

20         He tried to claim that he wasn't getting any benefit

21  from being here, that he wasn't getting anything out of

22  testifying, but he was.  He was getting letters from the

23  United States government that he could give to his parole

24  hearing in the hopes of getting out.

25         And again, use your common sense in judging his

1    demeanor and how he behaved on cross-examination versus direct

2    examination.  You heard him quibble with Ms. Luem when she

3    asked him why he hadn't had that giant COORS tattoo removed

4    from the front of his neck.

5            He said something like, Well, tattoos are permanent.

6            But you could see he had the other ones filled in.

7    He could have easily had that one filled in too.

8            And Mr. True -- and judge this on your own, but he

9    spent a lot of time trying to make ends meet and make sense of

10   how, you know, his COORS Family Skins was somehow, I don't

11   know, a better gang or different from the Aryan Brotherhood

12   and that the AB was certainly not like how he was.

13           And I want you to think about the character and the

14   credibility of somebody who thinks like this.

15           I asked him what COORS was.  And, you know, the left

16   side is him testifying about the Aryan Brotherhood and what he

17   thinks of them.

18           And he says that (as read):  They are white

19   supremacist, a racist organization, but their everyday beliefs

20   are different.  They believe in using drugs and selling drugs

21   and victimizing white people, murdering white people.

22           Anything that they can do to benefit the

23   Aryan Brotherhood, it doesn't matter, they believe in it.

24   Whereas when I was a skinhead, we believed in preserving white

25   people.  Drugs -- we weren't allowed to use drugs.  We're not

1  allowed to steal from people.  We weren't allowed to do

2  anything like that.

3          And he says --

4          But you are using drugs, right?

5          I've used drugs.

6          So his own COORS Family skinhead rules didn't seem to

7  apply to him.

8          Then he was asked again later about his COORS Family

9  Skins.  And we asked him (as read):  What does that stand for?

10          And he says, COORS stands for Comrades of Our Racial

11  Struggle or Children of Our Race Skins.

12          And I asked him, What does that mean?

13          He says, It's a neo-Nazi skinhead gang.

14          And he's been a member of that since he was 18, but

15  he claims to have dropped out in 2016.  And he explains that

16  this is a neo-Nazi skinhead ideologist.

17          And then compare that to when he talked about the

18  attempted murder that landed him in prison in the first place,

19  and think about if he's someone you can believe beyond a

20  reasonable doubt.

21          This is him testifying about the attempted murder

22  that landed him in prison.

23          (As read):  That guy Mr. Smith, the one that you and

24  Lemeur almost beat to death, he's white.

25          Yes, sir.

3164

1          Isn't that victimizing white people?

2          At that time in my life, I was a gang member, and he

3     was another skinhead gang member.  And, you know, I attempted

4     to murder him for my gang.

5          We heard a lot of people talk about the enterprise or

6     the Aryan Brotherhood enterprise, as the government calls it.

7     The government has not proven that the crimes committed by

8     Field and Bannick and Rapinoe and everyone else were in

9     furtherance of any enterprise.  There's no evidence of that.

10    These are street guys doing street crimes like they have their

11    whole lives.

12         You heard the Judge read the jury instructions to

13    you.  And they're all important, but I want to draw your

14    attention to a few that are especially important in this case.

15         The Judge told you that you should focus on a

16    witness's memory, focus on the manner that they testified, the

17    witness's interest in the outcome of the case, whether other

18    evidence contradicts their testimony.

19         And again, you only heard from cooperators in this

20    case about what's supposed to have happened and who's supposed

21    to have ordered it.

22         Yeah, you heard from the crime scene experts and the

23    CO who found Brandon Lowrey, but they weren't there when

24    anything happened.  They were there after the fact.

25         Think about how the people's memories and behavior in

1    this case were affected by their benefits, by their

2    cooperation agreements, by their immunity agreements, by the

3    payments that they were getting for what they were doing,

4    affected by drugs and lack of sleep.  Think about the way they

5    testified and their interest in the outcome of this case.

6          The Judge went over with you that you heard

7    Brandon Bannick and James Fields are people who plead guilty

8    for crimes.  You can consider that and you should.

9          Robert Eversole, Brandon Bannick, James Field,

10   Troy Clowers, Timothy True testified in exchange for favorable

11   treatment from the government.  Kaylen Chandler got immunity.

12   Rapinoe got payments.

13         Then the instruction tells you (as read):  For these

14   reasons, in evaluating the testimony of these witnesses, you

15   should consider the extent to which or whether each witness'

16   testimony may have been influenced by these factors.  You

17   should examine the testimony of these witnesses, in this case

18   all the cooperators, with greater caution than that of other

19   witnesses.

20         The problem here with all those green checkmarks in

21   the government's closing argument is that you have to treat

22   all those witnesses with greater caution because they are not

23   reliable.

24         You only heard from cooperators about what's supposed

25   to have happened.  You only heard from thieves, fraudsters,

1  drug dealers, and killers.  And that's not beyond a reasonable

2  doubt.  Think long and hard about these cooperating witnesses

3  the government wants you to believe beyond a reasonable doubt,

4  their incentives to lie, the benefits they're getting, their

5  demeanor on the stand, like Daniel Rubin and Kaylen Chandler,

6  their massive criminal records.

7          Beyond a reasonable doubt is not if you kind of

8  believe something or you think it's more likely or not.

9  Beyond a reasonable doubt is the highest standard of proof in

10  the criminal justice system.

11          You would not give any of those people on the witness

12  stand the keys to your house to water your plants, and that's

13  why you have to find Mr. Clement not guilty.

14          THE COURT:  All right.  Thank you.

15          For Mr. Johnson, please, Ms. Luem.

16          MS. LUEM:  Just a moment, Your Honor.

17          Sorry about that.  I know it looks like I'm going to

18  keep you here forever, but I'm not.

19          I want to start by saying that this trial has been

20  long.  And it was expected to be quite a lot longer.  So we

21  appreciate your time and your attention and your patience with

22  things like this.  And our client Mr. Johnson thanks you.

23          He is not guilty.  And I'm here to tell you why.

24          The government in this case has not met their burden

25  of proof.  And as Ms. Byrialsen just told you, the burden of

1    proof in a criminal case is beyond a reasonable doubt, the

2    highest in any type of case in this country.

3         The legal system -- a lot of people during jury

4    selection said our criminal justice system is broken.  I

5    disagree.  I think it's one of the greatest systems in the

6    world.  And the reason why is because we have people like you,

7    jurors who come in here, everyday people, who evaluate the

8    evidence, who listen to the witnesses.

9         We don't have a judge or a two judges deciding

10   somebody's fate.  And in this case, it's more than just money

11   or, you know, civil action or even something as important as,

12   for example, parental rights.  The standard in a criminal case

13   is higher than all of those because you're talking about

14   somebody's liberty.

15        So we thank you and we ask you to keep the promises

16   that you made during jury selection, to hold the government to

17   their standard of proof beyond a reasonable doubt.

18        One of the first promises you made was that you would

19   presume Mr. Johnson innocent.  That you understood that

20   concept, that you would follow the law, and that unless the

21   government proved their case, every element of their case to

22   you beyond a reasonable doubt, he would remain innocent in

23   your eyes until then.

24        And you've heard a lot of bad stuff.  I mean, we're

25   not talking about, you know, a perfect person sitting over

3168

1   here.  You've heard evidence that he is in prison.  He is

2   incarcerated.  He's done things in the past that put him

3   there.

4          And, uh, the question for you now is not is he a good

5   guy, is he a bad guy, should he be in prison for those things,

6   it's, did he commit the crimes that they charged in this

7   indictment?  And did they prove them beyond a reasonable

8   doubt?

9          So at the beginning of this case, the government in

10  their opening statement told you that there was going to be

11  these buckets of information of, you know, violent crimes and

12  RICO acts.  And I submit to you -- and this might be, I don't

13  know, my co-counsel didn't understand it when I said, show me

14  the receipts, but where are the receipts?  That's a question

15  that you should ask yourselves when you get back there in the

16  jury -- jury room.

17         Who keeps receipts?  And I mean it literally and

18  figuratively.  You know who keeps receipts?  Banks, the

19  California Department of Corrections, phone companies keep

20  receipts and records, government agencies like EDD keep

21  receipts.  And where are those receipts when it comes to

22  Mr. Johnson?

23         Ms. Byrialsen went through all these cooperators and

24  the statements that they made and how they did these things

25  and they committed these crimes.  And in particular, something

1    that the government repeated over and over and over through

2    this trial through every witness was that if you're doing

3    crime, you have to kick up to the Aryan Brotherhood, right?

4         Robert Eversole, I was kicking up to Kenny Johnson.

5    I was paying up to the kitty or the general fund.  Where were

6    those receipts?  The Department of Corrections keeps track of

7    money that comes in to the prison and goes on to inmate

8    accounts.

9         They have receipts.  They have records.  They have

10   the ability to get those records and show if Mr. Johnson was

11   receiving payments from anybody.  Where are they?  You didn't

12   see any receipts.  You didn't see any records.  Nobody from

13   CDCR came in and told you, Oh, well, there's an AB general

14   fund and everybody is tithing to it or that any of these guys

15   were receiving payments.  Nothing.

16        You heard from Troy Clowers who said something like

17   he -- he used this catalogue to send drugs in at

18   Kenny Johnson's request through the Department of Corrections

19   and they drill the hole in something and mailed in.  Where's

20   the record of that?  They keep records of packages coming in

21   to the prison.  They keep records of mail.  Inmates sign for

22   these things.  There was no evidence.  All you get is the word

23   of Troy Clowers.

24        What about wiretaps?  You heard testimony that they

25   had wiretaps going during the time of the Lomita homicides.

1    And I submit to you that while you heard one call that

2    purports to be Kenny Johnson talking to somebody named

3    Todd Morgan, there are no other calls, no other recorded phone

4    calls of Kenneth Johnson talking to anybody about anything.

5            There are no kites.  You heard a lot about kites and

6    passing kites.  Where are the kites that have Kenny Johnson's

7    name on them?  Where are the kites that Kenny Johnson wrote?

8    There are none.  Receipts.

9            There's no cell phone records that were presented

10   that have his name on them or his phone number.  He's on that

11   recorded call giving a phone number.  Presumably it's his

12   number.  And there was nothing done to corroborate or show

13   that that phone belonged to Mr. Johnson.

14           Same with Allan Roshanski's phone, which they had,

15   which they recovered.  No calls that indicate he was

16   communicating in any way with Mr. Johnson.

17           We talked a lot about Cellebrite extractions.  And

18   you heard from Robert Eversole, who I'm going to talk to you

19   at length in a little bit, I'm sorry to say, but he testified

20   that he had two phones taken shortly before he was ripped out

21   of his cell and charged federally.

22           The phone that he had at the time that he was

23   arrested, he didn't have it for very long and they took that.

24   But the two prior phones that he had through the months of

25   October and November were taken by law enforcement.  They are

1    in the hands of the California Department of Corrections.

2            You know who has access to those phones?  They do.

3    They could have taken those phones, Robert Eversole's phones,

4    done a Cellebrite extraction, and seen whether or not there

5    were any communications with Mr. Johnson.  That was not done.

6    Period.

7            You heard about people committing EDD fraud and that

8    Mr. Johnson was involved in EDD fraud.  The woman who

9    testified, God bless her, right, she was just here to talk

10   about, you know, what she knew and what she did.  And she's

11   got no dog in this fight.  But she said as far as records with

12   Kenny Johnson's name, I don't know anything about that.  I

13   didn't see anything like that.  No receipts.

14           That is not proof beyond a reasonable doubt.  So we

15   have cooperators, we have thieves, liars, killers, as

16   Ms. Byrialsen told you, but no corroboration, no hard

17   evidence, no receipts.

