JANE FISHER-BYRIALSEN
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
Denver, CO 80137
(202)256-5664
jane@fblaw.org

JEAN D. BARRETT
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
(973)744-1000
jeanbarrett@ruhnkeandbarrett.com

Attorneys for:   FRANCIS CLEMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>vs.<br><br>**(12) FRANCIS CLEMENT,**<br><br>Defendant | Criminal case No. 20-CR-238-JLT-SKO<br><br>**DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT** |

**INTRODUCTION**

This sentencing memorandum will not be like most this Court receives as Mr. Clement's sentence is a foregone conclusion. This Court is required by law to sentence Mr. Clement to life without parole. That being said, on behalf of Mr. Clement, undersigned counsel nonetheless wishes to file this memorandum in support of Mr. Clement. Francis Scott (Frank) Clement was born in Portland, Oregon on August 4, 1966, the oldest of two children of Shyrl Carpenter and George Rodney Clement. His parents were still in their teens. His sister Corlee was born a year or so later with multiple disabilities. His parents separated shortly after Corlee's birth.

Frank was exposed to violence at home. He was the victim of physical violence at the hands of his father in his later elementary and teenage years. Given these traumatic childhood experiences,

not surprisingly, he was committed twice to a mental hospital and spent time in a juvenile facility as a teen. The morning immediately after his 18th birthday, he was arrested for the murder of his friend in California after running away from home.

When Frank entered prison in California in 1985, the penal system was in disarray and plagued by violence. Of his nearly 40 years in prison, 82% of this time was spent in solitary confinement or administrative segregation, the majority of that time during a 25-year stint at the notorious "supermax" at Pelican Bay. As this Court is well aware, his life now consists of repeated, often unanswered, requests for medical care for his serious health problems.

## OBJECTIONS TO THE PRESENTENCE REPORT

The following are objections to the presentence (PSR) report:

Offense Conduct

Par. 6: There was no testimony at trial to support the first and last sentences, which allege in substance that to become a made AB member a person must commit a murder and that a member can only leave by dying.

Par. 7: No testimony supports that AB members are required to kill when ordered to do so. In fact, trial testimony about the murder at Kern Valley State Prison was that such an order was refused and another member committed the crime.

Par. 8: There was no trial testimony regarding quarterly taxes or an annual fee. Although the government had identified an expert who was to testify as to the history and general practices of the AB, the witness was never called.

Par. 12: Although the indictment alleged that extortion and arson were part of the pattern of racketeering activity, no testimony of such acts was elicited at trial.

Offense Behavior Not Part of Relevant Conduct

Par. 119 & 120: These paragraphs allege that there was a conspiracy to commit a robbery in Oregon but concede that no such testimony was elicited at trial. In the absence of any indicia of reliability, these paragraphs should be stricken. *See United States v. Hoang Ai Le*, No. 2:99-cr-00433 WBS, 2023 U.S. Dist. LEXIS 106429, at *18-19 (E.D. Cal. June 20, 2023) ("The court notes that the criminal conduct listed in the PSR at paragraphs 79-84 all involved instances where

defendant was charged with crimes but the charges were eventually dismissed, or prosecution was "released," "discharged," or "rejected," including some counts on the basis of insufficient evidence. The court finds that the government has not proven this uncharged conduct by a preponderance of the evidence, see United States v. Russell, 905 F.2d 1439, 1441 (10th Cir. 1990), and the court gives it no weight. Accordingly, the court ORDERS that paragraphs 79 through 84 regarding "Other Criminal Conduct" be STRICKEN from the Presentence Report.") See also, USSG § 4A1.3(a)(3).

Other Criminal Conduct & Other Arrests

Par. 132-142: Arrests without evidence of conviction are not sufficiently reliable to be considered and should be stricken. *See United States v. Hoang Ai Le, supra* and § 4A1.3(a)(3). This is particularly so for these paragraphs since, with the exception of the case in paragraph 132 which was dismissed, prosecution was declined and there was actually no arrest.

Par 152: Certificates of course work appear as Exhibits D and E of the objections to the PSR. Consequently, this paragraph should include language indicating that the Edovo learning platform studies are verified.

## **FRANCIS CLEMENT HISTORY AND CHARACTERISTICS**

A.    Frank was a Victim of Childhood Abuse and Neglect.

Francis Scott "Frank" Clement's mother Shyrl was 17 years old and his father George "Rodney" was 18 at the time of Frank's birth. The couple married in Idaho about a month prior to Frank's birth and separated before he turned two. The record of the 1969 divorce indicates that Frank's mother filed, while Rodney was incarcerated, citing "cruel and inhuman treatment."

