# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN GRAY,<br><br>Defendant. | Case No.: 1:20-cr-00238-JLT-SAB-17<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THREE<br><br>(Doc. 2120) |

The criminal trial of Justin Gray is scheduled to begin on August 18, 2026. He has moved to dismiss Counts Two and Three of the Fourth Superseding Indictment on due process grounds. Specifically, Gray argues that the Government's loss or destruction of potentially exculpatory evidence violated his right to present a complete defense. (Doc. 2120 at 1, 6–12.) Having considered the entire record, and for the reasons stated below, the motion to dismiss is **DENIED**.

## I.    FACTUAL BACKGROUND

On July 10, 2025, Gray was indicated by a federal grand jury for two counts of Murder in Aid of Racketeering under 18 U.S.C. § 1959(a)(1) and (2) (Counts Two and Three, respectively) for the murders of Allan Roshanski and Ruslan Magomedgadzhiev, committed for the purpose of "gaining entrance to and maintaining and increasing his position" in the Aryan Brotherhood

enterprise.[1] (Doc. 1970 at 11–12; *see also* Doc. 2124 at 3.) Both counts concern a single event: a shooting that occurred in Lomita, California on October 4, 2020 (the "Lomita Shooting"). (*Id*. at 11; Doc. 1120-1 at 8.)

### A.    Initial Law Enforcement Response to the Lomita Crime Scene

In the early morning hours of October 4, 2020, Deputy Christian Ramirez of the Los Angeles Sherriff's Department ("LASD") was dispatched to 2121 255th Street in Lomita, California, after LASD received a report of two unresponsive people lying on the sidewalk. (*See* Doc. 2120 at 3; *see also* BASH_00022189.) When he arrived, Deputy Ramirez discovered two male victims lying on the sidewalk, both appearing to have been shot. (BASH_00022189.) Sometime soon after, several LASD first responders arrived at 2121 255th Street, including Detectives Louie Aguilera and Maria Maciel and Deputy J. Romero. (*See* Doc. 2120-1 at 1-2; *see also* BASH_00041692.) While conducting a canvas of surveillance cameras in the area, LASD Investigators identified multiple residences with doorbell cameras within the vicinity of the crime scene. (*Id*.) As relevant to the instant motion, LASD Investigators determined that the residence located 212 255th Street had a "Ring" doorbell camera facing the sidewalk directly in front of the murder scene. (*Id*.)

### B.    LASD's Initial Discovery of the Ring Camera Footage

The record reflects that at least three LASD personnel – Deputy J. Romero, Detective Louie Aguilera, and Detective Maria Maciel – interacted with a woman living at the residence at 212 255th Street (hereinafter, the "Resident"). In the months after the murders, Deputy Romero and Detectives Aguiler and Maciel each described LASD personnel's interactions with the Resident and the investigative steps taken by LASD following the discovery of the Ring camera.

#### 1.    LASD Supplemental Investigative Report

On October 4, 2020, at 7:15 a.m., LASD Deputy "J. Romero" prepared a "Supplemental Report" of his involvement in the initial response to the Lomita Shooting. (*See* Exhibit A,

---

[1] The AB is a "criminal organization whose members and associates engage[] in drug trafficking, theft, and acts involving murder, extortion, burglary, robbery, and assault." (Doc. 1970 at 1.) "The leaders and members of the AB direct, sanction, approve, and permit other members and associates to carry out criminal acts in furtherance of the enterprise." (*Id*. at 4.)

Declaration of Counsel, Doc. 2120-1 at 1-2; *see also* BASH_00041692.) In the Report, Deputy Romero described his interaction with the Resident, during which he noticed a "Ring" doorbell camera located next to the front door of the residence, which "fac[ed] south towards the location of the incident." (*Id*.) The following is an excerpt from Deputy Romero's Report detailing his communication with the Resident regarding the Ring camera on the day of the Lomita Shooting:

> I asked Ms. [Redacted] if she had access to the camera which she stated she did. I asked Ms. [Redacted] if she had received a motions alert on her phone prior to speaking to me. Ms. [Redacted] stated the only notification she received was me ringing her doorbell. I asked Ms. [Redacted] if she can go back prior to see if her camera had caught anything that might be related to the above incident. Ms. [Redacted] stated that the "RING" camera captures a still photo every 15 minutes even if there is no motion alerts. I had Ms. [Redacted] check her cameras at approximately 01:15 hours and was able to see the still photo showing no abnormal activity on her front lawn. Ms. [Redacted] then checked 01:30 hours and had a still photo of what appeared to be two unknown persons laying on the floor possibly suffering from gunshot wounds. Ms. [Redacted] was unable to provide any additional photos or videos of the incident.
>
> I notified Deputy Ramirez of what Ms. [Redacted] told me and what she was able to show me from her RING camera.

