**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:20-cr-00238-JLT-SAB-17 |
| Plaintiff, | ORDER DENYING DEFENDANT'S RENEWED MOTION TO SUPPRESS |
| v. | (Doc. 2124) |
| JUSTIN GRAY, | |
| Defendant. | |

**I.     BACKGROUND**

On July 10, 2025, a grand jury charged Justin Gray with two counts of Murder in Aid of Racketeering under 18 U.S.C. § 1959(a)(1) and (2), Count Two and Three. (Doc. 1970 at 11–12.) The two homicides referenced in Count Two and Three resulted from a shooting which occurred on October 4, 2020, in Lomita, California. (*Id*. at 11; Doc. 1120-1 at 8.)  The Fourth Superseding Indictment charges Gray with the murder of Allan Roshanski and Ruslan Magomedgadzhiev for the purpose of gaining entrance to and maintaining and increasing position in the Aryian Brotherhood enterprise. (Doc. 1970 at 11–12; *see also* Doc. 2124 at 3.) The AB is a "criminal organization whose members and associates engage[] in drug trafficking, theft, and acts involving murder, extortion, burglary, robbery, and assault." (Doc. 1970 at 1.)

Gray's criminal trial is scheduled to begin on August 18, 2026. Defendant now brings a

renewed motion to suppress evidence derived from a search warrant involving his call detail records and cellular global positioning system location data, which the Government alleges connects him to the murders. Defendant argues that the Affiant's probable cause statement supporting the search warrant relied largely on information provided by an anonymous informant whose reliability and credibility were not verified and whose information was insufficiently corroborated.[1] (*See* Doc. 2124 at 4–6.) Having considered the entire record, and for the reasons stated below, the renewed motion to suppress is **DENIED**.[2]

## II.    FACTS

On October 4, 2020, Investigator Louie Aguilera with the Los Angeles County Sheriff's Department Homicide Bureau, the Affiant at issue, along with another LASD officer, were dispatched to the scene of a double homicide in Lomita, California involving two victims, Roshanski and Magaomedzhiev. (Doc. 1120-1 at 7, 8.) The officers found a black "iPhone" on

---

[1] Defendant filed an initial motion to suppress cell phone data on June 13, 2024, (Doc. 1120), arguing much the same, which this Court denied on September 19, 2024. (Doc. 1301.) In pertinent part, this Court found that:

> [T]he informant was not anonymous, and the information provided was corroborated. The informant said they heard Justin Gray boast about the murders and why he committed them. Doc. 1120-1 at 9. The informant provided a telephone number for Gray, which police officers confirmed was subscribed to Justin Gray. *Id*. The officers conducted further investigation and determined that Justin Gray was on probation and had provided a different phone number to his probation officer. *Id*. When they reviewed the call records for Roshanski and compared it to the phone number Gray provided to his probation officer, they found that Roshanski called Justin Gray three times in the hour preceding the murders. *Id*. All of this constitutes corroboration of the informant's "tip." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) ["[A]n informant's reliability may be demonstrated through independent police corroboration of the information provided."].

(*Id*. at 3.) In his renewed motion to suppress cell phone data, Defendant asks this Court to "reconsider [its] previous ruling." (Doc. 2124 at 2.)

[2] The Government argues that Gray's motion is an improper motion for reconsideration under Local Rule 430.1(i) because Gray fails to identify new facts or circumstances that warrant reconsideration. (*See* Doc. 2180 at 4–5.) While the Court agrees that Gray generally raises the same arguments as his initial motion, (*see* Docs. 1120, 2124), he nonetheless identifies specific challenges with this Court's prior order. (Doc. 2124 at 5.) Namely, that this Court's prior conclusion that the informant was not anonymous and was sufficiently corroborated is incorrect. (*Id*.) Thus, the Court reconsiders its ruling regarding these two issues.

