ERIC GRANT
United States Attorney
JAMES CONOLLY
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

AMANDA J. KOTULA
Trial Attorney, U.S. Department of Justice
Violent Crime & Racketeering Section
1301 New York Avenue, N.W., Suite 700
Washington, DC 20005
Telephone: (202) 514-3594

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>              v.<br><br>JUSTIN GRAY,<br>a.k.a. "Sidetrack"<br><br>                              Defendant. | CASE NO.  1:20-CR-00238-JLT<br><br>UNITED STATES' TRIAL BRIEF<br><br><br>DATE: August 18, 2026<br>TIME: 8:00 a.m.<br>COURT: Hon. Jennifer L. Thurston |

## I.      INTRODUCTION

The United States submits this trial brief to outline issues that it anticipates may arise during trial. Pursuant to the Court's pretrial order, and the Court's awareness of the facts of the case from extensive briefing, this brief focuses mainly on anticipated legal issues and describes the facts in brief.

## II.      CHARGES AGAINST THE DEFENDANT

The defendant is charged in the Fourth Superseding Indictment (hereinafter, the "Indictment") with two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959, for the October 4, 2020 murders of Allan Roshanski and Ruslan Magomedgadzhiev. ECF No. 1970, at 11–12. Each count alleges that "[t]he AB enterprise, through its members and associates, engaged in racketeering activity as defined

in 18 U.S.C. Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion, and arson in violation of the California Penal Code, acts involving robbery in violation of the California Penal Code, multiple acts indictable under 18 U.S.C. §§ 1028, 1341, and 1343, and multiple offenses involving drug trafficking in violation of 21 U.S.C. §§ 841, 843, and 846." ECF No. 1970, at 11.

### III.    STATEMENT OF FACTS

In the early morning hours of October 4, 2020, the Los Angeles County Sheriff's Department received a call for service for a suspected double homicide in Lomita, California.  At the scene, LASD personnel found Roshanski and Magomedgadzhiev on the sidewalk in a residential neighborhood, each with a fatal gunshot wound to the head. Through investigation, LASD determined Justin Gray to be their primary suspect.

In 2020, the Aryan Brotherhood ("AB") enterprise was making a significant amount of money from EDD fraud, through its network of associates, both inside and outside prison.  The AB also made money by taxing the proceeds of white criminals, whether they were incarcerated or not.   Kenneth Johnson and Francis Clement, both "made members" of the AB, identified Roshanski, a white street criminal, as one such person making a significant amount of money from EDD fraud.  They asked then–AB associate Robert Eversole to find out if Roshanski was affiliated with a gang so that, if he was not, the AB could tax him.  Eversole investigated and reported that he did not believe Roshanski was part of any gang or paying tax to any other enterprise.  Clement contacted Roshanski and demanded he hand over a portion of his EDD operation to the AB.  Roshanski refused.

Separately, Clement also claimed that Roshanski owed him money for drugs.  Through connections in the Southern California criminal world, Clement learned that Roshanski had come to possess two pounds of methamphetamine that Clement claimed to have been his own.  Clement also learned that Roshanski's friend, Lana Haley, had stolen the methamphetamine from Roshanski and sold it.  Haley was familiar with the AB and its reputation.  The person she knew as "Frank" (Clement) called her and told her she owed the AB $5,000 for the drugs.  Fearing the potential consequences for not paying, Haley paid Clement the money through an AB associate.

In September 2020, Clement told Haley that the AB planned to kill Roshanski.  Not long after, Johnson instructed Eversole to send Justin Gray, a member of the white street gang Baby Blue Wrecking

Crew and an AB associate, to collect EDD cards from Roshanski to pay for the AB's "protection." That plan changed, however, when Roshanski refused to pay the AB any money for the EDD fraud or the drugs. Clement devised a new plan: Gray would kill Roshanski and take the EDD cards. Clement and Johnson directed Eversole to tell Gray about the new plan, which Eversole did.