18           Instruction Number 14 is important.  And I don't want

19   to spend too much time on it, but I think you all understand,

20   we covered it in jury selection.  You are to evaluate the

21   evidence as to each defendant separately, right?

22           So Hollywood robbery, Kenny Johnson is not charged,

23   there's no evidence that he had anything to do with it, that

24   he knew anything about it.  James field told you this.  There

25   was a conference call.  Kenny, not on the call.  So we can

1    just skip past that.

2         Same with the homicide of Mike Brizendine.  Kenny

3    wasn't charged with that; he didn't know about it.

4    James Field testified that Kenny Johnson had nothing to do

5    with that.  Kaylen Chandler never even mentioned Kenny's name.

6    So we can skip past that.

7         Pomona homicides, again, Kenny not charged with that.

8    No evidence he had anything to do with it.  I will point out,

9    though, that the government brought up these Signal messages

10   that were going to James Field and his phone around the time

11   of the Pomona homicides where he was allegedly communicating

12   with somebody else in this case.

13        And Mr. Johnson was reaching out to Mr. Field and

14   trying to get ahold of Mr. Field because this other guy who

15   didn't have a phone was often with Mr. Field.  And Suspect,

16   Mr. Field, wasn't responding to any of Mr. Johnson's messages,

17   right, he wasn't answering.

18        And at one point, Mr. Johnson said, you know,

19   you're -- You're being disrespectful or, You're disobeying an

20   order and you're in the hat.  Right?  The government tells you

21   what that means and all the witnesses did too, which means

22   you're marked for death, certain death, you're in the hat.

23        So he sends that message to James Field.  And I asked

24   Mr. Field about that, you know, like you weren't answering and

25   Mr. Johnson was blowing up your phone about something totally

1   different than what you were involved with.  And what happened

2   to you for disobeying that direct order?  Nothing.  He wasn't

3   assaulted.  He wasn't -- obviously, he wasn't killed.  He

4   wasn't checked.

5           He said he had a -- he had, like, a good excuse,

6   basically is what he told me.  He told Mr. Johnson that he was

7   sleeping.  Which we know isn't true because he was involved in

8   these murders and all that.

9           So he lied to Mr. Johnson.  That's, according to

10  them, another violation that results in, you know, immediate

11  death.  That didn't happen.

12          And we know that Mr. Field was housed at the

13  Fresno County Jail along with Mr. Johnson for some time before

14  he decided to cooperate with the government.  So there's

15  plenty of opportunity for Mr. Johnson to enforce this rule

16  violation.

17          We heard testimony from Brandon Bannick that he was

18  ordered by somebody to kill Rick Rainey, but he didn't want to

19  do that because he didn't think it was right because

20  Rick Rainey was a -- a brother.  And so he disobeyed that

21  order.

22          And you know what happened to Mr. Bannick for

23  disobeying a direct order?  Nothing.  He wasn't assaulted.  He

24  wasn't hurt.  He was in the same jail, in the same pod.

25          Mr. Perkins owed money.  What happens, according to

1    the government, if you owe money to the AB?  You die.  That's

2    what they say.  That's what all of their witnesses say, the

3    same thing.

4            It's so strange.  You know, like, every one of these

5    witnesses says exactly the same thing.  You think that's a

6    coincidence?

7            Well, Mr. Perkins, who was celled in the same unit

8    over at the Fresno County Jail, wasn't assaulted.  Nothing

9    happened to him.

10           Mr. Rubin, Nutty, testified that he was ordered to

11   kill somebody when he was in prison, and he didn't do it.  And

12   as a result, the AB sponsors that he had, they withdrew their

13   sponsorship, you know, like Nike or something.  Like, We

14   don't -- you know, You're not ours anymore.

15           He wasn't assaulted.  He says, Well, it was only five

16   days before I locked up.

17           Well, that's -- five days is a lot of days for

18   somebody to -- to hurt you if they were, in fact, enforcing

19   these rules.

20           And again, you heard then from Timothy True that this

21   guy Fox was -- was told or asked to kill Brandon Lowrey.  And

22   he said, You know, I really don't want to do that.  I'm kind

23   of worried about the death penalty, so, like, it's just not

24   for me.  No, thank you.

25           And nothing happened to him, right?  Nothing.

1          According to True, Holmeyer said, Oh, you know what,

2     I'll do it.  That sounds like fun.

3          And nothing happened to this individual.  At least as

4     far as we know, no evidence was presented that he was ever

5     assaulted or killed.

6          Now, that takes me to what I really need to talk to

7     you about, which are the Lomita homicides that Mr. Johnson is

8     charged with.

9          And this is kind of a funky picture.  It's hard to

10    see.  But this is the backpack that was found -- or the fanny

11    pack that was on one of the victims which contained a cell

12    phone -- this comes from Detective Maciel -- credit cards,

13    most of them were in Roshanski's name, there was, I think, one

14    in the name of a woman by the name of Marina Lampert, a

15    firearm.  There were also in the car narcotics, this EDD

16    paperwork.

17         And I just want you to ask the question -- look, we

18    know that Allan Roshanski and Allan [sic] Magomedgadzhiev were

19    murdered.  We know that, right?  But why didn't they do

20    anything to investigate this crime?

21         She says, well, after I think a redirect by the

22    government, Do you usually investigate the victims?

23         Oh, no, we don't.

24         Well, they did, actually, for Ennis and Yagle.  You

25    recall they looked at their tattoos.  And I think they may

1   have done the same here.  But they did not contact any of the

2   people on the paperwork for the EDD, at least there was no

3   testimony to that.  They didn't contact the woman whose credit

4   card Allan had in his possession to see, hey, who might have

5   wanted these guys killed.  They didn't bother to preserve the

6   Ring video that showed the car pull up.  And just because it

7   didn't capture the actual shooting, I guess it wasn't

8   important enough for them to do.

9          They didn't follow up and interview witnesses that

10  knew Allan and Ruslan.  And they basically just sort of, like,

11  threw their hands up and said, Well, you know what, there's

12  these two dead Russians in the street of Lomita.  We don't

13  know what to do with this.

14         And then they turn it over to the ATF.

15         The ATF then decides based off of, I think, an

16  anonymous tip that they got, Well, this must be an AB crime,

17  somehow related to -- because of the EDD paperwork or

18  something.  Who knows?

19         And then they go from there, right?  And then

20  everything they do is just to collect evidence to confirm

21  their belief that this is an AB-ordered hit.

22         I very briefly want to talk to you about something

23  that came up during Mr. Eversole's testimony about an

24  interview in South Carolina when he was in custody.

25         And he said that he was interviewed by investigators

1    from Mr. Johnson's team.  And I just -- he sort of alluded to

2    the fact that he felt intimidated by this or somehow

3    threatened by this.  And I want you to ask yourselves, think

4    to yourselves for a second, What if I was charged with a

5    crime, okay?  I got pulled in by the federal government,

6    handed an indictment with my name on it, your name on it,

7    saying I am responsible for killing two people who I don't

8    know, who I've never met.  I have no idea why they were

9    killed, how they were killed, who killed them.  I know nothing

10   about this.  Right?  What do you do?  What do you do?

11          You're innocent of this crime, right?  And you don't

12   know who's accusing you.  There's a secret grand jury that was

13   convened, and somehow your name ends up in this paperwork.

14          Well, the first thing you do is plead not guilty.

15   The next thing you do, or maybe you can switch the order, is

16   you get a lawyer, you get an investigator, and you start

17   asking questions.  You start reaching out to people, people

18   that you know, maybe like Robert Eversole or other people

19   involved in the case and say, Hey, why am I in this

20   indictment?  Like, what do you know about this?  Do you know

21   anything?  Can you help me figure out, like, why I'm charged

22   with something I know nothing about?

23          I mean, there is nothing sinister, there's nothing

24   illegal, there's nothing unethical or strange about

25   interviewing potential witnesses.

1          So any suggestion from Mr. Eversole or the government

2     that that's -- that was a threat towards Mr. Eversole is

3     just -- is just false.  Mr. Johnson's investigator, nobody

4     knew at the time that he was a cooperating witness.  He told

5     you that.

6          He said it was -- it was a secret.  And so I just --

7     you know, I talked to them and I told them what I knew and --

8          Well, he must be a pretty darn good actor.  I mean,

9     he sat through that whole interview -- actually, two

10    interviews -- and never let on once that he knew anything

11    about the Lomita homicides, period.

12         The government has -- I just -- I can't wrap my head

13    around why they think these Lomita murders happened.  In

14    opening statement, the government said the message was clear,

15    if the AB says you owe them money and they have -- then they

16    have people who will come and collect.  And if you refuse to

17    pay up, you will be killed.

18         Okay.  But who said that Allan Roshanski owed anybody

19    money?  Who said that this was discussed with Roshanski, that

20    he was refusing -- I mean, where does this come from?

21         It's just like a made-up theory that fits with this

22    theory-driven investigation, right?

23         Lana Haley testified that -- that he was -- he was

24    disrespectful.  (As read):  Roshanski was disrespecting an AB

25    member.

1          She's asked, Well, how?

2          And she says, I don't know.  I don't know.

3          Well, when?

4          Nobody knows.

5          Why?

6          Uh, who knows.

7          And then we've got Robert Eversole who reiterates the

8   disrespect thing but then also says the whole point was to get

9   these EDD cards that Roshanski was supposedly going to bring

10  to this meeting 10 or 12 or 13 cards.  Where is the evidence

11  of any of that?

12          And there's a meeting, supposedly, according to

13  Brandon Bannick, before the killing where they approach the

14  car and have a conversation.  Don't you think there would have

15  been a discussion right then about, like, where's the

16  briefcase or where's this stuff?  But we don't know anything

17  about any of that.

18          Mr. Bannick testified, and he just said there was a

19  conversation, and then we drove to another location, and I

20  wasn't expecting this to happen.

21          So what's -- what's the motive for this crime?  So

22  that brings us to Brandon Bannick.  He was there, right?  So

23  presumably, he's the witness that testified in this case that

24  would know the most about why this happened and what happened

25  and the details of -- that, you know, lead up to the motel

1   room with -- with the other guys and then ultimately, you

2   know, going and doing this murder.

3          And he told you that, uh -- oh, and also keep in

4   mind, and I think I said this already, he was housed in the

5   Fresno County Jail, according to him, with Mr. Johnson for

6   eight months after they were arrested for these -- these

7   offenses.

8          He says that he -- that Kenny Johnson didn't know

9   anything about these homicides.  As far as he knew, Kenny knew

10  nothing.  That was his testimony.  Got it on the screen.

11         You probably remember but (as read):  Nobody told you

12  that Kenny wanted these homicides to happen, correct?

13         Correct.

14         Or that they were being done at his request or

15  direction, correct?

16         Correct.

17         Okay.  So that's the guy who knows the most about

18  what went down in Lomita, and he's saying, absolutely,

19  Kenny Johnson knew nothing about it.

20         And he tells it to these people.  That's a fact that

21  they cannot escape.  They cannot get away from that.

22         But what they have in their back pocket for you is

23  Robert Eversole, Rage, who is a cooperating witness.

24         And there's that instruction that Ms. Byrialsen

25  showed you.  I won't keep it up there because you have it in

3181

1    your packet.  But this guy is the definition of an

2    incentivized witness.

3        He was first arrested around '7 or '8, he says.  He

4    went to prison -- on direct he says he was 18.  On

5    cross-examination he said it was 20.  It doesn't matter.  It

6    was when he was just barely an adult.

7        He was raised -- I think he said in a Hells Angels

8    family, so he was aware of the Aryan Brotherhood and aware of

9    gangs and those kinds of things from a young age.