Shyrl's pregnancy with Frank was stressful. She reported that she attempted suicide using aspirin. Late in the pregnancy, she had surgery which precipitated early labor. Frank's birth records no longer exist and both parents are deceased, so how premature he was is unknown. Shyrl also reported postpartum depression leading to her withdrawing from care for Frank.

Frank's sister Corlee, the only surviving member of his immediate family, was born just a year after Frank. Corlee was born with dozens of congenital anomalies, including tumors on her optic nerves and epileptic seizures. She has undergone multiple corrective surgeries and has

operated at a much lower level of functioning than her peers throughout her life. She currently receives dialysis three days a week, has had a live-in caretaker all her adult life and now lives in an adult care facility.

Although Shyrl and Rodney separated after a year and a half of marriage, the time before Rodney's departure was characterized by Frank's parents' immaturity and Rodney's physical violence. When speaking to professionals about Frank's childhood, Shyrl reported that she and Rodney would exploit Frank as a way to win power over one another. Rodney, an alcoholic with a family history of alcoholism whom Shyrl described as "sociopathic," would beat her severely with the beatings often occurring in front of the children. Tellingly, one of Rodney's subsequent partners reported that he was "a woman beater," who beat her so badly that she required a doctor's care. After Rodney left the family, Frank, his mother and his sister Corlee moved often throughout central Oregon. When Frank was eight, Rodney re-entered Frank's life for the first time asking Shyrl to let him see Frank. Shyrl not only complied with the request but astonishingly agreed to allow Frank to move in with his father. After about nine months, however, Frank was back to living with his mother who continued their itinerant lifestyle. At some point in his early school years, Frank was prescribed Ritalin, but Shyrl thought it slowed him down and stopped administering it.

Frank did not see his father again until he was about 12 when he was once again sent to live with him. After two years in his father's care, he was returned to his mother due to severe beatings from his father. Not surprisingly this abusive conduct and chaotic childhood led to behavioral problems, resulting in foster care placements, juvenile justice involvement, among other things. Frank continued to bounce between his parents before he ran away just before his 18th birthday. One day after he turned 18, he was arrested in California for murder for which he received a sentence of 15 years to life imprisonment after a guilty plea. He has been incarcerated since the day of that arrest.

Frank's life before incarceration was riddled with multiple moves and living with abusive or unstable caretakers. The MacArthur Foundation has described the occasionally subtle, yet compounding effects of frequent residential moves on a child over time, including long-term

effects on their social-emotional outcomes.[1] Furthermore, researchers have repeatedly found that children who have witnessed domestic violence have more negative external and internal behaviors than those children who have not.[2] They are at a higher risk of developing severe mental health concerns[3] (i.e., attachment disorders, anxiety, depression) and demonstrating behavioral problems[4] (i.e., aggression, delinquency), psychological impacts which have been found to be closely related to Posttraumatic Stress Disorder (PTSD) symptoms.[5]

Children who witness domestic violence are more likely to become victims of physical abuse themselves.[6] Furthermore, child abuse has been associated with compromised mental and physical health concerns throughout the lifetime of the victim.[7] Lifelong physical health consequences can include being at a higher risk of developing diabetes, high blood pressure, cancer, pulmonary diseases, and bowel diseases. Regions of the brain like the amygdala (processing emotions), hippocampus (learning and memory), orbitofrontal cortex (reinforcement-based decision-making and emotion regulation) can all be negatively impacted.[8] Behavioral consequences include alcohol and drug use, and juvenile and adult criminality. Psychological