(*Id*.) Deputy Romero did not report whether he or any other LASD personnel collected any footage from the Ring camera or if Deputy Ramirez took any further investigative steps regarding the Ring camera.

                    2.    Affidavit in Support of Search Warrant

Four weeks after the murders, LSAD Detective Louis Aguilera included the following information regarding the alleged Ring camera footage in search warrant application: "Investigators reviewed video surveillance from a ring camera at 2121 255th Street, and saw a black Volkswagen arriving at approximately 0104 hours, and park at the north curb line. . . . The camera did not capture the incident." (Exhibit A, Declaration of Counsel, Doc. 2120-1 at 2; BASH_00022189.) Detective Aguilera also stated that the black Volkswagen captured on the Ring camera was a 2016 Volkswagen Passat registered to Victim Allan Roshanski. (*Id*.) Det. Aguilera did not document in the search warrant whether he spoke with the Resident on the day of the murders or whether he had ever personally reviewed the Ring camera footage.

3.      Testimony During Previous Trial of Co-Defendants

During the trial of Gray's co-defendants in January and February of 2025, LASD Detective Maria Maciel testified about briefly speaking with the Resident who showed her "video" pulled from a "motion-activated [Ring] camera." (Doc. No. 1763 at 1893, Trial Transcript ("TT") Day 8, 1/29/2025). Det. Maciel testified that "[w]hen she showed me the video, it only – it showed the victims' vehicle – the victims' vehicle driving up. And then there was, like, another clip that showed the two victims on the – on the ground, and it was either firemen or police that were present." (*Id*. at 1893.) Echoing the statements of both Det. Aguilera and Dep. Romero, Det. Maciel testified that the Ring camera footage shown to her did not capture the actual shooting. (*Id*.) On cross examination, defense counsel clarified with Det. Maciel that the footage showed the victims' vehicle arrive, that it did not capture anyone approaching the two victims and/or shooting them in the head, and that the footage next captured a scene of the bodies on the ground with emergency personnel present. (*Id*. at 1907–09.) Lastly, Det. Maciel testified that she did not collect the footage from the resident but later found out that the female resident provided the footage to her partner, Det. Aguilera. (*Id*.)

**C.      Ring Camera Footage Produced by Counsel for Co-Defendant**

During pretrial proceedings in this case, Gray's counsel filed numerous motions compelling the Government to produce the 2121 255th Street Ring camera footage. On February 21, 2024, Gray sought disclosure of "any surveillance footage or still photos taken from the Ring camera located on the wall, west of the front door, facing the front yard and street at 255th Street and confirmation that the camera did not capture the shooting incident." (Doc. 932 at 3.) On September 17, 2025, the Government provided Gray's counsel with the Ring camera footage from 212 255th Street that was produced to the Government by counsel for co-defendant Kenneth Johnson. (Doc. 2022 at 7.) Gray's counsel described this footage of "unknown provenance" as "not in its original form" and "clearly…altered," asserting that the Government's disclosure of the footage on September 17, 2025, was the first time counsel had seen the footage. (Doc. 2022 at 7, n.2; Doc. 2120 at 7.) The Government's position is that it first became aware of the Ring camera footage in late 2024, when counsel for co-defendant Kenneth Johnson indicated to the

4

Government that they procured the Ring camera footage directly from the Resident.[2] (Doc. 2177 at 4.) The Court has reviewed the Ring camera footage provided to the Government by counsel for co-defendant Johnson and makes the following observations.

The footage is approximately 36 seconds in length and appears to be an iPhone screen recording of a playback of Ring camera footage on a mobile device application. Rather than a traditional "video," the Ring footage appears to consist of still frames taken at various intervals. Directly above the still images are the words "Front Door." Throughout the screen recording, a user appears to be at times manually scrolling through the still images. At other times, the user "rewinds", "fast-forwards", and "zooms-in" on the Ring footage.