2

Roshanski's person, and an "LG" grey cell phone on the rear passenger floorboard of Roshanski's vehicle, which he had driven to the scene. (*Id*.) On October 7, 2020, officers spoke to a friend of the victims. (Doc. 1120-1 at 9.) She told officers that on October 2, 2020, two days before the murders, she had traveled with Roshanski to the Los Angeles area and overheard him telling Magomedgadzhiev that he "needed him to cover his back." (*Id*.) Roshanski told the friend that he had received a phone call telling him they had his "stuff" and that he had to go to a "trap house" in Long Beach. (*Id*.) The friend said Roshanski appeared very nervous, which was out of character for him, and assumed he was going to the "trap house" to pick up property that was stolen from him back in August when he was out of state visiting his mother. (*Id*.) The friend then provided officers with the cell phone number of each victim. (*Id*.) On October 27, 2020, the Norwalk Superior Court issued a warrant allowing officers to obtain the call records derived from both victims' phones. (*Id*.)

On November 10, 2020, a Los Angeles Police Department Narcotics Officer Makari contacted Investigator Aguilera, the Affiant in this case, with information regarding the Lomita murders, provided to him by a confidential informant. (Doc. 1120-1 at 9.) The confidential informant indicated to Officer Makari that, while at a friend's apartment in Long Beach, California, they overheard Gray talking to two unknown males about how he "got those two Russian guys" in Lomita. (*Id*.) The informant stated that Gray's motive for the murder was to become a member of the AB if he killed the two victims. (*Id*.) The informant provided the phone number (424) 703-0437 and indicated it was associated with Gray. (*Id*.) Investigators then confirmed that Gray was the subscriber of the phone number ending in 0437. (*Id*.) In reviewing Gray's criminal history, Investigators also discovered another phone number, (424) 224-1216, was the documented number on file with Gray's probation officer. (*Id*.)

While reviewing the records from Roshanski's phone, Investigators further discovered that Roshanski had called Gray's number ending in 1216 at least three times on October 4, 2020, less than one hour before the murders occurred. (Doc. 1120-1 at 9.) As such, Investigators sought a search warrant for Gray's phone numbers ending in 1216 and 0437 to determine (1) how long Gray had been in contact with Roshanski and (2) the location of Gray's cell phones at the time of

3

the murders. (*See id*. at 10.) The Los Angeles County Superior court issued the warrant. (*Id*. at 2–6.) The warrant was based, in large part, on Affiant Aguilera's statement of probable cause, which recounts many of the facts listed above. (*Id*. at 2, 8–10.) Affiant Aguilera has been employed with the Los Angeles County Sheriff's Department for the past thirty-four years and has worked with the Homicide Bureau for the past thirteen years. (*Id*. at 7.)

### III.    LEGAL STANDARD

The Fourth Amendment states, "(t)he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. A "search" occurs for purposes of the Fourth Amendment if the police seek information by intruding on a person's reasonable expectation of privacy, *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or by means of trespassing upon one's person, house, papers, or effects. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). A magistrate judge's finding of probable cause is entitled to "great deference," and this court will not find a search warrant invalid if the magistrate judge had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal citations and quotations omitted). A magistrate judge may issue a search warrant if, upon using a "practical, common-sense" approach, he or she determines that "all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238. (internal citations omitted).

### IV.    ANALYSIS

Defendant's arguments are two-fold. (Doc. 2124 at 5–6.) First, it was unlawful for the Affiant to rely on the confidential informant because the informant was unknown to him, and the secondary officer, who proffered the informant, failed to provide any details whatsoever regarding the informant's reliability. (*Id*. at 5–6.) Second, the Affiant's independent finding that Roshanski had called Gray's 1216 number three times mere hours before the murders was insufficient to corroborate the informant's tip. (*Id*. at 5.) Generally, "an affidavit relying on hearsay is not . . . deemed insufficient on that score, so long as a substantial basis for crediting

4

the hearsay is presented." *Illinois*, 462 U.S. at 241–42 (internal citations and quotations omitted). In other words, "an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Id*. at 242 (internal citations and quotations omitted).