On October 4, 2020, Clement called Brandon Bannick, a then–AB associate and member of the Public Enemy Number One ("PEN1") white street gang. Clement told Bannick that he needed to help Justin with a task and indicated that Bannick could work off some of his debt to Johnson by doing so. When Bannick got in touch with Gray, Gray told Bannick that their task was to kill someone. Bannick did not know the target or the reason but accompanied Gray even so. Gray and Bannick drove to meet Roshanski in Lomita, California, where they found him parked on 255th Street. Roshanski unexpectedly brought a second person, Magomedgadzhiev, to the meeting. Gray shot Roshanski and Magomedgadzhiev once each in the head. Gray then sent Eversole a text message telling him that the task had been completed. Eversole relayed the message to Johnson.

On the night of the murders, after the shooting, Gray told Bannick that they had been sent to kill Roshanski because he had "disrespected" Clement. Some time after the murders, Clement told Haley that the AB had taken care of that "situation," which Haley understood to mean that the AB had killed Roshanski.

### IV.    ELEMENTS OF THE OFFENSE

Congress passed the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959, to complement RICO. *United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir. 1992). The VICAR statute provides that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" engages in one of the predicate VICAR crimes "in violation of the laws of any State or the United States ... shall be punished" as set out in the subparts of § 1959(a). 18 U.S.C. §1959(a). The VICAR statute has the same definition of "enterprise" and "racketeering activity" as RICO. *Compare* 18 U.S.C. § 1959(b)(2) *with* 18 U.S.C. § 1961(4); *see also* S. Rep. No. 98-225 at 307; *Concepcion*, 983 F.2d at 380.

In order for the defendant to be found guilty of Murder in Aid of Racketeering, the government must prove each of the following elements beyond a reasonable doubt:

First, on or about the time period described in Counts One and Two, an enterprise affecting interstate commerce existed;

Second, the enterprise engaged in racketeering activity;

Third, the defendant committed a crime of violence (murder); and

Fourth, the defendant's purpose in committing the crime of violence was to gain entrance to, or to maintain, or to increase his position in the enterprise.

Model Crim. Jury Instr. 9th Cir. 18.8 (2022).

In addition, the government must prove that the violent crime satisfied both the generic federal definition of the offense and the state definition of the offense. *United States v. Keene*, 955 F.3d 391, 398–99 (4th Cir. 2020) ("Reading the language of the VICAR statute under which the defendants were charged, we conclude that Congress intended for individuals to be convicted of VICAR assault with a dangerous weapon by engaging in conduct that violated both that enumerated federal offense as well as a state law offense, regardless whether the two offenses are a categorical 'match.'").  As such, courts in VICAR cases routinely instruct the jury on both the elements of the federal generic offense and the state generic offense. *See, e.g.,  United States v. Adkins*, 883 F.3d 1207, 1210–11 (9th Cir. 2018) ("In the context of VICAR, we have permitted jury instructions using generic federal definitions. However, courts, in certain circumstances, should instruct on the state definition or otherwise risk prejudice to the defendant.") (citations omitted).

### A.    Murder: Elements Under Federal and State Law

#### 1.    Murder under Federal Law

*United States v. Vederoff*, 914 F.3d 1238, 1246–47 (9th Cir. 2019), sets forth the generic federal definition for murder.  It holds that the government must prove beyond a reasonable doubt that on or about October 4, 2020, the defendant caused the death of the victims either: (1) intentionally; (2) during the commission of a dangerous felony; or (3) through conduct evincing reckless and depraved indifference to serious dangers posed to human life.

#### 2.    Murder under State Law

For a murder charge under California state law, Judicial Council Of California Criminal Jury

Instruction 520 provides that the government must prove beyond a reasonable doubt that:

1.    The defendant committed an act that caused the death of the victims; and

2.    When the defendant acted, he had a state of mind called malice aforethought.

There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

The defendant had express malice if he unlawfully intended to kill.

The defendant had implied malice if:

He intentionally committed the act;

The natural and probable consequences of the act were dangerous to human life;

At the time he acted, he knew his act was dangerous to human life; and

He deliberately acted with conscious disregard for human life.

Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.

### B.    Proof of Enterprise

The government must prove that the Aryan Brotherhood gang functioned as an enterprise during the time period charged in the Indictment.  The government need not prove that the organization had a formal structure; instead, it need only show that there was a common purpose, relationships among those in the enterprise, and "sufficient longevity to permit the associates to pursue the enterprise's purpose." *United States v. Boyle*, 556 U.S. 938, 946-47 (2009); *accord United States v. Bingham*, 653 F.3d 983, 992 (9th Cir. 2011) (although prison gang structure changed, predicate acts remained related to the enterprise

and the goals the enterprise maintained, thus sustaining conviction under RICO); *Odom v. Microsoft Corporation*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc). To convict a defendant on a VICAR offense, the government does not have to prove a pattern of racketeering activity, only that the enterprise engaged in racketeering activity. *See* 18 U.S.C. § 1959(a).