10       He had prior convictions for possession of stolen

11   property, resisting arrest, possession of a firearm, felony

12   drug possession, and then finally, a robbery with use of a

13   deadly weapon, which put him in prison, state prison, for

14   21 years and 8 months.  He told you exactly 21 years,

15   8 months.  That's something that's in his brain.

16       And Mr. Robert "Rage" Eversole was three years to the

17   gate, right?  He had three years left on this very long

18   sentence before he was going to be released to the streets.

19   And who comes along scoops him up?  The federal government,

20   because of things he was doing in jail on the phone.

21       They yank him out of his cell early in the morning --

22   or in the middle of the night, I can't remember, they bring

23   him to the Fresno County Jail, and they tell him he's being

24   arrested for federal drug trafficking and gun trafficking

25   charges.

1          Oh, my gosh, right?  So here I am, I'm about to get

2     out of prison, and now I'm looking at this huge amount of

3     time.  Oh, and guess what else?  Mr. Robert Eversole, your

4     wife is facing charges, your daughter is facing charges, your

5     daughter's baby daddy is facing charges, your stepdaughters

6     are facing charges all for things that you, my friend, asked

7     them to do.  So not only are you not getting out of the

8     prison, these people are all potentially going into prison.

9          So that's when the deals start to happen, right?  He

10    says first interview, You know what, this is not for me.  I

11    don't think I want to talk you guys.  You know, I'm like a --

12    James Field, you know.  I've got my stitches tattooed across

13    my mouth.  Well, that didn't last long, did it?

14         He was looking at 10 to life, he said, or a mandatory

15    5 to 40.  And then as you know -- so that was in late 2020

16    that he got brought in, was facing up to life in prison.  And

17    he's home now, ladies and gentlemen.  Mr. Eversole is out of

18    prison.

19         So you heard from Daniel Rubin, right, another

20    upstanding member of society.  And he told you that

21    Robert Eversole had been a good friend of his and that they --

22    and that Robert Eversole, when they were in prison together,

23    said, If you want to be a leader and if you want people to

24    listen to you, you have to be charismatic.  You need to learn

25    to be likeable.  Maybe, you know, Mr. Rubin was not as

3183

1  likeable in the past as he is now.

2       So that's his schtick, right?  That's Rubin's [sic]

3  thing.  That's what he does.  Like, he gets people to like

4  him.  He gets his family to hide ghost guns in the attic, and

5  gets his daughter to go out and sell an illegal firearm to a

6  confidential informant.  He gets his wife to do this EDD fraud

7  for him and his daughters to cash these fake checks or apply

8  for -- for assistance when they don't actually need it,

9  defraud the State of California.

10      And that's because they trusted him, right?  Because

11  he was a likable charismatic guy.  And frankly, he was

12  their -- their family member, their father figure, the

13  husband.

14      He was asked, you know, You found out they were all

15  facing these charges, and those were things that they did at

16  your behest?

17      And he says, Yes.

18      And that's when he decides, you know what, I need to

19  cooperate with the government because I've got to get not only

20  myself out of this huge problem that I have, I've got to get

21  them out of this huge problem.  His wife is divorcing him.

22  His family, you know, hates his guts.  And so he -- he starts

23  talking.

24      He says, Okay, you know what, get me deals for

25  everybody, and I'll -- and I'll tell you what you want to --

3184

1  want to know.

2          This is the same instruction that Ms. Byrialsen

3  showed you.  But I do -- I do want you to think specifically

4  when it came to Mr. Eversole's testimony about a couple of

5  these things.  And one of them is the -- they sort of go

6  together, the witness's memory and manner while testifying on

7  the stand.  Direct examination, question, answer, question

8  answer, question, answer.

9          My co-counsel Mr. Villa gets up on cross-examination,

10  question, Oh, gosh, you know what, I don't remember.

11          Well, what if I showed you the transcript where you

12  said that, would that help?

13          Well, maybe.  Uh, nope, it doesn't help.  I still

14  don't remember.

15          He can't remember anything.  All of the sudden this

16  guy is just -- his brain has been erased.  Does he have an

17  interest in the outcome of the case?  Absolutely.  I mean,

18  that's what his whole cooperation agreement was about, was to

19  get him out of trouble and his family out of trouble.  And

20  guess what?  Now he and his wife have a better relationship

21  than they've ever had before.  Lucky him.

22          And whether other evidence is contradicted by his --

23  this testimony, right?  Again, they could have corroborated

24  it.  They could have taken those two phones that the CDCR had

25  and done these Cellebrite extractions and seen if he was

3185

1    actually talking to Mr. Johnson around that day that the two

2    gentlemen were killed in Lomita.

3         But they didn't bother to do that.  Do you know why?

4    Because they didn't need to because they had Robert Eversole

5    to say Kenny Johnson told me these guys were going to get

6    smoked.

7         Conflicting testimony.  Ms. Byrialsen talked about

8    this a little bit, but the two things she didn't talk about

9    were that Mr. Eversole says that when he called

10   Brandon Bannick, he was on a speaker phone and there were like

11   eight people in the room and he was pissed about it.

12        And Mr. Bannick says that didn't happen.  It was not

13   on speakerphone, I didn't hear who he was talking to, period.

14        Mr. Eversole testified before the grand jury that at

15   some point Bam piped in and said "Hey, bro" from the

16   background.  That's how he knew it was on speakerphone.

17   Again, Brandon Bannick, denied that ever happened.

18        There's also two other people, according to

19   Brandon Bannick, that were in the room, including Matt O'Day,

20   who could have corroborated whether or not this phone call

21   happened, whether it was speakerphone or a call, any call.

22   Nah.  You know what?  We don't -- we don't need to bother

23   bringing him in.

24        This is something that Mr. Eversole fought tooth and

25   nail over.  And you'll recall, and Mr. Villa told you about

1     this in opening statement, that Mr. Eversole started -- he

2     started agreeing to cooperate early in 2021, a couple months

3     after he was arrested and found out his family were all in

4     big, big trouble.

5              And he:  Can I get a transcript?

6              He, first couple of interviews, says, No, I want

7     nothing to do with you.  He meets with them again, Ms. Stokman

8     and Agent Gonzalez, and talks to them about, you know, this

9     and that, different crimes, the Lomita homicides.

10             He meets with them again, talks to them about Lomita

11    homicides, different crimes, things that he knows about the

12    Aryan Brotherhood.  He meets with them again.

13             These are all recorded, right?  That's what we were

14    showing him, the transcripts of these recordings.  He says --

15    you know, talks to them about different crimes, uh, Lomita

16    homicides again in May 2021.  He's meets with them again.  He

17    talks to them about different things.

18             Let's see.  December '24.  I think this is a

19    duplicate.  He meets with them.

20             And then in May of '22, just before the government is

21    going to go to the grand jury, Ms. Stokman brings up with

22    Mr. Eversole after all of these -- all of these proffer

23    sessions and says:  "So we talked to you about this, we talked

24    to you, I think we were just trying to get specifics and kind

25    of figure out the players, but you gave us a lot of

3187

1   information on Frank.  It seems to us, kind of knowing how

2   Kenwood also operates, that this was probably a Frank and K

3   decision.

4         Was there any indication to you or did you have any

5   conversation with K about the Lomita murder to indicate that

6   he had also like -- you know, him and Frank were kind of

7   putting this directive out?

8         That comes from the government.  The government is

9   asking a guy who's been sitting through proffer sessions,

10   hours and hours and hours of proffer sessions, about all these

11   different things, including the Lomita homicides.  Gosh, you

12   know what?  This sounds like maybe it's a Frank and Kenny

13   thing.  What do you think about that?

14         And then he says, Oh, yeah, you're right, you're

15   right.  I did get a call.  Thanks for reminding me.  I did get

16   a call from Kenny that the guy needed to be taken care of.

17         That's it.  That's the evidence against Kenny Johnson

18   that he ordered the Lomita homicide.  Not from Brandon Bannick

19   who was there at the Lomita homicide, but from this guy who

20   had everything to lose, his life, his wife, his kids.

21         And they gave him an out.  And he had everything he

22   wanted.  And guess what?  So did they.  Because Kenny Johnson

23   got stuck in this indictment and he's sitting over there and

24   now he's asking you to consider the evidence, the receipts.

25   He's asking you to find him not guilty.

3188

1          Robert Eversole is a career criminal.  He comes

2     across as maybe a likable guy.  He's been manipulating people

3     and using people his entire life, including his own family.

4     And if you think for a second that he's not going to do it to

5     them, that he's not going to do it to you, think again.

6          In order to convict Kenny Johnson of these Lomita

7     homicides, these Lowrey homicides, you have to believe

8     Robert Eversole beyond a reasonable doubt.  You have to

9     believe beyond a reasonable doubt that it didn't occur to him

10    to mention Kenny Johnson's involvement in Lomita until he was

11    asked by Ms. Stokman years after his arrest.

12         That is not proof beyond a reasonable doubt.  That is

13    not what our system of justice demands.  It demands so much

14    more.  It demands receipts.  It demands corroboration.  It

15    demands witnesses that tell you the truth.

16         Mr. Johnson is not guilty.  And I thank you for your

17    time.

18         THE COURT:  Okay.  Ladies and gentlemen, thank you

19    for your attention so far.  We're going to go ahead and take

20    another break and a little bit longer so you can grab a snack.

21    And we will return at twelve o'clock.  Thank you very much.

22      (Jury exits the courtroom at 11:40 a.m.)

23         THE COURT:  All right.  Anything for the record at

24    this time?

25         MR. REED:  No, Your Honor.

1          MS. LUEM:  No.

2          MS. STOKMAN:  No.

3          MS. FISHER-BYRIALSEN:  No.

4          THE COURT:  All right.  We'll take a break.  Thank

5     you.

6      (Recess held.)

7          THE COURT:  All right.  Everyone ready?  Let's go

8     ahead and call in the jury.

9      (Jury enters the courtroom at 12:04 p.m.)

10         THE COURT:  All right.  We have all of our jury

11    members back.

12         Mr. Reed, you may begin.

13         MR. REED:  Thank you, Your Honor.

14         Good afternoon.  I don't think I've spoken to you-all

15    directly in probably about four weeks now, but you all know

16    that I represent John Stinson.  Usually when I get up, those

17    are the questions that I ask.

18         This has been a quite a day for me, or the last

19    couple days.  So I didn't know -- I'm not from Fresno so I

20    didn't know anything about this cattlemen thing you guys do.

21    So my regular hotel room that I'd normally go to, I didn't get

22    to stay there.

23         So I'm on another side of Fresno that I didn't know

24    about, and I had the pleasure of a mosquito in my room all

25    night.  So I had that little fun.

3190

1          And then I came to the courtroom today.  I didn't

2     know it was going to freeze me all morning.  So I've been

3     cold.  And now I find that this machine doesn't work with my

4     Apple stuff.

5          So unfortunately, you don't get to watch another

6     PowerPoint presentation.  I'm going to do this old style.  I'm

7     just going to talk to you the way lawyers used to do.  And

8     I'll bring up some things on what a chart's supposed to say

9     and what I think the evidence says.

10          But of course, as the Court told you, that's not

11     evidence, what I say it says.  It's not evidence of what

12     Ms. Stokman says it says.  And in fact, we don't like to say

13     it, but the reality is, if you really want to know what

14     something says, you come back out here and ask the Court to

15     ask the court reporter to read it back to you and you can

16     decide what it says, listen to it.  That's how it's done.

17          This book right here, and there's another book that

18     goes with it, but this is the book on how to prove a criminal

19     case in federal court.  There's other book, I don't remember

20     what color it is, but it's called the Evidence Code, and

21     that's how things come in in federal court.

22          As I sat here listening to the opening statement of

23     the government -- and, you know, lawyers pick sides when they

24     decide who they're going to work for.  If you're a criminal

25     defense attorney, for the most part, you don't prove things.

1   There are some hearings where you do, but for the most part,

2   defense attorneys don't prove anything.