---

[1] https://www.macfound.org/media/files/hhm_brief_-_is_moving_during_childhood_harmful_2.pdf
[2] Edleson, J. L. (1999). *Children's witnessing of adult domestic violence*. Journal of Interpersonal Violence, 14(8), 839–870; Silverman, A., & Gelles, R. J. (2001). *The double whammy revisited: the impact of exposure to domestic violence and being a victim of parent and child violence*. The Indian Journal of Social Work, 62(3), 23; Ehrensaft, M. K., & Cohen, P. (2012). *Contribution of family violence to the intergenerational transmission of externalizing behavior*. Prevention Science, 13(4), 370–383. doi:10.1007/s11121-011- 0223-8.
[3] Ybarra, G. J., Wilkens, S. L., & Lieberman, A. F. (2007). *The influence of domestic violence on preschooler behavior and functioning*. Journal of Family Violence, 22, 33–42.
[4] *Id*.; English, D. J., Graham, C., Newton, R. R., Lewis, T. L., Thompson, R., Kotch, J. B., & Weisbart, C. (2009). *At-risk and maltreated children exposed to intimate partner aggression/violence: what the conflict looks like and its relationship to child outcomes*. Child Maltreatment, 14, 13.
[5] Levendosky, A. A., Huth-Bocks, A. C., Semel, M. A., & Shapiro, D. L. (2002). *Trauma symptoms in preschool-age children exposed to domestic violence*. Journal of Interpersonal Violence, 17, 15.
[6] Dick, G. (2005). *Witnessing marital violence as children: men's perceptions of their fathers*. Journal of Social Service Research, 32(2), 1– 24. doi:10.1300/J079v32n02_01.
[7] National Child Traumatic Stress Network (www.nctsn.org); Child Welfare Information Gateway – Children's Bureau (https://www.childwelfare.gov/pubpdfs/long_term_consequences.pdf).
[8] *Id*.; Ibrahim, P., et. al, (2021). *Molecular impacts of childhood abuse on the human brain*. Neurobiology of Stress, 15, 100343. https://www.childwelfare.gov/pubPDFs/brain_development.pdf

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 5

consequences include the development of severe mental health disorders, diminished executive functioning, poor attachment and poor social connections.[9]

### B. Frank Spent Important Years of His Life in Institutions.

Frank's critical years for brain development were spent in juvenile detention, the Oregon State Hospital (age 14-17 years old), and in jail, prison and solitary confinement (age 18-25 years old). This was not without consequences for reasons made clear in studies over time. Early in this century, studies of aging adolescents/emerging adults (age 18-25 years old) showed that, during this time of life, people's personalities tend to make significant strides and the prefrontal cortex (in charge of complex cognitive behaviors, personality, moderating social behavior, responses to fear and happiness related stimuli) is becoming more complete.[10] Later studies have reaffirmed that when someone 18 or 21 years old is in an emotionally charged state, they tend to react more like someone who is in their young teens.[11] It is for this reason that prison systems over time have housed juveniles and young adults separately from the adult prison population.

In 1980, California reorganized its juvenile and young adult facilities into the California Youth Authority ("CYA"), to be overseen by what is now the Department of Corrections and Rehabilitation ("CDCR"). In 1986, the National Institute of Justice examined violence inside the CYA from 1981-1985.[12] The resulting report included the Preston School of Industry where Frank

---

[9] U.S. Department of Health and Human Services, Children's Bureau (www.childwelfare.gov).
[10] Tanner, J.L., and Arnett, J.J. (2009). *The emergence of 'emerging adulthood': The new life stage between adolescence and young adulthood,* Handbook of Youth and young Adulthood: New Perspectives and Agendas, 39-45.; Giedd, J N, et al. (1999) '*Brain development during childhood and adolescence: a longitudinal MRI study*', Nature Neuroscience, 2: 861-3; L.M. Williams, et al. (2006) *The mellow years? Neural basis of improving emotional stability over age*', The Journal of Neuroscience, 26: 6422-30; Donnellan, M. B,. et al., (2007) '*Personality development from late adolescence through young adulthood: differential stability, normative maturity, and evidence for the maturity-stability hypothesis*', Journal of Personality, 752:37-64.
[11] Casey, B. J., et al., (2019). *Development of the emotional brain*. Neuroscience letters, 693, 29–34. https://doi.org/10.1016/j.neulet.2017.11.055; Icenogle, G., Steinberg, L., et al., (2019). *Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational, cross-sectional sample*. Law and human behavior, 43(1), 69–85. https://doi.org/10.1037/lhb0000315
[12] CYA (California Youth Authority) Report Part Two: *Bodily Harm - The Pattern of Fear and Violence at the California Youth Authority*, NCJ Number 104549 (1986). An abstract of this Book's content is available at https://ojp.gov/ncjrs/virtual-library/abstracts/cya-california-youth- authority-report-part-two-bodily-harm-pattern. Undersigned counsel have a copy available for revie upon request.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 6

was first housed after he was sentenced. NIJ found that, in the years leading up to Frank's placement at Preston, the number of cases of battery without a weapon almost doubled. NIJ also reported that the design of the dormitories and dayrooms was poor and the level of overcrowding contributed to the level of violence.[13] In June 2023, in the wake of news that the Division of Juvenile Justice (DJJ, formerly CYA) was shutting down, the Center on Juvenile & Criminal Justice published a report summarizing the brutal history of CYA, writing:

> From their beginnings in the 1890s, confinement in these institutions evoked the worst behaviors among young people and their adult captors. Staff treat youth as prisoners, while youth view staff as hostile guards. Youth from across the state are taken from their families and communities and then hoarded together. Facility staff inform arriving youth about the importance of following rules and not fighting. Staff then place youth in large living units where gang conflict is pervasive and fighting is unavoidable. Survival depends on fighting readiness. Youth have no chance to comply with the institutional rules in such an environment. They quickly resent their confinement and the false promise of rehabilitation.[14]

The largest prison population boom in the United States occurred in the 1980s. In 1980, the total number of people incarcerated in California institutions was 23,264.[15] Within five years, the population almost doubled to 50,111 in 1985.[16]

Frank entered the California prison system at a crucial time due to his age and due to the extreme overcrowding and violence in his new environment. Today, at 58 years old, he has been

---

[13] *Ibid.*
[14] https://www.cjcj.org/reports-publications/report/beyond-repair#fnref:2
[15] https://www.ojp.gov/ncjrs/virtual-library/abstracts/california-prisoners-1980-summary-statistics-felon-prisoners-and#:~:text=The%20California%20prison%20population%20increase,22%2C177%20men%20and%201%2C087%20women.
[16] https://bjs.ojp.gov/content/pub/pdf/cpus85.pdf

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 7

incarcerated for approximately 40 years. Frank has spent well over 31 years (82% of his incarceration and more than half his entire life) in solitary confinement or administrative segregation. He has spent more time in solitary confinement than he ever lived outside of prison.

### C. Confinement at Pelican Bay State Prison Caused Frank Irreparable Harm.

The majority of Frank's decades in solitary confinement occurred at the Security Housing Unit (SHU) of Pelican Bay State Prison, a notorious facility that has been the subject of decades of litigation, international condemnation, and scientific research and commentary. The SHU at Pelican Bay was one of the first "supermax" facilities in California when it first opened in 1989. Shortly after the opening, Frank was transferred to Pelican Bay and immediately placed into the SHU. Frank went on to spend over 10,000 days (approximately 28 years) in the SHU or in restrictive housing at Pelican Bay.

The Ninth Circuit has observed that Pelican Bay is a maximum security prison, which in the past has been "racked with intense prison violence."[17] In 2018, Akil and Lobel published a review of the horrific history of Pelican Bay's SHU and documented the profound psychological harm caused by prolonged solitary confinement:[18]

> A draconian example of such solitary confinement existed for many years at the Pelican Bay State Prison Security Housing Unit (SHU). At that prison, built in 1989, approximately 1,300 prisoners were imprisoned in small, Spartan, eighty-square-foot cells with no windows for almost twenty-three hours a day. For years, they had no view of the outside world; they saw no

---

[17] *Ramirez v. Reagan*, 82 F.3d 423 (9th Cir. 1996). *See also Clement v. California Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004) ("It is well known that Pelican Bay houses maximum-security prisoners under the most restrictive conditions of any California prison.").

[18] J. Lobel & H. Akil, *Law & Neuroscience: The Case of Solitary Confinement*, Dædalus, the Journal of the American Academy of Arts & Sciences (Amer.Academy of Arts & Sciences 2018), at 61, available at https://www.amacad.org/publication/law-neuroscience-case-solitary-confinement. Huda Akil, Ph.D., is a Gardner Quarton Distinguished University Professor of Neuroscience and Psychiatry and Co-Director and Senior Research Professor of the Molecular and Behavioral Neuroscience Institute at the University of Michigan. Research in Dr. Akil's laboratory is focused on understanding the neurobiology of emotions, including pain, anxiety, and depression. Dr. Akil also served as a past President of the Society for Neuroscience, the largest neuroscience organization in the world, and has been elected a member of the National Academy of Sciences.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 8

birds, trees, cars, or grass. For one-and-a-half hours per day, they went out to a recreation 'yard' attached to their cell block. This was a facility about twice the size of their cell, with fifteen-foot-high walls and a grate over the top where they recreated, alone. If they went out to the yard at the right time during the day, it was possible to see a little sunlight, but, generally, most prisoners had only fleeting, if any, glimpses of direct sunlight during their stay at Pelican Bay. They were allowed no phone calls at all except in an 'emergency,' which was defined as a parent dying, in which case they were allowed a fifteen-minute call with next of kin. They were permitted visits with their family, but no contact visits, meaning they only could speak with their visitors through an intercom, viewing them through a glass window, unable to touch or hug their loved ones. While some had televisions and radios, there was no educational, vocational, or religious programming or activities.[19]