The timestamp on the Ring footage begins at approximately 12:04:18 a.m. and shows the front curtilage of the house at 2121 255th Street, with a vehicle in the driveway, a streetlamp on the street in front of the house, and one car parked along the curb immediately to the right of the house and partially outside the scope of the Ring camera. As the user scrolls through the still images captured between 12:04:18 a.m. and 1:04:02., the overall scene remains unchanged. Then, at approximately 1:04:02 a.m., a dark colored car appears, parked at the curb behind the other parked car. The footage does not capture the car moving. In the same frame that the car appears, barely visible are two large shapes—ultimately determined to be the bodies of the victims— on/near the sidewalk, near the base of the streetlamp. The Court understands the dark colored car belonged to the victim Allan Roshanski, and the victims appear to have already been shot. The view of the bodies is partially obscured by the streetlamp's shadow and a hedge in front of the house. There is no change in this scene as the user scrolls forward to approximately 1:06:49 a.m. At that point, the user begins to scroll backward in time to 1:02:32 a.m., then forward to 1:04:17 a.m., then backward to 1:03:32 a.m., and then forward to 1:04:17 a.m.

Abruptly, the still images then appear to jump backward in time to 1:02:47 a.m., at which point the user begins to "zoom-in" on the area where the car and the bodies would appear in the frame in the next series of still images. The "zoomed-in" frame now shows the hedge in front of 2121 255th Street, the sidewalk, the streetlamp, and the car originally parked on the curb. The

---

[2] The footage was not introduced into evidence at the co-defendant's 2025 trial.

user begins to scroll forward again, with the "zoomed-in" frame remaining unchanged. Then, at 1:04:32 a.m., the "zoomed-in" frame clearly shows a dark colored sedan parked at the curb and the two victims' bodies laid prone on the sidewalk and lawn outside of 2121 255th Street.

The user then scrolls forward to 1:05:03 am, scrolls backward to 1:02:47 a.m., scrolls forward to 1:04:33 a.m., scrolls backward to 1:03:02 a.m., and then scrolls forward to 1:45:34 a.m., at which point, a team of law enforcement officers are present with large lights illuminating the scene. The last still imaged captures two officers standing over the bodies and the hip of another officer, apparently at the residence's front door, immediately next to the Ring camera.

### D.    Motion to Compel Ring Camera Footage

After receiving the Ring camera footage from the Government, Gray moved for an order compelling disclosure of "recordings, photographs, video footage, and other items related to the doorbell Ring camera located at 2121 255th Street, Lomita, California, taken on October 4, 2020." (Doc. 2022 at 1.) In his motion to compel, Gray alleged that defense investigators had recently interviewed the Resident at the time of the homicides. (*Id*. at 7; Dec. of Counsel at ¶ 7.) The Resident provided Gray's counsel with a copy of a text exchange between her and Det. Aguilera, wherein the resident sent Det. Aguilera the Ring camera footage from the early morning hours of October 4, 2020. (*Id*.) The Court will recreate relevant portions of the text message exchange that occurred between the resident and "Detective Louie" on October 4, 2020:

> [8:38 a.m.] Resident: Hello detective Louie this is [Redacted]
>
> [9:01 a.m.] Det. Louie: Hi [Redacted]…I'm hopeful you can find video of the black car arriving and parking in front of your house. The 9-1-1 calls came in around 1:30am…I appreciate your help.
>
> [9:16 a.m.] Resident: Yes here is a screengrab from the ring. [Attaches an MPEG4 media file entitled "IMG_5985.MP4."]
>
> [9:39 a.m.] Det. Louie: Do you remember what time you heard the shots?
>
> [9:40 a.m.] Resident: It was about 15 minutes prior to the officer ringing my doorbell
>
> [9:51 a.m.] Det. Louie: Okay thanks. Sorry for all the questions.
>
> [10:00 a.m.] Resident: Ok no problem please let me know if I can help in anyway

[10:01 a.m.] Det. Louie: I will. I'm sure I'll have a ton of questions.

[10:26 a.m.] Det. Louie: Do you have video of the two victims getting out of that car? Or, people on the sidewalk?

[10:37 a.m.] Resident: Here is the full grab of the footage that was captured.

[10:39 a.m.] Resident: [Attaches an MPEG4 media file entitled "IMG_5988.MP4."]

[11:59 a.m.] Det. Louie: Got it

(Doc. 2026-1 at 2.) Defendant does not indicate whether counsel for Defendant collected the video from the homeowner or tried to collect it from her, or whether they watched the video on the homeowner's device. On October 19, 2025, the Government filed an opposition to Defendant's motion to compel, claiming:

> The government has repeatedly indicated that it is not in possession of the requested discovery. The government has requested from the Los Angeles County Sheriff's Department (LASD) the item of discovery (Ring camera footage) at issue in defendant's motion on numerous occasions. Detectives assigned to this investigation from LASD are not in possession of the item, and despite the indications that the item was sent via text message to one of the detectives, it was not preserved by LASD and there is nothing for the government to obtain.