The Court agrees that the confidential informant may have been unknown to the Affiant, however the informant was nonetheless known to the Narcotics Officer Makari who presented him as his "confidential informant." (Doc. 1121-1 at 9.) As mentioned in this Court's prior order, an affiant may rely on information discovered by other officers. (Doc. 1301 at 3.) "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *See United States v. Ventresca*, 380 U.S. 102, 110–11 (1965) (finding that the affiant's reliance on "information received officially from other Investigators" within the same Alcohol and Tobacco Tax Division was justified because it involved the secondary investigators' firsthand account of the smell of fermenting mash, which strongly established probable cause of an illegal distillery); *see also Chin Kay v. United States*, 311 F.2d 317, 319–20 (9th Cir. 1962) (finding that the affiant's reliance on information furnished by his fellow Narcotic Agent was justified because it involved that agent's firsthand account of a transaction he overheard through a transmitting device between the confidential informant and the defendant where defendant stated he could provide opium).

The Court recognizes that *Ventresca* and *Chin Kay* present a stronger basis of reliability due to the secondary officer's personal knowledge of the information presented to the affiant. *Cf. Ventresca*, 380 U.S. at 111 ("[U]pon reading the affidavit as a whole, it becomes clear that the detailed observations recounted in the affidavit cannot fairly be regarded as having been made in any significant part by persons other than full-time Investigators of the Alcohol and Tobacco Tax Division of the Internal Revenue Service."). Furthermore, both cases involved first-hand observations of secondary officers who served within the same governmental organization. *Ventresca*, 380 U.S. at 103 (explaining that the affiant and secondary agent upon whose observations the affiant relied on both worked as investigators for the Alcohol and Tobacco Tax

5

Division of the IRS); *Chin Kay*, 311 F.2d at 319, 320 (noting that both the affiant and secondary agent worked as agents for the Federal Bureau of Narcotics).

Whereas here, the secondary officer Makari did not hear or eavesdrop on the conversation between Gray and the informant. (Doc. 1121-1 at 9.) Rather, the informant overheard Gray make incriminating statements to two unknown males at an apartment in Long Beach. (*Id*.) Furthermore, the information did not come from within the same governmental organization as an LAPD Narcotics Officer supplied the confidential informant's tip to an LASD Homicide Investigator. (*Id*. at 7, 9.) Nonetheless, the Court concludes that the Narcotics Officer's information constitutes that of a "fellow officer[] of the Government engaged in a common investigation." *Ventresca*, 380 U.S. at 111. Both LAPD and LASD serve the Los Angeles area, presumably assist one another with investigations from time to time, and may rely on information furnished by the other when establishing probable cause.[3] *See United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (explaining that "aggregation of facts is required" "because no single law enforcement officer knows all of the facts necessary to establish reasonable suspicion or probable cause" and that prior cases "have been willing to aggregate the facts known to each of the officers involved at least '[w]hen there has been communication among agents.'") (internal citations omitted).

---

[3]  Indeed, the Ninth Circuit has upheld the use of collective knowledge across differing law enforcement agencies, finding that a local sheriff could rely on information furnished by a customs official as the basis for reasonable suspicion in an investigatory stop. As the Ninth Circuit explained:

> In [*United States v.*] *Sutton*, 794 F.2d [1415] at 1425–27 [(9th Cir. 1986)], the case in which we first recognized the collective knowledge doctrine, we upheld an investigatory stop by a local deputy sheriff where Customs officials had requested that local law enforcement officers be dispatched to an airfield known for narcotics smuggling. In assessing whether there was founded suspicion of criminal conduct, we "combined" the facts known to the Customs officials with those known to the deputy sheriff—without discussing what facts, if any, had been communicated by the former to the latter. *Id*. at 1427. We explained that the collective knowledge doctrine applies "although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop," and we noted that an officer may act "based in part on information . . . from other law enforcement officials." *Id*. at 1426[.] []

*United States v. Ramirez*, 473 F.3d 1026, 1034–35 (9th Cir. 2007).