### C.      **Proof of Purpose**

VICAR requires proof that a defendant committed the violent crime to increase or maintain his position in the enterprise, or to gain entrance to it. This "motive requirement" does not require proof that a defendant's sole or primary motive was to increase or maintain his position in the enterprise. Rather, "the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Pimentel*, 346 F.3d 285, 295-96 (2d Cir. 2003) (*quoting United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)) (internal cites omitted); *accord United States v. Banks*, 514 F.3d 959, 968-971 (9th Cir. 2008) (violent act must be committed as an integral aspect of membership in the gang) (citations omitted); *United States v. Diaz*, 176 F.3d 52, 95 (2d Cir. 1999) (self-promotion in a gang need not have been a defendant's only motive or even his primary concern "if the act was committed as an integral aspect of membership in the enterprise. . . Thus the motive requisite is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."); *see United States v. Rahman*, 189 f.3d 88, 126-27 (2d Cir. 1999) (murder consistent with goals of organization); *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998) (violent crime expected by reason of membership and committed by defendant in furtherance of membership); *Wilson*, 116 F.3d at 1078.

General testimony as to the expectation of or importance of violence to a criminal enterprise, coupled with a specific violent act, will satisfy the motive requirement of VICAR. *See Phillips*, 239 F.3d at 845 (general testimony about the importance of violence and specific testimony about shooting provided sufficient evidence for jury to find beyond reasonable doubt that shooting type of behavior encouraged and demanded of members of gang in order to maintain status within gang); *United States v. Wilson*, 116 F.3d 1066, 1078-79 (5th Cir. 1997) (defendant's membership in gang required him to respond violently

to rival gang member's "poor signing etiquette").

### D. Interstate Nexus

The government must prove that the enterprise "is engaged in" interstate or foreign commerce, or that the enterprise's activities "affect" interstate or foreign commerce. The government is not limited to proof that the charged racketeering activity affects interstate or foreign commerce. Rather, the government may rely on proof that the enterprise is engaged in, or its activities as a whole, affect interstate commerce. The requisite effect need only be de minimus.

The United States will present evidence that the Aryan Brotherhood (AB) enterprise was engaged in drug trafficking activity, much of which took place entirely within California. This evidence is sufficient to satisfy the interstate nexus element of 18 U.S.C. § 1959, and the United States has submitted a proposed jury instruction that instructs the jury that proof of intrastate drug trafficking is sufficient to satisfy the interstate nexus element.

The Supreme Court has long held that purely in-state drug trafficking activity is sufficient to give the United States jurisdiction. In *Gonzales v. Raich*, the Supreme Court held that the Commerce Clause gives Congress the power to regulate purely intrastate drug cultivation and possession, because the production, possession, and distribution of controlled substances "are part of an economic 'class of activities' that have a substantial effect on interstate commerce," even when those activities occur entirely within a state. 545 U.S. 1, 17, 22 (2005). A decade later, the Supreme Court "graft[ed]" its holding in *Raich* "onto the commerce element of the Hobbs Act" and held that "a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction." *Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016). The Court therefore held that to obtain a conviction for Hobbs Act robbery for robbing a drug dealer, the government "need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines." *Id.* "Rather, to satisfy the [Hobbs] Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.'" *Id.*

The Second Circuit applied *Raich* and *Taylor* to the interstate nexus of 18 U.S.C. § 1959 and

reached the same conclusion: proof that the enterprise trafficked in drugs alone was sufficient to establish that the enterprise's activities affected interstate commerce. *United States v. Aquart*, 912 F.3d 1, 17–18 (2d Cir. 2018) ("No different sufficiency conclusion is warranted here because the interstate commerce element is part of the VICAR statute, *see* 18 U.S.C. § 1959 (pertaining to enterprise 'engaged in, or the activities of which affect, interstate or foreign commerce'), rather than the Hobbs Act, *see id.* § 1951 (pertaining to robbery that 'affects commerce'). Both statutes fall within Chapter 95 of Title 18, entitled 'Racketeering,' and this court has drawn on Hobbs Act precedent in rejecting a sufficiency challenge to VICAR's interstate commerce element."). The Court should therefore instruct the jury that even evidence of purely in-state drug trafficking is sufficient to show that the AB racketeering activity affected commerce.