3          That's not my job.  There is no beyond a reasonable

4   doubt Kenneth Reed standard that I have to deal with.

5          So I sat through the same trial that you did, not

6   hearing John Stinson's name wondering why John Stinson was

7   here.  Well, I know why he's here, but you may have wondered

8   that.  And I'm listening this morning and I'm hearing, Well,

9   of course John Stinson did this, of course John Stinson did

10  that, of course John Stinson knew what was going on.

11         And I caught -- saw myself thinking, well, geez,

12  where was I when this was all happening?  Because I didn't

13  hear those things.  But that's closing argument.  Lawyers get

14  to do that.

15         And if you might remember, if you really were

16  listening hard, on occasion I crossed over into argument when

17  I would ask questions and the Court would sustain the

18  objection.  But now I get to argue and nobody sustains the

19  objection.  Now I can tell you what's happened.

20         You will not ever hear the word presumption in this

21  case as applied to my client or any of the other defendants.

22  Because the only presumption in this entire book, in the

23  entire instructions that the Court read to you this morning,

24  in the entire instructions that she'll read to you in the

25  afternoon, is presumption of innocence.  There is no other

1    presumption.  Yet, I think sitting where you're sitting -- let

2    me back up a second.

3         I didn't talk to you-all directly and I'm not even

4    sure I spoke to you individually about it, but I did mention

5    the concept that being a juror in a criminal case is advanced

6    citizenship.  I think you might remember that.  Now I can tell

7    you why.

8         Because there's a -- there's a thing that kind of

9    makes you want to go, AB, bad guys, AB, murderer guys, AB,

10   guys tried for murder crimes, they must be guilty.  Why should

11   I spend time thinking about it?

12        In fact, there were people sitting in the chairs

13   you're sitting in right now who actually said that, I can't be

14   fair because I'm black.  There's a woman that sat -- I'm not

15   going to point at you, ma'am, but there was a woman that sat

16   in your chair that said exactly that, I can't be fair because

17   I'm black.

18        And to her credit, maybe not for the reasons she

19   thought, but that was a good thing, because she let us know

20   she can't do that.  You-all did just the opposite.  As you

21   were being picked, as we were -- as jurors were being excused,

22   as we were getting down to the last eight or nine, all of you

23   said, That's not me.  I can look at the evidence, I can make

24   the government prove their case beyond a reasonable doubt.

25        And in my case, because I only represent

1    John Stinson, I only care about John Stinson.  That's just the

2    way lawyers are.  That's why each defendant gets his own

3    attorney.

4            My job is to defend.  And I'm not going to go through

5    the history of that, but -- the history of how lawyers get to

6    do what lawyers do, but my job is to defend John Stinson on

7    the two things that he's basically being accused of.

8            That long jury instruction the Court gave you and the

9    prosecutor talked about where she went through the one through

10   four things, put differently, the government must prove that

11   John Stinson, again, my client, knowingly and intentionally

12   agreed to facilitate a scheme which included the operation of

13   management of an enterprise through a pattern of racketeering

14   acts.

15           That's a lot of words, got a lot of big words in it.

16   And I can tell you in lawyer world, there's a whole lot of

17   cases that explain what that really means.  But long and short

18   of it, it's in English, so you take that and that's the

19   template that you chase this case with.

20           Now, I'll give you two things that I'm stuck with and

21   cannot change.  There are two recordings that if you have

22   time, and if you're not positive, I'd ask you to have the

23   Court read them back -- or excuse me, have them where you can

24   hear them again.

25           One was a conversation where Mr. Stinson was on the

3194

1    phone -- or actually, they're both on the phone.  One is a

2    conversation of a bunch of old guys talking old guy talk.  Not

3    one time does John Stinson say, I want you to kill somebody.

4    Not one time does John Stinson say, I want you to defraud this

5    or defraud that.

6         He's asking the things that I guess a bunch of guys

7    would do when old guys have been living in prison for a fair

8    part of their life and they start talking about who's doing

9    what.  I would consider that gossip.  And unless somebody

10   explains it to you, but he's speaking English, you can

11   understand what his words are.

12        Is that dealing with the enterprise?  That's the

13   question to be decided.  I will live with your decision

14   because you promised that you would apply the facts to the law

15   in this case and you would do so impartially.

16        Even though you may take the position, that probably

17   everyone in this room holds is, that gangs are bad, the

18   Aryan Brotherhood is a gang, and I may not want them sitting

19   at my dinner table.

20        But that's not what this is about.  This isn't about

21   them sitting at your dinner table.  This is accusing them of a

22   crime -- and sentencing is not your world, but accusing them

23   of a crime.  And's that the key.  And that's always beyond a

24   reasonable doubt.  It doesn't care who the defendant is.

25        In theory, I don't know -- we don't -- I don't even

1  know if we have Lady Justice in this -- I'm not from here.  So

2  maybe somewhere around here there's a statute of Lady Justice.

3  And if you see her, you know she's always blind.  And she's

4  got a couple different things in her hands, but we aren't

5  worried about that part.  But the blind part is the key.  Who

6  the defendant is is not the test.

7         I was thinking about the witnesses and as they come

8  up, I write down what I think they said.  And sometimes I

9  guess I write down something different than what the

10 government says.  If I'm wrong, she'd give you the test, ask

11 the Court's permission, court reporter will come read it back

12 to you.

13        Troy Clowers, I listened to what little Troy had to

14 say.  In my presentation, I got a picture of him and

15 everything, but we don't get to do that.  But one of the

16 things I did notice -- and I'm not going to change, I still

17 like doing PowerPoint presentations, but in this particular

18 courtroom when it's done by a PowerPoint, you-all look down at

19 the screen so you're not looking at the lawyer when they are

20 talking to you.  Makes it feel as though we are not talking to

21 each other or we're not -- I'm not communicating.  So maybe

22 this may be the better way.  I can see you looking at me as

23 I'm telling you.

24        He said, Who's Pops?

25        We were in the first or second -- it was the second

1    witness out of the box.  He said, Stinson doesn't do -- and I
2    asked the Court's permission to make the whole statement
3    because I didn't know if we can say that word in here.  She
4    says it's okay.

5         Stinson doesn't do shit like that, he said that.

6         I think "shit like that" is the thing he's here for,
7    which he doesn't do, which Clowers said he doesn't do.

8         Then, later he says, Those older dudes -- I'm
9    assuming John Stinson is an older dude -- Those older dudes,
10   they are way out of the way.

11        Now, take that Witness Number 2, and add in, when we
12   get all the way back to Witness Number 15, we know
13   John Stinson is at Solano Prison and he's not at the prison
14   where all this other crap is going on.

15        He's one of the old dudes that's way out of the way.
16   So put that in your regular life.  I don't know where any of
17   you live, but let's say for the sake of argument, everything
18   that happened in this case happened in this room or happened
19   in this part of Fresno County.  And one of you lives in
20   Pixley -- maybe because I'm old enough to know, I think
21   Pixley, I think of Bug Tussle.  I think of Bug Tussle, I think
22   of Petticoat Junction.  I don't know if that's where Pixley
23   is, but I do like the fact that there's a town that goes from
24   something I remember as a kid.

25        But let's say you live in Pixley, if everything

1   happened right here in Fresno and you live in Pixley, in order

2   for somebody to convince you or convince your friend or to

3   convince the guy down the street that you, who lives in Pixley

4   got involved in something that happens in Fresno, I think you

5   would have to cover that distance block, right?

6         How did he do that?  He lives in Pixley.  The answer

7   is going to be, as we get farther down, is the telephone.  And

8   that's going to be a whole other problem.  But we're not there

9   yet.  But we do know, kind of what like what Troy said, Those

10  old dudes, they are out of the way.

11        Now, John Stinson is one of those old dudes and he's

12  in Solano.  There was not one person that came into this

13  courtroom who said, I was running the yard in Solano for John

14  Stinson.  John Stinson is in Solano.

15        I don't know nothing about the AB, but listening to

16  this case, it sounds like to me that the guy who's in that

17  prison, he may have other guys doing white guy stuff out on

18  the yard.

19        Seems like to me if you are in that prison and some

20  other guy that's in the same club that you're in, same group,

21  is not in your prison, and he wants that guy to do stuff for

22  him, that might be a problem.  Just saying.  Seems like one of

23  the things you would have to overcome to get beyond the

24  reasonable doubt part.  If you're trying to take the position

25  that something must have happened, if Johnson Stinson must

3198

1    have done something.

2          Remember, this book does not say "must have."  This

3    book does not say "presume."  This books does not say "of

4    course John Stinson was involved."

5          The funny thing is, the guy with the least amount of

6    evidence in this case, the guy that was talked about the

7    least, is on every slide.  John Stinson's picture, every

8    slide, why is that?  Everybody does this.  You lead with your

9    weakness and try to hide it by adding things that have nothing

10   to do with the person you're talking about.

11         I get it.  This is an adversarial situation.  I'm not

12   blaming them.  I'm not calling them unethical.  That's just

13   the way life is.  That's the way the law is.  That's the way

14   lawyers are.  You get past that.  Make them prove it beyond a

15   reasonable doubt.

16         I can even get back to that mosquito thing now.  It

17   just dawned on me but give me a minute.

18         Kaylen Chandler admits that she's committed crimes

19   most of her life, one of my co-counsel already talked about

20   that, only going to be here for a second, denied that she

21   committed crimes for the Aryan Brotherhood, never mentioned

22   John Stinson in her testimony.

23         It might have behooved her to say, I did it for

24   John Stinson because that seems to be coin of the realm around

25   here, blame John Stinson and something is going to work for

1   you.  Everybody knows John Stinson.  John Stinson did it.
2   John Stinson, I talked to John Stinson on the phone.
3   John Stinson ordered -- he gave somebody to give some money to
4   give to me to give me to kill somebody else.  John Stinson,
5   John Stinson, John Stinson.  Proof.
6           Problem is, who's saying it.  If one of you got up
7   and said that on the witness stand from wherever you live in
8   this county, John Stinson, that's one thing, because you don't
9   have any reason at all to lie.  You don't have a history of
10  lying.  You got to understand something, the obvious thing
11  that nobody seems to get in this situation is, if you've been
12  committing crimes all your life, what is the other thing
13  you've been doing all your life?
14          All of you had grandmothers.  All of you had moms.
15  What is the other thing that goes with committing crimes all
16  of your life?  Lying.
17          And the fact that you are a dope addict, now you are
18  definitely lying.  There's not a heroin addict in the world
19  that doesn't lie.  And not just lie, they are professionals at
20  it.  One of the witnesses against John Stinson, Mr. Rapinoe,
21  is a heroin addict or was at one time, and he admits that he
22  lies all the time.
23          We probably need something to bridge John Stinson and
24  Mr. Rapinoe to get past Mr. Rapinoe's lies.
25          Hold that mark.  That's just logic.  Hold that mark.

3200

1   I'm going to get to that.

2         James Field, dude named "Suspect."  Testified on

3   January 28, 2025.  If I'm wrong about it, ask the court

4   reporter.  He does not know John Stinson.  He has never spoken

5   to John Stinson.  And the one honest thing this dude said is,

6   The only thing I know about John Stinson is what somebody else

7   told me.  At least he's honest about it.

8         Eversole did not work for John Stinson.  Oh, it

9   sounds as though, probably was in a different room, and he

10  must have snuck that in maybe when I was talking to John

11  Stinson, but he did not work for John Stinson, has never

12  personally met John Stinson, never been in the same prison as

13  John Stinson, has never been on the same yard as John Stinson.

14  Hmm.  I don't care about all of the other lies he may have

15  told, those things he said to you in a courtroom.

16        Brandon Bannick.  I don't remember this Rick Rainey

17  because I wasn't a part -- that wasn't one of the things I

18  looked at, but he did say he didn't know what was going to

19  happen ahead of time.  He also said, Do not know John Stinson.