Based on the neuroscientific research available at the time of their 2018 report, the authors concluded: "It is hard to imagine surviving in this environment for more than a few days or weeks without becoming suicidal or mentally ill."[20] Yet many prisoners were able to survive in these "atrocious conditions" for decades; Frank for more than three decades. "Survival does not, however, mean that they did not suffer serious mental harm; depression, paranoia, and loss of concentration and memory are just some of the symptoms associated with extended solitary confinement."[21]

---

[19] *Id.*, at 64-65.
[20] *Id.*, at 65.
[21] *Ibid.*

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM
REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 9

1. *The 1990 Litigation.*

In 1990, a lawsuit was brought challenging the constitutionality of the horrific conditions at Pelican Bay.[22] There, the federal judge ruled that, for prisoners with mental illness, the conditions of confinement violated the Eighth Amendment.[23] The Court observed that "the conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."[24] While the state of constitutional law at the time was not such that an across-the-board Eighth Amendment violation could be found, the court did find that the atrocious conditions at Pelican Bay violated the constitutional rights of prisoners with mental illness. The case also revealed the violent and cruel punishments guards inflicted upon prisoners within the SHU, including acts such as caging prisoners naked outside during inclement weather.[25]

In the words of the federal judge presiding over the lawsuit: "For these inmates [with mental illness], placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe."[26] The court ruled that such prisoners were not required "to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief."[27] Sadly, even though the case brought to light the horrors in Pelican Bay SHU, it did not result in meaningful reform.

---

[22] *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). See also Lobel & Akil, *supra*, at 65-66 (describing judicial findings made during the litigation).
[23] *See discussion,* Arrigo, Bruce A.; Bullock, Jennifer Leslie, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What Should Change*, <u>International Journal of Offender Therapy and Comparative Criminology</u>. 52 (6): 622–40 (Nov. 8, 2007).
[24] *Madrid v. Gomez, supra*, at 1265.
[25] *Id.,* at l171-1172. *See also* Arrigo & Bullock, *supra*.
[26] *Id*, at 1265-1266
[27] *Ibid*.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 10

2. *Hunger Strikes.*

Over the years, the conditions that Frank was enduring gained national attention due to lengthy coordinated hunger strikes by a large group of prisoners. These hunger strikes provided additional evidence of the severe psychological distress, desperation, and hopelessness that the prisoners experienced from languishing in the SHU for decades. In later lawsuits, almost every plaintiff participant reported viewing the possibility of death by starvation as a worthwhile risk in light of their current situation.

The first Pelican Bay hunger strike, in 2002, lasted approximately 27 days. Frank participated in this hunger strike. The prisoners called off the strike after a California State Senator promised to look into the strikers' complaints, however, no reforms were implemented.

On July 1, 2011, another hunger strike began. At its peak, over 6,600 prisoners from every major ethnic, racial, and geographic group at 13 California prisons – again including Frank – participated. This hunger strike garnered national and international media attention and support. CDCR staff met with prisoner representatives, and on July 20, 2011, the hunger strike was temporarily suspended after officials agreed to provide a few basic amenities and to revise the regulations by which a prisoner would be assigned to and kept in the SHU. However, the promise of reform was short-lived, and meaningful reforms were not implemented.

On September 26, 2011, the hunger strike resumed because prisoners lost faith that CDCR officials would implement the revisions they had promised. This time nearly 12,000 prisoners – including Frank – participated. The hunger strike ended on October 12, 2011, after officials assured the prisoner representatives that they were working on new regulations and would continue conversations about other improvements sought by the prisoners. Again this proved to be an empty promise and no meaningful reforms were implemented.[28]

---

[28] On March 9, 2012, CDCR publicly issued a "concept paper" describing its proposed changes to gang validation regulations. That document has been condemned by prisoners and prisoner-rights advocates as making virtually no meaningful changes and, instead, expanding the net of who may be incarcerated in the SHU.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 11

On July 8, 2013, another hunger strike began at Pelican Bay and quickly spread throughout the California prison system. At the time, more than 1,000 prisoners remained in solitary confinement in Pelican Bay. It was estimated that over 33,000 prisoners took part in the hunger strike, and many thousands more conducted work strikes throughout CDCR.[29] The hunger strike ended when California lawmakers agreed to hold public hearings on the conditions within California's maximum-security prisons with prolonged solitary confinement. In light of the lawmaker's promise, the prisoners resumed eating on September 5, 2013.