(Doc. 2024 at 1.) On October 29, 2025, the parties appeared before Magistrate Judge Oberto on the motion to produce the Ring camera footage, during which the Government stated it requested but did not receive any doorbell Ring camera information for LASD and was told the information was not preserved. (Doc. 2029 at 10, Transcript of Motion Hearing, 10/29/2025.) Following the hearing, Magistrate Judge Oberto denied Gray's motion for disclosure of evidence on the basis that the Government did not have actual or constructive possession of the requested material. (Doc. 2031 at 2.)

On June 21, 2026, Gray filed the instant motion to dismiss, asserting that the Government's loss or destruction of potentially exculpatory evidence violated his right to present a complete defense. (Doc. 2120 at 1, 6–12.) The Government opposes the motion. (Doc. 2177.

## II.    LEGAL STANDARD

The Due Process Clause of the Fourteenth Amendment requires the Government to

7

preserve evidence that is material to the defense and possessed by the Government. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). Generally, the duty of law enforcement agencies to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta* (1984) 467 U.S. 479, 488. To protect against the real burden that would arise from an "absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance," courts use a sliding scale when analyzing a failure to maintain evidence. *Arizona,* 488 U.S. at 58. Where the lost evidence possesses "an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," there is a due process violation regardless of the reasons why the evidence was destroyed. *Trombetta*, 467 U.S. at 489. On the other hand, to establish a due process violation based on the failure to preserve evidence where the exculpatory value of the evidence is undetermined but may be "potentially useful" to the defense, a defendant must show that law enforcement acted in bad faith in destroying the evidence. *Youngblood*, 488 U.S. at 58. The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed. *Id*. at 56-57; *see also Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997); *United States v. Barton*, 995 F.2d 931, 934 (9th Cir. 1993); *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

## III.    DISCUSSION

Gray argues that the footage from the Ring camera located at 2121 255th Street is exculpatory and its exculpatory value was readily apparent to the Government at the time it was first discovered. (Doc. 2120 at 9.) Therefore, according to Defendant, the Government's failure to preserve the Ring camera footage violates his Due Process Rights. (*Id.*)

### A.    The exculpatory value or potential value of the Ring camera footage.

To establish a due process violation, Gray must show that the exculpatory value of the Ring camera footage was obvious and apparent, not merely hypothetical or "potential." *Youngblood*, 488 U.S. at 56.

In doing so here, Gray must demonstrate that the Ring camera footage, which he claims

8

was lost or destroyed by LASD, contained materially exculpatory evidence "documenting, at the very least, the moments before the shooting, if not the shooting itself." (Doc. 2120 at 12.) In asserting that the contents of the Ring camera footage remain "unconfirmed" and highlighting minute discrepancies between the various sources describing the Ring footage, Gray invites the use of imagination to fill in a gaping evidentiary chasm with the possibility of "potentially" exculpatory evidence. (Doc. 2120 at 9.) However, such an argument inherently relies on the hypothetical or potential exculpatory value of the Ring camera footage, directly in opposition to the definition of materially exculpatory value outlined in *Youngblood*.

Gray's attempt to invoke *Youngblood's* standards for "potentially useful evidence," defined as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," *Youngblood*, 488 U.S. at 57, also falls short in light of the record in this case. Ignoring the resident's statements to Dep. Romero that the Ring camera took only still images every 15 minutes if not triggered by motion, Gray suggests—without any evidence—that the Ring camera could have provided such potentially useful evidence such as: "How many people are visible in the car? Was the car being followed by another vehicle? Are any persons visible outside the car? Was the car being driven fast or show? Was the act of parking itself hurried or smooth? Is the driver or any other passenger speaking on a cell phone? Are the hands of the occupants visible and, if so, are they holding anything?" (Doc. 2120 at 10, fn. 2) All of these questions may have been able to be answered if the Ring camera took continuous or event-triggered video recordings of motion detected in the camera's field of view. However, the Resident's information is consistent that it did not.

Furthermore, consistent across the reports of all three LASD personnel is the assertion that the Ring footage did not capture the actual shooting or the events leading up to it. These assertions are corroborated by the Ring footage obtained by counsel for Kenneth Johnson and provided to Gray by the Government. In the footage, the first still image depicting the victim's car and the bodies appear is captured at 1:04:02 a.m. Thus, according to this version of the Ring camera footage, sometime between when the Ring camera took the prior still photo and 1:04:02 a.m., the victims drove up to the curb in front of 2121 255th Street, parked their vehicle, exited

their vehicle, moved to the sidewalk in front of 2121 255th Street, and were shot and killed. Absent footage of the actual incident, the Ring footage simply corroborates facts either already known or known through other means, such as the date and location of the murders and a rough timeframe of when the murders occurred, in addition to the fact that there were two victims. Because such evidence has no bearing on guilt, innocence, witness credibility, or potential defenses, the Court struggles to see how the Ring camera footage contains even "potentially useful" evidence.