Furthermore, though the LAPD Narcotics Officer lacked firsthand knowledge of Gray's incriminating statements, (*see* Doc. 1121-1 at 9), the information nevertheless came from *his confidential* informant who is certainly more reliable than a wholly anonymous tip. *See United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) ("[A] known informant's tip is thought to be more reliable than an anonymous informant's tip. That is because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law.") (internal citations omitted). Defendant argues it is unclear whether and how the secondary agent knew the informant. (Doc. 2124 at 5.) Such argument is unpersuasive. When one agent offers an individual as a *confidential* informant to another agent, to assist him in his homicide investigation, it is practical to conclude that the informant is a verifiable and/or a known source. *Illinois*, 462 U.S. at 231 (explaining that the probable cause standard is "practical," "nontechnical," and turns on "common-sense conclusions about human behavior") (internal citations and quotations omitted).

Moreover, the confidential informant explained their basis of knowledge to the secondary officer, which bolstered the tip's reliability. *See Rowland*, 464 F.3d at 908. Specifically, on or around November 10, 2020, the informant stated that they were "*recently at a friend's apartment in Long Beach*, when [they] overheard Justin Gr[a]y talking to two unknown males about how he '*got those two Russian guys*' in Lomita." (Doc. 1121-1 at 9 (emphasis added).) Such information correlates to information previously gathered by the Affiant from the victim's friend. Notably, the victim's friend previously stated that on October 3, 2020, Roshanski said that he planned to visit a "trap house" in *Long Beach* to collect his "stuff." (*Id*.) While it is unclear whether Gray was present at the same "trap house" that Roshanski intended to visit, given the proximity in time to the murders, similarity in location, and reference to two Russian victims, it was sensical for the Affiant to assign some reliability to the tip. (*Id*.) Importantly, however, the Affiant did not exclusively rely on the informant's tip to request a search warrant for Gray's phone records. (Doc. 1121-1 at 9.) Instead, the Affiant took additional steps to investigate Gray's identity, criminal history, and alleged involvement in the murders. (*Id*.)

Ultimately, due to the Affiant's corroboration efforts, there was a substantial basis to credit the hearsay in this case. *See Illinois*, 462 U.S. at 241–42; *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994) ("[A]n anonymous tip is insufficient to establish probable cause absent independent corroboration through police investigation or some other indication of reliability."). The Affiant had previously requested a search warrant for both victims' phones. (Doc. 1121-1 at 9.) He did so prior to receiving any information from the informant. (*Id*.) The Affiant was subsequently contacted with news of an informant claiming he or she overheard Gray make incriminating statements regarding the Lomita murders, which prompted the Affiant to further investigate Gray. (*Id*.)

In doing so, he discovered that a number ending in 1216 was on file with Gray's probation officer. (Doc. 1121-1 at 9.) Meanwhile, the Affiant reviewed the victims' call records and discovered that Roshanski called that same number ending in 1216 three times, less than an hour before the murder. (*Id*.) The discovery of this information was highly probative as it corroborated the informant's tip regarding Gray's involvement in the murders. This was not a "mere confirmation of innocent static details," but rather it established that Gray knew the victim and placed him in communication close in time to when the murders occurred. *Cf. United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993) (finding that the verification of a suspect's address in an anonymous tip was insufficient corroboration because it was a "mere confirmation of innocent static details"); *Clark*, 31 F.3d at 834–35 ("Although [the affiant] determined that [defendant] had surrendered a Missouri driver's license for an Alaska license, this information is insufficient . . . to corroborate the tip.").

///

///

///

///

///

///

///

8

That evidence, coupled with the friend's testimony that Roshanski was uncharacteristically nervous on October 3, 2020—after receiving a phone call indicating someone had his "stuff" at a "trap house" in Long Beach, which prompted him to request "back-up" from Magaomedzhiev—establishes probable cause for the search warrant. *See Illinois*, 462 U.S. at 230 ("This totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip."). Accordingly, Defendant's renewed motion to suppress is **DENIED**.

IT IS SO ORDERED.

Dated:   July 31, 2026

_____
UNITED STATES DISTRICT JUDGE