In addition to drug trafficking, the requirement is met when members or associates of the enterprise use cellphones to conduct their business, or maintain/use firearms manufactured outside the state. *See, e.g., United States v. Nascimento*, 491 F.3d 25, 43-45 (ruling that the following evidence established the requisite de minimis effect on interstate commerce: (1) the enterprise, a violent street gang, kept an arsenal of at least nine different firearms to be used by enterprise members in carrying out the enterprise's affairs; all but one of the firearms had been manufactured outside of Massachusetts, and thus had moved in interstate commerce; (2) an enterprise member traveled interstate to obtain one of the firearms for use in carrying out the enterprise's affairs, and (3) enterprise members communicated with each other by cell phones to keep abreast of, and carry out, enterprise activities); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (the enterprise engaged in trafficking in drugs obtained outside the United States and enterprise members used the instrumentalities of interstate commerce to conduct the enterprise's affairs, including telephones, pagers, Western Union, and the United States Postal Service); *United States v. Pipkins*, 378 F.3d 1281, 1294-95 (11th Cir. 2004) (de minimus impact demonstrated when members of the enterprise (1) used instrumentalities of interstate commerce – pagers, telephones, cell phones and the internet to conduct the enterprise's affairs; and (2) used automobiles and interstate highways to transport underage prostitutes across state lines).

### E.  Venue

Venue for continuing offenses is governed by 18 U.S.C. § 3237(a), which places venue "in any

district in which such offense was begun, continued, or completed." Therefore, when applying § 3237(a) to a VICAR prosecution, "venue is proper in any district in which the racketeering enterprise is alleged to have operated, regardless of whether the criminal offense was begun, continued, or completed there." *United States v. McIntosh*, 2007 WL 9676741 (C.D.Cali. 2007) (Murder of victim in another district does not defeat venue because the "elements and nature of the offense are alleged to be in furtherance of the Aryan Brotherhood enterprise […] because the Aryan Brotherhood […] conducts extensive and regular activity [in this district].").

## V.        ADMISSIBILITY OF THE GOVERNMENT'S ANTICIPATED EVIDENCE

The parties recently filed pre-trial motions and motions in limine, on which the Court has issued rulings that address some of the evidentiary issues anticipated at trial.  *See* ECF Nos. 2195, 2196, and 2197.  Out of caution, and to give notice of the government's position on certain issues that may arise, or issues for which the Court has reserved ruling, the government includes here discussion of anticipated evidentiary issues.

### A.        Evidence of Uncharged Overt Acts Demonstrating Conspiratorial Agreement Does Not Implicate Rule 404(b).

The government has charged the defendant with VICAR Murder. The government's evidence at trial, however, is not limited to the substantive crimes alleged in the Indictment. In this case, uncharged acts relevant to the existence of and agreement to join the charged enterprise are not "extrinsic" at all. Rather, this evidence is intrinsic to the VICAR offenses because it shows the nature of the charged criminal enterprise and the requisite racketeering activity. "Those charges require proof of such elements as the existence of an enterprise, the association of the defendant with the enterprise, as well as the traditional requirements of a conspiracy. In addition, proof of the predicate acts required for establishing a pattern of racketeering activity under RICO is essential." *United States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983).

Evidence of the existence of and the defendant's participation in the AB enterprise is not only relevant, but integral to proving the charged offenses. At trial, the government intends to introduce evidence and testimony related to intrinsic criminal acts demonstrating the defendants' association with and membership in the AB, as well as evidence of racketeering activity in which the enterprise engaged.

B.    **Scope of Lay Witness Testimony**

The United States will introduce evidence via cooperator(s) on a number of topics, to include: Aryan Brotherhood gang monikers, code of conduct, structure or organization, and expectations.