20  He knows John Stinson because his mentor, Matt Hall, told him

21  about John Stinson.

22        Can you convict him based upon what his friend

23  Matt Hall, who's now dead, what Matt Hall told him about

24  John Stinson?  Can I punish any of you because of something

25  your friend told me about you, and your friend's not here to

3201

1    be cross-examined?  Does that sound fair to you?  Does that

2    sound like that's the makings of beyond a reasonable doubt?

3          When you want to know how you deal with the evidence,

4    of course you listen to the Court's instructions, but it's

5    pretty much all common sense, and if you do the thing that we

6    do, in our world, which is make the defendants "the Other,"

7    make the enemy "the Other," it's always okay.  Because they

8    are "the Other."  And we're afraid of them.

9          So we don't apply the same rules we would to

10   ourselves.  That's how it becomes okay.  That's why it's

11   advanced citizenship.  That's why you can't do it.

12         That's not my fault.  That's just the rule.  That's

13   not the government's fault, because they knew going in that

14   those are the rules and you've got to come correct every time

15   you come to federal courthouse.  Every time.

16         I had this nice chart of all the prisons in

17   California.  Anyway, Solano is in a different place than these

18   other prisons where everything else happened.  I think

19   somebody even said, I wasn't in Solano.

20         Now Danielle Ponce de Leon, she told us a whole lot

21   of stuff about cell phones.  One of the things that she told,

22   because I tend to -- I'm one of those people that I have to

23   theme things out and then I'll add the facts to it.  But cell

24   phones have a footprint, that was my statement to her.  She

25   finally agreed that was true.  Date, time and location, that's

1   what cell phones give you.  Sometimes content.

2         Going to get to another witness, which I don't want

3   to blow it for you, but I'm going to add it to you right now,

4   that guy -- darn it.  His name was Ben Mendoza.  Ben Mendoza

5   said, If I want to know you, if I want to know who you are --

6   what did he say, ladies and gentlemen? -- give me your phone.

7   Remember that?

8         Now, Ben Mendoza wasn't Kenneth Reed's witness.  In

9   fact, you know Kenneth Reed did not call a witness.

10  Kenneth Reed also did not make an opening statement.  Anyway,

11  the government -- or my position is, you've got to prove your

12  case by yourself.

13        Ben Mendoza, the government's witness, expert witness

14  in the Correctional Intelligence Task Force, which is a joint

15  partnership between the federal government, FBI; Federal

16  Bureau of Prisons, BOP; and the CDCR.  These are the people

17  here -- these are the people here making this case.

18        Their witness told you that if you want to know the

19  person, give him their cell phone and they are going to do --

20  they are going to do their Cellebrite stuff and check it all

21  out.

22        Now, I want you to hold that thought for a second,

23  because I'm going to put that together with Mr. Rapinoe, but I

24  got to get down to Mr. Rubin first, because Mr. Rubin also

25  testified about John Stinson.  Mr. Rubin says that

1   John Stinson ordered his men to kill somebody.

2           And at the time he did this, it sounds as though it

3   was the guy they call "Misfit" who later on become a brother,

4   everybody starts talking about the Aryan Brotherhood rules,

5   about it takes three brothers to order a brother to be killed.

6   Mr. Rubin says he's not a brother, but he says John Stinson

7   called him on the phone or somehow they talked on the phone,

8   he didn't say if it was his phone or how it played out, and

9   John Stinson told him he needed to kill this Misfit guy who

10  was a brother.  And you'll add the Yandell thing in, too,

11  because he talked about both of those.

12          Here's the problem with lies.  My father taught me

13  this a long time ago when I used to get caught and get in

14  trouble with him.  He said, son -- or Kenny -- you can tell a

15  lie, but a lie, it can't walk.  Lies are single dimensional.

16  The moment you start walking around a lie, the moment you kind

17  of look at it a little bit, you realize there's some problems

18  with it.

19          In this particular case, with those two incidents,

20  which are the whole reason John Stinson is here by the way --

21  well, the EDD, but I'll get to that -- is this guy says that

22  he talked to John Stinson on the telephone and that

23  John Stinson told him that he needed to kill somebody.

24          Well, for now, forget the AB rule thing because that

25  also doesn't make sense.  John Stinson is not in the prison

1    where this guy is.  But John Stinson has been around for so

2    long that he's so reckless and so stupid that he would call up

3    a guy who is not a brother and tell him to go kill a brother.

4         Now, I don't know much about that world except what I

5    read, but my gut would be if a non-brother killed a brother,

6    then the other brothers might be mad about that unless they

7    knew they were supposed to kill him.  But we don't have any

8    evidence of that.  We just have some yard bird saying,

9    John Stinson ordered me to kill somebody.

10        Now, now let's get to the key part where Ben Mendoza

11   and the other phone lady got together and created a bit of a

12   hurdle for this illogical argument that somehow is supposed to

13   bridge the beyond a reasonable doubt as it applies to

14   John Stinson.

15        When Mr. Rapinoe got arrested, what did he tell you?

16   They got my phones, they got my computers.  What did

17   Ben Mendoza tell you what they do with phones and computers?

18   Take those two things, those two realities and truisms, and

19   then take this book, which tells you, add the judge's jury

20   instructions to it, what the government, what the

21   United States of America has to do in order to convince you to

22   vote guilty for John Stinson or against John Stinson.  You

23   have to prove the allegation beyond a reasonable doubt.

24        You can't believe Mr. Rubin by himself.  Even if you

25   want to believe Mr. Rubin by himself, what is the thing that

1  Ben Mendoza tells you about what they got from Mr. Rubin?  His

2  phones.  And if you want to know what really happened, you've

3  got to look at his phones.  Where?  I don't see a thing about

4  his phones.  I didn't hear any testimony about his phones.  If

5  they did, I would have cross-examined it.  And I didn't fall

6  asleep in this courtroom.

7          Now, before you get there, before you get there, I'm

8  going to stop you from going where I think you might be going

9  because I've been down this road with jurors before.

10          I had a case in my district, arguing a case in front

11  of -- the prosecutor and I argued, argued, argued, the jury

12  was hung.  Didn't matter what the split was, but they were

13  hung.  They didn't come back what a verdict.

14          I talked to the jurors afterwards.  I remember her

15  because I can see her like she was in my face right yesterday.

16  She says, Well, you didn't prove your case, Mr. Reed.  In

17  fact, neither of you proved your case.  That's why we couldn't

18  come up with a guilty or not guilty.

19          Well, you don't have to believe me because the Judge

20  will tell you, Mr. Reed does not have a burden.  Mr. Reed

21  doesn't have to prove anything.  There is nothing in this book

22  as to this issue that says Mr. Reed has to prove anything to

23  you.

24          My job is to alert you to the things that are not

25  there.  I don't have to prove anything except to lay up the

3206

1    information that needs to be put together.

2            And in this particular case, I didn't seize the

3    phones, I don't have the information.  I can speculate as to

4    why that information is not here, but that would just be me

5    arguing.  Oh, wait a minute, this is closing, I'm allowed to

6    do that.  I can argue that.

7            If you had the information that got you over the

8    bridge, I suspect that information would have come in from

9    somebody over there testifying.

10            We have this phone, we can tell that this -- one of

11    the five phones that we seized from this guy, we analyzed it,

12    somebody comes and explains it, some nice big chart with a pie

13    chart in colors and all those things like the witness did, and

14    show it.  Oh, yeah.  And then one of those calls sent from the

15    Solano area, they recovered where that phone is where

16    Mr. Stinson happened to be staying.  And that's consistent

17    with Mr. Rubin's testimony, ladies and gentlemen.

18            Now, I've got to be honest.  Mr. Reed is going to

19    cross-examine no matter what, but I didn't hear any of that.

20    Did you?  No.

21            Could it be that people lie?  Could it be that when

22    you have the information to corroborate your witness, or maybe

23    don't, or maybe you just took the phones and never did --

24    never looked at it at all, those are all problems for you if

25    you're on the government's side of the table.  But that's

3207

1 | something that can be considered.  I'm not making this up.
2 | You know both of those men had their phones taken.
3 | And funny thing is, now that we're talking,
4 | Mr. Rapinoe's situation, I'll give you an example of why
5 | that's the lie, because Mr. Rapinoe is a drug dealer.  Not
6 | just because he's a drug dealer, but that's part of it.
7 | Mr. Rapinoe and Mr. Ghost, they did things together.  And
8 | Mr. Rapinoe testified that the things he did with Mr. Ghost
9 | had nothing to do with the AB.
10 | Remember that?  If you don't, ask the court reporter.
11 | Because it's in there.
12 | Number two, Mr. Rapinoe is now getting hit on by some
13 | dude named Trip who's an AB guy who's out on the street in
14 | San Diego, which is where he was at that time.
15 | What does Rapinoe -- the first thing he says to this
16 | guy?  Hey, I'm kicking up to John Stinson.  Take two pieces of
17 | testimony.  One, what me and Ghost are doing has nothing to do
18 | with the AB.  John Stinson's AB.
19 | Trip says, I don't care, I want my money.  He says,
20 | No, I'm already kicking up to John Stinson.  So he's lying to
21 | this Trip guy who's worried about taking his money from this
22 | ill-gotten drug money that -- what is it, selling cocaine,
23 | heroin -- no, wait a minute, methamphetamine, fentanyl and
24 | heroin, and ghost guns.  And not the -- whatever he brings
25 | back from Mexico.  All federal crimes.  That's a different

1    question.

2           I didn't testify to that.  That came from him.  And

3    he testified to that information before a grand jury.  So it

4    means at the time he told that lie, if it was a lie, he was

5    under oath.  And when he comes in and explains this whole

6    story to you, the problem with a lie, ladies and gentlemen, as

7    my daddy told me, it -- you can't walk it around so you can't

8    put two pieces together because lies don't fit.

9           Was he lying to Trip, was he lying to you, or was he

10   lying to that grand jury back there in San Diego a couple

11   years ago?

12          Those are the two key John Stinson witnesses, and one

13   guy is coming in telling you, John Stinson ordered me to kill

14   this guy named Misfit.  You would think just a little bit that

15   maybe there'd be one or two witnessed that are going to

16   explain why John Stinson needs to kill Misfit.

17          If you listen to the Misfit calls, one side of those

18   calls, I need to talk to John.  I get the fact that John

19   Stinson and Misfit seem to talk to each other on the phone.

20   But when you want the content of that conversation, you need

21   more than, I need to get at John.

22          Because this guy now says Misfit and John hate each

23   other and John wants to kill him.  All from the same witness

24   who got his phones taken.  And the moment he had to deal with

25   that issue on cross-examination, it became bobbing and weaving

1 | and never said anything straight.

2 |         And then he does to me -- granted, maybe it didn't

3 | mean that way to you or maybe you didn't see it the way I saw

4 | it.  Maybe it's just personal to me.  But when you're on the

5 | witness stand, I have no further questions, ladies and

6 | gentlemen -- or Your Honor, and this boy under his voice

7 | mumbles, Thank God.

8 |         And I asked him, What did you say?

9 |         Nothing.  Nothing.  I didn't say anything.

10 |         That's who he is.  That's who he is.  Not -- forget

11 | the disrespectful, that has nothing do with it.  It has to do

12 | with the kind of sneaky -- oh, I can't use that word -- it has

13 | to do with the kind of person that this guy is.  You get to

14 | look at all of that because you judge the facts.

15 |         It is advanced citizenship to be a juror.  But you do

16 | something that no one else gets to do in a jury trial.  No

17 | one, not even the judge -- well, not on the key parts -- you

18 | judge the facts.  And you are equipped to do that.