    3.    The *Ashker* Litigation

*Ashker v. Governor of California,*[30] a class action suit filed in 2009, was brought by Todd Ashker and other named plaintiffs who had spent many years in solitary confinement at Pelican Bay. The *Ashker* lawsuit was settled in 2015 with an agreement calling for the release of thousands of prisoners being held in indeterminate solitary confinement. The litigation revealed appalling conditions at the Pelican Bay SHU including "prolonged social isolation and lack of environmental stimuli," which was causing "serious psychological pain and suffering and permanent psychological and physical injury" and such symptoms as "chronic insomnia," "severe concentration and memory problems," "anxiety," and other ailments.[31]

The *Ashker* plaintiffs filed an expert report by Dr. Matthew Lieberman, the director of the Social Cognitive Neuroscience Laboratory at the University of California, Los Angeles. Dr. Lieberman's research on the effect of social isolation on the brain again confirmed the psychological harm of long-term solitary confinement. The Lieberman research, along with the work of others, provided compelling evidence that the social pain of isolation involves "the same

---

[29] "Two Month California Prison Strike Ends," BBC News (Sept. 5, 2013), available at: https://www.bbc.com/news/world-us-canada-23975602

[30] The lawsuit was initially filed as *Axel and Troxell v. Schwarzenegger,* N.D. Calif. No. 4:09-cv-05796-CW (Complaint filed May 21, 2010). The caption changed over the years, e.g. *Ruiz, et al., v. Brown, et al.* (Second Amended Complaint filed Sept. 10, 2012), *Ashker, et al. v. Brown, et al.* (Supplement Complaint filed March 11, 2015), *Ashker v. Governor of State of California* (Notice of Motion for Final Approval of Settlement Agreement filed Jan. 13, 2016).

[31] See *Ashker v. Brown*, No. C 09-5796 CW, 2013 WL 1435148, at *5 (N.D. Cal. Apr. 9, 2013) (quoting Second Amended Complaint filed Sept. 10, 2012, Doc. 136, ¶¶ 181 and denying Defendants' motions to dismiss).

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 12

neural and neurochemical processes invoked during physical pain."[32] Indeed, fMRI studies that Dr. Lieberman conducted in collaboration with psychologist Naomi Eisenberger demonstrated that when people were subjected to social isolation, it affected neural activity in certain regions of the brain associated with physical distress, in the same way physical pain would. Dr. Lieberman's study has been replicated dozens of times in labs around the world.[33]

The extreme duration of Frank's solitary confinement has meant that the isolative and emotionally numbing effects have become even more pronounced. The symptoms are almost identical to those described in psychological literature about the long-term effects of severe trauma and torture. Whatever reforms followed the *Ashker* lawsuit could not remedy the severe psychological suffering inflicted upon Frank during his decades in Pelican Bay.

D.   Medical History

---

[32] Matthew D. Lieberman, expert report submitted in *Todd Ashker et al. v. Governor of the State of California et al.*, 4:09-cv-05796-cw (N.D. Cal. 2014), at 2, quoting Roy F. Baumeister and Mark R. Leary, "The Need to Belong: Desire for Interpersonal Attachment as a Fundamental Human Need," Psychology Bulletin 117 (3) (1995).

[33] Lobel & H. Akil, *supra*, at 69.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 13

F.  During His Time in Prison, Frank Has Participated in Available Educational Programming and Engaged in Self-Education When Programs Were Unavailable.

---

[34] Manz, C. R., Odayar, V. S., & Schrag, D. (2021). *Disparities in cancer prevalence, incidence, and mortality for incarcerated and formerly incarcerated patients: A scoping review*. Cancer medicine, 10(20), 7277–7288. https://doi.org/10.1002/cam4.4251.

Most records indicate that Frank was an academically bright student when he was younger. Frank earned his GED and his High School Diploma when he was 16 years old while at the Oregon State Hospital.

Programming at Pelican Bay State Prison was sparse, however, Frank was able to still educate himself. For approximately three years, Frank worked tirelessly and was able to earn two Associates in Arts degrees from Coastline Community College, with high enough grades for him to be part of the Honors List/Dean's List. Frank became a member of Alpha Sigma Lambda[35] due to his superior marks.

In conjunction with his Associates degree, Frank was able to advocate for himself to gain access to programming. As a result of his advocacy Frank was able to complete dozens of courses while at Pelican Bay State Prison. He has received dozens of certificates for completion of various courses and programs. In 2021, Frank earned the Ratcliff Award for his advocacy against solitary confinement[36]. While being housed at the Fresno County Jail, Frank has spent some of his time engaging in and completing various rehabilitative and educational programs. From September 2022 to the beginning of the trial, Frank earned almost 50 certificates through the application known as Edovo Learn which provides educational, vocational, and rehabilitative curriculum, totaling over 270 hours of learning. Wherever there is the opportunity to learn, Frank is an avid participant.