**B.      The exculpatory value of the Ring camera footage was not readily apparent to LASD personnel.**

In the absence of any readily available exculpatory evidence, as here, Gray must show affirmatively that the evidence was at least potentially useful and that the investigators who failed to preserve the Ring camera footage acted in bad faith. *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015) ("The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith.").

Assuming, *in arguendo,* that the Ring footage is even potentially useful evidence, the Court is not persuaded that the LASD personnel who allegedly viewed, collected, and/or ultimately failed to preserve the Ring footage were aware of any exculpatory value of the footage at the time it was lost. Gray's reliance on *Zaragoza-Moreira* and *United States v. Chelini*, 2025 WL 2144993 (D. Montana, July 29, 2025) on the issue of bad faith is misplaced. In both cases, it was clear from the record that the law enforcement officials responsible for initially handling the lost or destroyed evidence were aware of the evidence's exculpatory or potentially useful value at the time it was lost or destroyed. The following excerpt from *Chelini* provides a succinct summary of the facts and outcome of *Zaragoza-Moreira:*

> In *Zaragoza-Moreira*, the accused—Zaragoza—was arrested at a port of entry after Customs and Border Protection officers found a package containing heroin and methamphetamine on Zaragoza's body. *Id*. at 975. Zaragoza told a Homeland Security Investigations agent that she wanted to get caught because she did not want to bring

10

> the drugs into the United States. *Id*. Zaragoza stated that while she was waiting in the admission line at the port of entry, she repeatedly attempted to draw attention to herself so that border inspectors would notice that there was something wrong. *Id*. at 975–76. Surveillance cameras recorded footage of the admissions line at the port of entry.
>
> The Government filed a criminal complaint charging Zaragoza with importing heroin and methamphetamine into the United States. *Id*. at 976. Five days later, Zaragoza's attorney sent a letter to the Government requesting that any videotapes that relate to the arrest or events leading to the arrest of Zaragoza be preserved. *Id*. The following month, the video footage of the day of Zaragoza's arrest was destroyed after it had been automatically recorded over. *Id*. at 977.
>
> The Ninth Circuit found that, while the video footage was not materially exculpatory, it was potentially useful evidence to Zaragoza's duress defense. *Id*. at 977. The court further found that the value of the footage was readily apparent to the agent that interviewed Zaragoza, because Zaragoza repeatedly alerted the agent that she had trafficked the drugs under duress. *Id*. at 978–79.

*Chelini*, No. CR 25-11-BU-DLC, 2025 WL 2144993, at *4. The facts in *Zaragoza-Moreira* are even more egregious given that the video footage in question was destroyed after a request for the preservation of video evidence. *Id*. at *976. The record does not show – and Gray has not demonstrated – that similar facts exist in this case.

The facts of *Chelini,* which concerned the deletion of an obviously exculpatory voicemail, are similarly opposite. There, Chelini was charged with being a prohibited person in possession of a firearm and possession of an unregistered firearm. *Chelini*, 2025 WL 2144993, at *2. Before Chelini was indicted, another individual left a voicemail for the investigating officer admitting that the firearm underlying the charge belonged to him and not to Chelini, thereby directly undermining the Government's theory that Defendant knowingly possessed firearms. *Id*. at *3. After reviewing, but not preserving, the voicemail, the officer memorialized its contents in a supplemental record. *Id*. Ruling on Chelini's motion to dismiss his firearms charges, the court found that Chelini had demonstrated the existence of bad faith on the part of the investigating officer, given that "the exculpatory value of the voicemail was readily apparent" to the officer before he deleted it." *Id*. Again, the record does not show – and Gray has not demonstrated – that similar facts exist in this case.

As stated previously, the testimony of all three LASD personnel who viewed, collected,

and/or ultimately failed to preserve the Ring footage is consistent on the key issue in *Youngblood's* bad faith inquiry: nothing in their initial investigation of the Ring camera and the alleged footage alerted them to any exculpatory or potential useful value of the Ring footage because it did not capture the shooting or any moments leading up to the shooting. Thus, in the absence of bad faith, LASD's failure to preserve the Ring camera footage does not constitute a denial of due process of law. *Youngblood*, 109 S.Ct. at 336. As such, Gray's motion to dismiss is **DENIED**.

IT IS SO ORDERED.

Dated:   July 31, 2026

_____
UNITED STATES DISTRICT JUDGE