Lay witnesses and may offer opinion testimony when that testimony is "rationally based" on the witness's perception and not on "scientific, technical, or other specialized knowledge." Fed R. Evid. 602, 701. Testimony from an individual, such as a cooperator, providing information based on their own knowledge about how their organization operates, is not testimony that falls within Rule 702. *See United States v. Garcia*, 2025 WL 314126, at *5 (9th Cir. Jan. 28, 2025), cert. denied, 146 S. Ct. 1459 (2026) (Cooperators' testimony on "gang structure and tactics" was not specialized knowledge under Rule 702, but was based on the witnesses' personal experiences.)

Similarly, a cooperator testifying as to coded language used within the organization, is not specialized knowledge under Rule 702. *See United States v. Martinez*, 657 F.3d 811, 818–19 (9th Cir. 2011) (upholding admission of lay testimony on the meaning of coded communications by a former member of the Mexican Mafia after establishing the member's "long experience in writing notes for the organization"); *see also United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) (Member of Gambino crime family was allowed to testify about coded language used within intercepted phone conversations and offer his opinion on grounds that the testimony "[derived] solely from insider perceptions of a conspiracy of which he was a member" and that the cooperator was simply "shar[ing] his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness subject to Rule 701, not as an expert subject to Rule 702.") .

A lay individual, like a cooperator, "may opine about a person's role in an organization when the opinion is based on his own perceptions, is helpful to the jury, and does not require specialized knowledge." *Torralba-Mendia*, 784 F.3d at 661. Pursuant to Rule 701, lay witness opinions are appropriate under the aforementioned limitations. "In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation." *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014).

### C.   Foundation

#### 1.   Facebook Messages

Evidence must be authentic to be admissible. Fed. R. Evid. 901(a). In general, to be authenticated, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Linking a defendant to a social media account can be done by direct evidence but also circumstantially. *United States v. Lamm, 5 F.4th 942, 948* (8th Cir. 2021) (holding that in child pornography prosecution "the Government may authenticate social media evidence with circumstantial evidence linking the defendant to the social media account"). Extrinsic evidence that can be used to match a defendant to an account include profile photograph, names or nicknames use, call phone number, and other personal identifying information. *See United States v. Allen*, 159 F.4th 625, 634 (9th Cir. 2025) (Government connected account to defendant by use of the Facebook account's profile photograph, birthday, phone number, and messages referencing a moniker used by the defendant). Statements made in response are likewise admissive to provide context. *See United States v. Gonzales*, 553 F. App'x 715, 716 (9th Cir. 2014) (no abuse of discretion in admitting a conversation between the defendant and a woman where the woman's statements "were offered only to provide context for Gonzales's responses" and court issued an appropriate limiting instruction).

#### 2.   Co-conspirator Statements

Rule 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  For a statement to qualify as a co-conspirator statement, the government must show by a preponderance of the evidence that (1) a conspiracy existed at the time the statement was made, (2) the defendant and declarant were both members of a conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy.  *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 833–34 (9th Cir. 2024); *see also Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).  In deciding this preliminary question of admissibility, "the court is not bound by evidence rules," Fed. R. Evid. 104(a), and the Court may consider the content of the statement itself as evidence that the speaker joined the conspiracy.  *Bourjaily*, 483 U.S. at 181.  "The Court has discretion to allow the government to introduce purported co-conspirator statements before the entire foundation is laid, with the understanding that the

statements will be stricken if the government does not meet its foundational burden." *United States v. Ortega-Garcia*, No. CR 17-203 DSF, 2017 WL 11439800, at *1 (C.D. Cal. Dec. 11, 2017) (*citing United States v. Loya*, 807 F.2d 1483, 1490 (9th Cir. 1987)).