19 |         The law is judged by the Court.  The legal issues

20 | that we handle or they did handle that you guys had to stay in

21 | the back and wonder why we're waiting, those are all Judge

22 | issues, the lawyers talking back and forth stuff.  But fact

23 | stuff, you own that.  That's why the courtroom is so special.

24 |         And nowadays, or this time right now, we can't ever

25 | let that go away.  The government is just a party in a

1    criminal case.  They own nothing except they have a burden.

2    Never, never, never let them have to go below that burden.

3    That's your job.  That's why it's advanced citizenship.

4         And that's why it's so hard.  Because you ain't gotta

5    like the AB.  You don't have any reason to like them.  You

6    need to make your decision in spite of how you may feel about

7    them.

8         All right.  So I'm circling back to the mosquito.

9    I've figured out a way to make this work.

10        Mr. Reed, we've been listening to testimony for five

11   weeks, so many witnesses, so many things, it's just too much.

12   I'm just one person.  I'm just -- I'm just one guy.  I take

13   care of my mom.  I drive a truck.  I'm a school teacher.  I'm

14   not getting paid to be here.  This is hard for me.  This isn't

15   fun.  I just want to let it go.  It's too much.

16        You, the 12 of you that make the decision, forever

17   you will be the jury of the United States v. Stinson, Johnson,

18   and Clement.  Okay?  If you think that you are too small to

19   make a difference, I think you try spending a night in a

20   closed room with a mosquito.  A mosquito doesn't weigh next to

21   nothing and he annoyed me the whole night, haunted me the

22   whole night.

23        That's -- is that an allegory?  I'm not sure of the

24   word.

25        No matter how insignificant you might feel, your

1    individual action can still make a difference.  I want you --

2    or I'm asking you -- I don't even remember what the federal

3    jury instruction says.  I'd probably have to look it up

4    tonight, but I think that the Court demands, asks for, or one

5    of the two, asks for your individual opinion.

6          That means you don't have to agree with the other 11.

7    That's just life.  I'm asking you, the 12 of you that stay --

8    and I just don't remember where the split is, I'm sorry, it's

9    been a while, but -- right there where you are?  Okay.

10          The 12 of you that stay, I'm asking you for your

11    individual vote and opinion on the facts that are before you.

12    That's all any of us can ask for.  And it doesn't make a

13    difference if John Stinson is John Stinson, the

14    Aryan Brotherhood member, or if Kenneth Reed someday

15    represents somebody who, I don't know -- I'm trying to think

16    of something that's -- or a nun.  But why would a nun have a

17    criminal case?  I don't know.  I have to think of something

18    really -- I haven't been able to figure one of those out

19    because I haven't done -- represented any nuns.

20          But somebody else is charged, a beautiful little

21    blonde-haired, blue-eyed kid who's charged with some serious

22    crime that clearly he didn't do and everybody wants to convict

23    him because he's a blonde-haired blue-eyed kid.  That's

24    Stinson, John Stinson in that kid.  As far as you're

25    concerned, it shouldn't be any difference because the evidence

3212

1   is the evidence.

2          I don't know how the government gets past those

3   things when it comes to John Stinson.  And I'm asking you

4   individually, because I can't talk to you as a -- I can talk

5   to you as a group, but I'm asking you to make that call.  Go

6   through any evidence.

7          And I'm going to assume at the end, no matter how you

8   rule or how you decide, that you went through that hard part,

9   the part that makes it advanced citizenship.

10         Oh, it's five minutes past where I wanted to go.

11  Anyway, thank you very much for your time.

12         THE COURT:  All right.  Thank you, Mr. Reed.

13         Ms. Stokman.

14         MS. STOKMAN:  You're almost there, this is it.

15         I'm not going to address everything that defense

16  counsel brought to your attention because I'm going to rely on

17  your memory of what you heard and what you saw during this

18  trial and your ability to talk that out with each other.

19         But I am going to talk about some things because I

20  think that these are important things for you to remember.

21         I do want to say that everything you just heard, a

22  lot of that is taking things out of context, and I think

23  that's been the theme throughout this trial.  The witnesses

24  have been asked questions and they're asking questions that

25  have been taken out of context from what they actually said.

3213

1       Today you're here and you're being shown transcripts.

2   Those aren't in evidence.  Again, it's your memory, your

3   notes.  But again, those are being taken out of context.

4       So let's talk a little bit about what you need to go

5   back there to make this decision.  And I want to remind you of

6   this.

7       Timothy True told you that Kenneth Johnson said to

8   him that whites are to be used as tools for the benefit of

9   AB members.  And that is what you have heard throughout this

10  case.

11      Defense wants you to believe that because of what

12  witnesses who sat in front of you have done in their past,

13  that they are not credible, that what they did means that they

14  can't change their ways and that you shouldn't believe them.

15      But that's not what the evidence showed you, and

16  that's not what the witnesses showed you.

17      You have that instruction about judging credibility.

18  It is using your common sense.  The Judge gives you things

19  that you can look at to judge someone's credibility, but you

20  know to do that.  We judge people's credibility every day.

21      And you were able to sit here and watch witnesses

22  talk to you about things they've done in their past, things

23  that they've been charged with, things that they haven't been

24  charged with, and tell you about those, but also about the

25  reasons why they're sitting in front of you.  And you can use

3214

1 | all of that.

2 | Remember their demeanor, remember the way they

3 | answered questions.  And if those questions were ones that

4 | they actually weren't really understanding or if they were

5 | clear, all of these things that you already know, you can use

6 | to judge credibility.  You have those tools.

7 | The standard for judging credibility is not whether

8 | or not you would give them the key to your house.  That is not

9 | what you need to do.  You don't have to like these people.

10 | You just have to evaluate what they told you and everything

11 | surrounding that and come to your conclusion about whether or

12 | not you believe what they said to you.

13 | They come from different backgrounds, different

14 | perspectives, different times and experiences, and they told

15 | you what they experienced through those perspectives.  Every

16 | one of them told you that they were telling you what they had

17 | heard, what they had seen, what they had interacted, and their

18 | experience with the AB, which doesn't match up with each

19 | other, because they are all individual people who are in

20 | different positions and in different places to form those

21 | opinions for themselves.

22 | They told you that they were up here telling you

23 | their truth, not what the government wanted them to say, not

24 | what they think you want to hear in order to find these

25 | defendants guilty, but they told you their truth.  And I

1    submit to you, you have enough to believe what they told you.

2         They, those witnesses that got on the stand and told

3    you about their interactions with the AB, they were also tools

4    used by AB members like the defendants.  They were used as

5    tools to make money.  They were used as tools for violence.

6         And of course the people that the defendants were

7    using as tools had criminal histories.  That's exactly the

8    type of people they need, criminals who are good at being

9    criminals, because that's who can make money for them, and

10   those are the people willing to run into those fires that they

11   are telling them to go into, like James Field who told you

12   that he wanted to be a member so badly that he was going to

13   kill his friend, this person he became friends with, because

14   that was the order.  Tools.

15        But of course they have the histories that they have,

16   because otherwise, they wouldn't be chosen by these defendants

17   to do what they did.  And they were used as tools because if

18   they didn't follow orders, violence could be used against

19   them.  Again, that's a nonnegotiable obeyance of orders.

20        And I know Ms. Luem talked to you about some orders

21   that you heard that are seemingly not met with violence.  But

22   you heard who paid the price for the Rick Rainey incident.  It

23   was James Yagle and Ronnie Ennis.  You heard why Spencer Fox

24   wasn't pushed when he didn't want to commit the Lowery murder,

25   because they were afraid.  These defendants here, Johnson and

3216

1    Clement, were afraid that if they pushed him too hard, he

2    would get scared and he'd go tell people in the prison, and

3    they'd be in trouble.  He'd tell on them.

4         And that is similar to what you heard in that call

5    that I mentioned to you before with John Stinson and the other

6    AB brothers where they are trying to figure out if

7    Bobby Stockton is a snitch.

8         Andrew Collins pipes up and says, Hey, I just want to

9    let you guys know, I understand, we want to talk about this

10   guy.  He might be a snitch.  But let me remind you, he's doing

11   a lot of work for us.

12        So I submit to you that, yes, there are some times

13   when the rules are not consistent with the violence, but think

14   about whether those are occurring with people who have some

15   other benefit for these defendants, like Rubin, who was

16   willing to do anything asked; like Perkins, who although he

17   owed debt -- a debt money, or he owed money, he was making

18   money.  He was good at it.  And you heard that as long as that

19   pressure was on him for that debt, he was still making money.

20   So think about that.

21        You also heard that violence was held over those who

22   were given orders but also that there were other motivations

23   that were held over their heads to make them follow the

24   AB rules and to follow orders.  This included taxing.  Taxing

25   people for not answering their phones because they fell

1    asleep.

2              And what did Brandon Bannick tell you about that?

3              He got taxed, like we saw in the messages between

4    Kenwood and Field, because he wasn't answering his phone, and

5    he had racked up thousands of dollars in debt to Kenwood.

6              And when the time came for him to help Gray with the

7    Lomita murders, that was used as motivation over him to get

8    him to help, You owe us money.  Now let's get yourself out of

9    trouble by following an order we give you.

10             So think about that too.  It's not just to make the

11   money, but it's also to motivate people to follow the rules

12   beyond the motivation of violence.

13             I submit to you that you have enough to find these

14   witnesses credible and reliable based upon their demeanor and

15   the way you observed them and the way they told you what

16   happened.

17             But also the evidence matches what they told you, and

18   what they told you is consistent with one another.

19             You'll hear instructions, and I think you might have

20   heard it already, telling you that the testimony of one

21   witness is enough.  If you believe that witness, that's enough

22   to meet the burden beyond a reasonable doubt for what that

23   witness is telling you.

24             But you have more here.  Each witness is a piece of a

25   puzzle.  They don't know how they interact with the other

3218

1  pieces of the puzzles, but you do.  You sat here through this

2  entire trial, and you saw how each piece of the puzzles butted

3  up against the other pieces, butted up against the evidence

4  that corroborated what they told you and the testimony of

5  other witnesses who also said the same thing.

6          You're in the unique position to have heard all of

7  that and to see how this puzzle is put together.

8          Let's talk a little bit about specific things that

9  help you find that those pieces of the puzzles match when it

10  comes to some of these witnesses.

11          Brandon Bannick, again, some misrepresentations about

12  how that testimony went about.  And again, it's your

13  recollection of the evidence and your notes that rule, not

14  what we tell you up here.

15          But the question was asked -- or you were shown a

16  transcript, again, that is not in evidence that Bannick didn't

17  know if Kenwood was involved in the Lomita murders.  But

18  actually what he said was, Nobody told me he was involved

19  directly, that he didn't actually know the answer to that,

20  whether he was or not.

21          But I submit to you that you know the answer to that

22  based upon what Brandon Bannick told you and you what

23  Robert Eversole told you.  Because Brandon Bannick owed a debt

24  to Kenneth Johnson, and when Frank told him, Brandon Bannick,

25  to go help Justin Gray, that was what Frank told him, If you

3219

1  go help, the debt to Johnson will be cleared.

2          You heard that Johnson takes these debts seriously.

3  You heard that from Bannick and from Field, because Perkins'

4  debt was causing Perkins a lot of trouble.

5          And Johnson was arbitrarily fining Perkins for up to

6  half a million dollars and demanding he kept paying all of it,

7  even when significant chunks were being paid.

8          So think about this:  If Johnson takes those debts

9  seriously, wouldn't he need to allow Frank to use that as

10  motivation to get Bannick to help Gray?  Wouldn't Johnson need

11  to say, Yeah, if he goes and helps, that can clear my debt?

12          And that's consistent with what Robert Eversole told

13  you, that Johnson and Clement both were involved in the orders

14  to kill Allan Roshanski.