## THE CALIFORNIA DEPARTMENT OF CORRECTIONS

An enormous amount of resources was spent on this case and trial, to prosecute individuals who are serving life in prison. One cannot help but wonder what goals were being met with this. The government will likely say it was to punish the defendants and hold them

---

[35] Alpha Sigma Lambda is a nonprofit national honor society devoted to the advancement of scholarship and to the recognition of nontraditional students continuing their higher education.

[36] This 2021 Ratflicc Award certificate states that Frank has been awarded this award "for all your contributions in helping to liberate our elders principle thinker in the agreement to end hospitalizations and the prisoner's human rights movement blueprint." This award was apart of the *Mandela of the California Prison System* that was important legislation to limit the use of solitary confinement.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 15

accountable, and that is obviously one goal of the justice system.  Where the irony lies here is the way the prosecution chose, randomly based on who they could get to cooperate, the people that were to be held accountable and punished and the people, like Robert Eversole, who were neither held accountable nor punished for the crimes, including murder, that he committed.

The irony also lies in the overall picture of this case.  What difference does it really make to spend millions of tax payer dollars to give three elderly prisoners another life sentence, while not spending a penny on making institutional changes within California Department of Corrections to (1) make prison guards accountable for their roles in this alleged enterprise and (2) make institutional changes that allow prisoners, like Mr. Clement who entered prison at age 18, a chance at rehabilitation instead of solitary confinement for decades.

According to numerous CDCR prisoners who testified in this case, the guards at Kern Valley and other California prisons are some of the main culprits in smuggling narcotics into the prison, cell phones and other contraband needed to commit crimes.  For example, Troy Clowers testified that cell phones are brought into the prison by "cops"/guards.  (Trial Transcript, p. 1197, 1243).  He also testified that the guards ignored prisoners' use of cell phones to communicate.  (Trial Transcript, p. 1279-1280).

CDCR[37] operates 31 adult prison facilities.  Of these facilities, ten are deemed high security institutions, including Pelican Bay State Prison and Kern Valley State Prison[38]. It is understood that contraband cell phones within prisons can be a security risk for inmates, guards, and the community at large.  Even though CDCR has regulations specific to the search of and punishment for contraband cell phones, and CDCR publishes articles documenting their positive endings to finding these cell phones[39] CDCR has a major contraband cell phone issue that spans decades.  A 2011 article published by the National Institute of Justice reported that in the first six

---

[37] See www.cdcr.ca.gov
[38] Ibid.
[39] A 2019 CDCR published article reports donating 442 contraband cell phones to a local soldier focused nonprofit organization.  These cell phones were seized in "a short period."  A 2021 CDCR published article reports seizing and donating approximately 1,000 cell phones just from one facility, *Ironwood State Prison*. See www.cdcr.ca.gov.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 16

months of 2008, California correctional officers found 1,331[40]. Recent data collection efforts have shown that from 2013-2023, even high security institutions in the CDCR had a major contraband cell phone issue. See table below. A complete review of the CDCR contraband data collected from December 2012 through May 2023, reveals 24,541 cell phones were found at the ten high security CDCR institutions alone.

| CDCR - High Security Facilities | KVSP | PBSP |
|---|---|---|
| Possession of Cell Phones 2013 | 304 | 14 |
| Possession of Cell Phones 2014 | 217 | 32 |
| Possession of Cell Phones 2015 | 435 | 10 |
| Possession of Cell Phones 2016 | 78 | 1 |
| Possession of Cell Phones 2017 | 539 | 41 |
| Possession of Cell Phones 2018 | 380 | 26 |
| Possession of Cell Phones 2019 | 669 | 23 |
| Possession of Cell Phones 2020 | 519 | 3 |
| Possession of Cell Phones 2021 | 508 | 28 |
| Possession of Cell Phones 2022 | 341 | 75 |
| Possession of Cell Phones 2023 | 82 | 4 |
| **CELL PHONE TOTALS BY FACILITY FOR 10 YEARS** | **4072** | **257** |

Undersigned counsel and other defense team members went to numerous prisons in California during the pendency of this case. We witnessed time and time again, guards enter the prisons many times simply holding a flap open of their coolers and backpacks with no one actually searching the bag, sometimes with no search of them or their person whatsoever. Other times their bags were placed on a metal detector that no one was actually monitoring. At some prisons we, and the guards, passed through metal detectors that were not even plugged in.