### a.   Conspiracy

It is well established among different jurisdictions that the "conspiracy" contemplated by Fed. R. Evid. 801(d)(2)(E) does not only encompass a conspiracy that is charged within an indictment.  For purposes of a co-conspirator statement, the question is merely whether "there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir. 1995). *See United States v. Mazyak*, 650 F.2d 788, 791 (5th Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982)("It is not necessary that the conspiracy upon which admissibility of these statements is predicated be the conspiracy charged."); *See also United States v. Postal*, 589 F.2d 862, 886, n.41 (5th Cir. 1979) ("Nor need the conspiracy or agreement be criminal in nature; it may be in the form of a joint venture"); *United States v. Santiago*, 582 F.2d 1128, 1130 (7th Cir. 1978) ("The co-conspirator hearsay exception applies with equal force to joint ventures"); *United States v. Talbot*, 470 F.2d 158 (6th Cir. 1972) (Finding that even in absence of conspiracy count, extrajudicial declarations made by codefendant outside presence of defendant are admissible); *United States v. Adkins*, 842 F.2d 210 (8th Cir. 1988) (Holding that the testimony of coconspirator with regard to statements made by another conspirator, was admissible under coconspirator exception to the hearsay rule, even though testifying coconspirator was not indicted); *United States v. Pimentel-Tafolla,* 60 Fed.Appx. 656, 666–67, 2003 WL 42274 (9th Cir. 2003) (Statements made by unindicted co-conspirators in course and in furtherance of conspiracy were admissible against defendant); *United States v. Marino*, 277 F.3d 11, 25–26 (1st Cir. 2002) ("We have already ruled that another conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements.").   Statements made by unindicted co-conspirators in course and in furtherance of conspiracy were admissible against the defendant. *Pimentel-Tafolla*, 60 Fed. Appx. at 666–67.

### b.   In Furtherance

For a statement to be "in furtherance" of a conspiracy "'the statements must further the common

objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy.'" *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988); *see also United States v. Wilson*, 148 Fed. Appx. 602, 604 (9th Cir. 2005) (citing *United States v. Kearns*, 61 F.3d 1422, 1426 (9th Cir. 1995)). To be made "in furtherance of the conspiracy," a statement must amount to more than "[m]ere conversation[]" or "narrative declarations" among co-conspirators. *Yarbrough*, 852 F.2d at 1535. Even so, statements made with the simple aim of keeping another "abreast of the activities of the conspiracy[]" is considered in furtherance of the conspiracy. *United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006), *on reh'g en banc,* 495 F.3d 1094 (9th Cir. 2007); *Yarbrough*, 852 F.2d at 1535. Other examples of statements that satisfy this requirement include those made to "induce enlistment or further participation in the group's activities," "prompt further action on the part of conspirators," "reassure members of a conspiracy's continued existence," and to "allay a co-conspirator's fears." *Id.* at 1535–36 (internal quotation marks omitted).

c. **Declarant**

The availability of the co-conspirator declarant is immaterial to whether statements made by the declarant may be admitted. *Bourjaily v. United States*, 483 U.S. 171, 182 (1987)("[U]navailability, was not required when the hearsay statement is the out-of-court declaration of a co-conspirator.")

The witness from which the co-conspirator statement is elicited need not be a co-conspirator themselves. *United States v. Wolfson*, 634 F.2d 1217, 1219 (9th Cir. 1980) ("when a witness is present at a meeting between a group of conspirators, and they orally, in his presence, agree upon the conspiracy, its objectives, and its modus operandi, the witness' testimony about what each of them said is not hearsay."). Additionally, the defendant need not be present at the time the unindicted co-conspirator made the declaration. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970).

In support of the admission of co-conspirator statements, the government will introduce evidence sufficient to support a finding as to each of the three necessary factors using the contents of the declaration, together with independent evidence. *Bourjaily*, 483 U.S. at 181; *United States v. Neal*, 78 F.3d 901, 904-05 (4th Cir. 1996).

13

### D.    Impeachment

Federal Rules of Evidence 608, 609, and 613 govern the impeachment of witnesses.

#### 1.    Rule 608:  Character for Truthfulness

Rule 608 allows a party to attack a witness's credibility "by testimony about the witness's reputation for having a character for … untruthfulness, or by testimony in the form of an opinion about that character."  Fed. R. Evid. 608(a).  But such testimony by other witnesses is limited to "reputation" or "opinion" evidence, and may not include testimony about specific instances of conduct.  *Id.*

Rule 608 specifically forbids any "extrinsic evidence … to prove specific instances of a witness's conduct in order to attack … the witness's character for truthfulness."  Fed. R. Evid. 608(b).  Such "specific instances" of prior untruthful conduct may only be inquired into on cross-examination.  *Id.*  The party cross-examining the witness is "stuck with whatever response" the witness gives to such inquiry. *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir. 1993).  Regardless of the witness's response, extrinsic evidence is not allowed.[1]  *See id.*; Fed. R. Evid. 608(b).