15          It also -- there was also a moment where a transcript

16  of Brandon Bannick's testimony was shown to you about what was

17  said after the Pomona murders in the hotel room.  And again,

18  the transcript showed you one part but didn't go into the

19  next -- the next question asked.

20          And the next question that Brandon Bannick got asked

21  about what Field said after they were discussing, Why did

22  Jimbo get killed, was that, Did Field ever mention anything

23  about lying?  And Brandon Bannick said, Yeah.  He said that

24  Jimbo had lied.

25          That's not inconsistent with what James Field told

1  you he said.  And again, think about people and their memory.

2  One person's memory is different than another's when it comes

3  to the event because they are focusing on different things.  I

4  submit to you that the memory that's in their brains from this

5  incident is the actual killing of their friends, not

6  necessarily all the statements and what those statements were

7  after when that adrenaline was still in them and they were

8  kind of like processing this moment.

9         So think of that too.  When you come to this

10  conclusion of whether people are being inconsistent, remember

11  that they are seeing different perspectives because they are

12  different human beings.

13        So let's talk about Robert Eversole.

14        He got up there, and he told you that what he was

15  saying to you wasn't what anyone told him to say or what he

16  thought someone expected him to say, that it was his truth.

17        He told you about Kenwood's involvement in the

18  ordering of the Lomita murders, because that is what he knew.

19  Those are the conversations he had.

20        This is consistent with what we just talked about

21  with Brandon Bannick and that debt.  But also think of this:

22  The two witnesses who told you how the events of Lomita took

23  place told it to you from their perspective.  And Eversole was

24  in a much more trusted seat within the AB than Brandon Bannick

25  was.

1          Eversole was up for membership, which, as

2    Daniel Rubin told you, once that happened, it's like you're

3    part of the inner circle.  So of course he's trusted by

4    Johnson and Clement to know that there's a plan to kill

5    someone, where Brandon Bannick wasn't even told that until he

6    talked to Gray.  Because the other person who needed to know

7    the plan was Gray because he was supposed to enforce it.

8          So think about the difference, too, in that status

9    and why someone would know information that another witness

10   does not.

11         Eversole also told you that he had extensive

12   discussions about EDD that Roshanski was committing and that

13   Kenwood talked to him about the fact that because he didn't

14   belong to another white organization, his EDD fraud proceeds

15   needed to go up to the AB members.

16         You know that that was originally why this meeting

17   was scheduled, to get those profits.  But the disrespect came

18   in because in the meantime -- Eversole told you and

19   Brandon Bannick told you that somehow Roshanski had

20   disrespected Frank and that then became this reason for

21   murder.

22         Yes, the EDD and the owing of money was part of it,

23   but once that disrespect happened, that's when that order came

24   out.

25         Also, there's a lot of, again, testimony taken out of

1    context.

2          When Robert Eversole was asked on cross-examination

3    about why he didn't bring up Kenneth Johnson originally, he

4    was trying to tell you then that he had.  But he was pointed

5    to places in the transcript that made it seem like he wasn't

6    talking about Johnson.

7          And when I got up there and asked him again, Hey, why

8    don't you clarify what you were trying to show before, he told

9    you, There were multiple places in all of these interviews in

10    all of this discussion about Lomita where I was talking about

11    Johnson, because Johnson and Frank -- this was a thing they

12    were doing together.

13          So you take your memory of how he testified and what

14    he told you, and you put that in the context of the evidence

15    you actually heard on that stand and that was presented in

16    front of you.

17          He also told you that during the course of his

18    interviews, lengthy interviews, he was asked about multiple

19    different murders that were potentially related to the AB.

20    And he told you that he didn't identify Johnson and Clement as

21    ordering any of those murders because they -- he didn't know

22    if they did.  So I submit to you, he's giving you what you

23    need to find his testimony reliable.

24          He also was not in the room with Brandon Bannick or

25    Justin Gray, or even when Justin Gray was in that hotel room

3223

1    before Lomita, before Brandon Bannick came in.

2    Robert Eversole was sitting in a prison cell.  He wasn't in

3    the room.  He didn't know who was there.  He thought he heard

4    Brandon Bannick.

5          Brandon Bannick told you that Gray took a phone call.

6    He didn't know who it was with.  We don't know if that was the

7    call to Robert Eversole, but what you do know is that Eversole

8    wasn't in that room, just as he wasn't in the cell where

9    Lowrey was killed.  He only knew what he was told because

10   Thrasher Holmeyer told him that.

11         When Eversole testified, he told you about his own

12   involvement in the Lomita murder, and he told law enforcement

13   about that as well.

14         Despite being under the cooperation agreement -- and

15   I submit to you because he was under the agreement, which he

16   told you required him to tell the truth, he told the truth is

17   he knew from Lomita that he got the orders from Kenwood and

18   Frank, and he passed those on.

19         And he got emotional on that stand, if you remember,

20   when he was talking to you about passing those orders on to

21   Justin Gray because Gray was like a brother to him.  And he

22   told you and he told law enforcement about Gray's involvement

23   as well.

24         So I submit to you that what he told you came from

25   his memory and from what happened and was not something he

1    made up because he thought someone else wanted to hear it.

2         Timothy True, again, when you heard a little bit

3    about the transcript, from when he testified, just not that

4    long ago, it kind of stopped short in the point that was

5    trying to be made.  If you remember, there was discussion

6    about, Well, how are these ideologies different if you did

7    commit this act?  You killed -- you tried to kill someone from

8    your own gang.  And he said, Well, because the AB kills

9    non-white -- or white nongang members, nongang members.  So in

10   his mind, because he was a criminal, he was a gang member, his

11   mind, that violence, the line was, that, Okay, if it's against

12   other gang members, that's one thing, but when it's against

13   these other people who aren't part of a gang and this isn't

14   the life they chose, I have a problem with that.

15        So again, we get right up to where they -- you know,

16   his testimony was, and then you weren't told the rest of that

17   story.  But you remember that testimony, so use your memory in

18   that.

19        James Field told you that the drugs that he took did

20   not affect his behavior.  And again, the evidence, those

21   puzzles pieces, they point -- they jut right up to each other,

22   because the evidence is very consistent with what James Field

23   told you.

24        It's the robbery.  It's the murders.  It's the cell

25   phone location data that links where everybody is.  His

1    memory, I submit to you, is perfectly fine, despite all that

2    drug use, because the evidence tells you that it was.

3          As far as Ruben, he told you that John Stinson found

4    out about Andrew Collins' behavior that Stinson wasn't happy

5    with, and that's why the order went out about Collins.

6          And again, he talk -- he got up there and told you

7    about his history and his experience.  And I submit to you

8    that, again, the credibility, when you look at different

9    witnesses, they all have different personalities.  And it is

10   based on not only who they are as people, but their

11   experiences within the AB as well.

12         And some were a little bit more able to kind of

13   soften for you to see that, and some were not.  But that is

14   something that you needed to figure out.  And is that

15   something that you can automatically say they are not telling

16   you the truth about?  Use your common sense and the skills you

17   have to judge credibility and come to the determination.

18         But again, I submit to you that what you heard is

19   consistent with other witnesses and the evidence.

20         And lastly, Troy Clowers, this discussion about him

21   today was also taken out of the context.  Clowers told you who

22   John Stinson was, and what he did for him.  And other

23   witnesses also told you John Stinson's role in the AB.

24   Clowers told you that "Pops" was a name that people who were

25   close to John called him, and he wasn't sure if everybody knew

3226

1    about that because of that reason and Daniel Rubin told you

2    the same.

3         The comment about the "old dudes" I submit to you

4    means that when you've been in this gang for this long, you're

5    not getting your hands personally dirty anymore.  Sitting

6    back, doesn't that sound like it means you have other people

7    like Clowers and Rubin doing that dirty work for you?  Because

8    that, we know, is the position that John Stinson was in.

9         He was part of the three-man council, he was a

10   long-standing AB member, and everyone who talked to you about

11   him said that he was pretty high ranking.

12        As for the witnesses that you didn't hear from and

13   the evidence that you weren't shown, you're not to speculate

14   on that.  And the jury instructions tell you that.  You heard

15   the evidence presented to you from the people who were there,

16   and you heard the orders -- you heard the orders directly from

17   the people who testified.

18        Those are the people who got in front of you.  The

19   ones who personally committed these offenses and who

20   personally took the orders.  You're not to speculate about

21   what anyone else may or may not say or where they are.  And

22   that's goes for the evidence too.

23        But you did hear that during the course of the

24   activity of the AB, there was a lot of discussion about using

25   encrypted apps like Signal, and changing phone numbers, and

3227

1  doing other things to avoid getting detected by law

2  enforcement.

3        You heard that Cellebrite, it is not often, it's a

4  kind of a rare thing that it would pick up encrypted app

5  messages or details.  And you also heard that when those

6  encrypted apps are being used, it avoids wiretapping that

7  telephone, and also, on a cell phone data, as far as

8  Danielle Ponce de Leon told you, data is the only thing that's

9  going to show up, not calls, not details.  So think about that

10  too.

11        Consider also why the AB has the rules they have

12  about cooperation.  Why they used violence for control.  It's

13  like True said about the Lowrey murder and Spencer Fox, you

14  kind of go gently on him because you don't know if he's just

15  going to get scared and go talking to law enforcement.

16        What you saw here is a good example of that.  Most of

17  these witnesses told you that in the end the AB was not what

18  they believed it to be.  And what did that lead to?  It led to

19  testimony about the inner workings of the AB, because when you

20  are part of the gang committing crimes it's the inside people

21  who know the dirt.  And those are the witnesses you heard

22  from.

23        Inherent in the process of becoming a brother is

24  knowledge of the AB and what it does, and you heard that from

25  witnesses who were up for membership.

3228

1    But there's a period of time where you have to commit

2  certain crimes, learn about the AB, talk to AB brothers, learn

3  how to act like a brother.  You don't just fall into that

4  position.  It's a process that involves learning, it involves

5  knowledge of the AB and what the AB does.  And all of these

6  defendants have that knowledge.  Not only from that process

7  when they were -- they became members, but also from what

8  they've done while they've been AB brothers.  And what you've

9  heard from these witnesses tells you what they've been doing.

10    All of these defendants benefitted from the crimes

11  being committed by their associates.  And you heard from those

12  associates, you heard what those crimes were, and you heard

13  the crimes that the defendants themselves were personally

14  involved in.

15    Their roles as made members allows them to make the

16  rules, to give the orders, to take the money made by other

17  people through drug trafficking, robberies, and fraud.  They

18  also get to benefit from the use of violence including

19  murders.

20    As you heard, AB members are gods.  They are the

21  elite.  And they rule on fear and power.  Everything you have

22  heard during this trial has been done for or on behalf of the

23  AB.  Everything is in furtherance of the AB and these

24  defendants' position within that enterprise.

25    The defendants have used whites as tools to their

1    advantage for way too long.  The witnesses who sat before you,

2    they told you that.  In their testimony, they also told these

3    defendants that.

4          So now it's time for you to tell them that.  That

5    it's no longer okay to use people as tools for their own

6    benefit, and that they're guilty of the crimes that they've

7    been charged with.  Thank you.

8          THE COURT:  Ladies and gentlemen, I have a few more

9    instructions, including one that I accidentally skipped

10   earlier.

11         To prove that a defendant is guilty of distribution

12   of a controlled substance under federal law, the government

13   must prove that, one, the defendant knowingly distributed

14   methamphetamine or fentanyl, and two, the defendant knew the

15   substance was methamphetamine or fentanyl.

16         To distribute means to deliver or transfer possession

17   of methamphetamine or fentanyl to another person with or

18   without any financial interest in that transaction.

19         To possess with intent to distribute means possess

20   with intent to deliver or transfer possession of

21   methamphetamine or fentanyl to another person with or without

22   financial interest in the transaction.