The CDCR has a lengthy history of mismanagement, staff corruption, and violating prisoner rights. Compounding CDCRs history of inhumane policies and failure to provide actual rehabilitative services, is a pervasive longstanding culture of abuse and coverups perpetrated by staff. This would include the well-known "Gladiator fights" which started in the 1990s but

---

[40] See https://nij.ojp.gov/topics/articles/cell-phones-prisons#contraband.

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 17

appear to be continuing still[41], as well as the existence of the violent staff gang, the Green Wall, and its Code of Silence.

The Green Wall is a staff prison gang which started in 1998 by staff at Salinas Valley State Prison following a prisoner riot that resulted in injuries of multiple staff members.

> "Guards...began wearing enameled turkey pins to mark their solidarity.
> They named themselves after the color of their uniforms and began using
> the ganglike tag "7/23," for the seventh and 23rd letters of the alphabet,
> G and W. They attacked inmates and planted evidence on them. And they
> avoided discipline and prosecution by enforcing their "code of silence.""

*Whistleblower recounts origins of "Green Wall" at Salinas Valley State Prison.*
https://www.montereyherald.com/2009/11/22/whistleblower-recounts-origins-of-green-wall-at-salinas-valley-state-prison/

Since that time, the membership of the clandestine staff gang grew to include members from other CDCR institutions.  One overarching creed of the Green Wall is the "Code of Silence". The "Code of Silence" among staff was so embedded in the CDCR staff culture that a Senate Bill was introduced in the 2004 legislative session of the California congress to combat it[42]. Interestingly, an organization called California Correctional Peace Officers Association stood in opposition.

While there is little evidence that the Green Wall exists today in the same form as in the late 1990s and 2000s, it is clear the "Code of Silence" persists.  As recently as 2021 two

---

[41] See Officers charged in 'gladiator fights' at California youth detention centre, BBC. com, 4/25/2025 https://www.bbc.com/news/articles/czxneppzvxzo
[42] http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1351_1400/sb_1400_cfa_20040614_103808_asm_comm.html

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 18

whistleblower staff at New Folsom died after notifying top prison officials of corruption in the investigation unit[43]. As reported by the Associated Press, the corruption included:

> ""rogue" guards planted weapons and drugs in inmates' cells to obtain more overtime, spread false rumors and relayed private information from inmates' files to other inmates in violation of department policy, "and on at least two occasions have been directly involved in the killing of a CSP-Sacramento inmate,"

Without hyperbole, the life and death of prisoners at CDCR are very much in the hands of the staff charged with their custody and care and yet not only does CDCR staff not ensure their safety, they have staff themselves committing horrible acts of corruption and violence against prisoners.

Incarcerated people at CDCR are forced to live in a highly violent, unstable, chaotic environment, where evidence can be planted and lives upended, or just ended, by staff with impunity.

This is the environment where Frank and the other prisoners must live and try to survive. Punishing incarcerated people who are necessarily reliant on an organization that has proven time and time it cannot keep them stay safe and will not provide necessary services and resources, without also addressing the systemic issues that give rise to criminal behavior in prison, is akin to treating the symptoms but not the disease.

## CONCLUSION

It is easier to believe that people are evil than to try to understand where the behavior came from and how to change that. No one is born bad, but we are all capable of becoming so

---

[43] California prison guard died after reporting corruption _ AP News, https://apnews.com/article/sacramento-california-prisons-suicides-d5f204500854e4942a7323da51778904
OFFICIALS IGNORED WARNINGS BEFORE MASSIVE 'GLADIATOR FIGHT' AT SOLEDAD STATE PRISON IN CALIFORNIA https://shadowproof.com/2019/09/04/officials-ignored-warnings-before-massive-gladiator-fight-at-soledad-state-prison-in-california/

DEFENDANT CLEMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND MEMORANDUM REGARDING SENTENCING OF MR. FRANCIS CLEMENT - 19

given the right neglect and mistreatment. It is evident from this case, how it is easier for the government and the system to lay blame solely on an individual like Frank, than to reflect on the shortcomings of the institutions that have warehoused him for decades and so significantly contributed to where we are today.

Respectfully submitted,

*/s/Jane Fisher-Byrialsen*
Jane Fisher-Byrialsen

*/s/ Jean DeSalles Barrett*
RUHNKE & BARRETT

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day May of 2025, I served a true and correct copy of the foregoing via ECF to:

All counsel of record.

s/*Abigail Clement*
Abigail Clement
Paralegal