Importantly, cross-examination about prior instances of conduct is limited to conduct that is "probative of the character for truthfulness or untruthfulness" of the witness.  Fed. R. Evid. 608(b).  Thus, a witness's prior bad acts that do not go to truthfulness—such as prior acts of violence or other illegal activity (other than criminal convictions under Rule 609)—are not a proper subject for impeachment and may not be inquired into on cross-examination of the witness.  *See, e.g., United States v. Geston*, 299 F.3d 1130, 1137 (9th Cir. 2002) (acts of violence were not "probative of [the witness's] character for untruthfulness or his credibility").

#### 2.    Rule 609

A prior conviction is admissible to impeach a witness, subject to Rule 403, if the conviction was:

---

[1] There is one narrow exception to this rule called "impeachment by contradiction." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2009).  Where extrinsic evidence of a witness's prior bad acts would contradict testimony the witness gave *on direct examination*, it may be admitted as "impeachment by contradiction."  *Id.*  For example, where a witness volunteered on direct examination that he would never touch drugs, painting himself as a "paragon of virtue," it was proper to admit extrinsic evidence of his prior arrest for cocaine possession.  *See United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999).  But, such impeachment by contradiction is only permissible where the fact is "material."  *Kincaid-Chauncey*, 556 F.3d at 932.  Moreover, impeachment by contradiction is generally available only where the statements at issue were "volunteered on *direct* examination," not when they were elicited by cross-examination.  *Id.* at 932–33 (emphasis in original).

(1) a crime "punishable by death or by imprisonment for more than one year"; or (2) any crime in which "the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a). Even where these conditions are met, if more than 10 years have passed since the conviction or release from confinement, whichever is later, the conviction is admissible only if: (1) "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect"; and (2) the proponent gives the adverse party reasonable written notice in advance. Fed. R. Evid. 609(b).

### 3. Rule 613: Prior Inconsistent Statements

"A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness. As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent." *United States v. McLaughlin*, 663 F.2d 949, 952 (9th Cir. 1981) (quoting *United States v. Hale*, 422 U.S. 171, 176 (1975)).

Rule 613 regulates the procedure for impeaching a witness with a prior inconsistent statement. The party seeking to impeach the witness with a prior statement "need not show it or disclose its contents to the witness" but "must, on request, show it or disclose its contents to an adverse party's attorney." Fed. R. Evid. 613(a). While a prior inconsistent statement may be inquired into on cross-examination, extrinsic evidence of the statement "is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b).

The court may also exclude extrinsic evidence of a prior inconsistent statement where it relates to a matter "collateral" to the case. As the Ninth Circuit has explained:

> A collateral contradiction is typically one on a point not related to the matters at issue, but designed to show that the witness' false statement about one thing implies a probability of false statements about the matters at issue. The inconsistency might have been collateral if in an earlier statement, Tamon [the witness] had said he had not shown up at the airport because he was with his girlfriend, and at trial, he testified that he had not shown up because he could not get off work. The truth of the charges against Higa [the defendant] would be unaffected by which account was true, but Tamon's credibility might be impaired if someone testified that he had previously told the girlfriend story. In contrast, Tamon's inconsistencies had to do with whether Higa had willfully participated in a conspiracy, or refused to participate. This was the matter charged against Higa and at issue in the trial. The district judge did not abuse his discretion by determining

that extrinsic evidence of the inconsistent statements should be admitted. *United States v. Higa*, 55 F.3d 448, 452–53 (9th Cir. 1995) (citation omitted).

### D.   Cross-Examination of the Defendant[2]

The scope of cross-examination is within the discretion of the trial court. Fed. R. Evid. 611(b). A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined as to all matters reasonably related to the issues the defendant puts in dispute or which are made relevant by his or her direct testimony. *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir. 1985). "[U]nless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." *Doyle v. Ohio*, 426 U.S. 610, 636 n.7 (1976). This includes the government's "right to challenge the defendant's story on cross-examination" and the right to "impeach the defendant by developing inconsistencies in his testimony." *United States v. Hearst*, 563 F.2d 1331, 1341-42 (9th Cir. 1977).