23         When you begin your deliberations, elect one member

24   of the jury as your foreperson who will preside over the

25   deliberations and speak for you here in court.

3230

1          You will then discuss the case with your fellow

2    jurors to reach agreement if you can do so.

3          Your verdict, whether guilty or not guilty, must be

4    unanimous.

5          Each of you must decide the case for yourself, but

6    you should do so only after you have considered all the

7    evidence, discussed it fully with the other jurors and

8    listened to the views of your fellow jurors.

9          Do not be afraid to change your opinion if the

10   discussion persuades you that you should.  But do not come to

11   a decision simply because other jurors think it is right.

12         It is important that you attempt to reach unanimous

13   verdict, but, of course, only if each of you can do so after

14   having made your on conscientious decision.  Do not change an

15   honest belief about the weight and effect of the evidence

16   simply to reach a verdict.

17         Perform these duties fairly and impartially.  You

18   should also not be influenced by any person's race, color,

19   religious beliefs, national ancestry, sexual orientation,

20   gender identity, gender, or economic circumstances.

21         Also, do not allow yourself to be influenced by

22   personal likes or dislikes, sympathy, prejudice, fear, public

23   opinion or biases, including unconscious biases.  Unconscious

24   biases are stereotypes, attitudes or preferences that people

25   may consciously reject but may be expressed without conscious

3231

1  awareness, control or intention.

2        It is your duty as jurors to consult with one another

3  and to deliberate with one another with a view towards

4  reaching agreement if you can do so.

5        During your deliberations, you should not hesitate to

6  reexamine your own views and change your opinion if you become

7  persuaded that it is wrong.

8        Because you must base your verdict only on the

9  evidence received in the case, and on these instructions, I

10  remind you that you must not be exposed to any other

11  information about the case or the issues it involves.

12        Except for discussing the case with your fellow

13  jurors during your deliberations, do not communicate with

14  anyone in any way and do not let anyone else communicate with

15  you in any way about the merits of the case or anything to do

16  with it.  This restriction includes discussing the case in

17  person, in writing by phone, tablet, computer, or any other

18  means, via email, text messaging, or any internet chat room,

19  blog, website, or any other form of social media.

20        This restriction applies to communicating with your

21  family members, your employer, the media or press, and the

22  people involved in the trial.  If you are asked or approached

23  in any way about your jury service or anything about this

24  case, you must respond that you've been ordered not to discuss

25  the matter and to report the contact to the Court.

3232

1          Do not read, watch or listen to any news or media

2     accounts or commentary about the case or anything to do with

3     it.  Do not do any research, such as consulting dictionaries,

4     searching the internet or using other reference materials.

5     And do not make any investigation or in any other way to try

6     to learn about the case on you own.

7          The law requires these restrictions to ensure the

8     parties have a fair trial based on the same evidence that each

9     party has had the opportunity to address.  A juror who

10    violates these restrictions jeopardizes the fairness of these

11    proceedings and a mistrial could result that would require the

12    entire trial process to start over.  If any juror is exposed

13    to any outside information, please notify the Court

14    immediately.

15         Some of you may have taken notes during the trial.

16    Whether or not you took notes, you should rely on your own

17    memory of what was said.  Notes are only to assist your

18    memory.  You should not be overly influenced by your notes or

19    those of your fellow jurors.

20         The punishment provided by law for this crime is for

21    the Court to decide.  You may not consider punishment in

22    deciding whether the government has proved its case against

23    each defendant beyond a reasonable doubt.

24         Verdict forms have been prepared for you.  After you

25    have reached unanimous agreement on a verdict, your foreperson

3233

1  should complete the verdict form according to your

2  deliberations, sign and date it, and, when all three verdict

3  forms are complete, advise the bailiff that you are ready to

4  return to the courtroom.

5          If it becomes necessary during your deliberations to

6  communicate with me, you may send a note through the bailiff

7  signed by any one or more of you.

8          No member of the jury should ever attempt to

9  communicate with me except by assigned writing.  I will not

10 communicate with any member of the jury on anything concerning

11 the case except in writing or here in open court.

12         If you send out a question, I will consult with the

13 lawyers before answering it, which may take some time.

14         You may continue your deliberations while waiting for

15 the answer to any question.

16         Remember that you are not to tell anyone, including

17 the Court, how the jury stands, whether in terms of vote count

18 or otherwise, until after you have reached a unanimous verdict

19 or have been discharged.

20         All right.  Can we have the Court's security officer

21 sworn?

22     (Court Security Officer was sworn.)

23     THE COURT:  All right.  I will ask our 12 jury

24 members to -- you will be excused for deliberation.  The

25 remaining six of you, you are still retained for purposes of

3234

1   replacing a juror in the event that occurs.  However, you also

2   at this time will be excused to the jury deliberation room to

3   gather your things and to be excused for -- for today's

4   proceedings.

5          If you will just make sure -- I know we have contact

6   information for all of you.  And if it becomes necessary, then

7   we will contact you, and you will take the place of a juror if

8   they are excused.

9          Otherwise, thank you so much.  And you may go back to

10  the jury deliberation room and begin.

11     (Jury exits the courtroom at 1:13 p.m.)

12         THE COURT:  The jury members have stepped out.  Is

13  there anything for the record at this time?

14         MS. DE SALES BARRETT:  Your Honor, there are -- I

15  don't know what the procedure is for the Court in terms of

16  exhibits.  We can do this case by case if the exhibits are

17  remaining out of the -- outside the jury room.  But there are

18  some discrepancies that I have found with regard to the list

19  of what's in evidence and on the list that was circulated by

20  your deputy.

21         THE COURT:  All right.  Ms. Barrett, what -- what are

22  your discrepancies?

23         MS. DE SALES BARRETT:  Uh, Your Honor, what I have

24  with regard to this is -- has to do with the 1800 numbers,

25  beginning with 1800.

 1          They -- and this -- this pertains to five exhibits --
 2  six exhibits:  1800, 1806, 1809, 1810, 1811, and 1820.  Those,
 3  only the clips are introduced into evidence, not the entire
 4  marked exhibit.
 5          You may remember that the CDs were marked as a whole,
 6  but the government only offered the clips into evidence, and
 7  so I think that should be noted on the form.
 8          THE COURT:  Is that consistent with your
 9  recollection, Ms. Stokman?
10          MS. STOKMAN:  Yes.  The clips were admitted into
11  evidence except -- or unless -- such as 1820, the call itself
12  was very short, so there was no clip.  It was the call.
13          THE COURT:  Does that sound right, Ms. Barrett?
14          MS. DE SALES BARRETT:  Yes, Your Honor.
15          THE COURT:  All right.
16          MS. LUEM:  I'm sorry.  Just to clarify, on that note,
17  I know that at least two calls, there were redactions that
18  were made both from the transcript and the recording.  So I
19  assume those replaced the original clips that were provided.
20          MS. STOKMAN:  Yes, they did.
21          MS. LUEM:  Thank you.
22          MS. DE SALES BARRETT:  Your Honor, the question I
23  have about the clips is in the event that the jurors request
24  listening to the tapes, and the transcripts are not part of
25  the evidence, it would seem to me that they should only be

3236

1    listening to the tapes themselves and not viewing the

2    transcripts as they did during the trial.

3              THE COURT:  Correct.

4              MS. DE SALES BARRETT:  And then the last thing I have

5    is 1848, I believe, is on the list -- the Court's list as

6    being in evidence.  And I haven't had a chance to check with

7    the government, but I don't believe it's in evidence.

8              MS. STOKMAN:  That's correct.  There were some items

9    that we had admitted that are not on the admitted list as

10   well, if Ms. Barrett is finished.

11             MS. DE SALES BARRETT:  I am finished.

12             THE COURT:  All right.

13             THE CLERK:  So 1848 is removed.

14             THE COURT:  Right.

15             Ms. Stokman?

16             MS. STOKMAN:  We also had 1829 through 34 -- or 35.

17   I think some of these were already on the admitted list, but

18   not all of them, but they were all admitted.

19             MS. DE SALES BARRETT:  I agreed, Your Honor.

20             THE COURT:  1829 through 1835, is that what we're

21   talking about?

22             MS. STOKMAN:  Correct.

23             MS. DE SALES BARRETT:  Yes.

24             THE COURT:  All right.  Anything else for the

25   government?

3237

1          MS. STOKMAN:  I think that's it.

2          THE COURT:  Anything else for --

3          MS. FISHER-BYRIALSEN:  Yes.  Where would you like us

4    to wait?  Do you want us to come back to the courthouse?

5    Like, how close do we have to be?  And do you want us to be

6    here at 8:00 a.m.?  Just practically speaking, what do we need

7    to do?

8          THE COURT:  Let me finish this, and I'll definitely

9    get to that.

10          Is there any other exhibits that you feel have not

11   been marked properly for Mr. Johnson and Mr. Stinson?  All

12   right.

13          So as to that question, ideally, you will be -- well,

14   not ideally.  I need you to be within about 20 minutes from

15   the courthouse.  When the jury reconvenes in the morning, you

16   don't need to be here.  We're not going to call everyone

17   together, but you do need to be accessible in case there's a

18   question or whatever.

19          And that does bring up, I know now that Mr. Clement

20   and Mr. Johnson have filed waivers of their appearances, so

21   you will come or not come at your -- your option.  And

22   Mr. Stinson's is already there.

23          All right.  Anything else, then, at this time?

24          MS. STOKMAN:  Judge, I'm sorry, I just wanted to

25   confirm.  I think it was 1862 that was the probation

3238

1   department report on Mr. Rapinoe.  That is not admitted into

2   evidence, correct?  It is just marked because --

3          THE COURT:  It has been marked.

4          MS. STOKMAN:  Yes.  Okay.

5          MS. DE SALES BARRETT:  Let me get there.  Oh, yes.  I

6   don't have it as being in evidence.

7          MS. STOKMAN:  Just wanted to make sure.

8          THE COURT:  All right.  Anything else, then?

9          MR. VILLA:  Yes, Your Honor.

10          MS. LUEM:  Oh, I'm sorry.  I may have missed this,

11   but is the jury leaving at 1:30 today?

12          THE COURT:  That's what they had told us, yes.

13          MR. VILLA:  With respect to tomorrow, Mr. Johnson has

14   submitted a waiver, but he'd like to be present for the

15   verdict.  And in discussing it with the marshals, it seems

16   like that they could facilitate that within, you know, maybe

17   half an hour, maybe slightly more, you know, if there were

18   some hiccups.

19          So we would ask that -- that that be allowed.  If

20   there's a question or something else, you know, we don't need

21   to bring him.

22          THE COURT:  Here's the only difficulty:  If the jury

23   were to come back at one o'clock, say, and they need to leave

24   at 1:30, or they come back at 1:10, I mean, that could cause a

25   problem.  That's something to consider.

3239

1        If -- I mean, if you want to be here, you should

2   come.  If you don't, while I appreciate the marshals' efforts,

3   I can't bring a jury back another day.  I don't want to

4   inconvenience 12 people and incur the cost associated with

5   that for that reason.  I mean, so that's -- that's my position

6   on that.

7        All right.  Anything else?

8        MR. VILLA:  Your Honor, and I think he's saying if

9   that's happens, he'll -- he'll live without being here, but

10  otherwise, if it's feasible --

11       THE COURT:  Okay.

12       MR. VILLA:  Thank you, Judge.

13       THE COURT:  All right.  Anything else, then?  All

14  right.  Thank you.

15     (Proceedings were adjourned at 1:21 p.m.)

16

17

18

19

20     I, RACHAEL LUNDY, Official Reporter, do hereby certify the

21  foregoing transcript as true and correct.

22

23  Dated:  February 11, 2025          /s/ Rachael Lundy_____
                                       RACHAEL LUNDY, CSR-RMR
24                                     CSR No. 13815

25