At trial, a defendant faces a "fair choice. He could testify, subject to oath and cross-examination. Or he could refuse to testify, and not have his silence used against him." *Williams v. Borg*, 139 F.3d 737, 740 (9th Cir. 1998). That choice may be a difficult one, but it is "identical in kind to that faced by all defendants in criminal trials." *United States v. Lutz*, 621 F.2d 940, 945 (9th Cir. 1980). Should any defendant elect to testify in this case, the government is permitted to cross-examine him as to any subject reasonably related to his direct examination as well as any subject that has a bearing on the defendant's credibility, veracity, or believability. This includes the right to examine the defendant about any false statements he has made or that he has asked others to make on his behalf, as well as defendant's prior convictions pursuant to the aforementioned parameters of prior convictions for the purposes of impeachment. Defendants in this case all have prior convictions.

### E.   Explicit "Reliability" Findings Required For Each Expert

The United States intends to call four expert witnesses to testify in this case, including a medical examiner who reviewed the autopsies on the victims in this case, a crime analyst who analyzed phone data

---

[2] It is the government's understanding that Mr. Gray does not intend to testify at trial. The government includes this discussion out of caution, to allow for the possibility that Mr. Gray may choose to testify.

UNITED STATES' TRIAL BRIEF

16

(including historical cell site location and call detail records) relating to the offenses charged, an Employment Program Representative with the California Employment Development Department ("EDD") who will testify as to EDD state and federal funding and program fraud, and Special Agent Brendon Diggle who will testify as a gang expert.

In addition to finding each expert qualified to testify about the subject matter of his or her expertise, under recent Ninth Circuit authority, the Court is required to make an explicit finding that the expert's testimony is "reliable," meaning that it has "a reliable basis in the knowledge and experience of the relevant discipline." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188–90 (9th Cir. 2019) (internal quotation marks and citation omitted).

"Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Rule 702." *Id.* at 1188 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "This gatekeeping obligation 'applies to all (not just scientific) expert testimony.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)).

"An implicit reliability finding is 'not sufficient.'" *Id.* at 899 n.6 (quoting *Ruvalcaba-Garcia*, 923 F.3d at 1190). "Instead, to satisfy its gatekeeping duty under *Daubert*, the court must make an explicit reliability finding." *Id.* at 899 n.6 (internal quotation marks and citations omitted); *see also United States v. Irons*, 31 F.4th 702, 716 (9th Cir. 2022) (same).

While an explicit finding is mandatory, "district courts are vested with broad latitude to decide *how* to test an expert's reliability" because the "reliability analysis is a malleable one tied to the facts of each case." *Ruvalcaba-Garcia*, 923 F.3d at 1189 (emphasis in original) (internal quotation marks and citations omitted). In making that determination, the Ninth Circuit has emphasized that "voir dire is a recommended method for the district court to conduct a reliability determination and discharge its gatekeeping obligations." *Valencia-Lopez*, 971 F.3d at 899 n.5.

To satisfy the requirement for an explicit "reliability" finding for each expert, while maximizing procedural efficiency, the government respectfully suggests that, at the time the government asks the Court to recognize the witness as qualified to testify in a specified subject area, and after the defense has had an opportunity for voir dire, the Court find both that (1) the witness is qualified in the tendered area(s), and

(2) that, based on the methodologies employed, the witness has a "reliable basis in the knowledge and experience of the relevant discipline" to offer opinions in the tendered area(s).  These findings should be made before the witness is allowed to offer expert opinions.  *See, e.g., Ruvalcaba-Garcia*, 923 F.3d at 1188.

### F.       Witness Exclusion and Case Agent Designation

The government moves for exclusion of all witnesses from the courtroom until they are called to testify and their testimony has then been completed, pursuant to Rule 615 of the Federal Rules of Evidence. The government will further move that ATF Special Agent Anthony Gonzales be designated as the case agent for this case and therefore be exempt from the exclusion order pursuant to Rule 615. *See United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1985).

### VI.       CONCLUSION

The foregoing is a summary of issues the government anticipates may arise at trial.  Should any additional factual or legal issues arise that have not been covered in this trial brief, the government respectfully requests leave to submit such further memoranda or briefing as may be necessary.

Dated:  August 3, 2026

ERIC GRANT
United States Attorney

By:   */s/ Amanda Kotula*
AMANDA J. KOTULA
Trial Attorney, U.S. Department of Justice
JAMES CONOLLY
Assistant United States Attorney